**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

STIFEL, NICOLAUS & COMPANY, INC.,
STIFEL FINANCIAL CORP.,
SAYBROOK FUND INVESTORS, LLC
(successor to SAYBROOK TAX EXEMPT
INVESTORS, LLC),
LDF ACQUISITION, LLC,
WELLS FARGO BANK, N.A.,                        Case No. 13-cv-372
and GODFREY & KAHN, S.C.,

             Plaintiffs,

v.

LAC DU FLAMBEAU BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS and
LAKE OF THE TORCHES ECONOMIC
DEVELOPMENT CORPORATION,

             Defendants.

---

**TRIBAL DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO
DISMISS, OR IN THE ALTERNATIVE, TO STAY**

---

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................2

    I.  The Tribe and Corporation ................................................................. 2

    II.  IGRA ..........................................................................................................3

    III. The Transaction ....................................................................................4

    IV. The Transaction's Illegality ..............................................................6

    V.  The Resulting Litigation ............................................................8

        *Wells Fargo W.D. I* ...........................................................................9

        *Wells Fargo W.D. II* ..........................................................................9

        *Wells Fargo 7th Circuit* ................................................................ 10

        *Wells Fargo 7th Circuit Remand* ...................................................... 10

        *Saybrook W.D. III* ......................................................................... 11

        *The Parallel State and Tribal Court Cases* .....................................12

        *The Instant Suit* ..............................................................................13

ARGUMENT....................................................................................................14

    I.  THE PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PLEAD
        JURISDICTION OVER THE TRIBAL DEFENDANTS ................................14

    II.  THE PLAINTIFFS HAVE FAILED TO EXHAUST THEIR TRIBAL
         COURT REMEDIES, WHICH PRECLUDES THIS COURT FROM
         EXERCISING JURISDICTION OVER THIS CASE ....................................17

        A.  UNDER SUPREME COURT PRECEDENT, THERE IS A COLORABLE
           BASIS FOR TRIBAL COURT JURISDICTION OVER THE STATEMENT
           OF CLAIM .......................................................................... 18

           1.  The Tribal Court has jurisdiction over the Plaintiffs and the
              Statement of Claim because Congress has confirmed that
               tribes retain jurisdiction over nonmembers with respect to
               gaming ............................................................................. 19

i

2. Even if Congress hadn't delegated authority over nonmembers to the Tribe under IGRA, the Tribal Court has jurisdiction over cases involving nonmembers where, as here, the nonmember conduct or activities take place on *tribal lands* ........................................................................ 23

3. Even if *Montana* applied to this case, the first *Montana* exception applies to these facts .......................................... 28

4. Even if *Montana* applied to this case, the Tribal Court would have jurisdiction under the second *Montana* exception ........................................................................... 33

B. REQUIRING PLAINTIFFS TO EXHAUST THEIR TRIBAL COURT REMEDIES FURTHERS IMPORTANT FEDERAL POLICIES ........................ 38

C. THE "EXHAUSTION RULE" IS PARTICULARLY IMPORTANT WHERE, AS HERE, THE CASES INVOLVE TRIBAL ACTORS AND CONCERN ISSUES OF TRIBAL LAW ....................................................... 41

D. THE LIMITED EXCEPTIONS TO THE EXHAUSTION RULE DO NOT APPLY HERE ................................................................. 43

1. The "bad faith" exception does not apply in this case ....... 43

a. The "bad faith" exception only applies to the tribal court ........................................................... 44

b. Neither the Corporation nor the Tribe has acted in bad faith ............................................................ 45

i. The "delay" in commencing the Tribal Court Action ........................................................... 45

ii. Clarification of the Tribal Court's jurisdiction 48

iii. Tribal Court Code judicial-selection amendments .................................................. 49

iv. Tribal Court Code choice-of-law amendments ... 52

2. The "futility" exception does not apply in this case .......... 54

3. The Tribal Court does not "plainly lack" jurisdiction in this case ........................................................... 57

III. THIS COURT LACKS JURISDICTION OVER THE TRIBAL DEFENDANTS ........................................................................ 59

    A. THE ONLY PURPORTED WAIVER OF SOVEREIGN IMMUNITY ON WHICH PLAINTIFFS COULD RELY TO ESTABLISH JURISDICTION IN THIS CASE OCCURRED IN CONNECTION WITH THE BOND TRANSACTION THAT IS VOID AS A MATTER OF LAW............................. 60

        1. The Indenture is Void Under IGRA .................................. 61

        2. IGRA requires all documents that are inextricably intertwined to be construed together .................................. 62

            a. Unapproved management contracts are void under IGRA.................................................................. 63

            b. The NIGC applies a flexible test to determine whether an agreement is a management contract .... 63

            c. The NIGC has established two processes to help parties to Indian-gaming contracts comply with IGRA.................................................................. 64

            d. The NIGC evaluates all documents in a single transaction to determine whether, when reviewed together, they create a single unapproved management contract ................................................ 67

        3. The Bond Transaction is void under IGRA because the Bond Documents are inextricably intertwined with the void Indenture.................................................................. 69

        4. Enforcing the Bond Documents despite their reliance on and interdependence with the void Indenture would undermine the purpose of IGRA........................................ 77

    B. EVEN IF THIS COURT WERE TO IGNORE THE INDENTURE, THE BOND DOCUMENTS AND REMAINING DOCUMENTS IN THE BOND TRANSACTION CREATE AN UNENFORCEABLE MANAGEMENT CONTRACT........................................................................................ 78

    C. TAKEN INDIVIDUALLY, NONE OF THE BOND DOCUMENTS WAIVES THE TRIBAL DEFENDANTS' SOVEREIGN IMMUNITY ................................ 82

        1. The Bonds.......................................................................... 83

a.  By their terms, the Bonds cannot be enforced without a valid Trustee or Indenture ...................................... 83

b.  The Bonds are unapproved management contracts that are independently void under IGRA ................. 84

c.  The Bonds' purported waiver does not allow this suit ...86

2.  The Limited Offering Memorandum ................................. 88

a.  The Limited Offering Memorandum merely describes the terms of the Bond Transaction; it does not waive the Tribal Defendants' immunity ............................. 88

b.  Stifel cannot waive the Tribal Defendants' sovereign immunity.................................................................. 89

c.  The Offering Memo is itself void under IGRA as an unapproved management contract ........................... 90

3.  The Bond Resolution.......................................................... 91

a.  The Bond Resolution is a contract with a nonexistent trustee ...................................................................... 91

b.  There is no waiver in the Bond Resolution ............... 91

4.  Issuer Opinion and Bond Opinion..................................... 92

5.  The Bond Purchase Agreement ......................................... 93

a.  The Bond Purchase Agreement is void under IGRA . 93

b.  The Bond Purchase Agreement does not contain a valid waiver that allows this suit ............................... 93

6.  The Tribal Resolution ......................................................... 95

7.  The Tribal Agreement ......................................................... 95

a.  The Tribal Agreement may only be enforced by the nonexistent trustee .................................................... 95

b.  The Tribal Agreement is an unapproved management contract and therefore void ........................................ 96

IV. THE COURT SHOULD EXERCISE ITS DISCRETION TO DECLINE
TO EXERCISE JURISDICTION OVER THIS CASE ................................... 97

CONCLUSION .................................................................................................101

## INTRODUCTION

The Plaintiffs seek extraordinary relief from this Court – an order enjoining the sovereign Tribal Defendants[1] from pursuing justice in their own Tribal Court.[2] The Court may not grant this most unusual relief for the following reasons.

First, the Plaintiffs have failed to plead a plausible case for this Court's jurisdiction. Before addressing whether it has jurisdiction over the Tribal Defendants, the Court must first examine the Plaintiffs' complaint to see if it sets forth a *prima facie* case. Only if the Court determines that the Complaint makes a plausible case for jurisdiction can it then reach the issue of whether it *can* and *should* exercise jurisdiction. The Plaintiffs' single conclusory allegation regarding this Court's jurisdiction fails to meet this burden, so the Court must dismiss this case.

Second, the Court *cannot* exercise jurisdiction over this case because the Plaintiffs have not yet exhausted their Tribal Court remedies. Strong federal policies and considerations of comity weigh in favor of this Court declining jurisdiction over this case because there is parallel litigation pending in *both* the Tribal Court and Waukesha County Circuit Court. The doctrine of tribal court exhaustion requires this Court to "stay its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction."[3] This prerequisite to the Court's jurisdiction has not occurred. In fact, Plaintiffs' Complaint seeks to avoid the Tribal Court altogether.

---

[1] The Defendants Lac du Flambeau Band of Lake Superior Chippewa Indians (the "Tribe") and the Lake of the Torches Economic Development Corporation (the "Corporation") are collectively referred to as the "Tribal Defendants."

[2] The Lac du Flambeau Tribal Court is referred to as the "Tribal Court."

[3] *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 857 (1985).

Third, this Court *cannot* exercise jurisdiction over the Tribal Defendants because they are sovereign entities that have not waived their immunity from suit. All of the purported waivers of sovereign immunity the Plaintiffs rely on are found in documents that are void under the Indian Gaming Regulatory Act ("IGRA")[4], or otherwise fail to waive the Tribal Defendants' immunity to this suit.

Fourth, even if the Court could exercise jurisdiction here, it *should* not do so. The Wisconsin Supreme Court has developed a mandatory protocol to sort out jurisdictional disputes between state and tribal courts.[5] This Court can and should decline jurisdiction over this declaratory judgment action in order to avoid interfering with that process. Any or all of these reasons provide good cause for this Court to dismiss this case, or, in the alternative, to stay the case while the Plaintiffs exhaust their Tribal Court remedies and the *Teague* process plays out in the Waukesha Court.

## BACKGROUND

## I.    The Tribe and Corporation

The Tribe is a federally recognized Indian tribe that serves its members with a variety of governmental programs ranging from road repair to health services and educational assistance.[6] It is a sovereign entity immune from suit absent a valid waiver of its immunity.[7]

---

[4] 25 U.S.C. §§ 2701-2721.

[5] *Teague v. Bad River Band of Chippewa Indians*, 2000 WI 79, 236 Wis. 2d 384, 612 N.W.2d 709 (2000).

[6] *See generally* Declaration of Brooks Big John in Supp. of Mot. to Dismiss and in Opp'n to Pls.' Mot. for Prelim. Inj. (hereinafter "Big John Decl."), Ex. A, CONSTITUTION OF THE LAC DU FLAMBEAU BAND OF LAKE SUPERIOR INDIANS OF WISCONSIN.

[7] *See* Decl. of Paul R. Jarquart (hereinafter "Jacquart Decl."), Ex. 1, Compl. at ¶ 5, *Saybrook Tax Exempt Investors, LLC, et al. v. Lac du Flambeau Band of Lake Superior Chippewa Indians, et al.*, No. 12-CV-187 (Waukesha County Circuit Court Jan. 16, 2012) (hereinafter "State Court Compl.");*Wells Fargo Bank, Nat. Ass'n v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684,

The Tribe owns the Corporation, which is chartered under Article VI, Section 1(o) of the Tribe's Constitution.[8] The Corporation shares the sovereign immunity of the Tribe.[9] The Corporation owns and operates the Lake of the Torches Resort Casino (the "Casino") in Lac du Flambeau, Wisconsin. The Casino is the Tribe's primary source of revenue.[10] Without the income generated by the Casino, the Tribal government cannot operate or provide services to its members.[11]

## II.   IGRA

Both the Casino and the Corporation are strictly governed by IGRA.  IGRA is one in a long line of federal laws designed to protect Indian tribes from outsiders seeking to profit at their expense.[12] Congress passed IGRA in 1988 to pervasively regulate Indian gaming:

> Its stated goals were to create a comprehensive regulatory framework "for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," to "shield [tribes] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players."[13]

To enforce IGRA, Congress created the NIGC "to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue."[14] The NIGC is responsible for approving "management contracts" between tribes and their

---

689 (7th Cir. 2011) ("*Wells Fargo 7th Cir.*") (citing *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998)).

[8] *See* Jacquart Decl., Ex. 1, State Court Compl. at ¶ 17

[9] *Wells Fargo 7th Cir.*, 658 F.3d at 689, n.7; Jacquart Decl., Ex. 2, State Court Compl. at ¶ 34.

[10] *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, 677 F. Supp. 2d 1056, 1057 (W.D. Wis. 2010) ("*Wells Fargo W.D. I*").

[11] *See* Decl. of Karen M. Maki in Supp. of Mot. to Dismiss and in Opp'n to Pls.' Mot. for Prelim. Inj. (hereinafter "Maki Decl."), ¶¶ 17-29.

[12] *Wells Fargo 7th Cir.*, 658 F.3d at 686-87.

[13] *Id.* at 687 (citing 25 U.S.C. § 2702(1)-(2)).

[14] 25 U.S.C. § 2702(3).

3

outside partners, and ensuring that those contracts comply with IGRA.[15] Management contracts that are not approved by the NIGC are void as a matter of law.[16] And because an unapproved management contract is void *ab initio*, any waiver of sovereign immunity contained in such a contract is also void.[17] IGRA thus strongly incentivizes parties' compliance; a party's failure to comply with IGRA equates to a failure to contract. The NIGC's compliance processes are further described in Argument Section II(A)(2), *infra*.

### III. The Transaction

Plaintiffs Saybrook Fund Investors, LLC (successor to Saybrook Tax Exempt Investors, LLC) and LDF Acquisition, LLC (collectively "Saybrook")[18] are part of an investment-fund-management firm that seeks high-yield returns from risky investments in distressed companies, defaulted municipal bonds, and real-estate developments.[19] Plaintiffs Stifel, Nicolaus & Co., Inc. and Stifel Financial Corp., (collectively "Stifel") are part of a brokerage and investment-banking firm.[20] In 2007, Stifel served as the Tribal Defendants' financial advisor; in this capacity, Stifel worked with the Tribal Defendants to explore solutions that would allow the Tribal Defendants to refinance existing debt

---

[15] *Wells Fargo 7th Cir.*, 658 F.3d at 688 (citing 25 U.S.C. § 2711).

[16] *Id.* at 688 (citing 25 C.F.R. § 533.7); *First Am. Kickapoo Operations, L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1176 (10th Cir. 2005).

[17] *Wells Fargo 7th Cir.*, 658 F.3d at 686.

[18] The Tribal Defendants do not concede that these entities are proper parties to this litigation.

[19] Saybrook discloses its investments and investment philosophy on its website: www.saybrook.net, a copy of relevant pages of the site are attached hereto as Ex. 2 to Jacquart Decl., ("At Saybrook we believe the best returns are found on the least travelled paths . . . . Saybrook Capital, LLC is a fund management firm that specializes in distressed investments."). Saybrook alleges it is the managing member of Plaintiff LDF Acquisition, LLC, an entity Saybrook alleges is a "special purpose vehicle" it created to purchase the Bonds. *See* Dkt #1, Compl. ¶¶ 7-8. There are no allegations in the Complaint explaining LDF Acquisition, LLC's role in the Bond Transaction, *See* Dkt #1, Compl. ¶¶ 5-27, and the Tribal Defendants do not concede it is a proper party to this case.

[20] *See* Jacquart Decl., Ex. 1, State Court Compl. at ¶¶ 6-7, 20-25.

and to keep the Tribe solvent so the Tribe could continue to deliver governmental services to its members.[21]

Stifel introduced the Tribal Defendants and Saybrook and offered to broker a bond transaction (the "Bond Transaction) between them.[22] Saybrook devised the Bond Transaction with Stifel and Plaintiff Godfrey & Kahn ("Godfrey"), who served as counsel to the Tribal Defendants and counsel to the Bond Transaction.[23] Under the Bond Transaction, the Corporation would issue Bonds in the principal amount of $50,000,000 to Stifel, with the Bonds governed by an Indenture and the Transaction documented by various other Bond Transaction documents ("the Bond Documents").[24] Stifel would immediately resell the Bonds to a Saybrook entity for a fee. Godfrey would retain a portion of the Bond proceeds as its fee. Saybrook would retain several million dollars of the Bond proceeds as a reserve. The remaining proceeds would go to the Tribal Defendants to refinance existing debt, and nearly half of the principal would be "invested" in the "Grand Soleil" project—a riverboat casino in which the Stifel broker had an undisclosed interest.[25]

---

[21] *See* Dkt # 1-14, Compl., Ex. N, Statement of Claim ¶¶ 25-29, *Lake of the Torches Econ. Dev. Corp. et al. v. Saybrook Tax Exempt Investors, LLC, et al.*, No. 13-CV-115 (Lac du Flambeau Tribal Court April 25, 2013) (hereinafter "Tribal Court Statement of Claim").

[22] *See* Jacquart Decl., Ex. 1, State Court Compl. at ¶¶ 20-21.

[23] *See* Jacquart Decl., Ex. 3, December 19, 2007 Email from Saybrook with a redline version of the Indenture.

[24] These documents include the Bonds themselves ("the Bonds"), the Bond Purchase Agreement, the Corporation's Resolution approving the Bond Transaction ("the Bond Resolution"), the Tribal Agreement, the Tribe's Resolution approving the Bond Transaction ("the Tribal Resolution"), the Limited Offering Memorandum, and the opinions issued regarding the Bond Transaction, including an opinion issued by Bond Counsel ("the Bond Counsel Opinion Letter") and an opinion issued by Issuer's Counsel ("the Issuer Opinion Letter"). *See* Dkt # 1-1 – 1-10, Compl., Ex. A-J.

[25] Big John Decl., ¶¶ 7, 13, 17.

As the Tribal Defendants detailed in their Tribal Court Statement of Claim, Stifel owed the Tribal Defendants a fiduciary obligation to explain the consequences of the Transaction, but throughout the negotiation of the Bond Transaction, Stifel made false and misleading statements and withheld key material facts from the Tribal Defendants that induced the Tribal Defendants to enter into the Bond Transaction.[26] For example, the Stifel advisor represented that by funneling over half the Bond proceeds to the Grand Soleil project, the Tribal Defendants would receive an annual return sufficient to make the Bond payments without any effect on governmental funding and with millions to spare, but never disclosed that he himself had a significant interest in the Grand Soleil project.[27]

## IV.  The Transaction's Illegality

Throughout negotiations, Saybrook actively worked to protect its interests. For example, Saybrook insisted the Tribal Defendants waive their tribal sovereign immunity because without such waivers, the Bond Transaction could not be enforced.[28] The waivers were "central to Saybrook's decision to purchase the Bonds and w[ere] repeatedly highlighted during the negotiations for the Bonds."[29] Saybrook knew that the Bond Transaction was directly tied to Indian gaming, that it was necessary to comply with IGRA, and that the failure to do so would jeopardize the validity of the Tribal Defendants' waiver of sovereign immunity.[30]

---

[26] *See* Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim ¶¶ 51-73.
[27] Big John Decl., ¶¶ 16-17.
[28] *See* Jacquart Decl., Ex. 1, State Court Compl. at ¶¶ 34-35, 80-84.
[29] *See* Jacquart Decl., Ex. 1, State Court Compl. at ¶ 60.
[30] *See* Jacquart Decl., Ex. 1, State Court Compl. at ¶¶ 60-70; *see* Dkt # 1-6, Compl., Ex. F, Issuer Opinion Letter; Dkt # 1-7, Compl., Ex. G, Bond Counsel Opinion Letter.

Yet Saybrook *also* demanded that the Bond Transaction afford it maximum control of the Casino at the expense of the Tribal Defendants.[31] For example, to reduce the risk of its investment in the Bonds, Saybrook required the Corporation to offer revenues from the Casino as collateral.[32] Saybrook further insisted that the Bond Transaction's governing instrument – the Trust Indenture (the "Indenture") – permit it to exercise significant management powers over the Casino and effectively seize control of the Casino in the event of default.[33] Saybrook also required the Corporation to place Casino revenue in an account from which Plaintiff Wells Fargo Bank N.A. ("Wells Fargo"), as trustee, assumed oversight of Casino revenues and could withdraw funds to pay Saybrook according to the payment schedule.[34] Other provisions of the Indenture conferred even more significant casino-management powers to Saybrook.[35]

Godfrey, which held out its attorneys as experts in Indian law and Indian-gaming financing,[36] issued both an Issuer Opinion Letter and Bond Counsel Opinion Letter as part of the Bond Transaction. In these Letters, Godfrey opined that the Tribal Defendants' waivers of sovereign immunity in the Indenture and other Bond Documents were valid, that the Indenture and other Bond Documents were not "management contracts" under IGRA, and that consequently, the Bond Transaction was enforceable

---

[31] *See* Jacquart Decl., Ex. 1, State Court Compl. at ¶¶ 21, 61-68; *See* Jacquart Decl., Ex. 4, Executive Summary of Proposed Bond Terms prepared by Stifel Nicolaus; *See* Jacquart Decl., Ex. 5, Prelim. Term Sheet.
[32] *Wells Fargo W.D. I*, 677 F. Supp. 2d at 1059.
[33] *Id.* at 1059-60; *Wells Fargo 7th Cir.*, 658 F.3d at 690-91; *see* Jacquart Decl., Ex. 3, December 19, 2007 Email from Saybrook with a redline version of the Indenture.
[34] *Wells Fargo W.D. I*, 677 F. Supp. 2d at 1058; *Wells Fargo 7th Cir.*, 658 F.3d at 689.
[35] *See* Jacquart Decl., Ex. 1, State Court Compl., at ¶ 85; *Wells Fargo 7th Cir.*, 658 F.3d at 690-91.
[36] *See* Jacquart Decl., Ex. 1, State Court Compl., at ¶ 93; *see* Dkt # 1-6, Compl., Ex. F, Issuer Opinion Letter; *See* Dkt # 1-7, Compl., Ex. G, Bond Counsel Opinion Letter.

without NIGC approval.[37] Stifel, which claimed significant experience in Indian-gaming transactions,[38] likewise opined in a Limited Offering Memorandum to potential investors that the Tribal Defendants had waived their sovereign immunity in the Bond Transaction.[39] The parties relied on these opinions,[40] and no one sought NIGC approval of any of the documents.[41] But Stifel and Godfrey's opinions were later proven wrong.[42]

## V.    The Resulting Litigation

Contrary to Stifel's representations, the still-unbuilt Grand Soleil project has never generated *any* revenue for the Tribal Defendants.[43] Shouldering the Bond payments *without* that anticipated revenue stressed the Corporation's operation of the Casino and financially crippled the Tribe.[44] Consequently, the Tribal Defendants sought to restructure the Bonds in 2009.[45] During these negotiations, the Tribal Defendants hired new counsel who quickly recognized that the Bond Transaction was an unapproved management contract under IGRA.[46] The Tribal Defendants notified the Plaintiffs of this problem, but Plaintiffs refused to renegotiate the deal.[47] Years of litigation ensued.

---

[37] *See* Jacquart Decl., Ex. 1, State Court Compl., at ¶¶ 41-42, 93, *see* Dkt # 1-6, Compl., Ex. F, Issuer Opinion Letter; *See* Dkt # 1-7, Compl., Ex. G, Bond Counsel Opinion Letter..

[38] *See* Jacquart Decl., Ex. 1, State Court Compl., at ¶¶ 57, 97, 207.

[39] *See* Jacquart Decl., Ex. 1, State Court Compl., at ¶ 34; *see* Dkt # 1-2, Compl., Ex. B, Limited Offering Mem., 4.

[40] *See* Jacquart Decl., Ex. 1, State Court Compl., ¶¶ 64-68, 79-82, 209, 273-76.

[41] *See Wells Fargo 7th Cir.*, 658 F.3d at 697-99.

[42] *See* Jacquart Decl., Ex. 1, State Court Compl., at ¶¶ 54-55; *see generally Wells Fargo W.D. I, Wells Fargo 7th Cir.*, and *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, 2010 WL 1687877 (W.D. Wis. 2010) ("*Wells Fargo W.D. I*").

[43] *See* Big John Decl. at ¶ 21.

[44] *Wells Fargo W.D. I*, 677 F. Supp. at 1057-58; *see generally*, Maki Decl.

[45] Maki Decl. at ¶ 27.

[46] *See id.* at ¶ 9.

[47] *See* Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim at ¶¶ 90-91.

***Wells Fargo W.D. I:***     On December 21, 2009, Wells Fargo, as trustee on behalf of Saybrook, sued the Corporation in this Court, seeking the expedited appointment of a receiver. Wells Fargo only sued for breach of the Indenture, and the Court, Judge Randa presiding, dismissed the case, holding that the Indenture was a management contract because it gave "unapproved third parties the authority to set up working policy for the Casino Facility's gaming operation."[48] That management contract was not approved by the NIGC, so the Court held that it was void *ab initio*.[49] Because the Corporation's purported waiver of sovereign immunity was void along with the rest of the Indenture's terms, the court dismissed the case for lack of subject-matter jurisdiction.[50]

***Wells Fargo W.D. II:*** Wells Fargo then moved to vacate the Court's dismissal and sought leave to file a First Amended Complaint that levied additional causes of action based on purported waivers of immunity under other Bond Documents, including the Bonds themselves.[51] The Court denied both motions, holding that amendment was futile because the Bonds could not be separated from the void Indenture:

> Wells Fargo's attempt to separate the Bonds from the Trust Indenture is not persuasive. Indeed as in most transactions of this nature it is hard to imagine the Bonds existing without the Trust Indenture. Like the relationship between a note and a mortgage, the Bonds represent the Corporation's obligation to repay its debt, while the Trust Indenture provides security for the transaction.[52]

The Court did not independently evaluate each purported waiver, but rejected all the other Bond Documents and held, "[t]he waiver provisions in these documents were

---

[48] *Wells Fargo W.D. I*, 677 F. Supp. 2d at 1061.
[49] *Id.* at 1057, 1062.
[50] *Id.*
[51] *See Wells Fargo W.D. II*, 2010 WL 1687877.
[52] *Id.* at *7.

generated in connection with the bond transaction and they presuppose the validity of the same."[53]

**Wells Fargo 7th Circuit**: Wells Fargo appealed the dismissal of its suit and denial of its motion to vacate and for leave to amend.[54] The Seventh Circuit affirmed the Western District's holding that the trust indenture was void *ab initio* and the dismissal of the original complaint for lack of a valid waiver of sovereign immunity.[55] But it reversed the denial of Wells Fargo's motion for leave to amend, finding the ruling "premature."[56] The Seventh Circuit directed the Western District to: (1) allow Wells Fargo to file an amended complaint; (2) assess whether Wells Fargo had standing to pursue the new complaint; and (3) "determine whether the [Bond Documents], when read separately or together, waive the sovereign immunity of the [Corporation] with respect to any such claims."[57]

**Wells Fargo 7th Circuit Remand**: On remand, the Western District granted Wells Fargo's motion for leave to amend.[58] Instead of docketing the complaint it originally sought leave to file, however, Wells Fargo submitted a different version (the "Revised First Amended Complaint") that sought to add both Saybrook entities to the case caption as plaintiffs and the Tribe as a new defendant without seeking leave of court.[59] Meanwhile, the parties briefed the issues of Wells Fargo's standing, sovereign

---

[53] *Id.*

[54] *See generally Wells Fargo 7th Cir.*, 658 F.3d 684.

[55] *Id.* at 700-01.

[56] *Id.* at 701.

[57] *Id.* at 702.

[58] *See* Jacquart Decl., Ex. 6, Decision and Order, *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, No. 09-CV-768 (W.D. Wis. Nov. 22, 2011) (hereinafter "W.D. Wis. 11/22/11 Order").

[59] *See* Jacquart Decl., Ex. 7, First Amended Complaint, *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, No. 09-CV-768 (W.D. Wis. Dec. 23, 2011); *See* Jacquart Decl., Ex. 8,

immunity, and subject-matter jurisdiction.[60] While that briefing was still pending in the forum they had chosen two years earlier, Plaintiffs then filed a similar Complaint in Waukesha County Circuit Court on January 16, 2012. The parties stipulated to a stay of the Waukesha case.

After briefing, but before the Court's ruling on the issues before it, Judge Randa highlighted Wells Fargo's attempted forum shopping when he ordered Wells Fargo to show cause why it had added the Saybrook entities to the case caption without leave of the court and in defiance of the Seventh Circuit:

> For whatever reason, after years of litigation, Wells Fargo is attempting to avoid a substantive, preclusive ruling in federal court. In fact, it appears that Wells Fargo wants to start over in a different forum – Waukesha County Circuit Court, where Wells Fargo, in addition to the plaintiffs Wells Fargo attempted to bring into this case, are now pursuing claims that are identical to the claims alleged here on remand. This strategy will not be tolerated. Wells Fargo must file a pleading that complies with the mandate of the Seventh Circuit. Otherwise, this matter will be dismissed with prejudice.[61]

The Court ordered Wells Fargo to promptly file a new Amended Complaint and to show cause why sanctions should not be imposed.[62] Instead, Wells Fargo voluntarily dismissed its case, avoiding a ruling on the sovereign immunity question.[63]

**Saybrook W.D. III:** Following these procedural machinations, Saybrook filed a new action in this Court. Rather than litigating that case, however, Saybrook urged the Court to dismiss its own suit for lack of subject matter jurisdiction. Based on Saybrook's

---

Plaintiffs' Rule 15(a) Motion for Leave to File Second Amended Complaint, *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, No. 09-CV-768 (W.D. Wis. Dec. 23, 2011).
[60] *See* Jacquart Decl. Ex. 6, 11/22/11 Order.
[61] *See* Jacquart Decl., Ex. 9, Decision and Order at 4, *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, No. 09-CV-768 (W.D. Wis. March 30, 2012) (hereinafter "3/30/12 Order").
[62] *See* Jacquart Decl. Ex. 9, 3/30/12 Order at 5.
[63] *See* Notice of Dismissal, *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, No. 09-CV-768 (W.D. Wis. April 9, 2012), attached as Ex. 10 to Jacquart Aff.

artful pleading, the Court dismissed the case as Saybrook requested, which again permitted Saybrook to avoid a ruling on the sovereign immunity issue.[64] Having twice effected dismissal of their federal cases for strategic reasons, Wells Fargo and Saybrook proceeded with their case in Waukesha Circuit Court.

**_The Parallel State and Tribal Court Cases:_** In their Waukesha complaint, Saybrook and Wells Fargo acknowledged that the Indenture is invalid and that its invalidity has "created uncertainty about the validity of [the Bond Documents] associated with the sale of the Bonds."[65] They also acknowledged that the Bond Documents "contain some, but not all, of the provisions found by the Seventh Circuit to be _indicia_ of management contracts for Indian gaming facilities[.]"[66] Despite this, they alleged that the Bond Documents contain valid waivers of sovereign immunity.[67] In the Waukesha case, Saybrook and Wells Fargo for the first time plead allegations against the Tribe, and sought to enforce the Bond Transaction against both it and the Corporation. As alternative counts in their Waukesha case, Wells Fargo and Saybrook sought damages from Stifel and Godfrey for, among other things, erroneously opining that the waivers were valid.[68]

After the Plaintiffs engineered the dismissal of their case in this Court to revive the dormant state-court case, the Tribal Defendants promptly commenced an action for declaratory judgment in the Lac du Flambeau Tribal Court.[69] In addition to asking that

---

[64] _See_ Jacquart Decl., Ex. 11, Opinion and Order, _Saybrook Tax Exempt Investors, LLC, et al. v. Lake of the Torches Econ. Dev. Corp., et al._, No. 12-CV-255 (W.D. Wis. April 1, 2013).

[65] _See_ Jacquart Decl., Ex. 1, State Court Compl., at ¶ 55.
[66] _Id._
[67] _Id._ at ¶¶ 34-42.
[68] _Id._ at ¶¶ 185-291, p. 50.
[69] _See generally_ Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim,.

court to resolve the validity of the Bond Documents under IGRA, the Tribal Court Statement of Claim also seeks judgment regarding the validity of the Bond Documents and Bond Transaction under Tribal laws.[70]

Immediately after filing the Tribal Court Statement of Claim, the Tribal Defendants moved to stay the Waukesha case and hold a *Teague* Inter-Jurisdictional conference with the Tribal Court as mandated by the Wisconsin Supreme Court.[71] The Tribal Defendants notified the Tribal Court Judge of the request for a *Teague* hearing, but before the process could begin, the Waukesha Court denied the motion.[72] The Tribal Defendants have filed a petition for permissive appeal of this decision with the Wisconsin Court of Appeals.[73] Meanwhile, in Tribal Court, the Plaintiffs in this case have moved to dismiss the Tribal Court action for lack of jurisdiction. That motion is pending with no hearing date or briefing schedule set.

**The Instant Suit:** Contemporaneous with Plaintiffs' motion to dismiss the Tribal Court case, they filed this case seeking a preliminary injunction against the Tribal Defendants to compel them to dismiss their action before the Tribal Court can address the jurisdictional arguments they have raised in the Tribal Court.

---

[70] *Id.* at ¶¶ 139-65.

[71] *Teague*, 612 N.W.2d at 720.

[72] *See* Jacquart Decl., Ex. 24, Tribal Defendants' Petition and Supporting Memorandum for Leave to Appeal Non-Final Order of Waukesha County Circuit Case No. 12-CV-187, Ex. A, Order, *Saybrook Tax Exempt Investors, LLC, et al. v. Lac du Flambeau Band of Lake Superior Chippewa Indians, et al.*, Case No. 12-CV-187, Appeal No. ___-AP-___ (Wisconsin Court of Appeals District II June 13, 2013).

[73] *See generally*, Tribal Defendants' Petition and Supporting Memorandum for Leave to Appeal Non-Final Order of Waukesha County Circuit Case No. 12-CV-187, *Saybrook Tax Exempt Investors, LLC, et al. v. Lac du Flambeau Band of Lake Superior Chippewa Indians, et al.*, Case No. 12-CV-187, Appeal No. ___-AP-___ (Wisconsin Court of Appeals District II June 13, 2013).

**ARGUMENT**

**I.   THE PLAINTIFFS HAVE NOT MET THEIR BURDEN TO PLEAD JURISDICTION OVER THE TRIBAL DEFENDANTS.**

It is axiomatic that the Plaintiffs bear the burden to demonstrate that the Court has jurisdiction over their claim.[74] And for years, litigation between the parties has examined various courts' jurisdiction over the sovereign Tribal Defendants, with each hotly disputing whether either Tribal Defendant waived its immunity, because sovereign immunity is a jurisdictional bar from suit. In earlier proceedings, the Tribal Defendants have repeatedly explained that to move forward with *any* claim against the Tribal Defendants, a plaintiff must identify which waiver allows the claim, and must demonstrate that the waiver: (1) is contained in a valid document;[75] (2) is made by the appropriate Tribal Defendant;[76] (3) to allow suit by the appropriate plaintiff;[77] and (4) for the specific claims that plaintiff asserts.[78] Yet, in their instant complaint, the

---

[74] *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003); *Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 685-86 (8th Cir. 2011) ("The plaintiffs bear the burden of proving that either Congress or [the tribal entity] has expressly and unequivocally waived tribal sovereign immunity."); *Kopke v. A. Hartrodt S.R.L.*, 2001 WI 99, ¶ 10, 245 Wis. 2d 396, 410, 629 N.W.2d 662, 668.

[75] *Wells Fargo 7th Cir.*, 658 F.3d at, 686, 702. *Accord A.K. Mgmt. Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785, 789 (9th Cir. 1986) ("Since the entire contract is inoperable without BIA approval, the waiver is inoperable and, therefore, the tribe remains immune from suit."); *New Gaming Sys. Inc. v. Nat'l Indian Gaming Comm'n*, 896 F. Supp. 2d 1093, 1098 (W.D. Okla. 2012) ("Because the agreements were void, the tribal court held that the Tribe's limited waiver of sovereign immunity contained in the agreements was ineffective, requiring dismissal of the case for lack of jurisdiction."); *see also Mo. River Servs., Inc. v. Omaha Tribe of Neb.*, 267 F.3d 848, 854 (8th Cir. 2001) (applying the limited waiver of "the only enforceable, valid agreement before the court" instead of the waiver in a contract that was void for failure to secure required approvals).

[76] *See Mo. River Servs., Inc.*, 267 F.3d at 854.

[77] *E.g.*, *Coleman v. U.S. Bureau of Indian Affairs*, 715 F.2d 1156, 1162 (7th Cir. 1983) (holding that congressional waiver of immunity for "claim[s] which the Creek Nation may have against the United States" did not support suit by Creek members against the U.S.).

[78] *E.g.*, *Taylor v. St. Croix Chippewa Indians of Wis.*, 229 Wis. 2d 688, 694-95, 599 N.W.2d 924, 927 (Ct. App. 1999) (holding that even though a tribe agreed in a gaming compact with Wisconsin to maintain insurance for gaming activities and to waive its immunity for suit against

Plaintiffs offer only one conclusory paragraph of their entire complaint that even suggests that the Tribal Defendants are not immune from this suit:

> 26.     In addition to these repeated agreements to litigate Transaction-related disputes outside Tribal Court and within state or federal courts in Wisconsin, the Tribe and EDC unequivocally and expressly waived their sovereign immunity, both in the Bond Purchase Agreement and in several other Transaction Documents.  (Ex. B, pp. 4, 19; Ex. C, p. 19, § 14(b); Ex. E, pp. 2, 3; Ex. I, pp. 4-5, § 9(b); Ex. J, pp. 1, 2).

This conclusory allegation does not satisfy Fed. R. Civ. P. 8(a)(2)'s requirement that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[79]

The Supreme Court requires this Court to undertake a two-part inquiry to test the sufficiency of the Plaintiffs' complaint. First, the Court must identify "the allegations in the complaint that are not entitled to the assumption of truth."[80] Second, the Court must review the allegations remaining after excising the legal conclusions and conclusory allegations, and determine whether the remaining factual allegations "plausibly suggest an entitlement to relief."[81] The Plaintiffs' Complaint does not pass this test.

---

the insurer, that waiver did not authorize an employee to sue the tribe for injuries sustained at the tribe's casino); s*ee also Lewis v. Norton*, 424 F.3d 959, 962 (9th Cir. 2005).

[79] *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

[80] *Id*. at 680.

[81] *Id*. at 678. The Seventh Circuit has "interpreted *Twombly* and *Iqbal* to require the plaintiff to 'provid[e] some specific facts' to support the legal claims asserted in the complaint." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (*citing Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)). The "degree of specificity required is not easily quantified, but 'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together.' " *McCauley*, 671 F.3d at 616 (*citing Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

Under the first step of the test, the legal conclusions of Paragraph 26 of the Plaintiffs' complaint are not entitled to the presumption of truth.[82] The Supreme Court has held that a complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[83] Setting aside the issue of the validity of the waivers (which the Tribal Defendants vigorously dispute, *infra*), Plaintiffs' blanket assertion does not make a *prima facie* showing of this Court's jurisdiction. One conclusory allegation that the Tribal Defendants waived their immunity (for what? from whom?) does not even suggest how any of the purported waivers extend so far as to permit this Court to order the Tribal Defendants to dismiss *their own* suit in Tribal Court or why this Court should leap to this improbable conclusion. The naked assertion of paragraph 26 is a legal conclusion that the Court must excise before conducting the plausibility analysis set forth in *Twombly* and *Iqbal*.[84]

Without paragraph 26, the remaining allegations of the Complaint fail to plausibly suggest any entitlement to the relief sought. Under *Iqbal*, determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[85] The Seventh Circuit defines this plausibility as "the complaint taken as a whole must establish a nonnegligible probability that the claim is valid."[86] Outside of paragraph 26, the

---

[82] *Iqbal,* 556 U.S. at 681.
[83] *Id.* at 678 (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).
[84] *McCauley*, 671 F.3d at 618.
[85] *Iqbal*, 556 U.S. at 679.
[86] *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011).

Complaint does not even attempt to explain how the purported waivers could be read to permit this Court to disregard the Tribal Defendants' immunity from this suit seeking extraordinary relief. Accordingly, the Complaint fails to plausibly state a *prima facie* case for the Court's exercise of jurisdiction over the Tribal Defendants and should be dismissed.

## II.   THE PLAINTIFFS HAVE FAILED TO EXHAUST THEIR TRIBAL COURT REMEDIES, WHICH PRECLUDES THIS COURT FROM EXERCISING JURISDICTION OVER THIS CASE.

Even if the Plaintiffs had properly plead their Complaint, the Court cannot reach the merits of the Plaintiffs' claims because they have not exhausted their Tribal Court remedies. Congress has "consistently encouraged" the development of tribal courts as part of its effort to foster tribal self-government."[87] The Supreme Court has similarly recognized that "[t]ribal courts play a vital role in tribal self-government"[88] and so developed the "exhaustion rule."[89] Exhaustion "directs a federal court to stay its hand in order to give the tribal court a 'full and fair opportunity to determine its own jurisdiction[]'"[90] before considering questions regarding tribal court jurisdiction. Thus, although the issue of whether a tribal court has jurisdiction over nonmembers is a federal question, "even where a federal question exists, due to considerations of comity, federal court jurisdiction does not properly arise until available remedies in the tribal

---

[87] *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 14–15 (1987); *Nat'l Farmers Union*, 471 U.S. at 856.
[88] *Iowa Mut. Ins. Co.,* 480 U.S. at 14.
[89] *Id.* at 16.
[90] *Id.* (quoting *Nat'l Farmers Union*, 471 U.S. at 857).

court system have been exhausted."[91] Supreme Court precedent "requires that the issue of jurisdiction be resolved by the Tribal Courts in the first instance."[92]

### A. UNDER SUPREME COURT PRECEDENT, THERE IS A COLORABLE BASIS FOR TRIBAL COURT JURISDICTION OVER THE STATEMENT OF CLAIM.

The Supreme Court has stated that Tribal Courts can exercise jurisdiction over non-Indians in several circumstances, all of which are present in the Tribal Court Action. And when a federal court is reviewing a challenge to tribal court jurisdiction where the plaintiff has not first exhausted tribal remedies, the standard for determining whether tribal remedies must be exhausted is low: "Tribal jurisdiction need only be '*colorable.*'"[93] That standard is easily met here.

First, tribes can exercise jurisdiction over nonmembers when Congress expressly delegates the authority to do so to them, as it did in IGRA for claims like those at issue in the Tribal Court Action. Second, tribes can exercise jurisdiction over nonmembers when the subject matter of the dispute centers on *tribal* land (e.g. land held in trust by the United States for the benefit of the tribe), which is true for the subject matter of the Tribal Court Action. Even if the subject matter of a tribal-court dispute concerns non-Indian lands, however, tribal courts can exercise jurisdiction in two circumstances: (a) where a nonmember has entered into a consensual relationship with the tribe and there is a close nexus between that relationship and the subject of the suit; and (b) where the

---

[91] *Plains Commerce Bank v. Long Family Land and Cattle Co.*, ____ F. Supp. 2d ____, 2012 WL 6731812, at *3 (D.S.D. Dec. 28, 2012). *Accord Buchanan v. Sokaogon Chippewa Tribe*, 40 F. Supp. 2d 1043, 1048-49 (E.D. Wis. 1999) ("[T]he court concludes that the claims that are not barred for lack of jurisdiction by the doctrine of tribal sovereign immunity are barred upon principles of comity by the doctrine of tribal exhaustion. Consequently, this action must be dismissed.").

[92] *Iowa Mut. Ins. Co.*, 480 U.S. at 19.

[93] *Rincon Mushroom Corp. v. Mazzetti*, 490 Fed. Appx. 11, 13 (9th Cir. 2012) (quoting *Elliott v. White Mt. Apache Tribal Court*, 566 F.3d 842, 848 (9th Cir. 2008)).

nonmember's conduct directly affects the health and welfare, political integrity, or economic security of the tribe.    Here, the Tribal Court Action is directly related to the consensual relationships all three Plaintiffs entered into with the Tribal Defendants. Furthermore, Plaintiffs' attempt to enforce agreements that violate federal and tribal law to seize assets from the Tribal Defendants' primary source of revenue (their Casino), does not just directly affect the health and welfare of tribal members, but jeopardizes the political integrity and economic security of the Tribe itself.

### 1. The Tribal Court has jurisdiction over the Plaintiffs and the Statement of Claim because Congress has confirmed that tribes retain jurisdiction over nonmembers with respect to gaming.

In their motions for preliminary injunction, Stifel and Saybrook assert that the Tribal Court lacks jurisdiction over the claims the Tribal Defendants have asserted in the Statement of Claim. Both also suggest that whether the Tribal Court has jurisdiction depends on whether either of the so-called *Montana* exceptions are met in this case.[94] *Montana v. United States* has been called the "pathmarking case concerning tribal civil authority over nonmembers."[95] In it, the Court announced a general rule that for nonmember conduct on non-Indian lands within reservation boundaries, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the

---

[94] *See* Dkt # 6, 16-19, Stifel Pls.' Br. in Supp. of Mot. for Prelim. Inj.; Dkt # 18, Pls. Saybrook and Wells Fargo's Br. in Supp. of their Rule 65 Mot. for Prelim. Inj. Relief, 14-17. For its part, Godfrey cryptically "agrees in general with the points and authorities offered by the other plaintiffs, though not necessarily with the articulation and specifics of all the other plaintiffs' arguments." *See* Dkt # 43, Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., 3. Godfrey has waived all argument on this point because it has failed to address these issues with specificity. *See Doherty v. City of Chi.*, 75 F.3d 318, 324 (7th Cir. 1996) (holding that a litigant waived an argument because its brief failed to present issues it desired to litigate supported by appropriate judicial authority and reasoned discussion). This is instructive, as the record before the court is that the only three parties to this case that routinely encounter and apply Indian law—The Corporation, the Tribe, and Godfrey— do not dispute that the tribal court has jurisdiction over the Statement of Claim.

[95] *Strate v. A-1 Contractors*, 520 U.S. 438 (1997).

tribe."[96] The Court then set forth two exceptions to this general rule.[97] But, "[a]s the Court made plain in *Montana,* the general rule and exceptions there announced govern only in the absence of a delegation of tribal authority by treaty or statute[,]"[98] so *Montana v. United States*[99] does not govern here.

As sovereign entities, Indian tribes exercise certain inherent powers of self-government.[100] In addition, Congress can delegate authority to tribes, including authority to regulate nonmembers. For example, the Supreme Court found that statutes authorizing tribes to regulate the sale of liquor in Indian Country properly delegated tribes the authority to regulate nonmembers.[101] And the D.C. Circuit held that Congress delegated tribes authority under the Clean Air Act to regulate air quality "'within the exterior boundaries of the reservation,'" regardless of the ownership status of the land or the membership status of polluters.[102] Congress also authorized tribes to regulate gaming activities on Indian lands, which include all lands within reservation boundaries, regardless of ownership status.[103]

In the "findings" for the Indian Gaming Regulatory Act, Congress recognized that Indian tribes have the *exclusive* right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by federal law and is conducted within a

---

[96] *Montana*, 450 U.S. at 565.
[97] *Id.* at 565-566.
[98] *Strate*, 520 U.S. at 449.
[99] 450 U.S. 544 (1981).
[100] *See, e.g.*, *United States v. Mazurie*, 419 U.S. 544, 557 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory.").
[101] *Id.*
[102] *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1288 (D.C. Cir. 2000).
[103] Under IGRA, "Indian lands" means "(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4).

State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.[104] And in its "declaration of policy," Congress said it passed IGRA, among other purposes, to provide a statutory basis for "the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players."[105] Although IGRA gave federal regulators authority over tribal gaming operations, it also confirmed that:

> Nothing in this [Act] precludes an Indian tribe from exercising regulatory authority provided under tribal law over a gaming establishment within the Indian tribe's jurisdiction if such regulation is not inconsistent with this chapter or with any rules or regulations adopted by the Commission.[106]

Indeed, IGRA *requires* tribes to regulate gaming by enacting tribal gaming ordinances[107] and licensing "primary management officials" and "key employees" of tribal gaming enterprises.[108] And that regulation and licensing is not limited to tribally owned lands or

---

[104] 25 U.S.C. § 2701(5) (emphasis added). Wisconsin does not prohibit such gaming activity. *See, e.g.*, Wisconsin Department of Administration Web Site, http://www.doa.state.wi.us/section.asp?linkid=117&locid=7(last visited June 3, 2013) ("There are eleven federally-recognized Native American Tribes in the State of Wisconsin (State) that have entered into Class III gaming Compacts (Compacts); authorizing the scope and conduct of gaming to be offered by the Tribes within the State.").

[105] 25 U.S.C. § 2702(2). Another purpose was "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). The third was "to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indians lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702(3).

[106] 25 U.S.C. § 2713(d).

[107] 25 U.S.C. § 2710.

[108] 25 U.S.C. § 2710(b)(2)(F).

tribal members.[109] Thus, when it comes to regulating gaming, Congress has not only *recognized* tribal authority over nonmembers, it has *mandated* it. As the Eighth Circuit observed, "Congress unmistakably intended that tribes play a significant role in the regulation of gaming."[110]

The Statement of Claim seeks a declaration that various Bond Documents among the parties are void because they provide for management of the Tribe's Casino in the absence of an approved management contract, which both IGRA and the Tribe's Gaming Control Ordinance mandate.[111] The Bond Documents purport to give Saybrook substantial control over the Tribe's casino, which is located on trust land within the reservation.[112] For example, several of the Bond Documents state that Saybrook has a blanket lien on all casino revenues and fixtures, even revenues necessary to pay operating expenditures.[113] Others say that Saybrook can come onto the Tribe's

---

[109] 25 U.S.C. § 2710.

[110] *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 549 (8th Cir. 1996) (concluding that IGRA preempted state-court claims regarding tribal-gaming licensure). Moreover, if there were any doubt about Congress's intent, "'statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians.'" *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976) (quoting *Alaska Pac. Fisheries v. United States,* 248 U.S. 78, 89 (1918) (alterations in original).

[111] *See generally* Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim, Counts I – VII, 28-31.

[112] Big John Decl., ¶ 3 (declaring that the Tribe's Casino is located on tribal land); *see* Dkt # 1-1, Compl., Ex. A, Bonds, 5 (granting Saybrook, as holder of the Bonds, security interest in casino reveneues); Dkt # 1-2, Compl. Ex. B, Limited Offering Mem., 3 (pledging to Saybrook, as holder of the Bonds, all "right, title and interest in the Gross Revenues generated by the Casino Facility" and also pledging "all right, title and interest in and to the Corporation's Accounts"); Dkt # 1-9, Compl. Ex. I, Tribal Agreement, § 4(b) (requiring the Tribe to agree that it "will not replace the General Manager, Controller or Executive Director of the Casino Facility without prior written consent" of Saybrook, as the holder of the Bonds).

[113] Big John Decl., ¶ 13; Dkt # 1-1, Compl., Ex. A, Bonds, 5; Dkt # 1-2, Compl. Ex. B, Limited Offering Mem., 3.

22

reservation to remove gaming equipment and other fixtures.[114] And still others purport to require the Corporation or the Tribe to obtain Saybrook's consent before replacing the Casino's managers and the Tribe's gaming regulators.[115] By their terms, these agreements *not only* require approval of the Chairman of the NIGC to be valid,[116] but also fall within the regulatory ambit of the Tribe's gaming activity, which Congress has specifically delegated to the Tribe. And because they do, the Tribal Court has jurisdiction to hear claims regarding them,[117] regardless of the *Montana* judicial limitations on tribal jurisdiction over nonmembers.

### 2. Even if Congress had not delegated authority over nonmembers to the Tribe under IGRA, the Tribal Court has jurisdiction over cases involving nonmembers where, as here, the nonmember conduct or activities take place on *tribal lands*.

The *Montana* analysis also does not apply to this case for a second reason. Because the nonmember conduct at issue in the Tribal Court Statement of Claim occurred (or will occur) on tribal trust lands, the Tribe's inherent sovereignty extends to regulating that conduct, and *Montana* and its exceptions are irrelevant. *Montana's* "main rule" and its exceptions apply to nonmember activity *on non-Indian land*.[118] With

---

[114] *See* Jacquart Decl., Ex. 12, Lake of the Torches Economic Development Corporation's January 1, 2008 Security Agreement to Wells Fargo Bank, National Association (hereinafter "Security Agreement") at 3.; Dkt # 1-4, Compl., Ex. D, Indenture, 3.

[115] Dkt # 1-9, Compl., Ex. I, Tribal Agreement, § 4(b) (requiring the Tribe to agree that it "will not replace the General Manager, Controller or Executive Director of the Casino Facility without prior written consent" of Saybrook, as the holder of the Bonds); Dkt # 1-4, Compl., Ex. D, Indenture, § 6.20 ("The Corporation agrees that it will not replace or remove and will not permit the replacement or removal of the Casino Facilities' General Manager, Controller, or Chairman or Executive Director of the Gaming Commission for any reason without first obtaining the written consent of 51% of the [Bondholders].").

[116] *See* 25 U.S.C. § 2711(a); 25 U.S.C. § 2710(d)(9); *See* Big John Decl., Ex. C, Tribal Gaming Control Ordinance at § 43.103.

[117] *Strate*, 520 U.S. at 449.

[118] *Montana*, 450 U.S. at 557 (addressing the "narrow" question of "the power of the Tribe to regulate non-Indian fishing and hunting on reservation land *owned in fee by nonmembers* of

23

respect to reservation land held by the tribe or in trust for the tribe, the Supreme Court said in *Montana* that "[t]he Court of Appeals held that the Tribe may prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe, and *with this holding we can readily agree*."[119] The Supreme Court confirmed this rule in *Strate*, noting again "[w]e 'can readily agree,' in accord with *Montana*, that tribes retain considerable control over nonmember conduct on tribal land."[120]

The Ninth Circuit recently confirmed that *Montana*'s main rule lacks force on tribal lands, concluding that where a tort claim arose on a tribal road within a reservation, the tribal court could exercise jurisdiction without analyzing whether the facts fit either *Montana* exception.[121] This is so because tribes retain greater authority over tribal lands (like those at issue here, which are held in trust by the United States for the Tribe) than they do over lands that have been alienated from tribal ownership. For example, in *Strate*, the Court found that the case was covered by *Montana*'s main rule because the case arose from a car accident on land over which the tribe had granted a

---

[119] *Montana*, 450 U.S. at 557 (emphasis added).

[120] *Strate*, 520 U.S. at 454 (internal citation omitted). The Court in *Strate* applied *Montana's* main rule only after finding that the right-of-way through the reservation on which the tort at issue occurred constituted non-Indian land for the purposes of analyzing tribal jurisdiction. *Id.* at 456 (concluding that because accident occurred on state highway right-of-way, "[w]e therefore align the right-of-way, for the purpose at hand, with land alienated to non-Indians. Our decision in *Montana*, accordingly, governs this case.").

[121] *McDonald v. Means*, 309 F.3d 530, 540 (9th Cir. 2002) ("We conclude that under *Montana*, the Tribe retained enough of its gatekeeping rights that Route 5 cannot be considered non-Indian fee land, and that the Tribe thus maintains jurisdiction over Route 5.").

the Tribe.") (emphasis added).  The Court has since departed from this rubric only once, finding that a tribal court lacked jurisdiction over a § 1983 claim arising out of state police officers' execution of a search warrant on tribal lands for an off-reservation crime because of the state's substantial interest in investigating off-reservation crimes. *See Nevada v. Hicks*, 533 U.S. 353, 364 (2000). *See also Water Wheel Camp Recreational Area, Inc. v. Larance*, 642 F.3d 802, 813 (9th Cir. 2011) (discussing *Hicks'* limited application).

right-of-way to the State, and the tribe "expressly reserved no right to exercise dominion or control over the right-of-way," and so retained no "landowner's right to occupy and exclude."[122]

In contrast, where the tribe is the landowner, the power to exclude nonmembers "exists independently of [a tribe's] general jurisdictional authority."[123] And in its most recent case on tribal-court jurisdiction, the Supreme Court confirmed "the general rule that a tribe has plenary jurisdiction over tribal land until or unless that land is converted to non-Indian land."[124] Thus, in the Ninth Circuit case, that court evaluated the character of the tribal road on which the claim arose and concluded that "under *Montana*, the Tribe retained enough of its gatekeeping rights that Route 5 cannot be considered non-Indian fee land, and that the Tribe thus maintains jurisdiction over Route 5."[125] So long as the land remains in tribal or trust ownership, it retains plenary control over its land; it only loses "regulatory jurisdiction over the use of others" through alienation.[126]

The Tribe's reservation was established by the Treaty with the Chippewa of 1854[127] as a permanent homeland for the Tribe.[128] The Tribe retained the ability to exercise governmental power over its reservation, including the power to exclude

---

[122] *Strate*, 520 U.S. at 455-456.
[123] *Water Wheel Camp Recreational Area, Inc.*, 642 F.2d at 810 (citing *Duro v. Reina*, 495 U.S. 676, 696-97 (1990)).
[124] *Id.* at 816 (citing *Plains Commerce Bank v. Long Family Land and Cattle Co., Inc.*, 554 U.S. 316, 328 (2008) and *South Dakota v. Bourland*, 508 U.S. 679, 689 (1993)).
[125] *McDonald*, 309 F.3d at 540.
[126] *Plains Commerce Bank*, 554 U.S. at 329 (internal quotation omitted).
[127] Affidavit of Professor John P. Bowes, ¶ 3 (citing 10 St. 1109, in Kappler, Charles, Comp. and ed., Indian Affairs: Laws and Treaties (7 volumes, Washington: Government Printing Office, 1904), Vo. II, 648-652)).
[128] *Id.* at ¶¶ 9-12.

nonmembers from it.[129] And it retains those rights for lands it owns or to which it holds beneficial title. [130]

Because the Casino is located on land held in trust by the United States for the Tribe,[131] the Tribe retains the right to exclude nonmembers from it. "This power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct, such as a tax on business activities conducted on the reservation,"[132] which means the Tribe retains the right to regulate nonmember conduct affecting it.[133] And because of that, its tribal court retains the authority to adjudicate disputes arising out of conduct concerning the land.[134]   The Tribal Court Statement of Claim raises precisely such issues.

Although this case does not involve nonmembers leasing tribal land or operating independent businesses on tribal land, it does involve significant nonmember conduct and control over tribal land. For example:

- Stifel and Godfrey entered into consensual relationships with the Tribe and the Corporation to provide financial and legal advice, respectively;[135]

- Stifel and Godfrey came to the Tribe's trust property on the reservation to solicit the Bond Transaction and advise the Tribe and the Corporation with respect to the Bond Transaction; [136]

---

[129] *Id.* at ¶¶ 13-14.

[130] *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982) ("Nonmembers who lawfully enter tribal lands remain subject to the tribe's power to exclude them.").

[131] Big John Decl. at ¶ 4.

[132] *Id.*

[133] *Id. See also Water Wheel Camp Recreational Area, Inc.*, 642 F.3d at 814 ("In this instance, where the non-Indian activity in question occurred on tribal land, the activity interfered directly with the tribe's inherent powers to exclude and manage its own lands, and there are no competing state interests at play, the tribe's status as landowner is enough to support regulatory jurisdiction without considering *Montana.*").

[134] *Id.* at 816. *See also Strate*, 520 at 453 ("As to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction.").

[135] *See* Big John Decl. at ¶¶ 7, 11.

[136] *See* Big John Decl. at ¶¶ 11, 13, 16; *see also* Doud Decl., ¶ 3.

- Saybrook negotiated (and re-negotiated) the Bond Transaction with members of the Tribal government and the Corporation on the Tribe's trust property on the reservation;[137]

- The Bond Documents negotiated by Stifel and Saybrook (and opined upon by Godfrey):

  o were executed by the Tribe and the Corporation on trust land on the Tribe's Reservation;[138]

  o provided that the bonds were to be repaid out of revenues from the Tribe's Casino, which is located on trust land within the Tribe's reservation;[139]

  o required cash from the Casino to be taken out of the Casino on a daily basis and deposited into an account over which the Tribal Defendants had no control;[140]

  o permitted appointment of a receiver over the Tribe's Casino in the event of default;[141]

  o permitted the bondholders to be able to require the Corporation to engage a management consultant and follow that consultant's advice;[142]

  o gave the Bondholders the right to demand replacement of management personnel upon default;[143]

  o gave the Bondholders the right to consent to the change of upper management personnel at the Casino;[144]

  o limited the Corporation's ability to fund capital expenditures for the Casino;[145]

  o limited the Corporation's ability to pay operating expenses for the Casino;[146]

---

[137] *See* Big John Decl. at ¶ 13.

[138] *See* Big John Decl. at ¶ 19; *see also* Doud Decl. ¶ 4.

[139] *See* Dkt # 1-4, Compl., Ex. D, Indenture, § 5; Jacquart Decl., Ex. 12, Security Agreement at § 1; Dkt # 1-1, Compl., Ex. A, Bonds, 3; *See* Jacquart Decl., Ex. 13, January 18, 2008 Account Control Agreement between Lake of the Torches Economic Development Corporation, Wells Fargo Bank National Association and Chippewa Valley Bank (hereinafter "Control Agreement") at § 1; Dkt # 1-3, Compl., Ex. C, Bond Purchase Agreement, §§ 9(i)(5)(iv), 9(i)(6)(vii); Dkt # 1-2, Compl., Ex. B, Limited Offering Memorandum, 3, 4, 13, 14, B-1.

[140] *See* Dkt # 1-4, Compl., Ex. D, Indenture, 28; *see also* Dkt # 1-2, Compl., Ex. B, Limited Offering Mem., 3.

[141] *See* Dkt # 1-4, Compl., Ex. D, Indenture, § 8.04.

[142] *See* Dkt # 1-4, Compl., Ex. D, Indenture, § 6.19.

[143] *See* Dkt # 1-4, Compl., Ex. D, Indenture, § 8.01(d).

[144] *See* Dkt # 1-9, Compl., Ex. I, Tribal Agreement, § 4(b).

[145] *See* Dkt # 1-4, Compl., Ex. D, Indenture, § 6.18.

- o permitted the Trustee and the Bondholders to remove fixtures, furnishings, and equipment, including gaming machines, from the Casino upon an Event of Default;[147] and

- o limited the Tribe's ability to cancel its lease on Tribal trust land with the Corporation.[148]

In myriad ways, the Bond Documents purport to limit the Tribe's "gatekeeper" role over its trust land, so the Tribe and its court retain regulatory and adjudicative jurisdiction over these matters.

### 3. Even if *Montana* applied to this case, the first *Montana* exception applies to these facts.

Even if we assume, *arguendo*, that this case is governed by *Montana*'s main rule and its exceptions, the case fits the first exception. Even with respect to non-Indian lands, "a tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."[149] Since the Court first announced this rule, lower courts have confirmed that the consensual relationship must have a "sufficient 'nexus'" to the "assertion of tribal authority."[150] By their own admission, all the Plaintiffs entered into consensual relationships with the Tribal Defendants with respect to the Bond Transaction,[151] and the "assertion of tribal

---

[146] *See* Dkt # 1-4, Compl., Ex. D, Indenture, § 5.01.

[147] *See* Dkt # 1-4, Compl., Ex. D, Indenture, 3; *see also* Jacquart Decl., Ex. 13, Security Agreement at 3.

[148] *See* Dkt # 1-4, Compl., Ex. D, Indenture, § 6.22.

[149] 450 U.S. at 565 (internal citations omitted).

[150] *Crowe & Dunlevy v. Stidham*, 640 F.3d 1140, 1151 (10th Cir. 2011) (finding that lawyers' admission to practice in tribal court, by itself, was not sufficiently related to tribal court's order that lawyers had to return fees paid to it by the tribe to justify tribal-court jurisdiction over fee issues under the first *Montana* exception because the fee order "had nothing to do with conduct of [the firm's] attorneys practicing before the court.").

[151] *See* Dkt # 1, Complaint, ¶¶ 16-17.

authority" in the form of the Tribal Court Statement of Claim directly relates to those consensual relationships.

Godfrey served as legal counsel to the Tribe and the Corporation for the Bond Transaction and issued opinions regarding it.[152] Godfrey lawyer Brian Pierson communicated with tribal officials about the Bond Transactions and came to the Tribe's reservation and met with the Tribal Council and the Board of Directors of the Corporation (on tribal trust land) to explain the Bond Transaction to them on January 2, 2008.[153] Stifel served as the Tribal Defendants' financial advisor and as underwriter for the Bond Transaction.[154] Stifel representative Kevin Shibilski, was also at the January 2, 2008 meeting to explain and "sell" the Bond Transaction to the Tribal Defendants.[155]

Saybrook purchased the Bonds and has attempted to enforce the Bond Documents against the Tribal Corporation. Indeed, Saybrook has maintained, in an earlier suit in this saga, that it is the *real party in interest* in the Bonds.[156] Saybrook is the entity that insisted on adding many of the management controls directly affecting the on-Reservation Casino into the Bond Documents,[157] and who, through Wells Fargo,

---

[152] *See, e.g.*, Dkt # 1-6, Compl., Ex. F, Issuer Opinion Letter, 1 ("We have acted as counsel for the Lake of the Torches Economic Development Corporation . . . and as counsel for the Tribe in connection with the issuance by the Corporation of tis $50,000,000 Taxable Gaming Revenue Bonds . . ..").

[153] Big John Decl., ¶¶ 11, 15; s*ee also See* Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim 14; *see also* Decl. of Victoria Doud in Supp. of Mot. and in Opp. to Pls.' Mots for Prelim. Inj., ¶ 3.

[154] Big John Decl., ¶¶ 7-10.

[155] Big John Decl., ¶ 15; s*ee also See* Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim 14; *see also* Doud Decl., ¶ 3.

[156] *See* Jacquart Decl., Ex. 25, Pls.' Opening Br. on Subject-Matter Jurisdiction, Standing, and Sovereign Immunity, *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, Case No. 09-cv-768, at 12 (W.D. Wis. Feburary 17, 2012) (arguing that "Saybrook is the real party to the controversy").

[157] *See* Jacquart Decl., Ex. 28, email from Scott Bayliss, Managing Director, Saybrook Capital, LLC to Mike Schinzer, et al. (December 13, 2007, 17:45); *see* Jacquart Decl., Ex. 29, email from

exercised control over the Casino's on-Reservation revenues before the Indenture was declared void by making Corporation officials explain and justify their operating expenses each month before being permitted to pay them.[158] Saybrook also engaged with the Tribal Defendants the year after the Bond Transaction in an attempted renegotiation of the Bond Transaction, and throughout that process made similar demands on the Corporation officials.[159]

The Plaintiffs' consensual relationships with the Tribal Defendants, therefore, are *directly related* to the subject matter of the Tribal Court Action, *i.e.*, the enforceability of the Bond Documents. This is not a situation like *Strate*, for example, where the Supreme Court found that a tribal court lacked jurisdiction over a tort action based on a car accident involving a tribal-member victim and a tortfeasor who had a subcontract with the tribes at issue but the tribes were "strangers to the accident."[160] Rather, the Tribal Defendants' Tribal Court Action centers on the Bond Transaction and arises from the consensual relationships each of the Plaintiffs had with the Tribal Defendants.

Stifel and Saybrook argue in support of their motions for a preliminary injunction that because they were not doing anything on the Tribe's Reservation, their consensual relationships with the Tribal Defendants are irrelevant.[161] First, as noted, Stifel and Godfrey did have substantial contact with the Tribal Defendants *on tribal trust land on the Reservation*. And second, Saybrook negotiated and has attempted to enforce the

---

Scott Bayliss, Saybrook Capital, LLC to Tom Griggs and Rick Lindsley (December 19, 2007, 16:02 PST).
[158] Maki Decl., ¶ 9.
[159] *See Id*. at ¶ 27.
[160] 520 U.S. at 457.
[161] *See* Dkt # 18, Pls. Saybrook and Wells Fargo's Br. in Supp. of Their Rule 65 Mot. for Prelim. Injunctive Relief, 15; Dkt # 6, Stifel Pls.' Br. in Supp. of Mot. for Prelim. Inj., 15.

Bonds to permit Saybrook to come on the Tribe's trust land and seize revenues, fixtures, and equipment.

Moreover, the case law does not so limit *Montana*'s first exception. Those who enter into consensual relationships with tribes or their members do not have to be located on reservations to be subject to tribal court jurisdiction under the first exception. In two recent cases, federal district courts in North and South Dakota found that jurisdiction was possible under the first *Montana* exception even though the non-Indian defendants to the tribal court actions were located off the reservation.[162]

The Supreme Court also recognized such jurisdiction in *Plains Commerce Bank*. In that case, a nonmember bank located off the reservation had entered into a series of agreements with tribal members and their company (the "Longs") regarding loans and land for the company's on-reservation cattle business.[163] The Longs brought breach-of-contract and discrimination claims against the bank in tribal court. The court awarded money damages and the option to re-purchase a portion of the land the bank had seized from them.[164] When the case reached the Supreme Court, the only issue was whether the tribal court had jurisdiction to award the Longs the right to repurchase fee land from the bank based on their discrimination claims against the bank. The Longs' breach-of-contract action and monetary award of damages therefrom were not before the Court.[165]

---

[162] *Dish Network Serv., LLC v. Laducer*, No. 09-10122, 2012 WL 2782585 (D.N.D. 2012) (finding tribal-court jurisdiction over off-reservation contractor who had entered into contract for television services to tribal member residing on the reservation); *Federal Trade Comm'n v. Payday Financial, LLC,* No. 11-3017, 2013 WL 13093437 (finding that tribal-court jurisdiction over non-Indian borrowers who entered into loan agreements with on-reservation lenders could be subject to tribal-court jurisdiction but declining to enter summary judgment due to presence of arbitration clause in loan agreements).

[163] 554 U.S. at 320-21.

[164] *Id.* at 323.

[165] *Id.* at 324.

The Court noted, however, that "*the Bank may reasonably have anticipated that its various commercial dealings with the Longs could trigger tribal authority to regulate those transactions*—a question we need not and do not decide."[166]  If Saybrook and Stifel were correct that a tribal court could never exercise jurisdiction under the first *Montana* exception over a non-Indian located off-reservation, the Court would have had no reason to recognize this jurisdictional hook. The Court's ruling that tribal court jurisdiction was lacking was limited to the issue of whether the tribe (through its tribal court) could "regulate the Bank's sale of land it owned in fee simple."[167]

Saybrook and Stifel do correctly note that some cases have used broad language to suggest that tribal authority is limited to on-reservation conduct, but those cases are distinguishable. They generally involve situations where tribes are attempting to regulate what nonmembers do *off-reservation*, not situations where a tribe is regulating how a nonmember interacts with the tribe or accesses on-reservations tribal resources. For example, in *Hornell Brewing Co. v. Rosebud Sioux Tribal Court*, the Eighth Circuit held that the Rosebud Sioux Tribe couldn't regulate how a brewing company advertised off the reservation, even though its advertising violated tribal law.[168] And in *Philip Morris USA, Inc. v. King Mt. Tobacco Co., Inc.*, the Ninth Circuit found that the Yakama Tribal Court could not exercise jurisdiction over claims by a tribal-member-owned tobacco company for a declaratory judgment that it hadn't infringed on Philip Morris's

---

[166] *Id.* at 338 (emphasis added). This language makes clear that contrary to Saybrook's assertion, *see* Saybrook's brief at 10, the Court did *not* rule that nonmembers must explicitly consent to tribal court jurisdiction for the Montana exceptions to apply.
[167] *Id.*
[168] 133 F.3d 1087, 1091 (8th Cir. 1998) ("The activities at issue in this case are the Breweries' manufacture, sale, and distribution of Crazy Horse Malt Liquor. It is undisputed that the Breweries do not conduct those activities on the Rosebud Sioux Reservation within South Dakota.").

trademark[169] because the suit involved determinations about whether King Mountain had distributed cigarettes nationwide and Philip Morris had no consensual relationship with the tribal-member-owned tobacco company.[170] The present case differs significantly from those suits because here, the center of the Bond Transaction is tribal trust land on the Band's reservation and the center of the Tribal Court Action is the Plaintiffs' consensual relationships with the Tribal Defendants.

### 4. Even if *Montana* applied to this case, the Tribal Court would have jurisdiction under the second *Montana* exception.

Again, assuming that *Montana* could even apply here, the Tribal Court also has jurisdiction under the second *Montana* exception, i.e. that a tribe retains inherent authority over nonmembers on non-Indian fee lands within its reservation "when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."[171] The conduct at issue in the Tribal Court Action is the Plaintiffs' entering into a series of contracts to exercise management and operational control over the Tribal Defendants' most important resource, its Casino (which is located on the Reservation on tribal trust lands), without following both Tribal and federal law.[172] In the only preclusive decision concerning the Bond Transaction, the Seventh Circuit confirmed the Indenture was void *ab initio* because it did not meet the requirements of IGRA, which imposes federal approval requirements on management contracts like the Indenture in order to safeguard tribal assets.[173]

---

[169] 569 F.3d 932, 936 (9th Cir. 2009).
[170] *Id.* at 943.
[171] *Montana*, 450 U.S. at 566.
[172] *See generally*, Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim.
[173] As the Seventh Circuit observed:

Before the Indenture was declared void, the Bond Transaction had already had devastating effects on the Tribe's political integrity—by causing the Tribe to restructure and eliminate many governmental programs—and on its economic security and its members' health and welfare. As a result of the unapproved (and fraudulently obtained)[174] Bond Transaction, services and payments to tribal members were drastically reduced, government programs were eliminated, and many tribal employees were laid off. As detailed in the Tribal Court Statement of Claim:

- The Corporation's minimum monthly payment on the Bonds exceeded $750,000.00.

- But Casino revenue is cyclical and varies dramatically from month to month. While the revenue during the spring and summer months exceeded the monthly Bond payments, during the winter months, the Casino revenue was insufficient to meet both the debt service on the Bonds and to reinvest in the Casino at the levels

---

Congress enacted this legislation to provide a comprehensive regulatory framework for gaming operations by Indian tribes that would promote tribal economic self-sufficiency and strong tribal governments while shielding them from organized crime and other corrupting influences. Congress explicitly expressed a concern that Indian tribes be the primary beneficiaries of fair and honest gaming operations. *See* 25 U.S.C. § 2702(1)-(2). When we turn to the specific provisions governing the content of management contracts, we find that Congress attempted to implement these legislative goals by conditioning, through § 2711(b), the Chairman's approval of a management contract on the inclusion in the contract of several provisions designed to protect the interests of the Indian tribe. For example, the contract must provide "for adequate accounting procedures" and "verifiable financial reports ... prepared, by or for the tribal governing body." 25 U.S.C. § 711(b)(1). The contract also must allow tribal officials to have "access to the daily operations [and] ... to verify the daily gross revenues and income" of the gaming facility. *Id.* § 2711(b)(2). In addition, the contract must provide "for a minimum guaranteed payment to the Indian tribe that has preference over the retirement of development and construction costs," id. § 2711(b)(3), and it must specify "an agreed ceiling for the repayment of development and construction costs." *Id.* § 2711(b)(4). The contract cannot last more than five years unless the Chairman determines "that the capital investment required, and the income projections, for the particular gaming activity require the additional time." *Id.* § 2711(b)(5). Finally, the contract must set out "grounds and mechanisms" by which it may be terminated. *Id.* § 2711(b)(6).

*Wells Fargo 7th Cir.*, 658 F.3d at 694-95.
[174] *See* Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim ¶¶ 51-75.

that the Corporation historically had to maintain to ensure the business's profitability.

- Because Saybrook, Stifel, and Godfrey structured the Bond Transaction to use Casino revenues to pay Saybrook ahead of anyone else, in some months there would be literally no money left over for the Corporation to reinvest in key performance assets.

- The Corporation's inability to maintain normal levels of reinvestment had a direct negative impact on Casino operations, and the Corporation is still working to recover from these deficiencies.

- The Casino is virtually the only source of income for the Tribe's governmental operations.

- Historically, the Tribe has depended on transfers from the Casino totaling between $17 million and $18 million each year. But under the waterfall set by the Bond Transaction, in some months all of the Casino revenues were diverted to Saybrook and there was no money left over for the Tribe's governmental operations.

- The reduction in transfers and funding placed severe stress on the Tribe's governmental operations. For example, in the fiscal year ending September 30, 2008, the Casino distributed only $8.2 million to the Tribe—$9.5 million less than the Tribe's FY 2007-08 budget expectation.

- In addition to the complete elimination of any per capita distributions to the members, the Tribe was forced to suspend and terminate important governmental and social programs after the Corporation issued the Bonds. For example:

  o Between 2008 and 2009, the Tribe was forced to make a 15% cut in wages of Tribal employees;

  o In 2009, the Tribe was forced to cut those Tribal-employee wages an additional 19.5%;

  o Tribal members, who until 2007 had received annual per capita income ranging from $1,200 to $1,500 during the Thanksgiving and Christmas holiday season received nothing in 2008 and 2009;

  o The Tribe's Land Purchase Program, which had been aimed at restoring former lands owned by the Tribe or its members to Tribal ownership, was terminated;

  o The Census and Demographics program, which is key to planning and developing Tribal programs by identifying Tribal and membership needs, was suspended;

35

- General-fund support for WIA Comprehensive Services, a workforce-development program was eliminated;

- The Cultural/Prevention Program, which used traditional ceremonies and events to reduce alcohol and drug abuse was suspended;

- The Transportation Program, which provided much-needed transportation to higher-education students, was eliminated;

- The Building Inspection Program, which provided assistance to low- and moderate-income members for housing maintenance and repair to meet building and safety requirements was eliminated;

- The Tribal Youth Work Program, which provided summer-employment opportunities to tribal youth was eliminated;

- The GIS Mapping & Inventory Project, which catalogued reservation lands, was suspended;

- The Tribe eliminated funding for the Fish and Game Program, which monitored, managed, and protected fish and game within the reservation boundaries; and

- The Tribe could not fulfill its intention to hire a licensed social worker.

- In addition to suspending and eliminating these programs, the stress of the Bond payments forced the Tribe to substantially reduce other important Tribal governmental and social programs. In addition to other cuts:

  - The Tribe cut law enforcement budgeted funding by 23%;

  - The Tribe cut Tribal Court budgeted funding by 33%;

  - The Tribe cut funds for Tribal-member-scholarship programs and financial assistance to complete secondary and post-secondary education by 23% (approximately $140,000);

  - The Tribe cut Youth Sport and Fitness Program funds that had provided sports-team equipment and tournament-entrance fees for more than 400 youth annually, and had funded healthy-living and lifetime-sports activities and socialization programs, trips, and cultural exchanges by 76% ($330,000);

  - The Tribe cut Elderly Care Chore Worker funds that provided need-based assistance to Tribal elders to enhance their quality of live and extend life expectancy by 87.5% ($245,000);

  - The Tribe cut funding for a museum housing numerous irreplaceable artifacts by $73,000, forcing termination of the museum's curator;

36

- o The Tribe cut funding to repair and upgrade reservation roads by 100% ($250,000) for several years running; and

- o The Tribe cut health-care funding for Tribal members, their descendants, and other Native Americans without health insurance by over $1,400,000.

- As the pressure of the Bond payments mounted, the Tribe worked to prioritize critical governmental services. But in 2009, it faced the grim prospect of having to shutter the Tribal Governmental Center and send home all governmental staff because it could not afford to keep the Center open or to keep the staff on the payroll.[175]

In light of these facts, it is difficult to overstate the effect of the Bond Transaction on the Tribe's economic security and its political integrity.

The perilous effects of the Bond Transaction on the Tribe and its members occurred on-reservation. Under these circumstances, it is of no consequence whether the activities causing on-reservation harm occurred on- or off-reservation.  In the only second-*Montana*-exception case to have reached the 7th Circuit, *Wisconsin v. EPA*,[176] the court upheld tribal jurisdiction over reservation water quality, which had been confirmed by the EPA, including the tribe's right to enforce its water-quality standards against nonmembers residing on fee land they owned within reservation boundaries. The Court also noted that the tribe could, as the 10th Circuit had already held, require "upstream off-reservation dischargers . . . to make sure that their activities do not result in contamination of the downstream on-reservation waters . . .."[177] The Seventh Circuit noted that "[t]here is no case that expressly rejects an application of *Montana* to off-reservation activities that have significant effects within the reservation,"[178] and held that "[b]ecause the Band has demonstrated that its water resources are essential to its

---

[175] *See* Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim ¶¶ 76-85; Maki Decl. at ¶¶ 25-28.

[176] 266 F.3d 741 (7th Cir. 2001).

[177] *Id.* at 748 (citing *Albuquerque v. Browner*, 97 F.3d 415 (10th Cir. 1996).

[178] *Id.* at 749.

survival, it was reasonable for the EPA, in line with the purposes of the Clean Water Act and the principles of *Montana*, to allow the tribe to regulate water quality on the reservation, even though the power entails some authority over off-reservation activities."[179] And so it is here.

Casino revenues are essential to the Tribe's political integrity and economic security, and to the health and welfare of its members. Both tribal and federal law mandate that the Tribe must possess the sole-proprietary-interest in its Casino and that all management contracts be approved.[180] Where a tribe enforces regulations that are "intended to secure the tribe's political and economic well-being" against nonmembers and the nonmember activities have had the type of impact the regulations were designed to prevent, a tribe meets its burden of showing "colorable" tribal-court jurisdiction.[181] That is true even if enforcing the regulations may affect off-reservation businesses.[182] Even accepting Plaintiffs' unsupported argument that *Montana* applies to this *tribal-trust-land transaction*, the Tribal Court has jurisdiction under the second *Montana* exception.

## B. REQUIRING PLAINTIFFS TO EXHAUST THEIR TRIBAL COURT REMEDIES FURTHERS IMPORTANT FEDERAL POLICIES.

The Tribal Defendants offer this jurisdictional analysis to demonstrate that their Tribal Court Statement of Claim more than satisfies the low bar needed for this Court's present purposes. Where, as here, Tribal Court "jurisdiction is colorable or plausible,"

---

[179] *Id.*
[180] *See* 25 U.S.C. §§ 2710(b)(2)(A), 2711; Big John Decl., Ex. C, Tribal Gaming Control Ordinance, § 43.403.
[181] *See Elliott*, 566 F.3d at 850 (finding that, even if *Montana* applied, White Mt. Apache tribal court likely had jurisdiction over claim against non-resident nonmember who had started a forest fire on tribal lands).
[182] *Wisconsin v. EPA,* 266 F.3d at 750.

then the Court must look to the *National Farmers* tribal-court-exhaustion rule because "exhaustion of tribal court remedies is required."[183]

"The comity *National Farmers* seeks to afford tribal courts . . . is more than judicial courtesy. It is based on the federal government's policy of promoting tribal self-government and on the federal courts' respect for tribal courts as judicial bodies."[184] The Supreme Court recognized that "unconditional access to the federal forum" would impair tribal self-governance in several ways.[185] First, "[a] federal court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair the authority of tribal courts[.]"[186] Second, "[a]djudication of such matters by any nontribal court also infringes upon tribal law-making authority" by allowing federal courts to interpret and apply tribal law.[187] And third, "[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty[,]" so "[c]ivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute."[188] It is precisely this tribal authority that the Plaintiffs seek to evade. But the federal policy favoring self-determination requires

---

[183] *Elliott,* 566 F.3d at 848 ("If jurisdiction is colorable or plausible, then . . . exhaustion of tribal court remedies is required.") (internal citation omitted).

[184] *Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa,* No. CV12-8030-PCT-DGC, 2012 WL 1207149 ("*Skywalk I*"), at *6, affirmed at ___ F.3d ___, 2013 WL 1777060 (9th Cir. 2013) ("*Skywalk II*"). *Accord Iowa Mut. Ins. Co.,* 480 U.S. at 14 (describing the "the Federal Government's longstanding policy of encouraging tribal self-government[]" and tribal courts' "vital role" in effectuating that self-governance ) (citing as examples *Three Affiliated Tribes v. Wold Eng'g,* 476 U.S. 877, 890 (1986); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 138, n.5 (1982); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143–44, and n.10 (1980); *Williams v. Lee,* 358 U.S. 217, 220–21 (1959); 25 U.S.C. §§ 450, 450a (Indian Self-Determination and Education Assistance Act); 25 U.S.C. §§ 476–479 (Indian Reorganization Act); 25 U.S.C. §§ 1301–1341 (Indian Civil Rights Act)).

[185] *Id.* at 16.

[186] *Id.* at 15.

[187] *Id.* at 16.

[188] *Id.* at 18 (citing *Montana,* 450 U.S. at 565-66 (1981); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 152–53 (1980); *Fisher v. District Court,* 424 U.S. 382, 387–89 (1976)).

this Court to "provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal basis for the challenge."[189]

The exhaustion rule also offers important practical benefits.[190] For example, questions of tribal-court jurisdiction "require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions."[191] By requiring tribal-court exhaustion, "the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court" before a party may ask this Court to rule on such complex questions.[192]

As the Supreme Court has recognized, "[t]he risks of the kind of 'procedural nightmare' that has allegedly developed in this case will be minimized if the federal court stays its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction and to rectify any errors it may have made."[193] The same jurisdictional questions the Plaintiffs have asked this Court to consider are now before the Tribal Court because at the same time they commenced this suit, each of the Plaintiffs in this case moved the Tribal Court to dismiss the case against them for lack of

---

[189] *Nat'l Farmers Union*, 471 U.S. at 856.
[190] Even before the Supreme Court announced the exhaustion rule, federal courts have recognized the utility of requiring plaintiffs to exhaust their tribal remedies. *E.g. Jacobson v. Forest Cnty. Potawatomi Cmty.*, 389 F. Supp. 994, 996 (E.D. Wis. 1974) (suggesting plaintiff should avail herself of tribal remedies before bringing federal suit).
[191] *Nat'l Farmers Union*, 471 U.S. at 855-56.
[192] *Id.* at 856.
[193] *Id.* at 856-57.

jurisdiction.[194] The Tribal Court has not yet had the opportunity to rule on any of those motions. The Plaintiffs in the instant case have asked both courts to pass on the Tribal Court's jurisdiction *at the same time*. The Supreme Court has already decided that in such cases, this Court should "stay its hand[.]"[195]

### C. THE "EXHAUSTION RULE" IS PARTICULARLY IMPORTANT WHERE, AS HERE, THE CASES INVOLVE TRIBAL ACTORS AND CONCERN ISSUES OF TRIBAL LAW.

As the Supreme Court recognized, "tribal courts are best qualified to interpret and apply tribal law."[196] And where, as here, "many of the parties are Tribal entities . . . and the dispute arises from Tribal governmental activity involving a project located within the borders of the reservation[,]" exhaustion is "especially appropriate."[197] Similarly, the policies supporting the exhaustion rule are particularly strong "when litigation concerns the validity of a tribal ordinance—an issue that goes to the heart of tribal self-government and self-determination."[198] In cases like this, allowing the Tribal Court to assess its jurisdiction in the first instance "will . . . provide other courts with the benefit of [its] expertise in such matters in the event of further judicial review."[199]

---

[194] Jacquart Decl., Ex. 26, Def. Godfrey & Kahn, S.C.'s Notice of Mot. and Mot. to Dismiss the Statement of Claim for Lack of Subject-Matter Jurisdiction; Jacquart Decl., Ex. 27, Br. of Stifel, Nicolaus & Co., Inc. and Stifel Financial Corp.

[195] *Iowa Mut. Ins. Co.*, 480 U.S. at 14.

[196] *Id.* at 16.

[197] *Bruce H. Lien v. Three Affiliated Tribes*, 93 F.3d 1412, 1420 (8th Cir. 1996). *Contra Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 814 (7th Cir. 1983) (contrasting cases that applied the exhaustion rule to "reservation affairs" and refusing to require tribal-court exhaustion to the case before it where "there has been no direct attach on a tribal court's jurisdiction, there is no case pending in tribal court[.]").

[198] *Skywalk I*, 2012 WL 1207149, at *1. *Contra Altheimer & Gray*, 983 F.2d at 814 ("[T]he dispute does not concern a tribal ordinance as much as it does state and federal law."). Godfrey well understands that questions of tribal governance must be submitted first to a tribal court. It successfully argued as much on behalf of the Forest County Potawatomi Tribe in *Koopman v. Forest Cnty. Potawatomi Member Benefits Plan*, No. 06-C-163, 2006 WL 1785769, *3 (E.D. Wis. June 26, 2006).

[199] *Nat'l Farmers Union*, 471 U.S. at 857.

Here, management of the tribal Casino is a "reservation affair[,]" just as an earlier court agreed that management of a tribal housing authority was.[200] This dispute concerns the immunity of tribal actors involving a transaction directed at a tribal enterprise on tribal lands that is the primary source of the tribe's governmental revenue, and one of the jurisdictional arguments the Plaintiffs raise concerns the interpretation of a jurisdictional provision of the Tribal Court Code.[201] These facts render it a "'reservation affair' subject to the tribal exhaustion rule[.]"[202]

In support of their preliminary injunction motions, the Plaintiffs argue that *any* exercise of tribal jurisdiction is improper because they believe the events giving rise to this dispute occurred outside of the reservation, and they interpret the jurisdictional clauses of the void Bond Documents to prohibit the Tribal Court suit. But "[t]hose assertions frame exactly the type of threshold jurisdictional matter that should be decided in the first instance in the tribal forum."[203] Because "[t]he requirement of exhaustion of tribal remedies is not discretionary; it is mandatory[,]"[204] due deference to that Tribal Court demands that this Court require the Plaintiffs to exhaust those remedies.

---

[200] *Buchanan v. Sokaogon Chippewa Tribe*, 40 F. Supp. 2d 1043, 1048 (E.D. Wis. 1999).
[201] *See generally*, Big John Decl., Maki Decl.
[202] *Barker v. Menominee Nation Casino*, 897 F. Supp. 389, 396 n.6 (E.D. Wis. 1995).
[203] *See* Jacquart Decl., Ex. 22, Memorandum, *Native Am. Marketing and Dev. Corp. v. West Electronics, Inc.*, Civ. No. 04-0464, at *4 (D.D.C. April 26, 2004); s*ee also Duncan Energy v. Three Affiliated Tribes*, 27 F.3d 1294, 1300 (8th Cir. 1994) (holding that a "dispute arising on the Reservation that raises questions of tribal law and jurisdiction . . . should first be presented to the tribal court.").
[204] *Burlington N. R.R. v. Crow Tribal Council*, 940 F.2d 1239, 1245 (9th Cir. 1991). *Accord Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840, 849 (8th Cir. 2003) ("Exhaustion is mandatory, however, when a case fits within the policy[.]").

42

### D. THE LIMITED EXCEPTIONS TO THE EXHAUSTION RULE DO NOT APPLY HERE.

Against these important tribal and federal considerations, the Supreme Court has outlined narrow exceptions to the exhaustion rule. Exhaustion may be waived where (1) "an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith[;]" (2) "where the action is patently violative of express jurisdictional prohibitions[;]"[205] (3) "where exhaustion would be futile because of the lack of adequate opportunity to challenge the court's jurisdiction[;]" or (4) "when it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by *Montana*'s main rule, so the exhaustion requirement would serve no purpose other than delay."[206]

In arguing for a preliminary injunction, Saybrook argues that this case meets the first "bad faith" exception. Although Godfrey avoids using the words "bad faith" it nevertheless argues that this case meets some unexpressed exception that blends the "bad faith" and "futility" exceptions. And Stifel joins Saybrook in arguing that this case meets the fourth "plainly lacking" exception. But each of these arguments fails. A federal court may enjoin the conduct of litigation in tribal court "only in the most extraordinary circumstances[.]"[207] This case does not meet that bar.

### 1. The "bad faith" exception does not apply in this case.

Saybrook argues that "to require exhaustion would . . . be improper based on the Tribe and [Corporation]'s bad faith."[208] Godfrey similarly invites the Court to view the

---

[205] *Iowa Mut. Ins. Co.*, 480 U.S. at 19 n.12 (citing *Nat'l Farmers*, 471 U.S. at 856 n.21) (internal quotation omitted).

[206] *Nevada v. Hicks*, 533 U.S. 353, 369 (2001) (internal citation and quotation omitted).

[207] *Iowa Mut. Ins. Co.*, 480 U.S. at 21 (Stevens, J., concurring in part and dissenting in part).

[208] *See* Dkt # 18, Pls. Saybrook and Wells Fargo's Br. in Supp. of Their Rule 65 Mot. for Prelim. Injunctive Relief, 18.

Tribe with "extreme caution and skepticism" to avoid tribal-court exhaustion.[209] Both are wrong on the law and the facts.

### a. The "bad faith" exception only applies to the tribal court.

First, although the Supreme Court stated in *National Farmers* that exhaustion is not necessary "where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith[,]'"[210] it "gave no guidance as to what it meant by 'an assertion of tribal jurisdiction.'"[211] Other courts have interpreted *National Farmers* to "confine the bad faith exception to actions of tribal courts[,] and . . . decline to apply the exception when one of the parties before the tribal court can be accused of acting in bad faith."[212]

The Ninth Circuit has adopted this analysis.[213] It recognized that "our tribal court counterparts can identify and punish bad faith by litigants as readily as we can[,] and

---

[209] *See* Dkt # 43, Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., 19.

[210] *Nat'l Farmers*, 471 U.S. at 856 n.21 (quoting *Juidice v. Vail*, 430 U.S. 327, 338 (1977)).

[211] *Skywalk I*, 2012 WL 1207149, at *2.

[212] *Id.* at *2-4 (discussing *Rogers–Dial v. Rincon Band of Luiseno Indians,* No. 10cv2656–WQH–POR, 2011 WL 2619232 (S.D. Cal. July 1, 2011); *Legg v. The Seneca Nation of Indians*, 518 F. Supp. 2d 274 (D.D.C. 2007); *Landmark Golf Ltd. P'ship v. Las Vegas Paiute Tribe,* 49 F. Supp. 2d 1169 (D. Nev. 1999); *Melby v. Grand Portage Band of Chippewa,* No. CIV 97–2065, 1998 WL 1769706 (D. Minn. Aug. 13, 1998); *Calumet Gaming Grp.–Kan., Inc. v. The Kickapoo Tribe of Kan.*, 987 F.Supp. 1321 (D. Kan. 1997); *Espil v. Sells*, 847 F. Supp. 752 (D. Ariz. 1994). The *Skywalk I* Court held that, in contrast, the broader-reading cases included only "isolated statements[,]" (*id.* at *4 (discussing *A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411 (9th Cir. 1986) and *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943 (9th Cir. 2008)), were "accompanied by virtually no analysis or explanation[,]" (*id.* at *5 (discussing *Superior Oil Co. v. United States*, 798 F.2d 1324 (10th Cir. 1986)), "predate[d] the exhaustion requirement[,]" (*id.* at *5 (discussing *Dodge v. Nakai*, 298 F. Supp. 26 (D. Ariz. 1969)), and "d[id] not represent a considered analysis of the exception's scope." *Id.* (discussing *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916 (9th Cir. 2008)).

[213] It affirmed The *Skywalk I* court's holding that the "bad faith" exception to exhaustion could only apply if the Tribal Court itself had acted in bad faith – finding that the broader-reading cases included only "isolated statements[,]"were "accompanied by virtually no analysis or explanation[,]""predate[d] the exhaustion requirement[,]"and "d[id] not represent a considered

concluded that "the interpretation most faithful to *National Farmers* is that it must be the tribal court that acts in bad faith to exempt the party from exhausting available tribal court remedies."[214] This court should follow the "cases that have actually addressed the scope of the bad-faith exception" to do the same.[215] As a Minnesota District Court observed, "[a]n allegation that a tribal court claim is brought in bad faith does not mean that an assertion of subject matter jurisdiction by the tribal court over that claim would be in bad faith."[216] Because the Plaintiffs have not alleged—and there is no evidence to support a finding—that the Tribal Court (which has not done anything more than issue summonses and accept filings of the parties) has acted in bad faith, the exception does not apply.

### b.  Neither the Corporation nor the Tribe has acted in bad faith.

There is no evidence whatsoever that the *Tribal Court's* assertion of jurisdiction would possibly be "motivated by a desire to harass or is conducted in bad faith." This necessarily ends the "bad faith" inquiry. But to be clear, there is also no evidence that either the Corporation or the Tribe have acted in bad faith.[217]

### i.        The "delay" in commencing the Tribal Court Action.

The Plaintiffs contend the Tribal Defendants unnecessarily delayed in bringing their Tribal Court action, and so should be estopped from asserting their Tribal Court rights. First, the ancient doctrine of *nullem tempus occurit regi* applies to tribes as well

---

analysis of the exception's scope." It held that any other reading "would entirely disregard the judicial abilities of tribal courts[.]"CITE

[214] *Skywalk II*, 2013 WL 1777060, at *4.

[215] *Skywalk I*, 2012 WL 1207149, at *6.

[216] *Melby v. Grand Portage Band of Chippewa*, No. CIV 97-2065, 1998 WL 1769706, at *5 (Aug. 13, 1997 D. Minn.).

[217] In fact, it is *Saybrook and Wells Fargo* who initiated the procedural brinksmanship that ultimately landed them in Tribal Court.

as kings, so estoppel and laches do not bar exercise of sovereign rights.[218] But, second, the Tribal Defendants also had good cause to wait. The Tribe was never a party to *any* federal-court action concerning the Bond Transaction before it was named in the Waukesha case (which itself was stayed until this Court resolved whether it had subject-matter jurisdiction over Saybrook's suit before this Court). So questions of Tribal Constitutional Law specific to the Tribe simply were not in play until this Court's May 30, 2013 order dismissing Saybrook's case.

The Corporation did not commence a parallel suit while the federal cases were pending for precisely the reasons Godfrey so states. For 10-and-a-half pages in support of its requested preliminary injunction, it explains why the Tribal Court should not pass on issues that a federal court has already decided, and it was for precisely this reason that the Corporation believed that the federal court should answer the federal questions presented by the earlier federal cases without even the potential for conflict with Tribal Court litigation.[219] Moreover, Saybrook's decision to force the litigation out of federal court left the dispute to proceed before a state court that lacks any power over the Tribal

---

[218] *E.g.*, *Catawba Indian Tribe of S.C.*, 865 F.2d 1444, 1448 (4th Cir. 1989) ("Except where Congress provides otherwise, claims based on Indian title are not subject to state law defenses such as statutes of limitations, adverse possession, or laches."); *Swim v. Bergland*, 696 F.2d 712, 718 (9th Cir. 1983) ("Laches or estoppel is not available to defeat Indian treaty rights." (citing *Bd. of Comm'rs v. United States*, 308 U.S. 343 (1939)); *Mille Lacs Band of Chippewa Indians v. Minnesota*, 853 F. Supp. 1118, 1124 (D. Minn. 1994), *aff'd* 124 F.3d 904 (8th Cir. 1997), *aff'd* 526 U.S. 172 (1999) (refusing to apply laches to suit by U.S. and tribes to enforce fishing rights). The single Supreme Court case to depart from this rule is entirely distinguishable from this case. *City of Sherrill v. Oneida Nation*, 544 U.S. 197 (2005) (finding that laches precluded tribe from asserting Indian tax immunity on lands they had not occupied or exercised jurisdiction over for nearly 200 years).

[219] *Contra In re. Diet Drugs Product Liability Litig.*, No. 99-Civ.-20593, 2000 WL 1599259 (E.D. Pa. Oct. 26, 2000) (tribal-court exhaustion after final judgment of another court); *Alltel Commc'ns, LLC v. Oglala Sioux Tribe*, No. Civ. 10-5011-JLV, 2010 WL 1999315 (D.S.D. May 18, 2010) (tribal-court exhaustion after consent decree of another court); *Chick Kam Choo v. Exxon Corp*, 486 U.S. 140 (1988) (relitigation exception to the Anti-Injunction Act); *Rutledge v. Scott Chotin, Inc.*, 972 F.2d 820 (7th Cir. 1992) (relitigation exception to the Anti-Injunction Act).

Defendants.[220] The state-court action did not truly commence until late May of this year,[221] but as soon as it did, the Tribal Defendants promptly turned to a court that can exercise jurisdiction over all the parties.

The Tribal Defendants well understand the problems of inter-jurisdictional coordination that parallel litigation can raise, so it was out of respect for the federal process that the Corporation did not commence a parallel Tribal Court Action while Judge Randa, then the Seventh Circuit, then Judge Randa again, and then this Court decided—or could have decided—questions of federal law that would overlap with the Tribal Court's application of Tribal Law. *After* this court decided that it lacked jurisdiction to decide the still-open federal questions[222] that overlap with the Tribal Law

---

[220] *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 (1987) ("State jurisdiction is pre-empted . . . if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.") (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983)); *White Mountain Apache Tribe*, 448 U.S. at 142-43 (1980) (holding that state authority must not unlawfully infringe "on the right of reservation Indians to make their own laws and be ruled by them.") (internal quotation omitted) (citing *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 502 (1979); *Fisher v. District Court*, 424 U.S. 382 (1976) (*per curiam*); *Kennerly v. District Court*, 400 U.S. 423 (1971); *Williams v. Lee*, 358 U.S. 217, 220 (1959)). *See also St. Germaine v. Chapman*, 505 N.W.2d 450, 451 (Wis. Ct. App. 1993) ("This 'comprehensive preemption inquiry . . . examines not only the congressional plan, but also the nature of the state, federal, and tribal interests at stake' in order 'to determine whether, in the specific context, the exercise of state authority would violate federal law.') (quoting *State v. Big John*, 432 N.W.2d 576, 580 (Wis. 1988)).

[221] Stifel faults the Tribal Defendants' decision to commence a parallel suit instead of using Wis. Stat. § 801.54, which allows a circuit court to transfer a case to tribal court. That rule has no application to this situation because it presumes that the circuit court has jurisdiction over the state court case in the first place and that the claims that should be heard in tribal court are the same as those pending in the circuit court. Here, federal and tribal interests preempt Waukesha County's exercise of jurisdiction over the case. Moreover, even if the state-court case could proceed, simply transferring Saybrook and Wells Fargo's complaint into tribal court obviously would not resolve the important questions of Tribal Law presented by the Statement of Claim.

[222] Godfrey argues that the Tribal Parties' Statement of Claim is a "collateral attack" on the Seventh Circuit's decision. Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., at 6 *et seq.* As the Tribal Defendants detailed in earlier briefing, the Seventh Circuit reasoned that the interdependence of the Bond Documents was not "susceptible to resolution on the face of the amended complaint[,]" and held that Judge Randa's decision on

claims, the Tribal Defendants promptly and appropriately turned to a jurisdiction that could decide both the federal and tribal law issues in dispute.[223]

### ii.  Clarification of the Tribal Court's jurisdiction.

The Plaintiffs next complain that the Tribe amended its Court Code before bringing suit. At the outset, by asking this Court to address the effects of the Tribal Code amendments on the Tribal Court's jurisdiction, Saybrook and Godfrey improperly invite the Court to enter an "interpretive thicket" dependent entirely on the application of Tribal statutory and constitutional law.[224] The Court should decline this invitation because "[t]hese constitutional questions are, for good reason, matters of tribal law reserved to the tribal judiciary to resolve."[225]

But even if this Court could reach this question, the amendments did not "broaden"[226] the Tribal Court's jurisdiction; they simply clarified that its statutory jurisdiction is coextensive with the constitutional jurisdiction.[227] As the Tribal

---

this point was "premature[.]" *Wells Fargo 7th Cir.*, 658 F.3d at 701. On this point, the Tribal Defendants incorporate by reference the Corporation's Memorandum in Support of Motion to Reconsider, Alter, and Amend Order, *Saybrook Tax Exempt Investors, LLC, et al. v. Lake of the Torches Econ. Dev. Corp., et al.*, Case No. 12-cv-255, Dkt. # 55. in its entirety. The language of the Seventh Circuit's opinion and the behavior of the parties to the *Wells Fargo* case (which did not include Godfrey) on remand demonstrates that the Seventh Circuit did not actually or necessarily decide the ultimate question of the validity of the Bond Documents, so that remains an open question for the Tribal Court to decide.

[223] *Basil Cook*, 117 F.3d at 66 ("Federal courts, as a general matter, lack competence to decide matters of tribal law[.]"); *Altheimer*, 983 F.2d at 814 ("A tribal court, presumably, is as competent to interpret federal law as it is state law.") (citing *Iowa Mutual*, 480 U.S. at 19)).

[224] *Basil Cook*, 117 F.3d at 68.

[225] *Id.* (citing *Santa Clara Pueblo*, 436 U.S. at 55-56). *Accord Melby*, 1998 WL 1769706, at *10 ("[T]he Court finds this to be purely a question of tribal law, which this Court will not address.").

[226] Dkt # 43, Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., 20.

[227] *Compare* Dkt # 1-13, Compl., Ex. M, Tribal Code, Ch. 1, § 1.102 (2013) *with* Big John Decl., Ex. A, CONSTITUTION AND BYLAWS OF THE LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS OF WIS., art. X, §§ 2-4.

Defendants have already explained in the Waukesha case,[228] the allegedly "narrow categories" that existed before the 2013 amendments included "[a]ll matters which the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa invests, by appropriate ordinance, the Court with jurisdiction[,]" and "all actions brought under the provisions of this Code."[229] Put differently, the Tribal Court always had jurisdiction to hear all cases concerning the violation of tribal law. The Tribal Court Action alleges violation of the Tribe's Gaming Control Ordinance, which is Chapter 43 of the Tribal Code. It fits squarely within the scope of the pre-amendment Code. The Plaintiffs identify no prejudice from these revisions because there is none—the Tribal Court has jurisdiction over the Tribal Court Action today just as it did before the amendment.

### iii.  Tribal Court Code judicial-selection amendments.

The Plaintiffs also complain about amendments that created a *pro tempore* judicial position for certain classes of cases.[230] But the amendment the Tribe adopted cannot possibly prejudice any litigant, let alone demonstrate "bad faith." Under the amendment, the *pro tempore* judges are selected by a majority vote of the Tribal Council, but this is the same manner that judges were selected under the pre-existing code.[231] That is, whether a case comes before a standing or pro tempore judge, that judge would have been appointed by the Tribal Council. Saybrook complains that the Tribal Council appointed a judge "with no notice to or input from the non-Indian

---

[228] Jacquart Decl., Ex. 16, Letter Timothy Hansen, counsel for the Tribal Defendants, to the Hon Lee S. Dreyfus, Jr., Circuit Court Judge, *Saybrook Tax Exempt Investors, LLC, et al. v. Lac du Flambeau Band of Lake Superior Chippewa Indians, et al.*, No. 12-CV-187 (Waukesha County Circuit Court May 13, 2013).
[229] Dkt # 1-12, Compl., Ex. L, Tribal Code, Ch. 80, § 80.102(3) (1996).
[230] Dkt # 1-13, Compl., Ex. M, Tribal Code, Ch. 80, § 80.103(3) (2013).
[231] Dkt # 1-12, Compl., Ex. L, Tribal Code, Ch. 80, § 80.103(2)(a) (1996).

parties,"[232] but that cannot be the test of bad faith.[233] The Tribal Defendants challenge Saybrook to offer any other case where private litigants have an opportunity to advise a government as to who should sit on its judiciary.

The principal effect of the judicial-selection amendments is that, whereas the 1996 Code imposed no specific education or experience requirements for judges, the 2013 Code retains this structure for standing judges but requires *pro tempore* judges (including Judge Fletcher and the appellate judges Saybrook assumes will be "less august"[234]) to be law-trained and licensed, and to have practiced or judged for at least ten years.[235] Here again, the Plaintiffs cannot complain of any actual prejudice by the amendments because there is none.

The Plaintiffs' complaints about Judge Fletcher ignore that he is a well-respected scholar who has literally written the book on Indian law.[236] Judge Fletcher has served as a tribal-court judge on the courts of seven different tribes *besides* Lac du Flambeau

---

[232] Dkt # 18, Pls. Saybrook and Wells Fargo's Br. in Supp. of Their Rule 65 Mot. for Prelim. Injunctive Relief, 18.

[233] *Cf. Melby*, 1998 WL 1769706, at *5 ("Even in the event that the Band established its court system solely to create a means by which to enforce its [ordinance at issue in the commenced case], this exception would not apply. Creating a court so that a tribe has legal recourse when persons do not abide by its laws does not, *per se*, amount to bad faith."). Moreover, the Plaintiffs' argument on this point exemplifies the "pot calling the kettle black" given Saybrook and Wells Fargo's procedural contortions to twice effect a dismissal of their federal cases in order to seek what they perceive are greener pastures in Waukesha.

[234] Dkt # 18, Pls. Saybrook and Wells Fargo's Br. in Supp. of Their Rule 65 Mot. for Prelim. Injunctive Relief, 19.

[235] *Compare* Dkt # 1-12, Compl., Ex. L, Tribal Code, Ch. 80, § 80.103(2)(b) (1996), *with* Dkt # 1-13, Compl., Ex. M, Tribal Code, Ch. 80, §§ 80.103(2)-(3) (2013).

[236] *See* Curriculum Vitae of Mathew L.M. Fletcher at 1 (describing Judge Fletcher's work on the RESTATEMENT OF THE LAW THIRD: THE LAW OF AMERICAN INDIANS (forthcoming)), *available at* http://www.law.msu.edu/faculty_staff/matthew.fletcher.pdf. *See also id.* at 2 (describing citation to Judge Fletcher's work in Cohen's Handbook of Federal Indian Law §§ 4.04, 4.05, 4.06, 6.04 (2012 ed.); *generally id.* at 1-14 (describing Judge Fletcher's published works). Judge Fletcher's unpublished body of work is also extensive. *See generally, id.* at 14-27.

throughout the country for a combined almost-30 years.[237] In this extensive haystack of work, the Plaintiffs cite a single needle—a "paradigm-shifting re-examination by Indian tribes and Indian people about their place in the American constitutional structure"[238]— to extrapolate that *regardless* of his extensive judicial, academic, and authorship credentials, by selecting this article's author, the Corporation and Tribe "have shown an unmistakable intent to harass and delay, to prevent any competent court from reaching a decision on the merits, and to stack the deck against [the Plaintiffs] to the point where there is no chance they can obtain a fair hearing" in Tribal Court.[239]

First, concerns that a tribal court judge "will be unable to apply the appropriate Supreme Court precedents in determining the scope of its own jurisdiction over nonmembers" do not support any recognized exception to the tribal-court exhaustion doctrine.[240] "[A]llegations of bias are not sufficient to excuse exhaustion under any recognized exception."[241] Even the "alleged incompetence of tribal courts is not among the exceptions to the exhaustion requirement[.]"[242] Given the issues presented by the parties' dispute, it is hard to imagine a more competent and accomplished Tribal jurist to preside over the Tribal Court case.

Second, the Plaintiffs' allegations are just that—allegations. The Plaintiffs have not offered any evidence—and the Tribal Parties are aware of none—that demonstrates that Judge Fletcher will not fully, fairly, and impartially decide the issues raised by the

---

[237] *Id.* at 30-32.

[238] Fletcher, *Resisting Federal Courts on Tribal Jurisdiction*, 81 U. COLO. L. REV. 973, 976 (2010).

[239] *See* Dkt # 18, Pls. Saybrook and Wells Fargo's Br. in Supp. of Their Rule 65 Mot. for Prelim. Injunctive Relief, 19.

[240] *Melby*, 1998 WL 1769706, at *5 (citing *Iowa Mutual*, 480 U.S. at 18; *Duncan Energy*, 27 F.3d 1294).

[241] *Skywalk I*, 2012 WL 1207149, at *8.

[242] *Iowa Mut. Ins. Co.*, 480 U.S. at 19.

Tribal Court Action. Even the law review article they say demonstrates Judge Fletcher's bias makes no mention of any of the substantive legal issues that are presented in the Tribal Court case. As the Ninth Circuit recently ruled, procedural changes and *pro tempore* appointments simply do not demonstrate that a tribal court "does not offer an adequate and impartial opportunity to challenge jurisdiction."[243] Just as Presidentially appointed federal judges are expected to fully and fairly hear cases concerning the United States that come before them, and state court judges hear cases against their respective states, tribal judges are expected to fully and fairly hear cases concerning the Tribe that come before the Tribal Court. A litigant's hollow allegations of inherent bias cannot overcome this Court's comity obligations.

### iv.      Tribal Court Code choice-of-law amendments.

Godfrey calls the choice-of-law amendments that instruct the Tribal Court to place the greatest weight on Tribal Law and prioritize the weight of persuasive authority[244] "most troubling."[245] But these provisions are hardly novel and do not demonstrate "bad faith." Just as Wisconsin state courts *first* apply state law and *then* look outside of their jurisdiction when no mandatory authority controls, but may not afford persuasive authority from Florida the same weight as a decision of this Court, the Tribal Court may do the same. The amendment merely acknowledges the distinction between binding and persuasive authority.

The Plaintiffs suggest that the Tribal Court will apply tribal law to "override" federal law, but tribal law incorporates IGRA, the principal federal law applicable to that

---

[243] *Skywalk II*, 2013 WL 1777060 at *5.
[244] *See* Dkt # 1-13, Compl., Ex. M, Tribal Code, Ch. 80, §§ 80.103(2)-(3) (2013).
[245] *See* Dkt # 43, Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., 20.

case, rendering tribal law substantially similar to federal law for many of the claims raised in that action. The single instance of outright conflict between tribal and federal law that Godfrey has identified does not involve substantive law, but rules of procedure.[246] It is axiomatic that courts control their own rules of procedure, and tribal courts are no different.[247] The Plaintiffs' alarm that the Tribal Court may depart from the Federal Rules of Civil Procedure is surprising in light of their earlier strategy to move this action *away from* federal court and into Waukesha Circuit Court[248]—which obviously need not and does not follow the federal rules. The 2013 amendment appears to provide the Plaintiffs *greater* protections by specifically allowing the Tribal Court to "opt in" to federal rules where appropriate—a rule Stifel has already relied on.[249] And *all* the Plaintiffs have already relied on the Tribal Law rule affording off-reservation defendants over a week longer to respond to a statement of claim (the Tribal Court

---

[246] *See* Dkt # 1-13, Compl., Ex. M, Tribal Code, Ch. 80, §§ 80.321 (2013) (allowing the Tribal Court to adopt nonconflicting federal rules of procedure on a case-by-case basis, but providing that if any such federal rule would conflict with Tribal Law, Tribal Law controls). Here, too, the 2013 amendment is consistent with similar tribal-court rules of other tribes. *E.g.*, Lower Sioux Community Rules of Civil Procedure, Rule 1(d), *available at* http://www.lowersioux.com/pdffiles/Rules%20of%20Civil%20Procedure.pdf.

[247] *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982) ("Without regard to its source, sovereign power, even when unexercised, is an enduring presence . . . . To presume that a sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in a commercial agreement turns the concept of sovereignty on its head, and we do not accept this analysis.").

[248] *See generally*, Jacquart Decl., Ex. 26, Saybrook's Opening Br. on Subject-Matter Jurisdiction, *Saybrook Tax Exempt Investors, LLC, et al. v. Lake of the Torches Econ. Dev. Corp., et al.*, Case No. 12-cv-255 (W.D. Wis. May 29, 2012); Jacquart Decl., Ex. 27, Godfrey & Kahn's Resp. Br. in Opp. To Subject-Matter Jurisdiction, *Saybrook Tax Exempt Investors, LLC, et al. v. Lake of the Torches Econ. Dev. Corp., et al.*, Case No. 12-cv-255 (W.D. Wis. June 15, 2012); Jacquart Decl., Ex. 28, Stifel Defs' Resp. Mem. in Opp. To Federal Court Jurisdiction, *Saybrook Tax Exempt Investors, LLC, et al. v. Lake of the Torches Econ. Dev. Corp., et al.*, Case No. 12-cv-255 (W.D. Wis. June 15, 2012).

[249] *See* Jacquart Decl., Ex. 17, Mot. of Stifel, Nicolaus & Co., Inc. and Stifel Financial Corp. to Adopt Fed. R. of Civ. P. 12(b)(1) and Mot. to Dismiss Pls.' Statement of Claim for Lack of Jurisdiction or, in the Alt., to Stay Proceedings, *Lake of the Torches Econ. Dev. Corp., et al. v. Saybrook Tax Exempt Investors, LLC et al.*, 13-CV-115 (Lac du Flambeau Tribal Court May 24, 2013).

equivalent of a complaint) than they would to respond to a complaint under the federal rules.[250] The Plaintiffs can hardly claim that such rules of procedure prejudice them.

## 2. The "futility" exception does not apply in this case.

In a twist on exhaustion jurisprudence, Godfrey has chosen to avoid the "bad faith" label in favor of a never-before-recognized exception to exhaustion. It argues that "it would be 'inherently unfair' to require [federal Plaintiffs] to exhaust tribal procedures that were not in existence at the time they filed suit elsewhere,"[251] and invites this Court to extend a narrow class of cases that applied the "futility" exception.

*First*, the Tribal Defendants are not aware of any case that applies the "inherently unfair" exception Godfrey asks this Court to create, and with good reason. Supreme Court precedent belies the idea that it would be "inherently unfair" for a court to apply current and neutral rules of civil procedure to a case that arose (or even was commenced) before the change. It has explained that "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity."[252] It reviewed cases in which the Court "applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed[,]"[253] noting that there is little "reliance interest in matters of procedure[,]" and held that "[b]ecause rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule

---

[250] *Compare* Fed. R. Civ. P. 12(a)(1)(A)(i) (affording 21 days to answer) *with* Dkt # 1-13, Compl., Ex. M, Tribal Code, Ch. 80, § 80.311(3) (2013) (affording 30 days to answer).
[251] Dkt # 43, Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., 22 (quoting *Krempel*, 125 F.3d at 623).
[252] *Landgraf v. USI Film Products*, 511 U.S. 244, 275 (1994).
[253] *Id.*

at trial retroactive."[254] There is simply nothing unfair about applying neutral rules to a case before the Court—let alone anything so "inherently unfair" that it would overcome the important federal policies supporting the exhaustion rule.

*Second*, it appears that Godfrey has not located any such case either, because it relies solely on cases that applied the "futility" exception to excuse tribal court exhaustion where there *was no tribal court*.[255] This argument is unavailing. The "futility" exception excuses exhaustion only where it "would be futile *because of the lack of adequate opportunity to challenge the court's jurisdiction*[,]"[256] and so "[g]enerally . . . applies narrowly to only the most extreme cases."[257] Obviously, there is no opportunity to challenge the tribal court's jurisdiction "in a nonexistent tribal court[,]"[258] and it would be "inherently unfair" to require exhaustion in such a circumstance.[259] The Lac du Flambeau Court was originally established in 1948, and has taken its current form since 1983. Each of the Plaintiffs has filed motions in the Tribal Court to contest that Court's

---

[254] *Id. See also Brown v. Amoco Oil Co.*, 793 F. Supp. 846, 851 (N.D. Ind. 1992) (interpreting circuit precedent before *Landgraf* to hold "The trial court's application of the trial procedure in effect at the time of the trial does not seem to raise the same concerns as the retroactive application of provisions defining a party's substantive rights and obligations. That is, procedural rules generally regulate trial proceedings, and these rules are not generally targeted at proscribing unwanted conduct. Therefore, it does not seem unfair to require parties to comply with the rules of procedure applicable at the time in which they begin a new trial proceeding, especially considering that most persons and entities are not likely to conform their conduct in light of a slight change in the procedure that will be rendered if they violate the law.").

[255] Dkt # 43, Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., 22-23.

[256] *Iowa Mut. Ins. Co.*, 480 U.S. at 19 n.12 (quoting *Nat'l Farmers Union*, 471 U.S. at 856 n. 21) (internal quotation omitted) (emphasis added).

[257] *Skywalk II*, 2013 WL 177060 at *5 (citing *Johnson v. Gila River Indian Cmty.*, 174 F.3d 1032, 1036 (9th Cir. 1999) and *Krempel v. Prairie Island Indian Community*, 125 F.3d 621, 623 (8th Cir. 1997)).

[258] *Wasker, Dorr, Wimmer & Marcouiller, P.C. v. Bear*, No, 04-1917, 2006 WL 3017875, at *4 (Iowa Ct. App. Oct. 25, 2006). *Accord Comstock Oil & Gas, Inc. v. Alabama & Coushatta Indian Tribes of Tex.*, 78 F. Supp. 2d 589, 596 (E.D. Tex. 1999) ("The court agrees with Plaintiffs' proposition that, if no tribal court exists, exhaustion of remedies is inapplicable.").

[259] *Krempel v. Prairie Island Indian Community*, 125 F.3d 621, 623 (8th Cir. 1997).

jurisdiction over them, so the "futility" exception certainly cannot apply. The fact that some (but not all) procedural rules changed after Saybrook filed the Waukesha complaint does not mean the Tribal Court "was not operational until after" the state-court action commenced.[260]

*Third*, none of these amendments taken alone or together "significantly reconstituted"[261] the Tribal Court. Unlike the cases Godfrey relies on, there is no question here that the Lac du Flambeau Tribal Court was duly constituted under the Tribe's Constitution[262] long before *any* of the cases—state, tribal, or federal. Indeed, the very amendments Plaintiffs complain of specifically referenced that Constitutional authority.

Lastly, the Tribal Court Action is just months old, unlike *Johnson* in which there was a "two-year delay in the tribal appellate court[,]"[263] and Godfrey's attempt to stretch such thin case law across these facts simply cannot demonstrate, as the Supreme Court

---

[260] *Contra id. Accord Gaming World*, 317 F.3d at 850-51 ("Gaming World . . . points out that the tribal court was not available when it originally filed for arbitration, but that court was instituted, operating, and available by the time Gaming World filed its federal petition. . . . This case is therefore not like *Kremple v. Prairie Island Indian Community*, where the tribal court was not operational until after the federal claim had been filed.") (internal citation omitted).

[261] Dkt # 43, Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., 23.

[262] *Compare* Big John Decl., Ex. A, LAC DU FLAMBEAU CONST. ART. X *with Comstock Oil & Gas*, 78 F. Supp. 2d at 600 ("Pursuant to 25 U.S.C. §§ 435, 734(b), 735 and the implementing regulations found in 25 C.F.R. Part 81, the Tribe established a constitution when under federal supervision. Those codes and statutes provide the means by which the Tribe may amend or alter a constitution. They have not properly done so and the constitution as amended June 20, 1990 is the ruling authority for tribe and council. Under that authority, there is no provision for a valid tribal court such as the one purportedly created December 14, 1998 by the adoption of a tribal judicial code.").

[263] *Johnson v. Gila River Indian Cmty.*, 174 F.3d 1032, 1036 (9th Cir. 1999).

requires, that exhaustion would be futile "*because of the lack of adequate opportunity to challenge the court's jurisdiction.*"[264]

### 3. The Tribal Court does not "plainly lack" jurisdiction in this case.

Finally, Stifel and Saybrook argue that this Court should not require exhaustion because the Tribal Court "plainly" lacks jurisdiction over them. Stifel and Saybrook are wrong.  But they also overstate the breadth of the exception. In light of the broader purposes of the main exhaustion rule, courts have read this exception narrowly because requiring federal courts to complete a threshold full-blown *Montana* analysis before deciding whether to require tribal court exhaustion "would create an exhaustion exception that would swallow the rule."[265] Thus, courts have found that jurisdiction is not "plainly lacking" where "a question exists" regarding jurisdiction,[266] and the argument for jurisdiction was "not frivolous[,]"[267] presented a "colorable issue[,]"[268] and "at the very least, there is a debatable question or colorable claim" to tribal-court jurisdiction.[269] The Court should decline the Plaintiffs' invitation here to "make a final determination of a tribal court's jurisdiction when deciding the issue of exhaustion."[270]

In light of this relatively low threshold, "[a] substantial showing must be made by the party seeking to invoke the express jurisdictional prohibition exception to the tribal

---

[264] *Iowa Mut. Ins. Co.,* 480 U.S. at 19 n.12 (quoting *Nat'l Farmers Union*, 471 U.S. at 856 n. 21) (internal quotation omitted) (emphasis added).
[265] *Melby*, 1998 WL 1769706, at *4.
[266] *Glendale Colony v. Connell*, 46 F. Supp. 2d 1061, 1065 (D. Mont. 1997).
[267] *Boozer v. Wilder*, 381 F.3d 931, 936 n.3 (9th Cir. 2004).
[268] *Allstate Indem. Co. v. Stump*, 191 F.3d 1071, 1075 *amended,* 197 F.3d 1031 (9th Cir. 1999).
[269] *Elliott v. White Mountain Apache Tribal Court*, CIV.05 4240, 2006 WL 3533147 (D. Ariz. Dec. 6, 2006) *aff'd*, 566 F.3d 842 (9th Cir. 2009)
[270] *Paddy v. Mulkey*, 656 F. Supp. 2d 1241, 1247 (D. Nev. 2009).

exhaustion rule."[271] Moreover, of the few cases barring exhaustion on jurisdictional grounds most "involve statutes that grant the federal government exclusive jurisdiction."[272] And though the Plaintiffs raise *Montana* questions a "tribal court does not plainly lack jurisdiction [where] *Montana's* main rule is unlikely to apply to the facts"[273] of a case, like the one at bar.

*Altheimer & Gray v. Sioux Manufacturing Corporation* does not change this rule. It held simply that a federal plaintiff need not exhaust tribal court remedies when "there has been no direct attack on a tribal court's jurisdiction" because "there is no case pending in tribal court[.]"[274] The Seventh Circuit refused to extend the tribal exhaustion rule with a "precedent-setting application"[275] that would direct a litigant to *commence* a tribal-court action and litigate that action *before* returning to the federal court. That is obviously not the case here, where the Tribal Court action is live and the Plaintiffs have already appeared. These are the not sort of "extraordinary circumstances"[276] that allow a party to avoid tribal-court exhaustion.

---

[271] *Plains Commerce Bank v. Long Family Land and Cattle Co.*, ____ F. Supp. 2d ____, 2012 WL 6731812, at *7 (D.S.D. Decd. 28, 2012 (quoting *Kerr–McGee Corp. v. Farley,* 115 F.3d 1498, 1502 (10th Cir.1997)) (internal alteration omitted).

[272] *Id. See also, e.g. El Paso Natural Gas*, 526 U.S. at 484-85 (holding district court erred by enjoining respondents from pursuing any Price-Anderson claims in Tribal Court but refusing to decide whether claims were Price-Anderson claims before the respondents exhausted their tribal-court remedies because, an "unusual preemption provision" of the Price-Anderson Act gives district courts original jurisdiction over suits under the act and allows for removal as of right for cases brought in state court, so "Congress thus expressed an unmistakable preference for a federal forum" for Price-Anderson claims"); *Koniag, Inc. v. Kanam*, 3:1-cv-00077, 2012 WL 2576210 (D. Alaska Jul 3, 2012) (holding that a federal statute, had "extinguished 'Indian Country' in nearly all of Alaska[,]" so that "[a]s a result, territorial jurisdiction is not available to Alaska Native tribes on ANCSA lands[,]" and the jurisdiction "of Alaska Native tribal courts extends only to their members and other internal affairs.").

[273] *Skywalk II*, 2013 WL 177060 at *6.

[274] *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 814 (7th Cir. 1993).

[275] *Id.* at 814.

[276] *Iowa Mut. Ins. Co.,* 480 U.S. at 21 (Stevens, J., concurring in part and dissenting in part).

Fundamentally, Plaintiffs "misunderstand[] the import of National Farmers."[277] The Supreme Court has already decided that "Congress' commitment to supporting tribal self-government and self-determination 'favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge."[278] Far from "serv[ing] no purpose other than delay[,]" requiring exhaustion in this case furthers the federal interest in tribal self-governance by allowing the Tribe to "itself first interpret its own ordinance and define its own jurisdiction[,]"[279] and this Court's interest in "the orderly administration of justice . . . by allowing a full record to be developed in the Tribal Court."[280] The Plaintiffs must make their arguments regarding jurisdiction to the Tribal Court *first*, just as the Supreme Court required National Farmers Union Insurance to make its argument to the Crow Nation's tribal court. "The exhaustion rule may be prudential, but this fact does not diminish its importance as a principle of comity to be honored by the federal courts."[281]

## III. THIS COURT LACKS JURISDICTION OVER THE TRIBAL DEFENDANTS.

Even if the Supreme Court had not directed this Court to "stay its hand" in favor of the Tribal Court action,[282] this Court lacks jurisdiction over the Tribal Defendants because they are immune from suit. "Tribal sovereign immunity is 'a necessary corollary

---

[277] *Skywalk I*, 2012 WL 1207149, at *6 (quoting *Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1245 (9th Cir. 1991)).
[278] *Id.* (quoting *Nat'l Farmers*, 471 U.S. at 847).
[279] *Id.*, at *1 (quoting *Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1246 (9th Cir. 1991)) (internal quotation omitted).
[280] *Nat'l Farmers*, 471 U.S. at 856.
[281] *Skywalk I*, 2012 WL 1207149, at *6. (quoting *Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1245 (9th Cir. 1991))
[282] *Nat'l Farmers,* 471 U.S. at 857.

to Indian sovereignty and self-governance,'"[283] It "extends to suits for injunctive and declaratory relief."[284] Accordingly, "[s]uits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation."[285] This Court cannot exercise jurisdiction over the Tribal Defendants because they have not waived their immunity from this suit. The waivers relied on by the Plaintiffs are all void, or otherwise fail to waive the Tribal Defendants' sovereign immunity from this suit.

### A. THE ONLY PURPORTED WAIVER OF SOVEREIGN IMMUNITY ON WHICH PLAINTIFFS COULD RELY TO ESTABLISH JURISDICTION IN THIS CASE OCCURRED IN CONNECTION WITH THE BOND TRANSACTION THAT IS VOID AS A MATTER OF LAW.

In seeking to establish jurisdiction over the Tribal Defendants, Plaintiffs allege in cursory fashion that the Bond Documents somehow waive the Tribal Defendants' sovereign immunity from suit.[286] But the Plaintiffs' reliance on these documents ignores that the Indenture that governs the entire Bond Transaction is void. In the state-court proceeding, Saybrook and Wells Fargo acknowledged that "[t]he legal proceedings to date have invalidated the Indenture and created uncertainty about the validity of other documents associated with the sale of the Bonds."[287]

In fact, because the Indenture was void *ab initio*,[288] it and each of its provisions—including its purported waiver of sovereign immunity—are legal nullities. That void

---

[283] *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 928 (7th Cir. 2008) (quoting *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.*, 476 U.S. 877, 894 (1986)).

[284] *Ho-Chunk Nation*, 512 F.3d at 928 (citing *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1271 (9th Cir. 1991)).

[285] *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 812 (7th Cir. 1993) (quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991)).

[286] *See* Dkt. # 1, Compl. ¶ 26.

[287] *See* Jacquart Decl., Ex. 1, State Court Compl., at ¶ 55.

[288] *Id.* at ¶¶ 54-55.

Indenture, though, is the heart of an integrated whole. The Bond Transaction involved a series of inter-related Bond Documents, signed at the same time to accomplish one purpose. In fact, *none* of the Bond Documents is valid. They are all inextricably intertwined with the void Indenture and must fall with it. Because the Indenture is void, the entire Bond Transaction is void. None of the Bond Documents can waive the Tribal Defendants' immunity from this suit because all of the Bond Documents fall with the Indenture—each is a legal nullity. Just as the suit against the Corporation based on the Indenture was dismissed,[289] this suit against the Tribal Defendants must be dismissed for lack of jurisdiction. Any other result would contravene IGRA, undercut Congress, and ignore fundamental principles of contract law.

### 1.      The Indenture is Void Under IGRA

The Seventh Circuit held the following provisions, when taken together, rendered the Indenture a "management contract":

- The pledge of the Casino's gross revenues and all rights to the Corporation's equipment and accounts, without limitation, as collateral, Indenture Granting Clause I and II;

- The Capital Expenditure Provision, which permitted the bondholders to limit Casino capital expenditures, § 6.18;

- The Replacement Key Management Provision, which gave the bondholders authority over the hiring, retention, and firing of primary management officials of the Casino, § 6.20,;

- The New Management in Default Provision, which allowed the bondholders to require the Corporation replace its management with management approved by the bondholder in the event of default, § 8.02; and

- The Management Consultant Provision, which allowed the bondholders to engage a management consultant if the debt-service-coverage ratio

---

[289] *Wells Fargo 7th Cir.*, 658 F.3d at 700-01.

reached a certain level, and required the Corporation to promptly follow any resulting recommendations, § 6.19.[290]

As a result, the Seventh Circuit held that "taken together, the provisions discussed above transfer significant management responsibility to Wells Fargo and the bondholder and therefore render the Indenture a management agreement subject to the approval of the [NIGC] Chairman."[291] And, "[l]acking the formality of NIGC approval, an agreement to manage *does not become a contract: it is void.*"[292]

### 2.   IGRA requires all documents that are inextricably intertwined to be construed together.

Where other documents are inextricably intertwined with a void management contract, they are also void. Congress wrote IGRA in "broad strokes" to pervasively regulate Indian gaming and ensure that Indian tribes are its primary beneficiaries.[293] "IGRA effects these goals in part by providing for federal oversight of contracts between tribes and non-tribal entities for the management of tribal gaming operations."[294] Accordingly, IGRA created the NIGC as the sentinel to oversee all contracts remotely bearing on Indian casino management.[295]

---

[290] *See* Jacquart Decl., Ex. 1, State Court Compl., at ¶ 85.
[291] *Wells Fargo 7th Cir.*, 658 F.3d at 699.
[292] *First Am. Kickapoo Operations, L.L.C.*, 412 F.3d at 1176 (emphasis added). Although the Western District held that the Section 8.04 Receiver Provision, which permitted the court to appoint a receiver to take over the Casino's finances—including all Casino gross revenues, equipment, and accounts—and to have "such powers as the court making such appointment shall confer" also rendered the Indenture a management contract, the Seventh Circuit found it unnecessary to reach that issue. *Wells Fargo 7th Cir.*, 658 F.3d at 699, n.14.
[293] *Wells Fargo 7th Cir.*, 658 F.3d at 694-95 (citing 25 U.S.C. § 2702(1)-(2)).
[294] *First Am. Kickapoo Operations, L.L.C.* 412 F.3d at 1167-68.
[295] 25 U.S.C. § 2704.

### a. Unapproved management contracts are void under IGRA.

IGRA requires that all management contracts be approved by the Chairman of the NIGC, and that all management contractors submit detailed background information to the NIGC before approval.[296] The management-contract-approval process is rigorous, but critical to tribes and their commercial partners because without the NIGC's approval, management contracts are void *ab initio* and entirely unenforceable.[297] The voiding provision is crucial to the NIGC's regulatory oversight because it creates a strong incentive for parties to seek NIGC review.[298] Without this incentive, the NIGC might never learn about private contracts like the Bond Documents, and could not exercise its congressionally mandated oversight role.[299]

### b. The NIGC applies a flexible test to determine whether an agreement is a management contract.

The NIGC defines "management contract" as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation."[300] Under *Chevron U.S.A., Inc. v. Natural Res. Def. Council,*

---

[296] 25 U.S.C. § 2711; 25 C.F.R. § 533.1.

[297] 25 C.F.R. § 533.7; *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 128 (2d Cir. 2008) ("no part" of contract that is void under IGRA may be enforced or relied on) (quoting *A.K. Mgmt. Co.* 789 F.2d at 789); *see also* Kevin K. Washburn, *The Mechanics of Indian Gaming Management Contract Approval*, 8 GAMING L. REV. 333, 334 (2004) ("Washburn Article").

[298] *See* Jacquart Decl., Ex. 18, Affidavit of Kevin K. Washburn (hereinafter "Washburn Aff.") at ¶ 11.

[299] *Id.*

[300] *Wells Fargo 7th Cir.*, 658 F.3d at 695 (citing 25 C.F.R. § 502.15).

*Inc.*, this Court "may not substitute its own construction" of the term.[301] The NIGC has further explained that:

> [m]anagement encompasses many activities (e.g. planning, organizing, directing, coordinating, and controlling). The performance of any one of such activities with respect to all or part of a gaming operation constitutes management for the purpose of determining whether any contract or agreement for the performance of such activities is a management contract that requires approval.[302]

Courts have recognized that management contracts can be created unintentionally. "[T]he parties' expressed intent is not controlling . . . [a]n agreement's status as a management contract, or not, is determined by the substance of the agreement, not the label the parties attached to it."[303] Even the mere opportunity to manage a tribe's casino can invalidate an agreement because contingent management is still management.[304]

### c. The NIGC has established two processes to help parties to Indian-gaming contracts comply with IGRA.

Given IGRA's strict prohibition against unapproved management contracts, and the commercial reality that some parties want to enter into management contracts, but others want to avoid them, the NIGC has created two separate regulatory processes.

*First*, where parties *intend* to enter into management contacts, the NIGC subjects the agreements to the formal contract-approval process to ensure they meet all of

---

[301] 467 U.S. 837, 844 (1984).

[302] *Wells Fargo 7th Cir.*, 658 F.3d at 696 (citing NIGC Bulletin No. 94-5, at 1). This NIGC guidance has "the power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

[303] *New Gaming Sys. Inc.*, 896 F. Supp. 2d at 1104; *see also Catskill Dev., L.L.C.*, 547 F.3d 115; *First Am. Kickapoo Operations, L.L.C.*, 412 F.3d 1166; *Machal, Inc. v. Jena Band of Choctaw Indians*, 387 F. Supp. 2d 659 (W.D. La. 2005).

[304] *First Am. Kickapoo Operations, L.C.C.*, 412 F.3d at 1175; s*ee also New Gaming Sys. Inc.*, 896 F. Supp. 2d at 1105.

IGRA's requirements for management contracts.[305] *Second*, where the parties *do not intend* to enter into management contracts, the parties can ask the NIGC to review their agreements to advise whether it believes the agreements have inadvertently strayed into management-contract territory.[306]

The *contract-approval* process requires the NIGC to review the substantive provisions of the proposed contract and the proposed management company's background.[307] Parties seeking approval must submit the management contract and any related contracts (*i.e.*, "collateral agreements") to the NIGC for review. This permits the NIGC to confirm that the parties have not sought to avoid IGRA's restrictions on management contracts (*e.g.*, capping the amount of management fees) by hiding prohibited terms in collateral agreements.[308] Although the NIGC reviews the management agreement and all collateral agreements, its Chairman approves only the management contract itself, ensuring that it conforms with IGRA and includes all statutorily required provisions.[309] Through the process, the NIGC determines that the remaining agreements—the collateral agreements—do not contain management provisions and are enforceable on their own without approval.[310]

---

[305] *See* 25 C.F.R. Part 533 (Approval of Management Contracts); *see also* Affidavit of Penny J. Coleman, ¶¶ 8-14 (hereinafter "Coleman Aff.") (describing the approval process and its history).
[306] *See* Coleman Aff., ¶¶ 15-18 (describing process and its history).
[307] Washburn Article, *supra*, at 334, 337-45; *see also* Coleman Aff., ¶¶ 11-14.
[308] Washburn Article, *supra*, at 334-36.
[309] *See* 25 C.F.R. § 531.1.10; *see also* Coleman Aff., ¶¶ 13-14.
[310] Coleman Aff., ¶¶ 13-14. As Ms. Coleman explained:
   [A] typical set of agreements submitted to the NIGC for review and approval will include a management contract, a loan agreement, and a development agreement. The parties that are seeking management contract approval are careful to assure that the loan and development agreements can stand alone and not provide for any management of the gaming enterprise and thus do not require NIGC approval. This will allow the parties to proceed on these collateral agreements even as the management contract is pending approval.

65

The *declination* process is the converse of contract approval, and is used where parties seek a "declination letter" confirming that the NIGC agrees that contracts are not management contracts.[311] Under the declination process, *the NIGC considers the entire set of interrelated agreements together to ensure that none conveys management authority, judging the agreements as a group*.[312]

> Generally, the concept of 'collateral agreements' to a management contract is not relevant to a declination letter process. In most instances the contracts are submitted because the parties have no intention of entering into a management contract. Parties are therefore exercising due diligence by seeking NIGC review to assure that none of the contracts are subject to NIGC approval. The contracts are therefore reviewed not to determine whether they are collateral to management contracts. Rather, each contract, as well as the contracts taken together, are reviewed to determine whether they contain management controls and authorities and are therefore management contracts.[313]

After the NIGC "review[s] each submission and determine[s] whether the agreement requires the approval of the NIGC[,]" it advises the parties of its decision by letter.[314] Parties who seek to avoid creating a management contract yet decline to engage in the

---

[311] *See, e.g.*, Jacquart Decl., Ex. 19, Addendum to Brief of the Defendant-Appellee Lake of the Torches Economic Development Corp. at 13-81, *Wells Fargo, Nat'l Ass'n v. Lake of the Torches Econ. Dev. Corp.*, No. 10-2069 (7th Cir. Sept. 10, 2010) (hereinafter "7th Cir. Addendum").

[312] *See* NIGC Bulletin 94-5 (urging parties to send in all related and referenced agreements); Coleman Aff., ¶¶ 17-18.

[313] Coleman Aff., ¶ 27.

[314] *See* Jacquart Decl., 7th Circuit Addendum at 1; Coleman Aff., ¶ 21. If the NIGC finds that the agreements do not constitute a management contract and declines jurisdiction over them as such, the parties can take comfort that its agreements are valid without NIGC approval. *Id.* If the NIGC opines that the agreements collectively constitute a management contract, the parties must decide whether to work with the agency to remove the management provisions from the agreements (so that they do not need NIGC approval) or to affirmatively seek management-contract approval by reforming the agreements to meet all management-contract criteria. *Id.*

declination process assume the risk of creating an unapproved management contract that is void *ab initio*.[315]

> ### d. The NIGC evaluates all documents in a single transaction to determine whether, when reviewed together, they create a single unapproved management contract.

Under the declination process, like the contract-approval process, the NIGC reviews all of the related documents as a group to determine whether they, collectively or individually, provide for the management of all or part of a gaming operation.[316] Contracting parties have gone to great and creative lengths to craft agreements with Indian tribes that attempt to skirt NIGC review.[317] For example, parties have tried to avoid NIGC review by calling management contracts "consulting agreements" or other names,[318] and inserting management provisions into several different agreements to camouflage their individual impact while achieving the same result.[319] That is precisely why the NIGC requires submission of *all* related agreements—not just the primary agreement—as part of its review under both the declination and the contract-approval processes.[320]

---

[315] 25 C.F.R. § 533.7; *Catskill Dev., L.L.C.*, 547 F.3d at 128 (quoting *A.K. Mgmt. Co.*, 789 F.2d at 789); *Wells Fargo 7th Cir.*, 658 F.3d at 700-01; *U.S. ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 424-25 (8th Cir. 2002); *see also* Coleman Aff. at ¶ 23.

[316] *New Gaming Sys. Inc.*, 896 F. Supp. 2d at 1096 ("[T]he Nation sent the lease *and* note to the NIGC for review, seeking an opinion on whether the *two documents constituted a management agreement* within the meaning of IGRA, which required the NIGC Chairman's approval.") (citation omitted) (emphasis added); *See* Jacquart Decl., Ex. 30, Decision and Order at 13 n. 5, *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, No. 09-CV-768 (W.D. Wis. April 23, 2010); Jacquart Decl., Ex. 18, Washburn Aff. at ¶¶ 17, 30; Affidavit of Elaine Trimble Saiz, ¶ 11 (hereinafter "Saiz Aff."); Coleman Aff., ¶ 17.

[317] Coleman Aff., ¶ 15.

[318] *See* Saiz Aff., Ex. E, NIGC Bulletin 93-3.

[319] *See* Saiz Aff., Ex. F, NIGC Bulletin 94-5.

[320] *See* Jacquart Decl., Ex. 18, Washburn Aff. at ¶¶ 14, 30, 32; *See also* Saiz Aff., ¶ 11.

The key distinction is that the declination-letter process results in the NIGC either issuing a declination letter that applies to all of the documents that are part of the single transaction, or refusing to issue a declination letter as to any of the documents.[321] As a former NIGC General Counsel explained:

> In the course of federal review required by IGRA, the NIGC's practice is to review all related agreements and require explicit approval only of the documents that contain management. Since all of the documents are oriented toward a single goal, the NIGC would not view the various documents independently. The NIGC would view several of the documents, principally those in which a tribal entity is a party, as part of a single integrated agreement that is void absent approval.[322]

The long-time former Acting General Counsel put it this way: "each contract, as well as the contracts taken together, are reviewed to determine whether they contain management controls and authorities and are therefore management contracts."[323] In other words, the documents stand or fall together.

Under this analysis, even if one agreement, standing alone, is not a management contract, it becomes one if it is intertwined with, and dependent upon, other agreements that do provide for management.[324] This is true even if the document expressly states that it is not a management contract, and even if it is not a contract with a manager.

For example, in *U.S. ex rel. Bernard v. Casino Magic Corp.* ("*Casino Magic*"), the parties entered into a series of agreements between the various players in a casino construction deal.[325] An initial Consulting Agreement between Casino Magic and the tribe "specifically stated that Casino Magic had no management authority over the

---

[321] *U.S. ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 422-23 (8th Cir. 2002) ("*Casino Magic*"); Saiz Aff., ¶¶ 13-15; Jacquart Decl., Ex. 18, Washburn Aff. at ¶¶ 31-33.
[322] *See* Jacquart Decl., Ex. 18, Washburn Aff. at ¶ 17; s*ee also* Coleman Aff., ¶ 17.
[323] Coleman Aff., ¶ 24.
[324] *See, e.g.*, Coleman Aff., ¶ 25.
[325] *Casino Magic*, 293 F.3d at 420-24.

casino."[326] But two months later, a Loan Agreement between the tribe and a bank conditioned the loan on the tribe's commitment to "accept and comply with all of the recommendations made by the consultant under the Consulting Agreement[.]"[327] A third Participation Agreement between the bank and Casino Magic formalized Casino Magic's consent to contribute a percentage of the Tribe's financing for the casino.[328]

Even though the NIGC initially determined that the Consulting Agreement—standing alone—was not a management contract, "[w]hen the NIGC had the opportunity to review the Consulting Agreement *and* the Construction and Term Loan Agreement *together*, it determined that the documents created a management agreement, requiring approval under 25 U.S.C. § 2711."[329] Accordingly, the United States Court of Appeals for the Eighth Circuit held that all three agreements at issue—the consulting agreement, term loan agreement, and participation agreement—"constituted a management agreement[.]"[330] In essence, the Loan Agreement "convert[ed] the Consulting Agreement into a management contract requiring the approval of the NIGC[,]" and without approval, even though it was not a party to the Loan Agreement, Casino Magic could not enforce the Consulting Agreement against the tribe.[331]

### 3. The Bond Transaction is void under IGRA because the Bond Documents are inextricably intertwined with the void Indenture.

The Indenture and the Bond Documents were all part of a single Bond Transaction. The Indenture is the heart of an integrated whole and all the documents

---

[326] *Id.* at 421.
[327] *Id.* at 422.
[328] *Id.*
[329] *Id.* at 424 (emphasis added).
[330] *Id.*
[331] *Id.* at 423; *see also* Coleman Aff., ¶ 26.

were inter-related, designed to achieve one goal. Each is inextricably intertwined with the other. Accordingly, the entire Bond Transaction and its documents must stand or fall as a whole. Because the Indenture is void, the entire Bond Transaction is void.

As the Tribal Defendants' Indian-gaming-financing expert, Perry Israel, who co-authored *An Introduction to Indian Tribal Finance*, makes clear:

> For bond transactions that have a trust indenture, the trust indenture is viewed in the ordinary and customary practice in the industry as the master document, authorizing the issuance of the bonds, setting for the terms of the bonds, providing how the bonds are to be paid and secured, and setting forth the covenants of the issuer made on behalf of the bond holders, with the bonds requiring the trust indenture to be issued.[332]

The Indenture is the keystone of the Bond Transaction. Each of the Bond Documents was created and executed as part of one transaction—governed by and only effective through—the now-void Indenture.[333]

The Bond Documents themselves make this dependence clear. The chart attached as Exhibit 20 to Jacquart Affidavit details each of the Bond Document's express reliance on the void Indenture, including:

- Nearly every paragraph of the six-page Bonds refers to the Indenture or the obligations it created. In total, the Bonds refer to the Indenture or the Trustee 46 times.[334]

- Like the Bonds, the Limited Offering Memorandum expressly states that "[t]he Bonds are being issued pursuant to . . . a Trust Indenture dated January 1, 2008 (the 'Indenture') between the Corporation and Wells Fargo Bank, National Association, as trustee, registrar and paying agent (the 'Trustee')[,]"[335] and the

---

[332] Israel Aff., ¶ 14.

[333] *See* Dkt # 1-4, Compl., Ex. D, Indenture, Compl. §§ 6.01, 5.01, 8.01-.04 (provisions of the Indenture directing method and amount of payment of principal and interest, security, collateral, redemption, transferability, exchangeability, what constitutes a default, remedies upon default, and the limited waiver of sovereign immunity); *see also* Coleman Aff., ¶¶ 32-42.

[334] *See generally,* Jacquart Decl., Ex. 1, State Court Compl. and Dkt # 1-1, Compl., Ex. A, Bonds.

[335] *See* Dkt # 1-2, Compl., Ex. B, Limited Offering Mem., 1.

Indenture governs virtually every aspect of the transaction from issuance and security to pledged revenues and repayment.[336]

- The Issuer Opinion letter of Godfrey, as counsel to the Corporation, reiterates that the Bond Documents were issued "*all pursuant to the Trust Indenture . . . between the Corporation and Wells Fargo Bank, National Association, as Trustee*[,]"[337] and directly incorporated the Indenture's definition of capitalized terms as well as more substantive payment and enforcement terms.[338]

- The Bond Counsel Opinion letter of Godfrey, as bond counsel, described, for example, the authority of the Issuer to perform under and in accordance with the Indenture, and authentication of the Bonds "*by the Trustee, in accordance with the Indenture.*"[339]

- As but one of statement that the Indenture controlled the deal, the Bond Purchase Agreement declared that "the Corporation desires that the Initial Purchaser purchase the *Bonds according to the terms, and subject to the conditions, described in the Indenture ....*"[340]

- The Tribal Agreement similarly confirms that "[t]he Corporation and the Trustee have entered into the Indenture *pursuant to which the Bonds will be issued....*"[341]

Plaintiffs ask this Court to somehow read around the Indenture and enforce the Bond Documents despite their entanglement with the Indenture. But because the Indenture is void *ab initio*, the law deletes it from the transaction. A contract that is void

---

[336] *See generally,* Dkt # 1-2, Compl., Ex. B, Limited Offering Mem. and Dkt # 1-1, Compl., Ex A, Bonds.
[337] See Dkt # 1-6, Compl., Ex. F, Issuer Opinion Letter. (emphasis added).
[338] *See generally,* Dkt # 1-1, Compl., Ex. A, Bonds.
[339] Dkt # 1-7, Compl., Ex. G, Bond Counsel Opinion Letter (emphasis added; *see also, generally,* Dkt # 1-6, Compl., Ex. F, Issuer Opinion Letter and Dkt # 1-1, Compl., Ex. A, Bonds).
[340] Dkt # 1-3, Compl. Ex. C, Bond Purchase Agreement, 2 (emphasis added); *see also, generally*, Dkt # 1-6, Compl., Ex. F, Issuer Opinion Letter and Dkt # 1-1, Compl., Ex. A, Bonds.
[341] *See* Dkt # 1-9, Compl. Ex. I, Tribal Agreement at Recitals at A; *see also, generally*, Dkt # 1-1, Compl., Ex. A, Bonds.

for failure to comply with a statute is a nullity;[342] the Court must treat it as if it never existed.[343]

When the Indenture is deleted from the Bond Documents they become incomprehensible. For example, reading the Limited Offering Memorandum without the Indenture, it states that "[t]he Bonds are being issued pursuant to . . . a [nothing] between the [Corporation] and [no one]."[344] The Bond Purchase Agreement states that "the [Corporation] desires that the Initial Purchaser purchase the Bonds according to the terms, and subject to the conditions, described in [nothing]."[345] Removing the Indenture from the Bond Transaction causes the entire transaction to collapse.

In this case, if the parties *had* availed themselves of the NIGC, it would have either issued a declination letter applicable to the entire Bond Transaction or would have opined that all of the Bond Documents and Indenture collectively constitute a management contract.[346] And when those who have administered the NIGC's declination-letter process reviewed *this* Bond Transaction, they all agree: the NIGC would have found that the Bond Documents collectively constitute a management contract and the entire Bond Transaction is void.

---

[342] *See e.g., Bratt v. Peterson*, 31 Wis. 2d 447, 452, 143 N.W.2d 538, 540 (1966) (holding that contract that did not comply with statute of frauds was void) (citing *Henrikson v. Henrikson*, 143 Wis. 314, 127 N.W. 962 (1910)).

[343] *Laborers' Pension Fund v. A & C Envtl., Inc*., 301 F.3d 768, 779 (7th Cir. 2002) ("[W]hen a contract is void, it is as if it never existed"); *A.K. Mgmt. Co*., 789 F.2d at 789 ("Since it is void, [the contract] cannot be relied upon to give rise to *any* obligation by the Band[.]") (emphasis in original); *see also Wells Fargo 7th Cir*., 658 F.3d at 700 (holding that a void management contract "is not subject to reformation by excision of offending provisions.").

[344] *See* Dkt # 1-2, Compl. Ex. B, Limited Offering Mem., 1.

[345] *See* Dkt #1-3, Compl. Ex. C, Bond Purchase Agreement, 2.

[346] Saiz Aff., ¶¶ 11-14; Jacquart Decl., Ex. 18, Washburn Aff. at ¶¶ 31-33; Coleman Aff., ¶ 42.

When he served as the General Counsel of the NIGC,[347] Kevin Washburn reviewed gaming management contracts and advised the Chairman of the NIGC regarding his contract-approval responsibilities. After reviewing the Bond Transaction, he observed:

> In this case, none of the documents prepared in relation to the bond closing seem to have been designed to stand independently of the Trust Indenture. The transaction in question is a single integrated transaction between multiple parties oriented primarily toward a bond financing. Each of the documents was executed as part of the same transaction, presumably as part of a single closing. The heart of the transaction was the Trust Indenture. Many of the other documents, including the following named documents contain explicit references to the Indenture or the Trustee, often in numerous provisions [listing among other documents, the Bond Documents]. The Indenture governs nearly every aspect of the transaction and the deal makes little sense it its absence.[348]

Dean Washburn further testified that the NIGC's practice was to consider contracts interrelated to a management contract (like the Bond Documents and Indenture) to be part of one transaction that would be void without approval.[349]

Ms. Saiz, former Director for the Division of Management Contracts and Investigations at the NIGC, agrees. She reviewed hundreds of management contracts and gaming-related agreements during her tenure, and has more experience with the management-contract-review process than anyone.[350] After reviewing the Bond Documents, she concluded that they "are so intertwined with the Indenture, it is my

---

[347] *See* Jacquart Decl., Ex. 18, Washburn Aff. at ¶¶ 1-3, Ex. A. Mr. Washburn is now Assistant Secretary for Indian Affairs at the United States Department of the Interior, however, he expresses no opinions regarding this matter in his capacity as such and is referred to herein as Dean Washburn, as at the time of his affidavit he was Dean of the University of New Mexico School of Law.

[348] *See* Jacquart Decl., Ex. 18, Washburn Aff., at ¶ 16 (citing Cox & Hazen on Corporations § 18.02 (2d ed. 2003); 6A Fletcher Cyclopedia Corporations § 2751 at 209-10).

[349] *See* Jacquart Decl., Ex. 18, Washburn Aff., at ¶ 17.

[350] *See* Saiz Aff., ¶¶ 4-7.

opinion that all of the documents are also collectively one unapproved management contract," and thus also void.[351]

Furthermore, the NIGC's former Acting General Counsel, Penny Coleman, also concluded that the Bond Documents were "so dependent on each other, that none functions without the other," and that "the NIGC, upon review, would determine that the [Bond Documents] are so inextricably linked that they would be viewed as one total agreement for purposes of determining whether they constitute a management contract subject to NIGC approval."[352] Ms. Coleman worked in the Office of General Counsel at the NIGC from 1994 to 2010, serving as Acting General Counsel from 2002-2010,[353] and was an attorney for the Division of Indian Affairs within the Office of the Solicitor in the Department of the Interior, where Indian-gaming contracts were reviewed before the NIGC was operational, for 13 years before joining the NIGC staff.[354] She concluded that the Bond Documents "constitute management contracts subject to NIGC approval," and that "[s]ince they have not been and cannot be approved, they are void under NIGC regulations."[355]

In fact, the NIGC has *itself agreed* with the earlier courts' analysis that the Indenture was a void unapproved management contract.[356] Because the NIGC—the federal agency charged with implementation of IGRA—would have reviewed these

---

[351] *See* Saiz Aff., ¶ 20-21.
[352] Coleman Aff., ¶ 42.
[353] *Id.* at ¶¶ 3-4.
[354] *Id.* at ¶ 6.
[355] *Id.* at 62.
[356] *See, e.g.*, http://www.nigc.gov/Reading_Room/Management_Review_Letters_Declination_Letters.aspx (last visited May 18, 2013).

agreements as a group and found the Bond Documents to be void, so should this Court.[357]

The NIGC's method of reviewing interrelated documents together as one instrument is hardly novel. It is exactly how state law would treat the Bond Transaction in the absence of IGRA. Under Wisconsin contract law, the law considers all of the Bond Documents a single instrument:

> The general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one contract or instrument.[358]

All of the Bond Documents were executed contemporaneously. They were executed by the same group of contracting parties: the Tribal Defendants, Stifel, and Wells Fargo. They were all executed with the same purpose and in the course of the same transaction—the Bond Transaction. There is nothing in any of the Bond Documents indicating that the parties intended for them to be construed separately from the void Indenture.

The Western District found this rule persuasive in its decision that the Bond Documents were not independently enforceable:

> Even apart from the foregoing discussion, Wells Fargo's attempt to separate the Bonds from the Trust Indenture is not persuasive. Indeed, as in most transactions of this nature, it is hard to imagine the Bonds existing without the Trust Indenture. Like the relationship between a note and a mortgage, the Bonds represent the Corporation's obligation to repay its debt, while the Trust Indenture provides security for the transaction. The general rule in Wisconsin (and most jurisdictions) is that "instruments executed at the same time between the same contracting parties in the course of the same transaction will be construed together. One application

---

[357] *Casino Magic*, 293 F.3d at 422-24; *Wells Fargo W.D. II*, 2010 WL 1687677 at *6.
[358] *James Talcott, Inc. v. P & J Contracting Co.*, 27 Wis. 2d 68, 133 N.W.2d 473, 477 (1965).

of this rule is the construction together of a mortgage and the note for which it was given as security." [citation omitted] Construed together, the Bonds and the Trust Indenture reflect the parties' intention to allow the Trustee to exert managerial control in the event the Corporation defaults on the Bonds. For this purpose, they cannot be separated.[359]

The Bond Documents must be construed with—not apart from—the void Indenture, regardless of their treatment under IGRA. Under Wisconsin law, the Bond Documents cannot survive without the void Indenture.

All of this leads to the unavoidable conclusion that the void Indenture poisons the entire Bond Transaction. Just as in *Casino Magic*, where a loan agreement "convert[ed] the Consulting Agreement into a management contract requiring the approval of the NIGC[,]"[360] the void Indenture converts every Bond Document into a management contract requiring the approval of the NIGC.[361] Because none of the Bond Documents were approved, *every* clause in *every* Bond Document is void *ab initio*.[362] Because the Bond Documents that contain each waiver are inoperable without approval, "the waiver is inoperable and, therefore, the tribe remains immune from suit."[363] So it is here, and without any valid waiver of sovereign immunity, this Court must dismiss each claim leveled against the Tribal Defendants for lack of jurisdiction.[364]

---

[359] *Wells Fargo W.D. II*, 2010 WL 1687677 at *7 (citing *Wipfli v. Bever,* 37 Wis. 2d 324, 325-28, 155 N.W.2d 71 (1967)).
[360] *Casino Magic*, 293 F.3d at 423.
[361] *See* Jacquart Decl., Ex. 18, Washburn Aff. at ¶ 16-17; Saiz Aff., ¶ 21; Coleman Aff., ¶ 42.
[362] *Id.*, 658 F.3d at 699, 702.
[363] *A.K. Mgmt. Co.*, 789 F.2d at 789.
[364] *Puyallup Tribe, Inc.*, 433 U.S. at 172; *Santa Clara Pueblo*, 436 U.S. at 59; *Koscielak*, 811 N.W.2d at 454.

### 4. Enforcing the Bond Documents despite their reliance on and interdependence with the void Indenture would undermine the purpose of IGRA.

The contract-approval and declination processes are rigorous and not always convenient for tribes and their commercial partners, but they are "the core of Congress's protection for Indian gaming establishments."[365] That core protection depends on the voiding provision for its teeth. "From the government's perspective, the voiding provision is a crucial component of the regulatory scheme," which "incentivizes parties to seek that NIGC review or risk having their contracts voided later."[366] In particular, "[f]rom a regulatory point of view, the scheme succeeds in great measure precisely because parties, including lenders, tend to lose the benefit of their bargain if the contract is voided . . . . The voiding principle makes the costs of evading NIGC review very high."[367]

If parties were able to receive the benefits of their bargains despite having entered into unapproved management contracts, there would be no incentive for those parties to seek NIGC review or avoid entering into illegal unapproved management contracts. "If contracts were enforced despite being void under IGRA, it would substantially undermine the regulatory scheme[,]" [368] defeating the purpose of IGRA and the mandate of the NIGC. [369] But that is precisely what the Plaintiffs implicitly ask this Court to do by resting this suit on nullified waivers in invalid documents.

---

[365] *Wells Fargo 7th Cir.*, 658 F.3d at 700.
[366] Jacquart Decl., Ex. 18, Washburn Aff. at ¶14.
[367] *See* Jacquart Decl., Ex. 18, Washburn Aff. at ¶ 15.
[368] *See* Jacquart Decl., Ex. 18, Washburn Aff. at ¶ 15.
[369] *See* Jacquart Decl., Ex. 18, Washburn Aff. at ¶ 15; *accord Lewis v. City of Shreveport*, 108 U.S. 282 (1883) (holding that bonds issued without proper authorization are void even in the hands of *bona fide* holders); *Mosher v. Indep. Sch. Dist. of Ackley*, 44 Iowa 122, 124 (Iowa 1876) (holding that where the amount of the bonds exceeded the constitutional limit, "the bonds and

The contract-approval and declination processes are critical to tribes and their commercial partners because without the NIGC's approval, management contracts—all of them—are void *ab initio* and entirely unenforceable.[370] Parties who avoid the declination process do so at their peril.[371] That is precisely the risk that the Plaintiffs assumed here.[372] Invalidation of the Bond Transaction flows directly from the Plaintiffs' decision to avoid the NIGC's review process, and allowing them to now ignore IGRA's regulatory scheme and the NIGC's enforcement processes would "hobble the statute."[373]

### B. Even If This Court Were To Ignore The Indenture, The Bond Documents And Remaining Documents In The Bond Transaction Create An Unenforceable Management Contract.

Certain parties read the Seventh Circuit's remand instruction[374] to require determination of whether the Bond Documents "when read separately or together," *but independently of the Indenture*, waive the Tribal Defendants' immunity.[375] This

---

coupons attached are void without regard to the good faith with which they were purchased, and the want of notice of their invalidity by the holders."); *State v. Spring City,* 260 P.2d 527 (Utah 1953) (finding bonds issued in excess of constitutional debt limit to be void, without recourse to bondholders); *Union Bank of Richmond v. Comm'rs of Town of Oxford,* 34 L.R.A. 487 (N.C. 1896) (finding bonds "issued without authority, were absolutely void" and holding that "[i]t is incumbent on the purchaser of municipal bonds to examine whether the power to issue has been duly granted."). Each of these courts held that voiding bonds issued in violation of the law was the only way to uphold the essential purpose of the law at issue.

[370] 25 C.F.R. § 533.7.

[371] *See First Am. Kickapoo Operations, L.L.C.,* 412 F.3d at 1178-79; *Fargo W.D. I* at 1062; *Casino Magic,* 293 F.3d at 425.

[372] *Wells Fargo W.D. I,* 677 F. Supp. 2d at 1062 ("Given the size of the transaction and the complicated nature of the regulatory scheme, it is a bit surprising that Wells Fargo did not insist upon NIGC review and approval."). A law firm's failure to submit a contract for NIGC review can constitute legal malpractice. *See* Washburn Aff. at ¶ 32 (citing *In re SRC Holding Corp.* 352 B.R. 103 (Bankr. D. Minn. 2006)), *reversed sub nom. on other grounds, Leonard v. Dorsey & Whitney LLP,* 553 F.3d 609 (8th Cir. 2009).

[373] *A.K. Mgmt. Co.,* 789 F.2d at 789; *see also* Jacquart Decl., Ex. 18, Washburn Aff. at ¶15.

[374] *Wells Fargo 7th Cir.,* 658 F.3d at 702.

[375] Dkt # 43, Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., 7.

nonsensical reading fails.[376] But even if the Court were to conclude that the Bond Documents *were not* inextricably intertwined with the void Indenture, the other documents, taken together, render the entire Bond Transaction a void unapproved management contract.

Though the Plaintiffs do not mention them in their Complaint, the Bond Transaction includes several other documents[377] *in addition to* the void Indenture and the Bond Documents. These documents must also be construed with the Bond Documents because they were "executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction" as the Bond Documents and the parties did not express "absence of anything to indicate a contrary intention[.]"[378] In fact, the very language of the documents demonstrates their interdependence.[379] Because of this, even if the Court could ignore the Indenture, the

---

[376] The NIGC would not review the Bond Transaction without the Indenture. Coleman Aff. at ¶ 43. But there is also little reason for the Seventh Circuit to allow the District Court to read the Bond Documents "together" with each other but forbid reading them together with the Indenture. Instead, the Seventh Circuit simply held that questions regarding application of the Bond Documents are "not susceptible to resolution on the face of the amended complaint, and Wells Fargo's opportunity to file a reply brief was not an adequate opportunity for the thorough litigation required to resolve them." *Wells Fargo 7th Cir.*, 658 F.3d at 701. On this point, the Tribal Defendants incorporate by reference the Corporation's Memorandum in Support of Motion to Reconsider, Alter, and Amend Order in its entirety. Jacquart Decl., Ex. 15, Def. Lake of the Torches Econ. Dev. Corp.'s Mem. In Supp. of Mot. to Reconsider, Alter, and Amend Order, *Saybrook Tax Exempt Investors, LLC v. Lake of the Torches Econ. Dev. Corp.*, Case No. 12-cv-255 (W.D. Wis. 2012).

[377] *See* Jacquart Decl., Ex. 12, Security Agreement; Jacquart Decl., Ex. 13, Account Control Agreement (collectively, the "Transaction Documents").

[378] *James Talcott, Inc.*, 133 N.W.2d at 477.

[379] *See, e.g.*, Coleman Aff., ¶¶ 33 (describing the Bond Purchase Agreement's reliance on the Security Agreement, Tribal Agreement, Account Control Agreement, and Bond Resolution), 36 (describing the Limited Offering Memorandum's reliance on the Bonds, Bond Resolution, and Bond Purchase Agreement, 38 (describing the Bonds' reliance on the Bond Resolution), and 46-47 (describing the Bond Purchase Agreement and Bond Documents' reliance on the Bond Resolution, Security Agreement, and Limited Offering Memorandum).

Bond Documents and the Transaction Documents "are, in the eyes of the law, one contract or instrument."[380]

As Exhibit 20 of Jacquart's Affidavit summarizes, even without the Indenture, the remaining Bond and Transaction Documents evince *every one of* the management provisions that invalided the Indenture *and more*. For example, just as the Indenture placed a blanket lien on substantially all the Corporation's assets, including 100% of the Casino's gross revenues, so too does the Security Agreement.[381] Thus, it "bestows a great deal of authority in an entity other than the Tribe to control the Casino's operations."[382] Just as the Indenture required Bondholder consent before the Corporation could replace key Casino personnel *for any reason*, so too does the Tribal Agreement,[383] and so it "gives the bondholders truly powerful authority over the management of the Corporation[.]"[384] And just as the Indenture "permit[ed . . .] even greater control by the bondholders in case of default[,]"[385] those same default remedies are included in the Bonds, Security Agreement, and Limited Offering Memorandum.[386]

The Seventh Circuit was "firmly convinced" that these provisions "transfer[ed] significant management responsibility to Wells Fargo and the bondholder and therefore render the Indenture a management agreement subject to the approval of the

---

[380] *James Talcott, Inc.*, 133 N.W.2d at 477.

[381] *Compare* Dkt # 1-4, Compl., Ex. D, Indenture, § 5 *with* Jacquart Decl., Ex. 12, Security Agreement at § 1. *See also* Coleman Aff. ¶ 44.

[382] *Wells Fargo 7th Cir.*, 658 F.3d at 698 (finding § 5 of the Indenture evinces management).

[383] *Compare* Dkt # 1-4, Compl., Ex. D, Indenture, § 6.20 *with* Dkt 1-9, Ex. I, Tribal Agreement, § 4(b). *See also* Coleman Aff. ¶ 45.

[384] *Wells Fargo 7th Cir.*, 658 F.3d at 698-99 (finding § 6.20 of the Indenture evinces management).

[385] *Id.* (finding §§ 8.02 and 8.04 of the Indenture evince management).

[386] Dkt # 1-1, Compl., Ex. A, Bonds, 4; Jacquart Decl., Ex. 12, Security Agreement at § 4; Dkt # 1-2, Compl., Ex. B, Limited Offering Mem., at 19, 22; *see also* Coleman Aff., ¶¶ 53 (Security Agreement), 55 (Bonds), 60 (Limited Offering Mem.).

Chairman."[387] But the Bond and Transaction Documents afford Wells Fargo and Saybrook *additional* control that the Seventh Circuit did not even consider when it invalidated the Indenture:

- In the event of default, the Security Agreement requires the Corporation to "irrevocably appoint" the Trustee as its attorney-in-fact with the authority to "exercise any rights or remedies with respect to the Collateral or to endorse any checks which constitute part of the Collateral."[388]

- The Security Agreement forbids the Corporation from removing equipment like slot machines from the Casino without the Trustee's written consent,[389] but affording an outside entity control "for any length of time" over daily decisions about the profitability, placement, and replacement of gaming machines is a management function.[390]

- Tribal Agreement goes even further, affording the Trustee "complete control" over the personal property of the Casino[391] by allowing it to enter onto the Tribe's land at any time to remove or repossess any of the gaming machines—or anything else required to operate the casino.[392]

- The Tribal Agreement (and the Security Agreement in the event of a default[393]) even gives the bondholders authority over the trust land the Casino sits on by requiring the bondholders to give their written consent before the Tribe may even modify its land leases with the Corporation.[394]

Thus, even without their governing Indenture, the Bond and Transaction Documents evince *even greater* day-to-day and default control over the Casino than the Indenture. They indisputably "provide[] for the management of all or part of a gaming operation"[395] by granting authority for "planning, organizing, directing, coordinating, and controlling"

---

[387] *Wells Fargo 7th Cir.*, 658 F.3d at 699.

[388] Jacquart Decl., Ex. 12, Security Agreement at § 9; Coleman Aff., ¶ 48.

[389] Jacquart Decl., Ex. 12, Security Agreement at § 2(c)(ii).

[390] Coleman Aff., ¶ 54 (quoting June 25, 2009 letter to Ms. Ko, Bally technologies, from NIGC Acting General Counsel).

[391] Coleman Aff., ¶¶ 58-59.

[392] Dkt # 1-9, Compl., Ex. I, Tribal Agreement, Compl., § 4(c).

[393] *See* Jacquart Decl., Ex. 12, Security Agreement at § 4.

[394] *Id.* at § 4(d).

[395] *Wells Fargo 7th Cir.* 658 F.3d at 695 (citing 25 C.F.R. § 502.15).

to outside parties.[396] Regardless of whether any single Bond or Transaction Document is itself a management contract, the Court must consider the "combined effect of all [the] agreements"[397] because management provisions in one agreement can "convert" related agreements into a management contract.[398] If "the agreements, when considered together, constituted a management agreement,"[399] then they *all* "served as a management contract implicitly if not explicitly[,]"[400] and any decision to the contrary is reversible error.[401] But *none* of the Bond or Transaction Documents ever received NIGC approval. Because the Bond and Transaction Documents created a single unapproved management contract, they (and each of their included provisions) are all void *ab initio*.

## C. TAKEN INDIVIDUALLY, NONE OF THE BOND DOCUMENTS WAIVES THE TRIBAL DEFENDANTS' SOVEREIGN IMMUNITY.

Assuming *arguendo* that any of the Bond Documents survive the nullification of the Indenture and do not collectively comprise a management contract, the waivers in each Bond Document nevertheless fail—*on their own*—to waive the Tribal Defendants' immunity from this suit.[402] Courts must narrowly construe each purported waiver[403] to be certain that the waiver: (1) is contained in a valid document;[404] (2) is made by the

---

[396] *See id.* at 696 (citing NIGC Bulletin No. 94-5, at 1).

[397] *Casino Magic*, 293 F.3d at 425.

[398] *Id.* at 423.

[399] *Id.* at 424.

[400] *Id.* at 425; *see also* Jacquart Decl., Ex. 18, Washburn Aff. at ¶ 17; Coleman Aff., ¶ 17.

[401] *Casino Magic*, 293 F.3d at 427 (reversing and remanding where "[t]he district court erred in holding as a matter of law that the Consulting Agreement, Construction and Term Loan Agreement, and the Participation Agreement constituted a consulting agreement rather than a management agreement.").

[402] The chart of the relevant portions of the waivers are attached as Ex. 21 to Jacquart Decl.

[403] *Orff*, 545 U.S. at 601-02 (2005); *Rupp*, 45 F.3d at 1245; S*eneca-Cayuga Tribe of Okla.*, 874 F.2d at 715.

[404] *Wells Fargo 7th Cir.*, 658 F.3d at 686, 702; *Mo. River Servs., Inc.* 267 F.3d at 854; *A.K. Mgmt. Co.*, 789 F.2d at 789; *New Gaming Sys. Inc.*, 896 F. Supp. 2d at 1093.

appropriate Tribal Defendant;[405] (3) to allow suit by the appropriate plaintiff;[406] *and* (4) for the specific claim that plaintiff asserts.[407]

At each turn, Plaintiffs bear the burden of proving the validity and applicability of the waiver, and the court must resolve all doubts about the waiver in favor of the Tribal Defendants.[408] Here, some of the purported waivers expressly limit their scope, some are not made by the Tribal Defendants, some are not waivers at all, and some of the Bond Documents include the same *indicia* of management that rendered the Indenture void. Strictly construed as the law requires, none of the purported waivers in the Bond Documents clears all of these hurdles. Accordingly, Plaintiffs' complaint against the Tribal Defendants must be dismissed.

### 1.   The Bonds.

As a threshold matter, the "specimen bond" attached to Plaintiffs' Complaint is not an actual bond.[409] Therefore, it cannot contain any valid or enforceable waiver of the Tribal Defendants' sovereign immunity. Plaintiffs bear the burden of establishing the existence and validity of the documents they rely on to support their wavier argument. But even if Plaintiffs' specimen bond reflects the language in the actual bonds, they nevertheless fail to waive the Tribal Defendants' sovereign immunity.

### a. By their terms, the Bonds cannot be enforced without a valid Trustee or Indenture.

The Bonds explicitly condition their enforceability on the Indenture: "This Bond *shall not be valid or become obligatory for any purpose* until it shall have been

---

[405] *See Mo. River Servs., Inc.*, 267 F.3d at 854.
[406] *See Coleman* , 715 F.2d at 1162.
[407] *See Taylor*, 599 N.W.2d at 927; *see also Lewis v. Norton*, 424 F.3d 959, 962 (9th Cir. 2005).
[408] *Orff*, 545 U.S. at 601-02; *Amerind Risk Mgmt. Corp.*, 633 F.3d at 685-86.
[409] Israel Aff., ¶ 13(j) ("In the ordinary and customary practice of municipal finance, the Specimen Bond itself would not be seen as having any independent significance.").

authenticated by the execution of the certificate hereon endorsed by the Trustee under the Indenture."[410] Because the Indenture is void *ab initio*, however, there was never a valid trust or trustee.[411] Without a trustee to endorse the Bonds or Indenture under which to endorse them, the Bonds *did not become valid or obligatory for any purpose*.[412] Any other result would impermissibly render the authentication requirement "mere surplusage."[413] Thus, by their own terms, the Bonds never became valid, and their purported waivers have no effect.

### b. The Bonds are unapproved management contracts that are independently void under IGRA.

Apart from their dependence on the Indenture, the Bonds contain the same *indicia* of management that likewise renders them void under IGRA. For example, the Bonds provide a security interest in the Casino Facility's operating revenues and all future gross revenues.[414] The Bonds include a blanket lien on essentially every part of

---

[410] Dkt #1-1, Compl., Ex. A, Bonds, 5 (emphasis added).

[411] *Wells Fargo 7th Cir.*, 658 F.3d at 702 (finding that, because the Indenture was void, its provisions are also invalidated); *see also Michel v. Deutsche Bank Trust Co.*, 2012 WL 4363720, *5 (E.D. Cal. 2012) (stating that a trustee's sale undertaken by one who is not the valid trustee is void).

[412] Israel Aff., ¶15 ("In this transaction, as in other transactions governed by a Trust Indenture, the issuance of the Bonds is not separately authorized without the Trust Indenture. Thus, it is further my opinion that, if the Trust Indenture is void *ab initio*, the Bonds must also be treated as void since they were issued pursuant to and governed by the Trust Indenture."); Saiz Aff., ¶ 17(a)(i) ("Because the Bonds say they were issued pursuant to the Indenture, are virtually completely governed by the Indenture, and are an exhibit to the Indenture, it is my opinion that they are part and parcel of the Indenture and not subject to a declination letter."); Jacquart Decl., Ex. 18, Washburn Aff. at ¶16 n. 8 ("in cases where the bonds refer to the indenture agreement, bondholders are bound by the terms of the indenture as to the right to sue if bonds are not paid at maturity.") (citing 6A FLETCHER CYCLOPEDIA CORPORATIONS, § 2751 at 209-210).

[413] *See, e.g., Borek Cranberry Marsh, Inc. v. Jackson County*, 785 N.W.2d 615, 622 (Wis. 2010) (citing *Goebel v. First Fed. Savings & Loan Ass'n of Racine*, 266 N.W.2d 352 (Wis. 1978) ("[C]ourts must avoid a construction which renders portions of a contract meaningless, inexplicable or mere surplusage.")).

[414] Dkt # 1-1, Compl., Ex. A, Bonds, 5.

the Casino except the land it sits on[415] and allow attachment of the "Pledged Casino Revenues wherever located or maintained," and "Pledged Revenues" (defined in the now-void Indenture include "all Gross Revenues and investment earnings on Gross Revenues," which, in turn, includes "all receipts" of the Corporation).[416] But the NIGC's analysis on this point is clear:

> [A]n agreement containing a security interest in a gaming facility's future gross revenues, without further limitation, authorizes management of a gaming facility. We take this position because in the event of default, a party with a security interest in a gaming facility's gross revenues has the authority to decide how and when operating expenses at the gaming facility are paid, which is in itself a management function. Furthermore, a party that controls gross revenue potentially can control everything about the gaming facility by allocating or putting conditions on the payment of operating expenses. Therefore, agreements with such a security interest constitute management contracts that are void unless and until approved by the Chairman of the National Indian Gaming Commission (NIGC).[417]

Consequently, the pledged-gross-revenue provisions render the Bonds management contracts irrespective of the Indenture.[418]

Furthermore, the Bonds incorporate remedies for default from the Indenture.[419] Those remedies give "complete control by the Trustee, Bond Holders or a receiver of the casino assets including payment of casino expenses and capital expenditures[,]"[420] and the ability to require the Corporation to hire new management of the bondholders' choosing—a provision the Seventh Circuit held "places very significant management

---

[415] *Id.* at 3.

[416] *Id.* at 5, 8.

[417] Jacquart Decl., Ex. 18, Washburn Aff. at ¶ 22 (quoting from NIGC opinion letter authored by then-Acting General Counsel Coleman) (emphasis added); *see also* Coleman Aff., ¶ 19. Myriad NIGC declination letters agree. *See* http://www.nigc.gov/Reading_Room/Management_Review_Letters_Declination_Letters.aspx (last visited May 18, 2013).

[418] Jacquart Decl., Ex. 18, Washburn Aff. at ¶¶ 22-23; Coleman Aff., ¶¶ 19, 32, 33, 36, 62.

[419] Coleman Aff. at ¶ 55.

[420] *Wells Fargo 7th Cir.*, 658 F.3d at 699

authority in the hands of the bondholders."[421] The Bonds "allow[] the bondholders to control the amount that the Corporation can spend on capital expenditures related to the Casino, a major prerogative in determining the present and future direction of any corporate entity."[422] The Bonds' provision requiring the appointment of a management consultant in certain circumstances "implicates the apportionment of management responsibilities for the Corporation."[423] The Bonds' requirement that the Corporation seek bondholder consent to replace the general manager vests management authority outside of the Corporation by "tying the hands of the Tribe to replace key officers[.]"[424]

The Seventh Circuit held that even "a financing scheme that permits the provider of funding intermittently to interject itself in the management decisions of the facility to ensure the security of its investment—should be subject to the Chairman's scrutiny and approval as a management contact."[425] Thus, the Bonds are unapproved management contracts and all of their provisions—including their waivers of sovereign immunity—are void *ab initio*.[426]

### c. The Bonds' purported waiver does not allow this suit.

Even if the Bonds were effective without the Indenture and not independently void under IGRA, the purported waiver of sovereign immunity in the Bonds does not reach this case. The waiver provides:

---

[421] *Id.* at 697
[422] *Compare id.* at 698 *with* Dkt # 1-1, Compl., Ex. A, Bonds, 3.
[423] *Compare 7th Cir.* 658 F.3d at 698 *with* Dkt # 1-1, Compl., Ex. A, Bonds, 4.
[424] *Compare 7th Cir.* 658 F.3d at 698-99 *with* Dkt # 1-1, Compl., Ex. A, Bonds, 4.
[425] *Wells Fargo 7th Cir.*, 658 F.3d at 697 (emphasis in the original).
[426] *See* 25 C.F.R. § 533.7.

Indenture, the Security Agreement, or the Bond Resolution, or regarding the subject matter of the Indenture. The Corporation expressly consents to the levy of judgment or attachment of the Pledge Casino Revenues wherever located or maintained, including within the boundaries of the Lac du Flambeau Reservation, by the appropriate federal or state court. This waiver:

> (a) shall terminate upon payment in full of the Bonds and all other amounts payable by the Corporation under the Indenture,

> (b) is granted solely to the Trustee and the Holders from time to time of the Bonds,

> (c) shall extend only to a suit to enforce the obligations of the Corporation under the Indenture, the Bond Resolution, the Security Agreement, or the Bond Placement Agreement,

> (d) shall be enforceable only in a court of competent jurisdiction and only to the extent the Corporation has consented to the jurisdiction of such pursuant hereto and to the Indenture,

> (e) shall not be deemed as a waiver of or consent to any lien on lands or moneys held in trust for the benefit of the Corporation by the United States, and

> (f) shall remain in full force and effect notwithstanding that the governing law shall be as set forth herein and in the Indenture.

The Corporation expressly submits to and consents to the jurisdiction of the United States District Court for the Western District of Wisconsin (including all federal courts to which decisions of the Federal District Court for the Western District of Wisconsin may be appealed), and, in the event (but only in the event) the said federal court fails to exercise jurisdiction, the courts of the State of Wisconsin wherein jurisdiction and venue are otherwise proper, for the adjudication of any dispute or controversy arising out of this Bond, the Indenture, or the Bond Resolution and including any amendment or supplement which may be made thereto, or to any transaction in connection therewith, to the exclusion of the jurisdiction of any court of the Corporation.

Subsection (c) of the purported waiver limits it "*only* to a suit to enforce the obligations of the Corporation under the Indenture, the Bond Resolution, the Security Agreement, or the Bond Placement Agreement[.]"[427] Where a tribal entity "consent[s] to suit, any conditional limitation it imposes on that consent must be strictly construed and applied."[428] Accordingly, even if the Bonds were not void for any of the multiple reasons stated above, they do not contain a waiver to bring this suit seeking to enjoin the Tribal Court action.

In addition, subsection (d) makes clear the purported waiver is enforceable only to the extent the Corporation has consented to the jurisdiction of such pursuant hereto

---

[427] Dkt # 1-1, Compl., Ex. A, Bonds, 5 (emphasis added).
[428] *Mo. River Servs., Inc.*, 267 F.3d at 852 (internal alterations and citations omitted).

*and to the Indenture.*" The Indenture is a legal nullity so the Corporation did not consent to jurisdiction in it.[429] Thus, allowing this suit to proceed would require this Court to ignore subsections (c) and (d) as surplusage, a disfavored outcome.[430] When strictly construed, as the law requires,[431] the Bond waivers cannot support Plaintiffs' suit.

### 2. The Limited Offering Memorandum.

#### a. The Limited Offering Memorandum merely describes the terms of the Bond Transaction; it does not waive the Tribal Defendants' immunity.

Stifel used the Limited Offering Memorandum ("Offering Memo") to remarket the Bonds. Like a prospectus, it described the Bond Transaction but it did not have any bearing on the transaction itself.[432] While the Offering Memo describes purported limited waivers of sovereign immunity by the Corporation, "there is no separate waiver of sovereign immunity contained in the Limited Offering Memorandum."[433] This is clear from the language of the Offering Memo:

---

[429] *Wells Fargo 7th Cir.*, 658 F.3d at 699-700.

[430] *See, e.g., United States v. Wagner*, 29 F.3d 264, 266 (7th Cir. 1994) (stating that to interpret a statute so as to read surplussage therein conflicts with the Seventh Circuit's maxum to "give effect, if possible, to every clause and word of a statute"); *Borek Cranberry Marsh, Inc.*, 785 N.W.2d at 622 (2010) (citing *Goebel,* 266 N.W.2d 352 (Wis. 1978) ("[C]ourts must avoid a construction which renders portions of a contract meaningless, inexplicable or mere surplusage.")).

[431] *See e.g., Orff*, 545 U.S. at 601-02

[432] Israel Aff., ¶ 13(e).

[433] Israel Aff., ¶ 18.

**Limitations on Recourse Against the Corporation and the Tribe and the Corporation's and Tribe's Assets; Enforceability Risk**

> The Tribe is a sovereign nation and generally immune from legal proceedings commenced in federal court, tribal court and state courts. In the Indenture, the Security Agreement, the Tribal Agreement, the Tribal Resolution the Bond Resolution and the Bond Purchase Agreement (the "Bond Documents"), the Corporation and the Tribe have waived their sovereign immunity and consented to suits against them only in connection with the Bonds and the Bond Documents. In addition, the Corporation and the Tribe have consented in the Bond Documents the jurisdiction of the Federal District Court of the Western District of Wisconsin (and to the jurisdiction of all courts to which decisions may be appealed) and, in the event (but only in the event) the federal district court fails to exercise jurisdiction, the courts of the State of Wisconsin where jurisdiction and venue are proper, for any disputes arising out of the Bond Documents. With this waiver of sovereign immunity, the Corporation and the Tribe expressly consent to the levy of judgment or attachment of the assets of the Corporation and the Tribe wherever located or maintained, including within the boundaries of the Lac du Flambeau Reservation, by the appropriate federal or state court, notwithstanding the jurisdiction of the Tribal Court. Nevertheless, enforcement of a final judgment could be affected by disputes over the waiver of sovereign immunity, and will be subject to limitations imposed by federal law.

A description of a waiver purportedly contained in *another* document does not waive tribal sovereign immunity, particularly when strictly construed in favor of the sovereign.[434]

### b. Stifel cannot waive the Tribal Defendants' sovereign immunity.

The Offering Memo was "prepared and drafted by Stifel," as Saybrook acknowledges.[435] As a matter of law, Stifel *cannot* waive the Tribal Defendants' immunity—only Congress or the relevant Tribal Defendant can do so.[436] Nor can an agent of the Tribal Defendants waive their sovereign immunity.[437] But even if the law allowed an agent to waive sovereign immunity (it does not), Stifel is not an agent of the Corporation or the Tribe. Stifel was the underwriter and initial purchaser in an "arms'-

---

[434] *See Ute Distribution Corp. v. Ute Indian Tribe*, 149 F.3d 1260, 1267 (10th Cir. 1998).

[435] *See* Jacquart Decl., Ex. 1, State Court Compl., at ¶ 33(b).

[436] *E.g.*, *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1293 (10th Cir. 2008) (tribal sovereign immunity "may *only* be overcome in one of two ways. First, Congress has the power to abrogate the tribe's immunity. Second, *the tribe* can waive its own immunity.") (internal citations omitted) (emphasis added).

[437] *Mo. River Servs., Inc.*, 267 F.3d at 852 (holding that tribe's attorney could not waive sovereign immunity on behalf of the tribe).

length . . . [and] potentially adverse relationship with the Issuer."[438] The suggestion that Stifel, a potentially adverse party, could waive the Corporation's or the Tribe's sovereign immunity is absurd.

### c. The Offering Memo is itself void under IGRA as an unapproved management contract.

Even if it could create (rather than just describe) rights, the Offering Memo is also void *ab initio* under IGRA because it includes myriad terms that constitute management.[439] For example, the Offering Memo incorporates the blanket lien on the assets,[440] control over allocation and disposition of Corporation revenues,[441] limitations on Corporation capital expenditures,[442] requirements regarding the appointment of a management consultant and consent to the Corporation's change of key personnel,[443] default remedies like the appointment of a receiver and replacement of key personnel,[444] control over leases of tribal land[445] and gaming-equipment placement decisions,[446] and prohibitions on the Corporation's ability to incur debt.[447] These management provisions give the bondholders control over the Casino and render the Offering Memo, if it is a contract that creates rights, an unapproved management contract that is void by its own terms.[448]

---

[438] Israel Aff., ¶ 9(c).

[439] *See* Jacquart Decl., Ex. 18, Washburn Aff. at ¶¶ 27-28; Coleman Aff., ¶¶ 36, 62.

[440] Dkt 1-2, Compl., Ex. B, Limited Offering Mem., 3, 4, 13, 14.

[441] *Id*. at B-7, B-8.

[442] *Id*. at B-13.

[443] *Id*.

[444] *Id*. at 19, 22, B-15, B-16, and E-3.

[445] *Id*. at B-13.

[446] *Id*. at E-3.

[447] *Id*. at 16, B-1, B-14.

[448] *See* Jacquart Decl., Ex. 18, Washburn Aff. at ¶¶ 27-28; Coleman Aff. at ¶¶ 61-62; *Wells Fargo 7th Cir.*, 658 F.3d at 699.

### 3.    The Bond Resolution.

#### a. The Bond Resolution is a contract with a nonexistent trustee.

The Bond Resolution authorizes the Corporation's Board of Directors to execute the Indenture with the Trustee.[449] It specifically provides: "*this Resolution shall constitute a contract with the Trustee*[.]"[450]

> Bond Document, and this Resolution shall constitute a contract with the Trustee, and shall not be rescinded or modified without the written consent of the Trustee; and be it

But because the Indenture is void, there is no Trustee.[451] Without a trustee, there is no contract.[452] No other party can step into the Trustee's shoes to enforce the Tribal Defendant's *limited waiver* that only authorizes suit *against the Trustee*.[453] Thus, strictly construing this purported waiver, the Bond Resolution does not authorize this suit.[454]

#### b. There is no waiver in the Bond Resolution.

Moreover, the Bond Resolution does not itself waive the Corporation's immunity. The Bond Resolution *references,* but does not incorporate, the purported waivers of sovereign immunity in the other Bond Documents.[455] After defining "Legal Provisions" in the various Bond Documents to include waivers of sovereign immunity, the Resolution provides that "all Legal Provisions in the Bond Documents are hereby

---

[449] Israel Aff., ¶ 13(h).

[450] Dkt 1-5, Compl., Ex. E, Bond Resolution, 3 (emphasis added).

[451] *Wells Fargo 7th Cir.*, 658 F.3d at 702 (finding that, because the Indenture was void, its provisions are also invalidated); *Michel*, 2012 WL 4363720 at *5 (E.D. Cal. 2012) (stating that a trustee's sale undertaken by one who is not the valid trustee is void).

[452] *In re Hawthorne Townhomes L.P.*, 282 S.W.3d 131, 138 (Tex. App. 2009) ("If one of the parties does not exist, no contract can be formed.").

[453] *See Auto. United Trades*, 285 P.3d at 57.

[454] *See Ute Distribution Corp.*, 149 F.3d at 1267.

[455] The Bond Resolution has its own definition of "Bond Documents," which includes only the Indenture, the Bonds, the Security Agreement, and the Bond Purchase Agreement. Dkt 1-5, Compl., Ex. E, Bond Resolution, 2.

fapproved."[456] It goes on to generally describe the waivers of sovereign immunity, but significantly *does not* include the language—present in each of the explicit waivers—that the Corporation "hereby" waives its sovereign immunity from suit.[457] The Bond Resolution, strictly construed, merely *authorizes* waivers of sovereign immunity made by the Corporation in the other named Bond Documents; there is no independent waiver of sovereign immunity in the Bond Resolution.[458]

### 4.      Issuer Opinion and Bond Opinion.

Both the Issuer Opinion and the Bond Opinion reflect Godfrey's opinion that the Corporation waived its sovereign immunity in *other* Bond Documents, but like the Bond Resolution, they do not contain their own waivers.[459] Moreover, neither purports to be a representation *by the Corporation or the Tribe*. As Saybrook acknowledges, the Bond Opinion "is an objective legal opinion with respect to the validity of the bonds," and is not itself a waiver.[460] Even if the documents themselves contained a waiver (they do not) an outside firm's legal opinion—particularly one that was ultimately proven incorrect—cannot waive either Tribal Defendant's sovereign immunity.[461]

---

[456] Dkt 1-5, Compl., Ex. E, Bond Resolution,  3.

[457] *Compare id. with* Dkt # 1-1, Compl., Ex. A, Bonds and Dkt # 1-3, Compl., Ex. C, Bond Purchase Agreement.

[458] *See* Israel Aff., ¶ 19.

[459] *See* Dkt # 1-6, Compl., Ex. F, Issuer Opinion Letter and Dkt # 1-7, Compl., Ex. G, Bond Counsel Opinion Letter.

[460] *See* Jacquart Decl., Ex. 1, State Court Compl. at ¶ 72.

[461] *Mo. River Servs., Inc.*, 267 F.3d at 852 (holding that tribe's attorney could not waive sovereign immunity on behalf of the tribe). Indeed, the parties to a bond transaction typically would not expect that a law firm could waive immunity by its opinions. Israel Aff., ¶¶ 9(b), 9(f), 22.

### 5.   The Bond Purchase Agreement.

#### a. The Bond Purchase Agreement is void under IGRA.

The Bond Purchase Agreement is also independently void *ab initio* under IGRA because it includes revenue terms that clearly constitute management. For example, it repeats the blanket lien on substantially all the Corporation's assets (including the Pledged Revenues),[462] and states that the Bonds shall be subject to redemption on the terms set forth in the Indenture.[463] The Pledged Revenues do not exclude revenues necessary to pay casino operating expenses, and like the Indenture, "without some limitation on . . . discretion to allocate or condition the release of the Casino's gross revenues even to pay operating expenses, this provision bestows a great deal of authority in an entity other than the Tribe to control the Casino's operations."[464] Because it includes these *indicia* of management, it is void as an unapproved management contract.[465]

#### b. The Bond Purchase Agreement does not contain a valid waiver that allows this suit.

The Bond Purchase Agreement states on the very first page that it is an agreement between the Corporation and Stifel—*not* the Tribe and *not* Saybrook, Wells Fargo, or Godfrey.[466]

---

[462] *See* Coleman Aff., ¶ 56.

[463] *See* Saiz Aff., ¶ 17(f).

[464] *Wells Fargo 7th Cir.*, 658 F.3d at 698; *see also* Saiz Aff., ¶ 17(f); Coleman Aff., ¶ 56

[465] Coleman Aff., ¶ 56.

[466] Dkt # 1-3, Compl., Ex. C, Bond Purchase Agreement, 1. Stifel has not asserted any claims against either Tribal Defendant, but the Tribal Defendants do not concede they have waived their immunity if Stifel were to commence such an action. Such arguments are irrelevant to the Tribal Defendants' Motion to Dismiss and this supporting brief and, as such, are not addressed herein. The Tribal Defendants reserve any and all arguments related to Stifel's right to bring suit against the Tribal Defendants.

> This BOND PURCHASE AGREEMENT (the "Agreement") is made and entered into as of January 18, 2008, between LAKE OF THE TORCHES ECONOMIC DEVELOPMENT CORPORATION (the "Corporation") and STIFEL, NICOLAUS & COMPANY, INCORPORATED, a Missouri corporation (the "Initial Purchaser").

Moreover, the purported waiver included in the Bond Purchase Agreement specifically states that the limited waiver of sovereign immunity is granted only to the "Trustee" and the "Holders," and *only* authorizes suit under the Bond Purchase Agreement:[467]

> (b)     Limited Waiver of Sovereign Immunity; Jurisdiction. The Corporation hereby expressly waives its sovereign immunity from suit and any requirement for exhaustion of tribal remedies should an action be commenced under this Agreement or regarding the subject matter hereof. This waiver: (i) shall terminate upon payment in full of the Bonds and all other amounts payable by the Corporation under this Agreement; (ii) is granted solely to the Trustee and the Holders from time to time or its assignee; (iii) shall extend only to a suit to enforce the obligations of the Corporation under this Agreement; (iv) shall be enforceable only in a court of competent jurisdiction and only to the extent the Corporation has consented to the jurisdiction of such court as set forth in this Subsection (b) and the Indenture; (v) shall not be deemed as a waiver of or consent to any lien on lands or moneys held in trust for the benefit of the Corporation by the United States; and (vi) shall remain in full force and effect notwithstanding that the governing law shall be as set forth in Subsection (a).
>
> The Corporation expressly submits to and consents to the jurisdiction of the United States District Court for the Western District of Wisconsin (including all federal courts to which decisions of the United States District Court for the Western District of Wisconsin may be appealed), and the Lac du Flambeau Tribal Court, and in the event that the United States District Court for the Western District of Wisconsin lacks jurisdiction, then the courts of the State of Wisconsin wherein jurisdiction and venue are otherwise proper, with respect to any dispute or controversy arising out of this Agreement and including any amendment or supplement which may be made thereto, or to any transaction in connection therewith.

Both of the terms—"Trustee" and "Holders"—are only defined in the void Indenture that is a legal nullity. There is no Trustee anymore. Even if an identifiable party *could* rely on the waiver (against the Corporation, but not the Tribe), it still would not support this suit because it is expressly limited "only to a suit to enforce the obligations of the Corporation under [the Bond Purchase Agreement]."[468] Reading this waiver narrowly, as the Court must, the Plaintiffs cannot bring this suit against the Tribal Defendants.

---

[467] *Id.* at §14(b)(ii) and (iv).
[468] *Id.* at § 14(b)(iii).

### 6.     The Tribal Resolution.

The Tribal Resolution also fails by its own terms. Like the Bond Resolution, it explicitly states that it "shall constitute a contract with the Trustee,"[469] *not* Saybrook, Wells Fargo, Stifel, or Godfrey.

> or contemplated herein or in the Tribal Agreement and this Resolution shall constitute a contract with the Trustee, and shall not be rescinded or modified without the written consent of the Trustee; and be it further

But there was never a Trustee. Because one of the two parties to the Tribal Resolution does not exist, there is no contract.[470] In any event, the Tribal Resolution also called for the Tribe to "'covenant[] not to replace key management of the Casino Facility without obtaining the requisite consent of the holders of the Bonds.'"

> enter tribal lands, (v) covenants not to establish competing gaming facilities, and (vi) covenants not to replace key management of the Casino Facility without obtaining the requisite consent of the holders of the Bonds; and be it further

This gives the bondholders management authority and means that the Resolution is an unapproved management contract and therefore void.[471]

### 7.     The Tribal Agreement.

#### a.  The Tribal Agreement may only be enforced by the nonexistent trustee.

The Tribal Agreement "is made and given by the Lac du Flambeau Band of Lake Superior Chippewa Indians . . . in favor of Wells Fargo, National Association, as trustee (the 'Trustee') under that certain Indenture dated as of January 1, 2008 . . . ."[472]

---

[469] Dkt # 1-10, Compl., Ex. J, Tribal Resolution, 3.
[470] *In re Hawthorne Townhomes, L.P.*, 282 S.W.3d at 138.
[471] Coleman Aff., ¶ 61.
[472] Dkt # 1-9, Compl., Ex. I, Tribal Agreement, 1.

> THIS AGREEMENT, dated as of January 1, 2008, is made and given by the LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, a federally-recognized Indian tribe (the "Tribe"), in favor of WELLS FARGO BANK, NATIONAL ASSOCIATION, as trustee (the "Trustee") under that certain trust indenture dated as of January 1, 2008 (the "Indenture") relating to the issuance by the LAKE OF THE TORCHES ECONOMIC DEVELOPMENT CORPORATION (the "Corporation") of its $50,000,000 Taxable Gaming Revenue Bonds, Series 2008 (the "Bonds").

It is thus a contract between the Tribe and Wells Fargo, as Trustee. But because the Indenture was void *ab initio*, a trust never arose, and Wells Fargo never became a trustee under the Indenture. A contract between the Tribe and a party that does not exist is no contract at all.[473] And no other party has the right to enforce the Tribal Agreement.[474]

### b. The Tribal Agreement is an unapproved management contract and therefore void.

Although ostensibly a guaranty of the Bonds by the Tribe, the Tribal Agreement independently provides for management in violation of IGRA. For example, the Tribal Agreement effectively controls the management of the Casino by requiring the Tribe to agree that it "will not replace the General Manager, Controller or Executive Director of the Casino Facility without prior written consent" of the Bondholders.[475]

> (b)   The Tribe agrees that it will not replace the Casino Facilities' General Manager, Controller or Executive Director of the Gaming Commission without first obtaining the prior written consent of 51% of the Holders of the Bonds.

Reviewing an identical provision in the Indenture, the Seventh Circuit reasoned that by requiring such consent in every circumstance, "[t]his provision gives the bondholders truly powerful authority over the management of the Corporation[.]"[476]  The Agreement also affords the Trustee extraordinary management powers like unrestricted control

---

[473] *In re Hawthorne Townhomes, L.P.*, 282 S.W.3d at 138.
[474] *See Auto. United Trades*, 285 P.3d at 57.
[475] Dkt # 1-9, Compl., Ex. I, Tribal Agreement, § 4(b).
[476] *Wells Fargo 7th Cir.*, 658 F.3d at 33 (emphasis in original).

over allocation and disposition of Casino revenues,[477] the ability to enter onto tribal lands at any time to repossess or remove any collateral (including gaming machines)[478] and to "amend, modify, extend, or supplement" *any part* of the Bond Transaction "without notice to the Tribe[,]"[479] and divests the Tribe of authority to revise its own land leases without permission.[480] Since this management contract was not approved by the NIGC, it is also void *ab initio*. Put simply, "the failure of the parties to seek NIGC approval renders the [Tribal Agreement's] 'guaranty' null and void."[481] Because the Agreement is void, all of its provisions are also void, including its purported waiver.

## IV. THE COURT SHOULD EXERCISE ITS DISCRETION TO DECLINE TO EXERCISE JURISDICTION OVER THIS CASE.

Finally, even if the Plaintiffs had properly invoked this Court's jurisdiction, and even if comity did not require exhaustion of tribal-court remedies, the Court has discretion to exercise—or decline to exercise—jurisdiction over a declaratory judgment action,[482] and strong prudential concerns caution against hearing this case. "[I]n determining whether to stay or dismiss a declaratory judgment action in the face of parallel state court proceedings, 'the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and

---

[477] *Compare Wells Fargo 7th Cir.*, 658 F.3d at 698 *with* Dkt # 1-9, Compl., Ex. I, Tribal Agreement, § 3(b).

[478] Dkt # 1-9, Compl., Ex. I, Tribal Agreement, § 4(c); Coleman Aff. at ¶¶ 58-59; *see also* Coleman Aff. at ¶ 54 (describing how placement and removal of gaming machines is management).

[479] Dkt # 1-9, Compl., Ex. I, Tribal Agreement, § 4(b).

[480] Dkt # 1-9, Compl., Ex. I, Tribal Agreement, § 4(d); Coleman Aff., ¶ 56.

[481] Jacquart Decl., Ex. 18, Washburn Aff. at ¶ 26; *see also* Saiz Aff., ¶ 17(c).

[482] *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995) ("[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites.")

wise judicial administration.'"[483] Courts in this Circuit consider the following factors in determining whether to refrain from exercising jurisdiction over a declaratory judgment action:

> [1] whether the declaratory suit presents a question distinct from the issues raised in the state court proceeding, [2] whether the parties to the two actions are identical, [3] whether going forward with the declaratory action will serve a useful purpose in clarifying the legal obligations and relationships among the parties or will merely amount to duplicative and piecemeal litigation, and [4] whether comparable relief is available to the plaintiff seeking declaratory judgment in another forum or at another time.[484]

Each of these factors counsels this Court to decline jurisdiction over this case.

As to the first factor, while the Complaint in this case is quite different from the one pending in Waukesha or the Statement of Claim in Tribal Court, the question presented here – the allocation of jurisdiction between the Tribal Court and Waukesha – is one that controlling Wisconsin law says must be addressed by the Waukesha Court.

The Wisconsin *Teague* cases[485] concerned a contract dispute between a tribe and the general manager of its casino. After the manager first filed a suit in circuit court, the tribe sued the manager in its own tribal court. The two cases proceeded on parallel paths to judgment, and after extended litigation, the Wisconsin Supreme Court held that in cases of parallel state- and tribal-court jurisdiction, the state court must conduct an

---

[483] *Ironshore Indem., Inc. v. Synergy Law Group, LLC*, --- F. Supp. 2d ---, 2013 WL 673374, *5 (N.D. Ill. Feb. 25, 2013) (quoting Wilton, 515 U.S. at 288)

[484] *Medical Assur. Co., Inc. v. Hellman*, 610 F.3d 371, 379 (7th Cir. 2010) (citing *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 695 (7th Cir. 1995)) (further citations omitted)

[485] *Teague v. Bad River Band of Chippewa Indians*, 229 Wis. 2d 581, 599 N.W.2d 911 (Ct. App. 1999) (*Teague I*); *Teague v. Bad River Band of Chippewa Indians*, 2000 WI 79, ¶¶37-41, 612 N.W.2d 709 (2000) ("*Teague II*"); *Teague v. Bad River Band of Lake Superior Tribe of Chippewa Indians*, 2003 WI 118, ¶ 58, 665 N.W.2d 899, 915 (Abrahamson, J., concurring) ("*Teague III*").

inter-jurisdictional conference in order to evaluate which case should defer and which should proceed. It explained:

> Requiring such a conference under these circumstances ensures that the issue of jurisdiction allocation, involving as it does an evaluation of principles of comity and tribal exhaustion, will be decided by the courts in an atmosphere of mutual respect and cooperation, rather than by the litigants in the height of adversarial battle. In cases of jurisdictional conflict such as this one, *such a conference should be convened as soon as either court is aware of the pendency of an action on the same subject matter in the other jurisdiction.*[486]

The Wisconsin Supreme Court identified thirteen factors[487] to "help state and tribal courts determine, in the spirit of cooperation, noncompetition, which of two courts should proceed to judgment and which court should abstain and cede jurisdiction."[488] One of these factors is "[w]hether each court has jurisdiction over the dispute and the parties and has determined its own jurisdiction."[489]

The Tribal Defendants moved the Waukesha Court to stay its case and conduct a *Teague* conference, and notified the Tribal Court of this request. Though the Waukesha Court refused (at the Plaintiffs' urging) to hold this conference, the Tribal Defendants are seeking interlocutory appeal of that ruling in light of the mandatory direction of the

---

[486] *Teague II*, 2000 WI 79 at ¶ 38 (emphasis added). In *Teague*, the Supreme Court required the circuit court to address the "judicial allocation of jurisdiction pursuant to principles of comity and tribal exhaustion[,]" *Id.* at ¶ 34, *after* the circuit court denied the tribe's motion to dismiss on immunity grounds, denied the tribe's motion to recognize the tribal-court judgment on full-faith-and-credit grounds, held a jury trial, and denied a motion for judgment notwithstanding the verdict. It is confusing that Godfrey cited the *Teague* cases to the Waukesha court yet represented to this Court that Godfrey was

> unable to find any case in which a tribe or its alter ego litigated a controversy in federal or state court for several years and then, after substantive decisions had been rendered, started new proceedings in the tribe's own courts and demanded deference to those proceedings as a matter of comity and efficiency—let alone any case in which such a belated exhaustion claim prevailed.

Pl. Godfrey & Kahn, S.C.'s Am. Mem. in Supp. of Fed. R. Civ. P. 65 Am. Mot. for a Prelim. Inj., Dkt. 43. That is precisely what *Teague* did.

[487] *Teague III*, 2003 WI 118 at ¶ 71 (Abrahamson, J., concurring).

[488] *Id.*

[489] *Id.*

*Teague* cases. Thus, the extent of Tribal Court jurisdiction over the Plaintiffs – the subject matter of this case – does not present a question distinct from the issues raised in the state court proceeding, and the first factor cautions against accepting jurisdiction over this declaratory judgment.

Most obviously, the second factor cautions against this Court hearing this case because the parties in this, the Tribal Court, and the Waukesha actions are all identical.[490] Moreover, the federal exhaustion rule directs the Tribal Court to assess the question of its jurisdiction in the first instance and Wisconsin law directs the Waukesha court to confer with that Court regarding the issue. Adding a third court to the equation is not likely to clarify the legal obligations of the parties. Rather, by this suit, the Plaintiffs have commenced piecemeal litigation in triplicate, satisfying the third factor weighing against this Court's acceptance of jurisdiction.

Finally, under the fourth factor, because each of the Plaintiffs has moved the Tribal Court to dismiss the Statement of Claim against them on jurisdictional grounds, they have already sought comparable relief in that other forum. Those motions are pending and this court should allow the Tribal Court to address the question of its own jurisdiction in the first instance. If the Tribal Court does not do so to the Plaintiffs' satisfaction, they are all but certain to return to this court and seek comparable relief from this Court at another time. Thus the fourth factor weighs against this Court hearing this case.

By seeking to enjoin the Tribal Defendants from pursuing their Tribal Court action, the Plaintiffs ask this Court not only to interfere with the Tribal Court process,

---

[490] *See* Dkt 1, Compl.; *See* Dkt # 1-14, Compl., Ex. N, Tribal Court Statement of Claim 1; *See* Jacquart Decl., Ex. 1, State Court Compl., at 1.

but also to prematurely cut off the *Teague* protocol, scuttling the procedure mandated by state law and interfering with the comity between the Waukesha and Lac Du Flambeau courts. Such interference will allow the Plaintiffs to evade the *Teague* process entirely and chart a course for future litigants who wish to avoid it by running to federal court whenever parallel actions proceed in tribal and state court. The Court should exercise its sound discretion and refrain from halting this process before it has a chance to begin.

## CONCLUSION

For the foregoing reasons, the Tribal Defendants respectfully request that the Court dismiss this action, or, in the alternative, stay the case pending Tribal Court exhaustion, or the resolution of the jurisdictional issues through the *Teague* process in the parallel Waukesha case, whichever occurs first.

Dated: June 13, 2013.

**HANSEN REYNOLDS DICKINSON CRUEGER LLC**

By: _ s/ Paul R. Jacquart_

Timothy Hansen
thansen@hrdclaw.com
Paul R. Jacquart
pjacquart@hrdclaw.com
James Barton
jbarton@hrdclaw.com
316 N. Milwaukee St., Suite. 200
Milwaukee, WI 53202
Office: 414-455-7676
Fax: 414-273-8476

**JACOBSEN, MAGNUSON, ANDERSON, HOGEN & HALLORAN P.C.**

Vanya S. Hogen
VHogen@JacobsonBuffalo.com
*appearing pro hac vice*
Jessica Intermill
JIntermill@JacobsonBuffalo.com
*appearing pro hac vice*
335 Atrium Office Building
1295 Bandana Boulevard
St. Paul, Minnesota 55108
Tele: (651) 644-4710
Fax: (651) 644-5904

*Attorneys for Defendants Lac Du Flambeau Band of Lake Superior Chippewa Indians and Lake of the Torches Economic Development Corporation*