## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

STIFEL, NICOLAUS & COMPANY, INC.,
STIFEL FINANCIAL CORP.,
SAYBROOK FUND INVESTORS, LLC
(successor to SAYBROOK TAX EXEMPT
INVESTORS, LLC),
LDF ACQUISITION, LLC,
WELLS FARGO BANK, N.A.
and GODFREY & KAHN, S.C.,

        Plaintiffs,

v.
                              Case No. 13-CV-372

LAC DU FLAMBEAU BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS and
LAKE OF THE TORCHES ECONOMIC
DEVELOPMENT CORPORATION,

        Defendants.

---

### Declaration of Karen M. Maki in Support of Motion to Dismiss and in Opposition to Plaintiffs' Motions for Preliminary Injunctions

---

I, Karen M. Maki, make the following declaration under penalty of perjury:

1.      I am over the age of 18 and make this declaration based on my own personal knowledge.

2.      I am the Director of Finance for the Lake of the Torches Economic Development Corporation (the "Corporation"). I have been employed by the Lac du Flambeau Tribe in its gaming facility since 1993, and since 1996, when it was created, I have worked for the Corporation. Between 1996 and approximately one year ago, my title was Controller for the Corporation. I am very familiar with the finances of the Corporation. My duties as Director of Finance include: preparing and maintaining the corporate budget and

overseeing the accounting and cash operation departments of the Casino, including the oversight of the revenue audit for all aspects of the operation.  Additional responsibilities include, but are not limited to analytical reviews, establishing all money handling policies and procedures, monitoring and reviewing all purchases and vendor invoices for propriety and policy compliance, identifying any discrepancies and either initiate or refer these discrepancies for investigation when appropriate,  monitoring for both internal and external theft, reviewing all property polices for compliance with Minimum Internal Control Standards, coordinating all property reporting and revenue reporting with various regulatory agencies, coordinating all external audits, working closely with Lac du Flambeau Tribal Accounting as well as the Lac du Flambeau Tribal Government to insure the needs of the Tribe are met.

3.      The Corporation operates the Lake of the Torches Casino Resort (the "Casino") on lands held in trust by the United States for the Lac du Flambeau Band of Lake Superior Chippewa (the "Tribe") within the boundaries of the Band's Reservation ("Tribal Trust Lands").

4.      The Casino is by far the largest source of revenue for the Tribe's governmental operations, and the Corporation has routinely transferred Casino revenues to the Tribal government after payment of operating expenses and capital expenditures so the revenues can be used for governmental programs.

5.      I am familiar with the $50 million in bonds the Corporation issued in January 2008 (the "Bonds").

6.      Before the Bonds were issued, the Corporation routinely transferred $17 to $18 million in Casino revenues per year to the Tribal government.

2

7.     From January 2008 until December 2009, under the terms of the documents governing the Bonds, daily gross revenues from the Casino were deposited in a "Restricted Depository Account" at Chippewa Valley Bank.  The amounts required to service the Bond debt were swept out of that account at the end of every month.

8.     The Corporation began depositing its revenues into the restricted depository account on January 18, 2008 and stopped making those deposits for payment of the Bonds on December 11, 2009, which was shortly before Saybrook and Wells Fargo filed suit in federal court.

9.     Before the federal courts ruled that the Trust Indenture was void, Wells Fargo acted as the Trustee for the bondholders.  In that role, Wells Fargo monitored the Corporation's deposits into the restricted account, performed the monthly sweeps of Casino funds, disbursed the funds into the various accounts as outlined by the voided bond indenture, and returned any excess funds to the Casino Operating account.  Certain funds held in Trust at Wells Fargo were for the benefit of the Casino Operation, while other funds were for benefit of Saybrook.  The funds held for the benefit of the Casino Operation were an Insurance Escrow Account, as well as an Operating Reserve Account.  When the operation needed any money from either of these accounts, the request was sent to Wells Fargo for the money to be disbursed to back to the Casino Operating account.  As the Controller,  I was required to prepare and file monthly unaudited Financial Statements to Wells Fargo within 30 days of the end of the month.  This filing also included a Certificate signed by an Authorized representative of the Tribe attesting to the compliance with various financial covenants of the Bonds.  Additionally the annual audit was sent to Wells Fargo.

10.     Casino revenue in northern Wisconsin is cyclical and varies dramatically from month to month.

11.     From January 2008 to December 2009, the revenue during the spring and summer months exceeded what was required to make the monthly Bond Payments (which were approximately $782,000) and permitted the Corporation to distribute remaining funds to the Tribe for its general fund.  But during the winter months, the Casino income was not sufficient to meet both the debt service on the Bonds and distribute funds to the Tribe.  In eight of those months, there was literally no money left over for the Corporation or the Tribe once the Bond payments were made.  In addition there were three months in which there were some excess funds to transfer to the Tribe, but these transfers remained insufficient to meet the needs of the essential Tribal Government monthly operational costs.

12.     That lack of revenue left at the Casino after payment of the Bonds had a direct and negative impact on Casino operations.  The Casino has certain capital expenditures that are required in order to keep the business operational, and the Bond payments strained the Corporation's ability to make those capital expenditures.  In fact, the Corporation is still straining to recover from the deficiencies created by its inability to reinvest in the business while making Bond payments.

13.     For example, each year the Casino updates a certain portion of its slot machines, which requires those machines being replaced to be offline for up to one week.  In 2008 as a result of the details of the bond indenture coming to light in late January, 70% of the planned capital investments had to be canceled that year, in order to insure a viable Tribal Government.  In 2009 the projects that would have normally been performed in the slow season of the year were delayed into the busy season.  Projects slated for completion in 2010

4

included replacement of the gaming-floor carpet and installation of new IT equipment. Each of those projects is, by its nature, disruptive to business on the gaming floor and, ideally, should be done when business is slow. Given the cash-flow restrictions caused by the Bond terms, however, there was not sufficient cash to fund those projects during the winter of 2009-2010, and they had to be put off until the summer of 2010, when business peaked.

14.     The Casino's net income and cash flow remained relatively flat in 2010 and 2011. In late 2011, after the Seventh Circuit upheld that the Bond Indenture was void, the Tribe authorized a reinvestment into slot machines and related equipment. As a result of this investment into the gaming floor, the Casino saw a net income growth of approximately 17% or approximately $2.4 million dollars, which appears to be sustaining into 2013, however it should be noted that this perceived growth simply restores the property to the net income operating levels previously experienced in 2007 before the Bonds impeded our operational choices.

15.     Resumption of Bond payments would have a similar effect to what happened in 2008-2009 on the Casino and the Corporation now. In addition, Casino cash flow is what creates the primary funding for the Tribal Government, which was on the verge of shutting down in 2009. If the bondholders were allowed to declare the entire remaining Bond principal and interest due and owing immediately, the Casino would have no leftover income to insure a healthy reinvestment into the business nor would it be able to insure a proper distribution to the Tribal government, for the purpose of maintaining essential government operations as required to IGRA.

16.     And of course, if the bondholders were permitted to seize our gaming machines, the Casino would be virtually unable to operate at all because slot machines account for 85-86% of the Casino's revenues.

17.     The Bond terms and covenants also had a direct negative impact on the Tribal government's ability to operate.  During 2008 and 2009, when the Bond payments were being made, there was a budget shortfall between what the Tribe budgeted for its government operations based on pre-Bond-payment income and the income that was available to the Tribe after payment of the Bonds.  The situation would be even worse now if the bondholders were allowed to declare the entire remaining Bond principal and interest due and owing immediately.

18.     In 2008 and 2009 with Tribal Accounting staff focused on managing the meager cash flow of the Tribe and being further stretched by layoffs  and staffing cutbacks that resulted from the loss of government funding when the Bond payments were in place, I was asked to assist the Tribal Government operations with analyzing the financial impact of the Bonds on the government programs as well as assist in cash flow planning and restorative efforts.

19.     Nearly all of the Tribe's annual general-fund budget has been historically funded by distributions from the Lake of the Torches Casino and related amenities that are owned by the Tribe and managed by the Corporation.

20.     The Bonds caused extreme financial stress on the Tribal government and, consequently, the Tribe's members.

21.     While the Corporation was making payments on the Bonds, it was difficult for the Tribal government to continue to operate at an acceptable level.

22.     As a consequence of the Bond terms and covenants, the Corporation's transfers to the Tribe for the fiscal year ended September 30, 2008 were $8.2 million, a reduction of $9.5 million from the Tribe's 2008 budget expectations.

23.     Historically, the Tribe had depended (indeed, still depends) on transfers from the Corporation in the range of $17 to $18 million annually.

24.     But in the fiscal year ended September 30, 2009, the Corporation was only able to transfer about $4.0 million to the Tribe.

25.     That reduction in transfers and funding placed the Tribal government and Tribal members under severe duress.

26.     In addition to the complete elimination of any per capita distributions of Casino revenue to tribal members in the fall of 2008 and 2009, payment of the Bonds forced the Tribe to sustain severe cuts in governmental and social programs of the Tribe.  For example:

a.  Between 2007 to 2008 the Tribe was forced to make a 15% cut in the wages of Tribal employees and in 2009 the Tribe was forced to make an additional 19.% cut.  During 2009, approximately 100 full-time-equivalent positions were eliminated, and substantial reductions in hours worked were also incurred.

b.  The Tribal newspaper, a publication that provided news regarding community events, stories, and other matters relating to the Tribe and its members, and that was distributed both on and off the Tribe's reservation, was eliminated after 2007.

c.  The Land Purchase Program, which was aimed at restoring former lands owned by the Tribe or its members to Tribal ownership, was terminated.

7

d.  The Census and Demographics Program, which in the past had been key to planning and developing tribal programs by identifying various Tribal and membership needs, was suspended.

e.  General-fund support from the Casino revenues to the WIA Comprehensive Services, a workforce development program, was terminated.

f.  The Cultural/Prevention Program, which used traditional ceremonies and events in an effort to reduce alcohol and drug abuse, was suspended.

g.  The Transportation Program, which provided much-needed educational transportation to higher-education students, was eliminated.

h.  The Building Inspection Program, which provided quality- and safety-assurance for houses and other buildings constructed on trusts lands not subject to review by State inspectors, was suspended.

i.  The Housing Rehabilitation Program, which provided assistance to low- and moderate-income members for housing maintenance and repair to meet building and safety requirements and otherwise provide decent housing, was terminated.

j.  The Tribal Youth Work Program, which provided Tribal youth with summer employment opportunities, was eliminated.

k.  The GIS Mapping & Inventory Project, which was designed to catalogue reservation lands, was suspended.

l.  Tribal and budget support for the Fish and Game Program, which provided for monitoring, management, and protection of fish and game within reservation boundaries, has been eliminated.

8

m. The Tribe's intention to employ a paid licensed social worker, to provide a resource for enhancing the quality of life and economic opportunities for Tribal members and families, has been suspended.

n. The Tribe was also forced to substantially reduce other Tribal programs.

o. Education funds were cut by 23% (approximately $140,000) for a Tribal-member scholarship program providing financial assistance for post-secondary education, as well as for completion of high school and college educations.

p. Youth Sport and Fitness Program funds were cut 76% ($330,000) in a program annually serving more than 400 youth that funded costs for various sports-team equipment, practice, tournament and entrance fees, as well as healthy living and life-time sports activities, socialization programs, trips, and cultural exchanges.

q. Elderly Care Chore Workers funds were cut 76.5% ($245,000) for a program providing need-based assistance to Tribal elders related to enhancing their quality of life and extending life expectancy.

r. Museum funds were cut 38% ($73,000), forcing termination of the curator for the Tribal museum, which houses numerous irreplaceable artifacts.

s. Tribal roads funds were cut by 100% or $250,000 between 2008 and 2010 for reservation road upgrades and repairs.

t. Clinic funds for health care were cut by over $1,400,000 for Tribal members, their descendants, and other Native Americans without health insurance.

u. Law Enforcement budgeting was cut by 23%, from a little over $892,000 to just over $680,000.

v. Tribal Court funding was cut by 33%, from just over $204,000 to approximately $136,000.

w. Tribal Planning was cut by 85%, in 2008, from just over $40,000 to $6,200 virtually eliminating the planning budget.

x. The child support agency budget was cut from a little over $48,000 to $14,410 in 2008 and all funding was cut in 2009 and 2010.

y. Indian Child Welfare program budget was cut from $262,357 to $93,116 in 2008 and all funding was suspended in 2009 and 2010.

27.    In 2009, the Corporation and the Tribe had face-to-face meetings with Saybrook representatives to explain the Bond payments' crippling effects on Tribal governmental services, and to attempt to restructure the Bonds with Wells Fargo and Saybrook.  Saybrook's primary negotiator was Scott Bayliss, who had also been the primary negotiator when the Bonds were issued.  Saybrook and Wells Fargo ultimately failed to offer a restructuring plan that was met the needs of the Tribe, the Corporation, and the Tribe's membership.

28.    By November 24, 2009, the Corporation simply couldn't meet the Bond Transaction's onerous terms and insure the going concern of a viable Tribal Government as required by IGRA.  The Corporation asked Wells Fargo to transfer certain money to it from an operating reserve account created under the Bond Transaction.

29.    After the Indenture was declared void and the Corporation stopped paying on the Bonds, the Tribe was able to restore some of the programs listed in paragraph 26.  If the Corporation were forced to begin paying the Bonds again, or if revenues from the Casino

10

were swept out before money could be transferred to the Tribe, these programs—and likely others—would have to be cut or eliminated once again.

I state nothing further.

Dated this 12ᵗʰ day of June, 2013

Karen M. Maki