UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| STIFEL, NICOLAUS & COMPANY, INC., STIFEL FINANCIAL CORP., SAYBROOK FUND INVESTORS, LLC (successor to SAYBROOK TAX EXEMPT INVESTORS, LLC), LDF ACQUISITION, LLC, WELLS FARGO BANK, N.A., and GODFREY & KAHN, S.C., <br><br>Plaintiffs, <br><br>v. <br><br>LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS and LAKE OF THE TORCHES ECONOMIC DEVELOPMENT CORPORATION, <br><br>Defendants. | Case No. 13-CV-372 |

## AFFIDAVIT OF PERRY ISRAEL

I, Perry E. Israel, being first duly sworn, depose and state as follows:

1. I make this affidavit in support of Defendant Lake of the Torches Economic Development Corporation ("EDC" or the "Issuer"). I am fully familiar with the facts stated in this affidavit, and where opinions are expressed, I am competent to state such opinions based on my training, knowledge, experience, and expertise. If sworn as a witness, I am competent to testify to the contents of this affidavit.

2. I am an attorney and have been practicing law since 1979. I am a member in good standing of the State Bar of California and have been on retired status from the State Bar of Massachusetts for more than a decade. Since 1980, I have worked on municipal bond transactions, and since January 1984, I have concentrated my practice on the federal tax aspects of municipal bonds. Through the course of my practice, I have worked on literally hundreds of municipal bond issues. I have worked on a wide variety of municipal obligations, including general obligation bonds, revenue bonds, assessment bonds, Marks-Roos bonds, revenue anticipation notes, bond anticipation notes, and certificates of participation in municipal borrowings through purchase and sale agreements or capital leases. During the period 1999

1

through 2006, I spent more than half of my time working on financings for federally recognized Indian tribal governments.

3. I received my A.B. from Princeton University in 1974 in English. I received my J.D. *cum laude* from Boston University in 1979. I received an LL.M. in taxation from Boston University in January 1984.

4. Currently I have a solo practice, working for a variety of law firms or small law offices, municipal issuers of debt, and borrowers of conduit obligations. In all these matters I act as a consultant relating to or delivering opinions with respect to municipal obligations. Prior to starting my own practice in February 2007, I was a partner at Orrick, Herrington & Sutcliffe, LLP for 20 years (first in the San Francisco office and then in the Sacramento office), where I was a member of both the Tax and Public Finance Departments. During the period 2003 through 2006, I co-chaired the Indian Tribal Finance practice group at Orrick. From January 1984 through December 1986 I was an associate at Orrick. Prior to joining Orrick in January 1984, I was an associate at Palmer & Dodge in Boston.

5. I have been a member of the National Association of Bond Lawyers and of the American Bar Association Tax Section Tax-Exempt Financing Committee since 1984. I also served on the Board of Directors of NABL and served as Secretary of NABL. Over the years, I have served on the faculty of approximately 25 educational seminars run by NABL, including the Arbitrage Seminar, the Tax and Securities Law Institute, the Bond Attorneys Workshop, and the Fundamentals Seminar. I served as the chair of the Arbitrage Seminar in 1989 and am presently serving as the Chairman of the Bond Attorneys Workshop. I have also spoken at several industry events relating to Indian tribal financing.

6. I was the co-author of *An Introduction to Indian Tribal Finance* published by Orrick, Herrington & Sutcliffe in 2005. I have also been the author or editor-in-chief of numerous other titles, mostly not related to Indian tribal finance, including the *Orrick, Herrington & Sutcliffe Arbitrage Rebate Manual*, published in 1990, and the multivolume *Federal Taxation of Municipal Bonds*, first published in 2001.

7. I have not acted as an expert at trial or deposition within the preceding three years.

8. I am compensated for my role as expert consultant in this matter at my standard hourly rate of $500, which is what I generally charge for all my services.

9. During the period 1999 through 2006, I worked on approximately a dozen financings for Indian tribal governments that were completed. In those transactions, I worked variously as underwriters' counsel, bond counsel, or special tax counsel. Based upon my experience, in Indian tribal transactions the various parties have the same relationships and responsibilities that they do in other types of municipal financings. Based upon my experience, it is the ordinary and customary practice in the business of municipal financings in general and tribal financings in particular that the parties would expect the parties to bear the following relationships:

a. The Issuer (EDC, in the transaction that is the subject of the present litigation) is the borrower and would be expected to enter into various documents that describe its undertakings, obligations, and other legal matters relating to the Issuer. In this context, I note that in my experience in Indian tribal financings it was a common (although not uniform) practice for tribal corporations, rather than the Indian tribal government itself, to be the Issuer, particularly when the debt was to be secured by gaming revenues.

b. The Issuer's counsel is engaged to provide legal advice to the Issuer, to help draft documents and to render "third-party" opinions as to certain legal matters relating to the Issuer. It is the ordinary and customary practice in the industry that the parties would understand the Issuer's counsel not to act as an agent of the Issuer and it would not be the ordinary and customary practice in the industry for the parties to treat the Issuer's counsel as able to bind the Issuer by its opinions.

c. The Initial Purchaser or the Underwriter (Stifel, Nicolaus & Company, Incorporated in the present case) is the initial lender to the Issuer. It is the ordinary and customary practice in the industry that the parties would understand the relationship between the Initial Purchaser or the Underwriter and the Issuer to be an arms'-length relationship and, as borrower and lender, to be a potentially adverse relationship, although the Initial Purchaser or the Underwriter may also provide advice to the Issuer concerning market conditions and demands.

d. The Counsel to the Initial Purchaser or Underwriter is engaged to provide legal advice to the Initial Purchaser or the Underwriter. It is the ordinary and customary practice in the industry that the parties would understand that Counsel to the Purchaser or Underwriter would help draft documents and render legal opinions relating to the transaction and the documents to the Underwriter.

e. In transactions involving a trust indenture, the Trustee (Wells Fargo Bank, National Association in the present case) acts under the trust indenture on behalf of the holders of the bonds. It is the ordinary and customary practice in the industry that the parties would understand that the duties, obligations, and rights of the Trustee, either on its own behalf or on behalf of the holders of the bonds, are set forth in and governed by the trust indenture.

f. Bond Counsel is engaged, typically by the Issuer, to render one or more "third-party" opinions relating to the validity and enforceability of the bonds and certain documents relating to the bonds and often to provide one or more "third-party" opinions relating to tax matters. In furtherance of the delivery of that opinion, it is the ordinary and customary practice in the industry that Bond Counsel will take primary drafting responsibility for many of the bond documents, including the bonds and the trust indenture. In my experience in the industry, it is not the ordinary and customary practice of the parties to the

> > transaction to treat the Bond Counsel as an agent of the Issuer and or to treat the Issuer as bound by Bond Counsel's opinions.
>
> > g. In Indian tribal financings, it has been my experience that the bonds are generally sold pursuant to a private placement exception from securities laws. In those cases, the initial bond holders are typically identified as the Initial Bondholder and they are often represented by Counsel to the Initial Bondholder. It is the ordinary and customary practice in the industry that the parties would understand that the Initial Bondholder and its Counsel would negotiate many of the terms of the bonds and the trust indenture in furtherance of their economic and legal interests.
>
> > h. In many transactions, there is also a guarantor who guarantees performance of the Issuer under the bonds and the trust indenture. In the transaction that is the subject of the present litigation, the Lac Du Flambeau Band of Lake Superior Chippewa Indians (the "Tribe") acted as Guarantor. It is the ordinary and customary practice in the industry that the parties would understand that the Guarantor and its Counsel would negotiate the terms of the guarantee and that the obligations of the Guarantor would be limited to those set forth in the guarantee document.

10.    It was my experience on all Indian tribal transactions that I worked on that the borrower, the bond underwriter or placement agent, and the initial purchasers of the bonds (and their respective counsel) were all aware of the importance of determining whether the bond documents created a management contract under the Indian Gaming Regulatory Act ("IGRA"). It was further my experience that, at the time of the Indian tribal transactions I worked on, the parties worked to create documents that did not give rise to the control issues that would cause the documents to be treated as management contracts. It was also my experience in these transactions that advice and opinions were uniformly sought from counsel with nationally recognized experience and expertise in matters relating to IGRA to the effect that the bond documents did not give rise to management contracts under IGRA.

11.    It was my experience on Indian tribal transactions that the borrower, the underwriter or placement agent, and the initial purchasers of the bonds were all aware of the sovereign immunity of Indian tribal governments and their enterprises. Accordingly, they were very sensitive to exactly what potential liabilities any limited waivers of sovereign immunity by the Indian tribal governments would cover, and the parties to the transaction would negotiate very carefully the scope of limited waivers of sovereign immunity. By way of example, in none of the transactions that I worked on did the Indian tribal government waive sovereign immunity with respect to securities matters, such as a misrepresentation or fraud claim based upon an offering memorandum. In my experience, it is the ordinary and customary practice in the industry that the parties would expect that each waiver of sovereign immunity would be carefully and strictly read to determine exactly what potential claims are covered by the waiver. To quote from *An Introduction to Indian Tribal Finance*, which as previously mentioned I co-authored:

> [S]overeign immunity protects not only the tribal government itself but also tribal enterprises, instrumentalities, corporations, and other organizations. Furthermore, the

> shield of sovereign immunity is equally strong on or off the reservation. Understandably, lenders or bondholders may be unwilling to provide money to a tribe if they have no way of enforcing the contractual obligation to repay. Tribes typically understand and accept this commercial reality and are willing to grant limited waivers of their immunity. Waivers can be limited in several ways. For example, the waiver can be limited to (1) a particular tribal asset or enterprise revenue stream, or (2) a particular type of legal relief sought (e.g., specific performance of the contract as opposed to money damages), or (3) the nature of the claim (e.g., not to exceed the amount of the borrowing), or (4) a specific forum for adjudication and enforcement (e.g., court or arbitration panel). Each tribe has its own unique approach on if, when, and how it is willing to grant a waiver of immunity. And, in most cases, lenders and bondholders understand this uniqueness and do not insist on a one-size-fits-all formula. (At pages 32-33.)

In my experience, it is the ordinary and customary practice in the industry that the parties would expect that a waiver of sovereign immunity would need to be very explicit for an Indian tribal government or enterprise to be opening itself up to liability with respect to a tort claim, equitable claim, or similar claim.

12. I have reviewed the documents relating to the purported issuance by EDC of its Taxable Gaming Revenue Bonds, Series 2008 (the "Bonds"), as they are named in the Closing Index (attached as Exhibit A to this affidavit) and contained in the closing transcript relating to the transaction. I also have reviewed the earlier decisions in the present case and understand that the Trust Indenture under which the Bonds were purported to be issued has been declared void *ab initio* as an unapproved management contract, consistent with IGRA.

13. It is my opinion that the documents relating to the Bonds and named in the Closing Index are similar in purpose and effect to the normal documents in an Indian tribal financing or in municipal financings in general. Based upon my experience in municipal financing in general and in tribal financing in specific, it would be the ordinary and customary practice in the industry for the parties to the transaction to have the following understandings of the documents and their interrelationship:

   a. It is the ordinary and customary practice in the industry that the parties would expect and understand the Trust Indenture to be the basic governing document for the transaction. It is the ordinary and customary practice in the industry that most bond transactions are governed by a trust indenture: it is the document under which the Bonds are issued, it sets forth the obligations of the Issuer, and it establishes the manner in which the Bonds will be repaid and how the Bonds will be secured, the covenants of the Issuer, the procedures to be followed in the event of default, and the obligations and rights of the Trustee. It is the ordinary and customary practice in the industry that the parties would understand the Trust Indenture to be a contract between the Issuer and the bondholders, with the Trustee acting on behalf of the bondholders.

   b. It is the ordinary and customary practice in the industry that the parties would expect and understand the Bond Purchase Agreement to be a contract between

the Initial Purchaser (or Underwriter) and the Issuer, describing the terms under which the Initial Purchaser agrees to purchase the Bonds. The Bond Purchase Agreement for the Bonds, as is true of all bond purchase agreements I have seen, describes the various documents and opinions that must be delivered for the Initial Purchaser to be obligated to purchase the Bonds. It is the ordinary and customary practice in the industry that the parties would expect and understand that the Bond Purchase Agreement, in addition to obligating the Initial Purchaser to purchase the Bonds upon the satisfaction of various contingencies, would obligate the Issuer to provide certain information after the Bonds are purchased, to cooperate with the Initial Purchaser with respect to certain securities laws, and to pay certain expenses of the Initial Purchaser.

c. It is the ordinary and customary practice in the industry that the parties would expect and understand the Security Agreement to be a contract between the Issuer and the Trustee that grants security interest in certain revenues and equipment of the Issuer to provide security for the repayment of the Bonds pursuant to the terms of the Bonds and the Trust Indenture.

d. Where bonds are issued by a tribal enterprise rather than directly by the tribal government, it is the ordinary and customary practice in the industry that the parties would expect and understand that the tribal government would enter into a Tribal Agreement pursuant to which the tribe would agree to guarantee the obligations of the Issuer under the Bonds. It is the ordinary and customary practice in the industry that the parties would expect and understand the Tribal Agreement also to provide certain affirmative covenants on behalf of the tribe relating to its gaming enterprises, such as maintenance of the gaming enterprises and a covenant not to open competing gaming enterprises.

e. It is the ordinary and customary practice in the industry that the parties would expect and understand the Limited Offering Memorandum to be a document used in the remarketing of the Bonds by the Initial Purchaser or Underwriter. It is the ordinary and customary practice in the industry that the parties would expect and understand the Limited Offering Memorandum to be a document of the Issuer, even though the primary responsibility for the drafting of an offering document is typically that of the Counsel to the Initial Purchaser or Underwriter. It is the ordinary and customary practice in the industry that the parties would expect and understand the Limited Offering Memorandum to describe the terms of the Bonds, the expected use of the proceeds of the Bonds, the terms of the Trust Indenture, and the various covenants and obligations of the Issuer and, in this case, the Tribe (under the Tribal Agreement). However, based upon my experience, it would not be the ordinary and customary practice in the industry for the parties to the transaction to treat the Limited Offering Memorandum as a contract or expect it to establish a contractual relationship between any persons.

f.  It is the ordinary and customary practice in the industry that the parties would expect and understand that an Account Control Agreement would be entered into between the Issuer, the Trustee, and the Issuer's bank to give the Trustee certain controls over the accounts of the Issuer to provide security for the repayment of the Bonds pursuant to the terms of the Trust Indenture.

g.  Based upon my experience and review of the documents, it would be the understanding of the parties to the transaction that, in this particular transaction, EDC was lending the proceeds of the Bonds to another tribal entity, the Lake of the Torches Federal Development Corporation ("FDC"). The FDC issued the FDC Note to EDC as part of that loan. It would be the ordinary and customary practice in the industry to treat the FDC Note as establishing a relationship solely between the FDC and EDC.

h.  It is the ordinary and customary practice in the industry that the parties would expect and understand that a Closing Certificate of the Issuer would be provided by the Issuer, identifying the corporate officers and identifying and attaching the organizational documents of the Issuer, the gaming compact applicable to the Tribe, and a Bond Resolution of the Issuer. Often, it is the ordinary and customary practice in the industry that a Closing Certificate of the Issuer will duplicate the representations of the Issuer in the Trust Indenture and the Bond Purchase Agreement and state that the Issuer has complied with the Trust Indenture and the Bond Purchase Agreement to date, recite certain matters relating to litigation concerning the transaction, and acknowledge delivery of the bonds and receipt of payment for the Bonds. Often in tribal transactions, the Bond Resolution would be attached to the Closing Certificate. However, it is the ordinary and customary practice in the industry that the parties would expect and understand the actual operative document by which the Issuer's governing body authorizes the borrowing, authorizes entry into the Trust Indenture, and authorizes inclusion of the limited waiver of sovereign immunity would be the Trust Indenture.

i.  It is the ordinary and customary practice in the industry that the parties would expect and understand that a UCC Financing Statement would be prepared and filed to secure the lien against certain collateral.

j.  It is the ordinary and customary practice in the industry that the parties would expect and understand that a Specimen Bond would be part of the closing documents, usually in the form of a photocopy of the executed Bond with the signatures required to make the bond valid stamped with the word "COPY." In the ordinary and customary practice of municipal finance, the Specimen Bond itself would not be seen as having any independent significance.

k.  In the ordinary and customary practice of municipal finance, the DTC Letter of Representations is required by the Depository Trust Company from any issuer of bonds where the bonds will be registered in the name of Cede & Co. and beneficial interests will be transferred on the books of DTC.

l.  Where the bonds are issued by a tribal corporation rather than by the tribal government, it is the ordinary and customary practice in the industry that the parties would expect and understand that a Closing Certificate of the Tribe would be provided by the Tribe, performing a similar role to the Closing Certificate of the Issuer described above. Often in tribal transactions, the Resolution of the Tribe would be attached to the Closing Certificate. However, it is the ordinary and customary practice in the industry that the parties would expect and understand the actual operative document by which the Tribe undertakes any obligations or authorizes inclusion of the limited waiver of sovereign immunity would be the Tribal agreement or the Resolution of the Tribe.

m.  Where the proceeds of the bonds are loaned to a third party, such as the FDC in the transaction at hand, it is the ordinary and customary practice in the industry that the parties would expect and understand that a Closing Certificate of the third party would be provided and seen by the parties as performing a role similar to the Closing Certificate of the Tribe and the Closing Certificate of the Issuer.

n.  In the ordinary and customary practice of municipal finance, various other documents are delivered at the closing, including documents furnished by the Trustee and documents furnished by the Initial Purchaser or Underwriter. It is the ordinary and customary practice in the industry that the parties would expect and understand that such documents relate to the authorization of each party delivering such documents to perform its duty, acknowledgement of delivery of the purchase price and receipt of the Bonds, and certain other limited matters.

o.  It is the ordinary and customary practice in the industry that the parties would expect and understand that opinions of various counsel would be delivered and understood to be opinions as to the legal effects of the documents. It is not, however, the ordinary and customary practice in the industry that the parties would expect and understand the opinions to be documents binding the parties to the transaction.

14. Based upon my experience in municipal transactions in general and tribal financings in particular, it is my opinion that the ordinary and customary practice in all bond transactions is to recognize a strong interrelationship between the various documents relating to the transaction. It would be the ordinary and customary practice in such transactions, if any of the documents were feared or thought to have legal infirmities, to examine carefully the other documents to determine whether they can stand on their own. For bond transactions that have a trust indenture, the trust indenture is viewed in the ordinary and customary practice in the industry as the master document, authorizing the issuance of the bonds, setting forth the terms of the bonds, providing how the bonds are to be paid and secured, and setting forth the covenants of the issuer made on behalf of the bondholders, with the bonds requiring the trust indenture to be issued. I express no opinion as to whether the Trust Indenture is so integral to the transaction that, under Wisconsin law or IGRA, all other documents relating to the bond transaction would

also be void if the Trust Indenture is void. If, however, it was held that some of those documents continued to have some validity after the Trust Indenture was declared void, it would be the ordinary and customary practice in the industry to expect that those other documents, such as resolutions authorizing the void documents, would have to be carefully examined to determine whether there are provisions of those documents which can stand on their own or continue to have some legal effect. However, it would not, in my opinion, be the ordinary and customary practice in the industry to interpret those documents—if they continue to have any validity—so as to effectively reinstate the provisions of the voided Trust Indenture.

15. It is my opinion that it the ordinary and customary practice in the industry for the parties to the transaction to understand a Trust Indenture to authorize the issuance of the Bonds and contain all details relating to the Bonds. It is not the ordinary and customary practice in the municipal finance area separately to authorize the issuance of the Bonds in transactions governed by a Trust Indenture. Thus, it is further my opinion that, if the Trust Indenture is void *ab initio*, the Bonds must also be treated as void since they were issued pursuant to and are governed by an invalid Trust Indenture.

16. As discussed above, the Account Control Agreement and the Security Agreement would be understood in the ordinary and customary practice in the industry to be designed solely to provide security for payment of the Bonds and the performance of EDC's obligations under the Trust Indenture and control over the funds of EDC for the purpose of securing the payment and performance of certain obligations under the Trust Indenture, as provided by their terms. It is my opinion that, to the extent that the Trust Indenture is void *ab initio*, neither the Account Control Agreement nor the Security Agreement serve any purpose, since their sole reason for existence is void, and those two agreements should also be deemed to be without force.

17. To the extent that any of the other documents to the transaction were found to have continuing validity and to impose possible liabilities on either EDC or the Tribe and if those documents themselves were not considered void under IGRA (as to which I offer no opinion), it is my opinion that, in the ordinary and customary practice in the industry, those documents must be carefully examined to determine whether they contain any waivers of sovereign immunity and whether such waivers explicitly waive sovereign immunity with respect to such claims.

18. Without expressing opinion as to validity of any of the Bond documents under IGRA or of their continuing validity under Wisconsin state law, it is my opinion that, although the Limited Offering Memorandum purports to describe limited waivers of sovereign immunity by EDC and the Tribe, there is no separate waiver of sovereign immunity contained in the Limited Offering Memorandum. In my experience, it is the ordinary and customary practice in the industry, a Limited Offering Memorandum would not be expected by the parties to form the basis for any contractual claim.

19. Without expressing opinion as to validity of any of the Bond documents under IGRA or of their continuing validity under Wisconsin state law, it is my opinion that, although the resolution of the Tribe specifically approves the limited waiver of sovereign immunity contained in the Tribal Agreement, it does not include a separate waiver of sovereign immunity. Although the language of the resolution of EDC differs slightly from the language of the resolution of the Tribe, I am of the opinion that, based upon an analysis of the language and

9

because it is the ordinary and customary practice in the industry to expect waivers of sovereign immunity to be strictly construed, there is no independent waiver in the resolution of EDC.

20. Without expressing opinion as to validity of any of the Bond documents under IGRA or of their continuing validity under Wisconsin state law, it is my opinion that the waiver of sovereign immunity contained in the Tribal Agreement would be understood in the ordinary and customary practice in the industry of strict construction of waivers to be limited only to a suit to enforce the obligations of the Tribe under the Tribal Agreement, as provided in Section 9(b)(iii) of the Tribal Agreement. I note that the term "Obligations" is defined in the Tribal Agreement to mean the obligation of EDC for the payment of principal of and interest on the Bonds and it is my opinion that EDC has no obligation for the payment of principal of and interest on the Bonds because the Bonds are void.

21. Without expressing opinion as to validity of any documents under IGRA, it is my opinion that the waiver of sovereign immunity contained in the Bond Purchase Agreement would be understood in the ordinary and customary practice in the industry of strict construction of waivers to be limited solely to suits to enforce the obligations of EDC under the Bond Purchase Agreement, as provided in Section 14(b)(iii) of the Bond Purchase Agreement and would not waive any liability with respect to other claims, such as claims in tort.

22. As discussed above, the opinions of counsel in a bond transaction are in the ordinary and customary practice in the industry understood by the parties to represent those counsels' opinions as to the legal effects of the documents to the transaction. They do not represent any independent operative obligations or waivers by any party to the transaction; instead, there are merely the opinions of the respective law firms. Accordingly, it is my opinion that the sovereign immunity of an Indian tribal government or a tribal governmental entity cannot be waived by an opinion letter, such as the two opinion letters from Godfrey & Kahn, but requires explicit action by the governmental entity to waive such immunity.

23.  It is my opinion that, in the ordinary and customary practice in the industry of strict construction of waivers, neither the closing certificate of EDC nor the closing certificate of the Tribe separately contains a waiver of sovereign immunity.

Dated this June 10, 2013.

Respectfully submitted,

Perry Israel

Subscribed and sworn to before me this 10th day of June 2013.

_____
Notary Public, State of California

My Commission Expires: APRIL 20, 2?96

PLEASE SEE ATTACHED
CALIFORNIA JURAT

11

# Jurat

State of California

County of SACRAMENTO

Subscribed and sworn to (or affirmed) before me on this __10TH__ day of __JUNE__, 20__13__ by __PERRY ISRAEL__,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____ (Notary seal)
Signature

ANGELA DALTON
COMM. # 1975689
NOTARY PUBLIC - CALIFORNIA
SACRAMENTO COUNTY
COMM. EXPIRES APRIL 20, 2016

## OPTIONAL INFORMATION

**DESCRIPTION OF THE ATTACHED DOCUMENT**

AFFIDAVIT OF
(Title or description of attached document)

PERRY ISRAEL
(Title or description of attached document continued)

Number of Pages __11+cert__ Document Date __06/10/2013__

(Additional information)

### INSTRUCTIONS FOR COMPLETING THIS FORM

*The wording of all Jurats completed in California after January 1, 2008 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one which does contain proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the jurat process is completed.
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Signature of the notary public must match the signature on file with the office of the county clerk.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
  ❖ Additional information is not required but could help to ensure this jurat is not misused or attached to a different document.
  ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document