UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

STIFEL, NICOLAUS & COMPANY, INC.,
STIFEL FINANCIAL CORP.,
SAYBROOK FUND INVESTORS, LLC
(successor to SAYBROOK TAX EXEMPT
INVESTORS, LLC),
LDF ACQUISITION, LLC,
WELLS FARGO BANK, N.A.
and GODFREY & KAHN, S.C.,

        Plaintiffs,

v.

        Case No. 13-CV-372

LAC DU FLAMBEAU BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS and
LAKE OF THE TORCHES ECONOMIC
DEVELOPMENT CORPORATION,

        Defendants.

---

### Declaration of Brooks Big John in Support of Motion to Dismiss and in Opposition to Plaintiffs' Motions for Preliminary Injunctions

---

I, Brooks Big John, make the following declaration under penalty of perjury:

    1.    I am over the age of 18 and make this declaration based on my own personal knowledge.

    2.    I am an enrolled member of the Lac du Flambeau Band of Lake Superior Chippewa (the "Tribe"). I am an elected member of the Tribe's governing body, its Tribal Council, and a member of the Board of Directors of the Lake of the Torches Economic Development Corporation (the "Corporation"). I have served off and on in both of these capacities since 1999. I served in both of these capacities in 2007-2008 and I also currently serve in both capacities.

3. The Tribe's offices are located at 418 Little Pine Road, Lac du Flambeau, Wisconsin, which is on land held in trust by the U.S. government for the Tribe within the boundaries of the Lac du Flambeau Reservation ("Tribal Trust Land").

4. The Corporation's office are located at the Lake of the Torches Resort Casino, 510 Old Abe Rd, Lac du Flambeau, WI 54538, which is also on Tribal Trust Land.

5. In 2005, the Tribe, through its wholly owned corporation the Lake of the Torches Federal Development Corporation (the "Federal Corporation"), invested millions of dollars in what turned out to be an ill-conceived venture to build a riverboat casino, hotel, and bed-and-breakfast in Natchez, Mississippi (the "Grand Soleil Project").

6. Problems plagued the Grand Soleil Project. In 2007, with the project still unbuilt and running low on capital, the Tribal Parties began to explore solutions that would allow the corporate body through which the Tribe had invested in Grand Soleil to finish the Grand Soleil Project.

7. During the second half of 2007, Stifel Financial Corp., through Stifel Nicolaus & Company ("Stifel"), served as financial advisor for the Tribe and the Corporation (the "Tribal Parties"). Kevin Shibilski was the primary point of contact between Stifel and the Tribal Parties and suggested that the Tribal Parties explore financing options that would address the funding needed for the Grand Soleil Project while refinancing existing debt.

8. Nearly all of the Tribe's annual general-fund budget has been historically funded by distributions from the Lake of the Torches Casino and related amenities that are owned by the Tribe and managed by the Corporation.

9. Stifel and offered to broker a bond issuance by the Corporation. This bond issuance actually occurred on January 2, 2008 (the "Bond Transaction").

2

10. As I understood the transaction, Stifel arranged to be the initial purchaser of the bonds and to immediately resell the bonds to a Saybrook entity ("Saybrook").

11. Godfrey & Kahn, S.C. ("Godfrey") served as counsel to the Tribe and Corporation on the Bond Transaction and as bond counsel to the Bond Transaction. On at least one occasion as the Bond Transaction was being considered and negotiated, one or more lawyers from Godfrey came to the Tribe's offices on Tribal Trust Land to explain the transaction and advise the Tribal Parties about it.

12. Saybrook worked through Stifel, Godfrey, and its own lawyers, SNR Denton (formerly Sonnenschein Nath & Rosenthal), to craft the bond transaction so that the Corporation would issue $50,000,000 of bonds (the "Bonds") to refinance existing debt and to pour additional funds into the Grand Soleil Project.

13. Saybrook negotiated the following terms, among others:

    a. Stifel would serve as the initial purchaser of the Bonds with the intent to immediately resell them to Saybrook;

    b. The Corporation would pay 12% interest on the Bonds—a higher rate than any of the debt the Bond Transaction would finance;

    c. Neither the Corporation nor the Tribe would have any discretion or control over how the Bond Transaction proceeds would be used or allocated;

    d. Saybrook retained $5.5 million of the Bond proceeds as the bond reserve and bond discount, so that it only disbursed $44.5 million in bond proceeds;

    e. Approximately $32 million of the those Bond proceeds would go to the Grand Soleil Project;

    f. Stifel would retain $375,000 of the Bond proceeds as an initial purchaser's discount—essentially its fee for the transaction;

    g. Godfrey would retain $125,000 of the Bond proceeds as its fee for serving as Bond Counsel;

    h. the Corporation would pledge as collateral all gross revenue from the Casino, including revenue necessary to pay Casino operating expenses;

    i. In any given month, the Corporation could not make *any* distributions to the Tribe until that month's Bond payments were satisfied; and

    j. The Tribe would guarantee the Corporation's debt represented by the Bonds.

14. In negotiating the Bond Transaction, Saybrook dealt directly with the CFO for the Corporation, Rick Lindsley, whose office was on tribal trust land on the Reservation, and with Stifel, Godfrey, Wells Fargo, and SNR Denton.

15. Kevin Shibilski of Stifel came to a joint meeting of the Tribal Council and the Corporation's Board of Directors in the Tribal Council Room at the Tribe's offices on Tribal Trust Land on January 2, 2008 to "sell" the Bond Transaction to the Tribal Council and the Corporation's Board. Brian Pierson of Godfrey was also present at that meeting.

16. During the meeting, Mr. Shibilski told us the Grand Soleil Project would give us an annual return sufficient to make the Bond payments with millions to spare. Mr. Shibilski told the other Tribal Council and Board members and me that issuing the Bonds was urgent and that we'd lose our investment in the Grand Soleil Project if we didn't vote that night to approve the $50 million bond issuance. He also informed us that other loans were

coming due and we therefore had to approve the Bonds immediately so that we did not default on our other loans.

17. Mr. Shibilski did not disclose to us at that meeting or at any other time that I know of that he had a personal financial stake in the Grand Soleil Project, a fact which we learned much later.

18. At the end of the January 2, 2008 meeting, the Tribal Council and the Corporation's Board both voted to approve the Bond Transaction, although I personally voted against it.

19. The Bonds caused extreme financial stress on the Tribal government and, consequently, the Tribe's members. The Tribe was forced to cut or cancel many Tribal government programs, and we had to eliminate any per capita payments of casino revenues to tribal members.

20. In 2009, the Tribal Council was seriously considering having to close the Tribal Government Center and send home all Tribal Government staff because we could not afford to keep the Government Center open and pay the staff and still make the Bond payments.

21. The Grand Soleil Project has never been completed, and has never generated any revenues for the Tribe or the Corporation. Instead, the Grand Soleil Project filed for bankruptcy.

22. True and correct copies of the following documents are attached as exhibits to this declaration:

> **Exhibit A:** Constitution of the Lac du Flambeau Band of Lake Superior Indians of Wisconsin
> **Exhibit B:** Chapter 80 of the Lac du Flambeau Tribal Code

5

**Exhibit C:** Tribe's Gaming Control Ordinance

I state nothing further.

Dated this 13th day of June, 2013

_____
Brooks Big John