# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

STIFEL, NICOLAUS & COMPANY, INC.,
STIFEL FINANCIAL CORP.,
SAYBROOK FUND INVESTORS, LLC
(successor to SAYBROOK TAX EXEMPT
INVESTORS, LLC),
LDF ACQUISITION, LLC,
WELLS FARGO BANK, N.A.,                      Case No. 13-cv-372-wmc
and GODFREY & KAHN, S.C.,

       Plaintiffs-Counterclaim Defendants,

v.

LAC DU FLAMBEAU BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS and
LAKE OF THE TORCHES ECONOMIC
DEVELOPMENT CORPORATION,

       Defendants-Counterclaim Plaintiffs.

## TRIBAL PARTIES' ANSWER, AFFIRMATIVE DEFENSES, AND CONDITIONAL COUNTERCLAIMS

Defendants the Lac du Flambeau Band of Lake Superior Chippewa Indians and Lake of the Torches Economic Development Corporation (collectively, the "Tribal Parties"), by their undersigned attorneys, for their Answer, Affirmative Defenses, and Conditional Counterclaims to the Plaintiffs' Complaint for Declaratory and Injunctive Relief, state as follows:

## GENERAL OBJECTION

For the reasons set forth in the Tribal Parties' Memorandum in Support of Motion to

Dismiss, or in the Alternative, to Stay, the Tribal Parties are immune from this suit and the jurisdiction of this Court. The Tribal Parties incorporate the contents of that Memorandum into this Answer in full and expressly reserve their right to contest this Court's jurisdiction over them and this case. The Tribal Parties are required to Answer the Complaint under Federal Rule 12. By filing this Answer, Affirmative Defenses, and Conditional Counterclaims, neither Tribal Defendant waives its sovereign immunity from suit in any manner.

## ANSWER

1.      Answering paragraph 1, admit that the Plaintiffs' Complaint seeks the relief stated in paragraph 1 against the Tribal Parties but deny that Plaintiffs are entitled to relief; admit that the Tribe and EDC filed the Tribal Court Action against the parties described in paragraph 1, but state that the Tribal Court Statement of Claim speaks for itself; deny any allegation in paragraph 1 that is inconsistent with the Tribal Court Statement of Claim, and deny the balance of allegations in paragraph 1.

2.      Answering paragraph 2, admit that the Bond Transaction has been the subject of litigation for years, admit that on April 25, 2013 the Tribe and EDC filed a Statement of Claim in the Tribal Court, but deny that the allegations therein fully and accurately describe the procedural history preceding this action and therefore deny the balance of the allegations in paragraph 2.

3.      Answering paragraph 3, the allegations in paragraph 3 state legal conclusions to which no response is necessary, but to the extent a response is necessary, the Tribal Parties deny the allegations in paragraph 3.

4.      Answering paragraph 4, admit that the Plaintiffs seek the relief stated in

2

paragraph 4, but deny they are entitled to such relief and deny the balance of the allegations in paragraph 4.

## PARTIES, JURISDICTION AND VENUE[1]

5. Answering paragraph 5, lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 and therefore deny same.

6. Answering paragraph 6, lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 and therefore deny same.

7. Answering paragraph 7, lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 and therefore deny same.

8. Answering paragraph 8, lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 and therefore deny same.

9. Answering paragraph 9, lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 and therefore deny same.

10. Admit the allegations of paragraph 10.

11. Answering paragraph 11, admit that the Tribe is federally recognized and organized under the Indian Reorganization Act, and that the postal address of the Tribe's principal place of business is 418 Old Abe Road, Lac du Flambeau, Wisconsin 54538, but deny that the Lac du Flambeau Reservation is located within this District[2]; deny that the

---

[1] The Tribal Parties have reprinted the headings and subheadings of the Complaint for organizational purposes only and by doing so do not admit or accept any matter they express.  As to this heading, the Tribal Parties expressly deny that this Court has jurisdiction over this suit and over the Tribal Parties, and contest this Court's jurisdiction.

[2] See, e.g., *Bradley v. Deloria*, 587 N.W.2d 591, 593 (S.D. 1999) ("An Indian reservation constitutes a sovereign nation separate from a state and a '"reservation Indian's domicile on the reservation is not an in-state contact which grants jurisdiction to state courts."'") (quoting *Byzewski v. Byzewski*, 429 N.W.2d

allegations of paragraph 11 properly characterize the Tribe's governmental powers and authority and therefore deny the balance of the allegations in paragraph 11.

12.     Answering paragraph 12, admit that the postal address of the Corporation's principal place of business is 510 Old Abe Road, Lac du Flambeau, Wisconsin 54538, that the Corporation is a wholly owned entity of the Tribe established under tribal law to operate the Lake of the Torches Resort Casino, but deny the balance of the allegations in paragraph 12 because they constitute legal conclusions to which no response is necessary.

13.     Answering paragraph 13, the allegations in paragraph 13 state legal conclusions to which to response is necessary, but to the extent a response is necessary, deny the allegations in paragraph 13.

14.     Answering paragraph 14, the allegations in paragraph 14 state legal conclusions to which no response is necessary, but to the extent a response is necessary, deny the allegations in paragraph 14.

## FACTUAL BACKGROUND

### The Issuance and Sale of the Bonds

15.     Admit the allegations of paragraph 15.

16.      Answering paragraph 16, the allegations in paragraph 16 state legal conclusions to which no response is necessary, but to the extent a response is necessary, the Tribal Parties lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 and therefore deny them.

17.     Answering paragraph 17, admit that the Bond Transaction was memorialized

---

394, 397 (N.D. 1988) (quoting *State ex rel. Flammond v. Flammond*, 190 Mont. 350, 621 P.2d 471, 473 (Mont 1980)).

by various documents, including, but not limited to, the documents identified in paragraph 17, but deny the balance of the allegations contained in paragraph 17 (including the characterizations of the Transaction Documents, which speak for themselves), and affirmatively allege that the Bond Transaction is void and unenforceable as a matter of law.

**The Parties Repeatedly Agreed to Resolve the Transaction-Related Disputes Outside Tribal Court, and the Tribe and EDC Repeatedly Consent to Jurisdiction in Wisconsin Federal and State Courts[3]**

18.     Answering paragraph 18, deny the allegations contained in paragraph 18 and affirmatively allege that the Bond Transaction is void and unenforceable as a matter of law.

19.     Answering paragraph 19, admit that a specimen bond is attached as Exhibit A and speaks for itself, but deny the balance of the allegations in paragraph 19 and affirmatively allege that the Bonds and referenced specimen bond are void and unenforceable as a matter of law.

20.     Answering paragraph 20, admit that a document called the Limited Offering Memorandum is attached as Exhibit B and speaks for itself, but deny the balance of the allegations in paragraph 20 and affirmatively allege that the Limited Offering Memorandum is void and unenforceable as a matter of law.

21.     Answering paragraph 21, admit that a document called the Bond Resolution is attached as Exhibit E and speaks for itself, but deny the balance of the allegations in paragraph 21 and affirmatively allege that the Bond Resolution is void and unenforceable as a matter of law.

22.     Answering paragraph 22, admit that a document called the Tribal Agreement

---

[3] To the extent an answer to this unnumbered paragraph is necessary, the Tribal Parties deny the allegations in this paragraph.

is attached as Exhibit I and speaks for itself, but deny the balance of the allegations in paragraph 22 and affirmatively allege that the Tribal Agreement is void and unenforceable as a matter of law.

23.     Answering paragraph 23, admit that a document called the Tribal Resolution is attached as Exhibit J and speaks for itself, but deny the balance of the allegations in paragraph 23 and affirmatively allege that the Tribal Resolution is void and unenforceable as a matter of law.

24.     Answering paragraph 24, admit that a document called the Bond Purchase Agreement is attached as Exhibit C and speaks for itself, but deny the balance of the allegations in paragraph 24 and affirmatively allege that the Bond Purchase Agreement is void and unenforceable as a matter of law.

25.     Answering paragraph 25, admit that a document called the Bond Purchase Agreement is attached as Exhibit C and speaks for itself, but deny the balance of the allegations in paragraph 25 and affirmatively allege that the Bond Purchase Agreement is void and unenforceable as a matter of law.

26.     Deny the allegations of paragraph 26 and affirmatively allege that the Bond Transaction is void and unenforceable as a matter of law.

27.     Answering paragraph 27, admit the documents called the Bond Counsel Opinion Letter and the Issuer Opinion Letter are attached as Exhibits G and F, respectively, and speak for themselves, but deny the balance of the allegations contained in paragraph 27 and affirmatively allege that the Bond Counsel Opinion Letter and the Issuer Opinion Letter are void and unenforceable as a matter of law.

**Wells Fargo Files Suit Against EDC, the Indenture Is
Declared Void, and the Seventh Circuit Determines that
Other Transaction Documents Must Be Considered Separately[4]**

28.    Admit that in or around November 2009, EDC stopped depositing Casino

Facility revenues into a Trustee-controlled account; deny the balance of the allegations of

paragraph 28.

29.    Answering paragraph 29, admit that Wells Fargo filed a complaint in the U.S.

District Court for the Western District of Wisconsin and that that complaint speaks for itself,

but deny that the allegations of paragraph 29 fully and accurately describe that complaint and

deny the balance of the allegations of paragraph 29.

30.    Answering paragraph 30, admit that the District Court issued a Decision and

Order declaring *inter alia* that the Indenture was void *ab initio* as an unapproved

management contract and that the decision speaks for itself, but deny that the allegations in

paragraph 30 fully and accurately describe the decision and deny the balance of the

allegations of paragraph 30.

31.    Answering paragraph 31, admit that attached as Exhibit K is a letter that

speaks for itself from the Corporation's counsel, but deny that the allegations of paragraph

31 fully and accurately describe the contents of that letter and deny the balance of the

allegations of paragraph 31.

32.    Answering paragraph 32, admit that Wells Fargo filed a motion in the District

Court, which motion speaks for itself, but deny that the allegations in paragraph 32 fully and

---

[4] To the extent an answer to this unnumbered paragraph is necessary, the Tribal Parties admit that Wells
Fargo filed suit against EDC and that the Indenture was declared void, but deny the balance of the
allegations in this paragraph.

accurately describe the contents of that motion and deny the balance of the allegations of paragraph 32.

33.     Answering paragraph 33, admit that Wells Fargo attached the proposed Amended Complaint to Wells Fargo's motion, which speaks for itself, but deny that the allegations of paragraph 33 fully and accurately describe the contents of the proposed Amended Complaint and deny the balance of the allegations of paragraph 33.

34.     Answering paragraph 34, admit that the District Court denied Wells Fargo's motion, but deny that the allegations of paragraph 34 fully and accurately describe the decision and therefore deny the balance of the allegations of paragraph 34.

35.     Answering paragraph 35, admit that Wells Fargo appealed the District Court's order to the U.S. Court of Appeals for the Seventh Circuit, but deny that the allegations of paragraph 35 fully and accurately describe the contents of the decision of the Seventh Circuit and therefore deny the balance of the allegations of paragraph 35.

36.     Answering paragraph 36, admit that the Seventh Circuit remanded the case to the District Court for further consideration, but deny that the allegations of paragraph 36 fully and accurately describe the contents of the Seventh Circuit's decision and therefore deny the balance of the allegations of paragraph 36.

37.     Answering paragraph 37, admit that the Seventh Circuit remanded the case to the District Court, but deny that the allegations of paragraph 37 fully and accurately describe the contents of the Seventh Circuit's decision and therefore deny the balance of the allegations of paragraph 37.

**Saybrook Files Postremand Suits in Federal and
State Court, the Federal Actions are Dismissed,
And the State Court Action Proceeds[5]**

38.     Answering paragraph 38, deny that the allegations in paragraph 38 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 38.

39.     Answering paragraph 39, deny that the allegations in paragraph 39 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 39.

40.     Answering paragraph 40, deny that the allegations in paragraph 40 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 40.

41.     Answering paragraph 41, deny that the allegations in paragraph 40 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 41.

42.     Answering paragraph 42, deny that the allegations in paragraph 42 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 42.

43.     Answering paragraph 43, deny that the allegations in paragraph 43 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 43.

---

[5] To the extent an answer to this unnumbered paragraph is necessary, the Tribal Parties deny that the allegations in this paragraph fully and accurately describe the procedural history of the case and therefore deny the allegations in this paragraph.

44.     Answering paragraph 44, deny that the allegations in paragraph 44 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 44.

45.     Answering paragraph 45, deny that the allegations in paragraph 45 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 45.

46.     Answering paragraph 46, deny that the allegations in paragraph 46 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 46.

47.     Answering paragraph 47, deny that the allegations in paragraph 47 fully and accurately describe the procedural history of the case and therefore deny the allegations in paragraph 47.

**The Tribe Changes Its Tribal Court Code[6]**

48.     Answering paragraph 48, deny that the allegations in paragraph 48 fully and accurately describe the revisions to the Tribal Court Code and therefore deny the allegations in paragraph 48.

49.     Answering paragraph 49, deny that the allegations in paragraph 49 fully and accurately describe the revisions to the Tribal Court Code and therefore deny the allegations in paragraph 49.

---

[6] To the extent an answer to this unnumbered paragraph is necessary, the Tribal Parties admit that the Tribe revised the Tribal Court Code, but affirmatively allege that all such changes were lawful, timely, and not prejudicial in any way to the Plaintiffs or any other litigants.

**The Tribe Files Its Statement of Claim in the Tribal Court and
Selects the Judge Pro Tempore for the Case[7]**

50.     Answering paragraph 50, admit that under Chapter 80 of the Tribal Code, a statement of claim is the initial document beginning an action in the Tribal Court, but deny that the balance of the allegations in paragraph 50 fully and accurately describe the procedural history of the Tribal Court Action and therefore deny the balance of the allegations in paragraph 50.

51.     Answering paragraph 51, admit that the Statement of Claim is attached as Exhibit N and speaks for itself, but deny that the balance of the allegations in paragraph 51 fully and accurately describe the contents of the Statement of Claim and therefore deny the balance of the allegations in paragraph 51.

52.     Answering paragraph 52, deny that the allegations in paragraph 52 fully and accurately describe the contents of the Statement of Claim and therefore deny the allegations in paragraph 52.

53.     Answering paragraph 53, deny that the allegations in paragraph 53 fully and accurately describe the procedural history of the cases and therefore deny the allegations in paragraph 53.

54.     Deny the allegations of paragraph 54.

55.     Deny the allegations of paragraph 55.

56.     Deny the allegations of paragraph 56.

57.     Deny the allegations of paragraph 57.

---

[7] To the extent an answer to this unnumbered paragraph is necessary, the Tribal Parties deny that the allegations in this paragraph fully and accurately describe the procedural history of the case and therefore deny the allegations in this paragraph.

58.     Deny the allegations of paragraph 58.

**Plaintiffs Are Not Required to Exhaust Tribal Court Remedies[8]**

59.     Answering paragraph 59, the allegations in paragraph 59 state legal

conclusions to which no response is necessary, but to the extent a response is necessary, deny

the allegations in paragraph 59.

60.     Deny the allegations of paragraph 60.

61.     Deny the allegations of paragraph 61.

**Plaintiffs Are Entitled to an Injunction Against Further Proceedings in the
Tribal Court[9]**

62.     Deny the allegations of paragraph 62.

63.     Deny the allegations of paragraph 63.

64.     Deny the allegations of paragraph 64.

65.     Deny the allegations of paragraph 65.

**CAUSE OF ACTION[10]**
**(Declaratory Judgment)**

66.     Answering paragraph 66, the Tribal Parties restate the foregoing paragraphs as

if fully set forth in this paragraph.

67.     Answering paragraph 67, the allegations in paragraph 67 state legal

conclusions to which no response is necessary, but to the extent a response is necessary, deny

the allegations in paragraph 67.

---

[8] To the extent an answer to this unnumbered paragraph is necessary, the Tribal Parties deny the allegations in this paragraph.
[9] To the extent an answer to this unnumbered paragraph is necessary, the Tribal Parties deny the allegations in this paragraph.
[10] *See* footnote 1 of this Answer.

68.     Answering paragraph 68, the allegations in paragraph 68 state legal conclusions to which no response is necessary, but to the extent a response is necessary, deny the allegations in paragraph 68, and further deny that Plaintiffs are entitled to the relief sought.

## AFFIRMATIVE DEFENSES

The Tribal Parties, by their undersigned attorneys, without prejudice to their denials or other statements in their Answer and other pleadings, and without prejudice to their position that the Tribal Parties are immune from this suit and the jurisdiction of this Court, for their Affirmative Defenses to the Plaintiffs' Complaint, incorporating by reference into these Affirmative Defenses the factual allegations of the following Conditional Counterclaims, state as follows:

1.     The Tribal Parties are sovereign entities immune from suit and have not waived their sovereign immunity from suit. Because the Tribal Parties have not waived their sovereign immunity from suit, this Court lacks personal and subject-matter jurisdiction over the Tribal Parties and over the Plaintiffs' Complaint.

2.     The Plaintiffs have failed to exhaust their Tribal Court remedies, barring this Court from asserting jurisdiction over this case.

3.     The Bond Transaction and all of its constituent Bond Transaction documents' components are illegal, unenforceable, and void and are legal nullities and therefore no Plaintiff can rely, in whole, or in part, on them.

4.     In the alternative, if any Bond Transaction document is valid and enforceable, some or all of the Plaintiffs lack standing to enforce its provisions.

5.    The Plaintiffs have failed to state a claim upon which relief can be granted.

6.    Saybrook Fund Investors, LLC is not a real party in interest to this case.

7.    The Tribal Parties are not proper parties to this action and the Plaintiffs failed to name necessary parties to this action under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny.

8.    The Tribal Parties' treaty rights bar this action.

9.    By voluntarily negotiating and entering into the Bond Transaction with the Tribe and Corporation concerning tribal assets on tribal land, Plaintiffs assumed the risk of subjecting themselves to the jurisdiction of the Tribe.

10.    By voluntarily bargaining for, insisting upon, and including within the Bond Transaction documents clauses that purport to confer management authority and powers on persons other than the Tribe, but failing to submit the Bond Transaction documents to the National Indian Gaming Commission for "declination" review, Plaintiffs assumed the risk that Bond Transaction documents are all void *ab initio*.

11.    The Bond Transaction was procured by fraud and the Tribal Parties were fraudulently induced to enter into it and therefore should be relieved of any obligation to perform thereunder.

12.    The Bond Transaction terms were unconscionable and are therefore unenforceable.

13.    Some or all of the Plaintiffs' claims against the Tribal Parties are barred by the doctrine of unclean hands.

14.    The Plaintiffs may not disclaim the Tribal Court's jurisdiction because they

were aware that the Bond Transaction concerned on-reservation Indian gaming and accepted the benefits of engaging in the Bond Transaction with the Tribal Parties, which they knew to be paid from the proceeds of the Tribe's on-reservation gaming operation.  They have accordingly voluntarily undertaken activity that took place on or concerned tribal trust land and so are estopped from arguing that the Tribal Court lacks jurisdiction over disputes concerning the Bond Transaction.

15.   The Plaintiffs may not disclaim the Tribal Court's jurisdiction because they voluntarily entered into an on-reservation commercial relationship with the Tribe and so are estopped from arguing that the Tribal Court lacks jurisdiction over disputes concerning the Bond Transaction.

16.   The Plaintiffs may not contest the jurisdiction of the Tribal Court without first completely exhausting their Tribal Court remedies because doing so is contrary to the public policy and law of the United States and State of Wisconsin.

17.   The Plaintiffs may not contest the jurisdiction of the Tribal Court over an action concerning the Tribe's Indian gaming because doing so is contrary to the public policy and law of the United States.

18.   Principles of comity favor abatement of this action.

19.   Plaintiffs lack standing or capacity to bring this lawsuit.

## CONDITIONAL COUNTERCLAIMS[11]

Counterclaim Plaintiffs Lac du Flambeau Band of Lake Superior Chippewa Indians (the "Tribe") and Lake of the Torches Economic Development Corporation (the "Corporation") (collectively, the "Tribal Parties"), by their undersigned attorneys, without prejudice to their denials, objections, defenses, and other assertions in their Answer and Affirmative Defenses and other pleadings, for their Conditional Counterclaims against Counterclaim Defendants Stifel, Nicolaus & Company, Inc. and Stifel Financial Corp. (collectively "Stifel"), Saybrook Fund Investors LLC (alleged successor to Saybrook Tax Exempt Investors, LLC), LDF Acquisition, LLC (collectively "Saybrook"), Wells Fargo Bank, N.A. ("Wells Fargo"), and Godfrey & Kahn, S.C. ("Godfrey"), allege and state as follows:

### INTRODUCTION

For years, the Tribe's trusted financial advisor—Stifel—advised the Tribe to pour millions of dollars into an ill-conceived venture to build a riverboat casino, hotel, and bed-and-breakfast in Natchez, Mississippi, (the "Project"). Unbeknownst to the Tribe, however, Stifel's advice regarding the Project was anything but objective. Stifel Vice President of Wisconsin Public Finance Kevin Shibilski was an undisclosed silent member/owner of an entity that had invested millions in the Project. Shibilski had a seven-figure personal stake in the Project, which he stood to lose if the Project failed. The Project was mismanaged,

---

[11] These Conditional Counterclaims are conditioned on a determination by this Court that the Court has jurisdiction over this action and the Tribal Parties, which determination the Tribal Parties have and will continue to contest, and are made in the alternative, without prejudice to the Tribal Parties' defenses that this Court lacks jurisdiction over this action and them as raised in their Motion to Dismiss, or in the Alternative, Stay, and Answer and Affirmative Defenses, including, *inter alia*, that they are sovereign and immune from this suit, which defenses they continue to assert without qualification or waiver.

drowning in debt, and perpetually on the brink of collapse. Each time the Project's finances needed shoring up, the Tribe was cajoled into sinking additional funds in the Project.  This pattern culminated in the Bond Transaction that is the subject of this case, two previous federal cases that were dismissed, and two other pending actions. The Project, the Bond Transaction in particular, and the resultant litigation, have damaged the Tribal Parties enormously.

The Tribal Parties were defrauded by Stifel and seek compensatory damages in the amount of their entire investment in the Project, their losses resulting from the Bond Transaction and other damages they sustained, as well as an award of damages sufficient to punish Stifel for its gross misconduct and intentional disregard of the Tribal Parties' rights.

Saybrook, or its investors, acquired the bonds issued by the Corporation. Wells Fargo served as Trustee under the Bond Transaction's Trust Indenture ("the Indenture"). Saybrook was aware the Tribal Parties were unlikely ever to be able to meet their obligations under the Bond Transaction, but proceeded to invest on the erroneous assumption that it could exercise dominion over the Tribe's existing on-reservation casino in the event of default. To that end, Saybrook insisted on management provisions in the Bond Transaction that were illegal, voiding the Indenture, and calling into question the validity of the entire Bond Transaction, resulting in costly litigation to the detriment of the Tribal Parties. After the Trust Indenture was voided, Wells Fargo unlawfully swept accounts containing the Tribal Parties' funds and transferred millions of dollars to Saybrook, which Saybrook accepted. The Tribal Parties seek an award of compensatory, exemplary, and punitive damages for this conduct.

Godfrey was counsel for the Tribal Parties in the Bond Transaction. Its attorneys failed to look out for their clients' best interests in numerous respects and Godfrey

negligently provided legal opinions regarding the Bond Transaction, spawning years of litigation which have damaged the Tribal Parties. The Tribal Parties seek an award of compensatory damages for Godfrey's negligence in the Bond Transaction.

## THE PARTIES

1.      Counterclaim Plaintiff the Corporation is a corporation chartered under Article VI, Section 1(o) of the Constitution of the Lac du Flambeau Band of Lake Superior Chippewa Indians ("Constitution").  Its principal place of business is located on the Lac du Flambeau Reservation on trust land at 510 Old Abe Road, Lac du Flambeau, Wisconsin, 54538.

2.      Counterclaim Plaintiff the Tribe is a federally recognized Indian tribe organized under Section 16 of the Indian Reorganization Act of 1934. 25 U.S.C. §§ 461 *et seq*.  Its principal place of business is located on trust land on the Lac du Flambeau Reservation at 418 Old Abe Road, Lac du Flambeau, Wisconsin, 54538.

3.      Upon information and belief, Counterclaim Defendant Saybrook Fund Investors, LLC is the alleged successor in interest to Saybrook Tax Exempt Investors, LLC[12], a limited-liability company created and managed by Saybrook Capital, LLC, an investment-fund management company that seeks high-yield returns from risky investments in distressed companies, and distressed and/or defaulted municipal bonds secured by identified revenue streams, and real-estate projects or other assets.  Upon information and

---

[12] The Tribal Parties do not waive the right to contest the validity of Saybrook's assertions regarding successor status of Saybrook Fund Investors, LLC, nor the ability to contest any of the Saybrook entities' alleged status as a real party in interest to the Bond Transaction or its ability to enforce any alleged rights claimed under any instrument in the Bond Transaction. The Tribal Parties reserve the right to amend their Conditional Counterclaims regarding the relationship of the various Saybrook parties in due course after discovery yields relevant facts.

belief, Counterclaim Defendant LDF Acquisition, LLC is a Wisconsin citizen and limited-liability company, created as a special purpose vehicle by Saybrook Tax-Exempt Investors, LLC to purchase the Bonds.  The principal place of business for Saybrook is located at 401 Wilshire Boulevard, Suite 850, Santa Monica, California, 90401.

4.      Upon information and belief, Counterclaim Defendants Stifel, Nicolaus & Company, Inc. and Stifel Financial Corporation (collectively, "Stifel") are brokerage and investment-banking corporations. Upon information and belief, at all times relevant, Stifel was registered with the Securities and Exchange Commission as a broker-dealer and investment advisor.  Stifel's principal place of business is located at 510 North Broadway, St. Louis, Missouri, 53207.  Upon information and belief, at all times relevant, Stifel was a member of the Financial Industry Regulatory Authority, Inc. ("FINRA").  Prior to and during the negotiations culminating in the Bond Transaction, the Tribal Parties considered Stifel to be their financial advisor and put their trust in it and its representatives.  Stifel knew that the Tribal Parties relied upon it for financial advice.

5.      Counterclaim Defendant Godfrey & Kahn, S.C. ("Godfrey") is a law firm established as a Wisconsin service corporation.  Its principal place of business is located at 780 North Water Street, Milwaukee, Wisconsin, 53202.  At the time of the Bond Transaction, and during the negotiations culminating in the Bond Transaction, the Tribal Parties had an attorney-client relationship with Godfrey, considered Godfrey to be their legal counsel and put their trust in Godfrey and its attorneys. Godfrey knew that the Tribal Parties relied upon it for legal advice and considered the Tribe a valued and longstanding client. At all times relevant, Godfrey owed the Tribal Parties a fiduciary duty. While representing the Tribal Parties in the Bond Transaction, Godfrey also simultaneously served

as Bond Counsel to the Bond Transaction.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### Key Individuals

6.     **David Noack** worked at Stifel as a Senior Vice President and was the co-head

of its Milwaukee office until he left to join Robert W. Baird & Company Inc. in early 2007.

He worked for Stifel from 2000 to 2007 and he acted as an officer, employee, and

representative of Stifel during that period.  Stifel exercised power or control over Noack on

a day-to-day basis during the time when he was employed by Stifel. As a Stifel Vice

President, Noack's knowledge is imputed to Stifel. During his interactions with the Tribal

Parties on behalf of Stifel, Noack had management and control over financial matters

relating to the Tribal Parties. On information and belief, while at Stifel, Noack was

Shibilski's superior.  At all times relevant to these counterclaims, Noack was acting within

the scope of his authority as an agent, representative, and/or employee of Stifel and Stifel is

therefore liable for Noack's wrongful acts, errors, and/or omissions as complained of herein

under theories of agency, *respondeat superior*, and control person liability.

7.     In 2011, the SEC filed a civil enforcement action against Noack and Stifel,

based on the fraudulent sale of complex financial instruments to five Wisconsin public

school districts by Stifel and Noack, United States Securities and Exchange Commission v.

Stifel Nicolaus & Co., Inc. and David W. Noack, Case No. 11-CV-755 (E.D. Wis. 2011).

8.     **Kevin Shibilski** is a former Wisconsin state senator from Stevens Point,

Wisconsin.  He began working at Stifel in 2003.  He worked for Stifel, under Noack's

supervision, until he was fired by Noack in early 2007.  When Noack quit Stifel to move to

Baird in March 2007, Stifel immediately rehired Shibilski. Shibilski's title at Stifel when he

was crafting the Bond Transaction with the Tribal Parties was Vice President of Wisconsin Public Finance.  At all time periods relevant to the Tribal Parties' counterclaims, Shibilski acted as an employee and representative of Stifel. As a Stifel Vice President, Shibilski's knowledge is imputed to Stifel.  Stifel exercised power or control over Shibilski on a day-to-day basis during the time when he was employed by Stifel and he had apparent and actual authority to represent Stifel.  During his interactions with the Tribal Parties on behalf of Stifel, Shibilski had management and control over financial matters relating to the Tribal Parties.

9.     At the time of the Bond Transaction, and during the negotiations culminating in the Bond Transaction, the Tribal Parties considered Shibilski to be their financial advisor and put their trust in him and his fellow Stifel employees to provide them with unbiased objective advice and seek to further their best interests. Shibilski knew that the Tribal Parties relied upon him for financial advice.  At all times relevant to these counterclaims, Shibilski was acting within the scope of his authority as an agent, representative, and/or employee of Stifel and Stifel is therefore liable for Shibilski's wrongful acts, errors, and/or omissions as complained of herein under theories of agency, *respondeat superior*, and control person liability.

10.     Beginning in at least 2004, Shibilski invested in multiple business ventures with William Bayba.  In 2004 Shibilski and Bayba formed Indian Lakes Partners LLC.  In 2005, Big River Enterprises, LLC ("Big River") was formed to invest in the Project. Shibilski joined Big River in 2005.

11.     **William Bayba** is a real estate developer and investor from Stevens Point, Wisconsin.  Prior to the Bond Transaction, Bayba had partnered with the Tribal Parties in

investing in the development of two hotels in Wisconsin.  As mentioned above, Bayba was also a partner with Shibilski in at least two different business ventures, including Big River. Big River was a part-owner of the Project and was also the general contractor for the building of the Project.

12.     **Brian Pierson** is a partner at Godfrey.  By at least 2005, Pierson served as counsel to the Tribe and was providing legal advice to it on numerous issues and held himself out as an expert in Indian law and the financing of Indian gaming facilities.  At the time of the Bond Transaction, and during the negotiations culminating in the Bond Transaction, the Tribal Parties considered Pierson to be their legal advisor and put their trust in him and his fellow Godfrey attorneys.  Pierson knew that the Tribal Parties relied upon him for legal advice. At all times relevant to these counterclaims, Pierson was acting within the scope of his authority as an agent, representative, and/or employee of Godfrey and Godfrey is therefore liable for Pierson's wrongful acts, errors, and/or omissions as complained of herein under theories of agency, *respondeat superior*, and control person liability.  Pierson had apparent and actual authority to act on behalf of Godfrey at all times relevant to these counterclaims.  During his interactions with the Tribal Parties on behalf of Godfrey, Pierson had management and control over legal matters relating to the Bond Transaction.

13.     **Thomas Griggs** was also a Godfrey partner during the negotiations and execution of the Bond Transaction.  He provided legal advice to the Tribal Parties on the Bond Transaction.  At the time of the Bond Transaction, and during the negotiations culminating in the Bond Transaction, the Tribal Parties considered Griggs to be their legal advisor and put their trust in him and his fellow Godfrey attorneys.  Griggs knew that the

Tribal Parties relied upon him for legal advice. At all times relevant to these counterclaims, Griggs was acting within the scope of his authority as an agent, representative, and/or employee of Godfrey and Godfrey is therefore liable for Griggs' wrongful acts, errors, and/or omissions as complained of herein under theories of agency, *respondeat superior*, and control person liability.  Griggs had apparent and actual authority to act on behalf of Godfrey at all times relevant to these counterclaims.

14.     **Charles Cato** is a Florida-based developer who was the original investor in the Project.

15.     **Scott Andress** is a Mississippi-based attorney who is identified as the incorporator of the Project and represented both the Project and, upon information and belief, Big River.  His law firm, Balch & Bingham, represented Stifel in the Bond Transaction.

16.     **Scott Bayliss** is a representative of Saybrook and, upon information and belief, was the person at Saybrook with primary responsibility for the Bond Transaction.

17.     **Richard Lindsley** worked as the Chief Financial Officer for the Tribe from June 2006 until February 2008.  In February 2008 he left the Tribe and was immediately hired to be the Chief Financial Officer for the Project.

### Stifel Uses its Role as Trusted Advisor to the Tribe to Solicit Tribal Investment in the Project

18.     Upon information and belief, in 2002 or 2003 Cato made an initial investment in the Project. At that time the Project was known as the Emerald Star Casino Resort, but its name was later changed to Grand Soleil – Natchez.

19.     Cato hired Stifel's Noack to seek financing for the Project. Upon information

and belief, at or about this time Shibilski worked under Noack at Stifel.

20.     Noack had previously provided financial advice to the Tribe, including work on a bond deal for the Lac du Flambeau public school system and Stifel was considered a trusted advisor by the Tribe.

21.     Noack introduced the Tribal Parties to Cato as a potential investor for the Project.

22.     By 2004, Shibilski was also a trusted financial advisor to the Tribe who attended meetings to discuss investment opportunities with the Tribal Council.

23.     Both Noack and Shibilski were intimately aware of the Tribe's financial situation, as well as the fact that the Tribal Council members were elected from the general populace of the Tribe, generally lacked education or experience with complex financial products, and were relying heavily on Stifel for objective investment advice and guidance.

24.     On March 16, 2005, Noack wrote to the Tribal Parties about investing in the Project with Stifel acting as placement agent. Later that month, Noack travelled to the Lac du Flambeau reservation on behalf of Stifel and addressed the Tribal Council at a facility on tribal trust land regarding the potential investment in the Project with Cato.  Shibilski attended the meeting.

25.     Around that time, Noack also introduced Cato to another potential investor, William Bayba. Upon information and belief, Shibilski had previously worked with Bayba on real estate development projects in the Stevens Point, Wisconsin area.

**Shibilski Makes a Large Personal Investment in the Project
While Advising the Tribe to Invest in the Project**

26.     Sensing opportunity, in June 2005, Bayba formed Big River to invest in the

Project.

27.    Shortly after its formation, Shibilski joined Big River to invest in the Project.

28.    The members of Big River collectively invested millions of dollars in the Project through Big River.

29.    Shibilski had a seven-figure stake in Big River, funding the investment with cash as well as loans he and his wife took against real property they owned.  *See* Dep. Of William J. Bayba, Vol. 1 at 19-26, 78-80, 87, *Good Hope Constr., Inc. v. RJB Financing, LLC* (*In re: Grand Soleil-Natchez, LLC*), No. 12-00013 (Bankr. S.D. Miss. Jun. 28, 2013) ("GSN Adversary Proceeding"), Dkt. 402-1 (attached hereto as Ex. 1); *see also* Big River Enters., LLC 2007 Tax Return at 7-8, GSN Adversary Proceeding, Dkt. 402-16 (attached hereto as Ex. 2); Big River Enters., LLC 2008 Tax Return at 12-13, GSN Adversary Proceeding, Dkt. 402-17 (attached hereto as Ex. 3); Big River Enters., LLC 2009 Tax Return at 7-8, GSN Adversary Proceeding, Dkt. 402-18 (attached hereto as Ex. 4); Big River Enters., LLC 2010 Tax Return at 13-14, GSN Adversary Proceeding, Dkt. 402-19 (attached hereto as Ex. 5).

30.    Shibilski owned various percentages of Big River during its existence, from 2005 until after the Bond Transaction. (*See* Ex. 1 at 19-26; Ex. 2 at 7-8; Ex. 3 at 12-13; Ex. 4 at 7-8; Ex. 5 at 13-14)

31.    Big River's interest in the Project, and therefore Shibilski's interest, substantially increased over time as its members invested additional funds in the Project through Big River.

32.    Thus, Stifel, through its Vice Presidents, Shibilski and Noack, pitched its client, the Tribe, to invest in the Project in which Shibilski had a large personal interest.

**Shibilski's Conflict of Interest is Never Disclosed to the Tribal Parties**

33.    Upon information and belief, Noack was aware of Shibilski's membership in Big River and personal investment in the Project.

34.    Stifel is imputed with knowledge of Shibilski's membership in Big River and his investment in the Project, and was otherwise actually or constructively aware of Shibilski's membership in Big River and personal investment in the Project.

35.    Shibilski never disclosed his membership in Big River and his investment in the Project to the Tribal Parties.

36.    Noack never disclosed Shibilski's membership in Big River and his investment in the Project to the Tribal Parties.

37.    Stifel never disclosed Shibilski's membership in Big River and investment in the Project to the Tribal Parties.

38.    On August 1, 2005, at a special meeting of the Tribal Council regarding the potential investment in the Project with Cato, at a facility on tribal trust land, Cato and a business associate pitched a proposed investment by the Tribe in the Project.  At that meeting, the Tribal Council inquired who was behind Big River, which was listed as a partner with equity interest in the Project. The Council was informed that Bayba owned Big River. Shibilski's interest was not disclosed.

**Unaware of Shibilski's Conflict—and at his Urging—the Tribe Pours
Millions of Dollars into the Project**

39.    In the fall of 2005, the Tribe, through its wholly owned corporation the Lake of the Torches Federal Development Corporation (the "Federal Corporation"), the Tribe made its initial investment, paying $5,000,000 for a 10% equity interest in the Project.

40.     The Tribe still had no idea that Shibilski had a large personal interest in the Project.

41.     To add insult to injury, upon information and belief, Cato paid Noack a $100,000 commission for bringing Bayba and the Tribal Parties into the Project.  Upon information and belief, Noack shared that commission with Shibilski for his work bringing investors to the Project.

42.     On Stifel's advice, in 2006, the Tribe, through the Federal Corporation, paid an additional $3.6 million dollars to increase its ownership interest in the Project to a 27.5 percent, for a total equity investment at that time of $8.6 million.

43.     By 2007, the Project had run up expenses, incurred substantial debts, and was running out of cash.  The Project's future was in jeopardy and the pressure mounted to find additional financing.

44.     Shibilski and/or Bayba returned to the Tribe to persuade it to loan additional money to the Project in an effort to protect Big River's investment in the Project.

45.     As a result, the Tribe incurred substantial additional debt obligations at Shibilski's and/or Bayba's urging. The Tribe made four loans to the Project totaling $7,187,000.

46.     Upon information and belief, Shibilski and/or Bayba structured the loans so that the Tribe obtained no additional ownership interest in the Project. It was ultimately free money for Big River.

### Shibilski Pushes the Tribal Parties to Increase Their Investment in the Project and Bundle Project-Related Debt and Other Existing Debt into a Bond Issuance

47.     The Tribal Parties' loans were insufficient to shore up the Project and, upon

27

information and belief, Shibilski recognized that in order to salvage his personal investment, he had to convince the Tribal Parties to make a massive cash infusion into the Project.

48.     The Tribal Parties had several other loans unrelated to the Project that were coming due in 2008. The Tribal Parties put out RFP's for debt refinancing and/or consolidation options.

49.     Unaware of Shibilski's personal interest in the Project and Stifel's resulting conflict of interest, the Tribal Parties selected Stifel to act as its financial advisor for the loan refinancing, with Shibilski as its lead.

50.     Godfrey, already the long-term lawyer for the Tribe, was then engaged to act as the Tribal Parties' attorneys for the loan refinancing with Stifel.

51.     Upon information and belief, Shibilski seized the opportunity to funnel more tribal funds into the Project by encouraging the Tribal Parties to package existing debt with Project debt and make another large capital infusion in the Project.

52.     Shibilski thus had the opportunity to both shore up his personal investment in the Project with tribal funds and earn a commission when the deal closed while Stifel could make hundreds of thousands of dollars for its role in the deal.

53.     On September 25, 2007, Shibilski and other Stifel representatives presented the Tribal Parties, at a facility on tribal trust land, their recommendation that the Tribal Parties issue $75 million in bonds to consolidate debt and make a massive additional investment in the Project. The Tribe agreed and Stifel sought investors.

**Saybrook, Stifel, and Godfrey Craft the Bond Transaction**

54.     Stifel ultimately identified Saybrook as a potential purchaser for the proposed bonds.

55.     Stifel introduced Saybrook to the Tribe and offered to broker what would become the Bond Transaction.

56.     Upon information and belief, Shibilski lacked the proper licensure to broker the Bond Transaction.

57.     Upon information and belief, Stifel knew or should have known Shibilski lacked the proper licensure to broker the Bond Transaction, but permitted him to proceed to broker the Bond Transaction.

58.     At all times the Tribal Parties were led to believe, and did believe, that they were Stifel's client, that Stifel was making objective recommendations to the Tribal Parties with the their best interests in mind, and that Shibilski was their financial advisor.

59.     Godfrey served as counsel to the Tribal Parties and as Bond Counsel to the Bond Transaction. In its capacity as Bond Counsel, Godfrey authored the Bond Counsel Opinion Letter and in its capacity as Issuer's Counsel, Godfrey authored the Issuer Opinion Letter.

60.     Completion of the Bond Transaction was expressly conditioned on Godfrey's issuance of the Bond Counsel Opinion Letter and Issuer Opinion Letter.

61.     Godfrey's fees were to be paid out of the Bond Transaction proceeds.

62.     Stifel was represented in the Bond Transaction by Scott Andress' law firm, Balch & Bingham. Earlier, Andress incorporated Emerald Star for Cato and had represented that entity and its successor, Grand Soleil. Upon information and belief, Andress had also represented Big River and was aware of Shibilski's personal interest in the Project.

63.     Stifel and its attorneys, along with Saybrook, Wells Fargo and their counsel, SNR Denton, worked with Godfrey to craft a bond issuance in which the Tribal Parties not

only refinanced existing debt but agreed to take on $32 million in additional debt to provide a massive influx of cash to the Project.

64.     Saybrook declined to provide $75 million as recommended by Stifel to fund the Project and instead agreed to purchase $50 million of bonds, if the Tribal Parties agreed to a number of onerous terms.

65.     Saybrook, Stifel, and Godfrey negotiated the following terms, which, when taken together, were unconscionably detrimental to the Tribal Parties' interests:

a.  The Corporation would pay 12% interest on the Bonds—a higher rate than any of the debt being refinanced as part of the Bond Transaction;

b.  Neither the Corporation nor the Tribe would have any discretion or control over how the Bond Transaction proceeds would be used or allocated;

c.  Saybrook would retain $5.5 million of the Bond proceeds as the bond reserve and bond discount, so that only $44.5 million in bond proceeds was actually disbursed;

d.  The Corporation would pledge as collateral for the Bond Transaction all gross revenue from the Casino, including even the revenue necessary to pay Casino operating expenses;

e.  In any given month, the Corporation could not make *any* distributions to the Tribe until that month's Bond payments were satisfied;

f.  The Tribe would guarantee the Corporation's debt represented by the Bonds; and

g.  As directed by Shibilski, the entire balance of the Bond Transaction proceeds—approximately $32 million (72% of the proceeds)—was

disbursed for use on the Project, with the distribution of these funds controlled by Wells Fargo, not the Corporation.

66.     Thus, despite incurring new debt of over $32 million, the Corporation had no control over the distribution of funds from the bond issuance, never possessed the funds, did not receive any consideration or security for the debt they incurred in exchange for the funds, and did not receive *any* increased ownership interest in the Project in exchange for incurring this massive debt.

67.     Godfrey and Stifel utterly failed to represent the Tribal Parties' best interests in negotiating the terms of the Bond Transaction. But Stifel and Godfrey ensured they would get paid.

68.     Under the terms negotiated by Stifel, Saybrook, and Godfrey, Stifel would retain $375,000 of the Bond proceeds as an initial purchaser's discount—its fee for the Bond Transaction and Godfrey would retain $125,000 of the Bond proceeds for serving as Bond Counsel.

69.     Upon information and belief, Stifel, Saybrook, and Godfrey knew or should have known that, as structured, the Tribal Parties would never be able to live up to their obligations under the Bond Transaction despite convincing the Tribal Parties of the opposite —that they could easily satisfy their debt burden with the revenue the Project itself would generate.

70.     In other words, Stifel, Saybrook, and Godfrey knew or should have known that the Bond Transaction was setting the Tribal Parties up for failure, but Saybrook felt its investment was protected from the risk of default by the management terms described below.

## Saybrook Insists on Illegal Management Provisions

71.     In order to protect its investment, Saybrook demanded multiple revisions to the Bond Transaction documents, with Stifel and Godfrey actively and directly working to protect Saybrook's interests at the expense of the Tribal Parties.

72.     Saybrook, Stifel, and Godfrey conferred on Saybrook extensive management control over the Tribe's existing on-reservation casino in the event of default.

73.     For example, on December 13, 2007, Saybrook e-mailed Stifel to add provisions to the Indenture (a) requiring the Corporation hire a management consultant if the debt-service-coverage ratio dropped below a specific threshold, and (b) giving the bondholders the right to require the Corporation to hire new management if a major event of default occurred. E-mail from Scott Bayliss, Managing Director, Saybrook Capital, LLC, to Mike Schinzer, et al. (Dec. 13, 2007, 17:45) (attached hereto as Ex. 6).

74.     Similarly, on December 19, 2007, Saybrook sent Stifel, Godfrey, SNR Denton, and the Corporation a redlined version of the Indenture by e-mail.  The body of the e-mail described Saybrook's addition of a term requiring the Corporation to get the bondholders' consent before replacing key management personnel, including the Casino's General Manager, the Corporation's Controller, or the Executive Director of the Tribe's Gaming Commission, in a provision entitled "Replacement of Key Management Personnel."  The redline shows that Bayliss also made additional changes to the management-consultant provision. E-mail from Scott Bayliss, Managing Director, Saybrook Capital, LLC, to Tom Griggs, Partner, Godfrey & Kahn, S.C., and Richard Lindsley, Chief Financial Officer, Lake of the Torches Band of Lake Superior Chippewa Indians (Dec. 19, 2007, 16:02 PST) (attached hereto as Ex. 7).

75.     In the course of negotiations of the Bond Transaction, Saybrook demanded, and Godfrey and Stifel agreed to provide Saybrook: (a) a security interest in the Tribe's existing on-reservation casino fixtures and property; (b) an unlimited pledge of the casino's gross revenues; (c) a management-consultant provision; (d) new-management-in-default provisions; (e) a replacement-of-key-management provision; and (f) the inclusion of terms such as "management," "manager," and "controller."

76.     Saybrook insisted on these provisions so that it could obtain control over the casino in the event of default.

77.     These management provisions left Saybrook with little to fear in the event of a default because Saybrook would essentially own and control the Tribal Parties' on-reservation casino and could pay its investors with the casino's revenues.

78.     Saybrook bargained for and received control of the Tribe's on-reservation tribal gaming operation and was ultimately the only party who would have control over the casino in the event of default, and the negotiation for and inclusion of those provisions was done at the direction of and for the benefit of Saybrook.

79.     By insisting on the inclusion of these management provisions in the Bond Transaction without seeking approval of the National Indian Gaming Commission ("NIGC"), Saybrook assumed the risk of voiding the Bond Transaction.

80.     Godfrey knew or should have known that Saybrook's management provisions were unusual for such a transaction and that the Bond Transaction violated IGRA, Tribal Law, and the Tribe's compact with the State of Wisconsin.

81.     Nevertheless, Godfrey opined in the Bond and Issuer Opinion Letters that the Bond Transaction documents did not contain any management provisions, did not violate

any law, and were valid and enforceable.

**Stifel and Godfrey Press the Tribe to Approve the Bond Transaction**

82.     On January 2, 2008, Shibilski, on behalf of Stifel, and Pierson, on behalf of Godfrey, traveled to the Lac du Flambeau reservation and appeared at a facility on tribal trust land at a joint meeting of the Tribal Council and the Boards of the Corporation and the Federal Corporation.

83.     There, they presented the final Bond Transaction documents to the Tribal Parties and pressured the Tribal Parties to approve the Bond Transaction.

84.     The Bond Transaction required the approval of the Tribal Council and the Board of Directors for the Corporation. Both bodies are comprised of the same individuals, all of whom were tribal members who generally lacked a background in complicated financial transactions, had little or no training or experience with multi-million dollar bond transactions and were relying on Stifel and Godfrey for their professional judgment regarding the Bond Transaction.

85.     At that meeting, and in his role as the representative for the Bond Transaction's underwriter, Stifel, Shibilski acknowledged that Stifel had a fiduciary responsibility to tell the Tribal Parties about the consequences of the Bond Transaction and he was obliged to disclose material facts to the Tribal Parties. Lac du Flambeau Band of Lake Superior Chippewa Indians Special Tribal Council, et al., Transcript of Meeting Minutes of January 2, 2008 at 69:24-70:5 (unpublished transcript) (attached hereto as Ex. 8).

86.     Despite assuring the Tribal Parties of his fiduciary obligations to provide them with complete and accurate information, Shibilski made a number of material representations to the Tribal Parties that were either false, or made recklessly or negligently

34

without any reasonable factual support or basis. Specifically, he:

    a.   Assured them that the money from the Bond Transaction would be lent with positive arbitrage to the Project; (*Id.* at 13:13-14:5)

    b.   Told the Tribal Parties that an extra fee of a million dollars was going to be paid by the Tribal Parties to ensure that greater interest would be paid back to the Tribal Parties from the Project than what they would be paying on the bonds; (*Id.*)

    c.   Said that Stifel's very smart analysts  had looked closely at the projected cash flow for the Project and that they projected that, in the first full year of the Project, after all expenses were paid on the Project and that year's debt payments were made, the Tribal Parties would net approximately $9 million; (*See id.* at 26:9-27:11)

    d.   Repeated, in response to a question from a tribal member, that the Tribal Parties would have a 1.5 percent positive arbitrage on the payments they would receive from the Project compared to the payments they would have to make on the Bonds, which meant the Tribal Parties would immediately start making $3 million a year; (*Id.* at 32:10-12)

    e.   Emphasized that there was a substantial positive profit margin in the Project; (*Id.* at 27:12-17)

    f.   Told them that the money lent to the Project would be secured debt – that the Tribal Parties were getting liens on everything substantial and obtaining personal guarantees – so if there were not sufficient funds to pay the Tribal Parties back they would have recourse; (*Id.* at 28:3-13)

g.  Represented to the Tribal Parties that there was no halfway option – the bond deal was a single bond issue and they could not just take part of it; (*Id.* at 33:24-34:11)

h.  Emphasized that failing to approve the Bond Transaction that night would kill the Project and endanger the money the Tribal Parties had invested previously in the Project; (*Id.* at 61:2-7)

i.  Said that if the Tribal Parties did not approve the Bond Transaction, they would impair their credit and harm their ability to borrow for business; (*Id.* at 61:8-15)

j.  Told the Tribal Parties that the only compromise position was to approve the Bond Transaction, pay outstanding bills, finish site work for the Project, and then sell the Project; (*Id.* at 69:24-70:11)

k.  Assured the Tribal Parties that there were many people who would want to purchase their interest in the Project and he could guarantee that they had a valuable asset that they would be able to sell; (*Id.* at 70:6-11, 80:21-22)

l.  Said that in Bayba, the Tribal Parties had a 50/50 partner who would also be on the hook for any Project liabilities; (*Id.* at 83:11-20)

m.  Told the Tribal Parties they had a fiduciary obligation to enter the Bond Transaction in order to protect the interests of their good partner, Bayba; (*Id.* at 84:11-20)

n.  Stated that if the Tribal Parties failed to authorize the Bond Transaction, they would be ruining not just their project but their partner Bayba's project; (*Id.*)

o.  In response to a question about what the monthly fees would be on the $50 million, said that the net effect is that the Tribal Parties would have cash, the new debt payments would be at the same interest rates that were currently being charged on the existing debt, and the Tribal Parties would get $1 million; (*Id.* at 137:5-7)

p.  Told them that the payments made as a result of the Bond Transaction were the same as the payments that the Tribal Parties were already making; (*Id.*) and

q.  Stated that the Tribal Parties had no choice but to vote that day on the Bond Transaction because if they did not, they would lose their investment in the Project. (*See id.* at 61:2-62:7)

87.     At that same meeting, and while still in his role as Stifel's representative, Shibilski omitted a number of material facts from his presentation to the Tribal Parties:

a.  He did not inform them that he had a large personal financial stake in the Project;

b.  While claiming that he was obligated, because it was a fiduciary fact, to tell the Tribal Parties that their failure to act would ruin their partner Bayba's project, he failed to mention that *he* was Bayba's business partner and also their business partner;

c.  He did not mention that Bayba, a real estate developer and broker in Stevens Point, Wisconsin, lacked the skill and experience to manage development of the Project and that many of the Project's problems were of Big River's own making;

d.  He did not disclose that if the Project did not obtain a second round of financing in 2008 then the Project, and the Tribal Parties' ability to sell their interest in it, would be severely jeopardized; and

e.  He did not inform the Tribal Parties that the 12% interest rate on the Bond Transaction was significantly higher than the various interest rates on the Tribal Parties' then-existing debt, that the Tribal Parties could have refinanced the existing debt without taking on new debt, and that there were less-risky refinancing alternatives that did not require sinking additional funds into the Project.

88.     During that same meeting, Pierson knew that the Tribal Parties were relying on him to provide legal advice regarding the Bond Transaction and he made numerous statements to convince them that they should rely on him and not attempt to understand the documents they were being asked to approve.

89.     For example, Pierson assured the Tribal Parties that clients normally rely on bond counsel to draft and understand the complicated Bond Transaction documents. (Ex. 8 at 9:8-23)  He conceded that he himself did not understand the documents that had been circulated to the Tribal Parties and was relying on a fellow partner, Griggs, to interpret and understand them. (*Id.* at 64:15-21)

90.     Pierson also made a number of material representations at that meeting, in his role as attorney to the Tribal Parties, that were either false or made recklessly without any reasonable factual support or basis, including the following:

a.  In responding to a question about what would happen if there was a default on the bond payments, he stated that a certain percentage of casino revenue

38

would have to paid to service the debt and the tribe would have to *consult* with (as opposed to get approval from) the bondholder regarding new management; (Ex. 8 at 19:3-24)

b. He claimed that his partner, Griggs, was the bond expert and pushed back and negotiated on behalf of his client, the Tribal Parties; (*Id.* at 47:1-8)

c. He echoed Shibilski's dire warnings of the harm the Tribal Parties would suffer if they did not approve the Bond Transaction, including harm to their reputation in the marketplace; and (*Id.* at 62:9-63:12)

d. Following all of the dire consequences, he said that it came down to the consequences of what would happen if they did not act that night. (*Id.* at 64:22-65:4)

91.    Meanwhile, Pierson also omitted material information and failed to correct material misrepresentations made by Shibilski, despite the fact that he knew or should have known that Shibilski's statements were false or recklessly made without a reasonable basis, and he had a duty to inform his client of such misrepresentations:

a. When Shibilski materially misrepresented the types of security interest the Tribal Parties had in the Project, Pierson failed to explain the limited nature of the Tribal Parties' protection if there were financial problems with the Project; (*Id.* at 28:17-29:11)

b. He did not correctly inform the Tribal Parties of the differences between the interest rates they were paying on existing debt at that time as compared to the interest rate they would be paying on the Bonds; and

c. Pierson also failed to correct or even raise any question regarding any of

39

the wildly incorrect financial projections Shibilski made at the meeting.

92.     The January 2, 2008 Tribal Council meeting was contentious and members of the Council were confused and complained they had inadequate, or no time to review or contemplate the Bond Transaction, yet Pierson joined Shibilski in pushing the Council to approve the Bond Transaction that night.

93.     The confusion and dismay of their clients, the Tribal Parties, should have been obvious to Stifel and Godfrey as they participated in the January 2, 2008 meeting, but they continued to provide false assurance and pressured the Tribal Parties to approve the deal.

94.     On information and belief, Pierson and Shibilski ushered the then-Chairperson of the Tribal Council outside of the public meeting to sign documents related to the Bond Transaction in a private room.

95.     Scott Andress, of Balch & Bingham, Stifel's attorneys in the Bond Transaction, appeared by telephone at the January 2, 2008 meeting and gave legal advice to the Tribal Council regarding the potential liability of Council members who were also named as officers of Grand Soleil.

96.     On information and belief, Andress knew Shibilski had an ownership interest in Big River.  Andress made no mention of Shibilski's ownership interest in Big River during the January 2, 2008 meeting with the Tribal Council. Andress also did not disclose that his firm was representing Stifel in the Bond Transaction when he advised the Tribal Council.  Nor did Stifel or Godfrey inform the Tribal Parties of Andress's firm's role in the Bond Transaction when he gave legal advice to the Council.

**The Tribal Parties Approve the Bond Transaction
Based on Misrepresentations**

97.     The Tribal Parties relied on Shibilski's representation that he owed fiduciary duties to them and his other material misrepresentations and omissions when voting on January 2, 2008, to approve the Bond Transaction.  Shibilski was acting on behalf of Stifel when he made each of the misrepresentations and omissions in order to induce the Tribal Parties' approval of the Bond Transaction.  All of the misrepresentations and omissions were either made intentionally, recklessly, or negligently by Shibilski.

98.     Stifel knew that the Tribal Parties were relying on the advice provided by its representative related to the Bond Transaction and Stifel made material omissions and false and misleading statements to the Tribe and the Corporation during the January 2, 2008 meeting that induced the Tribal Parties to proceed with the illegal Bond Transaction.

99.     The Tribal Parties also relied on Godfrey as their legal advisor to provide them with accurate information regarding the Bond Transaction.  By failing to correct Stifel's misrepresentations or provide material information that Stifel omitted, while also applying pressure on the Tribal Parties to approve the Bond Transaction immediately, Godfrey aided Stifel in inducing the Tribal Parties to approve the Bond Transaction.

100.    Stifel materially misrepresented the true financial ramifications of the Tribal Parties' involvement in the Bond Transaction. Godfrey failed to bring the Tribal Parties' attention to these misrepresentations despite a duty to do so. Stifel and Godfrey knew that the Tribal Parties lacked the ability to independently assess the cash flow analyses repeatedly referred to by Shibilski as providing the Tribal Parties "positive arbitrage" on the deal.  Stifel and Godfrey knew that the Tribal Parties were relying on Stifel's statements in

connection with the Bond Transaction.

101.    Stifel and Godfrey, through their representatives, misled the Tribal Parties regarding the profits they would receive as a result of the Bond Transaction.  Stifel's representative assured the Tribal Parties multiple times that they would see positive arbitrage as a result of the Bond Transaction and would net millions of dollars each year.

102.    At the same time, Stifel's and Godfrey's representatives also misrepresented the terms of the Bond Transaction in order to give the Tribal Parties a false sense of security about the deal. At the time Stifel and Godfrey made the misrepresentations they knew or should have known their representations were false.

103.    Despite its massive investment in the Project based on the misrepresentations, the Tribal Parties did not receive any increased equity or ownership stake in the Project.

104.    The Tribal Parties also did not receive any liens on the Project. In addition, the guaranty the Corporation received was essentially worthless because it was from Big River – as opposed to Big River's partners or members themselves.  Yet Stifel promised exactly the opposite during Shilbilski's presentation to the Tribal Parties – and Godfrey did not correct that misrepresentation.  Finally, Stifel repeatedly made the baseless promise that the Tribal Parties would easily be able to sell their interest in the Project.

105.    Stifel also misled the Tribal Parties regarding its agent's interests in that Shibilski was also a principal and member/owner of Big River with a very large personal stake in the Project that would be lost if Shibilski could not convince the Tribal Parties to commit to the proposed Bond Transaction.  Stifel hid this conflict of interest from the Tribal Parties and neither Godfrey nor Saybrook took any steps to disclose Stifel's conflict to the Tribal Parties. Likewise, at no point did Stifel, Godfrey, or Saybrook inform the Tribal

Parties that the same law firm that represented the Project also represented Stifel in the Bond Transaction.

106.    Stifel knew that Shibilski had an ownership interest in Big River and that he therefore had a conflict of interest in the Bond Transaction.

107.    Saybrook knew, or in the exercise of due diligence should have known, that Shibilski had an ownership interest in Big River and that Stifel therefore had a conflict of interest in the Bond Transaction.

108.    Godfrey knew, or in the exercise of due diligence should have known, that Shibilski had an ownership interest in Big River and that Stifel therefore had a conflict of interest in the Bond Transaction.

109.    Had the Tribal Parties known about, *inter alia*, the multiple conflicts of interests, the lack of support for Stifel's financial projections, the lack of secured interest in the Project's assets, and the lack of outside interest in the Project, they would not have entered into the Bond Transaction and would have instead sought alternative financing options, or done nothing. Under either scenario, the Tribal Parties would have been much better off and would have avoided the damages resulting from the misrepresentations, omissions, and other misconduct of Stifel and Godfrey.

110.    By misrepresenting and failing to disclose the true risks of the Bond Transaction, Stifel and Godfrey succeeded in convincing the Tribal Parties to approve the inappropriately risky, unsuitable, unconscionable, and illegal Bond Transaction.  At all relevant times, Stifel and Godfrey had an obligation and duty to the Tribal Parties, in connection with the Bond Transaction, to comply with applicable law, as well as those of the self-regulatory agencies, including FINRA, of which Stifel is a member.

111.     Stifel and Godfrey and their agents offered their services as professional financial and legal advisors to the Tribal Parties but did not provide such services as represented.

112.     Stifel and Godfrey engaged in the misrepresentations and omissions described above.  They did not exercise good faith and fair dealing with the Tribal Parties.  Stifel's misrepresentations were false, fraudulent, intentional, reckless, and/or negligent, were done willfully and maliciously with reckless or intentional disregard for the rights of the Tribal Parties, and were a proximate cause of damages suffered by the Tribal Parties.

113.     Godfrey's misrepresentations and omissions were negligent and/or reckless and were a proximate cause of damages suffered by the Tribal Parties.

114.     The Tribal Parties voted to approve the Bond Transaction—an approval that never would have been given if the truth regarding the Bond Transaction had been disclosed to the Tribal Parties.  Stifel and Godfrey, through their representatives, failed to provide facts basic to the Bond Transaction while knowing that the Tribal Parties were under mistakes with regard to several of those basic facts.  Meanwhile, based on the long-standing relationships the Tribal Parties had with both Stifel and Godfrey, it was reasonable for the Tribal Parties to expect Stifel and Godfrey to disclose those basic facts, yet Stifel and Godfrey both violated their duty to disclose facts basic to the Bond Transaction.

115.     As a result of Stifel's and Godfrey's actions, misrepresentations, and omissions, the Bond Transaction closed on January 18, 2008.

116.     After the Bond Transaction closed, Tribal CFO Rick Lindsley did not return to work with the Tribe and left town.  Lindsley immediately quit his job with the Tribe and went to work as Chief Financial Officer for the Project, to which he had just assisted in

44

transferring over $32 million from the Tribal Parties.

### The Bond Transaction Almost Immediately Harms the Tribal Parties but Saybrook Refuses Meaningful Renegotiations

117. The Corporation's minimum monthly payment on the Bonds exceeded $750,000.00.

118. But Casino revenue is cyclical and varies dramatically from month to month. While the revenue during the spring and summer months exceeded the monthly Bond payments, during the winter months, the Casino revenue was insufficient to meet both the debt service on the Bonds *and* to reinvest in the Casino at the levels that the Corporation historically had to maintain to ensure the business's profitability.

119. Because Saybrook, Stifel, and Godfrey structured the Bond Transaction to use Casino revenues to pay Saybrook ahead of anyone else, in some months there would be literally no money left over for the Corporation to reinvest in the Casino, including in refreshing slot machines and furnishings in accordance with industry standards.

120. The Corporation's inability to maintain normal levels of reinvestment had a direct negative impact on Casino operations, and the Corporation is still working to recover from these deficiencies.

121. Moreover, the Casino is virtually the only source of income for the Tribe's governmental operations.

122. Historically, the Tribe has depended on transfers from the Casino totaling between $17 million and $18 million each year. But under the waterfall set by the Bond Transaction, in some months all of the Casino revenues were diverted to Saybrook and there was no money left over for the Tribe's governmental operations.

123.     The reduction in transfers and funding placed severe stress on the Tribe's governmental operations.  For example, in the fiscal year ending September 30, 2008, the Casino distributed only $8.2 million to the Tribe—$9.5 million less than the Tribe's FY 2007-08 budget expectation.

124.     In addition to the complete elimination of any per capita distributions to the members, the Tribe was forced to suspend and terminate important governmental and social programs after the Corporation issued the Bonds.  For example:

   a.  Between 2008 and 2009, the Tribe was forced to make a 15% cut in wages of tribal employees;

   b.  In 2009, the Tribe was forced to cut those tribal-employee wages an additional 19.5%;

   c.  Tribal members, who until 2007 had received annual per capita income ranging from $1,200 to $1,500 during the Thanksgiving/Christmas holiday season received nothing in 2008 and 2009;

   d.  The Tribe's Land Purchase Program, which had been  aimed at restoring former lands owned by the Tribe or its members to Tribal ownership, was terminated;

   e.  The Census and Demographics program, which is key to planning and developing tribal programs by identifying tribal and membership needs, was suspended;

   f.  General-fund support for WIA Comprehensive Services, a workforce-development program was eliminated;

   g.  The Cultural/Prevention Program, which used traditional ceremonies and

events to reduce alcohol and drug abuse was suspended;

h.  The Transportation Program, which provided much-needed transportation to higher-education students, was eliminated;

i.  The Building Inspection Program, which provided assistance to low- and moderate-income members for housing maintenance and repair to meet building and safety requirements was eliminated;

j.  The Tribal Youth Work Program, which provided summer-employment opportunities to tribal youth was eliminated;

k.  The GIS Mapping & Inventory Project, which catalogued reservation lands, was suspended;

l.  The Tribe eliminated funding for the Fish and Game Program, which monitored, managed, and protected fish and game within the reservation boundaries; and

m.  The Tribe could not fulfill its intention to hire a licensed social worker.

125.  In addition to suspending and eliminating these programs, the stress of the Bond payments forced the Tribe to substantially reduce other important tribal governmental and social programs.  In addition to other cuts:

a.  The Tribe cut law enforcement budgeted funding by 23%;

b.  The Tribe cut Tribal Court budgeted funding by 33%;

c.  The Tribe cut funds for Tribal-member-scholarship programs and financial assistance to complete secondary and post-secondary education by 23% (approximately $140,000);

d.  The Tribe cut Youth Sport and Fitness Program funds that had provided

47

sports-team equipment and tournament-entrance fees for more than 400

youth annually, and had funded healthy-living and lifetime-sports activities

and socialization programs, trips, and cultural exchanges by 76%

($330,000);

e.  The Tribe cut Elderly Care Chore Worker funds that provided need-based

assistance to tribal elders to enhance their quality of live and extend life

expectancy by 87.5% ($245,000)

f.  The Tribe cut funding for a museum housing numerous irreplaceable

artifacts by $73,000, forcing termination of the museum's curator;

g.  The Tribe cut funding to repair and upgrade reservation roads by 100%

($250,000) for several years running; and

h.  The Tribe cut health-care funding for tribal members, their descendants,

and other Native Americans without health insurance by over $1,400,000.

126.    As the pressure of trying to make the Bond payments mounted, the Tribe

worked to prioritize critical governmental services.  But in 2009, it faced the grim prospect

of having to shutter the Tribal Governmental Center and send home *all* governmental staff

because it could not afford to keep the Center open or to keep the staff on the payroll.

127.    Meanwhile, the Project was never completed and the Tribal Parties lost the

nearly $32,000,000 of Bond proceeds that went to the Project.

128.    Far from kicking off $3 million a year for the Tribe, as Stifel promised, the

Tribal Parties never earned a cent on the Project.

129.    Shibilski knew that the Project required funding beyond what the Bond

Transaction provided, and, upon information and belief, sought a secondary round of

financing from Saybrook in 2008 which Saybrook declined to provide.

130.    The Project was badly mismanaged by Big River and ultimately failed.

131.    In short, the Bond Transaction was a financial disaster for the Corporation and the Tribe.

132.    Throughout this period, the Corporation submitted monthly financial reports to Bayliss as Saybrook required.

133.    In 2009, the Tribal Parties hired new counsel and attempted to renegotiate the Bond Transaction.

134.    In face-to-face negotiations with Saybrook in 2009, representatives of the Tribal Parties outlined the Bond payments' crippling effect on Tribal governmental services, and sought to restructure the Bond payments with Saybrook to make the payments more reasonable.

135.    The new counsel for the Tribal Parties realized that the Bond Transaction was an unenforceable management contract within the meaning IGRA, and alerted Saybrook to this issue.

136.    Saybrook nevertheless refused to renegotiate the Bond Transaction.

137.    The Corporation still could not meet the Bond Transaction's onerous terms, and on November 30, 2009, the Corporation requested that Wells Fargo (as trustee under the Indenture) transfer certain money to it from an operating reserve account created under the Bond Transaction.

138.    A dispute arose over the allocation of funds requested by Wells Fargo and Saybrook directed Wells Fargo to declare the Corporation in default.

139.    The Corporation received a Notice of Default under the Indenture on

December 18, 2009.

## Litigation over the Bond Transaction

140.    Days later, Wells Fargo brought the first suit against the Corporation in the United States District Court for the Western District of Wisconsin and immediately sought the expedited appointment of a receiver to manage the Tribe's Casino and assume control over its gross revenues. Upon information and belief, Saybrook directed Wells Fargo to undertake these actions.

141.    Judge Randa, sitting by designation in the Western District, ordered the case dismissed because, "[u]pon consideration of the briefs, affidavits, declaration and exhibits submitted in this matter, the Court finds that the Indenture is a management contract that was executed without prior approval from the [NIGC and] . . . without prior approval, the entire contract is void *ab initio*."  Order at 1, *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, Case No. 09-CV-768 (W.D. Wis. Jan. 6, 2010), Dkt. 43.

142.    The Tribal Parties wrote to Wells Fargo after Judge Randa's ruling to demand return of funds belonging to the Tribal Parties held by Wells Fargo as Trustee under the Indenture.

143.    Wells Fargo refused and, despite losing its standing as Trustee, transferred millions of dollars belonging to the Tribal Parties to Saybrook, which funds Saybrook accepted.

144.    In addition, Wells Fargo withdrew funds belonging to the Tribal Parties and paid itself fees as purported Trustee, paid its attorneys' fees, and otherwise used Tribal Party funds for its own benefit.

145.    The Seventh Circuit Court of Appeals upheld Judge Randa's decision that the

Indenture was a void unapproved management contract:

> Specifically, the Indenture grants a security interest in the Casino's gross revenues; prohibits Lake of the Torches from making capital expenditures beyond a certain limit without bondholder approval; provides for the appointment of a management consultant if Lake of the Torches fails to meet a specified debt-service ratio and requires Lake of the Torches to use its best efforts to implement the consultant's recommendations; limits Lake of the Torches' ability to replace or remove certain key management personnel without bondholder consent; gives bondholders the right upon default to require that Lake of the Torches replace management personnel; and permits Wells Fargo to seek the appointment of a receiver of the trust estate upon default.
>
> . . .
>
> We conclude that the Indenture constitutes a management contract under IGRA and that, as a condition of its validity, it should have been submitted to the Chairman of the NIGC for approval prior to its implementation. The parties' failure to secure such approval renders the Indenture void in its entirety and thus invalidates the Corporation's waiver of sovereign immunity.

*Wells Fargo Bank Nat. Assn. v. Lake of the Torches Econ. Dev. Corp.*, 658

F.3d 684, 699, 702 (7th Cir. 2011).

146.    The Seventh Circuit remanded the case for additional proceedings concerning whether the other Bond Transaction documents were also void. Wells Fargo dismissed that action.

147.    Saybrook and Wells Fargo sued the Tribal Parties in Waukesha County Circuit Court, Case No. 2012CV187, which remains pending, and filed another suit against the Tribal Parties in the Western District, which was dismissed for lack of jurisdiction at Saybrook's urging.

148.    On April 25, 2013, the Tribal Parties filed suit against Saybrook, Stifel and Godfrey in the Lac du Flambeau Tribal Court ("the Tribal Court"), Case No. 13CV115, seeking a declaration, *inter alia*, that the Bond Transaction documents are void under IGRA

and Tribal laws.

149.    Saybrook, Stifel, and Godfrey moved to dismiss the Tribal Court case and filed this action against the Corporation and Tribe, seeking a declaration that the Tribal Court lacks jurisdiction over them, and an order enjoining the Tribal Parties from pursuing their suit in Tribal Court.

150.    The Tribal Court judge denied Saybrook's, Stifel's, and Godfrey's motions to dismiss.

## COUNT I: INTENTIONAL MISREPRESENTATION – FRAUD AND FRAUD IN THE INDUCEMENT
### (Against Stifel)

151.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

152.    Stifel (through Shibilski and other employees), as described above with particularity in ¶¶ 18-117, made material misrepresentations to the Tribal Parties in order to induce them to enter into the Bond Transaction.

153.    Stifel misrepresented material information regarding the Bond Transaction to the Tribal Parties.

154.    Stifel made these representations either knowing they were untrue or made them recklessly without caring whether they were true or false.

155.     Stifel further failed to speak to the Tribal Parties, despite a duty to do so, regarding Shibilski's conflict of interest and the undisclosed risks of the Bond Transaction described above.

156.    In failing to speak to the Tribal Parties despite a duty to do so, Stifel made untrue factual representations or omissions.

157.    Stifel made these representations and omissions with the intent to deceive the Tribal Parties and to induce them to enter into the Bond Transaction.

158.    The Tribal Parties reasonably believed Stifel's misrepresentations (by commission and omission) and relied upon them in entering into the Bond Transaction.

159.    As a direct and proximate cause of Stifel's misrepresentations, the Tribal Parties suffered economic injury in an amount to be determined at trial.

160.    Shibilski was an officer of Stifel with management or control over Stifel's underwriting of the Bond Transaction.  As such, all of Shibilski's knowledge related to the Bond Transaction is imputed to Stifel.

161.    As a proximate result of Stifel's intentional misrepresentations, the Tribal Parties sustained damages in an amount to be determined at trial.

162.    Stifel is liable in *respondeat superior* for the intentional misrepresentations of Shibilski and its other employees as they were made in the scope of their employment with Stifel.

163.    In performing the above-described acts and omissions, Stifel intentionally disregarded the rights of the Tribal Parties.

## COUNT II: STRICT RESPONSIBILITY MISREPRESENTATION
### (Against Stifel)

164.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

165.    Stifel (through Shibilski and other employees), as described above with particularity  in ¶¶ 18-117, misrepresented material facts to the Tribal Parties in order to induce them to enter into the Bond Transaction.

166.    Stifel and its representative made these misrepresentations on the basis of their

own personal knowledge or in circumstances in which they necessarily ought to have known the untruth of the statements made.

167.   Stifel and its representative had economic interests in inducing the Tribal Parties into the Bond Transaction and financially gained as a result of the misrepresentations it made.

168.   The Tribal Parties believed the misrepresentations were true and relied on them.

169.   As a proximate result of Stifel's misrepresentations, the Tribal Parties sustained damages in an amount to be determined at trial.

170.   Stifel is liable in *respondeat superior* for the misrepresentations of Shibilski and its other employees as they were made in the scope of their employment with Stifel.

## COUNT III: NEGLIGENT MISREPRESENTATION
### (Against Stifel)

171.   The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

172.   Stifel (through Shibilski and other employees), had a duty to speak and to exercise ordinary care in making statements to the Tribal Parties regarding the Bond Transaction.

173.   Stifel, as described with particularity above in ¶¶ 18-117, made untrue representations of fact and/or failed to speak despite a duty to do so and was negligent in failing to exercise ordinary care when making such representations and/or remaining silent despite having a duty to speak.

174.   The Tribal Parties believed Stifel's misrepresentations to be true and justifiably relied upon them when entering the Bond Transaction.

175.    As a proximate result of Stifel's negligent misrepresentations, the Tribal Parties sustained damages in an amount to be determined at trial.

176.    Stifel is liable in *respondeat superior* for the negligent misrepresentations of Shibilski and its other employees as they were made in the scope of their employment with Stifel.

## COUNT IV: NEGLIGENCE
### (Against Stifel)

177.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

178.    Stifel had a duty to exercise ordinary care in advising the Tribal Parties on financial matters, including but not limited to the Bond Transaction.

179.    Stifel has contracted with self-regulatory organizations, including FINRA, to follow the regulations and standards set forth by FINRA to protect the investing public, including the Tribal Parties. Stifel owed the Tribal Parties a duty of care to abide by these regulations and standards.

180.    As described in this Complaint, Stifel violated relevant rules, regulations, and customs of FINRA, including but not limited to: Rule 2110 (Standards of Commercial Honor and Principles of Trade); Rule 2120 (Use of Manipulative, Deceptive or Other Fraudulent Devices); Rule 2310 (Suitability of Recommendations to Customers), including IM-2310-2 (Fair Dealing with Customers); and Rule 3010 (Supervision of Registered Representatives).

181.    As an SEC registered broker-dealer and a member of FINRA, Stifel had a duty to perform due diligence on any product it was recommending to its clients, including the bonds at issue in this case, to gain a thorough understanding of the characteristics and potential risks of that product prior to recommending it to any client, and to explain those

characteristics and risks fully and faithfully.

182.   As a member of FINRA, Stifel had a further duty, imposed by FINRA rule 2310, to make only those recommendations to the Tribal Parties that were suitable to them in light of their investment needs, objectives, and risk tolerances, and to make full disclosure of the characteristics and risks of the investment when making the recommendation.

183.   By recommending the Bond Transaction to the Tribal Parties, Stifel violated FINRA rule 2310 in that it failed to make full disclosure of the characteristics and risks of the Bond Transaction, and in that the Bond Transaction was unsuitable for the Tribal Parties, and the Tribal Parties were damaged as a result.

184.   As described above, the information presented by Stifel to the Tribal Parties in support of the Bond Transaction was materially false and misleading.  As such, Stifel used manipulative, deceptive and/or fraudulent devices in violation of FINRA Rule 2120; did not deal fairly with the Tribal Parties in violation of FINRA Rule IM-2310-2; and failed to uphold principals of Commercial Honor and Fair Trade in violation of FINRA Rule 2110, and the Tribal Parties were damaged as a result.

185.   Stifel had an affirmative duty to supervise their registered representatives, including Shibilski and Noack, but failed to do so, permitting the acts, errors, misrepresentations, and omissions complained of herein in violation of FINRA Rule 3010, and the Tribal Parties were damaged as a result.

186.   Among other things, Stifel, as described with particularity above in ¶¶ 18-117, failed to disclose Shibilski's personal financial interest in Big River, failed to advise the Tribal Parties about the potential consequences of the Bond Transaction, failed to advise the Tribal Parties of alternatives to the Bond Transaction, and failed to advise the Tribal Parties

that the Bond Transaction did not have to be approved during the January 2, 2008 Tribal Council meeting.

187.    Such failures and advice were a breach of Stifel's duty to exercise ordinary care in advising the Tribal Parties regarding the Bond Transaction, and constituted negligence.

188.    Such failures and advice were a breach of Stifel's duty of care to abide by the above-referenced FINRA rules and regulations and constituted negligence.

189.    As a proximate result of Stifel's negligence, the Tribal Parties sustained damages in an amount to be determined at trial.

190.    Shibilski and other Stifel employees also individually owed the Tribal Parties a duty to exercise ordinary care in advising the Tribal Parties regarding the Bond Transaction.  Shibilski and other Stifel employees failed to exercise ordinary care in the advice provided, while also failing to disclose Shibilski's known conflict of interest, as described above, and were therefore negligent.

191.    As a proximate result of Shibilski's and other Stifel employees' negligence, the Tribal Parties sustained damages in an amount to be determined at trial.

192.    Stifel is liable in *respondeat superior* for the negligent acts and omissions of Shibilski and other employees as they were performed in the scope of their employment with Stifel.

<u>**COUNT V: NEGLIGENT SUPERVISION**</u>
**(Against Stifel)**

193.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

194.    Stifel had a duty to exercise ordinary care in advising the Tribal Parties on

financial matters, including but not limited to the Bond Transaction.

195.    Stifel breached its duty of care by failing to supervise Shibilski and other employees by, among other things, failing to inquire about and/or disclose Shibilski's conflict of interest and allowing him and other employees to make false and misleading statements and omissions, described above with particularity in ¶¶ 18-117, regarding the Bond Transaction.

196.    As a proximate cause of Stifel's negligent supervision of Shibilski and other employees, the Tribal Parties have been damaged in an amount to be determined at trial.

**COUNT VI: INFORMATION NEGLIGENTLY**
**PROVIDED FOR THE GUIDANCE OF OTHERS**
**(Against Stifel)**

197.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

198.    As more fully set forth in the preceding paragraphs of this Complaint, Stifel, acting in the course of transactions in which they had a pecuniary interest, provided the Tribal Parties with false information for the Tribal Parties' guidance in Bond Transaction.

199.    Stifel did not exercise reasonable care or competence in obtaining or communicating the false information to the Tribal Parties for their guidance in the Bond Transaction.

200.    The Tribal Parties justifiably relied on the false information supplied to them by Stifel for their guidance in the Bond Transaction.

201.    As a result of Stifel's conduct, the Tribal Parties have suffered damages in an amount to be determined at trial.

## COUNT VII: BREACH OF CONTRACT and BREACH OF
## DUTY OF GOOD FAITH AND FAIR DEALING
### (Against Stifel)

202.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

203.    Separate and apart from any Bond Transaction document, Stifel had a contractual relationship with the Tribal Parties to provide independent and objective financial advice to the Tribal Parties and to perform the other services described above.

204.    Stifel breached the contract with the Tribal Parties by failing to provide independent and objective advice to them, materially misrepresenting the terms of the Bond Transaction to the Tribal Parties, failing to disclose Shibilski's personal investment in the Project, and engaging in the other misconduct described above.

205.    As a contracting party, Stifel owed a duty of good faith and fair dealing to the Tribal Parties.

206.    Stifel also breached its duty of good faith and fair dealing to the Tribal Parties by engaging in the above-described conduct.

207.    As a result of Stifel's breach of the contract and breach of its duty of good faith and fair dealing, the Tribal Parties have been damaged in an amount to be determined at trial.

## COUNT VIII: PROMISSORY ESTOPPEL
### (Against Stifel)

208.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

209.    Stifel made numerous promises to the Tribal Parties described with particularity in ¶¶ 18-117 above.

210.    Stifel's promises induced the Tribal Parties to enter the Bond Transaction,

further invest in the Project, and forego more appropriate financing options to consolidate their existing debt.

211.    Injustice can be avoided only by enforcement of Stifel's broken promises and/or an award of damages, in an amount to be determined at trial, making the Tribal Parties whole for their resultant damages.

### COUNT IX: CIVIL THEFT – Violation of Wis. Stat. § 895.446
### (Against Saybrook and Wells Fargo)

212.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

213.    When the Trust Indenture was determined to be void *ab initio*, Wells Fargo was divested of its status as Trustee under the Trust Indenture.

214.    Nevertheless, Wells Fargo continued to exercise authority over various accounts belonging to the Tribal Parties.

215.    Wells Fargo swept the Tribal Parties' accounts, transferred millions of dollars belonging to the Tribal Parties to Saybrook, continued to pay itself fees as purported Trustee from the Tribal Parties' funds, paid its attorneys from the Tribal Parties' funds, and otherwise used the Tribal Parties' funds for its own benefit.

216.    By performing the above-described acts, Wells Fargo possessed or assumed custody over funds rightfully belonging to the Tribal Parties and transferred them to Saybrook and/or itself, without the Tribal Parties' consent and contrary to their authority, with the intent to convert the funds to the use of Saybrook and/or itself, and as such engaged in conduct prohibited under Wis. Stat. § 943.20, Theft.

217.    Saybrook was aware that Wells Fargo's status as trustee was a nullity, yet knowingly and intentionally received the funds from the account sweeps, which rightfully

belonging to the Tribal Parties, and as such engaged in conduct prohibited under Wis. Stat §
943.34, Receiving Stolen Property.

218.    As a result of the above-described conduct of Wells Fargo, pursuant to Wis.
Stat. § 895.446, the Tribal Parties are entitled to recover from Wells Fargo: their actual
damages, including the value of all funds improperly transferred to Saybrook, all costs of
investigation and litigation reasonably incurred, and exemplary damages of not more than
three (3) times their actual damages.

219.    As a result of the above-described conduct of Saybrook, pursuant to Wis. Stat.
§ 895.446, the Tribal Parties are entitled to recover from Saybrook: their actual damages,
including the value of all funds improperly transferred to Saybrook, all costs of investigation
and litigation reasonably incurred, and exemplary damages of not more than three (3) times
their actual damages.

## COUNT X: CONSPIRACY TO INJURE IN TRADE
## OR BUSINESS under Wis. Stat. § 134.01
### (Against Saybrook and Wells Fargo)

220.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

221.    By engaging in the above-described conduct, Saybrook and Wells Fargo
combined, associated, agreed, mutually undertook, or concerted together for the purpose of
willfully or maliciously injuring the trade or business of the Tribal Parties.

222.    In the account sweeps, Saybrook and Wells Fargo intentionally disregarded
the rights of the Tribal Parties.

223.    The Tribal Parties suffered damages as a result of the unlawful conduct of
Saybrook and Wells Fargo.

## COUNT XI: CONVERSION
### (Against Saybrook and Wells Fargo)

224.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

225.    As described above, Saybrook and Wells Fargo intentionally or otherwise took control of property and funds belonging to the Tribal Parties.

226.    Saybrook and Wells Fargo did so without the Tribal Parties' consent or did so in a way that exceeded the scope of any consent that may have been given.

227.    Saybrook and Wells Fargo's control of the funds resulted in serious interference with the rights of the Tribal Parties to possess the funds in question.

228.    As a result of Saybrook and Wells Fargo's control, the Tribal Parties have been damaged in an amount to be determined at trial.

## COUNT XII: UNJUST ENRICHMENT
### (Against Saybrook and Wells Fargo)

229.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

230.    As described above, Wells Fargo and Saybrook received a benefit from the Tribal Parties.

231.    Saybrook and Wells Fargo appreciated and knew of the benefit.

232.    Saybrook and Wells Fargo accepted and retained the benefit.

233.    Saybrook's and Wells Fargo's retention of the benefit is inequitable without payment of its value to the Tribal Parties.

234.    In addition, prior to the voiding of the Trust Indenture, the Corporation paid millions of dollars to Saybrook in interest under the Bond Transaction and in so doing conferred a benefit on Saybrook.

235.    Saybrook appreciated and knew of the benefit.

236.     Saybrook accepted and retained the benefit.

237.     Saybrook's retention of the benefit is inequitable without payment of its value to the Corporation.

### COUNT XIII: CONCERTED ACTION under Wis. Stat. § 895.045
### (Against Saybrook and Wells Fargo)

238.     The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

239.     On information and belief, Saybrook and Wells Fargo acted in accordance with a mutually agreed upon scheme or plan to perform the account sweeps described with particularity in ¶¶ 118-150 above.

240.     As described with particularity in the foregoing paragraphs of this complaint, Saybrook and Wells Fargo committed unlawful and tortious acts and omissions in furtherance of their common scheme or plan.

241.     The unlawful and tortious acts undertaken to accomplish the common scheme or plan of Saybrook and Wells Fargo resulted in damages to the Tribal Parties.

242.     Pursuant to Wis. Stat. § 894.045, Saybrook and Wells Fargo are jointly and severally liable to the Tribal Parties for their unlawful and tortious acts performed in furtherance of their common scheme or plan.

### COUNT XIV: BREACH OF FIDUCIARY DUTY
### (Against Wells Fargo)

243.     The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

244.     As a custodian of funds belonging to the Tribal Parties and former Trustee under the Indenture, Wells Fargo owed a fiduciary duty to the Tribal Parties.

245.     Wells Fargo breached that fiduciary duty by engaging in the conduct described above.

246.   The Tribal Parties were damaged as a result of Wells Fargo's breach of its fiduciary duty in an amount to be determined at trial.

## COUNT XV: NEGLIGENCE
### (Against Wells Fargo)

247.   The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

248.   Wells Fargo owed the Tribal Parties a duty of ordinary care to with regard to the funds over which it had control, described above.

249.   Wells Fargo breached that duty of care and was negligent in that it knew or should have known that the funds, described above, which it transferred to Saybrook and retained for its fees, rightfully belonged to the Tribal Parties.

250.   The Tribal Parties were damaged by Wells Fargo's negligence in an amount to be determined at trial.

## COUNT XVI: NEGLIGENCE
### (Against Saybrook)

251.   The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

252.   Saybrook owed the Corporation and the Tribe a duty to exercise ordinary care with respect to its statements and conduct in the negotiation and execution of the Bond Transaction.

253.   Saybrook knew, or should have known, about the conflict of interest Shibilski had in the Bond Transaction, and owed a duty of ordinary care to the Tribal Parties to disclose the conflict.

254.   Saybrook breached that duty by failing to disclose the conflict and was negligent.

255.   Saybrook also breached that duty, by, *inter alia*, insisting on management

provisions in the Bond Transaction which it and/or its attorneys or agents knew, or should have known, would render it illegal under applicable law, and/or by failing to submit the Bond Transaction to the NIGC for approval, and such conduct constituted negligence.

256.    Saybrook also owed a duty of ordinary care to the Tribal Parties not to accept and retain funds it knew or should have known rightfully belonged to the Tribal Parties, as described above.

257.    Saybrook breached that duty by accepting the funds described above and was therefore negligent.

258.    As a result of Saybrook's negligence, the Tribal Parties have suffered damages in an amount to be determined at trial.

## COUNT XVII: LEGAL MALPRACTICE
### (Against Godfrey)

259.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

260.    Godfrey held its attorneys out as experts in Indian law and in the financing of Indian gaming facilities.

261.    Godfrey represented the Tribal Parties with respect to the Bond Transaction and advised the Tribal Parties regarding Indian-law and tribal-law issues presented by the Bond Transaction.

262.    Godfrey also served as Bond Counsel to the Bond Transaction.

263.    Godfrey participated in drafting and preparing the Bond Transaction documents, including, *inter alia*, the Indenture.

264.    In its capacity as Bond Counsel, Godfrey authored the Bond Counsel Opinion Letter.

265.    Completion of the Bond Transaction was expressly conditioned on Godfrey's issuance of the Bond Counsel Opinion Letter.

266.    In its capacity as Issuer's Counsel, Godfrey authored the Issuer Opinion Letter.

267.    Completion of the Bond Transaction was also expressly conditioned its completion on issuance of the Issuer Opinion Letter.

268.    Both the Bond Counsel Opinion Letter and Issuer Opinion Letter expressed opinions regarding Indian-law and tribal-law issues presented by the Bond Transaction.

269.    In the Bond Counsel Opinion Letter, Godfrey incorrectly opined, *inter alia*, that "[t]he Bonds, the Indenture and the Bond Purchase Agreement have been duly and validly authorized, executed, and delivered by the Issuer and are the valid and binding obligations of the Issuer enforceable in accordance with their terms." Bond Counsel Opinion Letter from Bond Counsel Godfrey & Kahn, S.C. to Lake of the Torches Econ. Dev. Corp., et al. (January 18, 2008) (attached hereto as Ex. 9).

270.    In the Issuer Opinion Letter, Godfrey incorrectly opined, *inter alia,* that:

a.      "Neither the adoption of the Bond Resolution, the execution, delivery or

        performance of the Bonds, any of the Bond Documents by the Corporation,

        nor the authorization and execution of the Bonds and the payment of principal

        of and interest thereon, will violate, contravene, conflict with, or cause a

        default or the imposition of any lien not contemplated thereby, under any law,

        regulation, ordinance, decree or resolution of the Tribe, the State, the United

        States or any agency or instrumentality of the foregoing . . ." Issuer Opinion

        Letter from Issuer Counsel Godfrey & Kahn, S.C. to Stifel, Nicolaus & Co.,

Inc., et al. ¶ 15 (January 18, 2008) (attached hereto as Ex. 10).

b.      "Neither the adoption of the Tribal Resolution, nor the execution, delivery or performance of the Tribal Agreement by the Tribe, will violate, contravene, conflict with, or cause a default or the imposition of any lien not contemplated thereby, under any law, regulation, ordinance, decree or resolution of the Tribe, the State, the United States or any agency or instrumentality of the foregoing . . ." (*Id.* at ¶ 16)

c.      "All approvals required to be obtained from any tribal, state or federal agency, body or instrumentality for the execution, delivery or performance of the Bond Documents by the Corporation, the Tribal Agreement by the Tribe and the FDC Note by the FDC have been obtained, including all necessary approvals of the Secretary of the Interior, the Bureau of Indian Affairs and the National Indian Gaming Commission." (*Id.* at ¶ 21)

d.      "The Corporation was not required to obtain any consent, approval, authorization, or order of any governmental agency for the issuance, delivery, and sale of the Bonds, including approvals of the Secretary of Interior, the Bureau of Indian Affairs, and the National Indian Gaming Commission, except such as may be required under the securities or Blue Sky laws of the various states (and the rules and regulations thereunder)." (*Id.* at ¶ 34)

271.    As explained *supra*, the Seventh Circuit Court of Appeals has held the Indenture is a management contract and that the parties' failure to secure approval of that management contract rendered it void *ab initio* under IGRA.

272.    The other Bond Transaction documents are also void *ab initio* under IGRA

because they are unapproved management contracts or are part of a unitary unapproved management contract.

273.    The Tribal Parties relied on Godfrey's incorrect opinions and did not submit the Bond Transaction documents to the NIGC for approval.

274.    Without NIGC review, the Tribal Parties lost the opportunity to learn at the outset of the transaction that the Bond Transaction documents were unenforceable and to reform the Indenture and Bond Transaction documents to remove oppressive and onerous management terms.

275.    Moreover, Godfrey's incorrect opinions were a precondition to the Bond Transaction, and if Godfrey had correctly opined as to above-discussed matters, the parties would not have entered into the Bond Transaction at all.

276.    In addition, the Bond Transaction documents are also invalid and unenforceable under Tribal Law and the Tribe's Gaming Compact with the State of Wisconsin.

277.    Godfrey also failed to properly advise the Tribal Parties with respect to applicable Tribal laws and treaty rights, and the risks of entering into the Bond Transaction.

278.    For example, Godfrey failed to advise the Tribe that it could not pledge tribal assets under the Tribal Agreement unless the pledge first passed a referendum vote of the membership and was approved by the Secretary of Interior, even though the plain text of the Constitution imposed these requirements.

279.    Because the Tribal Defendants relied on Godfrey's incorrect advice concerning the Constitutional requirements, the Tribal Parties lost the opportunity for the Tribal Membership and the Secretary of the Interior to review and question the onerous terms

of the Bond Transaction, and if Godfrey had correctly opined as to these matters, the Tribal Parties are not likely to have entered into the Bond Transaction at all.

280.    Godfrey similarly failed to advise the Tribal Parties that if the Indenture and other Bond Transaction documents were not valid, then an action to enforce the invalid Indenture or other Bond Transaction documents would conflict with and attempt to abrogate the Tribe's treaty right to exclude nonmembers from its Reservation and its trust land.

281.    Godfrey also failed to advise either the Tribal Parties of the risks to both the Tribal Parties of pledging revenue from the Casino to make Bond payments.

282.    Upon information and belief, if Saybrook pledged an additional secondary round of financing for the Project, Godfrey failed to document this pledge with a letter of intent or similar document.

283.    In addition, Godfrey failed to conduct due diligence with regard to potential conflicts of interest within the parties to the transaction and did not advise the Tribal Parties that representatives and agents of Stifel had an undisclosed interest in the Bond Transaction.

284.    By ratifying and otherwise concurring with and failing to correct false statements that Stifel and its representatives and agents made to pressure the Tribal Council and Board of the Corporation to enter into the Bond Transaction, Godfrey failed to advise the Tribal Parties of facts material to their decision to enter into the Bond Transaction.

285.    As their counsel, Godfrey owed the Tribal Parties a duty to exercise the degree of care, skill, and judgment that a reasonably prudent lawyer practicing in Wisconsin with special experience, knowledge, or skill in Indian law and Indian-gaming financing under the circumstances.

286.    Godfrey breached its duty to the Tribal Parties and negligently failed to adhere

to the applicable standard of care with respect to its representation of the Tribal Parties in the Bond Transaction.

287.     As a direct and proximate result of the negligence of Godfrey, the Tribal Parties have been damaged, including but not limited to entering into the disastrous Bond Transaction, performing under contracts that were void *ab initio*, incurring enormous legal expenses in connection with extensive litigation in multiple courts over the Bond Transaction, experiencing damage to their creditworthiness, and suffering other economic consequences arising from the disastrous Bond Transaction, all of which would have been averted had Godfrey adhered to the applicable standard of care.

### COUNT XVIII: BREACH OF CONTRACT and BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (Against Godfrey)

288.     The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

289.     Godfrey contracted with the Tribal Parties to provide legal advice to the Tribal Parties and to perform the other services described above with regard to the Bond Transaction.

290.     As described above, Godfrey breached the contract with the Tribal Parties by failing to provide legal advice and perform the services as it contracted.

291.     As a contracting party, Godfrey owed a duty of good faith and fair dealing to the Tribal Parties.

292.     Godfrey also breached its duty of good faith and fair dealing to the Tribal Parties by engaging in the above-described conduct.

293.     As a result of Godfrey's breach of the contract and breach of its duty of good faith and fair dealing, the Tribal Parties have been damaged in an amount to be determined at

trial.

## COUNT XIX: STRICT RESPONSIBILITY MISREPRESENTATION
### (Against Godfrey)

294.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

295.    As described with particularity in ¶¶ 18-117, Godfrey (through its

representative, Pierson) misrepresented material facts to the Tribal Parties in order to induce

them to enter into the Bond Transaction.

296.    Godfrey and its representative made misrepresentations on the basis of their

own personal knowledge or in circumstances in which they necessarily ought to have known

the truth or untruth of the statement.

297.    Godfrey had an economic interest in inducing the Tribal Parties into the Bond

Transaction and financially gained as a result of the misrepresentations it made.

298.    The Tribal Parties believed the misrepresentations to be true and justifiably

relied on them in approving the Bond Transaction.

299.    The Tribal Parties suffered pecuniary loss as a result of Godfrey's

misrepresentations in an amount to be determined at trial.

300.    Godfrey is liable in *respondeat superior* for the misrepresentations of Pierson

and its other employees as they were made in the scope of their employment with Godfrey.

## COUNT XX: NEGLIGENT MISREPRESENTATION
### (Against Godfrey)

301.    The Tribal Parties reallege the foregoing paragraphs as if fully set forth herein.

302.    Godfrey (through Pierson and other employees) had a duty to speak and to

exercise ordinary care in making statements to the Tribal Parties regarding the Bond

Transaction.

303.    As describe with particularity in ¶¶ 18-117 above, Godfrey made untrue representations of fact and/or failed to speak despite a duty to do so and was negligent in that its representatives failed to exercise ordinary care when making such representations and/or remaining silent despite having a duty to speak.

304.    The Tribal Parties believed Godfrey's misrepresentations to be true and justifiably relied upon them when entering the Bond Transaction.

305.    As a proximate result of Godfrey's negligent misrepresentations, the Tribal Parties sustained damages in an amount to be determined at trial.

306.    Godfrey is liable in *respondeat superior* for the negligent misrepresentations of Pierson and its other employees because they were made in the scope of their employment with Godfrey.

**WHEREFORE,** the Defendants-Counterclaim Plaintiffs the Tribal Parties seek the following relief against Plaintiffs-Counterclaim Defendants:

A.   Judgment dismissing the Plaintiffs-Counterclaim Defendants' Complaint for Declaratory and Injunctive Relief with prejudice, and awarding the Tribal Parties their costs and disbursements according to law;

B.   Judgment awarding the Tribal Parties their compensatory, consequential and statutory damages; plus, additionally or alternatively;

C.   Judgment awarding the Tribal Parties exemplary and punitive damages; plus additionally or alternatively;

D.   Judgment awarding the Tribal Parties their compensatory damages for all lost opportunities incurred as a result of the above-described acts and omissions; plus, additionally or alternatively;

E.  Judgment ordering the equitable disgorgement of any and all funds belonging to the Tribal Parties wrongfully acquired by any Plaintiff-Counterclaim Defendant;

F.  Judgment awarding the Tribal Parties their attorneys' fees, costs, and disbursements according to law; and

G.  Such other relief in law or equity as the Court deems just and proper.

**THE TRIBAL PARTIES DEMAND TRIAL BY JURY
ON ALL CLAIMS TRIABLE IN THIS COURT.**[13]

---

[13] The Tribal Parties maintain that this Court lacks jurisdiction over them and this action and seek a jury trial only in the event this Court erroneously determines that it possesses jurisdiction.

February 12, 2014.                    **HANSEN REYNOLDS DICKINSON**
                                      **CRUEGER LLC**

                                      By: _s/Timothy Hansen_____
                                      Timothy Hansen
                                      thansen@hrdclaw.com
                                      Paul Jacquart
                                      pjacquart@hrdclaw.com
                                      Jessica Mederson
                                      jmederson@hrdclaw.com
                                      316 N. Milwaukee St., Suite 200
                                      Milwaukee, WI 53202
                                      Office: 414-455-7676
                                      Fax: 414-273-8476

                                      **HOGEN ADAMS PLLC**
                                      Vanya S. Hogen
                                      vhogen@hogenadams.com
                                      *admitted pro hac vice*
                                      Jessica Intermill
                                      jintermill@hogenadams.com
                                      *admitted pro hac vice*
                                      1935 W. County Road B2, Suite 460
                                      St. Paul, Minnesota  55113
                                      Tele:  (651) 842-9100
                                      Fax:  (651) 842-9101

                                      *Attorneys for Defendants-Counterclaim Plaintiffs*
                                      *Lac Du Flambeau Band of Lake Superior Chippewa*
                                      *Indians and Lake of the Torches Economic*
                                      *Development Corporation*