# EXHIBIT 8

1

1

2

3

4

5

6

7

8

9               LAC DU FLAMBEAU

10      BAND OF LAKE SUPERIOR CHIPPEWA INDIANS

11      MEETING MINUTES OF JANUARY 2, 2008,

12           SPECIAL TRIBAL COUNCIL

13      FEDERAL DEVELOPMENT CORPORATION

14   AND ECONOMIC DEVELOPMENT CORPORATION

15

16

17

18

19

20

21

22

23

24

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

2

1           Vicki Doud:  I am calling this meeting to order

2       under the auspices of the Tribal Council, the Federal

3       Development Corporation, and the Economic Development

4       Corporation.

5           I would like to run this meeting in an orderly

6       manner and anybody that wants to speak must direct to

7       the Chair.  If not, then you will be asked to leave.

8       I would like to have the Secretary call the Roll.

9           WHEREBY, Roll Call was taken.

10          It was noted that the following people are

11      visitors of the meeting:  Brian Pierson, Attorney;

12      Bill Bayba, Partner and Friend; Kevin Shibilski.

13          Vickie Doud:  And I guess I am going to ask the

14      help of Brian to lead us through this.  Do you have

15      the meeting agenda?

16          BRIAN PIERSON:  Thank you, Madame President.

17      Thanks for inviting us here today.  If anybody gets

18      hungry, I brought bagels from Milwaukee.  If you want

19      a mid-afternoon snack, they are over there with some

20      cream cheese.

21          "BROOKS" BIG JOHN:  They are not like the old

22      Indian days where they brought stuff in small pots.

23          BEVERLY BAUMAN:  Everybody is on their New Year's

24      diet.

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

3

1        BRIAN PIERSON:  My understanding of the purpose

2    of the meeting is to address the bond issue, the way

3    it is structured and Kevin, who is a representative of

4    your underwriter, an opportunity to give his over

5    view.  I have got your five resolutions that are

6    intended to accomplish the transaction.

7        The two principle resolutions that directly

8    relate to the bond are:  One, a resolution from Lake

9    of the Torches Economic Development Corporation to

10   issue the bonds and a resolution of the tribe in

11   connection with guaranteed backing of the bonds.  And

12   then there are three sort of subordinate resolutions.

13       Before we can get to the two bond-related

14   resolutions, we have to first do something that the

15   tribe has talked about for a number of years and that

16   is consolidate all of the operations of Lake of the

17   Torches under one entity.  Right now, going back to

18   1995, it's been divided between Lake of the Torches

19   Federal Development Corporation, which is owned and

20   operated the casino and Lake of the Torches Economic

21   Development Corporation, which has owned and operated

22   the hotel.

23       Pursuant to the direction we have received and in

24   consultation with Bill Guelcher, we have also in

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

4

1    preparation for this transaction, prepared documents

2    that would transfer the assets of the Federal

3    Development Corporation that relate to Lake of the

4    Torches over to the Economic Development Corporation

5    with a view toward the Economic Development

6    Corporation hereafter having the control of Lake of

7    the Torches Casino, the hotel, hotel sasino, and the

8    Federal Development Corporation having its various

9    activities off reservation.

10        So what I thought I would do is simply read

11   through them.  They provide overview of the

12   transactions, read through the resolutions.  I thought

13   first, the three resolutions that accomplish the

14   transfer of the assets from the FDC to the EDC.  The

15   reason for that order is simply that first the assets

16   would be transferred to the EDC and then the EDC would

17   actually be in a position to issue the bonds because

18   the principle security that the bond buyers requiring

19   is the revenue of Lake of the Torches and therefore,

20   it makes sense first to consolidate those operations

21   under the EDC before addressing the resolutions that

22   relate to the bond itself.

23        If that makes sense, I would propose that we just

24   start with the resolution of the FDC transferring the

1    assets of the Casino to the EDC and just read through

2    it and as questions arise, address those.  Does that

3    make sense?

4         TOM MAULSON:  One question before we get started.

5    These here corporations, does it require by corporate

6    law to have annual meetings before the stockholders

7    being able, in order to address these here types of

8    issues that we are talking about here today?  Or

9    describe all the corporations that are going to go

10   forth here into the future?

11        BRIAN PIERSON:  You know I have looked at the

12   articles and bylaws for both corporations.  They are

13   rather short.  They don't go into shareholder meetings

14   of the membership.  They basically provide that the

15   Tribal Council is the Board and has the full power to

16   run the show.

17        As you recall, there were sort of clones back in

18   1995, Al Bachall (phonetic) formed them both, almost

19   simultaneously, and as best as I can reconstruct

20   because I am often puzzled on why there weren't two

21   corporations, as best as I can reconstruct, although I

22   was not directly involved at the time, the original

23   plan was actually to have the FDC have all the

24   operations, but the approval did not come back from

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

6

1   Washington in time, so as an interim provision in

2   order to do the financing, that at the time was a

3   $10.7 million-dollar financing.

4       Al formed the Economic Development Corporation

5   under tribal law and then immediately transferred that

6   over to the FDC as soon as the approval came down.

7   But, Tom, there are no provisions in there for annual

8   meetings for the shareholders, basically the tribe,

9   and the tribal shareholders represented by Counsel

10  under those documents.

11      There is no annual meeting like you see for big

12  corporations.

13      TOM MAULSON:  Right.

14      BRIAN PIERSON:  There is nothing like that in

15  those Articles and Bylaws.  Okay, the first one that I

16  am taking is entitled:  Lake of the Torches Federal

17  Development Corporation, and then in parentheses

18  underneath it says:  Approving 1) transfer of certain

19  assets of Lake of the Torches Economic Development

20  Corporation, and 2) borrowing the funds from Lake of

21  the Torches Economic Development Corporation, and 3)

22  local funds to Grand Soleil Natchez.

23      So this approves the transfer of the corporations

24  to the Economic Development Corporation, but the whole

7

1     transaction is complicated because it is the FDC,

2     which is the member of Grand Soleil, LLC and it is the

3     FDC that has committed itself to making this loan to

4     the LLC, Grand Soleil Natchez, LLC.  So EDC is using

5     its money-raising power as the owner and operator of

6     the casino to issue the bonds.  It has been,

7     immediately going to be the bonds to the FDC, which is

8     the member of the LLC.  The FDC is using those funds

9     to make this loan to the LLC.

10        VICKI DOUD:  We have a question from Rick.

11        RICK LINDSLEY:  One question, I know Brian said

12     we are going into separate corporations here.  I just

13     want to make sure these fall under whatever

14     corporation?

15        VICKI DOUD:  Yes, I called the meeting to order

16     under the three.

17        RICK LINDSLEY:  It's under all three at once?

18        VICKI DOUD:  Yes.

19        BRIAN PIERSON:  It's going to be joint and that's

20     because in order to do Step 1, which is consolidation

21     of the assets, we are actually going to need

22     resolutions.

23        RICK LINDSLEY:  I just want to make sure from a

24     technical standpoint.

8

1        MURIEL FRALICK:  I would like clarification as to

2    when the $20 million got attached to the $30 million,

3    that consolidation, who made that decision?  And I

4    want some documentation as to the loan distribution,

5    where this $20 million, if it gets approved, where it

6    is going to go?  What loans that the $30 million is

7    going to pay, and I don't see any security agreements,

8    I don't see any loan agreements.  I don't see anything

9    here other than resolutions and we have four

10   resolutions placed before us at 3:30 and we are

11   expected to make a decision.

12       And also, one question:  Can we do a part of this

13   resolution?  Can we do the $30 million dollars, that

14   consolidation without attaching the $20 million dollar

15   loan?  And let me tell you why.  I feel that we don't

16   want to do the $20 million dollar loan because we have

17   no guarantee of obtaining a Mississippi Gaming

18   License.  I am not going to apply for that license,

19   and when I don't apply, the Tribe will not get a

20   Mississippi Game License.

21       So that's totally taken out of the picture and if

22   Council passes that and decides to send the $20

23   million dollars down without any guarantees, Cato is

24   still in the picture, he has not been dissolved yet,

1  there is no bank -- the IRS is coming here on the 29th

2  of January to do an audit.  If there is improprieties

3  that come up, maybe that will affect our application.

4  So I would like to see this not included as one

5  resolution.  I would like to see it as a $30 million

6  for a debt consolidation, and I would like to not see

7  the $20 million.

8      BRIAN PIERSON:  The part of that question that I

9  can address is on the documents that are mentioned

10  here that can distribute -- we mainly relied on your

11  underwriter and your attorney, Godfrey and Kahn, in

12  drafting.  Of course, you can see the tribal secretary

13  has been cc'd on those.  I have to say that typically

14  these types of transactions, the bond issuer, you

15  know, does rely on counsel for those, they are rather

16  technical, but it shouldn't be a problem making them

17  available to you.  They are rather dense documents.

18      As far as the other items, I am going to let your

19  underwriter, I don't have that history, you know, when

20  we assume that the business decision to make the -- to

21  borrow the money and issue the bonds is made by the

22  client, and we sort of salute and prepare the

23  documentation.

24      MURIEL FRALICK:  Okay, just to clarify something,

1    we -- most of us as Council people have not been

2    brought up to date on any of these.  We have been

3    totally left out of the picture and then told at the

4    12th hour that you now want us to make a decision on

5    this.  I think that's very unfair.  We should have

6    been brought aware of this right from the start.

7         I am new to the Council, okay, I am not going to

8    be up to speed on everything, but not at the last

9    minute is this going in and expected to be (INAUDIBLE,

10   14:54).  We have a lot of tribal members that have no

11   clue as to what the tribe is getting into.  They have

12   not had a voice in this decision from Day 1, there has

13   not been a tribal referendum, and it's time that the

14   people have a voice and say.  Do they want to put $20

15   million more dollars into this tribe?  Let them speak

16   up and say whether they want to or not.  That's not

17   the decision for one or two Council people to make.

18        MYRON DOUD:  It is my understanding that as we

19   had the referendum that both the $500 million dollars

20   that Maulson created, to me that gives you guys the

21   authority to do anything you want basically, eh?  I

22   mean --

23        BRIAN PIERSON:  There are political questions

24   and legal questions. On the legal question, I can say

1    that the bond buyers will ask for an opinion from our

2    law firm on the enforceability of the documents.  And

3    assuming that Council approves it, we will give the

4    opinion because the tribal corporations, in fact, are

5    free from some of the requirements that are imposed on

6    the tribal government, and that's why tribes do form

7    corporations.

8         Even under Section 17 of the Indian

9    Reorganization Act, those corporations, and this tribe

10   has two of them, one of them dating back to 1937 and

11   one of them dating to 1995.  It was the intention of

12   the Department of Interior to allow tribes more

13   flexibility in business, get them out from under the

14   constraints of government in their business dealings.

15   So that is the legal issues.  These corporations do

16   have the legal ability.

17        We will put it to (INAUDIBLE, 16:49) we will put

18   it to malpractice limits on the line and say that.

19   The second question of accountability to membership is

20   something that as lawyers I can't speak to, that's

21   completely -- counting on you as leaders to satisfy

22   your constituents, so that's a separate issue.  As far

23   as the flow of funds and where it goes, Kevin, I think

24   you can provide a better education of that.

1       KEVIN SHIBILSKI:  Sure.

2       BRIAN PIERSON:  Before you do that, Kevin.

3       VICKI DOUD:  Carl?

4       CARL EDWARDS:  Now with this -- when you guys

5   were doing that $500 million, how many towns turned

6   you down?  How many towns turned us down, 36, 38?  I

7   think (INAUDIBLE, 17:30) can give you an answer to

8   that one.  He was always telling me it was 36 or 38

9   towns.

10      JOHN BROWN:  It was quite a few.

11      CARL EDWARDS:  It was quite a few towns that you

12  guys went to, to try to get a casino and there is

13  still one sitting out there.  The other question I

14  have is since Muriel is not going to submit the gaming

15  application for Mississippi, what is in the best

16  interest of the tribe, perhaps you can answer or Rick

17  can, with this loan, is it worth more -- will we try

18  to make more money going out and selling it then,

19  since we are not going to be able to get it because

20  Muriel is not going to submit.

21      Is it worth more, like getting this loan and

22  selling it or is it going to hurt by not getting the

23  loan, and try to sell it or get out of it that way? I

24  guess that's my other question.

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1     BRIAN PIERSON:  Should I start with a little

2   history and then get in --

3     CARL EDWARDS:  Sure.

4     VICKI DOUD:  I think it would be worth it to go

5   through the operations.

6     KEVIN SHIBILSKI:  Thank you, Madame President,

7   greetings to Members of the Council. I am here on

8   behalf of Stifel Nicolaus.  We are privileged to have

9   been hired by you back in July after a very

10   competitive process to pursue a debt in the form of

11   refinancing your existing debt and new monies for your

12   casino project in Mississippi.

13     The structure actually was the same.  They were

14   hired although the borrowing is smaller now than when

15   we were hired originally.  You were looking to seek

16   closer to $60 million dollars, and the proposal

17   according to today is $50 million dollars.

18     It always has been a two-part structure.  It

19   always has been existing debt, refinanced with new

20   monies and lent with positive arbitrage to the project

21   in Natchez, which you essentially have.  That's always

22   been a structure that we have been pursuing on your

23   behalf.  There was also extra fee of a million dollars

24   ·tacked on it that you paid for assisting and securing

14

1        the debt so a positive arbitrage, which is greater

2        interest than you're paying going back to the tribe as

3        well as a million dollars.  That was the structure

4        that we were given to take to the debt markets

5        beginning in July.

6            You had asked us to try and finish that project

7        by November or December and we failed in that

8        timeframe, we took a little longer than expected, I

9        apologize for that, and take responsibility.  The debt

10       market has been jolted in the last six or seven months

11       so it just took longer to create a competition in the

12       bond market to provide you with the options you need

13       to do a wise financing.

14           It has always been structured that way, that's

15       what they want.  There has always been existing debt

16       and new monies in this bond thing.  I can tell you

17       that.  And to get to Carl's question, I think,

18       probably, you should ask that of your partner, Mr.

19       Bayba, or Rick.  There is no question that the further

20       along a project is, the greater the return to value is

21       for sure, but I think I should speak to the bond

22       issuance and not to that kind of a tactical question.

23       Should he answer?

24           CARL EDWARDS:  Rick, can you answer or should I?

15

1        RICK LINDSLEY:  I will let (INAUDIBLE 21:06).

2    The question is:  Do we try to set up a (INAUDIBLE

3    21:11) account or do we go ahead, get it built to a

4    certain level, and then sell it.  I think it probably

5    makes more sense to continue with the construction at

6    this point rather than to stop and trying to sell it

7    as it is.

8        CARL EDWARDS:  So it is worth more to the tribe

9    if it goes further and then we sell our interest

10   because we are not going to be gaming in Mississippi?

11   It is worth more to the tribe by getting the loan and

12   continuing this and then selling it?  As opposed to

13   stopping it now and then a risk of it sitting there

14   and us losing more money?

15       RICK LINDSLEY:  Right.  Correct.

16       VICKI DOUD:  Mike.

17       MIKE CHRISTENSEN:  Went in back of what Muriel

18   was talking about.  She said she never seen a contract

19   and reading back, I would like to see a contract.  I

20   have never a contract; with all this casino business,

21   I have never seen one contract.  Muriel is on the

22   right track, you have got to have a contract before

23   you sign it.  Nobody recalls having ever seen it and

24   what's the purpose of signing a contract and putting

1      us further in debt when no one has had a chance to

2      reach the contract?  Everyone is talking around the

3      contract, but nobody is discussing the contract.

4      What's in it?  What's our liability?  What's going on

5      with, that's what I would like to see, before we spend

6      any more money.

7          VICKI DOUD:  Muriel?

8          MURIEL FRALICK:  I would like to ask Mr. Bayba to

9      please put that in writing, a guarantee to us, that we

10     are going to -- if we invest $20 more million that we

11     are going to make more money than we will make

12     tomorrow.  Would you please put that in writing, sir?

13         BILL BAYBA:  You want me to put that in writing?

14         MURIEL FRALICK:  Yes, a guarantee.

15         BROOKS BIG JOHN:  I guess we are getting down to

16     some things we really need to talk about here a little

17     bit.  Maybe putting the Board into shape by just

18     taking the time to come in tonight to appreciate the

19     comments I have heard so far, but really got to look

20     at what they call disclosure.

21         You know, piece the information, being informed

22     to make educated decisions.  From Day 1, I know, maybe

23     it's my fault, maybe' it's Muriel's fault, but other

24     members of the Council, I just wonder how much they

17

1    are informed of this project.  When you see things

2    like what happened last Friday that are purposely done

3    to go around the Treasurer, and it puts a sour taste

4    in my mouth, it kind of leads you to mistrust and

5    doubt.  Like this morning, I just called chaos.

6         You know are never going to get out of that

7    boat.  We are never going to get anywhere positive if

8    we don't come to a resolution or if we don't come to

9    an agreement.  The only way I think we can come to

10   agreements is if the Council in its entirety is

11   informed as Mr. Christensen was saying.  I don't want

12   the onus on myself.  I would like to have them hear

13   the voice of the people.  I think once we get back to

14   that we get away from creating self-doubt and second-

15   guessing and chaos.

16        You know, we don't need to go at approaching

17   business at 100 miles an hour and I think when they

18   made the decisions to get away from informing the

19   people, and then using the people as a crutch, so to

20   speak, I think that was a terrible mistake.  I think

21   we need to get back to that.  I am not here to

22   campaign, you know, I am done.  I am just speaking

23   from my heart.  Some of these things did come to us

24   here at the 11th hour.  I got the chance to take them

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

18

1    home and read them for a little while before I had to

2    come here, but for me to sit here and make a decision,

3    gentlemen, in all due fairness, with my colleagues

4    here and my children that I look after each and every

5    day, I can't sit here and rationally say that I

6    support some of these things.

7         I like the question that Muriel asked when she

8    asked if we could bring this resolution down to two

9    parts because I do believe we need to consolidate our

10   debt and I do believe we need to borrow this money to

11   get us out of this trouble that maybe a great part of

12   the Cancun boat deal put us in.  And I don't know who

13   was part of that but some people in here do know who

14   part of it was, when you look at bringing in the

15   people for considerations, I always think that 10

16   minds are better than one or two.

17        So without total disclosure, I just feel at a

18   loss here.  I feel insecure having these placed in

19   front of me for this meeting, having to read them,

20   having to understand them and having to put my tribe

21   in debt to the tune of this amount of money, it makes

22   the hairs on my neck stand up.  I appreciate you guys

23   coming here, but this is just      how I feel this

24   evening.  Thank you.

19

1          MYRON DOUD:  I got one more question.

2          VICKI DOUD:  Myron?

3          MYRON DOUD:  Listening to Brooks, probably I got

4     two questions asked of me.  So once we bind this

5     question, suppose we consolidated all our loans,

6     what's the worst that could happen if we defaulted on

7     payments?

8          BRIAN PIERSON:  Well, the combined owners would

9     levy on the security which is the casino revenue and

10    depending upon, and I may not calculate -- do this too

11    because I am consciously thinking as I am talking this

12    out.  Depending upon whether any of the casino revenue

13    was marketed for public government services, there

14    could be a cut-back in government services if there is

15    enough of a bill to be christened, you know, the

16    consequence would just be that, you know, you pay a

17    certain percentage of casino revenue to service the

18    debt.

19         MYRON DOUD:  But would we have new management?

20         BRIAN PIERSON:  I believe the bond document

21    provides that in the event of a non-payment the tribe

22    has the responsibility to consult with them about new

23    management, all kinds of bondholder rights kick in

24    when there is a default.

1              KEVIN SHIBILSKI:  Right, yeah, yeah, in case of

2       default, of course you need to avoid it; it would

3       wreck your credit.  The longer consequences would be

4       probably worse than the shorter consequences and it's

5       to be avoided at all costs and that's why it is

6       important to crunch the numbers to make sure that

7       Central Governmental Services are not even threatened

8       by the pledge in the cash-flow analysis.

9              But yes, in the event that the tribe would

10      default, all kinds of nasty things would happen.  I

11      mean that's true of any financial transaction. If you

12      don't make the payments and default, they want their

13      money.

14             MIKE CHRISTENSEN:  Would they take over?

15             MYRON DOUD:  Okay, my second question, wait a

16      minute, would they take over every operation that the

17      tribe owns for credit?

18             VICKI DOUD:  Myron, you are out of order.

19             MYRON DOUD:  My second question is to Brooks and

20      what you are talking about.  Mr. Brooks, here is a

21      question for you:  How would you feel that when we

22      rescinded that $500 million dollar referendum we had,

23      how would you feel about that, would you vote for

24      that?

1          BROOKS BIG JOHN:  Sure would, in a heartbeat.

2          MYRON DOUD:  So would I.

3          BROOKS BIG JOHN:  Then we ought to look at the

4      referendum tomorrow morning.  I think we should call a

5      special meeting for that so it is not a knee-jerk

6      reaction as it is right now.  I think we should have a

7      special meeting to that effect, Myron.  Maybe we

8      should go ahead and inform the people just as to what

9      the resolution means.

10         MMYRON DOUD:  I am thinking about -- what I am

11     thinking about now is I am thinking about the next

12     election.

13         VICTORIA DOUD:  Well, I am thinking about, you

14     know, my grandchildren; they're at home here, their

15     children, my own children.  I am thinking about the

16     child wanting to move ahead instead of staying in one

17     place trying to preserve my income, trying to get more

18     income so that we can buy the better quality of life

19     for tribal members, that's what I am thinking about.

20     You get so far and then it's that (INAUDIBLE 30:37)

21     you don't want to get pulled down, all the former

22     Executive Board (INAUDIBLE 30:47) did a rigorous

23     background check that was done by an agency and we

24     were very -- we went through -- no problem.

1          Mr. Cato, there were problems there.  I think we
2     are holding the LLC or something, the corporation
3     (INAUDIBLE 31:11) but this project has been going on
4     for, I am not sure, a couple of years, and it's been a
5     good relationship, especially with Mr. Bayba, who has
6     been -- it's been two successful operations, the hotel
7     in Green Bay and Stevens Point.
8          I feel very safe in working with him and this
9     project would provide us with extra income needed to
10    provide with our people and to see it all for nothing
11    at this point in time, it's a sad thing, and I really
12    have no desire to see it, that's my opinion.  Mike?
13         MIKE CHRISTENSEN:  I understand what you are
14    saying, Vickie, but you got to go back, look at how
15    many deals we started off with Shullsburg how we got
16    ripped on that by jumping at the gun at the 11th hour.
17    All the way down the line we have had nothing but
18    failures.
19         I applaud you here for what you did with Stevens
20    Point and the Green Bay with the hotels and on the
21    other hand you guys are sitting here at the 11th hour
22    with no attorneys present to advise you what you guys
23    are getting into.  Never seen a contract, you got two
24    attorneys sitting here who want to make their money.

23

1    You know this guy want to make his money and we as

2    tribal members are sitting back here taking the brunt

3    of everything.

4        I would suggest you guys take it back for a

5    little bit and say, wait a minute; we are going to die

6    anymore if we don't get the Natchez deal.  None of you

7    will drop dead.  Like he was talking about, if you

8    guys were to default on your bank loans, they are

9    going to send a company to take over every damn thing

10   we own and they are going to run it and pay us what

11   they feel like paying us, that's where they are not

12   telling you the truth.

13       I sit down with other lawyers constantly, go

14   right other things with lawyers constantly; you just

15   don't take something and say we will spend $20

16   million.  No, you take the contracts and look at them;

17   we get our own attorney's approval or disapproval,

18   whatever, the pitfalls.  We all know what we vote on,

19   apparently nobody knows what they are voting on right

20   now, it's now the Council's problem.

21       The guy either stops, sits back, takes a look,

22   listens, like Muriel said the 11th hour, you are

23   dropping all these contracts on us.  I don't

24   understand all the resolutions but I don't have the

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

24

1  opportunity to look at all the resolutions, but yeah,

2  what you are saying doesn't make some sort of sense.

3  But jump in there and get another failure, I have

4  watched $50,000 go out at Shullsburg, now we own land

5  at a mine that we can't do nothing with.

6      I think it's time we stop, sit back, and take a

7  look at it and quit looking at the lawyers.  Bring in

8  your own attorneys that are going to tell you whether

9  it's a good deal or a bad deal.  These guys want to

10  make money just like I do, they got to sit there and

11  chat.

12      VICTORIA DOUD:  I would like to say that this

13  isn't the 11th hour.  We have been working on this

14  second consolidation for -- we have been waiting for

15  it, in fact, for --

16      MIKE CHRISTENSEN:  I don't recall getting a copy

17  of the contract to sit and read.

18      VICTORIA DOUD:  -- we don't know -- I guess who

19  doesn't --

20      MIKE CHRISTENSEN:  It's like we have this casino,

21  Vickie, built.  Tom also didn't look at the contracts.

22  Tom never signed them.  It was your signature and

23  Brooks signature on all the contracts that had built

24  this.  We couldn't find out where the money went or

25

1    anything and I don't want to see us get back into

2    something we had over here where the first five years

3    all the money has gone to the investor and we are

4    stuck with nothing.

5         VICTORIA DOUD:  No, I don't think that's the way

6    it is going.  We have a return on our investment.

7    Would you please help me with that, Rick?

8         MIKE CHRISTENSEN:  Actually, Kevin can state --

9    Stifel Nicolaus listed all the projections on this so

10   Kevin, if you want to --

11        VICTORIA DOUD:  That's what we are going with;

12   the debt consolidation and we are investing, investing

13   in our future, Steve.  If you don't want to move

14   forward, if you want to stay put, you know, then

15   that's your position.

16        MIKE CHRISTENSEN:  But your debt consolidation is

17   facing you right now.  You are looking at debt

18   consolidation, Vickie.  Your corporation will come in

19   with a Casino Smoke Shop, everything --

20        VICKI DOUD:  You are out of order. Mr. Shibilski

21   has the floor.

22        KEVIN SHIBILSKI:  I appreciate the importance of

23   keeping the Council updated.  We were here at least

24   three different times to continue to update the

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1    Council on the progress we are making as well as to

2    reaffirm the ongoing structure and the intent of the

3    borrowing.  I think we have had good, we always can

4    improve if there has been any short-comings in

5    information, I apologize, but we have certainly gone

6    out of our way to be here many times to provide all of

7    the information to the Council as well as the analysis

8    of the proposed borrowing.

9         Our analysts look at your existing cash flow as

10   well as the projected cash flow of your investment in

11   Natchez and it is all of that that's securing the bond

12   buyer who is willing to invest as your partner,

13   essentially, in that operation, because they believe

14   that it's a sound investment.  The projected cash flow

15   available for that service, after you paid all your

16   expenses on your project in Natchez, Mississippi, the

17   first year, the whole operation, not a partial year,

18   in '09 is around $18 million dollars.

19        Your debt service is about half that, so in your

20   first full year of operation, there is substantial net

21   cash flow available that you have to decide what you

22   are going to do with.  If you are going to pay off

23   your debt faster, that's within, but from a business

24   analysis perspective, this has been looked at very

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1   closely, by not me, but very smart analysts that are

2   helping you crunch the numbers and we want to make

3   sure that they and the person buying these bonds,

4   imagine somebody is actually buying these bonds for

5   $50 million dollars.

6       They are concerned and everything has to work,

7   too, so they have been looking these past months to

8   make sure those numbers make sense.  And the analyses

9   that they have done, the analyses that your analysts

10  have done and that others who bid on this debt package

11  have done has given them reassurance.

12      Is there a risk?  No question.  There is always

13  risk in a business venture, but there is substantial

14  positive profit margin in your operation in

15  Mississippi and that's what's given the debt that the

16  bond buyers comfort here.  So there is no question

17  about that.

18      VICKI DOUD:  Jeannie?

19      JEANNIE WOLFE:  This morning, what was the name

20  of the gentleman on the phone?  On the conference

21  call, Mr. Pierson, he said in that conversation that

22  the LDF Industries and the other corporations that

23  have gotten into these projects or ventures, those

24  individuals would be responsible for the failure of

1    the projects and not the tribe itself; is that

2    correct?

3        KEVIN SHIBILSKI:   I just want to speak to the

4    second component, the Redunning Component, Brian, you

5    can speak to that, too; it's secured debt.   You are

6    not lending it with a handshake.   You're grabbing

7    liens on everything you can which is substantial.   You

8    have real estate, you have projected cash flow, you

9    have guarantees, personal guarantees, if that's what

10   you are getting at the answer is the portion of the

11   debt you are proposing to relend to yourselves and to

12   your partners is secured debt.   So should there not be

13   sufficient funds, you have recourse.

14       BRIAN PIERSON:   You are talking about the loan

15   being made by the FDC to the LLC?

16       KEVIN SHIBILSKI:   To the LLC, that's right.

17       BRIAN PIERSON:   Is that your question or is that

18   a separate question?   It's true that when the tribes

19   form these separate corporations any liability is

20   limited for those corporations, so to that extent, for

21   example there is no tribal trust property, there is no

22   land (INAUDIBLE, 40:02) of looking to the cash flow of

23   the casino for that repayment.   They looked at the

24   history of that and that's what persuaded them to loan

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1    a million dollars and so that's why the EDC, which is

2    going to be the owner of the casino, is the one

3    actually issuing the bond.

4         Issuing the bond basically is (INAUDIBLE 40:28).

5    What is true, as a legal principle that when an entity

6    forms a separate corporation, the owner of the

7    corporation is not liable for those debts, just the

8    corporation is unless there is a guarantee.  So in

9    this case, for example, the bondholders are asking for

10   a guarantee from the tribe and certain commitments

11   from the tribe, but the borrower will back the EDC.

12        VIRGINIA CHOSA:  Who provides the bond?

13        BRIAN PIERSON:  The bond will be issued by the

14   Regulatory Economic Development Corporation and they

15   purchased it by the company, this investor which means

16   a purchaser is like a lender in the bond world, it's

17   just different terminology.  The purchaser of the bond

18   lending money, the issuer of the bond is the EDC,

19   which is borrowing money.

20        VICKI DOUD:  The next question I have is from

21   Virginia.

22        VIRGINIA CHOSA:  I was just wondering when you

23   mentioned that we're trying to make money, I would

24   like to know how much money we have already?  Is there

1    any answer to that?  On all of our projects starting

2    from Shullsburg on up or even before, are we

3    eventually all going to become millionaires like the

4    other reservations?

5         VICKI DOUD:  I don't know if we are going to be

6    millionaires, but we are hoping -- certainly we are

7    hoping to budget in our own tribes and that it will be

8    worth it (INAUDIBLE, 42:12).

9         Shullsburg is still pending, the ones that we do

10   have are Stevens Point hotel operations and Green Bay

11   hotel operations.  We won't see any income from that

12   until they start operating for a while before we see

13   any actual income.  We've gotten a little bit from

14   Stevens Point.

15        But we are trying to move ahead and we try to be

16   a progressive tribe.  We don't want to be sitting back

17   while the world is moving ahead of us.

18        VIRGINIA CHOSA:  But by moving ahead it seems

19   like we are getting further and further in debt. Now

20   you want to debt consolidate $30 million dollars.

21        VICKI DOUD:  We have to consolidate that debt so

22   that we can move ahead.

23        VIRGINIA CHOSA:  That doesn't sound like we are

24   moving ahead.

1        VICKI DOUD:  Muriel was next.

2        MURIEL FRALICK:  I have several questions.  Mr.

3    Shibilski speaks of analyses, paper analyses, all

4    these different groups; where is this analyses?  Can

5    you give it to us that we can read and understand?

6        KEVIN SHIBILSKI:  We handed it out at previous

7    meetings.  I can make additional copies and get them

8    out to you, sure.

9        MURIEL FRALICK:  Okay.  And then, Mr. Pierson

10   speaks of a guarantee, they want a guarantee on this

11   loan from the tribe and certain commitment, I mean,

12   everything is certain -- there's no definitive.  What

13   are the commitments?  They want all of our money?

14   They want all of our slot machines?  What do they

15   want?  Why are you saying 'certain commitments'?

16       Is that where we are at?  There is nothing

17   definitive with that?  Just a minute, I am not done.

18   You also spoke of a million-dollar fee that is

19   attached; I would like to know who is getting that

20   million dollars.

21       KEVIN SHIBILSKI:  Oh, I wrote that up.

22       MURIEL FRALICK:  Okay.

23       KEVIN SHIBILSKI:  You get the track list.

24       MURIEL FRALICK:  It's the million-dollar fee, and

32

1    who are we getting that from?

2        KEVIN SHIBILSKI:  From the Grand Soleil, LLC.

3        MURIEL FRALICK:  And when are we getting that?

4        KEVIN SHIBILSKI:  At the time of refinancing.

5    You created incentives in the structure of your loan

6    to get them to refinance -- half of it is you but to

7    get that entity --

8        MURIEL FRALICK:  So we need to borrow $20 million

9    so they will give us a kick back of $1 million?

10       KEVIN SHIBILSKI:  Many more millions than that --

11   you have a 1.5 percent positive arbitrage, so you may

12   get something like $3 million a year.

13       MURIEL FRALICK:  Some day?

14       KEVIN SHIBILSKI:  No, no, no immediately.

15       MURIEL FRALICK:  We don't have any guarantee of a

16   license, sir

17       KEVIN SHIBILSKI:  I can't speak to that.

18       MURIEL FRALICK:  I mean, how can we make money if

19   we have no license?

20       KEVIN SHIBILSKI:  The project would kick off $3

21   million a year for the tribe.

22       MURIEL FRALICK:  If we have a license, right?

23   And if we continue to be a part of this project,

24   right?

33

1         KEVIN SHIBILSKI:  Right.

2         MURIEL FRALICK:  One other question.  We wired

3    $70,000 to Saybrook (phonetic) to secure a bridge loan

4    of $2.856 million dollars, $2,856,000.00.  We wired

5    Saybrook $70,000 on December 11th.  That loan fell

6    through.  Saybrook could not give us that loan because

7    of bank positioning?  Are we going to be reimbursed

8    that $70,000 from Saybrook because they could not

9    follow through with it?

10        KEVIN SHIBILSKI:  The $70,000 had nothing to do

11    with the interim financing.  The interim financing fee

12    was going to be $56,000.  $70,000 is for this bond

13    purchase for the $50 million dollars.  It had nothing

14    to do with the $2.8 million dollar interim debt.

15        MURIEL FRALICK:  Excuse me, but we were told -- I

16    was told when I questioned it that this had nothing to

17    do with that, this was money that had to be mailed to

18    Saybrook for that bridge loan.

19        KEVIN SHIBILSKI:  Not for the bridge loan, for

20    the bond purchase, for the $50 million dollars.

21        MURIEL FRALICK:  So are we still -- do we still

22    have to mail the additional $80,000 to them, then,

23    for this bond?

24        KEVIN SHIBILSKI:  Yes, I should answer Brooks

1    question from earlier.  This is a single bond issue of

2    $50 million dollars that we worked the past 5 months

3    to put together and we bid it out.  It's not like a

4    bank loan where you can take part of it.  We

5    identified, we sold these bonds, $50 million dollars

6    worth of bonds.

7         We identified a buyer for these bonds and so

8    there is no sort of halfway.  And the fee to Saybrook

9    is part of the agreement with them to cover their

10   expenses for the purchase of the $50 million dollars

11   for the bonds.

12        MURIEL FRALICK:  Okay, and we also talk about

13   some LOC, the purchaser is by investors.  Investors,

14   we have no names, we don't know who is buying our

15   bonds -- we don't know who?

16        KEVIN SHIBILSKI:  No.

17        MURIEL FRALICK:  Will we ever know?

18        KEVIN SHIBILSKI:  No.  The links are -- it's

19   Saybrook, I mean that's but who they are as

20   underwriters Saybrook, Nicolaus -- a bond is package

21   unit.  It's no different than a loaf of bread.  It's

22   debt and you sell it on the marketplace and it's

23   really not the concern of the debt issuer other than

24   the terms and the conditions of that issuance who buys

1    it.  Whoever wants to buy it in the marketplace is

2    buying units of debt and that's what a bond is.  It's

3    sold in the marketplace, whoever wants to step up and

4    buy that bond.  Lots of people have it in their

5    investment portfolios.

6        MURIEL FRALICK:  So where is our security that

7    maybe the Mafia isn't going to come in and buy our

8    debt, then?  Here we are out the door because we are

9    gaming facility -- somebody that cannot have any links

10   to the Mafia?

11       KEVIN SHIBILSKI:  We identified the single buyer

12   of all $50 million dollars of bonds and it's a

13   reputable entity.

14       MURIEL FRALICK:  How do we know this?  Just by

15   what you are saying?

16       KEVIN SHIBILSKI:  Exactly.  We are heavily

17   regulated, FDC regulated, government banking.

18               **END OF TAPE 1 - SIDE A**

19

20

21

22

23

24


VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

36

1                    **TAPE 1 - SIDE B**

2          BROOKS BIG JOHN:  Let's get the horses in front

3    of the carts where they belong, not as we are going

4    about it now, put the cart in front of the horse.  If

5    we have no gaming license, you know, we have nothing,

6    we don't get it.  I hear you saying we can make some

7    money.  I think maybe we can't do it.  I don't want to

8    be a deal killer if it is a good, sensible business

9    plan and everything's on the up-and-up and if the

10   counsel has fully disclosed and if our people are

11   disclosed, then there are no arguments.

12         We go forward in totality and the total

13   agreement, there are no fights, there are no

14   arguments, when are we going to get there?  That's all

15   we need to get back to.  The fight can be squashed

16   simply by informing us other Council members, getting

17   us on board with all of these things.

18         Muriel has a question and is worried about,

19   that's what I talk about, full disclosure.  We are

20   still constitutionally bound, whether I hear otherwise

21   or not, because I wear this hat as a Council member,

22   because I wear this hat as a corporate officer.  We

23   are still bound to that constitution.  I don't care

24   what anybody tells me. I believe that and I will go to

1    my grave believing that.  You know, if Jeannie has

2    questions about this casino over here and our revenues

3    that are up for grabs, not only up for grabs today,

4    they are up for grabs for the rest of our lives until

5    the debt is paid.

6        The building and the land are held in trust; we

7    cannot touch that as Mr. Pierson pointed to.  My

8    research tells me the same thing.  You know, I got a

9    question for you, Myron, since you had one of me.  How

10   did we go ahead and invest into this XIT back to the

11   motel deals without a referendum?

12       This didn't have to do with that $500 million-

13   dollar gaming resolution.  When we take that onus up

14   to Council and off my shoulders, I can feel a lot more

15   comfortable in making decisions when the rest of my

16   colleagues on the Council can say, hey, yeah, let's

17   all -- this sounds like a good deal.

18       Not just a couple, but when I hear from everybody

19   that tells me they put some thought into it and they

20   feel comfortable with it and I know they are looking

21   out for their kids and grandchildren, too.  And

22   finally, when we go to the people and we hear how

23   positive -- the men, then everything goes through.  It

24   may take a little while longer, but so what?

1    Thank you.

2         MYRON DOUD:  You asked me a question, though,

3    what was the question?

4         BROOKS BIG JOHN:  How did we invest in these

5    other companies that were non-gaming without a

6    referendum?  Since that referendum that you are

7    talking about, that $500 million-dollar licensee,

8    that's the question.

9         MYRON DOUD:  Probably started in executive

10   session and everything was getting put together in the

11   packet and then bring it to the rest of the Council.

12        MYRON DOUD: But, hey, you are right.  We should

13   have had a referendum on this.

14        VICKI DOUD:  Garret Christensen?

15        KEVIN SHIBILSKI:  Just a quick response.  I

16   should defer a question regarding Natchez to Mr.

17   Bayba, absolutely, to Mr. Lindsley and I will focus on

18   the bond issue.  You had a lot of good questions that

19   Mr. Bayba and Mr. Pierson can answer regarding the

20   status of the Natchez project.  I am not here to talk

21   about our role, I am here to talk about the bond

22   issue, which you hired us to do a few months ago.

23        VICKI DOUD:  Tom?

24        TOM MAULSON:  I got a couple of questions and one

1    of them is to (INAUDIBLE 4:15) maybe I need to hear

2    some explanation far more than what you explained here

3    in reference to the economy that we are supportive of

4    the fact that we needed a -- your company was, I

5    guess, bidding for the best price to do a consolidated

6    loan for the Tribe.

7         My question would be how did we attach this here

8    additional rider and why did we do that?  Let me

9    finish because I believe I was supportive of the fact

10   that we needed to consolidate these funds so that each

11   and every one of these loans, when they come due, that

12   we make sure that we have ample dollars in order to

13   secure those loans, and that was -- I guess that was

14   the clinching statement.

15        What I heard is we need to do that in order to

16   make things happen.  I believe that Mr. Lindsley

17   indicated that we were out there looking for

18   additional dollars, where we had investors to do the

19   Natchez deal.  And all of a sudden it feels better

20   than the $20 million-dollar rider on top of a $30

21   million-dollar consolidated debt that we were going,

22   you know, consolidate.

23        Take the pressure off on how we were going to pay

24   back here some of this debt.  Maybe someone can

1   explain this to me.  Why we went that route?  I mean,

2   do we have no investors out there that can pick up the

3   $20 million dollars to buy into this venture or -- I

4   mean, because I have heard a lot of things, even at

5   Tribal level indicating that it will be all ours.

6   Hopefully, it will be down the road.

7      KEVIN SHIBILSKI:  From Day 1, we were hired to

8   look at maximizing the borrowing opportunity to do

9   both.  I don't know what happened before that, I can't

10   speak to that, but when we were hired it was to seek

11   actually the original number was bigger than that, I

12   think it was $60 million dollars.  It was scaled back.

13   It was always a single borrowing with two purposes in

14   mind, vaguely you are right.  All that happened, and

15   how that came to be that's probably it's a question of

16   your partners at Natchez.  We were hired initially to

17   borrow with loan purposes.

18      RICK LINDSLEY:  That was back in '80.

19      KEVIN SHIBILSKI:  That was always that and every

20   time we updated the balance on the status of our

21   efforts, it was with both of those borrowings in mind.

22   I really want to be clear, nobody has been trying to

23   hide the nature of this borrowing from anybody and we

24   have been here many times, me personally and others

41

1   from the firm, at least three times, I should say, but

2   several times to update the Council on the status and

3   the purpose has never changed.  I mean it hasn't

4   changed once other than reducing the borrowing.  It is

5   smaller now than it was intended to be original.

6       TOM MAULSEN:  Did we have a guy here that had the

7   $50 million dollars that he was going to put up?

8       RICK LINDSLEY:  That's gentleman that -- purpose

9   from.

10      TOM MAULSON:  He was going to secure that part of

11  that loan?  Part of the Natchez loan, ain't that

12  right, Bill?  He was an older gentleman that we met;

13  Carl, who was that guy?

14      KEVIN SHIBILSKI:  Oh, that was before my time.  I

15  think you might be talking about Raul (phonetic),

16  maybe?  That was before my time.

17      CARL EDWARDS:  The guy within the last 6 months?

18      TOM MAULSON:  Yeah.

19      CARL EDWARDS:  He came up here that was Saybrook.

20  That's was the guy.

21      TOM MAULSON:  Huh?

22      CARL EDWARDS:  That was the guy from Saybrook.

23  He came up here -- that was him.  I believe two months

24  ago or a month-and-a-half ago he came up here.

1         TOM MAULSON:  You and I were there.  They had a

2    gentleman that was in the front - mapped a portion of

3    that instead of the tribe taking the hit for that

4    portion of the gaming dollars.

5         RICK LINDSLEY:  You are thinking of Turpin.

6         TOM MAULSON:  Turpin.

7         RICK LINDSLEY:  That was back in --

8         TOM MAULSON:  Oh, Doherty was part of that.

9    Doherty was going to be the other investor.  It was

10   going to be not only Doherty but the tribe, Mr. Bayba

11   (phonetic) back there.

12        RICK LINDSLEY:  Let Kevin tell you what the terms

13   are.

14        TOM MAULSON:  Maybe we need to -- I mean, that's

15   what I am trying to say:  how did we get another

16   Doherty or whatever?  I would have taken -- we

17   probably wouldn't be here today.  We'd only be looking

18   at consolidating a loan that we need in order to take

19   care of a debt that's out there.

20        KEVIN SHIBILSKI:  May I answer?

21        TOM MAULSON:  Sure.

22        KEVIN SHIBILSKI:  Doherty is a company that

23   actually -- it pieces out its loans to a variety of

24   community banks around the country.  And Turpin was

1      going to be the participant in that participated

2      lending.  They actually ordered much, much more, but

3      it wasn't an investor, it was a loan.  It wasn't a

4      bond it was a loan.  Dozens and dozens of banks were

5      going to each take a piece of that.

6          That was the arrangement under Doherty's

7      proposal.  And they ended up, who knows the real story

8      behind their not getting the entire rate, it was $75

9      million dollars, they came close, but didn't get it

10     all.  But it was not an investor these were banks who

11     were trying to do more than $50 million.

12         They were trying to do -- was it $70?  $70

13     million dollars worth of borrowing, but it was the

14     same structure.  And I want to be clear, too, about

15     the pledged revenues.  That's nothing different than

16     what you currently have pledged now.  Nobody is asking

17     the tribe for collateral beyond what is used in your

18     daily operations for the variety of loans that have

19     come up over the years.

20         VICKI DOUD:  Myron?

21         MYRON DOUD:  A question for you, Muriel, let's

22     say I went along with the deal, what would the per

23     capita -- what would happen to the per capita?

24         MURIEL FRALICK:  If we went along with the $50

1     million?

2          MYRON DOUD:  Yeah.

3          MURIEL FRALICK:  I don't know.  I don't know how

4     we would pay that back.  You would have to ask

5     somebody smarter than me, probably Rick Lindsley, he

6     has it all down as to where it is written, but

7     however, if we weren't in some kind of trouble

8     financially, do you think we would be doing a debt

9     consolidation?  Do you think that we are just doing

10    that because we want to pay a higher interest rate

11    than what we have on some of these loans?  No.  To me,

12    debt consolidates when you are in trouble, but that --

13    I am just a layman.

14         VICTORIA DOUD:  As such.  Debt consolidation

15    would help the tribe.

16         MYRON DOUD:  My question is:  How did we get $30

17    million dollars in debt anyways? That's the question.

18    We knew that we were $30 million dollars in debt but

19    there is no paperwork to show how we got into debt

20    other than jumping all over the country looking for a

21    casino.

22         VICTORIA DOUD:  We have already done all the

23    construction and renovation of the boat, the gambling

24    boat and (INAUDIBLE, 12:43).  In fact, last Friday

45

1     workers hadn't been paid and almost didn't come back

2     to work but that's from (INAUDIBLE 12:98) through that

3     wire.

4          MYRON DOUD:  I remember that Vickie, because that

5     happened --

6          VICTORIA DOUD:  I prepared that at that time.

7     Muriel has provided that information after the fact. I

8     took very -- precaution with the money that was

9     invested in it and which treasurer not (INAUDIBLE,

10    13:34) background checks that the rest of us were

11    subject to.  I am concerned that we have a system that

12    is going to work.  The treasurer doesn't apply for the

13    gaming license.

14         BRIAN PIERSON:  I don't know if we have to

15    research the issue.  Just like to say a couple of

16    things.  I feel badly about this because it's not

17    really true that all I care about is the fee, yes, I

18    do, to make my living, but I do see that people on one

19    point of view are generally concerned for the best

20    interest of the tribe, they are concerned about the

21    risk.

22         Other people see this as a great opportunity,

23    risk is rewarded.  If you don't take the risk, you

24    generally don't get a reward.  But of course these

1 questions are understandable.  Rather than harm my

2 relationship with this tribe, this fee, I don't care

3 about this.  I have worked with this tribe in 1990 and

4 my first involvement was with a very contentious,

5 long-term and not lucrative civil rights case, so I

6 feel very close to this tribe.

7   Normally, when we get involved it's because the

8 political leadership has already made a decision that

9 this is what they are going to do.  And Kevin, I am

10 sure feels the same way sitting here, it's like we are

11 involved now in a meeting about whether this is a good

12 business decision, and kind of, you know, our

13 involvement as bond counsel is really outside the

14 scope.

15   I understand are concerned about risk and now

16 what comes to my mind is what are the options now if

17 the truck is full what happens to the amount that has

18 already been invested in Natchez and going forward,

19 what are the options?  But people should feel

20 comfortable with their real counsel projectory is at,

21 that we do have an ethical duty of loyalty and I

22 personally feel a strong sense of commitment to the

23 tribe and we have -- we circulated documents at the

24 end of November.

47

1        And we do, usually, it's true, we usually do

2    work with, you know, a development team because they

3    are complicated.  If I started a real team here, your

4    mind would go numb, and I rely on Tom Griggs, he's my

5    law partner who is in the Black Book of Bond Counsel.

6    There aren't a lot of people in that; that's a very

7    specialized practice of law.  It's outside my

8    practice.

9        I'm involved because of the Indian law issues,

10   really because I'm a fair convergence with business

11   law and lending, but there's a bond specialist

12   involved in this back in my office and I am grateful

13   and I relied on him for the bond things, and I have

14   been on conference calls with him and he's engaged the

15   other side and pushed back and negotiated these things

16   on behalf of our client which is you.

17       So I am just -- yes, it is true, when somebody

18   gives you $50 million dollars, they arrange the

19   documents pretty much so that unpleasant things happen

20   if they don't get paid back.  The documents are

21   drafted to make sure they get paid back.  So there is

22   business decision there to do that risk analysis but

23   we have worked diligently in your interest.

24       I am not in the position to push the deal or make

1    a business judgment on it, that is something your

2    political leaders have to make.  Those are hard

3    decisions.  But I guess I would like to have some

4    discussion of what would happen, Kevin, in your point

5    of view now would somebody -- would you as an

6    underwriter be able to find somebody to come in and

7    buy out the tribe's position, just kind of think of

8    going forward, what is in the tribe's best interest.

9         KEVIN SHIBILSKI:  Surely, we couldn't close on

10   this bond deal if there was an attempt to split in

11   two, so this would collapse.  The relative value of

12   the project compared to where it would be three months

13   down the road is a legitimate question, but I think

14   Mr. Bayba is in a better position to answer that and

15   Mr. Lindsley.

16        We were hired to seek money for refinancing of

17   your system debt which is a very good sound business

18   practice, I should say, it really is.  It happens

19   every day, and it is not a sign of trouble or duress

20   necessarily at all.  I mean, it happens every day and

21   we were hired to pursue the refinancing of your

22   existing debt, and additional monies for your

23   investment in Natchez.

24        And while I am not making this presentation, the

1  gentlemen in the back room, I know they talk to you

2  regularly about the status of that.  We were down

3  there (INAUDIBLE 18:32) our company and I saw several

4  down there at times checking out the progress of the

5  project as well.  So I don't think there were any -- I

6  don't think anything was dropped on anybody.  I don't

7  think this was a surprise at the 11th hour, certainly

8  not from our perspective.

9      We have been working assets to find these monies

10  and we've been working very hard to secure these

11  monies for the past several months.

12      RICK LINDSLEY:  Kevin, follow up a little bit

13  with that (INAUDIBLE 18:56) as to what could happen

14  going forward.  One thing about making light of

15  Muriel, about me sharing that we have not renewed the

16  license, there's going to be some issues with

17  receiving the proceeds from the bond because there are

18  certain points, trigger mechanisms and one of them is

19  for all the applications to be submitted in the

20  initial report being the Executive Director in which

21  that report has been submitted at this point in time

22  except for the money that we are talking about.  So I

23  mean it's about $8.7 million dollars that will be held

24  back, so you know, in light of that, Muriel that

1    didn't hold -- you didn't submit your application, we

2    wouldn't receive another $50 million dollars

3    (INAUDIBLE, 19:54).

4        RICK LINDSLEY:  That is correct, so I guess the

5    big question, then, did you handle this and what

6    happens in that situation, I mean, it doesn't make a

7    lot of sense in my opinion if we only had (INAUDIBLE,

8    20:04) without that additional $8.7 million dollars we

9    wouldn't be able to do marine work.

10        With it we would be able to get the sidewalk to

11   grade our parking lot to grade to do marine work so

12   would we be stuck at that point?  When I say green

13   work, I share with you guys' pictures, the portal,

14   shade, the rounds, the transition barge and then also

15   the boat, those are on hold.  So we would have a nice

16   retaining wall and parking lot down near the water,

17   that's what we need this.

18        RICK LINDSLEY:  That adds value to the property,

19   no doubt about it.

20        BROOKS BIG JOHN:  Why didn't we simply just --

21   how come we didn't get a gaming license before going

22   through with all of it -- construction and all that?

23   Secondly, I want you to think about this two-parter

24   here, how many times can we pledge our casino revenues

51

1·    and how far are our pledge assets stretched over

2     there?  Can we keep going on and pledging these that,

3     our casino revenue, time after time after time?  And I

4     guess do you guys consider that, Bill?

5          KEVIN SHIBILSKI:  The refinancing reorganizes

6     whose in line first so that the bond buyers who are

7     investing $50 million dollars of their money to

8     partner with you in both your refinancing and your

9     Natchez project are first in line.

10         RICK LINDSLEY:  With that, Brooks and Bill,

11    (INAUDIBLE 21:54) Stifel Nicolaus was just out here

12    and Robert Baird (phonetic) was out here, Dave Nowak,

13    (phonetic) I think they both relayed on to the Council

14    that our borrowing limit is I want to say $65 to $70

15    million dollars based on single revenue.

16         As far as number of positions, Brooks, as long as

17    lenders are willing to keep, you know, 12, 13, 14

18    positions, I mean keep going down, it gets to be --

19    bond borrowing and money and there's 12 people in

20    front of me, you know, they might not be willing to do

21    that.  You have a great relationship with Chippewa

22    Valley, Rick and Muriel have been keeping that orderly

23    to this point in time.  With the bond refinancing it

24    puts, you know, addition, one, one position and one

52

1    position only.

2         Go back to why didn't we apply for a gaming

3    license before we started construction, you know, a

4    lot of that stuff started before I came on board.  The

5    officers had already submitted applications, and Bill,

6    maybe you can add to this, but from my understanding

7    in talking to the Gaming Commission, and also Scott

8    Andress, you talking, I mean, that's very normal, that

9    you had all this in place and the licensing is

10   something that goes on, you know, over the time frame.

11   And Bill, correct me if I am wrong on that.  I mean it

12   was --

13        BILL BAYBA:  Right.

14        VICTORIA DOUD:  (INAUDIBLE 23:29).

15        BROOKS BIG JOHN:  That's the question I had.

16        RICK LINDLSEY:  I would like to follow up on

17   Brooks on that.  One reason, too, why this process was

18   delayed so long is because of Cato.  Cato was supposed

19   to be -- I think you guys and leaders were due back in

20   February of '07?  Cato was supposed to be submitting

21   at that same time.  They did not complete his

22   application until November because he kept delaying,

23   delaying, delaying.  So even our license back in the

24   May, June, July time frame.

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1        BROOKS BIG JOHN:  When did you tell us it would

2    be considered (INAUDIBLE, 24:26) for this question, in

3    the middle of February?

4        RICK LINDSLEY:  Yes, Cato has, as explained, Cato

5    has until January 28 to divest his interest in his

6    application will be brought to the Gaming Commissioner

7    on the 1st of February.

8        BROOKS BIG JOHN:  Is he still part of the Board

9    of Directors, then until?

10       BROOKS BIG JOHN:  He is not part of the Board of

11   Directors.  He doesn't have a vote.  He's part of the

12   corporation, yet, right?  He is a member of the

13   corporation, but your directors are -- Bill has two

14   votes on the Board of Directors and the tribe has two

15   votes on the Board of Directors.

16       VICKI DOUD:  I have Myron, first.

17       MYRON DOUD:  Oh, okay, when you are talking about

18   an audit in January, whenever that is, are you talking

19   about auditing the whole tribe, just the gaming part

20   of it or --

21       MURIEL FRALICK:  We received a letter from the

22   IRS saying they were coming here January 29th and they

23   have a whole slew of things.  They want to look at

24   everything.  They want to look at credit card stuff,

1   they want to look at general ledger, they want to look

2   at gaming, I mean, it's a page long of items that they

3   want to investigate.

4       MYRON DOUD:  In essence, could that affect the

5   whole deal?

6       MURIEL FRALICK:  I have no idea.  If they find

7   impropriety, I don't know if that would affect the

8   gaming applications, I don't know.  I don't know how

9   they came --

10      MYRON DOUD:  As a matter of fact -- at this point

11  in time, I don't think this is the time to be making

12  decisions about anything until this audit is done.

13      BRIAN PIERSON:  I have seen a number of tribes

14  kept the same way, it could be traded but it could

15  just

16      be one of these random things.  They seem to be

17  methodically approaching tribes with these things to

18  address these issues.  So I am just throwing that out

19  because I know from other tribal clients that it's not

20  necessarily a danger sign.

21      CARL EDWARDS:  We are working with you for that.

22      VICTORIA DOUD:  If we've got good accounting.

23      CARL EDWARDS:  Thank you, Vicki.  Brian, maybe

24  you can attest to this a little bit, my experience

55

1    with IRS in the tribe is that they are trying to look

2    for payments that are made to individuals that do not

3    have W-9s and that have not received 1099s.  They want

4    to make sure that the payments are being made are

5    treated properly from a tax perspective.  So

6    therefore, in the review of say a credit card they

7    found out that one of the credit cards used for an

8    emergency fill on an L.P. gas tank was that person a

9    1099 worker?

10        Everyone who sees something from the tribe

11   because you do get your per capita which is over the

12   $600 dollar threshold, all the payments on top of

13   that, you know, are taxable.  And I think the tribe

14   has done a very good job in certain areas in gaining a

15   thorough understanding and I think a lot of roads have

16   been opened up now.

17        JEANNIE WOLFE:  As the Chief Financial Officer

18   sold the $2 million that was wired on Friday, was that

19   done properly?

20        RICK LINDSLEY:  That was done under a resolution

21   that was adopted by the tribe.

22        JEANNIE WOLFE:  Is there a paper trail and

23   signatures on documents?

24        RICK LINDLSEY:  I am assuming that when Mr.

56

1        Gerber (phonetic) came over here with the loan

2        documents that he got the proper signatures.

3              JEANNIE WOLFE:   The resolution is included in the

4        packet?

5              MURIEL FRALICK:   I would like to address that $2

6        million.   On Friday, Rick arranged for Vicki to take

7        out a $2 million dollar loan with the Chippewa Valley

8        Bank.   I spoke this morning to the Office of the

9        Inspector General, we went off an old resolution that

10       this to Vicki and Rose is being authorized to sign for

11       any loans for the tribe so that it could fund, so they

12       could fund Natchez and the Inspector General told me

13       this morning that as soon as Rose was no longer a

14       Council person or the treasurer that that

15       documentation was null and void.

16             So as to a legality I don't think that that was a

17       legal transfer.   I don't think Vicki has the authority

18       on one signature because if she goes with that

19       resolution that says Vicki and Rose should sign for

20       that loan, and Vicki did all of this on her own

21       signature.   That money was wired directly from

22       Chippewa Valley Bank to -- we don't know where it was

23       wired.

24             They tell us it was to Natchez for construction,

1    but we have no documentation of that.  Chippewa

2    Valley, that loan it never hit accounting, it never

3    hit tribal books, whatsoever.  There was no internal

4    control with that money.  So what's to say that she

5    didn't go this morning and borrow two more million and

6    wire it somewhere without it coming here to the tribe?

7         VICTORIA DOUD:  (INAUDIBLE 30:29).

8         MURIEL FRALICK:  Well, you did it Friday.

9         VICTORIA DOUD:  I am not talking --

10        MURIEL FRALICK:  Well, it was illegal.  The

11    resolution states that you have to have a directing

12    signature, not yours alone.  And also when I ran for

13    the treasurer's position, I was not told that I would

14    have to apply for a Mississippi Gaming License and my

15    business is my business, I am not going to give up all

16    of my bank accounts for whoever needs them, that is

17    nobody's business but my business.  And if these girls

18    were comfortable doing that, well so be it, but this

19    is my call, this is my life, and it is not going to be

20    put on the line for a venture that our membership has

21    no say in and that I had no say in, so I don't feel

22    obligated as a member of the Council Executive Board

23    to follow through with this.  I am not going to be

24    forced into it and now it's kind of being held over

58

1    our heads, I believe, because we cannot split that.

2    You said it was a two-part $30 million and $2 million

3    but now you are saying we have to take the whole $50

4    million, is that right?

5         KEVIN SHIBILSKI:  That's structure, the purposes

6    were always as close to -- it's one issue -- we are in

7    tuned.

8         MURIEL FRALICK:  So there is no way we can get

9    the $30 million debt consolidation alone?

10        KEVIN SHIBILSKI:  It is not our intention to hold

11   you hostage.  We're asking -- we're asking you a debt

12   that cleared both of those purposes from the

13   beginning.  I really want to make it clear that we are

14   not trying to force you at all --

15        MURIEL FRALICK:  I understand that, I understand.

16   I am asking you now, is there any way we can do the

17   $30 million dollar debt consolidation alone?

18        KEVIN SHIBILSKI:  You have to start all over

19   again, you can do that.  You can't do this, but it is

20   not going to happen fast and this $50 million dollar

21   deal that we put together now, and we are several

22   months into this, identifying a bond buyer and

23   paperwork has been done, it would roll back this deal

24   for sure and I should - on behalf of Madame President,

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

59

1       the $2 million dollar issue is not new money,

2       additional money.  That's been taken out by this $50

3       million dollars.

4            MURIEL FRALICK:  It's still money that was

5       pledged to us.

6            KEVIN SHIBILSKI:  It was interim financing,

7       approved by resolution --

8            MURIEL FRALICK:  It was not.

9            KEVIN SHIBILSKI:  It was to replace $2.85 million

10      dollars.

11           MURIEL FRALICK:  It was accepted resolution, and

12      that bridge loan was specifically for another company.

13      It was not for Chippewa Valley Bank.  What I am saying

14      is the resolution in place why would we give any one

15      person, any one person on this Council, why would give

16      any one person the authority to go out and borrow $2

17      million and pledge it against our tribal assets?  One

18      person, on one signature, that's a lot of authority

19      and I hope to God that never happens.

20           MARLENE GRAVEEN:  How much money has been spent

21      total for Natchez?

22           VICKI DOUD:  I don't know, I don't know.

23           MURIEL FRALICK:  I can answer that.  According to

24      the loan information that I have, the Tribe has so far

60

1    spent $16,012,392.00; that's the original loan for

2    Natchez.   That's not counting the receivables that the

3    tribe holds for Natchez which would be Lindsley's

4    expenses, tribal expenses --

5         RICK LINDSLEY:   $16,361,667.00.

6         MURIEL FRALICK:   And as of today we still owe

7    $14,536,621.79.   I could be off a little bit, but to

8    the best of my knowledge with the documentation that I

9    have been provided, that's what we owe, what we have

10   invested in Natchez right now.

11        VICKI DOUD:   At this time, I am going to call for

12   a recess for 5 or 10 minutes.

13        (A BREAK WAS TAKEN - END OF TAPE 1 - SIDE B)

14

15

16

17

18

19

20

21

22

23

24

61

1                        **TAPE 2 - SIDE A**

2          KEVIN SHIBILSKI:  The consequences are to no

3     action.  You will absolutely kill the project and, you

4     know, I am not your business advisor but I think that

5     anybody who walked in this room would know that you

6     would instantly endanger or jeopardize your money

7     invested so far.

8          If I was in your chair, and I was an elected

9     official, too, we knew the consequences of our

10    decisions and just as somebody who has been pursuing

11    this bond for you for six months, I feel obliged to

12    tell you what the consequences of doing nothing would

13    be.  You would certainly impair your credit in

14    business, and it is not me doing that, it is the

15    market place.

16         You will imperil your ability to borrow business,

17    I am not talking about Natchez, I just mean on a daily

18    basis that is not in the Tribe's best interest.

19    Anybody who looks at this decision will tell you that

20    allowing a project to go into receivership, allowing

21    your site work to be willowed with river risings,

22    allowing your credit to go into the ditch could tell

23    you with a straight face that it is in your best

24    interest to do nothing.

1        It is not.  It is certainly your prerogative, I

2   understand that, but there are dire consequences.  You

3   jeopardize your credit; you jeopardize your investment

4   in Natchez.  So what we were hoping was maybe, you

5   know, you probably are going to have a whole bunch of

6   liens filed against the project, if you speak of

7   consequences of that.

8        (INAUDIBLE, 2:00, SOUND IS DISTORTED)

9        BIRAN PIERSON:  If you ask me sitting here, it

10  would be irresponsible as the lawyer, not to say I

11  agree, I think you will end up with loss of this

12  investment you have which seems like a bad

13  consequence, potential loss of reputation when you go

14  out in the market place the next time.

15       All the concerns that were raised are sound and

16  all the things that were said about, you know, not

17  enough communication -- maybe it is a bad investment.

18  I don't know, I haven't crunched those numbers.  I

19  don't know if Natchez is going to be -- I don't know

20  if the market study for Natchez is sound, but let's

21  say Natchez, the market study is bad and it's not

22  really going to be profitable, you still on January 2,

23  2008, have a decision to make and if you pull the

24  plug, I just think you won't be able to recoup what

63

1    you've already got so if there is some way of

2    positioning it so you don't throw away what you have

3    and then maybe sell it, just so you don't lose your

4    investment, just get it so they have something to

5    sell.

6        Don't let the thing go down the drain so you have

7    nothing to sell and then however many million you have

8    into it is gone.  You know avoid that result by

9    putting it into a position where you can sell it if

10    you want to go forward.  But I tend to agree, again,

11    the policy decision for leadership it would be

12    irresponsible not to say as an individual.

13        MIKE CHRISTENSEN:  Brian, that same thing we went

14    through Shullsberg, our credit was hurting, the Dream

15    Catcher boat, our credit was hurt we are paying out

16    all these projects --

17        BRIAN PIERSON:  But the way I see it, the way I

18    see it, they are about to get completed --

19        MIKE CHRISTENSEN:  It's already damaged.  We

20    already got three projects pulled out we can't get

21    nailed down.  We got another boat we are paying on.

22    We got a chunk of land sitting, it's a mine thing, and

23    we can't do nothing.

24        BRIAN PIERSON:  If we walk off the job and start

64

1          to get lawsuits and liens who is going to buy it from

2          you?  Then all the investments and money put in --

3              MIKE CHRISTENSEN:  Apparently somebody must think

4          we are something.  We got a deal down in Chicago for

5          another boat.  When are we going to get our money

6          again?  It's locked up in Shullsberg, only we aren't

7          going to get our money again, our creditability ain't

8          hurt.  I don't like high-pressure tactics, I'm sorry.

9              VICTORIA DOUD:  I don't think that's high-

10         pressure tactics, I think it's legal.

11             MIKE CHRISTENSEN:  We lost a bunch of money

12         already, what's the sense of holding off for another

13         30 days so everybody looks over this contract and then

14         decides on it.

15             BRIAN PIERSON:  I just want to say on that, the

16         documents have circulated, the bond indenture, for

17         example, again a very dense document like this, I have

18         difficulty understanding the doggone thing.  I rely on

19         my partner for those highly technical documents

20         circulating at the end of November among the

21         Development Team, gone through several drafts.

22             You know, we got involved in your hiring August

23         for a deal that we understood had been in progress for

24         a while, so I understand that at this point that there

65

1    is opinion divided about this and I am totally looking

2    at it not in terms of who's right or who's wrong, it's

3    what about right now, on January 2nd, what are the

4    consequences of this Choice A versus Choice B?

5        MIKE CHRISTENSEN:  I am sure you can get another

6    attorney in here who will give you a different opinion

7    and say hey you are better off holding off for 30 days

8    before you make your mind up.

9        VICKI DOUD:  I would like to remind the Council

10   here too that there are a lot of people that we're

11   representing that aren't out here right now.  Where

12   are they?  We've got a responsibility to those people

13   not just we people present.

14       MIKE CHRISTENSEN:  What?  We don't mean nothing

15   out here?

16       VICKI DOUD:  (INAUDIBLE, 6:00)

17       MIKE CHRISTENSEN:  -- like I said, I want to see

18   the books that you guys do when you built the casino -

19   obviously, it wasn't on the nothing list -- yours and

20   Butch's were on the papers.

21       VICKI DOUD:  You are out of order.

22       MIKE CHRISTENSEN:  The same thing is happening

23   here again, right back to the damn secrecy --

24       VICKI DOUD:  I am going to call on Muriel.

1          MIKE CHRISTENSEN:  I've got the floor.  If you

2     throw me out I will call the cops, Vilas, tribal cops,

3     whatever you want but the same damn thing, the secrecy

4     got us right to where we are at today from Shullsberg,

5     everything else, right back in the same spot.  We have

6     one inch, everybody is taking our money, shelling it

7     out and we are getting shit back and all of a sudden

8     because we are sitting here in the audience and we are

9     not part of what the deal was, we don't matter?

10          VICKI DOUD:  We are trying to move ahead.

11          MURIEL FRALICK:  If you create a disturbance, Mr.

12     Christensen, you will be suspended.  We can pretend

13     you have been suspended today as our Treasurer by our

14     esteemed President.

15          I was not working, I got assaulted in the hallway

16     today and I got suspended because I created a hostile

17     environment, that I was the one that was the accosted

18     and attacked, yet I created that.  My question, my

19     question is:  If we sign these documents and we pay

20     that $50 million dollar bond sale, is there something

21     in the documentation that says we have to send this

22     $20 million to Natchez?

23          KEVIN SHIBILSKI:  You could shut down the $8.5

24     simply by not applying, I am not your attorney.  There

67

1    is a clause in the bond document that withholds over

2    $8 million dollars if you would not submit your

3    application.  What I am saying is there may be some

4    middle ground, that's your decision, but you could

5    probably pay your bills, make sure the thing doesn't

6    erode.  You owe $16 million, and hold back on almost

7    $9 million dollars of this.  I have to get the bond

8    buyers to reissue the bond, but it is an option.

9    MURIEL FRALICK:  Okay, but we can take this $50

10    million, you're saying of that $20 we have to send $16

11    million down there?  I don't understand the state --

12    KEVIN SHIBILSKI:  No, it would the $12.  What you

13    would be doing is you would be paying your bills.  The

14    project would continue to be current; it would

15    continue to be saleable, if you get the bullet.  What

16    I was trying to think of was a way for you -- because

17    clearly some of you are talking about selling this

18    project, then you want to protect your $16 million you

19    already invested and you want to have something that

20    you can sell to somebody and I think you can do that

21    without taking the extra $9 million dollars.

22    MURIEL FRALICK:  So my question is:  Is that

23    written in the documentation that we are going to sign

24    if we take that $50 million?  That is definitely asked

68

1·      to go?

2           KEVIN SHIBILSKI:  That $9 -- you absolutely --

3       you could just not apply, that $9 would not be

4       disbursed, that's a fact, yes.

5           MURIEL FRALICK:  Just the $9, though, that's all

6       we can save?

7           KEVIN SHIBILSKI:  Well, not saving because you

8       are keeping the project current.  You are avoiding --

9       you know, you are avoiding lawsuits.  You are creating

10      something you can sell.  You have bought a decision to

11      make and that's all yours to make.  If you decide you

12      want to get out of this, you certainly don't want to

13      lose your $16 million so get current on your bills,

14      solidify the site work and then sell it if you want to

15      move on.

16          MURIEL FRALICK:  Okay, why are we at risk of

17      losing our $16 million dollars, I thought we had

18      equity in there?

19          KEVIN SHIBILSKI:  If you did nothing, what would

20      happen is all the contractors that are working on this

21      will start a series of lawsuits again all of this --

22      well, lien can speak to that line.  Its liens, they

23      will file liens.

24          MURIEL FRALICK:  Against us as a tribe or against

69

1      LLC?

2         KEVIN SHIBILSKI:  Against the project.

3         BRIAN PIERSON:  So the liens against the project,

4      which means that they're, like encumbrances on the

5      land and they prevent anybody else from lending more

6      money.

7         MURIEL FRALICK:  So it is not on us?

8         BRIAN PIERSON:  They probably would sue the LLC.

9         MURIEL FRALICK:  Right.  Okay, but we still have

10     equity in there, that wherever it is at now because

11     Rick Lindsley, he said right now, he felt if we were

12     to sell now that our position is $13 million dollars.

13        KEVIN SHIBILSKI:  You have a very good position

14     as long as you don't let it go into receivership and

15     lawsuits, then you have nothing to sell and then your

16     money is at risk.

17        MURIEL FRALICK:  What will our position be if we

18     do the $16 million?  Are we in the same as if we were

19     $32 million dollars into it then?

20        KEVIN SHIBILSKI:  If you didn't do the $9 -- I

21     mean, I am getting way out of my role here --

22        MURIEL FRALICK:  I mean, I don't know, I am

23     trying to understand

24        KEVIN SHIBILSKI:  What I am trying to do is look

70

1      for a way, I guess I have a fiduciary responsibility

2      to tell you what the consequences would be and maybe

3      there is a compromise position.  At least get your

4      bills paid, get your site work completed, get the boat

5      there, then you can sell it.

6          Lots of people would love to buy that project, I

7      don't think that's an issue.  You can decide if that's

8      what you want to choose to do.  If you do nothing, and

9      it falls into lawsuits and receivership and all the

10     other nasty consequences and you do nothing, you

11     jeopardize your $16 million dollars invested in there.

12         So if you want out of the project, at least

13     project what you invested, keep your bills current.

14     If you don't apply, Muriel, the $9 million doesn't get

15     drawn, that clause is in there that would be a smaller

16     borrowing under the same structure we wouldn't have to

17     reissue this.

18         MURIEL FRALICK:  So when you say the $9 million

19     doesn't get drawn, I don't understand that.

20         KEVIN SHIBILSKI:  There is a clause in here

21     saying you have to meet your application, the Tribe

22     has to submit its application to this Mississippi

23     Gaming Commission before $9 million dollars is allowed

24     to be accessed.  It's a provision in this deal.

1          MURIEL FRALICK:  So that documentation that shows

2     that, when are we going to be given that documentation

3     so we know -- I mean, I don't know what we are getting

4     into.  I see nothing in writing in this agreement.

5          KEVIN SHIBILSKI:  I can only speak from the

6     financial consequences, and that would mean you would

7     not get the $9 million.  So you are borrowing would be

8     reduced.  Instead of $50 you would be borrowing $41.

9     Most of which financing existing -- financing existing

10    now.

11         MARY WHITE:  I believe what the Treasurer is

12    saying is we would like to see some of the documents.

13    I haven't seen anything.

14         KEVIN SHIBILSKI:  Sure.

15         MARY WHITE:  Do you have any to give her so she

16    can at least acknowledge the --

17         KEVIN SHIBILSKI:  Sure, I have all of our

18    financing -- I have all of our offering circular.

19         MURIEL FRALICK:  So I thought -- I guess I

20    gathered earlier in the meeting that it was $50

21    million, and that's all it was.

22         KEVIN SHIBILSKI:  You would still be doing this

23    deal, you just would violate one of the covenants of

24    this deal and you would not get the $9 million

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

72

1    dollars, so you still would be -- you know, we

2    wouldn't have to redo this.  You would just be taking

3    $9 million less by virtue of what you saved earlier

4    and I reiterate that you wouldn't be applying.

5         MURIEL FRALICK:  Right.

6         KEVIN SHIBILSKI:  If you don't do that, that's a

7    consequence.  And then you can still -- you can be

8    current on your bills, you got a project that you can

9    sell and you don't jeopardize the $16 million.  I

10   don't see how it is possibly in your interest, for

11   what it is worth, to undo what you have done, to

12   jeopardize your $16 million.

13        MURIEL FRALICK:  Okay, before we make a decision

14   on that can I see the loan distribution?  Where this

15   $40 million is going to be, who we are going to pay

16   off, where all this money is going to go?

17        KEVIN SHIBILSKI:  That's all your contractors, I

18   mean, I didn't do that.  But your partners and Mr.

19   Lindsley can talk to you about that.

20        MURIEL FRALICK:  I mean, you know, we are going

21   to borrow $41 million from, right?

22        KEVIN SHILBILSKI:  $30 of that is refinancing

23   your debt.

24        MURIEL FRALICK:  Right.  I mean, that's what I

1    want because I need to know.  I want to know exactly

2    who is being paid off, how much they are being paid,

3    what's going down to Natchez, who down there is being

4    paid, where is it going?

5         KEVIN SHIBILSKI:  It's all contractors.

6         MURIEL FRALICK:  It's all -- the whole $16

7    million is contractors?

8         KEVIN SHIBISKI:  Well I don't think that's -- it

9    would leave $16 if you didn't do the $9, about $50 is

10   $12 more.

11        MURIEL FRALICK:  The $12 million, the $12

12   million.

13        KEVIN SHIBILSKI:  And some of it is reserved for

14   (INAUDIBLE, 14:25) expenses off.

15        MURIEL FRALICK:  Well, see, that's what I am

16   saying.  I don't understand this and I think we need

17   to know this.

18        KEVIN SHIBILSKI:  You would be paying your bills.

19   You could probably have something like $7 or $8

20   million dollars to pay bills with in Natchez.  It

21   would all go to contractors.

22        MURIEL FRALICK:  Okay.

23        KEVIN SHIBILSKI:  So you would be paying the

24   people that already worked on your project down there.

1        MURIEL FRALICK:  And who is going to have this $8
2   million dollars extra, $7 million?
3        KEVIN SHIBILSKI:  In any bond deal it goes to a
4   trustee, a third party.  Nobody touches it.
5        MURIEL FRALICK:  You are going to have control o
6   it?
7        KEVIN SHIBILSKI:  No, no, no, a trustee.
8        MURIEL FRALICK:  Who is the trustee?
9        KEVIN SHIBILSKI:  Wells Fargo.
10        MURIEL FRALICK:  Wells Fargo, they get the whole
11   $41 million and they dole out our payment?
12        KEVIN SHIBILSKI:  No, no, remember $30 million of
13   this is refinancing.
14        MURIEL FRALICK:  I realize that.  I am talking
15   about the total.  I know $30 million is the debt
16   consolidation.
17        KEVIN SHIBILSKI:  Yeah, right.
18        MURIEL FRALICK:  I want to know who has total
19   control of the $41 million, the $30 plus the $12 or
20   whatever.
21        KEVIN SHIBILSKI:  Well it would be the $12 less
22   the reserves, so probably $7 or $8.  Well Fargo would
23   control that $7 or $8 million dollars.
24        MURIEL FRALICK:  So can they tell us who is going

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1       to be paid?

2           KEVIN SHIBILSKI:  Well bills are submitted; it's

3       like any other construction.

4           MURIEL FRALICK:  Who has that -- I am asking, I

5       want to know who is going to be paid, is that such a

6       hard --

7           KEVIN SHIBILSKI:  No, no, it's just not me it's

8       Mr. Bayba.  I can tell you that the contractors

9       involved down there are Yates Construction, they are

10      the (INAUDIBLE, 15:56).

11          MURIEL FRALICK:  What do we owe Yates?

12          KEVIN SHIBILSKI:  I don't know, I don't know.

13          MURIEL FRALICK:  Who knows what we owe Yates?

14          KEVIN SHIBILSKI:  Mr. Bayba and Mr. Lindsley

15      would know that, can you grab them out of Rick

16      Lindsley's office?

17          MURIEL FRALICK:  Is there going to be

18      accountability to the Tribe for this money that we are

19      going to be leveraging our casino on?

20          KEVIN SHIBILSKI:  The bondholder in this case,

21      it's their money, they are lending this money.  They

22      want to make sure this money is not wasted to

23      inappropriate -- there is a lien waiver process like

24      when you build a house.  You got to pay the plumber,

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1     you go to the bank, the bank sends someone out, the

2     plumber does his work, it is exactly that process.

3         MURIEL FRALICK:  Okay.

4         KEVIN SHIBILSKI:  Nobody has a checking account

5     with all the money in it.

6         MURIEL FRALICK:  But it's going to be accountable

7     to us, also?

8         KEVIN SHIBILSKI:  Absolutely, every penny.

9         MURIEL FRALICK:  And it is not just going to go

10    to one person?  It's not going to go to Mr. Lindsley

11    and not be shared with the rest of us?

12        KEVIN SHIBILSKI:  No, no.

13        MURIEL FRALICK:  I mean, that's been the history.

14        KEVIN SHIBILSKI:  That's not my job.

15        MURIEL FRALICK:  I know it's not your job but I

16    want some assurance that the rest of us are aware of

17    what's going on.

18        KEVIN SHIBILSKI:  That's fair enough.  I can

19    assure you that Wells Fargo has fiduciary

20    responsibility in this deal.  And Brian, this is

21    really some (INAUDIBLE, 17:15) as well.  Your job is

22    to make sure those funds are appropriately spent on

23    your behalf, and they have to provide -- bills will

24    be provided, lien waivers will be provided, only

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1

2      after they approve that it is legitimate.

3          BRIAN PIERSON:  It's a very tight process. Wells

4      Fargo, they are very experienced with these kinds of

5      things and they have a draw process like a

6      construction draw process.

7          MURIEL FRALICK:  I want to be a part of that

8      information, I think the whole Council needs to be a

9      part of that whole information and I think that's the

10     way the future is going to be. It's not one or

11     (INAUDIBLE, 17:54) decision.  So is this something

12     that needs to be decided upon tonight or can we ponder

13     this?

14         KEVIN SHIBILSKI:  It's your decision what to do.

15     From a process perspective, I think for this to move

16     forward, you have to approve the proposal and if you

17     choose to stop the $9 million you simply don't make

18     the application.  That's the effective result of your

19     not applying for a license.  Everything else goes away

20     if you don't approve it.  We can't do the bond deal

21     with your authorization.

22         MURIEL FRALICK:  And you need to have that at the

23     same time?

24         KEVIN SHIBILSKI:  Yeah, we have been working this

1    for five-and-a-half to six months.

2        MURIEL FRALICK:  Okay.

3        VICKI DOUD:  Paco?

4       PACO FRALICK:  I just have three questions.  I am

5    trying to understand this in its entirety.  What was

6    the reason that we can't wait a month or a week?  Why

7    does this have to be tonight?

8        VICKI DOUD:  There are people that need -- that

9    expect to be paid.  There are bills that have not been

10    paid to keep the operations going.

11       PACO FRALICK:  And I am trying to understand this

12    Cato that wants $35 million dollars to sell his

13    property to the Tribe.  How does he fit in?  What

14    happens if we don't want to pay him $35 million and we

15    owe him nothing.  What happens to our wholly bill on

16    that track of land?

17       KEVIN SHIBILSKI:  I could answer that, that's a

18    good question.  Mississippi anticipates that he will

19    have otherwise you have a minority partner in a casino

20    project who wouldn't get a license, it would hold up

21    the whole project.  So they, in their statutes have

22    anticipated that and they created a resolution

23    process, which prepares a third-party appraiser to say

24    -- they come in and say hey look, this is what I can

79

1    do.

2         PACO FRALICK:  That's pretty (INAUDIBLE, 20:00)

3         KEVIN SHIBILSKI:  I don't know.  I am saying the

4    reality is (INAUDIBLE, 20:02) that's way, way off.

5         PACO FRALICK:  And I understand they are trying

6    to dissolve it?

7         KEVIN SHIBILSKI:  I don't now that.  I just know

8    that every state has a process.

9         PACO FRALICK:  So think about it, now you are

10   talking $50 million plus $35?  Is the Tribe going to

11   borrow money and be so far into it that we are going

12   to be at this point again where you will be asking

13   well do you want to protect what you already invested?

14   you know, how far do you go?  And my third question

15   is:  How much money do you think you have to put in to

16   get it saleable?

17        KEVIN SHIBILSKI:  To me that's the question you

18   have to consider because if you (INAUDIBLE, 20:44) not

19   keeping your bills current and not making sure your

20   site would be worked on.

21        PACK FRALICK:  What guarantee do we have that it

22   would sell?  I hear you talking about excavating and

23   so we've got $16 million, how much more do we have to

24   put in to get to this.

1          KEVIN SHIBILSKI:  If Muriel withholds the

2     application that would reduce the borrowing by $9

3     million, you have enough of what's left (INAUDIBLE,

4     21:10) refinancing to get your bills current and

5     retaining wall completed so that the builder can't

6     undo or take the money to get done.  So you don't

7     jeopardize your $16 million.  That's the short answer

8     to that question.  You have a sale, then you can

9     decide if you want to sell it, then you have something

10    to sell.  Having the spring floods wash out what you

11    have already done and having the liens and lawsuits

12    that eliminates your ability to sell this investment.

13         PACO FRALICK:  So you are saying we would have to

14    have $25 million?

15         KEVIN SHIBILSKI:  No, I am saying --

16         PACO FRALICK:  $16 plus $9.

17         KEVIN SHIBILSKI:  I don't know where you are

18    getting the $16 from -- oh, right, right, right.

19         PACO FRALICK:  But we have to spend $25 million

20    in the hope it sells.

21         KEVIN SHIBILSKI:  Not hope, you have a valuable

22    asset there that would sell.  That's certain.  If you

23    did nothing, that's for sure, you are losing $16

24    million dollars and that's not a matter of opinion.

81

1      you are going to jeopardize that, maybe it's $14,

2      whatever.  You are going to jeopardize your integrity

3      of the investment if you do it that way.

4          MIKE CHRISTENSEN:  Do we actually own that land?

5          PACO FRALICK:  I just have a comment.  I think it

6      is somewhat irresponsible to have gotten to this point

7      with this many people uninformed.  I don't know who

8      the people are that have that information, but I just

9      think it is irresponsible.

10         MIKE CHRISTENSEN:  Very irresponsible.

11         BROOKS BIG JOHN:  My question was that after Rick

12     had told us we were into this venture, 37.5 percent is

13     our lot bill through Big River, Bill Bayba is an equal

14     partner and I hear Muriel and other people say that we

15     have $16 million invested.  I guess that I would like

16     to hear the dollar figure that Mr. Bayba has invested

17     since he is an equal partner.

18         BILL BAYBA:  Well, the way it was originally set

19     up, I was going to gather personal guarantees and

20     other credit, so the cash, the actual cash dollars

21     that I put in does not equal what you guys put in, but

22     I was putting up letters of credit, personal

23     guarantees for millions of dollars.

24         MR. BROOKS:  How do you stand to reap the

1       benefits of that amount if it is equal to the Tribe?

2       I mean equal partners to me, one over here is equal to

3       this one.  I give $16 million here to this group and

4       not $16 million there, that's hard.  I don't get it.

5           RICK LINDSLEY:  Brooks, with the Tribe's

6       investment, the Tribe originally was offered a deal

7       that was passed down, that was before my time.  I

8       don't know what happened; I don't know what the deal

9       was.  When they went back to the investor, they put in

10      $5, they tried to put in $5 million dollars.  We later

11      acquired additional shares for $3.6 million dollars.

12      Our actual investment in the project was $8.6 million

13      dollars.  The other dollar amount that we subsidized

14      was $16.3, which is approximately $7.6 million

15      dollars; those are loans to the project that upon the

16      refinancing the Tribe would be reimbursed for and

17      those who didn't then become the debt of Natchez.  The

18      Tribe's investment is $8.6 million.

19          MURIEL FRALICK:  But we are taking out the loan

20      to pay back to ourselves?  I mean, that doesn't make

21      sense.

22          RICK LINDSLEY:  Right now, it's the Tribe's debt.

23      In the refinancing, it will be Grand Soleil's debt, so

24      the Tribe then is --

83

1        MURIEL FRALICK:  But then eventually --

2        RICK LINDSLEY:  They will be responsible for

3    $37.5 million dollars of that $7.6 million dollars as

4    opposed to 100 percent.

5        (INAUDIBLE 25:26, TALK OVER)

6        MURIEL FRALICK:  -- but I know we have Mr. Bayba

7    who answered Brooks question about how much cash do

8    you have invested?

9        MR. BAYBA:  About $10 million dollars.

10       MURIEL FRALICK:  $10 million?

11       KEVIN SHIBILSKI:  He's on the hook by the way for

12   that.  Say you did this and whatever, $7 million

13   dollars went down, he is on the hook for half of it.

14   Just so you know that is it's not just the Tribe, and

15   that's immediate, right away.  There is no gap, there

16   is no exposure.  He is immediately on the hook for

17   that, too, with you, as 50/50 partners.  And in

18   addition to that, he has lent millions to the deal on

19   his own to keep it going.  You should know that, too.

20   You have a very good partner, Mr. Bayba.

21       MURIEL FRALICK:  I believe that, but it would

22   have been nice to know this along the way.

23       KEVIN SHIBILSKI:  I personally know that he has

24   paid bills for hundreds and hundreds thousands of

1    dollars without any guarantee that he would ever be --

2    made whole.

3       MURIEL FRALICK:  Well it's nice to know that and

4    it would have been nice if we knew that.

5       KEVIN SHIBILSKI:  I think that's a testament of

6    his character that he did that without flinching.  He

7    could have come here and put you on hold, but he

8    didn't, he wrote a check.  I know only one person in

9    the world who did that, and I know you know, too, he

10   is standing right there.

11      You are going to ruin not only your project, but

12   you are going to ruin your partner's project if you do

13   nothing.  That's a fiduciary fact, and I am obliged to

14   tell you that.  You can sell the project, that's your

15   call, that's a political decision, that' all your own

16   decision, and that's all yours but you ought to know

17   the consequences of doing nothing is prepare to lose

18   your $16 million dollars and to lose millions for your

19   partner as well.  Think about that before you go and

20   waste all this.

21      MURIEL FRALICK:  We probably should have did a

22   little investigating on all this before --

23      KEVIN SHIBILSKI:  He is high on the project.  He

24   is very happy with the project.

1         VICTORIA DOUD:  I think there is some

2   responsibility, too, on your part (INAUDIBLE, 27:20).

3       MURIEL FRALICK:  They kept everything a secret,

4   how can I find out?  I have been asking these

5   questions from the start.  Vicki, you guys all met in

6   your office on Friday and you all wired out $2 million

7   dollars.  I sat over here in this other office, did

8   anybody call me?  No.  I am the Treasurer.  I have

9   custodial responsibilities for all funds of the Tribe

10  and I am the only one that was left out of that

11  arrangement, the borrowing of $2 million, and the

12  wiring out of $2 million, illegally, I feel.

13      VICTORIA DOUD:  Resolution authorizing that.

14      MIKE CHRISTENSEN:  I have a question, Vicki.

15  This gentleman is not putting out more cash; he is

16  putting his investment in a boat?

17      KEVIN SHIBILSKI:  No, $10 million dollars.

18      MIKE CHRISTENSEN:  We got nothing back and now

19  you expect us to invest in another thing where we

20  don't even own the land, we own what?  How much land

21  do we own?  Zero.  (INAUDIBLE, 28:29, TALK OVER)

22      MIKE CHRISTENSEN:   I want to know how much land

23  we own down there.

24      MR. BAYBA:  Sir, I put up $10 million in cash

1    (INAUDIBLE, 28:48, TALK OVER) -- the project and the

2    $10 million guarantees.

3        MIKE CHRISTENSEN:  How much land do we own as a

4    Tribe down there?

5        MR. BAYBA: 55 acres.

6        MIKE CHRISTENSEN:  Is that in your name or in our

7    name, do we have a clear title to it?

8        MR. BAYBA:  It's in the name of the LLC.

9        MIKE CHRISTENSEN:  It's another corporation that

10    means zip and you are going to stick it to us again.

11    We already went through this with the Dream Catcher,

12    we already went through this with Shullsburg.  How

13    many more times is the (INAUDIBLE, 29:12) going to

14    take a beating at our expense and sit back and tell us

15    you are doing a job for us?  That's upsetting to me

16    that we lose all this damn money down the drain.

17        Another guy comes in here, you have a letter,

18    great, an LLC corporation.  You guys better get in a

19    lawyer that is going to talk for you and make you

20    understand what is going down and not to have somebody

21    and say hey give me some money and you're done.  Get a

22    couple of more lawyers, here's some more money and

23    you're done.  We have been taken to the cleaners, how

24    many times because like Muriel said,

1   secrecy.

2        When I was on this Council, I got kicked out

3   because I opened my mouth against the secrecy and I am

4   not going to shut up because everyone wants it to be a

5   secret and wants to spend money and act like big

6   shots.  Take a pay cut if you guys want to act like

7   big shots and give us back some of our money.

8        VICKI DOUD:  Are you done now?

9        MIKE CHRISTENSEN:  Whatever happened to our elder

10   per capita payment this year?  Out the window.  Where

11   is all the promise of taking care of the elderly, the

12   Tribal members an everything else?  We get the shaft

13   anyway.  I come up here and start asking questions and

14   nobody knows anything.  I am asking about the deal --

15   (INAUDIBLE, 30:08) get no money, how much land do we

16   own, what's in the corporation?

17        VICKI DOUD:  When are you going to let us answer

18   you?

19        MIKE CHRISTENSEN:  We don't own the land.  We

20   don't own nothing.  Every time I ask questions, I am

21   out of order.

22        VICTORIA DOUD:  We own 40% of the investment.

23        MIKE CHRISTENSEN:  Your investment in 40 percent

24   like we are invested in the Dream catcher, it went

1    down the tubes.  We own land up in Shullsberg, it went

2    down the tubes.  We have another investment going down

3    the tubes, the stock market crashes every day, you

4    don't get nothing back, Vicki.

5        VICTORIA DOUD:  You don't let anybody respond.

6    We still own land on the Shullsburg and if we buy it

7    at --

8        MIKE CHRISTENSEN:  $300,000.

9        VICTORIA DOUD:  -- then what it was worth.

10       MIKE CHRISTENSEN:  $100,000 going to an

11    underground mine, land, drilling and we can't do

12    nothing, Vicki.

13       VICTORIA DOUD:  That's your opinion of it.

14       MIKE CHRISTENSEN:  I have heard our DNR people

15    tell us you can't put pillars underground for the boat

16    --

17       VICTORIA DOUD:  I don't know -- I don't know if

18    the suggestion would be -- (INAUDIBLE, 31:20, TALK

19    OVER) I know you direct me to do a lot of things.

20    There might be going with the $40 million rather than

21    -- we need to stop all this back and forth.  Bring it

22    out in the open, no more hiding; bring it out in the

23    open.

24       CARL EDWARDS:  I want to introduce the issue for

89

1    the bond issue.  If we don't want to continue, we

2    can sell it, this way we will get something for it.

3        If you don't want to keep on going, we can sell

4    it, the first one.

5        CHRIS OR PACO FRALICK:  I think we need a

6    referendum for this here.  This is way too much money.

7        CARL EDWARDS:  There is a resolution there I

8    introduced.  Call for the question.

9        (INAUDIBLE, 32:23, TALK OVER)

10       CHRIS OR PACO FRALICK:  I got a question, you

11   just called for a question; I have a question, that

12   means he asked for a question.

13       VICKI DOUD:  All those in favor say, aye.

14       ALL:  Aye.

15       VICKI DOUD:  Opposed?

16       TOM MAULSON:  I oppose.

17       VICKI DOUD:  Do you know?

18       TOM MAULSON:  I will give you my reason for

19   opposing; one abstention.

20       VICKI DOUD:  One abstention.  Resolution carried.

21       (INAUDIBLE, 32:56, TALK OVER)

22       BETTY JACK:  What did you vote on?

23       VICKI DOUD:  Transfer of certain assets to

24   Lake of the Torches Economic Development Corporation,

1    borrowing of funds from Lake of the Torches

2    (INAUDIBLE, 33:06) Corporation, and three, (INAUDIBLE,

3    33:08) funds to Grand Soleil Natchez, LLC.

4        BETTY JACK:  And that's in the best interest of

5    all the Tribal members, Vicki?

6        CARL EDWARDS:  And if you want to sell it, we can

7    sell it, that's fine.

8        VICKI DOUD:  We want to move on to the next order

9    of business, please.

10       KEVIN SHIBILSKI:  We need a motion on all five of

11   those resolutions.  I just put that out, that wasn't

12   for all of them.

13       CARL EDWARDS:  Then I guess the second I will

14   introduce for the EDC Revenues proving the transit of

15   assets from FDC, from the loan funds for the FDC which

16   are both under the EDC.

17       MURIEL FRALICK:  Could somebody please explain

18   this resolution to me?  I'd like it read word-for-

19   word.

20       VICKI DOUD:  Resolution introduced.

21       MURIEL FRALICK:  I mean I don't understand this.

22   Could somebody please explain it to me?

23       BROOKS BIG JOHN:  Under discussion, I have some

24   questions that I believe need to be addressed here,

1    Madame President.

2         TOM MAULSON:  Let Carl explain it, I believe he's

3    the guy that introduced it.

4         CARL EDWARDS:  It's your second one, the EDC.

5    Can the Secretary read out the resolution, it's the

6    second one for the EDC, it is Number 3.

7         MURIEL FRALICK:  We don't have numbers on ours,

8    Carl.

9         CARL EDWARDS:  You have five in front of you,

10   Muriel.  Two have EDC on top.  And then you have one

11   that's an FDC and you have two that are Tribal.  This,

12   the second one with the EDC, see that one, it's on

13   top.

14        BROOKS BIG JOHN:  For the consolidation or

15   program issuance?

16        CARL EDWARDS:  Consolidation.  The other one for

17   the issuance is done.  Can Geraldine Brown read it,

18   the second one, Number 3 on your sheet, consolidation

19   of Lake of the Torches?

20        MURIEL FRALICK:  Can you explain it as you read

21   it, please.  After all, we are voting on this,

22   shouldn't we understand it?

23        BRIAN PIERSON:  I hope that I drafted it so that

24   it sort of explains itself.  I tried to lay it out.

1          SECRETARY:  Whereas we (INAUDIBLE, 36:04, READING

2     VERY FAST) Under the economic Development Corporation,

3     whereas Lake of the Torches Economic Development

4     Corporation, the Corporation is (INAUDIBLE, 36:14) is

5     controlled by the LDF (READING FAST, TELEPHONE

6     RINGING) is the governing body of the Corporation,

7     (INAUDIBLE, 36:30, TELEPHONE RINGING) The Articles of

8     Incorporation.

9          MURIEL FRALICK:  What are these articles of?  Can

10    you pull those out and read them to me?

11         GERALDINE BROWN:  The Articles of Incorporation

12    (INAUDIBLE, 36:47) the Order of Directors has the

13    authority to do all things necessary to actively and

14    aggressively participate in all matters pertaining to

15    a social, economic and industrial welfare of the band

16    and to engage in any lawful or activity which may be

17    necessary and appropriate for caring all and

18    accomplishing any of the foregoing purposes

19    (INAUDIBLE, 37:09).

20         And whereas, the Tribe has also formed a wholly-

21    owned corporation chartered by the Secretary of

22    Interior in Section 17 of Indian (INAUDIBLE, 37:14)

23    Reorganization (INAUDIBLE, 37:15), LOTC Federal

24    Development Corporation and whereas on August 13,

1    1995, the Tribe issued a lease to the Corporation for

2    parcels of land comprised on the site of the Lake of

3    the Torches Casino (INAUDIBLE, 37:30) and whereas on

4    December 29, 1995, the Tribe issued a lease to the

5    Corporation for parcels of land comprised on the site

6    of Lake of the Torches Hotel in which there is an

7    adjacent parking area at Lac Du Flambeau and whereas

8    the Corporation continues to own and operate the hotel

9    in 1996 and whereas the Corporation leases the casino

10   to the FDC by lease dated September 1, 1995, since

11   1995, and whereas the casino and hotel are operated

12   (INAUDIBLE, 38:04).

13       Whereas the division of Lake of the Torches

14   Casino ownership and management is between the

15   Corporation and FDC (INAUDIBLE, 38:15), and whereas

16   the 1995 and 1996 loans that financed (INAUDIBLE,

17   38:27) and whereas the Division of the Lake of the

18   Torches reserved casino ownership and management as

19   stated operationally and (INAUDIBLE, 38:25) outside

20   entities and (INAUDIBLE, 38:37) ownership and all

21   components of the Lake of the Torches Casino be

22   consolidated under the Corporation and whereas Tribe

23   and its Trustee provides that the FDC focuses economic

24   development activities and opportunities outside the

94

1    reservation.

2        The amended Articles of Incorporation of the

3    Corporation include language in Article 4 are also

4    included in the original Article of Incorporated Draft

5    in 1995, that this Corporation is a Not-For-Profit

6    Corporation and no dividends or (INAUDIBLE 39:14)

7    shall be declared to any private individual of Officer

8    or Director of the Corporation.

9        And whereas Articles are a result of (INAUDIBLE

10    39:24) and the records to the Corporation as a

11    (INAUDIBLE 39:30) not-for-profit Corporation are

12    misleading because the Corporation tries to earn as

13    much profit as possible, to run governmental services

14    that benefit members of the Tribe.

15        And whereas in no event could the Corporation

16    qualify for Charitable, 501-C3 status under the

17    Internal Revenue Code because its activities do not

18    qualify (INAUDIBLE 39:49) and the Internal Revenue

19    Service has issued a ruling that (INAUDIBLE 39:53) all

20    Corporation chartered under Tribal Law Shares, the

21    owners immunity from Federal Income Tax and we are

22    recommending that the Articles that characterize the

23    Corporation under the for-profit Business Corporation

24    wholly owned by the Tribe will not affect the Tribe's

95

1    non-practical status under Federal Income Law and

2    whereas the next clause relating to the approval of

3    the loan to the FDC.

4        Whereas the FDC is a member of Grand Soleil

5    Natchez, LLC, and strictly limits the liability

6    accompanied with the development (INAUDIBLE, 40:20) to

7    the Riverboat Casino owned by the (INAUDIBLE, 40:26,

8    TALK OVER) whereas the FDC as a member of the Grand

9    Soleil is in need of funds to loan to Grand Soleil in

10   order to finance a portion of the Grand Soleil

11   project.

12       And whereas to provide financing for purposes of

13   1) Consolidating any refinancing by a bank; 2)

14   Providing funding for the Grand Soleil project; 3)

15   Funding at that service reserve and 4) Paying certain

16   costs to issue the bonds, records to hold.  The

17   Corporation proposes to issue $50 million taxable,

18   giving revenue bonds during the 2008, all pursuant to

19   a Trust indenture dated as of January 1, 2008, between

20   the Corporation and Wells Fargo Bank, National

21   Association and Trustee for the bond.

22       And whereas the Corporation has agreed to loan

23   the FDC the bond proceed sale funds that the FDC

24   (INAUDIBLE, 41:25, COUGHING) loan of Grand Soleil,

1   LLC, for purpose of those Grand Soleil projects.

2          And whereas the loans from the FDC to Grand

3   Soleil, LLC, will be originated by Grand Soleil, LLC,

4   at the rate interest of 2.75 percent higher than the

5   rate of interest paid by the Corporation to the bond

6   holders and the FDC will act as a conduit for

7   transferring all payments to Grand Soleil for the

8   Corporation.  The Corporation is used to make the

9   required payments to the loan and the bond.

10          Whereas the directors of the corporation and sole

11   shareholder believes 1) The consolidation of the Lake

12   of the Torches Grand Casino ownership, the management

13   and Corporation, 2) The amendment of the Articles, and

14   3) The loan to the FDC to be in the best interest of

15   the Corporation and its sole shareholder.

16          Therefore, be it resolved that the Resolution is

17   approving consolidation of LOTC Casino under the

18   Corporation, resolved that the acquisition of the FDC

19   as it originally purchased the casino by the

20   Corporation is hereby approved, and that all three

21   resolved the Lease Assignment for the Corporation, the

22   FDC dated September 1, 1995, casino site terminated

23   and the Corporation owned and operate the entire Lake

24   of the Torches Casino under the lease issued to the

97

1    appropriation by the Tribe August 17the and December

2    29th, 1995.

3         And read further that the Corporation by

4    (INAUDIBLE, 42:51, TELEPHONE RINGING) and each of them

5    is hereby authorized and (INAUDIBLE, 42:53) in the

6    name and (INAUDIBLE, 42:58), and shareholders and

7    Board of Directors of the Corporation regarding the

8    purchase of the Corporation (INAUDIBLE, 43:08) all of

9    the assets of the assets of FDC related to the

10   original purchase of the casino as described, therein.

11        A copy of the Purchase Agreement is hereby deemed

12   ordered to be filed with the Records of the

13   Corporation, and we also resolve that any and all

14   additional communication, instruments, and

15   certificates contemplated and required as necessary or

16   appropriate (INAUDIBLE, 43:25) other transactions

17   contemplated (INAUDIBLE, 43:30) are approved with such

18   date (INAUDIBLE, 43:31), should have two Officers who

19   shall execute the purchase agreement and such initial

20   agreement, instruments, documents, and shall approve

21   (INAUDIBLE, 43:41) by such individuals be conclusive

22   evidence of their approval of an such changes or

23   additions

24        Be it further resolved that the Officers of the

98

1     Corporation be and is each hereby authorized to

2     deliver the Purchase Agreement subject as shown in

3     these documents and (INAUDIBLE, 43:59) so executed

4     (INAUDIBLE, 44:00) other parties there who against

5     delivery to the Corporation of the Purchase Agreement

6     but that additional agreement, instruments, documents

7     (INAUDIBLE, 44:06) by the other party.

8          Thereto, be it further that Article 4 of Articles

9     be reaped as needed (INAUDIBLE, 44:15), Article 3, and

10    also that Article 3, (INAUDIBLE, 44:16) be amended in

11    its entirety to be the sole shareholder of the

12    Corporation of the Tribe and interest of the

13    Shareholder shall be represented for all purposes by

14    Members of the Tribal Council who shall represent the

15    shareholder's interest (INAUDIBLE, 44:34) issued only

16    during the term of office.

17         And be it further resolved that the loan from the

18    Corporation of the FDC for purposes of the FDC loan,

19    Grand Soleil, as described above is hereby approved.

20         And be it further that the Officers of the

21    Corporation be and then is hereby is authorized

22    (INAUDIBLE, 44:49) directed in the name and on behalf

23    of the Corporation that such loan documents as may be

24    required to loan funds to the FDC (INAUDIBLE, 44:59).

1    A copy of such loan document hereby being ordered to

2    be filed into to the Records of the Corporation.

3         And may all three resolve that any and all

4    additional agreements of these service documents

5    (INAUDIBLE, 45:09) contemplated and required as

6    necessary, appropriate for the effectuation of the

7    transaction contemplated by the loan documents or

8    approved with such changes varying on the addition.

9    There to the Officers who shall keep the loan document

10   and such additional agreements, instruments,

11   documents, shall approve the signing thereof by such

12   individuals (INAUDIBLE, 45:29) twofold.

13        Any such changes or additions can be assertive as

14   Officers of the Corporation be and at least

15   (INAUDIBLE, 45:34) is authorized to deliver the loan

16   documents and such additional agreements, instruments,

17   documents (INAUDIBLE, 45:42) so executed the other

18   parties thereto (INAUDIBLE, 45:46) loan documents,

19   and such additional agreements, documents, and

20   instruments shall be (INAUDIBLE, 45:49) by the other

21   party thereto.

22        Be it further resolved that officers of the

23   Corporation be and so that it is hereby authorized in

24   authority to take all but further action (INAUDIBLE,

1    46:00) as their sole discretion and especially be

2    necessary, proper, and hereby advisable in order to

3    carry out the essential intent and to accomplish the

4    purpose for the (INAUDIBLE, 46:10) Resolutions and

5    fully perform the obligations and appropriations again

6    (INAUDIBLE 46:14) documents get delivered pursuant

7    thereto.  And finally resolve that any and all actions

8    heretofore (INAUDIBLE 46:22) made by the Officers of

9    the Corporation consist of (INAUDIBLE 46:30) foregoing

10   Resolutions be and they hereby are ratified, confirmed

11   and approved in all respects.

12        MURIEL FRALICK:  Can you summarize that in all

13   one paragraph and tell me what were you reading?

14        BEVERLY BAUMAN:  What was she reading?

15        MIKE CHRISTENSEN:  There was one thing in there

16   that you read about two signatures.

17        GERALDINE BROWN:  For the Resolution?

18        MIKE CHRISTENSEN:  You were reading fast and all

19   you said was two signatures and the FDC --

20        GERALDINE BROWN:  You talk fast.

21        CARL EDWARDS:  -- and the FDC -- what is the FDC?

22        MIKE CHRISTENSEN:  Federal Development

23   Corporation.

24        CARL EDWARDS:  Oh, I thought you said FCC.  It is

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

101

1          hard to hear back here.

2                  FEMALE VOICE:   That was a lot of reading.

3                         **END OF TAPE 2 – SIDE A**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1        **TAPE 2 - SIDE B**

2            BRIAN PIERSON:  I drafted it and I know it is

3        legalese and gobbledy.

4            MURIEL FRALICK:  So can you summarize it?

5            BRIAN PIERSON:  Sure.

6            MURIEL FRALICK:  So I can understand it?

7            BRIAN PIERSON:  Absolutely.  I tried to divide

8        the whereas clauses by topic so in order for the EDC

9        to become an owner of the entire Lake of the Torches

10       Resort Casino, there are several documents.  An Asset

11       Purchase Agreement is the main document.  It's the

12       Agreement whereby the Federal Development Corporation

13       transfers, no money changing hands, all of its

14       interest in the LOTC Resort Casino to the Economic

15       Development Corporation.

16           Even though they are both subsidiary corporations

17       of the Tribe and therefore, in now way adversarial to

18       each other, we still have to have a legal

19       documentation for it so that if anybody ever asks, you

20       know, who owns the Corporation, you will be able to

21       show that the assets were in the FDC and now have been

22       transferred.

23           So that's what the first whereas clause is all

24       about.  They go through that history of how it came

1   about, the EDC was owning and operating the Hotel

2   Casino and the FDC was owning and operating the -- I

3   am sorry, the EDC is the Hotel and Convention Center

4   and the FDC was the Casino.  And just that division or

5   ownership in management is -- the very last clauses

6   were in my best understanding were based on discussion

7   with Tribal people, people from the Tribe with Bill

8   Gelcher (phonetic) -- over the years, stuff I knew.

9   So my understanding of this is reflected here and Bill

10  Gelcher can confirm this and the drafts were

11  circulated.

12      The second part of this Amendment of the

13  Articles, really a very minor one, Bill Gelcher

14  (phonetic) sent me an email several weeks ago about

15  this.  Why do our Articles say that we are a non-

16  profit Corporation?  And I puzzled over this and I

17  asked one of our corporate guys and there was also

18  standard language that was used for the Articles, for

19  the Bylaws and 501-C3 Corporation.

20      It says that none of the profits will (INAUDIBLE,

21  4:08) to the benefit of any private individual.  And

22  if you didn't change this, it would be okay, it's just

23  it is odd to have it as a non-profit corporation.

24      Actually what it is, is it is a for-profit

1    whose single Shareholder, the Tribe, is already a

2    nontaxable entity.

3         And it would just confuse people to continue

4    to -- it was using language that made it sound like it

5    was trying to hold itself out like a 501-C3.  But to

6    be a 501-C3 you have to be engaged in charitable

7    activities.  Whatever your interpretation of gaming,

8    and I am very favorable disposed to gaming myself, I

9    don't regard it as a charitable undertaking.  That was

10   just sort of fixing up the Bylaws.

11        And I think what was going on there for a little

12   historical digression, I think at the time this was

13   Bill's guess, and it made sense to me, there were

14   Bills in Congress taking Tribes, particularly taxing

15   casino revenue, and he thought by throwing in that

16   language maybe you could qualify for 501-C3 status.

17   Well, you know, both bills have not gone anywhere.  I

18   know bills like that and even if it were that language

19   wouldn't help.

20        The third major thing adjoined with this is the

21   loan to the FDC.  Remember it's the FDC that a member

22   of the LLC Grand Soleil so they need the money to loan

23   to the LLC.  The issuer of the bonds has to be the

24   entity that has the casino revenue to pledge, so the

1    EDC is borrowing the money from Saybrook and then they

2    have to get it to the FDC which in turn loans it to

3    the LLC.

4        So the third thing we are accomplishing by this

5    is the approval of the loan from the EDC to the FDC,

6    and that is it.  Those are the three items covered by

7    the Resolution.

8        MURIEL FRALICK:  Why do we have to transfer them?

9    Why do we have to transfer the casino to the EDC?

10       BRIAN PIERSON:  You don't have to, this is

11   something that's been discussed by Leadership over the

12   last few years.

13       MURIEL FRALICK:  I know it is in the works; I am

14   just trying to understand the reality of why.

15       BRIAN PIERSON:  I think it was because the

16   division was considered like a historical accident and

17   people who were around then might know better than me,

18   but I believe that if the FDC Charter had been

19   approved by the Secretary of the Interior earlier, Al

20   Bacall, who was legal counsel at the time probably

21   would not have bothered with the EDC and all the loans

22   would have been made by the FDC.

23       The Tribe ended up with these two Corporations

24   and yet Lake of the Torches Casino is operated under

1     one CEO, Bill Gelcher (phonetic) and it is marketed to

2     the public that as one -- as one entity and just for

3     operational simplicity and logic the idea was it makes

4     more sense to consolidate.  Under the FDC, we do the

5     off-Reservation stuff, and the EDC would just do LOTC

6     Casino.

7          MURIEL FRALICK:  Well, are they securing us in

8     any way by doing this?  Are they securing anything for

9     the tribe?  Is that part of the reason of doing it?

10          BRIAN PIERSON:  I mean part of the reason is the

11     bond deal would be more complicated because we would

12     be then -- it would be more complicated because two

13     separate entities would have to pledge.

14          The main thing driving this is the casino

15     revenue, but I think the hotel revenue is (INAUDIBLE,

16     7:45).  That's all the Corporation revenue, so that

17     would have complicated it.  I think primarily the

18     reason of simplifying the management and the

19     structure.

20          So now going forward, you know your CEO, it is

21     clear to him that he is not balancing two corporations

22     in running that thing over there.  The facility is all

23     under one corporation and under one management

24     structure.

1        MURIEL FRALICK:  I have one other question,

2    because I am not going to be signing the applications

3    for the license, will you be changing the $50 million

4    dollar figure in this resolution if·it gets passed?

5        KEVIN SHIBILSKI:  That effectively becomes $41

6    from that reserve, it is hardly being spent, it is

7    sitting there, you pay it off.  If we change the

8    amount of the borrowing, then we undo all of this.  If

9    you just refuse to apply, the effect of the result of

10    that consequence is clear, that $9 million or $8.75 is

11    not going to be released.  You have real power, you

12    have to stay

13        MURIEL FRALICK:  So we have to stay at the $50

14    million at this point?

15        KEVIN SHIBILSKI:  Yes, to do the bond deal as we

16    structured, yes, but you shut down, $9.

17        CARL EDWARDS:  Call for the question.

18        VICKI DOUD:  (INAUDIBLE, 9:16) all those in

19    favor, say aye.

20        ALL:  Aye.

21        VICKI DOUD:  Opposed.

22        MURIEL FRALICK:  I oppose.

23        TOM MAULSON:  Opposed.

24        VICKI DOUD:  Three opposed, one abstention,

1        Resolution carried.

2            TOM MAULSON:  I may have to borrow the money?

3            CARL EDWARDS:  (INAUDIBLE, 9:33) Resolution for

4        the Federal Development Corporation, Resolution

5        approved borrowing of the -- from the EDC and the loan

6        to the Grand Soleil which is Number 4 on your sheet

7        and it starts out with:  Federal Development

8        Corporation, only one ahead on top of it.

9            MURIEL FRALICK:  What does it start off with?

10           CARL EDWARDS:  Federal Development Corporation,

11       on top, it says transferring assets, if you look at

12       your sheet.

13           MURIEL FRALICK:  Certain assets?  Does it say

14       certain assets?

15           CARL EDWARDS:  There it is.

16           MURIEL FRALICK:  Will somebody please read that

17       for me?

18           CARL EDWARDS:  Yes.

19           (INAUDIBLE, 10:09, TALK OVER)

20           CARL EDWARDS:  Do you want an adoption on the

21       second?

22           (INAUDIBLE, 10:29, TALK OVER)

23           BRIAN PIERSON:  It is the only resolution of the

24       Federal Development Corporation at the very top in the

1    caption.  There are two Tribal resolutions and two EDC

2    Resolutions.  There is only one (INAUDIBLE, 10:45,

3    TALK OVER).  This one accomplishes three things:  It

4    transfers the assets to the EDC.

5         MURIEL FRALICK:  Certain assets?

6         BRIAN PIERSON:  Certain assets.  That's because

7    it's not transferring, for example, its interest in

8    Grand Soleil, and I don't know, maybe the FDC is

9    involved in the hotels, too.  It's only -- I say

10   certain assets because it is transferring in Lake of

11   the Torches Resort Casino.

12        It is also the approval of the borrowing of the

13   funds from the EDC and then turning around and

14   approving the loaning of those funds to Grand Soleil.

15   And those are the bond proceeds.

16        Whereas Lake of the Torches Federal Development

17   Corporation, and in this one, we call it, the

18   Corporation is the FDC, is a Corporation chartered by

19   the Secretary of the Interior pursuant to Section 17

20   of the Indian Reorganization Act, 25 USC, Section 477,

21   and wholly owned by Lac du Flambeau band of Lake

22   Superior Chippewa Indians, a federally recognized

23   American Indian Tribe, organized pursuant to the

24   Indian Reorganization Act of 1934.

1          Whereas the Board of Directors of the Corporation

2     is the governing body of this Corporation pursuant to

3     its Articles of Incorporation and Bylaws and whereas

4     the Corporation's Articles of Incorporation provides

5     that the Board of Directors has the authority to do

6     all things necessary to actively and aggressively

7     participate in all matters pertaining to the social,

8     economic, and industrial welfare of the Lac du

9     Flambeau band of Lake Superior Chippewa Indians and to

10    engage in any lawful act or activity which may be

11    necessary or appropriate for carrying out and

12    accomplishing any of the foregoing objects approaches,

13    aside, that language is drawn from the Bylaws.

14          Whereas Lake of the Torches Economic Development

15    Corporation herein after referred to, as the EDC is a

16    Corporation chartered under Tribal law, both wholly

17    controlled by the Tribe.  And whereas on August 17,

18    1995, the Tribe issued a lease to the EDC for parcels

19    of land comprising of the site of Lake of the Torches

20    Casino, Lac du Flambeau, Wisconsin, herein after,

21    Casino.

22          Whereas on December 29, 1995, the Tribe issue a

23    lease to the EDC for parcels of land comprised of the

24    site of Lake of the Torches Hotel and Convention

1      Center and adjacent parking area of Lac du Flambeau,

2      Wisconsin, herein after collectively as the Hotel.

3          Whereas the EDC has continued to own and operate

4      the Hotel since 1996, and whereas the EDC assigned its

5      lease on the Casino to the Corporation that is the FDC

6      by a lease assignment dated September 1, 1995.  And

7      whereas the Corporation has continued to own and

8      operate the Casino since 1995 and whereas, the Casino

9      and Hotel are operated and promoted as a single

10     business known as the Lake of the Torches Resort and

11     Casino.

12         Whereas the division of the Lake of the Torches

13     Resort Casino ownership and management between the

14     Corporation and the EDC was made aware to facilitate

15     the separate financing of the hotel and Casino in 1995

16     an 1996, and whereas the 1995 and 1996 known as the

17     financed construction of the Casino and hotel have

18     been paid off.

19         And whereas, the division of the Lake of the

20     Torches Resort Casino ownership and management has

21     created inconvenience operationally and confusion

22     among outside entities.  And whereas the Tribe's

23     business strategy provides that ownership and

24     management of all components of Lake of the Torches

1  Resort Casino be consolidated under the EDC and

2  whereas the Tribe's business strategy provides that

3  the Corporation that is the FDC focus its economic

4  development activities on opportunities outside the

5  Reservation.

6  And whereas the Corporation understands that

7  William Gelcher (phonetic) heretofore, Chief Executive

8  Officer of the Corporation and EDC shall follow in the

9  consolidation of the Lake of the Torches Resort Casino

10  under the EDC no longer hold the position of Chief

11  Executive Officer of the Corporation but shall

12  continue and manage Lake of the Resort Casino as Chief

13  Executive Officer of the EDC.

14  Now the next set of whereas clauses relate to the

15  loan from the Corporation to Grand Soleil using funds

16  borrowed from the EDC, the bond proceeds.  Whereas the

17  Corporation is a member of Grand Soleil Natchez, LLC,

18  a Mississippi limited liability company herein after

19  referred to as Grand Soleil which is developing a

20  gaming complex at Natchez, Mississippi consisting of a

21  riverboat casino, a hotel and a bed and breakfast inn

22  collectively called herein after Grand Soleil Project.

23  Where as there are certain outstanding bank

24  loans, the bank debt, which have been incurred to

1       finance the Casino and the Grand Soleil Project and

2       the Corporation has determined to refinance and

3       consolidate the bank debt, and whereas, the

4       Corporation as a member of Grand Soleil is in need of

5       funds to loan to Grand Soleil in order to finance a

6       portion of the Grand Soleil Project and whereas to

7       provide financing for purposes of:  1) consolidating

8       and refinancing the bank debt; 2) Providing funding

9       for the Grand Soleil Project; 3) Funding a debt

10      service reserve, and 4) Paying certain cost of issuing

11      the bond on referenced below.

12          The EDC proposes to issue its $50 million dollar

13      taxable faming revenue bonds Series 2008, herein after

14      the Bond, all pursuant to a Trust indenture dated

15      January 1, 2008, between the EDC and Wells Fargo Bank

16      National Association as Trustee for the bonds.  And

17      whereas the EDC has agreed to loan to the Corporation

18      from bond sale proceeds funds that the Corporation in

19      return will loan to Grand Soleil, LLC for purposes of

20      the Grand Soleil Project and whereas the loan from the

21      Corporation to Grand Soleil, LLC will be repaid by

22      Grand Soleil, LLC, at a rate of interest that is 2.25

23      percent.  That should be changed to 2.75 percent

24      higher than the rate of interest paid by the EDC to

114

1     the bond holders.

2          And whereas the Corporation will act as a

3     conduit by transferring loan payments from Grand

4     Soleil to the EDC for the EDC's use in making the

5     required payments to the bond holders.

6          And whereas the Board of Directors has determined

7     that no laws, ordinances, resolutions or other actions

8     of the Board of Directors, Tribe, or any other

9     agencies or instrumentalities of the Tribe either

10    written or established by tradition prohibit the Board

11    of Directors of approving the bonds from the EDC or

12    the loan of bonds to Grand Soleil, LLC as described

13    above or from entering into any of the foregoing

14    agreements by the indicated party or being create any

15    obligation of the Board of Directors to submit these

16    matters of approval of or consent from any Officer,

17    bond agency, or instrumentality of the Tribe, or any

18    vote by Tribal Members of the Tribe.

19         And whereas the Directors and sole shareholder of

20    the Corporation believe the aforementioned

21    consolidation of the Lake of the Torches Resort Casino

22    ownership and management and 2) Loan from the

23    Corporation to Grand Soleil, and 3) Borrow the funds

24    from the EDC to be in the best interest of the

115

1    Corporation.  And its said sole shareholder, now

2    therefore be it, and these are now in a matter or⁻

3    order of subject matter.  The first group is

4    resolutions relatc to the EDC.

5        Be it resolved that the transfer of the

6    Corporation's assets relating to the Lake of the

7    Torches Resort Casino to the EDC is hereby approved.

8    And be it also resolved that the termination of the

9    Corporation's lease assignment on the premises of the

10   casino is hereby approved.

11       And be it further resolved that the Officers of

12   the Corporation be it each of them hereby is

13   authorized, and powered and directed in the name and

14   on behalf of the Corporation to execute that certain

15   Asset Purchase Agreement by and between the

16   Corporation and the EDC in substantially the forms

17   submitted to the sole share holder and the Board of

18   Directors of the Corporation regarding the purchase by

19   the Corporation of substantially all the assets the

20   seller has described in the Purchase Agreement.

21       A copy of the Purchase Agreement hereby being

22   ordered to be filed with the Director of the

23   Corporation; we have also resolved that any and all

24   additional agreements, instruments, documents and

116

1.    certificates contemplated and required necessary or

2    appropriate for the effectuation of the transaction

3    contemplated by the Purchase Agreement are hereby

4    approved with such changes there and additions thereto

5    as the Officers who shall execute the Purchase

6    Agreements such additional agreements, instruments,

7    documents and certificates shall approve the signing

8    by such individuals be inclusive evidence of their

9    approval of any such changes or additions.

10        And be it further resolved that the Officers of

11    the Corporation being each of them is hereby

12    authorized to limit the Purchase Agreement and such

13    agreements, instruments, documents, and certificates

14    still executed to the other parties thereto against

15    delivery to the Corporation of the Purchase Agreement.

16    Such additional agreements, instruments, document and

17    certificates executed by the other parties thereto.

18    And be in further resolved that William Gelcher

19    (phonetic) heretofore the Chief Executive Officer of

20    the Corporation for purposes of managing Lake of the

21    Torches Resort and Casino shall no longer hold that

22    position and is hereby relieved of all duties relating

23    to the Corporation.

24        And be it further, these next relate to the Bond

117

1       funds from the EDC.  Be it resolved that the borrowing

2       of funds from the EDC as described above is hereby

3       approved and be it further resolved that the Officers

4       of the Corporation be and each of them hereby is

5       authorized to power directed in the name and on behalf

6       of the Corporation to execute such promissory notes

7       and other documents hence thereafter called the EDC

8       Loan Documents as may be required to borrow funds from

9       the EDC as described above.

10          A copy of such loan documents hereby being

11      ordered to be part of the Corporation.  And be it also

12      resolved that any and all additional agreements,

13      instruments, documents and certificates contemplated,

14      required necessary and appropriate for the

15      effectuation of the transactions contemplated by the

16      EDC loan documents are hereby approved.

17          With such changes therein and additions thereto

18      that the Officers who shall execute the EDC loan

19      documents and such additional agreements and

20      instruments, documents or certificates shall approve

21      the signing thereof by such individuals in conclusive

22      evidence of their approval of any such changes or

23      additions.

24          Be it further resolved that the Officers of the

118

1     Corporation be and each of them hereby is authorized

2     to deliver the EDC loan documents and such additional

3     agreement, instruments, documents and certificates so

4     executed to the other parties thereto again.  They

5     will bring to the Corporation of the EDC loan

6     documents and such additional agreements, instruments,

7     documents and certificates executed by the other party

8     thereto.

9          And be it further these are now resolutions

10    relating to Corporation known to be Grand Soleil.  Be

11    it resolved that the loan drawn by the Corporation to

12    Grand Soleil, LLC, as described above is hereby

13    approved.  And be it further resolved that the

14    Officers of the Corporation and each hereby is

15    authorized in part and directly in the name of and on

16    behalf of the Corporation to execute that such

17    documents, Grand Soleil loan documents, has made and

18    required the loan fund for Grand Soleil as described

19    above, a copy of such loan documents hereby being

20    ordered to be filed with the Records of Incorporation.

21         And be it also resolved that any and all

22    additional agreements, instruments, documents and

23    certificates contemplated and described necessary or

24    appropriate for the effectuation of the transactions

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1   contemplated by the Grand Soleil loan documents

2   including as necessary (INAUDIBLE, 22:10, POOR TAPE

3   QUALITY) that the Officers who shall execute the Grand

4   Soleil loan documents (INAUDIBLE, 22:18, POOR TAPE

5   QUALITY) therein approve.  The signing thereof by such

6   individuals will be conclusive evidence of their

7   approval of any such changes or additions.

8        And be it further resolved that the Officers of

9   the Corporation be, and each of them hereby is,

10   authorized to deliver the Grand Soleil loan documents

11   and such additional agreements, instruments, documents

12   and certificates so executed to the other parties

13   thereto against the delivery to the Corporation known

14   as the Grand Soleil loan documents and such additional

15   agreements, instruments, documents and certificates as

16   executed by the other parties entered.

17        And be it further resolved that the Officers of

18   the Corporation be, and each of them hereby is,

19   authorized and empowered to take all such further

20   action in the name of and on behalf of the Corporation

21   as they in their sole discretion view as necessary,

22   proper or advisable in order to carry out the

23   essential intent and to accomplish the purposes of the

24   foregoing resolution and fully perform the obligations

1.      of the Corporation contained in each of the

2.      agreements, instruments, documents and certificates

3.      delivered and shown in (INAUDIBLE, 23:17, POOR TAPE

4.      QUALITY).

5.          And be it further resolved that any and actions

6.      heretofore taken or caused to be taken by the Officers

7.      of the Corporation consistent with intent or purposed

8.      with the foregoing Resolution be and hereby are

9.      ratified, confirmed, approved in all respects.  Don't

10.     ask me to read it again.

11.         TOM MAULSON:  I have a question; I have a couple

12.     of them.

13.         VICKI DOUD:  Tom?

14.         TOM MAULSON:  Page 3 of the (INAUDIBLE, 23:43) in

15.     reference to the -- there is a provision in there that

16.     talks about (INAUDIBLE, 23:46, POOR TAPE QUALITY) and

17.     the third, fourth word on the very bottom it's

18.     definitely identified any vote by Members of the

19.     Tribe.  Why was that in there?  What is your perfect

20.     (INAUDIBLE, 24:08) then?

21.         BRIAN PIERSON:  That I believe was -- may have

22.     been a request from -- I believe that was the request

23.     of the bondholders.  I have to check.  You know, there

24.     have been a lot of phone conversations and emails back

1    and forth over the last 6 weeks, but I think that's

2    there (INAUDIBLE, 24:28).

3        TOM MAULSON:· Could this jeopardize something if

4    we don't allow the Membership to vote, or if you want

5    to call it Stockholders?

6        BRIAN PIERSON:· No, it couldn't because what this

7    is saying is that the Board has made its

8    determination.  This is an issue that I addressed

9    briefly earlier on and that, Tom, as you know, has

10   come up over the last 10 years.  Again, there's the

11   legal issue and there's the political issue.

12       There is no question and it is authoritative that

13   solicitors opinion on this which when Tribes formed a

14   corporation, it is a separate and legal entity from

15   private government.  And constitutional restrictions

16   on Tribal government including the one we are all

17   aware of under the Tribe's Constitution (INAUDIBLE

18   25:10, POOR TAPE QUALITY) assets don't apply these

19   private Corporations.

20       Now that's a separate issue from, you know, your

21   communications with your constituents and whether or

22   not you want to put that out for the sense of the

23   community.  Legally it is not required.  Whether or

24   not politically it is a wise thing to do is a separate

1       question.

2           TOM MAULSON:  My second question is on Page 5.

3       And that's the Resolution, one, two, three, resolved,

4       in about the center, it says a limited waiver in the

5       Corporation's community.  What does the Corporation

6       have when it have, when it carried their Tribal hat

7       into this Corporation subject to, I mean, could a

8       Tribal member sue us for zero active duties or --

9           BRIAN PIERSON:  No, enough.

10          BRIAN PIERSON:  Tribal Corporations, the law is

11      pretty well settled on this.  If a Corporation is

12      owned and controlled by a Tribe, it shares the Tribe's

13      immunity from suing, your housing authority's immunity

14      from suing.  The FDC has immunity from suit.

15          The EDC has immunity from suit.  This was put in

16      because the documentation for the (INAUDIBLE, 26:32)

17      the loan going from the FDC to the LLC, wasn't sure

18      whether it was a paid thing in there, I would not

19      offer it to them, a waiver to the FDC's immunity.  I

20      don't think it should be required because the FDC will

21      be the one making the loan, so I would like to avoid

22      that issue, but I put it in the Resolution just in

23      case, you know, the purchasers of the bond raising -

24      I didn't want to have to come back.  I mean, this is

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1    certainly something that needs to be taken care of.

2        TOM MAULSON:  I mean, what they call a limited

3    waiver, what do you mean by limited, 25 percent, 50

4    percent, 75 percent limited?

5        BRIAN PIERSON:  You know, limited, but in

6    practice all of these waivers that the Tribe has

7    entered into since 1995 on basically provide, they

8    usually provide for -- well, it's a limited waiver,

9    limited only to the --

10       TOM MAULSON:  To this issue.

11       BIRAN PIERSON:  Yes, and the other party that

12   you're are entering into the contract with, so it is

13   limited in that sense.  The Tribe usually puts in

14   there that it is limited to federal court unless the

15   federal court rejects jurisdiction, then the Tribe

16   agrees to stay put.  And there is no federal

17   jurisdiction, so as a practical matter you are being -

18   -

19       MALE SPEAKER:  (INAUDIBLE, 27:49).

20       BRIAN PIERSON:  Thank you.  But, you know, it is

21   for enforcement of these particular agreements, so

22   whether it was (INAUDIBLE, 27:59) in 1995 that gave

23   you 10.7 or Saybrook that's going to forward the $50

24   million, we want a waiver saying if we don't get paid

124

1    back, we have remedies, we have suit.

2        VICKI DOUD:  Any other questions?

3        HAROLD JACKSON:  Yeah, I have a question.  I

4    listened to a lot of recent talk here, you know,

5    trying to question (INAUDIBLE, 28:25) in the last

6    (INAUDIBLE, 28:27) and then you hear one final word of

7    conversation on liabilities and indemnifications,

8    whatever, and reality, in the real world, we really

9    talking about who takes the hit.  There is no

10   discussion here.

11       Nobody has been willing to discuss who, which  it

12   will be here, just who will take the ultimate hit if

13   this money is spent and squandered?  Now, you never

14   once said (INAUDIBLE, 29:02).  Or a liability, who

15   takes the hit?

16       For instance, say the Tribe doesn't want to

17   operate this casino anymore, I don't think the Council

18   will allow that, but there are tribal members here who

19   might say, well, we're not going to let this casino

20   operate, and they could do that, they can take the

21   casino to the ground and just say, we are going to --

22   we're screwing that or whatever.

23       You know, that's a self-imposed liability.

24   When the money comes down and it's honest.  But none

125

1     of you have talked about that and been honest about

2     that because you haven't told any of these Indians in

3     here that they're going to be piss poor, out-of-

4     pocket, without any money.

5          They will be looking at each other saying what

6     happened to it, you know, who did this, who is liable

7     for it?   Is it the bond company that has the

8     liability or is it this Corporation that we are going

9     to bed with?  Commit this so-called legal (INAUDIBLE,

10    30:14).

11         All I have seen is some greasy legal talk.  This

12    Corporation is going to stick it to this Tribe.

13    That's it.  The only one that's going to be liable for

14    this are my fellow band members and they may not even

15    copy each other, they may not even like each other,

16    but they will be just as broke, just as poor, each

17    one.

18         BRIAN PIERSON:  Well we can't tell you, if our

19    money is (INAUDIBLE, 30:44) question, you are saying

20    what -- if Lake of the Torches Resort Casino is

21    pledged to -- that revenue is pledged to repay this

22    and the Members choose to shut that down, I think it

23    is pretty clear, Kevin, weigh in on this that in that

24    event, the bonds are callable, what would happen?

1         KEVIN SHIBILSKI:  You would be forced to

2    refinance the account (INAUDIBLE, 31:15) bonds would

3    come to receivership.

4         BRIAN PIERSON:  There would be bad consequences

5    if you -- it's true you can't pledge assets to repay a

6    debt and then shut down the source of repayment

7    without adverse consequences.  Would any of the Tribal

8    members be personally liable?  No.

9         Would it diminish the tribe's ability to deliver

10   services?  Probably, probably there would be bad

11   consequences.  But you know, they are not greasy, it's

12   just the language of the law is not every day speech.

13   I don't talk like this every day, either.  One of our

14   corporate guys, they do this because of long

15   experience.

16        Lawyers learn to think of everything, put it in

17   language in daily speech you would never use.  This

18   language is no different than what is used for most

19   asset loans and resolutions of corporations.  It is

20   very standard type of language, believe it or not --

21   natural language.

22        HAROLD JACKSON:  You know, because in your own

23   way you just told us that this Tribe and these Tribal

24   members cannot sue this corporation in Federal court,

1    we can't go to court for it and neither can they.   The

2    only thing that we can do is come here on a given a

3    day, set time and place, and bitch about it.

4         And that's all – that's only recourse that Indian

5    Tribes are allowed under this Federal Development

6    Corporation rules to screw us out of our assets;

7    that's the crux and basis of Cobell (phonetic) lawsuit

8    going through a Federal court system, that reality

9    alone that all the Tribes be screwed royally.   And in

10   your language, it's just a passive freedom tag.   Yes,

11   we have separate laws for corporate issues and

12   opinions and one is:   You can't go to Federal court to

13   get your money back.

14        BRIAN PIERSON:   Most people consider the Tribal

15   side of the union a good thing.   It's actually from

16   lawsuits by third parties and it protects Tribal

17   treasuries, I mean, I don't know --

18        HAROLD JACKSON:   It doesn't protect our assets,

19   in this case.

20        BRIAN PIERSON:   It doesn't protect the casino,

21   that alone, that is being pledged to pay us back,

22   that's true.

23        HAROLD JACKSON:   There should be some

24   indemnification, insurance, whatever offered along

1    with this.

2        BRIAN PIERSON:  What kind of indemnification do

3    you mean?  I am trying to understand what you mean.

4        HAROLD JACKSON:  There should be some kind of a

5    guarantee, some kind of insurance policy that

6    guarantees the loan.

7        BRIAN PIERSON:  That would insure against?

8        HAROLD JACKSON:  Against our loss through gross

9    mismanagement or failure in action.

10       BRIAN PIERSON:  There you go, and I mean, Kevin

11   said before --

12       HAROLD JACKSON:  Every corporation that I know of

13   takes out insurance like that, to insure their assets

14   to make sure -- General Motors, Ford, to Halliburton,

15   to anybody else, even the Federal government, to make

16   sure that whatever they execute will be delivered.

17   But in this case, you're saying the Tribe doesn't have

18   anything.

19       BRIAN PIERSON:  The Tribe has insurance.  Lake of

20   the Torches is insured.  I haven't seen it.

21       BETTY JACK:  Cato is suing the Corporation.

22   (INAUDIBLE 34:38, TALK OVER).

23       BRIAN PIERSON:  I have to kind of take my orders

24   from the Chair.  I will be glad to respond if the

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

129

1        Chair will let me.  I'm sorry, go ahead.

2            BETTY JACK:  Cato is suing the Corporation, but

3        Tribal members can't?

4            BRIAN PIERSON:  Well, here is my understanding,

5        again, I explained about this earlier and I am not

6        representing the Tribe on this so, it's just from my

7        input.  He sued the Tribe in a Federal district court

8        in Florida.  The suit was dismissed.  My guess is that

9        the Tribe is immune from suit by him; so far he has

10       not successfully sued.

11           BETTY JACK:  Tribal members can't sue a

12       corporation.

13           BRIAN PIERSON:  Tribal members can sue a

14       corporation they just can't sue a corporation that is

15       wholly owned by the Tribe without the Tribe waiving

16       suit.  Just like, you know, construction contractors

17       can't sue the Tribe unless the Tribe waives immunity.

18       You know, most Tribes guard their immunity pretty

19       closely and they don't redeem waiver at all, but they

20       all have to waive it whenever people start loaning

21       them millions of dollars.  You have to recognize that

22       the people who are risking millions of dollars will

23       require that they get a waiver so that if the thing

24       goes sour they have avenues.

130

1    BETTY JACK:  The Tribal Council is also the Board

2    of Directors of the Corporation, where to they fit

3    into the whole scenario?  If we are going to put the

4    whole thing up, what if the $50 million, what if they

5    walk off (INAUDIBLE, 36:37) what happens to the

6    corporation, is it no longer, then?

7    BRIAN PIERSON:  Oh sure there's a corporation.

8    What the consolidation does is it -- right now there

9    are two corporations for Lake of the Torches Resort

10   Casino.  Lake of the Torches Economic Development

11   Corporation and this is kind of (INAUDIBLE, 36:57) of

12   history from the 1995 original funding. Lake of the

13   Torches Economic Development actually has a lease on,

14   owns and operates the hotel and the convention center.

15   Lake of the Torches Federal Development

16   Corporation has a lease on actually, actually has

17   signed that lease, on Lake of the Torches casino.  So

18   it is kind of an oddity because both think of it as

19   one.  It has the same management structure, but it is

20   divided.  The Economic Development Corporation will

21   continue on as a separate corporation, its only

22   activity that will be to own and operate Lake of the

23   Torches Economic Development function, Lake of the

24   Torches Resort.

1        Lake of the Torches Federal Development

2    Corporation will also continue and I don't know

3    exactly what the full scope of its activities, but I

4    know one, I know is that it is a member of and owner

5    of this LLC that's building Natchez, so the two

6    corporations will continue.

7        BETTY JACK:  I have a question.  You are getting

8    paid here by the Tribe for your job?  How much do you

9    get paid for the man sitting next to you?  Do you get

10    paid by him to drop all the rig-a-ma-roll?

11        BRIAN PIERSON:  (INAUDIBLE, 38:37) it would be

12    mind numbing.  I am not being paid off by a legal or

13    mental obligation to the Tribe, which is (INAUDIBLE,

14    38:23).  I take direction from the elected leadership

15    and do the best I can.  I know there is an opinion

16    divided.  I appreciate that and I respect that.

17        MURIEL FRALICK:  What is your opinion of the loss

18    of business insurance?  Should we be getting more

19    insurance for the loss of business so that we can pay

20    these debts if something should happen to our casino?

21        BRIAN PIERSON:  I can't that say that I know I

22    looked at that issue.  Maybe loss of business

23    insurance has –

24        RICK LINDSLEY:  Saybrook has requested that point

132

1    of issue in order to be certain the subject does have

2    the casino -- they want to make sure they have it

3    fully insured.  So (INAUDIBLE, 39:13) discussed that

4    issue.

5        MURIEL FRALICK:  And can you also ensure me that

6    there is anything in this document that will allow one

7    person to go out and borrow millions of dollars to

8    support this other corporation, there is nothing in

9    this legalese that allows that?

10       BRIAN PIERSON:  No, no, I can guarantee that.

11       TOM MAULSON:  Does this leave the door open for,

12    I guess, what I would call a more elaborate Lake of

13    the Torches because I believe there was a question

14    about how many times can we leverage the fund of the

15    Lake of the Torches?

16       I guess my question would be to the rest of this

17    Tribal Council, this governing body, are we going to

18    move forth because now, after tonight are we saw that

19    this here loan will go through and will definitely

20    take a pressure off, I guess our Treasurer or monies

21    that we do owe out there that we, hoping that we

22    don't, pledge any more Lake of the Torches, can we

23    resolve these here issues once and for all because we

24    got a lot to clean up because we are looking at Bill

133

1    coming over here in the next couple of months or

2    whatever.

3        He's going to say I want another $50 million to

4    do a major expansion across the road, and you know and

5    I know that we are leveraged out, I think, I don't

6    know. I guess that's my -- I am asking that question.

7    I will allow you to my colleagues here.

8        RICK LINDSLEY:  But then, Tom, if I may, as I

9    said before then Steve Stifel and Robert Baird, they

10    still had your legal lending money was probably --

11    your asset was probably around $65 million, let's say,

12    $65 so from a standpoint financially, can you?

13        Yes, but realistically people aren't going to

14    want to take the position to giving you a $50 million

15    dollar bond offering for the bond offer or $12 million

16    or whatever the amount comes to be.

17        And the other thing, too, is that Saybrook has

18    the ability to look at the money that does come

19    through so there are going to have to be an awful lot

20    of answers before that's done.  My opinion is that you

21    would want the books being looked at, you know, until

22    we get a substantial income.  And again, we positioned

23    this so we could refinance for Grand Soleil, we did

24    have Saybrook come in from (INAUDIBLE, 42:04).

1     (INAUDIBLE 42:19, TALK OVER)

2     HAROLD JACKSON:  I just have a comment, a short

3     comment, listening to what you read and all what the

4     readers read and your documents, I have to say that

5     there is only one person in all of these documents

6     that will rise up out of this whole scenario, totally

7     stake free and that would Mr. Bill Gelcher (phonetic)

8     because he has put the law upon himself and not come

9     forward to be a part of this whole venture, at least

10    in a supervisory capacity.

11    And he will rise, he will move on after this

12    churns up here at Lake of the Torches.  The only

13    consolation I have for that is he won't be rising up

14    in the ranks of casinos.  He can only go to another

15    casino or a lesser casino than the one we got.  The

16    fact that he has no record proving profits here at

17    Lake of the Torches; he is the only one that will rise

18    up out of this.

19    VICKI DOUD:  Beverly?

20    BEVERLY:  I think you are wrong there because

21    Bill is married to a Tribal member.  He is not going

22    to jeopardize his wife's Tribe just to make himself

23    .  rise above others.

24    HAROLD JACKSON:  Oh, I said in the legal

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1    documents, it is written in there that he doesn't have

2    to be part of any of this so he will be free from any

3    blame whatsoever.  He's taken very good care of

4    himself.  He has not increased our profit margin, so

5    when he leaves us, the only consolation I have is that

6    he won't be going to a better casino, he will be going

7    to a lesser casino.

8        VICKI DOUD:  He has improved the profit margins

9    annually every year.

10       HAROLD JACKSON:  The only profit that Bill

11   Gelcher (phonetic) takes credit for every year is

12   because the sun rises every day and a few more kids

13   are of age to get in there to gamble.  That's the only

14   profit and I have tracked that profit since Day 1 when

15   we had that casino.  Every year a certain amount of

16   kids come of age to gamble and that's where our profit

17   comes from.  It doesn't come from mishaps.

18       VICKI DOUD:  Thank you.  Myron you have had

19   your hand up, I will recognize you and then I am going

20   to call for a question.

21       MYRON DOUD:  Okay, there's a couple of question.

22   The first question is:  What's the length of this

23   consolidation?  That's the first question.

24       BRIAN PIERSON:  Five years.

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

136

1        MYRON DOUD:  Five years?  So if the deal goes

2    into receivership and then somebody comes and takes it

3    over like that Grand Soleil venture --

4        KEVIN SHIBILSKI:  Grand Soleil is the LLC that --

5        MYRON DOUD:  I think I am going to manage it

6    since that's casino revenue, we get our per capita --

7    that could be stopped by the LLC that runs (INAUDIBLE

8    45:52, TELEPHONE RINGING).

9        KEVIN SHIBILSKI:  -- so you just pass it on to

10   them, they have to pay half of it; the other half is

11   your other partner.  And you have the actual physical

12   assets and the revenues being made down there.

13        MYRON DOUD:  So that if they do take over they

14   will have to pay.

15        KEVIN SHIBILSKI:  The first thing that happens is

16   the bonds are instated.  They just want their money

17   back.  I think that's fair, they give you $50 million

18   or $40 million, whatever it is, and if you refuse to

19   pay them back.

20        VICKI DOUD:  I want to call on the Resolution,

21   all those in favor, say aye.

22        ALL:  Aye.

23        VICKI DOUD:  Opposed.

24        ALL:  Aye.

1      MADAME RESIDENT:  Three opposed.  Abstained?  One
2  abstention, Resolution carried.
3      MURIEL FRALICK:  May I just ask what our monthly
4  fees will be on that $50 million?
5      KEVIN SHIBILSKI:  The net effect is that you will
6  have cash, the debt will be at the same rate you are
7  at now, plus you get the million dollars.
8      MURIEL FRALICK:  How much is it?
9      KEVIN SHIBILSKI:  I don't have the number.
10      CARL EDWARDS:  Can you get it and get it to
11  Muriel?
12      KEVIN SHIBILSKI:  Yes.
13      MURIEL FRALICK:  Can you get it tonight so that
14  everybody knows.
15      KEVIN SHIBILSKI:  I will introduce the
16  Resolution, the Tribal Resolution approve the
17  guarantee, which is the second one on your sheet.  It
18  starts out with approving Agreement and in lieu
19  waiver.  Just two are left.
20      MIKE CHRISTENSEN:  And these guys gave us $50
21  million?  Okay, I will bring some more white guys in
22  here and get some more money out of you.
23      CARL EDWARDS:  The second one, Muriel, the second
24  one on top of that single sheet, it starts out

138

1    approving Agreement.  This one here, do you see it

2    Muriel.  I introduced and I need an adoption.

3        VICKI DOUD:  Muriel?

4        MURIEL FRALICK:  I just want assurance that no

5    one has the authority in this resolution to borrow any

6    money for the Tribe based on one, you need four

7    signatures.  Can you assure me that, that's not in

8    this Resolution?

9                **END OF TAPE 2 - SIDE B**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

139

1          **TAPE 3 - SIDE A**

2          MURIEL FRALICK:  I just want assurance that it

3     says you cannot go and borrow $2 million dollars

4     tomorrow based on anything in this resolution.

5          CARL EDWARDS:  Offer the question.

6          VICKI DOUD:  Questions been called for.  All

7     those in favor say aye.

8          ALL:  Aye.

9          VICKI DOUD:  Opposed.  Abstained.

10         TOM MAULSON:  Which meeting are we in now,

11    Vickie?

12         VICKI DOUD:  We are in all combined (phonetic).

13         TOM MAULSON:  I will introduce a resolution that

14    we no longer borrow any more monies until our debts

15    are cleared.

16         MURIEL FRALICK:  Second to that.  Adopt.

17         BROOKS BIG JOHN:  Second.

18         (INAUDIBLE, 0:54 TALK OVER)

19         TOM MAULSON:  I would like to offer a question.

20         VICKI DOUD:  Questions been called for.  All

21    those in favor say aye.

22         ALL:  Aye.

23         VICKI DOUD:  Opposed.  Abstained.

24         MALE SPEAKER:  I want to ask to introduce a

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1      resolution to -- I don't know where Myron is at, but

2      he is so worried about the $5 million -- $500 million

3      dollars because that seems to be the thorn in the

4      Tribe's side that -- I would like to introduce a

5      resolution that we apply to a referendum that will --

6      what do you call it, Weeders?

7          That we rescind that $500 million dollars and

8      that any amount that we have to go -- any amount of

9      dollars that we have to go to any type of business

10     that we have to go to a full resolution or to a full

11     referendum that we get away from this thing because it

12     seems to haunt us always.

13          VICKI DOUD:  It was binding.

14          TOM MAULSON:  I know it was binding, yes, but for

15     whatever reason it's haunting everybody.

16          CARL EDWARDS:  Adopt.

17          MURIEL FRALICK:  Doesn't that cover any

18     corporations, also?

19          TOM MAULSON:  Yeah, that means all that, any

20     entity.

21          MURIEL FRALICK:  Any entity of the Tribe?

22          JOHN BROWN:  Call for the question.  Can you re-

23     read that?

24          KEVIN SHIBILSKI:  Oh man, I don't have time to

141

1    reread that.  I would say go to a referendum if you

2    want any money from --

3         VICKI DOUD:  A referendum to rescind.  A

4    referendum that approves the $500 million for

5    authorization in gaming and any dollars that the Tribe

6    extend needs to go over the referendum including all

7    corporations.

8         MALE SPEAKER:  Call for a question.

9         VICKI DOUD:  Questions been called for.  All

10   those in favor say aye.

11        ALL:  Aye.

12        VICKI DOUD:  Opposed.  Abstained.

13        KEVIN SHIBILSKI:  (INAUDIBLE, 3:06) Resolution

14   Number 5, (INAUIBLE, 3:10) approving the

15   consolidation of Lake of the Torches Casino under the

16   EDC, which is the 5th one and the last one.

17        VICKI DOUD:  Resolution adopted and seconded.

18        TOM MAULSON:  Call for questions.

19        VICKI DOUD:  Questions been called for.  All

20   those in favor say aye.

21        ALL:  Aye.

22        VICKI DOUD:  Opposed.  Three opposed.

23   Abstained.  One abstention.

24        CARL EDWARDS:  Motion to adjourn.

142

1          VICKI DOUD:  Second?

2          TOM MAULSON:  I got one -- I got a question

3     on --

4          CARL EDWARDS:  John seconded it.

5          VICKI DOUD:  (INAUDIBLE, 3:54, TALK OVER) Tom,

6     you have a comment?

7          TOM MAULSON:  Discussion, yes.  I would like to -

8     - you guys need to deal with this thing.  The ones

9     that weren't here.  There's three of our Council

10    people that were here.  Our Treasurer here has been

11    accosted today, and now being suspended by our

12    Administrator for doing something wrong which she did

13    --

14         VICKI DOUD:  (INAUDIBLE, 4:13).

15         TOM MAULSON:  I mean, I am making it an issue

16    here.  I am saying that, that should not happen.

17         VICKI DOUD:  You are out of order, Mr. Maulson.

18         TOM MAULSON:  Well, I think they ought to know.

19         GILBERT "GIBBY" CHAPMAN:  You're out of order,

20    Vickie.

21         MADAME PRESIDENT (INAUDIBLE, 4:27)

22         MURIEL FRALICK:  You're out of order, Vickie.

23         (INAUDIBLE, 4:31, TALK OVER)

24         PACO OR CHRISTOPHER FRALICK:  Continue what you

143

1    were saying.

2         VICKI DOUD:  Let's get under -- are there any --

3         TOM MAULSON:  I asked that the people to make a

4    motion.

5         FEMALE SPEAKER:  Aye.

6         TOM MAULSON:  Aye.

7         MALE SPEKAER:  I oppose.

8         VICKI DOUD:  The motion carries.

9         BROOKS BIG JOHN:  I will make a motion that we

10   re-enter back into a forum here.

11        VICKI DOUD:  The meeting has been adjourned.  You

12   asked for a motion to adjourn and it's adjourned.

13        TOM MAULSON:  No, no.

14        (INAUDIBLE, 5:05, TALK OVER)

15        CHRISTOPHER OR PACO FRALICK:  I am ashamed of all

16   of you.

17        (INAUDIBLE, 5:31, TALK OVER)

18        CHRISTOPHER OR PACO FRALICK:  It's already signed

19   and it's already approved.

20        GILBERT "GIBBY" CHAPMAN:  Give it to Vickie.

21        MALE SPEAKER:  Why did the Secretary leave?

22   Seriously.

23        (INAUDIBLE, 5:47, TALK OVER)

24        BEVERLY BAUMAN:  I don't have any idea what

144

1          happened here today.   It would have been all right

2          with me to listen because I don't know what happened.

3                        (INAUDIBLE, 6:30, TALK OVER)

4                           **END OF TAPE 3, SIDE A**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1.  **TAPE 4 – SIDE A**

2   (The meeting started at 17:22 minutes into the

3   tape.  The telephone was dialed and placed on speaker

4   for all to hear.)

5   RICK LINDSLEY:  Hey, Scott, this is Rick.  I have

6   several members of the Tribal Council here with me.  I

7   gave them a copy of the memo that you had sent out.

8   We are just going to talk about the liability of the

9   individual officers who are up for license review and

10  (INAUDIBLE 17:45), I would appreciate it.

11  SCOTT ANDREWS:  Sure, hello everyone, good

12  morning.

13  ALL:  Good morning.

14  SCOTT ANDREWS:  The memo that we submitted to

15  Rick about liability of individuals with the

16  Commission there is essentially with every license

17  applicant there are individuals that have to be found

18  suitable to be associated with that gaming license.

19  And if the situation with the Tribe which is the

20  four Officers of the Tribal Council which are also

21  Officers of the Federal Development Corporation,

22  ordinarily if there is some sort of violation on the

23  level of the Licensee which would be (INAUDIBLE,

24  18:37), it would be Grand Soleil that would be fined

1    or disciplined as the entity and not the individuals

2    that are involved.

3         Unless there is a situation where the individual

4    is acting willfully or maliciously in convention of

5    the requirement that gives him control to act for the

6    Regulations of the Mississippi Gaming Commission; I

7    mentioned to Rick when we put this Amendment together

8    that in my experience we should stand in the offset of

9    gaming in Mississippi, I have only been involved in

10   one particular instance where there was a person was

11   bonded as opposed to a company.

12        And that was a situation where a third party that

13   had an equity ownership in a licensee incrementally

14   transferred that interest without getting prior

15   Commission approval and also did not notify the

16   licensee that he was transferring the venture.  So the

17   licensee was really an innocent bystander in that

18   whole process.  And the Commission recognized that and

19   instead bonded the unappreciated third party that had

20   an ownership interest.  Is there something in

21   particular that I can address or that with which you

22   (INAUDIBLE, 20:20)?

23        RICK LINDSLEY:  I am just opening it up for the

24   Council members, Scott, I don't know if you can hear

147

1    me, but if they have any question of you in

2    particular.

3        MR. BROOKS:  I have a question for you, Scott,

4    this is Brooks Big John, here, good morning.

5        SCOTT ANDREWS:  Good morning, how are you?  I can

6    barely hear you all, by the way.

7        MR. BROOKS:  This is Brooks, here. I am part of

8    the Tribal council.

9        SCOTT ANDREWS:  Yes.

10       MR. BROOKS:  The question I guess I have is that

11   we are talking about liabilities here.  Now not only

12   are these Officers are liable, but I think that

13   everybody that's involved throughout the Corporation

14   will be held liable, won't they?

15       SCOTT ANDREWS:  Which are the to?

16       DEE MAYO:  The Tribal Council.

17       MR. BROOKS:  There are 12 members of the Tribal

18   Council who wear another hat, Scott.  We wear that hat

19   as Corporate Officers.

20       SCOTT ANDREWS:  Right, the four members of the

21   Tribe, I am sorry, I am getting a lot of feedback now.

22   The four members of the Tribal Council, in my

23   understanding they are also the four Officers of the

24   Federal Development Corporation; they are one in the

1    same.  Is that correct?

2        MR. BROOKS:  Yes.  They are also members of the

3    Council.

4        SCOTT ANDREWS:  So we are talking about the same

5    four individuals here?

6        BROOKS BIG JOHN:  Yes, we are.

7        RICK LINDSLEY:  Does that open any liability to

8    the other eight non-officer Council members, Scott?

9        BROOKS BIG JOHN:  I guess that's what I am

10   asking.

11       SCOTT ANDREWS:  It does not because the

12   Commission really has no jurisdiction over them

13   because they are not holder of a finding of

14   suitability.

15       BROOKS BIG JOHN:  Even though --

16       SCOTT ANDREWS:  They are required to be

17   (INAUDIBLE, 22:11).

18       BROOKS BIG JOHN:  Even though they are

19   Corporation members, Scott?

20       SCOTT ANDREWS:  That's correct.  Let's just say,

21   for example, that the Federal Government Corporation

22   violated a gambling law or a regulation in some

23   manner, the Commission, in all likelihood would fine

24   that Corporation in itself.  Now if in investigating

149

1   the matter it was determined that one of the Officers

2   was acting in willful violation or defiant of the

3   Commission, then I could conceivably see how that

4   individual might be fined or have suitability be

5   impacted.  But the other members of the Board, of the

6   Corporation, the other eight, once again, the

7   commission would have no jurisdiction over those

8   members individually.

9       BROOKS BIG JOHN:  Have you had a chance to review

10  our Constitution, which is our Bible here?

11      SCOTT ANDREWS:  I seen it, but I have not looked

12  at it for quite some time.   Is there something in

13  particular that is related to the issue in that

14  document?

15      BROOKS BIG JOHN:  Just that the familiarity,

16  being familiar with it, I guess, and in doing business

17  with the Tribe, I think it is important because their

18  Constitution is the Bible, okay.  There is also other

19  Corporations that we are involved with, some have

20  incorporations, some have bylaws, articles of

21  incorporation, some have bylaws, and they kind of

22  bounds us in certain ways and how we act and what we

23  do.

24      But in my opinion, and it goes with an opinion of

1      one of our attorneys that, that document, I am talking

2      our Constitution, although we wear a separate hat as a

3      Corporate Officer, I guess what I am looking for is

4      basic clarification.  You know, are we still subject

5      to our Constitution when we act as Corporate Officers?

6          SCOTT ANDREWS:  You certainly are.  You certainly

7      are subject to all of those requirements.  However, if

8      you are confronted with a situation where you are

9      bound by the provisions of that Constitution, in those

10     (INAUDIBLE, 25:03) the requirements of Gaming Control

11     Act in the Regulations of the Gaming Commission, then,

12     I can't imagine a situation where that would happen.

13     But I guess presuming for this conversation that would

14     happen, that would certainly be a problem.

15         MR. BROOKS:  Are you familiar with the Indian

16     Reorganization Act, Section 16?

17         SCOTT ANDREWS:  I'm sorry, I'm not.  Is there

18     something in particular that you are sorted out

19     that --

20         BROOKS BIG JOHN:  It has to deal with

21     corporations, Scott and how we are able to take care

22     of business and operate under that particular hat that

23     we are wearing that day

24         SCOTT ANDREWS:  Is that in some way conflicting

151

1 with the jurisdiction of the Mississippi Gaming

2 Commission and its ability to oversee the operations

3 of the Grand Soleil Development as well as

4 jurisdiction over the FDC and the Tribe?

5    BROOKS BIG JOHN:   Let me tell you one thing,

6 Scott, if you're going to be advising us on certain

7 matters to this effect, I think you need to know this

8 IRA, I think you need to know Section 17, 16, they are

9 involved with the Indian Reorganization Act.   I think

10 you need to be up to speed on our Constitution.   I

11 think you need to see a couple of opinions out there

12 by Mr. Pierson and Mr. LaSieur and I think there is a

13 whole lot of stuff that you don't have before you.

14 Before you write a memo to this effect, and you start

15 explaining liability to us.

16    SCOTT ANDREWS:   The purpose of the memo in my

17 charge was explaining liability under the Mississippi

18 Gaming Control ACT and the Regulations of the

19 Mississippi Gaming Commission, both of which I am

20 familiar.   That was the purpose of the memo.·

21    BROOKS BIG JOHN:   Okay.

22    VICTORIA DOUD:   I would like to clarify this is

23 Vicki Doud, that we are going into the venture as a

24 corporation, not under the auspices of the Tribe or

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

152

1    our IGRA, Indian Gaming Regulatory Act under the

2    regular operations of the regular Mississippi Gaming

3    Laws.

4        SCOTT ANDREWS:  That's correct; you're entering

5    this casino development just as any other private

6    party would.

7        BROOKS BIG JOHN:  But we are still bound by our

8    Constitution.  I heard you say that.

9        VICTORIA DOUD:  Yes, we are entering this as a

10   private party.

11       TOM MAULSON:  Scott, this is Mr. Maulson.  I just

12   got to reiterate other than the project, you know, Mr.

13   Big John and myself, we have looked at and talked to a

14   few attorneys out there and they indicated that we

15   need to have full disclosure of what's going on there

16   before we move forward.

17       There are particular areas we looked at and we

18   don't want to be shutting projects down.  We want to

19   make sure that they are done right and that everybody

20   Brooks says needs to understand where we are coming

21   from.  We are an Indian nation even though our

22   President has indicated we won't as individual but we

23   didn't as individual put monies into this project.

24       This was Tribal monies, which is owned by over

153

1        3000 Tribal members here so it is indirectly an

2        Indian-owned project.  There are certain requirements

3        that take place in order for us to continue to go

4        forth in making this thing come to fruition.

5            I guess we need to be very clear in our

6        understanding and I guess that's why we are having

7        this meeting today to get a better handle on how --

8        you know, these are situations that could occur and

9        one of them is a fact that I was told, sitting in a

10       meeting with some other colleagues that indicated that

11       if we do have a Board of Directors that can't meet the

12       MICS of the Mississippi Gaming, you know, there is a

13       possibility that all the ones that took their license

14       and passed their license except for maybe one, you

15       know, could be for naught.

16           That means that we would probably have to sell

17       the interest of that particular boat or whatever, so I

18       would like to get some clarifications in that

19       particular area because, you know, this Tribe is

20       stuck, went out on a limb, you can call it that, to

21       borrow millions of dollars in order to make this

22       venture, you know, go.

23           SCOTT ANDREWS:  I understand your question.  It

24       is the usual and uniform practice of the Regulators

154

1    here, the Mississippi Gaming Commission, to -- when a

2    corporation that is affiliated with a project or and

3    LLC or whatever type of entity that the person that

4    control that corporation or entity have to be

5    individually licensed or what we most typically we

6    call bond suitable.  In the corporation that is the

7    corporate officer is ordinarily President, Vice

8    President, Secretary and Treasurer.

9         Because the Federal Development Corporation owns

10   a portion of the casino entity and then the Federal

11   Development Corporation is in turn owned by the Tribe,

12   the governing body of those two entities had to go

13   through the suitability process.

14        And in negotiations with the Commission, we were

15   able to limit that to the officers only and not any of

16   the other directors.  So in going through, in order

17   for the Federal Development Corporation and the Tribe

18   to maintain their respective bonding suitability their

19   officers also must maintain their suitability.

20        If there's a situation where one of the Tribal

21   officers cannot be found suitable, for instance if a

22   Tribal officer should have a felony conviction that

23   would be a bar to finding that person suitable and

24   that would therefore let suitability of the FDC and

155

1    the Tribe which would require one of two things.

2    Either that person would have to resign as an officer

3    and be replaced or the Tribe and the FDC would have to

4    disassociate from the casino project.

5        RICK LINDSLEY:  Hey, Scott, right now the Board

6    of the FDC is the same as the Board or the Tribal

7    Council.  I am assuming; I don't know if it is in the

8    constitution or the bylaws of the FDC that it states

9    that.  Could the council out of their 12-member Board

10   select a President, Vice President, Secretary and

11   Treasurer of the Federal Development Corporation when

12   they enter into office?  Could they, you know, select

13   those people as the Officers of that corporation,

14   therefore, those are peoples that be presented to the

15   application?  Or does the Commission default back to

16   the Tribal council itself?

17       SCOTT ANDREWS:  The commission often falls back

18   to the Tribe and the Tribal Council because the Tribe

19   owns 100 percent of the Federal Development

20   Corporation.

21       MURIEL FRALICK:  Mr. Andrews, this is Muriel

22   Fralick, I am the new Treasurer of the Lac du Flambeau

23   Tribe.

24       SCOTT ANDREWS:  Hi.

156

1          MURIEL FRALICK:  Hi.  I guess I am the thorn in

2     the side of this project because I have not decided at

3     this point if I am going to apply for the license.  I

4     feel that there has been a lot of mistrust amongst our

5     Council members.  There are two people on the Council,

6     I believe one staff member that has been making all of

7     the decisions on this project.

8          I have not been brought up to date on any of the

9     information surrounding Natchez.  They have been

10    wiring out millions of dollars without my knowledge.

11    They feel that they have the authority based on old

12    resolutions that named the prior Tribal Treasurer.

13    And because this project has been ongoing and how we

14    got started -- our Constitution states that we cannot

15    venture into projects in excess of $10,000 without a

16    referendum hold by our people.

17         And so I feel that we need to finally bring it to

18    the people for them to make a decision if they want to

19    proceed with this project.  And so right now I am

20    leaning more towards not filling out an application at

21    this point.  I feel everything is being pushed at us

22    to do this.

23         Your memo today has gotten to us and we have one

24    minute to look at it before we get you on phone call

157

1    to answer questions.  And that's been the history of

2    this Council since I have been on:  To not share

3    anything with the Council previous to the meetings,

4    let them read it, and decide at that point.  I am very

5    uncomfortable with this, and that's my situation.

6        VICTORIA DOUD:  I would like to make a

7    clarification on Mrs. Fralick's definition in the

8    Constitution which is talking about the limit for

9    referendum on $10,000.  It pertains to money held in

10   trust for the Tribe by Federal government.  If you

11   want to clarify that, please, that's how our

12   Constitution reads.

13       MURIEL FRALICK:  I beg to differ.  This is out of

14   the LDFNews.com, Amendment 4, it says, and this was

15   adopted in June 19, 1959.  To appropriate for Tribal

16   use any available, applicable Tribal funds provided.

17   That if any appropriations shall result in the total

18   appropriation for any fiscal year amounting to more

19   than $10,000, such appropriation shall not be affected

20   until approved by popular referendum.

21       Now that's on our official Tribal website.

22       VICTORIA DOUD:  That was in 1959?

23       MURIEL FRALICK:  That's on here.  That's on here.

24       VICTORIA DOUD:  Well that's been amended, Muriel.

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1      There has been an Amendment.

2          MURIEL FRALICK:  That's a new one.  Then you

3      better put the right Amendments on there so we know

4      what to go by.  I have been asking for the

5      Constitution since I got on.  I have been given a Blue

6      Book that are all dated; they are not official.  I

7      have another one, and I am told it's not official.  We

8      don't even have an official one.  We have to have a

9      current Constitution.

10          VICTORIA DOUD:  I need to get with (INAUDIBLE,

11      37:25).

12          BROOKS BIG JOHN:  Scott, I got a question for

13      you.

14          SCOTT ANDREWS:  Okay.

15          MR. BROOKS:  This is Brooks, again.  Would there

16      be any problem, for me to feel comfortable, Scott, as

17      to go forward, and Mr. Maulson explained we don't want

18      to be rally killers here or nothing, but I tell you

19      what, I need to have an understanding, and I guess

20      Muriel has said, too, of -- I would like to see full

21      disclosure.  I would like to see where every nickel

22      that the Tribe has spent, where that went to, who got

23      their hands on it, how that happened.  Whether through

24      wire transfers, through checks, however it's been

1    done.  A lot of the correspondences through email,

2    through faxes, through telephone conversations for us

3    to feel comfortable as part of the Council, we need to

4    go ahead and be brought in as a team member and I

5    think full disclosure is not only asking for an

6    authorized -- I am going to require it.

7        So I tell you what, before anything, before I

8    step on board and start to feel comfortable with this

9    thing, I need to be appeased with all this

10   information.  I think some of the other Council

11   Members that are here, too, would feel a lot more

12   comfortable if they seen such documents and were

13   explained to in this matter.  I would hope you would

14   consider that.

15       SCOTT ANDREWS:  I am certainly (INAUDIBLE, 38:53,

16   DOOR SLAMMED) with that and at least where I am

17   standing, I felt there has been full disclosure but,

18   you know, of course I am not standing there amongst

19   you and I don't know how information is disseminated

20   within your Tribal organizations.

21       MURIEL FRALICK:  Mr. Andrews, this is Muriel,

22   again.

23       SCOTT ANDREWS:  Hi.

24   MURIEL FRALICK:  Hi.  Right now the Mississippi

1      Gaming Commission is holding a license in the name of

2      an application in the name of Rose Mitchell who is

3      also our prior Treasurer, are we --

4      SCOTT ANDREWS:  That application - given that

5      she is no longer Treasurer was requested to be

6      withdrawn and was in fact approved for withdrawal

7      (INAUDIBLE, 39:42,

8      LOUD BUZZING NOISE OVER VOICE).

9      MURIEL FRALICK:  Can you tell me when that

10     happened?

11     SCOTT ANDREWS:  The approval of withdrawal would

12     have occurred in December.  I am sorry I don't have

13     that right in front of me.  I would have to pull that

14     out of the file and I believe there was a month lag in

15     between the request for withdrawal and the approval of

16     the withdrawal.

17     MURIEL FRALICK:  Okay, I was told I need to get

18     my application in here fairly soon in order to be

19     considered in February; is that correct?

20     SCOTT ANDRREWS:  Well there is no time frame set

21     right now.  The normal process after the filing of an

22     application is that an investigator is assigned and

23     then the investigator will have compiled certain

24     background documents for inspection.  Then an agent of

1    the Commission, an investigator, will travel and visit

2    with you and personally interview you during which

3    time they will review documents requested and then

4    come back to Jackson, Mississippi and prepare an

5    investigative report.  The Executive Director would

6    then review the investigative report and make a

7    decision on the recommendations for suitability.

8        Nobody will be granted their suitability until

9    the license appears on the agenda for approval.  It

10    will all happen at the same time.  Based on

11    conversations with Commission.  The time frame that

12    they looked at for approval of the license is the

13    March/April timeframe.

14        MURIEL FRALICK:  Can you tell me, I don't know if

15    this is in your area or not, but because Mr. Cato, we

16    have been informed is not eligible for a Mississippi

17    Gaming License and he has been notified to that

18    effect, and because he will remain a partner in this

19    business venture, how will that affect getting a

20    Mississippi Gaming License if he is still a part of

21    the group?

22        SCOTT ANDREWS:  If, and this goes for anybody who

23    is told that they will not be approved by the

24    Commission, they have two options.  They can either

1    disassociate and withdraw their application, or if

2    they don't do that then they will be found unsuitable

3    by the Gaming Commission and their disassociation is

4    required by the statute.

5        MURIEL FRALICK:  Is the disassociation with the

6    Natchez Grand Soleil?

7        SCOTT ANDREWS:  Yes, complete disassociation from

8    the project.  That means ownership, management,

9    anything.

10       MURIEL FRALICK:  And what if he chooses not to go

11   that route?

12       SCOTT ANDREWS:  And does what, instead?

13       MURIEL FRALICK:  He chooses to keep his

14   percentage of ownership?

15       SCOTT ANDREWS:  Well the Commission has the power

16   under the Act to take legal action and disassociate

17   him.

18       MURIEL FRALICK:  And that's the Mississippi --

19       SCOTT ANDREWS:  Until he disassociates then the

20   company's license application will be held up until

21   that happens.

22       TOM MAULSON:  Mr. Andrews, Mr. Maulson, again.  I

23   got one question here:  Do we, and I guess part of the

24   Federal Development Corporation or the Lac du Flambeau

163

1     Tribe, is there just a special license down there just

2     for this here project that we have to have or is it

3     based on the four Commissioners that have to be

4     certified?  Is there a Federal Development Corporation

5     license saying we have a place in Natchez right now?

6          SCOTT ANDREWS:  Nothing has been granted yet, but

7     Grand Soleil Natchez, LLC, will have what's called a

8     Gaming Operator's License.

9          TOM MAULSON:  Okay.

10         SCOTT ANDREWS:  That's what they applied for.

11    Then associated with that there are several corporate

12    Finding of Suitability Applications:  The Federal

13    Development Corporation, the Tribe, and Big River

14    Enterprises, as well as Mr. Cato's company.  And then

15    associated with all of those entities are officers and

16    directors and majority shareholders that we discussed

17    earlier.

18         TOM MAULSON:  So what -- I guess my question

19    would be:  What are the chances of this corporation,

20    along with all our relationships with the different

21    entities in requiring a license at this here

22    particular time.  What are -- is it good, is it bad

23    because of Cato being involved?  Cause we -- how long

24    does it take to get a license of that nature?  Cause

164

1      you understand we are spending millions of dollars

2      here and we are continuing to go forth, sort of

3      building a gaming site; we've got our boat, we are

4      hoping to be up and running by March of this year, I

5      am told.  Is that a realistic time frame?

6          SCOTT ANDREWS:  Well the Commission, even as late

7      as last week, has consistently said that they are

8      comfortable with the March/April time frame of

9      considering the project for licensure.  Now, first of

10     all we have one application from Miss Muriel that

11     still has to be filed and investigated.  So if that is

12     not done, that will result in delay.

13         Also the disposition of the Cato application

14     needs to be resolved and the Commission has informed

15     him as to deadlines in which to take care of certain

16     items or he will be placed on the agenda for finding

17     of unsuitability --

18         MURIEL FRALICK:  What is that, now?

19         SCOTT ANDREWS:  -- which is consistent with a

20     March/April time frame for consideration of a license

21     at Grand Soleil.

22         BROOKS BIG JOHN: Scott, Brooks here again.  I

23     heard you mention a disassociation with Mr. Cato.  I

24     guess I am asking:  Under what grounds would this

165

1        Mississippi Gaming Commission be pushing on to get away

2        from Cato in the event that he doesn't want to get out

3        of this business venture with us?

4            SCOTT ANDREWS: I am sorry, is your question how

5        would I do that or why did I not find him suitable?

6            BROOKS BIG JOHN:  I guess what grounds would the

7        Mississippi Gaming Commission have to disassociate

8        with Charles Cato?

9            SCOTT ANDREWS:  Are you asking why did they want

10       to disassociate?

11           BROOKS BIG JOHN:  What grounds would the

12       Mississippi Gaming Commission have to disassociate

13       with Charles Cato?

14           VICTORIA DOUD:  If he is not suitable.

15           SCOTT ANDREWS:  Once again, I don't understand if

16       you are asking why we need to disassociate or what --

17       how would they have the force to disassociate?

18           BROOKS BIG JOHN:  I guess I am asking how they

19       would pursue, I guess, and maybe it's the Mississippi

20       Gaming Commission.  You just told us here a little

21       earlier Scott that the Gaming Commission would file

22       suit to disassociate with Mr. Charles Cato.

23           SCOTT ANDREWS:  I guess I had the authority under

24       the Gaming Control as to --

1                    **END OF TAPE 4 – SIDE A**

2

3                       **TAPE 4 – SIDE B**

4        TOM MAULSON: -- I want to make sure they are

5    right and we can make them right if everybody knows.

6    There is nothing to hide here and when it comes to our

7    people then we need to bring things to our people.

8    And that's why we get ourselves in the arguments and

9    we really have been praying hard to get out of, so I

10    mean, and this bothered me when you all went and gave

11    $2 million dollars without my approval.  Brooks did

12    approve.

13        DEE MAYO:  You have to go back from the original

14    time of this projects, and Tom, you have been at a lot

15    of those.  Don't sit there and say you have not been

16    included.

17        TOM MAULSON:  I am not saying I wasn't included.

18    I haven't been included in all of the stuff and

19    certain people have.

20        DEE MAYO:  A lot of US weren't for a lot of

21    projects that we didn't get elected on.  We play

22    catch-up and review all the minutes and bring us up to

23    speed because there are projects that have been going

24    on.  You have been here two years, three years, Tom.

167

1      You are very well aware --

2          VICKI DOUD:  Order. (INAUDIBLE, 1:23,

3      MICROPHONE MUFFLED)

4          BROOKS BIG JOHN:  Scott, Brooks here, again.

5          SCOTT ANDREWS:  Yes.

6          BROOKS BIG JOHN:  A couple of things, how do

7      these court cases that Cato has against the

8      Corporation affect our, I guess, our moves to go

9      forward?

10         SCOTT ANDREWS:  Well as long as the Commission is

11     concerned, the Commission has indicated that the fact

12     that litigation is pending will not, in order to be a

13     barrier, to be reconsidered for licensure.

14         RICK LINDSLEY:  With that, Brooks, I am not aware

15     of any Resolution that Charles has to (INAUDIBLE,

16     1:58).  The last litigation that he had was dismissed

17     in the Iowa Court.  We have a lawsuit against him in

18     New Orleans.

19         BROOKS BIG JOHN:  How will that lawsuit that we

20     have in New Orleans affect our move to go forward?

21         RICK LINDSLEY:  As Scott said, the Gaming

22     Commission is aware of the pending litigation; is that

23     correct, Scott?

24         SCOTT ANDREWS:  I couldn't quite hear your

1      response, but the litigation having to do with the

2      insurance per se?

3           RICK LINDSLEY:  Yes.

4           SCOTT ANDREWS:  No, the provision though is

5      entirely an internal matter and that's not going to

6      impact the ability to move forward, to be considered

7      (INAUDIBLE, 2:46).

8           BROOKS BIG JOHN:  I guess I have one more

9      question, while my thing is that after reading Project

10     Osprey in regards to Cato, there are about 36

11     different things that was either thrown out of court

12     or that he was slammed with.  It is hard to trust a

13     man like that.

14          I don't know how we got into bed with him in the

15     first place, but let me ask you a question about his

16     father and his availability to some of these licenses

17     in Mississippi.  Mr. Cato's father, are you aware of

18     what they have done in the past and what they may try

19     and do in the future if Charles is not provided a

20     gaming license in Mississippi?

21          SCOTT ANDREWS:  I have heard various things about

22     that but I think it is all speculation at this stage.

23     As far as what they have done in the past, I have

24     heard various stories that -- none of which have ever

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

169

1      been the same so I am not sure what the factual

2      situation would be.  I can tell you that his father

3      does hold a current signing of suitability in

4      Mississippi.

5          BROOKS BIG JOHN:  He does.  For what project or

6      what operation?  Do you know the name of that?

7          SCOTT ANDREWS:  It was -- there's a company

8      called Rainbow Entertainment.

9          BROOKS BIG JOHN:  Rainbow Entertainment?

10         SCOTT ANDREWS:  Right, Rainbow Entertainment,

11     Inc., which is owned primarily by his father.  Both

12     his father and Rainbow Entertainment both hold current

13     signing suitability and because Rainbow Entertainment

14     owns a 20 percent interest in a casino in Greenville,

15     Mississippi called the Lighthouse Point Casino.

16         BROOKS BIG JOHN:  What is that called, the

17     Lighthouse Point?

18         SCOTT ANDREWS:  Lighthouse Point.

19         BROOKS BIG JOHN:  Just one more question about

20     where I am from down here.  I would like to get your

21     email, Scott.  I would like to get your phone number,

22     your address and your fax number.

23         SCOTT ANDREWS:  Okay.  Would you like me to send

24     that to you or tell you over the phone?

1          BROOKS BIG JOHN:  Right now.  I need to write it

2     down.

3          SCOTT ANDREWS:  All right, my email address is –

4          VICKI DOUD:  Wouldn't you rather have it in

5     writing, Brooks?

6          BROOKS BIG JOHN:  I'd rather have it right now,

7     Vickie.  Go ahead, Scott, I am listening.

8          VICKI DOUD:  We have it right here.

9          BROOKS BIG JOHN:  Just so I get the right one,

10    Scott, I'd rather have it from you.

11         VICKI DOUD:  That's his private information and

12    he gave it to us right here.

13         BROOKS BIG JOHN:  I don't see how private it is.

14    Scott, I would like to have it from you because like I

15    said, I have not, and some of the other Council

16    members have not been provided a lot of the

17    information, half the truth, like Paul Harvey says on

18    the radio every day: Here's the rest of the story.  I

19    would like to get your email, your phone number, your

20    address and your fax number right from your mouth.

21    Scott?

22         SCOTT ANDREWS:  Given that this is a public

23    meeting where there is a disagreement among Council

24    members, I am hesitant to do so.  My information has

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

171

1    not changed in the last 5 years so any of the

2    information you would have been provided with is

3    accurate.

4         BROOKS BIG JOHN:  Can you at least give me your

5    phone number so I can call you back and get it.

6         VICKI DOUD:  We can provide that for him,

7    Scott.

8         BROOKS BIG JOHN:  Oh, come on Vickie don't start

9    fighting.

10        VICKI DOUD:  Why do you need it public?

11        BROOKS BIG JOHN:  Quit hiding stuff, Vickie.

12        VICKI DOUD:  (INAUDIBLE, 6:43) and I am not

13   hiding anything.  Macker, you can calm down back

14   there.

15        BROOKS BIG JOHN:  Scott, I will get the phone

16   number through other sources and I will be calling you

17   later.

18        SCOTT ANDREWS:  I understand you got handed with

19   what they provide you.

20        BROOKS BIG JOHN:  Yeah, I don't know how truthful

21   it is, but we will see.

22        MURIEL FRALICK:  This is Muriel again and I have

23   a couple of more questions.  As a Corporate Officer of

24   the Board or Grand Soleil, am I going to be subject to

1    criminal or civil lawsuits?

2         SCOTT ANDREWS:  From what type of activity?  I

3    mean, such as the common slip and fall type liability

4    on the project in Natchez?

5         MURIEL FRALICK:  Any possibilities?

6         SCOTT ANDREWS:  Well there is always the

7    possibility that somebody can sue someone else and sue

8    an officer along with a corporation that happens all

9    the time.  But the real question is:  Do they have

10   standing to actually sue you and will it hold up?  And

11   unless thee has been -- unless there has been -- you

12   have violated a low in the exercise of your duties or

13   have committed some sort of personal malpractice in

14   exercising your duties, that answer would be, no, you

15   would not be subject to liability.  However, that's a

16   (INAUDIBLE, 8:14) somebody states to.

17        MURIEL FRALICK:  If a Tribal member feels that I

18   am negligent down there because as officer I am not

19   providing them with their information that they need

20   or they might feel that I'm misappropriating funds or

21   whatever down there, do they have the right to sue me

22   as an officer of that corporation?

23        MURIEL FRALICK:  This is Muriel again and I have

24   file suit and do whatever they want, but will it stand

1      up is the question.

2          MURIEL FRALICK:  Do we need to be bonded to be in

3      that position beyond what we are bonded through the

4      Tribal indemnity insurance?

5          SCOTT ANDREWS:  Well as long as you insurance

6      policy covers your activities as a member, as an

7      Officer of the FDC and the Tribe, I would say that

8      would be adequate because my information is that you

9      will not be an Officer or a Director of the Grand

10     Soleil Project.

11         MURIEL FRALICK:  What position are we holding

12     then?  Are we just a name on a piece of paper, yet we

13     will have a say?

14         SCOTT ANDREWS:  The Economic Development

15     Corporation owns 40.05 percent of Grand Soleil

16     Natchez, LLC.

17         RICK LINDSLEY:  Actually, Scott and Muriel with

18     that, Vickie is the -- Bill is the President; Vickie

19     is the Vice Chair, and Muriel you would be the

20     Treasurer/Secretary of the Grand Soleil Corporation.

21     Once you assume that title, Grand Soleil actually does

22     have insurance for Officers and Directors of the

23     Company so you would fall under that coverage, the

24     same type of coverage that you as a Council member

174

1       have here on the Tribe -- that important Mattson,

2       whatever their name is.

3           MURIEL FRALICK:  As Secretary/Treasurer then of

4       that organization, what are my duties and my

5       responsibilities; is that defined anywhere?  Or can

6       anyone answer that?

7           RICK LINDSLEY:  Well I will go back to the

8       minutes of the meeting and get that information for

9       you.  That first meeting was held, the Corporation

10      meeting was to reserve (INAUDIBLE, 10:58).

11          CHRIS FRALICK:  Have you looked in minutes or

12      actually the Bylaws or something?

13          RICK LINDLSEY:  There were Bylaws that were

14      lumped out of that, Chris.

15          CHRIS FRALICK:  So why do we have to go back to

16      the minutes if there were Bylaws?

17          RICK LINDLSEY:  I'm sorry I will have to go back

18      to the Bylaws.

19          MURIEL FRALICK:  I have one other question.  If

20      the Corporation, would the Grand Soleil be protected

21      against any investor past or future liabilities such

22      as liens or judgments?  Can the judgments transcend to

23      the Corporation's assets, if so, can these judgments

24      tie up all investors' equity in the Corporation until

1        that judgment is satisfied?

2              SCOTT ANDREWS:  Is that a question for me?

3              MURIEL FRALICK:  Yes.

4              SCOTT ANDREWS:  Would you please repeat it?

5              MURIEL FRALICK:  Is the Corporation protected

6        against any of the investors' past or future

7        liabilities such as liens or judgments and can these

8        judgments transcend to the Corporation's assets?  If

9        so, can these judgments tie up all of the investors'

10       equity in the Corporation until that judgment or lien

11       is satisfied?

12             SCOTT ANDREWS:  Are you asking if the Federal

13       Development Corporation as that can be impacted by

14       liens or judgments against the other investors in

15       Grand Soleil Natchez?

16             MURIEL FRALICK:  Yes.

17             SCOTT ANDREWS:  That doesn't have anything to do

18       with Grand Soleil Natchez or the Federal Development

19       Corporation?

20             MURIEL FRALICK:  I'm sorry can you clarify that?

21             SCOTT ANDREWS:  These liens and judgments of

22       these other investors don't have anything to do with

23       the activities of Grand Soleil Natchez or the Federal

24       Development Corporation?

176

1          MURIEL FRALICK:  Yes.

2          SCOTT ANDREWS:  They do not?

3          MURIEL FRALICK:  If they don't -- if they are

4    independent.

5          SCOTT ANDREWS:  I don't see how they could.

6          RICK LINDSLEY:  So for instance, if Bill had a

7    lien against one of his warehouses could that affect

8    the Corporation?

9          MURIEL FRALICK:  Right.  Yes.

10         RICK LINDSLEY:  I don't know if you heard that,

11   Scott?

12         SCOTT ANDREWS:  Yeah, I heard the example.  I

13   don't see how it could.

14         MURIEL FRALICK:  Well I have been in business and

15   I have had that happen where we were in a partnership

16   corporation and another investor had a lien on another

17   property.  They attached it to our business and we

18   could not sell our business until that lien was

19   satisfied.  I don't know if Mississippi is different

20   from Wisconsin, but I know for a fact that, that has

21   happened here.

22         SCOTT ANDREWS:  That could be attached to --

23   let's say it's an investor in the Natchez, LLC

24   Project, well yes, then they could attach on the

177

1     ownership interest of the investor in the Natchez

2     Project but that would not impact the Federal

3     Development Corporation.

4          VICKI DOUD:  Tom?

5          TOM MAULSON:  Scott, do we own that property down

6     there?  Do we own all of the Briars?  Do we own all of

7     the property where the development is going on now?

8          SCOTT ANDREWS:  Yes, the real property is in the

9     name of Emerald Star Natchez, LLC which the name has

10    now changed to Grand Soleil, LLC.

11         TOM MAULSON:  Cato don't have nothing to do with

12    that property down there.

13         SCOTT ANDREWS:  Well, he owns part of the LLC,

14    currently, and he has claimed that, I don't know if it

15    can be substantiated or not about various portions of

16    the property.

17         TOM MAULSON:  So it is not really clear then?

18         RICK LINDSLEY:  Tom, it is clear in the Operating

19    Agreement.

20         SCOTT ANDREWS:  (INAUDIBLE, 15:00, TALK OVER)

21    operated thus far, so I can't really speak to that.

22         RICK LINDSLEY:  Scott, correct me if I am wrong,

23    it's clear in the operating agreement that Cato did

24    transfer that property into the LLC, correct?

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

178

1          SCOTT ANDREWS:  That's correct.

2          VICKI DOUD:  But not the Tribe individually

3     owning it, it's the LLC that owns it.

4          MURIEL FRALICK:  And where can we get a copy of

5     this operating agreement that we have not evidently

6     been given, do you have that?

7          RICK LINDSLEY:  I have a copy of the signed one.

8     I can give that to you.

9          MURIEL FRALICK:  I have no more questions for

10    him.

11         RICK LINDSLEY:  Are there any more questions for

12    Scott, then?

13         MALE SPEAKER:  No.

14         RICK LINDSLEY:  Tom and Brooks?

15         BROOKS BIG JOHN:  Just one more, just checking

16    here, this address at Vault.com, 401 East Capital

17    Street, Suite 200, Jackson, Mississippi, 39201-2608;

18    877-313-6055; is that how we get a hold of you?

19         SCOTT ANDREWS:  That is all correct.

20         BROOKS BIG JOHN:  All right, my friend, thank

21    you.

22         SCOTT ANDREWS:  Okay.

23         RICK LINDSLEY:  Scott, thank you for your time.

24         SCOTT ANDREWS:  Thank you.


                VICTORIA'S TRANSCRIPTION SERVICES, INC.
                          (312) 551-8801

1        TOM MAULSON:  You know I want to make it clear, I

2     didn't know you guys wired that money the other

3     Friday.  You said that the Council authorized it.

4     Maybe we need to know the names of the people that

5     authorized it because I wasn't one of them.

6         We were in the process of working those types of

7     things out until we come to that issue and

8     everything -- all hell broke loose in the office.  I

9     just felt we needed to be a party to all this here

10    stuff going on because I think it took the whole

11    governing body here is needed to authorize a transfer

12    of that particular nature.

13        Once again, even though there was an old

14    resolution, you know, that was there and I guess we

15    just -- it takes seven people to do that.

16        VICKI DOUD:  Resolution 138(07) adopted on July

17    9th of 2007:  Be it resolved that this Council in

18    rescheduled regular sessions assembled hereby

19    authorize (inaudible, 17:54) by CVB (Chippewa Valley

20    Bank) Terms and Conditions set forth by CVB be it

21    further resolved FDC, to diversify, expand financial

22    goals, tribe authorizes Chairperson Victoria Doud and

23    Dee Mayo, Vice Chairperson, to act as signatories on

24    behalf of the tribe in banking transactions as may be

180

1    required to secure finances.  And authorized to

2    include the lines of credit approved to it has to be

3    amended.

4          CARL EDWARDS:  Sure, let's do it.

5          BROOKS BIG JOHN:  Do you want to read the other

6    one that goes with it, Vickie?  Resolution 207 (07)

7          DEE MAYO:  They don't become null and void, need

8    to rescind them.

9          BROOKS BIG JOHN:  I don't see how money can be

10    wired out without an amendment or a proper resolution,

11    Vickie.  That's I guess where the question Tom comes

12    from.  When we look at that and we don't have a proper

13    resolution, do you start wiring money?

14          VICKI DOUD:  We have a proper resolution.

15          BROOKS BIG JOHN:  No, that's not a proper

16    resolution.

17          (INAUDIBLE, 19:44, TALK OVER)

18          MURIEL FRALICK:  You have to rescind the

19    Resolution.  I can't see when any Council would

20    authorize one person, the authority to wire, to loan

21    or borrow $2 million dollars on one signature and have

22    it wired out directly from the banking from the

23    banking institution.  Wired out to Natchez, never cam

24    through the Treasurer who is supposed to be the

1    custodian of all the funds.  Never did our accounting

2    books, there is no internal controls when you are able

3    to do that.

4         (INAUDIBLE, 20:25, TALK OVER)

5         CHRISTOPHER FRALICK:  The Tribal Council never

6    gave the Federal Development Corporation the authority

7    to do that.

8         LIL MACKER BESON:  And we don't give authority to

9    (INAUDIBLE, 20:38, TALK OVER) and you have to go

10   through her to get the authorization from the

11   Treasurer to disperse any money.  It is in the

12   Constitution.

13        BROOKS BIG JOHN:  Question.  Resolution 2(07)

14   Lake of the Torches Development Corporation states:

15   Be it resolved by the Board of Directors of the

16   Corporation, that Victoria Doud as President of the

17   Corporation and Rose Mitchell as Treasurer of the

18   Corporation are hereby authorized and empowered to

19   execute and deliver on behalf of the Corporation such

20   guarantees as may be required, contemplated or deemed

21   necessary by the President and Treasurer in order to

22   secure construction loans, operating capital loans, or

23   lined up credit from any financial institution for the

24   benefit of Emerald Star for which the Corporation is a

182

1       member.

2           On such terms as Emerald Star Casino is deemed a

3       valuable to achieve the economic purposes of the

4       Corporation and Emerald Star.  Okay, what it talks

5       about in there is it says Vickie and Rose.

6           It doesn't say Vickie and/or Rose; Vickie alone,

7       Rose alone, no.  When you start looking at things,

8       start deciphering out that you can act on resolutions

9       like this and start wiring off $2 million dollars, I

10      think it's a bunch of bullshit.

11          MADAME PRESIDENT (INAUDIBLE, 22:06)

12          BROOKS BIG JOHN:  That's what it is called.

13      Running amuck, you mentioned it before, Vickie.

14      That's what's going on here.

15          MURIEL FRALICK:  Excuse me, but the certification

16      also states, and this certification is signed by Rose

17      Mitchell so this could have been developed just

18      between Rose and Vickie alone.  That does not state

19      how many people voted, we don't know who attended

20      that, it just says that a quorum set forth.  It

21      doesn't state who or how many voted for it or nothing.

22      And because we have no recordings of anything there is

23      no way to validate that this is even authentic.

24          BROOKS BIG JOHN:  That's what you call running

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

183

1          amuck.

2                    VICKI DOUD:  I have a question for Muriel.

3                    MURIEL FRALICK:  Go ahead, ask me anything you

4          want.

5                    VICKI DOUD:  If you are not in favor of this

6          project and you are not going to be acting in the best

7          interest (INAUDIBLE, 23:04, TAPE BUZZING).

8                    BROOKS BIG JOHN:  What do you suggest?  Do as

9          Carl said, remove her?

10                   VICKI DOUD:  The purpose, no.

11                   BROOKS BIG JOHN:  Is that the answer?  That's

12         what Carl said the other day, maybe we should remove

13         you.  That's a bunch of bullshit, too.

14                   CARL EDWARDS:  I didn't quite word it like that.

15                   BROOKS BIG JOHN:  Yes, you did, a bunch of

16         bullshit.  I am sick of this shit, man.

17                   VICKI DOUD:  What we are doing is trying to move

18         ahead and make improvements and get money from --

19                   BROOKS BIG JOHN:  On your own, Vickie.  It takes

20         a team to do it and it takes people behind us to do

21         it.  When you get away from the people you are doing

22         things on your goddamn own self and that's where you

23         are getting in trouble and that's a bunch of bullshit.

24                   VICKI DOUD:  No, I am not.  I've got a

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

184

1    resolution supporting it.

2         MURIEL FRALICK:  That resolution, I believe is

3    unlawful.  I believe you have broken some laws.  And

4    the reason I say --

5         VICKI DOUD:  On behalf of the Tribe, all yous

6    were there.

7         MURIEL FRALICK:  You asked me why I am not going

8    for this.  I told you why:  The people have not

9    approved of it.  The people have not been a part of

10   this from Day 1 and it is time the people have a voice

11   and any of the money that is going out, especially the

12   millions that you are looking at.

13        You want to attach $20 million dollars to a $30

14   million dollar debt consolidation that we originally

15   wanted.  Now we got to look at taking on $20 million

16   when we cannot even pay the loans we have.  Why do you

17   think we have to consolidate?  We are consolidating

18   because we can't pay our bills.

19        CHRISTOPHER FRALICK:  Carl, you had the nerve to

20   advise staff not to inform the Council?  What right do

21   you have?

22        LIL MACKER BESON:  I think the Feds ought to step

23   in.

24        CARL EDWARDS:  So are we done?

185

```
1          MURIEL FRALICK:  No, I have a lot of questions.

2     A lot of questions on things that should have been

3     brought before us prior to this meeting, a lot of

4     things that Mr. Lindsley has not shared with us.  I

5     don't know if that was his decision or if that was a

6     collaboration between Carl, Dee and rest of the

7     Council or whoever, but I am not the only one, I

8     believe, that has not been privy to the information

9     that we need to make educated decisions.

10          And Mr. Lindsley told me himself at an Executive

11     Board Meeting when I asked:  When is this information

12     going to be given to the Council?  Oh, I don't give

13     them all this information.  I only give it to them

14     when I am ready.

15          That's not right.  We are a 12-member Council.

16     We are elected by the people.  We are not a one-

17     member, two-member Council that are going to make all

18     the decisions for the Tribe, and I believe that's why

19     we were put here.  Let us take part in it.

20          VICKI DOUD:  (INAUDIBLE 26:00)

21          MURIEL FRALICK:  Yeah, after the fact.  Now you

22     want to push it through.  You want to, by tonight,

23     make all these, to back all these resolutions and

24     borrow all this money.  Yeah, when you are old and you
```

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

1    don't know what's going on -- so what.  You want to

2    borrow money like that?  You better educate yourself.

3        LIL MACKER BESON:  I am getting so frickin' and

4    goddam need relying on you.  Forget it already.

5        GOLDIE LARSON:  Your guys spending is out of

6    control.

7        MURIEL FRALICK:  You could have kept us informed.

8        (INAUDIBLE, 26:47, TALK OVER)

9        VICKI DOUD:  I will be there.  It will be good

10   for the people.

11       BETTY JACK:  Vickie, you were made Chairman to

12   act on behalf of all Lac du Flambeau Tribal members

13   including yourself and your --

14       VICKI DOUD:  I am trying to bring money into --

15   so we can all have a better life.

16       CHRISTOPHER FRALICK:  Excuse me --

17       BETTY JACK:  I am talking to you.  You were

18   elected to act on behalf of the people and you have

19   engaged in a business venture where the land isn't

20   even --

21       GOLDIE LARSON:  Run out, everybody run home.

22       (INAUDIBLE, 27:20, TALK OVER)

23       GOLDIE LARSON:  They are all crooks, if that's

24   the case.

VICTORIA'S TRANSCRIPTION SERVICES, INC.
(312) 551-8801

187

1           LIL MACKER BESON:  Well I think the Feds are on

2      to something.  Have you and the rest of the people

3      that are involved in that bullshit already -- I think

4      that (INAUDIBLE, 27:53).

5           CHRISTOPHER FRALICK:  Have you read any documents

6      on it?

7           VICKI DOUD:  I know of --

8           CHRISTOPHER FRALICK:  Because if you did --

9           VICKI DOUD:  I know about it.

10          CHRISTOPHER FRALICK:  Did you read?  Because if

11     you didn't read all about it -- (INAUDIBLE, 27:59)

12          (INAUDIBLE, 28:13, TALK OVER)

13          MURIEL FRALICK:  How much money have we put into

14     Natchez; do you know?

15          VICKI DOUD:  No, I don't.

16          MURIEL FRALICK:  You don't know?  Millions of

17     dollars, you don't know that we've got $16 million

18     dollars already stuck into Natchez; you don't know

19     that?  You're the Administrator.  You're the Head of

20     this Tribe.  You should know where all of our money

21     is.

22          CHRISTOPHER FRALICK:  Do you know that Weeders?

23     There is $16 million dollars stuck in Natchez?

24          MURIEL FRALICK:  Somebody that knows what's going

188

1      on, those are major things, Vickie.

2          (INAUDIBLE, 28:50)

3          TOM MAULSON:  Did you know about that $2 million

4      dollars here, Friday before we got that thing?

5          TOM MAULSON:  No, I didn't.  I have been trying

6      to get a hold of Vickie for this.

7          (INAUDIBLE, 29:05, TALK OVER)

8          TOM MAULSON:  Even when I came in, legally nobody

9      talked to me about nothing (INAUDIBLE, 29:09) a

10     million from Chippewa Valley.  I never (INAUDIBLE,

11     29:12, TALK OVER)

12         GILBERT "GIBBY" CHAPMAN:  We need a stand on

13     this, Weeders.

14         (INAUDIBLE, 29:59, TALK OVER)

15         GERALDINE BROWN "WEEDERS":  We disagree, whatever

16     we do.  We might as well disagree; we have been for

17     years, whatever the Council wants to do.  It will

18     never change.  No matter what we do, you guys will be

19     against it.  Every Referendum, no matter what it is --

20         (INAUDIBLE, 30:18, TALK OVER and YELLING)

21                    **END OF TAPE 4 - SIDE B**

22

23

24

1   STATE OF ILLINOIS )

2                   ) SS:

3   COUNTY OF COOK    )

4

5       I, VICTORIA E. ROCK, Notary Public, do hereby

6   certify that I caused this audio recording to be

7   transcribed.

8       I further certify that the foregoing is a true

9   and correct transcription to the best of my ability;

10   and further, that I am not counsel for nor in any

11   way interested in the outcome thereof.

12       I further certify that this certificate applies

13   to the original and certified transcripts only.  I

14   assume no responsibility for speaker identifications

15   given by the client or the accuracy of any

16   reproduced copies not made under my control or

17   direction.

18       IN TESTIMONY WHEREOF, I have hereunto set my

19   hand this *8th* day of *March* , 2010.

20

21   *Victoria E. Rock*

22   VICTORIA E. ROCK

23

24

"OFFICIAL SEAL"
Victoria E. Rock
Notary Public, State of Illinois
My Commission Exp. 07/15/2010