# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

STIFEL, NICOLAUS & COMPANY, INC.,
STIFEL FINANCIAL CORP., SAYBROOK FUND
INVESTORS, LLC (successor to SAYBROOK TAX
EXEMPT INVESTORS, LLC), LDF
ACQUISITION, LLC, WELLS FARGO BANK,
N.A.,and GODFREY & KAHN, S.C.,

        Plaintiffs,

   v.

LAC DU FLAMBEAU BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS and
LAKE OF THE TORCHES ECONOMIC
DEVELOPMENT CORPORATION,

        Defendants.

Case No. 13-cv-372-wmc

## TRIBAL PARTIES' OMNIBUS RESPONSE TO STIFEL'S AND SAYBROOK'S MOTIONS TO STRIKE EXPERT TESTIMONY

The Court should deny the motions brought by Stifel, Nicolaus & Company, Inc., and Stifel Financial Corp. (collectively, "Stifel") as well as Saybrook Fund Investors, LLC and LDF Acquisition, LLC (collectively, "Saybrook") seeking to strike opinion testimony from the Tribal Parties' experts. Stifel's lengthy discussion concerning the admissibility of opinion testimony on legal issues conspicuously omits controlling precedent rejecting its arguments and holding that opinion testimony addressing how regulators enforce regulations, whether transactions comply with regulations, and how regulators ensure that the public knows about regulations is admissible. *United States v. Davis*, 471 F.3d 783, 789 (7th Cir. 2006). Saybrook's due process and reliability arguments fare no better. The former ignores

that this is a preliminary injunction hearing, not a trial on the merits, and Saybrook's "due process" concerns arise from its own decision not to depose the experts earlier while pushing for a quick hearing date. The latter arguments about reliability are premised on a distortion of the testimony and ignore that this Court and the Seventh Circuit have already accepted the evidence into the record.

Finally, while the Tribal Parties reserve the right to rely on all the expert opinion testimony, at the hearing they only intend to call Ms. Coleman to discuss the NIGC protocol for reviewing Indian gaming contracts and the policy reasons underlying the NIGC's analysis of these transactions; and they only seek to rely on select portions of Mr. Washburn's affidavit (*see, e.g.,* Dkt. # 54-18, Washburn Aff., ¶¶ 10, 11, 14, 15, 17, 21, 22, 28, 30-35) to further the policy behind the NIGC's interpretation of these agreements. Given the limited scope of these experts' testimony at the hearing, the Court can easily receive this testimony into evidence and determine to what extent it is relevant to the various issues that will be addressed at the preliminary injunction hearing.

## ARGUMENT

**I.    THE TRIBAL PARTIES' EXPERT TESTIMONY IS RELEVANT AND ADMISSIBLE UNDER CONTROLLING SEVENTH CIRCUIT LAW.**

Stifel's discussion of Federal Rule of Evidence 702 and the Court's "gatekeeping" role is largely irrelevant as the Tribal Parties' expert testimony is being presented in a preliminary injunction hearing. As the schedule in this case reflects, a preliminary injunction hearing "is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). Given that the procedures are less formal with

limited factual development, the rules of evidence generally do not apply strictly in preliminary injunction hearings. *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010) (court may consider evidence during preliminary injunction that is otherwise inadmissible under the Federal Rules of Evidence); *see also Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) ("the rules of evidence do not apply strictly to preliminary injunction proceedings"); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (holding the same and collecting cases from First, Fifth, Seventh, Ninth, Tenth and Eleventh circuits).

Not only are the rules of evidence relaxed in preliminary injunction proceedings, but Stifel is not really moving to exclude the Tribal Parties' experts on the basis of their qualifications or the reliability of the methodology through which they arrived at their conclusions—the traditional bases by which the admissibility of expert testimony is judged under Rule 702.[1] Instead, Stifel argues the experts' evidence is purportedly "irrelevant" to the issues in this case. Whether evidence is relevant and admissible is determined by Rules 401 through 403, not Rule 702. Here, it is difficult to imagine how the experts' testimony *could not* be considered relevant given that it concerns the enforceability of the Bonds Documents; the evidence addresses how the NIGC reviews bond transactions and the policy behind the NIGC's review protocol.

By way of example, Ms. Coleman, who previously served as Deputy General Counsel and Acting General Counsel at the NIGC, will testify how contracting parties go to great lengths to try and skirt NIGC review, and provide an incomplete picture of the extent to

---

[1] We address Saybrook's claim that the Washburn and Saiz testimony is unreliable in Section IV, *infra*.

which parties are trying to control operations at a tribe's gaming facility. *See, e.g.,* Dkt. # 49, Coleman Aff. ¶¶ 15, 24. Many parties try to accomplish this by, among other ways, disaggregating management provisions across multiple documents and then submitting only some, but not all, of the documents for review. *Id.* As Ms. Coleman will explain, this is exactly why the NIGC requires parties to submit all related agreements—not just the primary agreement—as part of the NIGC review process. *Id.* at ¶ 24; *see also* Dkt. # 54-18, Washburn Aff. ¶ 24 (explaining the declination process and the reason why the parties submit all contracts and related agreements for NIGC review).

Such evidence is relevant to, among other things, help the Court understand why it is important that all of the Bond Documents stand or fall as a single transaction. It is also relevant to explain why permitting piecemeal enforcement of Bond Documents—as Plaintiffs request—encourages parties to avoid NIGC oversight and runs counter to the NIGC's voiding provision in 25 C.F.R. § 533.7.

To that end, Ms. Coleman will testify concerning how the NIGC's use of the voiding regulation, 25 C.F.R. § 533.7, promotes parties to comply with NIGC oversight. And Mr. Washburn's affidavit could not have been clearer: "[f]rom the standpoint of the NIGC, the voiding provision is crucial to the regulatory structure because it creates a strong incentive for parties to seek NIGC review." Dkt. # 54-18, Washburn Aff. ¶11. Indeed, "[w]ithout such an incentive, the NIGC might never know of such contracts which are, after all, agreements between private parties and sovereign tribes." *Id.* Thus, "[t]he voiding provision incentivizes parties to seek [that] NIGC review or risk having their contracts voided later." *Id.* at ¶ 14.

Indeed, the relevance of the experts' opinions is underscored by Stifel's argument that they should be excluded because they purportedly infringe on legal issues the Court alone must decide in this case. The Seventh Circuit, however, has made clear that there are a myriad of instances when experts can offer opinions on legal issues, *United States v. Sinclair*, 74 F.3d 753, 758 n.1 (7th Cir. 1996); in fact, it soundly rejected arguments similar to those Stifel raises here to exclude expert testimony opining on agency practices and procedures in *United States v. Davis*, 471 F.3d 783 (7th Cir. 2006)—a case the Tribal Parties earlier brought to Plaintiffs' attention but that Stifel inexplicably continues to ignore.

*Davis* was a Medicaid fraud prosecution where one issue concerned whether a psychologist's practice of billing for services actually performed by unlicensed staff members (substitute billing) was illegal under Indiana's Medicaid regulations. *Id.* at 785-86. To prove its case, the government relied on testimony by an employee of Indiana Medicaid, an expert in reimbursement practices who opined that Indiana would not reimburse for services that were actually conducted by unlicensed staff members. *Id.* at 786, 788-89. The district court overruled the defendant's objection to exclude this opinion testimony, finding that while the judge instructs the jury on "the meaning of the law," the agency expert "can testify to how its enforced, how its interpreted, how its distributed to people in the forms of manuals and so forth." *Id*. The court of appeals affirmed:

> Experts *are* permitted to testify regarding how their government agency applies rules as long as the testimony does not incorrectly state the law or opine on certain ultimate legal issues in the case. Fed. R. Evid. 704; *United States v. Turner,* 400 F.3d 491, 499 (7th Cir. 2005). For example, we have held that expert testimony is allowed to the effect that financial transactions did not comply with regulations and appeared to be fraudulent. *United States v. Owens,* 301 F.3d 521,

526-27 (7th Cir. 2002) (noting that Fed. R. Evid. 704 partially displaces the "old ultimate issue rule" in a case such as this where the only major issue at trial was the mental state of the defendant).

*Id.* at 789 (emphasis added).

While the defendant in *Davis*, like Stifel does here, relied heavily on *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900-01 (7th Cir.1994) to argue such testimony was inadmissible, the *Davis* Court noted that in *Bammerlin*, the district court abused its discretion to admit expert testimony concerning whether a seat-belt assembly passed federal safety standards because the experts "were unable to even agree on what the applicable laws were." *Davis*, 471 F.3d at 789. "We have held before, and hold today, that experts are allowed to testify about how they enforce regulations, whether transactions comply with regulations, and how they ensure that the public knows about regulations." *Id.*

Unlike *Bammerlin*, there is no disagreement on what the applicable law is in this case—IGRA. The Tribal Parties' experts are therefore allowed to testify about how the NIGC enforces IGRA and whether the Bond Documents complied with IGRA or would have been void as a management contract. *Id.* This expert testimony is both relevant and useful to the Court to describe the form and structure of these unique types of financing transactions, including the relationship between the various documents. Stifel's arguments otherwise ignore *Davis*, and thus ignore the binding law in this Circuit.[2]

---

[2] *Davis* is consistent with other cases that have addressed the issue. *See e.g., Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2008) ("We have no reason to doubt that Mr. Bliss—an experienced patent attorney—is qualified to testify as to patent office procedure generally."); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) (experienced former counsel for the SEC with expertise in offshore securities transactions could testify to "[t]he customs and business practices in the securities industry at the time the parties entered into the

## II. THE PLAINTIFFS' FILINGS MAKE CLEAR THAT THE EXPERT TESTIMONY IS RELEVANT AND ADMISSIBLE.

Stifel's tongue-in-cheek arguments that the Tribal Parties' expert opinions are inadmissible not only ignore binding law, but exhibit a degree of amnesia about the Plaintiffs' prosecution of the case in prior litigation over the bond transaction and about their filings in this case since then. In the original case, the Plaintiffs, through their then-trustee Wells Fargo, submitted purported expert testimony by William Newby "regarding the customs and practices in the Indian gaming finance industry, to opine on the bond transaction at issue, the Trust Indenture at issue," and whether the various provisions amounted to management prohibited under IGRA. *See* Case 3:09-cv-768, Dkt # 53. They also submitted purported expert testimony by Michael Cox, who not only opined that the Trust Indenture did "not constitute management within the meaning of IGRA," but also opined that even if the Trust Indenture was void, the other Bond Documents "still did not need to be submitted to the NIGC for approval because they did not provide for management of the Casino Facility." *Id.*, Dkt. # 51, ¶¶ 16-20. Of course, the Tribal Parties' expert testimony that Plaintiffs now want to exclude is the same type of expert testimony Plaintiffs submitted to this Court in prior litigation over the bond transaction.

---

Agreement provides an important context which will aid the jury in determining whether Berckeley had the requisite scienter at the time to evade the registration requirements."); *United States v. Rothenberg*, 328 F. App'x 897, 902 (5th Cir. 2009) ("We agree with the Seventh Circuit that, in cases where it is relevant, an expert can opine about how a board charged with administering a regulation actually interprets that regulation, subject to the court's conducting an appropriate Rule 403 balancing."). *See also Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 79 (1st Cir. 2006) ("Expert testimony on industry standards is common fare in civil litigation.") (collecting cases); *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) (finding expert testimony properly admitted to interpret contract provisions having a specialized meaning in the railroad industry); *CDX Liquidating Trust ex. rel. CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 588 (N.D. Ill. 2009) (allowing a lawyer expert qualified in "fiduciary duty law" to "provide a helpful explanation to the jury regarding the standard practices and procedures of corporate governance.").

Likewise, in this case Godfrey has disclosed that it intends to call purported experts to testify that: (1) the "documents associated with the subject bond transaction are not inextricably linked with the trust indenture such that they are all void and unenforceable as a management contract;" (2) the other documents "are not inextricably linked;" (3) each document "should be evaluated separately to determine if it is a management contract;" and (4) the "custom and practice" the Tribal Parties' experts testify on does not exist. Dkt. # 107 at 2-3. What is more, Stifel "joins in the witness disclosure filed by co-Plaintiff Godfrey & Kahn" for the upcoming preliminary injunction hearing. Dkt. # 106. Thus, Stifel's contentions that the Tribal Parties' expert testimony should be excluded as irrelevant is contrary to *Davis* and is belied by Stifel's and the other Plaintiffs' earlier and current filings in this Court. The Court should therefore deny Stifel's motion

### III. OTHER POINTS HIGHLIGHTING WHY THE EXPERTS' TESTIMONY IS RELEVANT AND ADMISSIBLE.

#### A. THE NIGC EXPERTS CORRECTLY OPINED ON HOW THE NIGC WOULD REVIEW AND INTERPRET THE BOND TRANSACTION.

The Tribal Parties' NIGC Experts properly opined on how the NIGC—the agency at which they worked when this transaction was consummated—would interpret the Bond Documents. While Stifel quibbles that these opinions conflict with the Seventh Circuit's holding that nullified the Indenture, a review of the proffered testimony demonstrates that this is not true.

When the Seventh Circuit addressed Judge Randa's denial of Wells Fargo's motion to amend its complaint to assert claims that did not rely on the Indenture, it did not reverse as erroneous the district court's ruling "that the waivers of sovereign immunity in the collateral documents are void because the documents are interdependent and support but one

8

transaction, of which the Indenture was a crucial part." *Wells Fargo*, 658 F.3d at 702. Instead, the court thought the decision was "premature" in light of the record before it and it remanded for further development of the parties' evidence and argument on this point. *Id*.

The NIGC Experts opine on, among other things, how the NIGC views the interdependent nature of these Bond Documents (*see, e.g.,* Dkt. # 54-18, Washburn Aff. ¶¶ 16-17; Dkt. # 49, Coleman Aff. ¶ 47; Dkt. # 49, Saiz Aff. ¶ 17)—the precise issue left open by the Seventh Circuit. *See Wells Fargo*, 658 F.3d at 702. Accordingly, this testimony is not incorrect or otherwise inconsistent with the court's decision in *Wells Fargo*. The NIGC experts simply offered their opinion—based on thier practical experience working at the NIGC—concerning whether the Bond Transaction complied with applicable NIGC regulations. *Davis*, 471 F.3d at 788. Accordingly, this testimony is admissible. *Id*.

### B. THE NIGC EXPERTS ARE NOT OPINING ON OUTCOME DETERMINATIVE LEGAL ISSUES.

Nor do the NIGC experts "opine on certain ultimate legal issues in the case." *Davis*, 471 F.3d at 788. In other words, they are not "offering opinions about legal issues that will determine the outcome of a case." *See Sinclair,* 74 F.3d at 757-58 n. 1. The ultimate legal issue for this Court to consider is whether the Tribal Court can properly exercise jurisdiction over the Stifel, Saybrook, Wells Fargo, and Godfrey Plaintiffs. *See* Dkt. # 1. The NIGC Experts' testimony does not resolve this issue. Accordingly, some of the experts' opinions, even if about legal issues, may be considered by this Court.

### C. TESTIMONY CONCERNING THE CUSTOMS AND PRACTICES OF THE INDIAN GAMING FINANCE INDUSTRY IS ADMISSIBLE.

For similar reasons, the proffered testimony of the Tribal Defendants' Indian Gaming Finance expert, Perry Israel, is also admissible. Stifel does not contest Mr. Israel's

9

qualifications as an expert in municipal and tribal bond transactions. Nor does it contend that Mr. Israel's affidavit concerning the customs and practices in the Indian gaming finance industry is inaccurate. And like the NIGC experts, Mr. Israel's opinion concerning the relationship of the Bond Documents, based on is professional experience, is not "outcome determinative" as to whether the Tribal Court can exercise jurisdiction over the Plaintiffs.[3]

Accordingly, his testimony concerning the customs and practices in the Indian Gaming Finance industry—including the manner in which a typical bond transaction is structured—is certainly relevant and can be considered by the Court. *See, e.g., Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) (finding expert testimony properly admitted to interpret contract provisions having a specialized meaning in the railroad industry); *CDX Liquidating Trust ex. rel. CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 588 (N.D. Ill. 2009) (allowing a lawyer expert qualified in "fiduciary duty law" to "provide a helpful explanation to the jury regarding the standard practices and procedures of corporate governance.")

**IV. THE COURT SHOULD LIKEWISE REJECT SAYBROOK'S SEPARATE ARGUMENTS REGARDING WASHBURN AND SAIZ.**

**A. SAYBROOK'S DUE PROCESS ARGUMENT LACKS MERIT.**

Saybrook has known of and had the Washburn affidavit since 2010.[4] Saybrook never issued a subpoena or tried to compel his testimony. Assuming Saybrook wants to depose Washburn, it conspicuously omits any explanation of why it decided to delay taking his

---

[3] In fact, Stifel does not appear to challenge the relevance of Mr. Israel's testimony concerning the customs and practices in the Indian Gaming Finance Industry. *See* Dkt. # 104 at 6-11.
[4] Saybrook's due process arguments concerning Saiz are rendered moot because she will be deposed on March 4, 2014.

deposition for months and even years, and then on the eve of a preliminary injunction hearing they scheduled, try and depose him. Thus, the problem Saybrook complains of is the foreseeable consequence of its earlier decisions and in no way warrants the exclusion of relevant evidence undercutting Saybrook's arguments. *See, e.g., Ortiz v. Eichler*, 794 F.2d 889, 895-96 (3d Cir. 1986) ("[O]ut-of-court statements … where the claimant had an opportunity to cross-examine the witness at a prior court proceeding to which the claimant was a party … are admissible despite their hearsay nature.")

Equally misplaced is Saybrook's lofty claim that "[p]ermitting the tribe to offer unchallengeable affidavit testimony dispenses with these hallmarks of due process and our adversary system of justice." Dkt. # 105 at 2. The Tribal Parties' expert testimony is not "unchallengeable" as Saybrook is free to offer contrary evidence, including expert testimony, to address any perceived flaws in Washburn's testimony. Moreover, preliminary-injunction hearings are conducted based on "procedures that are less formal and evidence that is less complete than in a trial on the merits," *University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981), and the cases Saybrook cites about the right to cross examination involve full-blown trials on the merits—not preliminary-injunction hearings. Dkt. # 105 at 2.

If admitting hearsay and other inadmissible evidence during a preliminary-injunction hearing does not violate due process, *Dexia Credit Local*, 602 F.3d at 885, then the fact that Saybrook does not have time to depose Washburn prior to the hearing raises no due process concerns either. This is particularly true where, as here, any issue Saybrook complains of is

the result of its earlier decisions not to depose Washburn, its failure to subpoena him now, and its desire to push the schedule in this case.[5]

### B. WASHBURN'S AND SAIZ'S TESTIMONY IS RELIABLE AS THEY DERIVED THEIR CONCLUSIONS REGARDING AGENCY PRACTICE FROM THEIR EXTENSIVE AND SPECIALIZED EXPERIENCE WITH THE NIGC.

An expert may be qualified by experience to be a witness. Fed. R. Evid. 702. When expert testimony is primarily based on the experience that the expert has gained through personal endeavors, the expert "must explain how that experience leads to the conclusion reached ... and how that experience is reliably applied to the facts." *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 794 (N.D. Ill. 2011) (quoting *Thomas v. City of Chattanooga,* 398 F.3d 426, 432 (6th Cir.2005)). Washburn's and Saiz's testimony easily satisfies that standard; in fact, the testimony is no different than the expert testimony in *Davis*, 471 F.3d at 789, opining on how regulators enforce regulations, and whether transactions comply with regulations, which was admissible to convict the psychologist of Medicaid fraud. *Id*.

The Washburn Affidavit opens with a description of Washburn's extensive NIGC experience and why this provides a sufficient basis for his expert opinions regarding agency practice as it relates management-contract review. *See, e.g.*, Dkt. # 54-18 ¶ 2 (stating that Washburn served as NIGC general counsel for over two-and-a-half years and "personally reviewed every document presented to the Chairman regarding official action related to his

---

[5] If anyone has been prejudiced thus far it is the Tribal Parties who first learned the names (and nothing else) of some of the Plaintiffs' experts on February 21, 2014, only three weeks before the hearing. Moreover, Saybrook has not disclosed any expert testimony to date, and presumably will not wait until February 28, under the guise that it is "rebuttal" testimony. The Plaintiffs, particularly Saybrook, cannot practice trial-by-ambush on one hand and then complain their due process rights are violated because they decided against deposing experts whose testimony they have had for years.

regulatory responsibilities and advised him about the action"); *id.* at ¶ 3 (stating that during his time as general counsel, Washburn reviewed each management contract submitted for the NIGC Chairman's review and supervised the NIGC's "declination letter" process). The Washburn Affidavit also provides a detailed description of Washburn's understanding of NIGC practice as it relates to the agency's interpretation of its congressionally mandated responsibilities under IGRA, *id.* at ¶¶ 7-10, and the NIGC's interpretation of the importance and function of 25 C.F.R. § 533.7's management-contracting-voiding provision. (*Id.* at ¶¶ 11-15.

After its detailed explanation of NIGC practice and the reasons therefore, the Washburn Affidavit provides Washburn's opinion that the NIGC would: (1) construe the Bond Documents as a single integrated agreement *id.* at ¶¶ 16-17; and (2) conclude that several of the Bond Documents independently constitute management contracts. *Id.* at ¶¶ 18-28. Here, the Washburn Affidavit does not offer Washburn's *ipse dixit*, but rather provides a clear explanation of how and why Washburn reaches these conclusions, based on a detailed and reliable application of the NIGC practice annunciated earlier in the affidavit to specific provisions in each of the referenced Bond Documents. *See, e.g.*, *id.* at ¶¶ 16-17 (explaining Washburn's basis for concluding that the Trust Indenture is a necessary governing instrument for virtually all of the Bond Documents, and why, based on the NIGC's understanding of its congressionally mandated role under IGRA, the agency would require a review of all of the Bond Documents and construe them as a single integrated agreement), *id.* at ¶¶ 19-23 (explaining Washburn's basis for concluding that problematic provisions from the Bonds would have led the NIGC to conclude that the Bonds are a management contract, based on

13

the agency's understanding of the term as used by IGRA, and referencing a prior NIGC pronouncement in a bond transaction that supports this opinion).

The Washburn Affidavit concludes with Washburn's opinion of how the NIGC would have treated the Bond Transaction documents if the parties had opted to submit them for a "declination letter" review prior to consummating the Bond Transaction. Washburn bases this opinion on his expert knowledge of NIGC practice, and applies his understanding of how the NIGC carries out its declination letter review process to specific facts regarding the documents in the Bond Transaction. *See e.g.*, *id.* at ¶¶ 30-33 (explaining why the NIGC would demand to see all of the documents in the Bond Transaction prior to approving the Trust Indenture and why the NIGC most likely would have required the management provisions discussed in the Washburn Affidavit to be struck from the documents prior to issuing a declination letter).

The Saiz Affidavit opens with a recitation of her experience as an NIGC management-contract-review analyst. *See* Dkt. # 51 ¶¶ 4-7. Saiz's NIGC experience provides the Court with ample reason to believe that she has a sufficient basis to form an expert opinion regarding NIGC management-review practices. *See e.g.*, *id.* at ¶ 4 ("I was employed by the [NIGC] for over 18 years"); *id.* at ¶ 7 ("Currently, I have more years of NIGC experience reviewing management contracts and other gaming-related agreements than any other person."). In addition to relying on her over 18 years of experience as an NIGC analyst, Saiz references several NIGC pronouncements and publications as a basis for the opinions drawn in her affidavit. *See id.* at ¶ 13. After describing her experience with the NIGC, Saiz analyzes the Bond Transaction documents that, based on her agency experience, the NIGC would consider, individually or collectively, to contain management provisions.

14

*Id.* at ¶¶ 14-19. In drawing these conclusions, Saiz analyzes the specific provisions of the Bond Documents that she deems indicative of management contracts in light of her expertise from reviewing such documents for over 18 years. *See, e.g.*, *id.* at ¶ 16 (stating that, based on Saiz's experience, the Tribal Agreement is "highly unusual" because it allowed Wells Fargo to unilaterally amend, modify, or extend all agreements and instruments relating to" the Bond Transaction obligations, and that this was an indicia of management).

The Western District of Wisconsin's and Seventh Circuit's treatment Washburn's affidavit submitted to the Western District of Wisconsin in prior litigation over the bond transaction is instructive. *Compare* Dkt. # 54-18 *with* Affidavit of Kevin K. Washburn, *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, 677 F. Supp. 2d 1056 (W.D. Wis. 2010) (No. 09-CV-768), Dkt. # 32. In that case, the Western District explicitly relied upon and quoted Washburn's 2010 Affidavit as the basis for its holding that the Trust Indenture was an unapproved management contract. *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, 677 F. Supp. 2d 1056, 1059-60, 1062.

In denying Wells Fargo's subsequent motion to alter or amend the judgment and for leave to file an amended complaint, the Western District held that it was entitled to rely on the Washburn's 2010 Affidavit as persuasive evidence. *Wells Fargo Bank, Nat. Ass'n v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 691 (7th Cir. 2011). In affirming the Western District's holing that the Trust Indenture was void *ab initio* as an unapproved management contract, the Seventh Circuit never criticized the Western District for relying on this evidence. Accordingly, these affidavits are sufficiently reliable to be deemed admissible at the preliminary injunction hearing.

15

## CONCLUSION

For the foregoing reasons, the Tribal Parties respectfully request the Court to deny Stifel's and Saybrook's motions to strike the Tribal Parties' expert testimony.

Dated: February 25, 2014.

**HANSEN REYNOLDS DICKINSON CRUEGER LLC**

By: s/Paul Jacquart
   Timothy Hansen
   thansen@hrdclaw.com
   Paul Jacquart
   pjacquart@hrdclaw.com
   James Barton
   jbarton@hrdclaw.com
   316 N. Milwaukee St., Suite. 200
   Milwaukee, WI 53202
   Office: 414-455-7676
   Fax: 414-273-8476

**HOGEN ADAMS PLLC**

   Vanya Hogen Moline
   vhogen@hogenadams.com
     *appearing pro hac vice*
   Jessica Intermill
   jintermill@hogenadams.com
     *appearing pro hac vice*
   1932 W. County Rd. B2, Suite 460
   St. Paul, MN 55113
   Tele: (651) 842-9100
   Fax: (651) 842-9101

   *Attorneys for Defendants Lac Du Flambeau Band of Lak Superior Chippewa Indians and Lake of the Torches Economic Development Corporation*