```
 1                  UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF WISCONSIN
 2   ------------------------------------------------------------

 3   STIFEL NICOLAUS & COMPANY, INC.,
     STIFEL FINANCIAL CORP.,
 4   SAYBROOK FUND INVESTORS, LLC
     (successor to SAYBROOK TAX EXEMPT
 5   INVESTORS, LLC),
     LDF ACQUISITION, LLC,
 6   WELLS FARGO BANK, N.A.,
     and GODFREY & KAHN, S.C.,

 7                     Plaintiffs,

 8                vs.                    Case No. 13-CV-372

 9   LAC DU FLAMBEAU BAND OF LAKE
10   SUPERIOR CHIPPEWA INDIANS and
     LAKE OF THE TORCHES ECONOMIC
11   DEVELOPMENT CORPORATION,

12                     Defendants.
     -----------------------------------------------------------
13

14

15              Deposition of DAVID DeYOUNG

16              Monday, March 3rd, 2014

17                     1:05 p.m.

18                        at

19              GASS WEBER MULLINS LLC
20              309 North Water Street
                 Milwaukee, Wisconsin
21

22

23

24

25         Reported by Dawn M. Lahti, RPR/CRR
```



WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN REPORTING

Innovation · Expertise · Integrity

1              Deposition of DAVID DeYOUNG, a witness in

2      the above-entitled action, taken at the instance of

3      the Defendants, pursuant to the Federal Rules of

4      Civil Procedure, pursuant to notice, before Dawn M.

5      Lahti, RPR/CRR and Notary Public, State of

6      Wisconsin, at 309 North Water Street, Milwaukee,

7      Wisconsin, on the 3rd day of March, 2014,

8      commencing at 1:05 p.m. and concluding at 5:15 p.m.

9  A P P E A R A N C E S:

10              GASS WEBER MULLINS LLC, by
                   Mr. David J. Turek
11                 309 North Water Street
                   Milwaukee, Wisconsin 53202
12                 Appeared on behalf of Plaintiffs
                   Stifel Nicolaus & Company, Inc.
13                 and Stifel Financial Corp.

14              GRIPPO & ELDEN, by
                   Mr. Daniel R. Fine
15                 111 South Wacker Drive
                   Chicago,  Illinois  60606
16                 Appeared on behalf of Plaintiffs
                   Saybrook Fund Investors, LLC
17                 (successor to Saybrook Tax Exempt
                   Investors, LLC), LDF Acquisition, LLC,
18                 Wells Fargo Bank, N.A.

19              FOLEY & LARDNER LLP, by
                   Mr. James R. Clark
20                 777 East Wisconsin Avenue
                   Milwaukee, Wisconsin  53202
21                 Appeared on behalf of Plaintiff
                   Godfrey & Kahn.

22

23

24

25



```
 1   A P P E A R A N C E S (cont'd):

 2
                  HANSEN REYNOLDS DICKINSON CRUEGER LLC, by
 3                   Mr. Timothy M. Hansen
                     Mr. Paul R. Jacquart
 4                   316 North Milwaukee Street, Suite 200
                     Milwaukee, Wisconsin 53202
 5                   Appeared on behalf of the Defendants.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                E X A M I N A T I O N

 2
     BY MR. HANSEN                                    5
 3   BY MR. TUREK                                   122
     BY MR. HANSEN                                  135
 4

 5

 6

 7

 8

 9

10                  E X H I B I T S

11   EXHIBIT                           PAGE IDENTIFIED

12   No. 17   Notice of Deposition               7
     No. 18   Notice of Deposition               8
13   No. 19   Executive Summary                 41
     No. 20   Limited Offering Memorandum       64
14   No. 21   Bond Purchase Agreement           75
     No. 22   Meeting Minutes, 1/22/08          81
15   No. 23   Computer Run of Stifel's Trading 131
                Inventory Account
16
     (Original exhibits attached to original transcript.
17   Copies of exhibits attached to copies of transcript.)

18

19

20

21

22

23

24

25
```

WWW.GRAMANNREPORTING.com · 414.272.7878



GRAMANN
REPORTING

Innovation · Expertise · Integrity

```
 1                   TRANSCRIPT OF PROCEEDINGS
 2                   DAVID DeYOUNG, called as a witness
 3          herein, having been first duly sworn on oath, was
 4          examined and testified as follows:
 5                        EXAMINATION
 6     BY MR. HANSEN:
 7     Q    Good afternoon, Mr. DeYoung.  Could you state your
 8          name for the record, please?
 9     A    David DeYoung.
10     Q    And your address?
11     A    1305 Lookout Drive in Waukesha, Wisconsin.
12     Q    Where do you work?
13     A    Stifel Nicolaus & Company.
14     Q    What do you do there?
15     A    Currently I'm a senior vice president and managing
16          director in their public finance department.
17     Q    What does your job entail?  What do you do with
18          that title?
19     A    It involves representing the firm in new issue bond
20          issues either as a financial advisor to one of the
21          parties, as a placement agent between buyer and
22          seller or as an underwriter of securities for
23          resale to the public.
24     Q    Who is your direct supervisor?
25     A    My direct supervisor is Peter Czajkowski in
```



| | | |
|---|---|---|
| 1 | | St. Louis. |
| 2 | Q | What's his title? |
| 3 | A | He is the manager of public finance. |
| 4 | Q | And forgive me if I missed this.  You say it's |
| 5 | | Stifel Nicolaus or Stifel Financial? |
| 6 | A | Stifel Nicolaus. |
| 7 | Q | Are you here today to testify on behalf of Stifel |
| 8 | | Nicolaus and Stifel Financial? |
| 9 | A | That's my understanding. |
| 10 | Q | Your role, where does it fall in the hierarchy of |
| 11 | | Stifel positions?  Is it a CEO and then on down or |
| 12 | | how -- describe a little bit the organizational |
| 13 | | structure where you fit in. |
| 14 | A | It's a typical corporate structure, yes.  We have a |
| 15 | | CEO, a CFO.  We are divided into functional |
| 16 | | operational areas.  At Stifel Nicolaus you'll find |
| 17 | | that I am in what's referred to as the fixed income |
| 18 | | division which means that I'm not involved in |
| 19 | | equity, securities or transactions like that. |
| 20 | | We also have areas that cover |
| 21 | | compliance and legal, et cetera.  But I have always |
| 22 | | functioned since I joined Stifel in the fixed |
| 23 | | income area, and the municipal bond area is a |
| 24 | | subset of that. |
| 25 | Q | How long have you held your current position? |



```
 1   A    Since April of 2007.
 2   Q    What did you do -- what was your title immediately
 3        before April 2007?
 4   A    I was manager of public finance for Griffin, Kubik,
 5        Stephens & Thompson in Milwaukee.
 6   Q    So you started -- did you start with Stifel in
 7        2007?
 8   A    Yes.  I joined Stifel in April of 2007.
 9                  (Exhibit 17 was marked for
10        identification.)
11   BY MR. HANSEN:
12   Q    Mr. DeYoung, I'm handing you what's been marked as
13        Exhibit 17.  Have you seen that document before?
14   A    I have.
15   Q    And I'll represent to you that this is the 30(b)(6)
16        notice that we sent over to your attorneys.  If you
17        look on page 2 and 3, it sets out matters for
18        examination.  Do you see where that is there?
19   A    Yes.
20   Q    And there are five of them, correct?
21   A    Yes, there are.
22   Q    And have you read all five?
23   A    I have.
24   Q    And are you prepared to testify today on -- about
25        all of those five matters for examination --
```



```
 1    A     Yes.
 2    Q     -- on -- and for Stifel Nicolaus & Company,
 3          correct?
 4    A     Yes.
 5                    (Exhibit 18 was marked for
 6          identification.)
 7   BY MR. HANSEN:
 8    Q     I'll hand you what's been marked as Exhibit 18.
 9          Just in the interest of completeness this is
10          essentially an identical notice, but this is to
11          Stifel Financial as opposed to Stifel Nicolaus.
12                    You've seen all five of these
13          matters for examination as well?
14    A     I have.
15    Q     Have you been deposed before?
16    A     In my life, yes.
17    Q     Usually we go over some of the ground rules just to
18          make sure we have a clean record.  So the court
19          reporter can only take down verbal responses and
20          verbal questions from me.  And she can only record
21          one of us at a time.  Do you understand that?
22    A     I do.
23    Q     So as conversations evolve, people start to
24          anticipate where folks are going.  Sometimes we cut
25          each other off.  I'll try to do my best to answer a
```

```
1          question and give you time to answer and let you
2          finish answering before I continue.  And if you do
3          the same, it will be a lot easier on Dawn.  Okay?
4   A      (Nods.)
5   Q      You have to say yes.
6   A      Yes.
7   Q      It's already started.  If you have a question or
8          don't understand any of my questions, let me know,
9          and I'll try to clarify it or have the reporter
10         read it back.  If you do answer, I'll assume you
11         understood the question.  Okay?
12  A      That would be fine.
13  Q      If you need to take a break or get up, whatever you
14         need to do, just let me know.  All right?
15  A      Yes.
16  Q      So in preparing for today's deposition, which
17         relate again to the matters for examination on
18         Exhibit 17 and 18, what did you do to prepare?
19  A      I met with counsel here at Gass Weber:  Dave Turek,
20         Brian Cahill, had some discussions with former
21         employees, Kevin Shibilski.
22  Q      Anyone aside from Kevin Shibilski?
23  A      I'm trying to recall.  Yes, Mike Schinzer,
24         salesman.
25  Q      Anyone else at Stifel?  And when I say Stifel, I'm
```



```
 1          referring to either Stifel Nicolaus or Stifel
 2          Financial unless I indicate otherwise.  Okay?
 3    A     There have also been discussions with our general
 4          counsel's office.
 5    Q     And I don't want to know about those.
 6    A     Okay.
 7    Q     I'm thinking more of folks that were involved in
 8          the -- what we'll get into in a minute, this
 9          underlying bond transaction.
10                     Did you talk to anyone else about
11          that?
12    A     No.
13    Q     What documents did you review in preparation for
14          today?
15    A     The bond purchase agreement, the limited offering
16          memorandum.  There were e-mail correspondence, and
17          there were also some -- there was some written
18          agreements involved by both the -- Stifel Nicolaus
19          was a party to as well as -- I don't recall
20          exactly.  I had access to a transcript of all the
21          documents, but the ones that were the focus of my
22          attention in preparation for today were those.
23    Q     Those three -- you said bond purchase agreement,
24          limited offering memorandum, e-mail correspondence,
25          and you said written agreements with Stifel.
```

```
 1                    Are those different from the bond
 2        purchase agreement?
 3    A   Yeah, because we had -- there were other
 4        correspondence that weren't transcript documents.
 5    Q   When you say transcript documents, what do you
 6        mean?
 7    A   Documents that were included in the transcript that
 8        were necessary for closing.
 9    Q   When you say transcript, you're not talking about a
10        transcript of a deposition or a legal proceeding?
11    A   I'm talking about a bond closing transcript.
12    Q   Got you.  What were those written agreements?
13    A   There was an authorization to proceed that we
14        received in writing from the tribe at one point.
15    Q   Did you bring any of the documents with you today?
16    A   No.
17    Q   What is the relationship between Stifel Nicolaus
18        and Stifel Financial?
19    A   Stifel Nicolaus & Company is a wholly owned
20        subsidiary of Stifel Financial.
21    Q   I'd like to talk to you a little bit about some
22        specific folks, two of whom you mentioned already.
23        Kevin Shibilski, what -- at the time of the bond
24        transaction, I'm talking about let's say middle of
25        '07 to middle of '08, what was Kevin Shibilski's
```



```
 1       job title?
 2   A   Kevin, I believe, was vice president.  He reported
 3       to me.
 4   Q   At that time?
 5   A   At that time.
 6   Q   You said vice president?
 7   A   Yes.
 8   Q   Of what?
 9   A   Public finance.
10   Q   And what were his dates of employment?
11   A   I am not sure.  Kevin had a brief break in
12       employment, so I don't know if it was continuous.
13       I have to ask a clarification question.  From what
14       period of time?
15   Q   I'm thinking of a time when I think David Noack
16       terminated Kevin Shibilski, and then David left,
17       and Stifel rehired Mr. Shibilski.  I just want to
18       understand the chronology there, roughly when that
19       happened.
20   A   My understanding is -- sometime in 2003 my
21       understanding is that Kevin was hired by David
22       Noack.  He worked with Stifel continuously until
23       early 2007.  At that point Kevin was terminated,
24       and Mr. Noack also left the firm.  Kevin was
25       rehired by Stifel after a short period of time also
```

|    |   |                                                      |
|----|---|------------------------------------------------------|
| 1  |   | in 2007, and it would have been at some point prior  |
| 2  |   | to April because Kevin was back in the office when   |
| 3  |   | I started in April 2007.                             |
| 4  | Q | Do you know why Mr. Shibilski was fired?             |
| 5  | A | No.                                                  |
| 6  | Q | Do you know why Mr. Noack left?                      |
| 7  | A | Yes.                                                 |
| 8  | Q | Why?                                                 |
| 9  | A | I was led to believe that there was a dispute over   |
| 10 |   | bonus distribution in early 2007 over production     |
| 11 |   | and performance in 2006.                             |
| 12 | Q | Did any of that performance production bonus         |
| 13 |   | dispute relate in any way to the bond transaction    |
| 14 |   | that is the subject of this lawsuit?                 |
| 15 | A | No.                                                  |
| 16 | Q | Same period of time.  What was David Noack's         |
| 17 |   | position, job description and date of employment?    |
| 18 | A | Date of employment I do not know.  Job description,  |
| 19 |   | he was managing Wisconsin public finance, and        |
| 20 |   | that's what he was hired to do, and he did that      |
| 21 |   | from the time he started to the time he left in      |
| 22 |   | early 2007.                                          |
| 23 | Q | Was he -- was he Kevin Shibilski's superior?        |
| 24 | A | Yes.                                                 |
| 25 | Q | Same kind of questions about Michael Schinzer.      |



```
 1        Title, job description, dates of employment.
 2   A    Michael Schinzer is an institutional salesman for
 3        Stifel Nicolaus & Company.  He works in a different
 4        department.  He works in investment sales, and he's
 5        been with the firm for some time, though I don't
 6        know exactly the length of Mike's employment.
 7   Q    Where does the institutional salesman position fall
 8        in the hierarchy of things if you're in charge
 9        of -- if you're above Noack, Noack is above
10        Shibilski, are they both above Schinzer?
11                  MR. TUREK:  I'm going to object to the
12        extent it mischaracterizes, but go ahead -- the
13        premise of the question.  Go ahead, Dave.
14                  THE WITNESS:  No.  Institutional sales
15        is, for lack of a better description, a separate
16        silo in the organizational chart to public finance.
17        So Mike reports to a sales manager and -- but we
18        are separate silos.
19                  In other words, I report to Peter
20        Czajkowski.  There are no circumstances under which
21        Mike Schinzer would report to Peter Czajkowski.
22   BY MR. HANSEN:
23   Q    What about Brian Lehky, L-E-H-K-Y?
24   A    Lehky.
25   Q    Lehky, sorry, Brian.  What is his title during this
```

```
 1        middle '06 to middle '08 time period?
 2   A    I don't know exactly what Brian's title was.  I
 3        didn't go back to check.  His function was as a --
 4        we refer to him as an analyst which meant that
 5        he -- he both ran numbers for us and also did
 6        credit investigation for us.
 7   Q    Is he still employed by Stifel?
 8   A    He is not.
 9   Q    Do you know when he left?
10   A    Don't know the exact date.  I believe it was in
11        2009.
12   Q    Do you know why he left?
13   A    He received the offer of a position from Dana
14        Investments.
15   Q    What about Mr. Schinzer, is he still with Stifel?
16   A    He is.
17   Q    How about Paul Patrie, P-A-T-R-I-E?
18   A    Paul Patrie was also vice president, also in public
19        finance, and he reported to me.  He would be on the
20        organizational chart as Kevin Shibilski's
21        colleague.
22   Q    When was the first time Stifel began working with
23        the Lac du Flambeau tribe?
24   A    First contact, I do not know.
25   Q    Who at Stifel would know that?
```



```
 1   A    At Stifel presently, I can't think of anyone who
 2        would know that for certain.
 3   Q    Who would be the most knowledgeable person in
 4        general about that?
 5   A    It would be David Noack.  It is most likely that he
 6        was the original contact.
 7   Q    What was the first -- what was the nature of the
 8        work that Stifel first performed for the
 9        Lac du Flambeau tribe?
10   A    I've seen references to a transaction that was done
11        for school purposes that Stifel had some role in.
12   Q    Was that in 2004?
13   A    I believe so.  It was before I came on board, but
14        there was -- yeah.
15   Q    And would that be David Noack's?
16   A    That would have been David Noack's work product,
17        yes.
18   Q    What's the next time that Stifel did work for the
19        Lac du Flambeau tribe?
20   A    The next transaction we were engaged to perform
21        would have been the transaction in question here.
22   Q    Did Stifel ever serve as a financial advisor to the
23        Lac du Flambeau tribe?
24   A    Not that I'm aware.
25   Q    Is there any contract between any Stifel entity and
```



```
 1         any Lac du Flambeau tribal entity other than the
 2         bond purchase agreement?
 3    A    Not that I'm aware.
 4    Q    Is there a way to confirm that for sure within
 5         Stifel?
 6    A    There should be.
 7    Q    There should be a way to confirm it?
 8    A    Well, if there was a financial advisory contract as
 9         you indicated, it would have -- we would have
10         needed to maintain that for regulatory purposes.
11         I've checked the financial advisory file, and no
12         such contract is on file there.
13    Q    So you don't have any reason to believe that they
14         did -- Stifel did serve in that capacity?
15    A    No, I have no reason to believe they served in that
16         capacity.
17    Q    Even absent a formal agreement like that, the
18         investment-type contract you just mentioned, are
19         you aware whether Mr. Noack or Mr. Shibilski
20         nevertheless provided financial advice to the
21         Lac du Flambeau tribe or one of its entities?
22    A    Not aware of that.
23    Q    Would such advice have been permissible in the
24         absence of a financial-advice-type contract like
25         you just mentioned?
```



```
 1   A    At that time, yes, it would have been.

 2   Q    And what would have permitted it?

 3   A    It could have essentially -- I need to have a

 4        better understanding as to what you mean by advice.

 5   Q    What was the name of the contract that you

 6        mentioned that would have -- that you looked for

 7        and that you didn't find?

 8   A    A financial advisory agreement.

 9   Q    Financial advisory agreement, okay.  What type of

10        advice would Stifel typically give under such an

11        agreement?

12   A    We would -- at that point we were assisting a

13        client and evaluating, first of all, projects that

14        may be undertaken.  It would be within the scope of

15        that agreement that we would also assist them in

16        evaluating sources of capital, and we would also

17        advise them on steps that they could be taking to

18        improve the perception of their credit in the

19        market either for a rating service or an insurer,

20        guarantors, letter of credit providers, people of

21        that ilk.

22   Q    I guess so -- let's use that definition.

23   A    Okay.

24   Q    So when I say advice, let's assume that it's the

25        advice that typically would have been given under a
```

WWW.GRAMANNReporting.COM · 414.272.7878

GRAMANN
REPORTING

Innovation · Expertise · Integrity

```
 1        financial advisory agreement.  Okay?
 2    A   Um-hum.
 3    Q   You said at that time such advice would have
 4        been -- let me rephrase that.
 5                  There would have been no prohibition
 6        from Stifel as an institution on someone like David
 7        Noack or Kevin Shibilski giving the type of advice
 8        one would traditionally give under a financial
 9        advisory agreement, correct?
10    A   That's correct.
11    Q   What did -- what does the qualifier "at that time"
12        mean?
13    A   Recently Securities and Exchange Commission rules
14        have changed that have more strictly defined what
15        constitutes financial advice and prohibits
16        essentially the provision of that advice outside
17        the scope of a written agreement.
18    Q   And it's your understanding that those prohibitions
19        were not in place mid-'06 to mid-'08?
20    A   They were not in place at that time.
21    Q   Even in the absence of regulatory prohibition,
22        Stifel itself didn't have any of its own
23        independent prohibitions on that type of advice?
24    A   No.
25    Q   If Kevin Shibilski or David Noack were giving that
```



```
 1        type of advice during that time, is there anyone at
 2        Stifel that they would have been communicating with
 3        about the provision of that advice, or are they
 4        kind of out there?  They're in charge of their own
 5        sort of market or client, and that's just what they
 6        do?
 7   A    Exactly.  There was -- there's a lot of
 8        independence provided to our people who are having
 9        direct customer client contact in nurturing that --
10        facilitating that type of relationship.
11   Q    Even in the absence of a rule requiring a written
12        agreement as is the case now, back at the time that
13        we're talking about, would the normal rules of
14        financial advisors to have governed someone like
15        David Noack or Kevin Shibilski if they were given
16        advice?
17   A    I don't understand that question.
18   Q    Sorry.  At the time, mid-'06 to mid-'08, even
19        though there might not have been a rule that said
20        you have to have a written agreement before you can
21        give financial advice to a client, if you did
22        decide to do that, there would still be rules
23        governing the type of advice and the rules over
24        that relationship, correct?
25   A    Yes.
```

```
 1  Q    Would those -- if that advice has been given, would
 2       someone in Kevin Shibilski's position have been a
 3       fiduciary to the client to whom they're giving the
 4       advice?
 5  A    No.
 6  Q    Why not?
 7  A    Because at this point our rule had always been
 8       contemplated to be one of a placement agent with
 9       regard to this transaction, and so we were not a
10       fiduciary to the -- to the tribe.
11  Q    In general though if Kevin Shibilski were to decide
12       to give advice in general to a client at the time,
13       would he be a fiduciary?
14  A    No.
15              MR. TUREK:  Object to the extent it calls
16       for a legal conclusion.
17              MR. HANSEN:  I didn't hear the answer.
18              THE WITNESS:  The answer is no.
19  BY MR. HANSEN:
20  Q    So the only two projects that you're aware of that
21       Stifel worked on with the LDF tribe was the school
22       deal in 2004 and this -- the bond transaction that
23       is the subject of this lawsuit?
24  A    That's what I'm aware of.
25  Q    Do you know what Mr. Noack or Mr. Shibilski did to
```



```
 1          foster the relationship with the Lac du Flambeau
 2          tribe?
 3                    MR. TUREK:  I'm going to object to it
 4          being compound.  Go ahead.
 5                    MR. HANSEN:  If you'd prefer to take them
 6          in turn, Kevin Shibilski and then Mr. Noack, that's
 7          fine.
 8                    THE WITNESS:  Not specifically.  I assume
 9          that they would be using what were in the industry
10          normal client development-type contacts.  You stay
11          in touch, give them a phone call, and some
12          participants in our market are more disciplined in
13          that than others.
14                    I don't know how disciplined David
15          was, but Kevin I know from experience did a pretty
16          good job of staying in touch by phone.
17     BY MR. HANSEN:
18     Q    Do you know whether apart from the -- what
19          culminated in the bond transaction whether anyone
20          from Stifel advised the Lac du Flambeau tribe on
21          something called the Emerald Star project or
22          anything related to something called Emerald Star?
23     A    I'm not familiar with that.
24     Q    Did anyone at Stifel advise the Lac du Flambeau
25          tribe regarding anything called the Grand
```

```
 1        Soleil-Natchez?  And Soleil is S-O-L-E-I-L, and
 2        it's a hyphen, and then Natchez, N-A-T-C-H-E-Z.
 3   A    Yes.
 4   Q    And what was the nature of that advice?
 5   A    I didn't characterize it as advice.
 6   Q    How would you characterize what happened?
 7   A    It's a project that we were introduced to in part
 8        of the conversation of this transaction.  Grand
 9        Soleil-Natchez represented a hotel casino
10        development in Natchez, Mississippi that the tribe
11        was looking to make an investment in.
12   Q    And what was Stifel's role in anything related to
13        Grand Soleil-Natchez?
14   A    Stifel, again, was contacted as a potential
15        facilitator or source of capital for that
16        investment.
17   Q    Who contacted Stifel about that?
18   A    I don't know who made the original contact.  I know
19        that when I assumed responsibility for the
20        transaction, my contact was Rick Lindsley most
21        likely.
22   Q    Does Stifel view the Grand Soleil-Natchez project
23        as separate and distinct from the bond transaction?
24   A    Yes.
25   Q    Was there a contract between the Lac du Flambeau
```



```
1            tribe and Stifel as it related to Stifel's services
2            in connection with Grand Soleil-Natchez?
3    A    Not that I've been able to identify.
4    Q    Who from Stifel was involved in the Grand
5            Soleil-Natchez -- can we call it the Grand
6            Soleil-Natchez project?
7    A    Sure.  As best I understand, Grand Soleil-Natchez
8            was originally an idea from a gentleman by the name
9            of Charles Cato.  Charles Cato had this site, this
10           land on the Mississippi River in Natchez,
11           Mississippi that he felt was suitable for a river
12           boat, casino and hotel project.
13                        Charles Cato had some customer
14           relationship with a Stifel Nicolaus broker in
15           Florida.
16   Q    Do you know who that was?
17   A    I do not recall that individual's name.
18   Q    Can we find that out?
19   A    We can try, yeah.  But that -- it was that broker
20           who then introduced Cato to David Noack as best I
21           understand, and it was then Mr. Noack who I believe
22           introduced Mr. Cato to -- and the Natchez project
23           idea to the tribe.
24   Q    Do you know when that was?
25   A    Looking back in the files, it was probably -- it
```



```
 1           may have been as early as late '05.  It was most
 2           likely most of the conversation was in '06.
 3   Q   What's your understanding of what the -- when you
 4           say introduced it, what was it?
 5   A   Well, it would indicate that it was an individual
 6           who had a site in Natchez that they were seeking to
 7           develop for gaming purposes and was looking for a
 8           partner with gaming experience and money.
 9                      And it's -- you know, I know that it
10           was those terms that Mr. Noack talked about this
11           transaction with the tribe.  I don't know who else
12           he may have talked to about the same transaction.
13   Q   Was it an investment opportunity?
14                   MR. TUREK:  "It" being Grand Soleil?
15                   MR. HANSEN:  I'm sorry, yeah.
16   BY MR. HANSEN:
17   Q   This Grand Soleil project that Mr. Noack brought to
18           the Lac du Flambeau tribe, what was he asking them
19           to do or what was he -- what was the concept behind
20           those discussions?
21   A   I do not know if it was presented as an investment
22           or also if they were seeking management and
23           expertise in both hospitality and gaming.
24   Q   Do you know who Mr. Noack dealt with at
25           Lac du Flambeau at the time?
```



```
 1   A    I don't know which tribal officials he was talking
 2        to, no.
 3   Q    What was the result of that -- the presentation of
 4        the Grand Soleil project by Mr. Noack to
 5        Lac du Flambeau tribe?
 6   A    By the time we started working on this, the tribe
 7        had made an investment from -- I'm not sure whether
 8        this was purely -- anticipated purely an investment
 9        participation or if there was going to be other
10        management responsibilities at that point.
11                    But yeah, they had provided some
12        funds to the development of the Grand Soleil
13        project out of -- I assume from the currently
14        available funds of the tribe or their development
15        corp.
16   Q    Were the funds a loan, or were they for the
17        purchase of equity?
18   A    I do not know.
19   Q    Do you know whether Mr. Noack received a commission
20        or any other type of compensation for the Grand
21        Soleil project culminating in some money going from
22        the tribe to Grand Soleil?
23   A    I do not know that.
24   Q    Would that be in Stifel's records somewhere?
25   A    Again, I don't know that either.  We do not have a
```

```
 1          record that we were party to a transaction.
 2   Q   What about the Stifel person in Florida, do you
 3          know whether they received compensation in any form
 4          as a result of the tribe providing money to the
 5          Grand Soleil project?
 6   A   I don't know.
 7   Q   Did Stifel remain involved in the Grand Soleil --
 8          excuse me.
 9                  Did Stifel remain involved with the
10          Lac du Flambeau tribe and Lac du Flambeau tribe's
11          dealings with Grand Soleil-Natchez after that
12          initial payment from the tribe to Grand Soleil?
13   A   It was part and parcel of the discussion of this
14          transaction, so I would say yes.
15   Q   Who at Stifel was primarily responsible for that?
16   A   At what time?
17   Q   From the initial investment that the tribe made in
18          the Grand Soleil in 2005 forward.
19   A   Again, that would have been David Noack for the
20          term that he was employed at Stifel.  Kevin
21          Shibilski was the lead on that relationship for
22          that short period of time between the time when
23          Mr. Noack left and I was recruited and hired, and I
24          would have picked up responsibility for that
25          relationship after that point.
```

1   Q   Were you hired by Stifel specifically to deal with

2       the Lac du Flambeau tribe and the Grand

3       Soleil-Natchez project?

4   A   No.

5   Q   Do you know whether Mr. Noack visited the tribe --

6       when I say visited the tribe, I mean on reservation

7       property or on tribe trust land, did he visit there

8       to -- as part of his dealings with the

9       Lac du Flambeau tribe and the Grand Soleil-Natchez

10      project?

11  A   From the records I've been able to review, we don't

12      have any record of that.

13  Q   Did anyone from Stifel visit the tribe in

14      connection with the Grand Soleil-Natchez project?

15  A   Not that I know of during that period of time.

16  Q   When are you aware of the first visit by anyone

17      from Stifel to the Lac du Flambeau tribe

18      physically?

19  A   That would have been our meeting of May 29th, 2007.

20  Q   What happened at that meeting?

21  A   We -- Stifel representatives made a presentation to

22      tribal officials of our qualifications to execute a

23      transaction to refinance tribal debt and provide

24      capital for investment in Natchez.

25  Q   Is the May 29, 2007 meeting, is that sort of the

```
 1        meeting that became what is the bond transaction?
 2   A    That would have been, yeah, one of the -- that was
 3        the first time that I could find in our records
 4        that we actually laid out with some specificity the
 5        way we envisioned the project budget and in terms
 6        of identifying what debt should be refinanced.
 7                   My recollection is that at -- in
 8        anticipation of that meeting the tribal official,
 9        Rick Lindsley, indicated that one thing they would
10        like us to be prepared to discuss was the maximum
11        amount of bonds that we felt the tribe could
12        support, that the current tribal casino could
13        support.
14                   And so I know that there was some --
15        there were some numbers to that effect that
16        Mr. Lehky put together in anticipation of helping
17        us to put together that proposal.
18   Q    Mr. Lehky was the analyst we talked about earlier
19        before?
20   A    Right.
21   Q    And so he was the person who had the expertise to
22        say, you can afford this much but not this much
23        based on what was going on --
24   A    We discussed credit criteria and how they would be
25        applied to the casino.  He was the guy however with
```

```
 1        the facility with the computer program that
 2        basically generated the solution that we were going
 3        to show the tribe.
 4   Q    Got you.  Who from Stifel was at the meeting
 5        May 29, '07?
 6   A    It was myself.  There was Kevin Shibilski, Paul
 7        Patrie, and I know we brought in Mike Hark from our
 8        Denver office in public finance.
 9               MR. CLARK:  I'm sorry, what was the last
10        name?
11               THE WITNESS:  Hark, H-A-R-K.
12   BY MR. HANSEN:
13   Q    And what was the reason to bring Mr. Hark in?
14   A    Mr. Hark had particular Indian finance experience,
15        and he was the individual within the public finance
16        department at Stifel Nicolaus that had that
17        experience, and we were competing with David Noack
18        and Robert W. Baird at that time for this business.
19               We were led to believe this was a
20        competitive interview, and we knew that David Noack
21        had already completed some transactions with the
22        Lac Courte Oreilles Band of Chippewa and was
23        touting that individual Indian finance experience,
24        and we felt we needed to counter that with the
25        person as best we could to that experience at
```

```
 1         Stifel in Indian finance.  That individual was Mike
 2         Hark.
 3    Q    Got it.  Do you remember where the presentation
 4         took place?
 5    A    In a -- in a large room.  I assume a boardroom at
 6         the tribal offices.
 7    Q    The tribal center -- the -- was the casino like
 8         across the parking lot?
 9    A    Right.  It was not the casino.  This was at the --
10         basically the tribal center, the tribal office.
11    Q    Do you remember who from the tribe was there?
12    A    There were about six to 10 people, so it may have
13         been an entire complement of the tribal council,
14         and Mr. Lindsley was there also because I recall
15         him handling introductions.
16    Q    What was the result of that meeting?  I assume you
17         didn't close the deal that day.
18    A    No.  The result of the meeting is that we were
19         contacted by either Mr. Lindsley or Carl Edwards.
20         The reason for that is that the follow-up contact,
21         the call was taken by Mr. Shibilski, not myself
22         because that contact post-meeting occurred on a
23         weekend, and I was down in Chicago with my wife's
24         parents for a barbecue, and I wasn't carrying my
25         cell phone with me at the barbecue.
```



```
 1                      But the nature of those initial
 2        phone calls were the tribe seeking our -- seeking
 3        that we revise our proposal to reduce the fees that
 4        we quoted in the initial proposal.  We stepped into
 5        fee negotiation mode.
 6   Q    And did those fee negotiations continue with
 7        Mr. Shibilski primarily or yourself?
 8   A    With Mr. Shibilski primarily, though he ultimately
 9        did track me down to make sure that he wasn't
10        overstepping his authority, and I gave him
11        parameters within which we were prepared to
12        negotiate, and I found out then a day or so later
13        that he had in fact been able to achieve agreement
14        with the tribal officials he was talking to.
15   Q    How does the compensation work at Stifel?  When you
16        get the fee agreement, do the individual folks that
17        went up there, yourself and Mr. Shibilski and
18        Patrie, do they share in some commission or some
19        kind of fee?  How are people compensated?
20   A    People are compensated based upon production.  It's
21        not a direct mathematical contribution, and there
22        is some judgment imposed at the end of the year at
23        bonus time as to how much that's available in the
24        compensation pool should be divided to what
25        individuals, but yes, there was an expectation that
```

```
 1        everyone who went up to secure this business would
 2        at some point share in the compensation
 3        commensurate with their contribution to the
 4        project.
 5    Q   Whose project was it at Stifel?  Was it merely your
 6        deal?  Was it Kevin's deal?
 7    A   Kevin was the relationship lead, although I managed
 8        the project, financed it.  And that's essentially
 9        the -- one of the differences.  And the reason
10        Kevin was the relationship lead was Kevin covered
11        northern Wisconsin for us.
12                    He lived in Phillips and the -- and
13        he had a relationship that was developed and
14        associated with Mr. Noack that predated my coming
15        into the firm.  I didn't see any business reason to
16        upset that.  However, the transaction also
17        presented some credit questions that were beyond
18        the scope of Kevin's expertise and experience, and
19        so I wanted to make sure that on that business
20        relationship/business transaction that I was the
21        gatekeeper and the lead on that part of the
22        relationship.
23                    MR. TUREK:  Tim, whenever you get to a
24        breaking spot.
25                    MR. HANSEN:  Yeah, let's take a break.
```

```
 1                    (Discussion off the record.)
 2    BY MR. HANSEN:
 3    Q    So we were just talking about this May 29, 2007
 4         meeting and the upshot of it.
 5                         When was the next time that Stifel
 6         heard from the Lac du Flambeau tribe after that
 7         meeting?
 8                    MR. TUREK:  Just so I'm clear.  Other
 9         than what he talked about with fees or it's kind of
10         completely new now?
11    BY MR. HANSEN:
12    Q    Was the next time fees?
13    A    Yeah.  After we had arrangements on fees, I -- we
14         didn't keep a phone log, so I don't know exactly.
15    Q    What else was there to discuss besides fees?
16    A    Then it was the manner in which we would proceed.
17         At that point I was discussing with Rick Lindsley
18         how we would move forward and that would have
19         occurred pretty quickly because they had some
20         deadlines that they were concerned about.
21    Q    The tribe had deadlines?
22    A    Yes.
23    Q    Was that with respect to debt obligations coming
24         due, or were there other things?
25    A    They had both balloon payments coming due on their
```

```
 1        existing debt, and the project in Natchez was also
 2        running low on capital, and Mr. Lindsley made it --
 3        made it clear to us that we wanted to move forward
 4        deliberately to make sure the contractors were
 5        getting paid on a timely basis.
 6   Q    When was the next time that anyone from Stifel
 7        visited the tribe?
 8   A    I visited in September.  I believe it was
 9        September 25th --
10   Q    Just you?
11   A    -- is my recollection.  Kevin may have met me at
12        that meeting from Phillips.
13   Q    What was that meeting about?
14   A    At that meeting we presented to tribal officials an
15        outline of two different financing structures from
16        two different firms that had given us expressions
17        of interest in the transaction.
18   Q    Who were those two?
19   A    One was Saybrook, and I still cannot recall -- I'm
20        drawing a blank.  It was another institution.
21   Q    Dougherty?
22   A    No, it wasn't Dougherty.  This is one that -- it
23        was a customer of Pat.  Pat Dolan was another
24        institutional salesman at Stifel that had generated
25        that individual -- that proposal.  I hesitate to
```

```
 1        call it a proposal -- that indication of interest.
 2   Q    Is that documented somewhere, this presentation
 3        that you made or these -- the indication of
 4        interest from Saybrook or Mr. Dolan's firm?
 5   A    The terms of the indications of interest were
 6        communicated to me verbally through the salesperson
 7        that covered the accounts, Pat Dolan and Mike
 8        Schinzer.
 9   Q    Schinzer was responsible for the Saybrook interest?
10   A    Saybrook was his customer.
11   Q    And was the presentation also oral?
12   A    I believe so.
13   Q    Would this also take place at the same tribal
14        center we talked about earlier?
15   A    I remember, yes, it did.
16   Q    Do you remember any of the tribal officials who
17        were there?
18   A    It was a smaller group.  I remember that.  And
19        Mr. Lindsley was there, and I believe Vicky Doud
20        was there, and there may have been a couple or
21        three other individuals.
22   Q    What was discussed at that meeting; you made your
23        presentation, and what was the reaction?
24   A    Well, we laid out for them the -- an outline of the
25        nature of the Saybrook interest and the nature of
```



```
 1          the interest of this other firm and told them that
 2          we needed them to make a decision and give us a
 3          specific authorization to proceed to due diligence
 4          with one firm or the other.
 5     Q    What were the -- what were the natures of the two
 6          levels of interest or expressions of interest?
 7     A    The difference between the expressions of interest
 8          that they had to come to grips with is the Saybrook
 9          proposal was for a higher principal amount in terms
10          of the amount that -- the leverage they were
11          willing to assume, they were willing to assume a
12          higher leverage than the alternative proposal,
13          however their interest rate was likewise higher
14          than the alternative proposal.
15     Q    Do you remember the specifics of those numbers?
16     A    I know that Saybrook was -- and their proposal was
17          at 50 million.  It was -- the other proposal was
18          something less than that and I want to -- and
19          again, working from memory, it was -- it was a
20          fairly significant difference.  By significant I'd
21          say the difference was more than $5 million.
22     Q    It could have been 45 million?
23     A    It was 45 or less.  And Saybrook's interest
24          proposal was -- they gave again like -- they
25          gave -- it would be -- they indicated more than
```

```
 1        10 percent.
 2                     Again, until -- you're not going to
 3        get these guys to commit to a rate until they've
 4        completed due diligence, and the other proposal --
 5        initially it wasn't -- didn't want to quote me
 6        anything but for purposes of allowing the tribe to
 7        make a comparison, I pressed Pat Dolan to get his
 8        client to at least give me a number that was going
 9        to be either more or less than 10 percent.  And
10        interestingly enough they indicated that the number
11        they were thinking of was less than 10 percent.
12   Q    And did you have -- when did you follow up then
13        with the Lac du Flambeau tribe about those two
14        expressions of interest and which direction to go?
15   A    After that meeting I was calling Rick --
16   Q    Rick Lindsley?
17   A    Rick Lindsley -- normally in response to calls I
18        was getting from Pat Dolan or Mike Schinzer.
19   Q    Because their clients were eager to know?
20   A    Their clients were wondering, okay, you present --
21        what did the tribe decide?  And for several weeks
22        the tribe didn't decide as far as we knew.  At
23        least it had not been relayed to me, and so I
24        remember communicating with Pat and Mike, and they
25        were relaying those communications to the customers
```

```
 1          trying to keep them interested.
 2                      I mean we didn't want them to lose
 3          their indication of interest while the tribe was
 4          trying to reach a decision, so I was communicating,
 5          but I was communicating just because it's -- it's
 6          just bad form for me to go around my salespeople to
 7          their customer.  My communications were going to be
 8          through the salesperson that was covering that
 9          account.
10   Q    Were the communications by phone, in person,
11          e-mail, a combination?
12   A    Most often --
13                      MR. TUREK:  With whom and by whom, to the
14          salespeople?
15                      MR. HANSEN:  Yeah.  Sorry, your
16          communications to --
17                      THE WITNESS:  Most often by phone.
18   BY MR. HANSEN:
19   Q    Were there any e-mails --
20                      MR. TUREK:  I'm sorry.  I still don't
21          know who the conversations are with.  The
22          salespeople, the investors or the tribe?
23                      MR. HANSEN:  Right.  My question is from
24          Mr. DeYoung to the salesperson, either Schinzer or
25          Pat Dolan.
```

```
 1                    THE WITNESS:  It would have been mostly
 2        by -- by phone.  I think there were a couple of
 3        occasions or maybe only one in which Pat left me a
 4        phone message, I called him back, we weren't able
 5        to connect.  So before leaving at the end of the
 6        day, I may have sent him an e-mail because he was
 7        indicating what he was calling about, that kind of
 8        thing.
 9   BY MR. HANSEN:
10   Q    But you never reached out directly to Pat Dolan's
11        client or to Saybrook?
12   A    No.
13   Q    When did the tribe next communicate to you -- well,
14        let me ask you this.
15                    What was Mr. Shibilski's role in all
16        this?  What was he doing while these communications
17        were going on?
18   A    If I was going to be calling Mr. Lindsley to follow
19        up on the questions that we were getting from
20        potential investors and their salespeople, I
21        would -- if Kevin was available, I would have him
22        on the call with me.
23                    Now, did Kevin have other
24        discussions as this was going along?  He may have
25        but not that I was aware of.  But I do -- it would
```

```
 1        be common because he was the relationship manager
 2        that if there was a need for a call, I would often
 3        get Kevin on the line first, and we would then call
 4        Rick's office.
 5   Q    When did you eventually hear back from the tribe
 6        about their impressions of the two interested
 7        parties?
 8   A    My recollection, it was over a month.  And so I
 9        want to say it went to the end of October, early
10        November.  I know the decision was made, and it was
11        resolved in early November because I generated a
12        written authorization to proceed and submitted it
13        to -- for Vicky Doud's signature that memorialized
14        their selection of Saybrook and our authorization
15        to proceed with them to consummate the transaction.
16   Q    Who at the tribe communicated to Stifel that the
17        tribe had selected Saybrook?
18   A    I don't remember.
19   Q    Do you remember whether they told you, or did it go
20        to Mr. Shibilski?
21   A    I don't remember that either.
22                   (Exhibit 19 was marked for
23        identification.)
24   BY MR. HANSEN:
25   Q    I'll hand you what's been marked as Exhibit 19.
```



1          The front page is Exhibit N because it was an

2          exhibit to a filing in this case, but the second

3          page looks like the front page of a PowerPoint.

4          It's titled executive summary.  Do you see that?

5    A     Yes.

6    Q     Are you familiar with this document?

7    A     I am.

8    Q     And I'm showing it to you now because it seems like

9          it's around this time period where this document

10         might be relevant.

11                      Why don't you take just a minute and

12         glance through it if you need to.  Just tell me

13         generally what this document is.

14                 MR. TUREK:  Read the whole thing, Dave.

15         Not read it all, but look at it all.

16   BY MR. HANSEN:

17   Q     Can you just tell me generally what this document

18         is?

19   A     This document was a summary of the -- in terms of

20         the transaction as of this date in November of

21         2007.  The first eight pages are the ones that are

22         pages 2 through 8 as they're paginated on there --

23         I'm sorry, page 2 through 7.  That was a little bit

24         of reorganization but a memorialization of the

25         terms of Saybrook Capital's financing proposal that

```
 1            they were finally willing to reduce to writing.
 2                      Following -- the pages following
 3            that were a reproduction of the -- some of the
 4            material that we had pulled together and provided
 5            to our institutional salespeople very early on to
 6            solicit among institutional investors indications
 7            of interest.  So this document has been with the
 8            tribe -- is a combination of those two.
 9                      Essentially we're reminding the
10            tribe that we provided Saybrook and other entities
11            like them with this information about the tribal
12            operations, and they've responded with this outline
13            of a potential transaction.
14    Q    So pages 8 through 19 of Exhibit 19 --
15    A    Were a -- first our work product with information
16         that the tribe provided for us as well.
17    Q    Right.  And that was what you --
18    A    Not Stifel, but its work product.
19    Q    That Stifel used to generate or try to generate
20         interest in the Natchez project?
21    A    Yes.
22    Q    And Stifel Nicolaus prepared this document, is that
23         correct?
24    A    Yeah, we assembled that document.
25    Q    And I take it this would have been -- Stifel used
```



```
 1         this to present to the tribe, is that right?
 2    A    To the tribe and to Saybrook.
 3    Q    Saybrook would have already gotten it, right?
 4         Saybrook would have seen pages 8 through 19?
 5    A    Yes.
 6    Q    Was this -- was this -- who is the audience -- who
 7         is the intended audience of this document?
 8    A    Both Saybrook and the tribe.
 9    Q    As sort of a summary of everything that had been
10         discussed and the general structure of the deal
11         going forward?
12    A    Yes.
13    Q    At page 18 of the document, there's a heading
14         called Management Team.  Do you see that there in
15         the middle of the page?
16    A    Okay.  That was the management team regarding --
17         yes.  I see that.
18    Q    It's the management team of what?
19    A    Of the Emerald Star Casino project in Natchez.
20    Q    And Emerald Star, that was just the -- was that the
21         name of this project before it was the Grand
22         Soleil-Natchez?
23    A    Yes.  It appears, yes.
24    Q    And I think you indicated -- it says -- under the
25         management team it says, The management team will
```



```
 1        consist of Emerald Star Casino-Natchez, LLC, a
 2        Mississippi single project limited liability
 3        company whose members are Mr. Charles Cato,
 4        Mr. William Bayba and a political subdivision of
 5        the Lac du Flambeau Band of Lake Superior Chippewa
 6        Indians of Wisconsin, correct?
 7   A    Yes.
 8   Q    Mr. Cato is the person you indicated before who had
 9        the contact at Stifel in Florida, and that person
10        in Florida went to Noack, and Noack went to the
11        tribe, correct?
12   A    That's my understanding.
13   Q    Who is Bill -- Mr. William Bayba?
14   A    Mr. Bayba is a hospitality developer in Wisconsin
15        predominantly.  I'm not familiar where Bill has
16        done all his projects, but there's a couple of his
17        projects in Wisconsin.
18   Q    What's Big River Enterprises, LLC?
19   A    I don't know specifically.  The reference to Big
20        River had always been that it was an entity that
21        Bill Bayba controlled that was going to be working
22        on the hotel portion -- the hospitality portion of
23        the Natchez project.
24   Q    Right below that it says Management Team, and it
25        has that paragraph I just read, and then it's got
```

```
 1        three entities listed.  It says Emerald Star Casino
 2        & Resorts, Inc., 19.9 percent, correct?
 3   A    Um-hum.
 4   Q    Big River Enterprises, LLC, and then in parentheses
 5        Mr. William Bayba, close parentheses,
 6        40.05 percent, correct?
 7   A    Um-hum.
 8                MR. TUREK:  Yes?  You got to answer
 9        verbally.
10                THE WITNESS:  Yes.
11 BY MR. HANSEN:
12   Q    Lake of the Torches Federal Development
13        Corporation, 40.05 percent, correct?
14   A    Correct.
15   Q    Do you know why Mr. Bayba is identified
16        parenthetically after Big River Enterprises, LLC?
17   A    I do not know for sure.
18   Q    What do you think?
19   A    I suspect it was a way in which we were able to
20        identify that this was the firm from which
21        Mr. Bayba was acting as the principal.  I mean it
22        could have been that neither the tribe nor Saybrook
23        was familiar with the name Big River Enterprises
24        though they were familiar that Mr. Bayba was going
25        to be involved in the hospitality and development.
```

```
1   Q    Was any of that management team of significance to

2        Stifel when it was generating interest from

3        Mr. Dolan's client and Saybrook?

4   A    It was of interest because we needed to be accurate

5        in the description of the management.

6   Q    Why is the description of the management so

7        important?  Who is that important to?

8                  MR. TUREK:  I'm going to object and

9        instruct him not to answer.  I'm having a hard time

10       seeing where any of this goes into the five topics

11       that's in the notice.

12                  So I've got jurisdictional contacts,

13       factual basis for documents, corporate relationship

14       with Stifel.  So I mean, I invite you to kind of

15       give me a reason before we start going too far down

16       this line.

17  BY MR. HANSEN:

18  Q    Do you know when Exhibit 19 would have been

19       presented, if at all, to the tribe and by whom?

20  A    It was -- it's the type of document that we would

21       have circulated to make sure that we had in fact a

22       meeting of the minds on this transaction.  It was a

23       recapitulation of some material information that

24       had come in from various sources.

25  Q    Do you know whether -- is this the kind of thing
```

| | | |
|---|---|---|
| 1 | | you would have -- someone from Stifel would have |
| 2 | | e-mailed to the tribe or was -- is this a |
| 3 | | PowerPoint presentation that would have been |
| 4 | | presented in person? |
| 5 | A | I've never made this as a PowerPoint presentation. |
| 6 | | So it would have been either e-mail or U.S. mail. |
| 7 | Q | Do you recall any reactions from the tribe to this |
| 8 | | document, Exhibit 19? |
| 9 | A | No. |
| 10 | Q | How about from Saybrook, did they react to |
| 11 | | Exhibit 19? |
| 12 | A | I do not recall. |
| 13 | Q | After that September 2007 meeting up at the tribe, |
| 14 | | what was the next time that someone from Stifel |
| 15 | | visited the tribe? |
| 16 | A | That would have been done as part of the due |
| 17 | | diligence visit to the tribe. |
| 18 | Q | When would that have occurred? |
| 19 | A | That was in November of 2007. |
| 20 | Q | And who would have done that? |
| 21 | A | I was on that trip as was Mr. Patrie, Mr. Schinzer |
| 22 | | and Scott Bayliss from Saybrook.  Kevin Shibilski |
| 23 | | met us. |
| 24 | Q | Because he lived up there? |
| 25 | A | He met us.  He picked us up at the airport.  He was |



```
 1        driving us around that day.
 2   Q    What did you do that day?  Do you remember what day
 3        it was exactly?
 4   A    I did at one time.  It's in the records, but I
 5        don't recall.
 6   Q    But it was some day in November of '07?
 7   A    Right.
 8   Q    What was the purpose of that visit?  When you say
 9        due diligence, what does that mean?
10   A    Saybrook requested the opportunity to meet with
11        tribal officials to provide some follow-up
12        questions on the financial information on both
13        tribal and casino and hotel operations that they
14        had previously been provided in writing.  Also just
15        to look at the facility, walk the land, if you
16        will.
17   Q    Kick the tires?
18   A    Kick the tires and speak directly to officials of
19        the tribe.
20   Q    Do you remember who you spoke with from the tribe
21        on that trip?
22   A    We met with Rick Lindsley.  We met with management
23        at the casino.  I don't recall the names.  We also
24        met with management at the hotel as well.  And that
25        was pretty much the order in which their due
```

```
 1         diligence occurred.  It started out at the tribal
 2         offices and -- and it kind of worked its way around
 3         there.  I remember we had the lunch at the casino.
 4    Q    Was it mostly Mr. Bayliss asking questions and
 5         doing due diligence?  Who was sort of in charge?
 6    A    Mr. Bayliss was leading -- it was there for him to
 7         get the information he felt he needed in order to
 8         move the transaction forward.  I was also asking
 9         questions but for the purposes of making sure that
10         I understood what Scott was asking or what
11         Mr. Bayliss was asking.
12    Q    What was -- what did you view your role as at that
13         time?
14    A    Again, we were still at that point serving, as we
15         have always, serving as placement agent which means
16         we were bringing together the buyer and the seller
17         of these securities.
18                   I wanted to make sure however that I
19         at all times had an accurate understanding of how
20         the terms of this transaction were developing and
21         also had an accurate understanding of what was
22         material to Saybrook and Mr. Bayliss.  And --
23         because those all would have had input into the
24         preparation of the offering memorandum.
25    Q    Was there a representative of Big River Enterprises
```

 1        there during the due diligence process?
 2   A    Not that I recall.  Not at that meeting, no.
 3   Q    Did Stifel do any of its own due diligence
 4        independent of Mr. Bayliss?
 5   A    Preliminarily we had gathered available financial
 6        information to prepare our proposal of May 29th,
 7        but that was the extent of it.  When we were
 8        invited to submit a proposal, there was some
 9        follow-up communication to Mr. Lindsley saying can
10        you send us this if it's readily available.
11   Q    Stifel's due diligence though was focused primarily
12        on the casino, correct?
13   A    Yes.
14   Q    Not really on the Grand Soleil-Natchez project
15        itself?
16   A    Right.
17   Q    Do you remember -- I think you mentioned at that
18        May 2007 meeting that the tribe had requested that
19        Stifel had identified the maximum amount of
20        borrowing that the tribe could do and that they had
21        asked for less than that.
22                 Do you remember what was the maximum
23        amount that Stifel thought that the casino could
24        support?
25   A    I don't recall.  I do know that it was in excess of



1        $50 million.

2   Q    Like 55 million or more like 100 million?

3   A    No, I don't recall reaching that level, but once we

4        had gathered the financial information, we made

5        certain credit assumptions that was then applied to

6        that information and produced for them as part of

7        the May 29th meeting what our analysis was of what

8        the current operations could support.

9   Q    What led you to conclude that it was a competitive

10       bidding process in May?

11  A    We were told.

12  Q    By who?

13  A    Rick.

14  Q    Rick Lindsley?

15  A    Yeah.

16  Q    He just said it's down to you and Baird or it's

17       competitive --

18  A    Basically said we're interviewing you and Baird

19       that they gave -- I remember asking, well, do I

20       have my choice of which interview slot I get?  He

21       said, no, Dave Noack already took the first slot.

22       So we knew we were coming in second.  Dave was

23       leaving as we were coming in that night.

24  Q    Did you see David up there?

25  A    Oh, yeah, we met in the lobby.

| | | |
|---|---|---|
| 1 | Q | How was that exchange? |
| 2 | A | It was -- it was fine.  The public finance |
| 3 | | fraternity is a small fraternity, and we compete |
| 4 | | all the time. |
| 5 | Q | Did Stifel have any input in the September meeting |
| 6 | | which way the tribe should go, the Saybrook route |
| 7 | | or Pat Dolan's route? |
| 8 | A | No. |
| 9 | Q | Is that something that Stifel would have tried to |
| 10 | | avoid in fact? |
| 11 | A | Yes. |
| 12 | Q | After the November 2007 meeting with Saybrook up at |
| 13 | | the tribe, what was the next time that you recall |
| 14 | | Stifel representatives visiting the tribe? |
| 15 | A | That would have been the January 2, 2008 meeting |
| 16 | | that was called to -- the tribal council to adopt |
| 17 | | the enabling legislation for the transaction. |
| 18 | Q | Did you attend that meeting? |
| 19 | A | I did not. |
| 20 | Q | Who did? |
| 21 | A | Kevin Shibilski attended representing Stifel. |
| 22 | | Brian Pierson, the tribe's legal counsel, was |
| 23 | | carrying those documents up from Milwaukee because, |
| 24 | | again, I believe Kevin came over from Phillips to |
| 25 | | attend the meeting. |

| | | |
|---|---|---|
| 1 | Q | What was your understanding of the purpose of that |
| 2 | | meeting? |
| 3 | A | To adopt the final resolutions that would be -- |
| 4 | | that would then set us on a path to closing.  There |
| 5 | | were -- my recollection was that there were |
| 6 | | resolutions -- corporate resolutions that were |
| 7 | | necessary to consolidate some pledged assets and |
| 8 | | revenues in one place, in one new corporate entity, |
| 9 | | and then there was also a borrowing resolution that |
| 10 | | approved several documents by reference. |
| 11 | Q | How come you didn't go? |
| 12 | A | I was sicker than a dog. |
| 13 | Q | You remember it well? |
| 14 | A | I was coming off of December sinus surgery that did |
| 15 | | not heal.  I made the mistake of trying to get -- |
| 16 | | decided that between Christmas and New Year's was a |
| 17 | | good time to get it done.  It was not a good time |
| 18 | | to get it done. |
| 19 | Q | Doesn't sound like it was ever a good time for |
| 20 | | something like that. |
| 21 | A | Yeah. |
| 22 | Q | How did that meeting go? |
| 23 | A | They approved the transaction. |
| 24 | Q | Did Mr. Shibilski report back to you during your |
| 25 | | recovery period about the meeting? |

```
 1   A    He mentioned that there was considerable
 2        discussion, but yeah, that the transaction received
 3        majority support.
 4   Q    Were you surprised at all to learn that there was
 5        discussion given that in November that term sheet
 6        seemed like it was a done deal?
 7   A    I was not surprised.
 8   Q    Why were you not surprised?
 9   A    Because of the delay that we experienced between
10        the September meeting in which I laid out the two
11        alternative proposals and then it was more than a
12        month before they got back to me with their
13        decision, and this was from a client that had up to
14        that point been emphasizing how time was of the
15        essence.  And we saw a month disappear on the
16        calendar while the ball was in their court if you
17        will.
18   Q    What did that delay suggest to you?
19   A    That there was a lot of debate among the tribe as
20        to how the project should move forward or if it
21        should move forward.
22   Q    Did Stifel have any particular interest in whether
23        the bond transaction was consummated or not?
24   A    We're in the investment business.  We only get paid
25        if a deal closes.
```



```
 1   Q    What was the -- you said you had negotiated the
 2        fee.  What was the fee?  What was Stifel's fee at
 3        the bond deal close?
 4   A    We ended up agreeing on a fee of I believe
 5        three-quarters of one percent which on a
 6        $50 million transaction would have been $375,000.
 7   Q    Is that a typical fee for this type of transaction?
 8   A    It was in the range.
 9   Q    In on the low end or in on the high end?
10   A    It was in on the low end.
11   Q    What led to that fee being on the low end of the
12        range?
13   A    As we discussed after our presentation on May 29th,
14        tribal officials tracked down Kevin Shibilski and
15        wanted to negotiate the fee down from the level we
16        had originally proposed.
17   Q    What was Stifel's role at the January 2, 2008
18        meeting?
19   A    Placement agent, and we were the -- in that role we
20        were the initial purchaser under the bond purchase
21        agreement.
22   Q    And what was the purpose of Stifel appearing at the
23        meeting?
24   A    To answer questions that may come up.  It would be
25        customary that we make ourselves available as a
```



```
 1          resource if there are questions.  Bond transactions
 2          can be complicated.  Though we weren't going to
 3          provide opinions on -- that call for a legal
 4          conclusion of the documents.  But in terms of
 5          financial provisions, Saybrook was not there, and
 6          we would make ourselves available to answer those
 7          questions.
 8    Q     Stifel would be the party though that would have
 9          been responsible for financial projections and the
10          financial structure of the deal, correct?
11    A     No.
12    Q     Who would have been responsible for that?
13    A     The structure of the transaction was negotiated
14          between Saybrook and the issuer.  We put out a
15          solicitation of interest in very general terms, and
16          things like structure are matters of specificity
17          that are normally brought to the table initially by
18          that investor describing the terms under which he
19          has interest.
20    Q     So if questions arose about the bond transaction,
21          what would Stifel -- what type of questions would
22          you have expected Stifel to be prepared to answer?
23          If not about the financial structure of the deal,
24          then about what?
25    A     We would be prepared to answer questions at that
```



```
 1        January 2nd meeting about the financial structure
 2        of the deal.  At that point the budget is set
 3        there, the repayment schedule is set in that
 4        resolution, but how those are portrayed in that
 5        resolution on January 2nd was a result of
 6        negotiations between Saybrook and their counsel and
 7        the tribe and their counsel.
 8   Q    What was Stifel's role at that meeting with respect
 9        to giving advice about the Grand Soleil-Natchez
10        project?
11   A    Grand Soleil-Natchez was one of the purposes for
12        which bond proceeds were proposed to have been
13        expended.  Other than -- other than that by this
14        point decisions on the merits of that decision
15        would have already been made by the tribe or they
16        wouldn't have been present in the resolution.
17   Q    And Stifel hadn't done due diligence on the Grand
18        Soleil project specifically, correct?
19   A    No, they had not.
20   Q    So Stifel wouldn't have been in a position to
21        advise the tribe on the risks or benefits or wisdom
22        of investing in the Grand Soleil project, correct?
23   A    Correct.
24   Q    What would be the reason for Stifel not -- would it
25        have been responsible for Stifel to do that?
```



```
 1    A    It depends on the question as asked.  Rick Lindsley
 2         was representing the tribe's interest -- financial
 3         interest in Natchez at this point.  And there
 4         were -- from time to time we'd get inquiries
 5         regarding the status of the Natchez project.  Those
 6         references were always made to Rick.
 7    Q    Who would get inquiries about the status of the
 8         Natchez project?  I didn't hear you.
 9    A    They would come from -- Saybrook would ask Schinzer
10         and we'd -- I'd relay that information to -- to
11         Mr. Lindsley.
12    Q    You would relay questions from Saybrook about Grand
13         Soleil-Natchez to Mr. Lindsley?
14    A    Yeah.
15              MR. CLARK:  Excuse me, could you read
16         back that last question and answer?
17              (Record read.)
18    BY MR. HANSEN:
19    Q    You were aware of the January 2, 2008 meeting,
20         correct?
21    A    Correct.
22    Q    And you knew Mr. Shibilski was going to go?
23    A    Yes.
24    Q    And you would have gone yourself if you hadn't been
25         sick, right?
```



```
 1   A     Yes.
 2   Q     Would you have gone ordinarily with Mr. Shibilski?
 3         It would have been both of you typically?
 4   A     What was typical, I would have asked him to meet me
 5         there, yeah.
 6   Q     Of the fee, the $375,000 fee that Stifel made on
 7         the bond transaction, do you know how much of that
 8         went to Mr. Shibilski?
 9   A     No.
10   Q     A portion of it did?
11   A     Not necessarily.
12   Q     You said after the January 2nd meeting there was a
13         majority approval to do the transaction, correct?
14   A     Um-hum.
15              MR. TUREK:  Yes?
16              THE WITNESS:  Yes.
17   BY MR. HANSEN:
18   Q     And the -- certain documents were executed that
19         day, correct?
20   A     Normally.  I was not there.
21   Q     Oh --
22   A     But normally that would have been the case.
23   Q     Do you know if -- I know you might not have
24         personal knowledge, but does Stifel know that
25         documents were executed that day?
```



```
 1   A   I believe there were documents executed that day.
 2   Q   Do you know which ones?
 3   A   Often they would have been submitted by -- but with
 4       just signature pages -- clearly the resolutions
 5       because they were there I would -- I'm presuming
 6       would have been executed that day.
 7   Q   At the tribal center?
 8   A   Yeah.
 9   Q   Yes?
10   A   Yes.
11   Q   Did you feel that you were familiar with the
12       structure of the bond transaction?
13   A   Yes.
14   Q   Is there any detail of it that Stifel felt that it
15       didn't understand or didn't know about?
16   A   The limited offering memorandum did produce an
17       accurate description of the material terms of the
18       transaction.  Whether there were anything involved
19       in the transaction that we were not privy to, I
20       can't answer that question.
21   Q   But the big picture stuff, Stifel knew?
22   A   Yes.
23   Q   For example, the security interest that Saybrook
24       would have had in various assets of the tribe or
25       the EDC, the Economic Development Corporation,
```

```
 1        correct?
 2   A    Yes.
 3   Q    Those would have all been spelled out?
 4   A    Yes.
 5   Q    Stifel understood those?
 6   A    Yes.
 7   Q    Remedies in the event of defaults, Stifel would
 8        have understood all of those?
 9   A    Yes.
10   Q    When Mr. Lehky did his analysis of the level of
11        debt that the casino could support, did he generate
12        written reports of that analysis?
13   A    Yes.
14   Q    Just one, or were there multiple analyses done or
15        versions, et cetera, that type of thing?
16   A    It would have been typical there would have been
17        multiple versions circulated internally at Stifel
18        Nicolaus.
19   Q    Did those analyses consider the casino revenue at
20        various points of the year?
21   A    No.
22   Q    What was the nature of the analysis?  What was he
23        looking at?
24   A    He was looking at net revenues available for debt
25        service and -- as -- we at least in the preparation
```



```
 1            for the May 29th meeting defined them internally.
 2            That term became very important as we moved to
 3            negotiate -- as final terms were developed by -- in
 4            a single investor, but we had to make some
 5            assumptions.
 6                         So those were some of the
 7            assumptions that we made going into -- so -- so
 8            yes, there was -- he had financial information from
 9            the tribe on an annual basis, and we made certain
10            assumptions as to what would -- what we would be
11            willing to assume in net revenues available for
12            debt service.
13       Q    Was there consideration given to seasonal
14            fluctuations in revenue?
15       A    Not at that time.
16       Q    Was Stifel aware that there were seasonal
17            fluctuations in casino revenue?
18       A    Absolutely.
19       Q    Do you know why Mr. Lehky wouldn't have considered
20            those in his calculations?
21       A    Because it would have had an effect in determining
22            things like when was principal paid, and that was
23            outside the scope of that analysis, so we were
24            working on annual figures.
25                         (Discussion off the record.)
```

```
 1                    (Exhibit 20 was marked for
 2          identification.)
 3    BY MR. HANSEN:
 4    Q   Before we move on, first real quick on Exhibit 19.
 5        Who actually prepared that document?  Who drafted
 6        it?  That's the executive summary.
 7    A   It would have been prepared by Stifel Nicolaus.  It
 8        would have been a collaborative effort of the
 9        public finance department which would include
10        administrative staff as well as myself, Brian
11        Lehky, Paul Patrie and Kevin Shibilski.
12    Q   I'll hand you what's been marked as Exhibit 20.
13        Again, there's a cover page that says Exhibit B.
14        It was an exhibit to a filing.  If you turn to the
15        second page, you'll see it's the limited offering
16        memorandum --
17    A   Yes.
18    Q   -- that's been mentioned before.  It is the -- it's
19        24 pages, and I'll represent to you that the
20        document -- the complete document has exhibits and
21        attachments.  But for purposes of today, I just
22        wanted to ask you a few questions about this
23        document.  All right?
24    A   Okay.
25    Q   You're familiar with it?
```



www.GramannReporting.com · 414.272.7878

GRAMANN
REPORTING

Innovation · Expertise · Integrity

```
 1   A    I am.
 2   Q    This is -- tell me what this is.  What's the
 3        purpose of the limited offering memorandum?
 4   A    The purpose of this document is to present all
 5        material facts necessary to make an informed
 6        investment decision on the bonds that are
 7        described.  It speaks as of its date, January 18,
 8        2008 and only as of its date, January 18, 2008.
 9   Q    Who's the intended audience?
10   A    The intended audience is both Saybrook and
11        subsequent purchasers of the bonds, if any.
12   Q    Who drafted it?
13   A    Stifel Nicolaus provided to our placement agent's
14        counsel a template for this document that was based
15        upon other similar transactions that we had done.
16        And then it was -- that template was then amended
17        to conform to the terms of this transaction, the
18        financial condition of this borrower or issuer, but
19        we start with the template because we don't want to
20        duplicate a lot of effort.  And secondly, it acts
21        as a guide so we hopefully don't miss anything
22        that's material.
23   Q    Is a limited offering memorandum such as this
24        common in the industry, or is this more of a Stifel
25        specific-type document?
```

```
 1    A    It's common in the industry.
 2    Q    Who provided the information that went into the
 3         limited offering memorandum?
 4    A    Several parties.  It would be the tribe.  It would
 5         be other sources that we found that we deemed
 6         reliable in terms of the auditors for the tribe,
 7         the financial information that went in there.
 8                        Also it was -- terms of the
 9         transaction were provided by Saybrook, and also
10         there are entities like Depository Trust Company
11         that contributed information, I described them.
12         The opinion of bond counsel was described with
13         information we derived from bond counsel, the
14         opinion of the issuer's council was described with
15         the information we derived from them.
16                        Stifel Nicolaus and its counsel
17         acted as a clearinghouse for all that information
18         being contributed to produce this document.
19    Q    Stifel sort of assembled the information from a
20         variety of sources, fair to say?
21    A    Yes, that's fair to say.
22    Q    And the placement agent counsel, who was that?
23    A    That was Balch & Bingham in Jackson, Mississippi.
24    Q    Do you know what lawyer specifically assisted with
25         this?
```

```
 1   A    Chris Waddell.  I believe it's Christian Waddell
 2        down at Balch & Bingham.
 3   Q    Why use a Mississippi law firm?
 4   A    One of the terms of this transaction limited the
 5        release of bond proceeds for the Natchez project
 6        until certain defined progress points had been met
 7        in the gaming license application process.
 8                    Balch & Bingham was well suited in
 9        assisting us in monitoring the license application
10        with the Mississippi Gaming Commission, and it was
11        helpful that they were also a qualified firm in the
12        securities industry.
13                    So they were situated in a way that
14        a firm perhaps in Wisconsin would not have been so
15        well situated.
16   Q    Who was responsible for hiring Balch & Bingham?
17        Who found them?
18   A    That would have been my call.  That was my
19        decision.
20   Q    You knew that firm before dealing with the bond
21        transaction here?
22   A    Yes.  I had met Chris Waddell at a professional
23        function.
24   Q    Was Balch & Bingham's role limited to advising
25        Stifel?
```



```
 1   A     We were Balch & Bingham's only client in this
 2         transaction.
 3   Q     The limited offering memorandum is not a contract
 4         between parties, is it?
 5              MR. TUREK:  Object to the extent it calls
 6         for a legal conclusion.  You can answer.
 7              THE WITNESS:  It's not a contract to the
 8         extent that it's not countersigned by another
 9         party, but other parties do acquire certain rights
10         in this document.
11   BY MR. HANSEN:
12   Q     What parties acquire rights under this document?
13   A     Holders of the bonds.  There is an affirmative
14         obligation to refrain from fraud, for example, by
15         the issuer of the securities in this document.
16         That was just one example.
17   Q     Anyone aside from holders?
18   A     Well, and again, it's a document that even
19         potential future holders would -- or purchasers or
20         investors would rely upon.  If nothing else, it
21         would put them on notice that they should be
22         seeking additional information if they seek a date,
23         financials that's dated, but it's a document that
24         enters the stream of commerce in our industry.
25   Q     It's designed for informational purposes to
```

```
 1        prospective holders?
 2   A    Yes.
 3   Q    Did it create any rights in Stifel?
 4   A    Yes.
 5   Q    What rights does Stifel have under the limited
 6        offering memorandum?
 7   A    We were identified as the initial purchaser of the
 8        bonds.
 9   Q    And as an initial purchaser of the bonds, what
10        rights does Stifel take under this limited offering
11        memorandum?
12   A    Well, we have --
13                 MR. TUREK:  Objection, legal conclusion.
14        Go ahead and answer, Dave.
15                 THE WITNESS:  Rights specifically, that's
16        a very broad question.  But there was -- as the
17        initial purchaser of bonds, as that title
18        indicates, initially at closing we were the only
19        owner of the bonds.
20   BY MR. HANSEN:
21   Q    They were immediately transferred to a Saybrook
22        entity, correct?
23   A    Immediately meaning?
24   Q    Within -- I don't know.  You tell me.  When did it
25        happen?
```

```
 1   A    I believe our -- it happened the same day.  The
 2        transfer to Saybrook happened the same day.
 3   Q    Physically -- not physically but it goes -- just
 4        electronic moving within accounts, correct?
 5   A    Yes.
 6   Q    Can you describe the exact flow of how this worked
 7        when the -- what was the first step when these
 8        bonds are issued?  What does that actually mean?
 9   A    Bonds are issued when they are delivered and paid
10        for.
11   Q    How was that effected here?
12   A    It's effected by essentially prior to closing,
13        normally about two days, the bond certificate and
14        then a book-entry-only issue such as this is sent
15        to the Depository Trust Company in New York that
16        receives the certificate for the bonds.  They make
17        certain entries on their book entry system
18        identifying the bonds.
19             Normally the day before closing is
20        a -- what we refer to as a pre-closing in which all
21        of the closing documents are assembled, and we make
22        sure all parties are in agreement that everything
23        there is in order by the end of the day.
24             On the day of closing, then there
25        are two things that happen to constitute issuance.
```

```
1         One is that funds are transferred under the terms
2         of the bond purchase agreement from the initial
3         purchaser to the issuer of the bonds, and a phone
4         conversation is had with Depository Trust Company
5         to release those bonds from their trust status, if
6         you will, and post them to a participant's account.
7         Stifel Nicolaus company is a participant in
8         Depository Trust Company.
9    Q    And where does Saybrook's money come in?
10   A    Saybrook then essentially makes money funds
11        available at Stifel in their customer account with
12        us in exchange for their funds.  We then post a
13        transfer of the bonds to their customer account.
14   Q    At that point, the initial purchaser is out of the
15        picture completely?
16   A    Not out of the picture completely because the bonds
17        are still registered in our participant account at
18        DTC because Saybrook or their nominee has
19        essentially purchased their interest through an
20        account that they maintained with Stifel Nicolaus.
21   Q    Is the initial purchaser ever out of the picture
22        completely?
23   A    Yes.
24   Q    At what point?
25   A    If the bonds are transferred to or -- to a customer
```



```
 1        of or directly to some other direct participant at

 2        DTC.   I mean if XYZ Investment Corp acquired the

 3        bonds from Saybrook and they were a direct

 4        participant, we would notify DTC to remove the

 5        bonds from our participant account and post them to

 6        XYZ securities' participant account.

 7    Q   What's Wedbush Morgan Securities?

 8    A   It's a securities broker/dealer.

 9    Q   How do they fit into this transaction here?

10    A   I've seen them in this transaction because Saybrook

11        or LDF Acquisitions moved their account

12        relationship from Stifel Nicolaus to Wedbush.  And

13        so we basically had to -- we didn't have to -- what

14        we did is we then made arrangements with DTC that

15        took Stifel out of the -- took the bonds out of

16        Stifel's participant account and credited them to

17        Wedbush's.

18    Q   Okay.  That's the kind of transaction we talked

19        about before?

20    A   Right.

21    Q   Wedbush is the XYZ?

22    A   Right.  Okay, Wedbush is the XYZ, that's right.

23    Q   So at that point though, now that that occurred in

24        2009, Stifel is out in terms of its initial

25        purchaser role is over, correct?
```

```
 1   A   We no longer have an interest in the bonds in any
 2       respect at that point.
 3   Q   There's nothing in the limited offering memorandum
 4       anymore that affects Stifel or you're relying on?
 5   A   Au, contraire.
 6   Q   Explain.
 7   A   Representations made in this transaction -- like I
 8       said, this is a document that has -- that speaks
 9       only as of its date, but it has a life that
10       continues.  And like I said, subsequent purchasers
11       and owners of these bonds, if they meet the
12       requirements for ownership, are clearly going to be
13       still identifying Stifel as the initial purchaser,
14       and we still stand in the chain of title, if you
15       will, of the securities.
16   Q   How does that affect Stifel?
17   A   It would affect Stifel if they felt -- if anyone --
18       if any subsequent holder felt that there was a
19       substantial misrepresentation in this document that
20       we were a party to, if there was -- I mean, the
21       securities laws don't allow you to walk away from
22       fraud even if you no longer have a financial
23       interest in the transaction.
24   Q   Are you aware whether there are any such fraudulent
25       statements contained in the limited offering
```

```
 1      memorandum?
 2   A  I am not aware that there are.
 3   Q  But if there were, that would -- you feel at that
 4      point Stifel would have a potential liability or
 5      some sort of legal interest in that situation?
 6   A  Yes.
 7   Q  Were there any other situations aside from fraud or
 8      misstatements in the limited offering memorandum
 9      that would affect Stifel's potential liability?
10              MR. TUREK:  I'm going to object for a
11      legal conclusion and overbroad, but you can answer.
12              THE WITNESS:  You're asking me to -- if I
13      can make up a scenario that could potentially cause
14      liability to arise and that's -- use your
15      imagination.
16   BY MR. HANSEN:
17   Q  There's nothing that you're specifically aware of
18      as you sit here today?
19   A  No, nothing that I'm aware of today.
20   Q  Given that, is there any -- is Stifel some sort of
21      beneficiary of the limited offering memorandum?
22              MR. TUREK:  Object, legal conclusion.  Go
23      ahead.
24   BY MR. HANSEN:
25   Q  This wasn't done to help Stifel, correct?
```



```
 1   A    Well, the representations to the tribe in here were
 2        initially made to us.  And my recollection is our
 3        bond purchase agreement had the delivery of this
 4        document by the tribe to be one of the conditions
 5        of our accounts to make the purchase.  So yes,
 6        Stifel was as benefited by this document as any
 7        owner/purchaser of the bonds would be.
 8   Q    In that it was entitled to rely on the
 9        representations contained in the limited offering
10        memorandum?
11   A    Yes.
12   Q    And once Stifel's divested of any obligation or
13        ownership of the bonds, unless there's some --
14        unless you learn later that there's a flaw
15        contained in this limited offer memorandum, it
16        doesn't affect Stifel?
17   A    Once the bonds are transferred to another DTC
18        participant, all incidents of ownership have left
19        Stifel and been vested elsewhere.
20                    (Exhibit 21 was marked for
21        identification.)
22   BY MR. HANSEN:
23   Q    I'll hand you what's been marked as Exhibit 21.
24        Again, it's got the cover page we know now is an
25        exhibit to the pleading.  The second page I'll
```

1         represent to you it says is the bond purchase

2         agreement between Lake of the Torches Economic

3         Development Corporation and Stifel Nicolaus &

4         Company, Incorporated.  Do you see that?

5    A    I do.

6    Q    You're familiar with this document, certainly?

7    A    I am.

8    Q    And this is a contract between the Lake of the

9         Torches Economic Development Corporation and Stifel

10        Nicolaus, correct?

11   A    That's correct.

12   Q    Aside from this document, Exhibit 21, are there

13        other contracts between Stifel and any

14        Lac du Flambeau tribal entities such as the

15        Economic Development Corporation, the Federal

16        Development Corporation or the tribe itself?

17             MR. TUREK:  Objection, legal conclusion.

18        Go ahead.

19             THE WITNESS:  There was a document with

20        an authorization to proceed in which Victoria

21        Doud's and my signature both appear.

22   BY MR. HANSEN:

23   Q    I was going to ask you about that.  What's the

24        nature of that document?  What's the point of it?

25   A    It was one that was generated by me, and I felt it

```
1         was just necessary for us to get a written
2         understanding as to what investor we were going to
3         be working with to move the transaction.
4                      The document also designates the
5         tribe's legal counsel, so I knew that I would have
6         a right to communicate with Godfrey & Kahn, so that
7         designation is in there.
8                      My recollection is that Saybrook had
9         not yet decided who their legal counsel was, so
10        that is -- there's -- that isn't there, but we
11        identified who the parties are, who was represented
12        by counsel, and it just gave us an authorization to
13        help identify this as the team that's going to try
14        to move this forward, and that particularly in
15        areas of attorney/client relationships, I wanted to
16        know that when I picked up the phone as we were
17        trying to move documents forward, that I knew who I
18        was going to be talking to at Godfrey & Kahn.
19   Q    Aside from that contract in Exhibit 21, are there
20        any other contracts that you're aware of between
21        any Stifel entity and any tribal entity?
22   A    I am not aware of anything else that we are both
23        signatories to.
24   Q    Anything that you're not signatories to that might
25        full under this concept of creating obligations or
```

```
 1        giving rights to either side?
 2                  MR. TUREK:  Objection, legal conclusion.
 3        Go ahead.
 4                  THE WITNESS:  To the extent that we were
 5        at any time in this transaction a bondholder, we
 6        had all the rights of the bondholder.  And
 7        bondholders are often not signatories to many
 8        documents but clearly are beneficiaries of -- talk
 9        about anything to -- in terms of pledges of assets,
10        pledges of revenues, security agreements.
11                  So we had an interest and a -- and a
12        financial interest in a lot of what the other
13        documents, if you will, portray even though we
14        weren't signatories to those.
15  BY MR. HANSEN:
16  Q    And those arise as your status -- as Stifel's
17        status as a bondholder?
18  A    Yes.
19  Q    And presumably would last for as long as you are
20        bondholders?
21  A    Um-hum.
22  Q    Yes?
23  A    Yes.
24  Q    But not after, correct?
25                  MR. TUREK:  Objection, legal conclusion.
```

1        Go ahead.

2                THE WITNESS:  Obligations could survive

3        again to the extent that there were subsequently

4        discovered events during the time of our ownership.

5        It still gives rise to a claim.

6                        For example, there are promises made

7        under the bond purchase agreement that clearly

8        survive our relationship with the tribe even when

9        we are -- even when we've fulfilled our obligations

10       as the initial purchaser of bonds.

11  BY MR. HANSEN:

12  Q    In the limited offering memorandum, is it -- is an

13       important part of that issues that related to the

14       Grand Soleil-Natchez project?  In other words, as

15       you're disclosing -- as that document discloses

16       certain things to the world at large, bondholders

17       and subsequent potential holders, is it important

18       to discuss issues related to the -- where the bond

19       proceeds go, for example to the Grand

20       Soleil-Natchez project?

21  A    The fact that a part of the proceeds were in

22       fact -- were specifically -- a defined part of the

23       proceeds were being expended at Grand Soleil was

24       one of the disclosures on the sources and uses in

25       the final budget for the project.

1           But because Grand Soleil provided
2      none of the security for the transaction and Grand
3      Soleil in fact didn't have any revenues at this
4      point, other than that, it was not a material fact
5      anyone who would make an informed investment
6      decision in this transaction.
7   Q  What about the fact that the Grand Soleil-Natchez
8      project was the investment vehicle by which the
9      issuers were to repay the bonds?  Is that a
10     material fact that the bondholders and future
11     bondholders would want to know and understand about
12     in a limited offering memorandum?
13  A  Grand Soleil-Natchez did not pledge anything to the
14     repayment of the bonds.
15  Q  Was the investment in the Grand Soleil-Natchez not
16     the basis on which the tribe and the EDC would be
17     able to repay the bonds?
18  A  No.
19  Q  What is your understanding of the source of the
20     repayment of the bonds by the tribe?
21  A  The revenues of the hotel and casino in
22     Lac du Flambeau, Wisconsin.
23  Q  So Stifel's understanding is that the tribe's --
24     the Lake of the Torches casino revenue would
25     actually be used to fund the repayment of the



```
 1      bonds?
 2  A   Yes.
 3  Q   And that whether the Grand Soleil-Natchez project
 4      was successful or had positive cash flow, what have
 5      you, was not really relevant?
 6  A   That project was not pledged as security for these
 7      bonds.
 8  Q   So there would be no reason to disclose in the
 9      limited offering memorandum any interest that the
10      placement agent would have in the Grand
11      Soleil-Natchez project?
12              MR. TUREK:  Objection, legal conclusion,
13      outside the scope of the listed topics.  I'll
14      instruct the witness not to answer.
15              (Exhibit 22 was marked for
16      identification.)
17  BY MR. HANSEN:
18  Q   I'll hand you what's been marked as Exhibit 22.
19      It's double-sided because it's long, but the second
20      page identifies this document as a Lac du Flambeau
21      Band of Lake Superior Chippewa Indians meeting
22      minutes of January 22, 2008.  Do you see that
23      there?
24  A   I do.
25  Q   In your preparation for today, did you review this
```



WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN
REPORTING

Innovation · Expertise · Integrity

```
 1        document?
 2   A    I've seen this document, yes.
 3   Q    So this contains some specific on-reservation
 4        conduct by Stifel, and I want to just talk to you a
 5        little bit about it.
 6   A    Okay.
 7   Q    At page 13 -- the page is indicated in the upper
 8        right-hand corner.
 9   A    Um-hum.
10   Q    Do you see -- at line six this is Kevin Shibilski
11        speaking.  Do you see that?
12   A    I do.
13   Q    And you're aware that this is the meeting that you
14        were talking about before where Stifel went up and
15        presented to the tribal council, correct?
16   A    Yeah.  This is the January 2, 2008 meeting.
17   Q    And this is Kevin Shibilski speaking?
18   A    Kevin represented us at that meeting.
19   Q    And Vicky Doud says at lines four and five,
20                  "I think it would be worth it to go
21        through the operations."
22                  Do you see that?
23   A    Yes.
24   Q    And then Kevin Shibilski began speaking?
25   A    Um-hum.
```



```
 1                    MR. TUREK:  Was that a yes?
 2                    THE WITNESS:  Yes.
 3   BY MR. HANSEN:
 4   Q    And he speaks throughout page 13, and up at the top
 5        of page 14 -- well, at the bottom he says -- lines
 6        23 and 24, page 13.  He says,
 7                    "There was also extra fee of $1
 8        million tacked on it that you paid for assisting
 9        and securing the debt so a positive arbitrage,
10        which is greater interest than you're paying going
11        back to the tribe as well as $1 million."
12                    Do you know what he's talking about
13        there?
14   A    I think so.
15   Q    What do you think he's talking about?
16   A    The proceeds from the bonds that were being
17        provided in Natchez were going down to Natchez as a
18        loan from the EDC.  It was the intention that that
19        loan would carry a higher interest rate and perhaps
20        even some origination, if you will, fees that were
21        going to be charged to Natchez by the tribe.
22                    Again, it wasn't part of the bond
23        transaction.  It was never pledged to bonded
24        transactions.  The EDC's obligation to make
25        payments under the bonds was never conditioned upon
```

```
 1          Natchez making prompt and timely payments to them,
 2          but part of the transaction and part of the -- part
 3          of the way the financials were built was that in
 4          exchange for making this loan, the tribe was going
 5          to be entitled to charge a higher interest rate
 6          than what they were paying on their funds.
 7                    I believe that that is what Kevin's
 8          referring to when he refers to positive arbitrage.
 9          Arbitrage is the ability in the bond industry of
10          borrowing money at one rate and reinvesting it or
11          lending it out at a higher rate.
12    Q     If Stifel wasn't advising the tribe on the Grand
13          Soleil-Natchez project and whether it was a good or
14          bad investment or otherwise, why would
15          Mr. Shibilski be telling this to the tribe?
16    A     It's because it was -- because he was -- that's the
17          way he interpreted the information he was being
18          asked for.  It wasn't a secret.  We knew that the
19          EDC was going to be lending money to Natchez.
20                    We just didn't want -- we just
21          didn't see that added any value to the collateral
22          of security for the bond deal.
23    Q     In fact, it's not even relevant to the bond deal I
24          think is what you're saying?
25    A     It's relevant in that it constitutes an expenditure
```

1           of the proceeds.  The limited offering memorandum

2           in the -- in the financing budget among the uses of

3           funds is a loan to Natchez of 15-plus million

4           dollars.

5    Q    Was this something that was discussed by Stifel in

6           any of these meetings in May or September or in the

7           November presentation?

8    A    No.

9    Q    How does --

10   A    At that point we didn't discuss whether or not it

11          was going to be a loan or an equity investment.

12          And ultimately we were informed of what had been

13          decided, but we weren't a party to the discussions

14          that led up to that decision.

15   Q    Who made the decision?

16   A    I assume the tribe and whoever was making those

17          decisions down in Natchez for Grand Soleil.

18   Q    Who was doing that?

19   A    I don't know.  Grand Soleil wasn't my client.

20   Q    How does Mr. Shibilski know?

21   A    I don't know how --

22                MR. TUREK:  Hold on.  Again, I think

23          we're far afield from what is relevant under the

24          five topics.  I get that there's -- here's topic

25          one:  Knowledge of Stifel Nicolaus & Company,



1          Inc.'s jurisdictional contacts with the tribal

2          parties including but not limited to Stifel's

3          on-reservation conduct, its direction and control

4          or attempted direction and control on-reservation

5          travel resources and contacts with the tribal

6          parties on the reservation.

7                    Jurisdictional contacts I

8          interpreted to be the Montana factors, and that

9          would be the two exceptions under Montana.  The

10         nature of these particular questions I don't think

11         goes under either of those factors.

12                   So if you read this question back,

13         let me -- I think there's still a problem with this

14         but that's -- I think we're getting to a point

15         where we're getting far afield.

16                   To add on to that, my position is in

17         the tribal court litigation there is no claim

18         against Stifel, and so the misrep claims or

19         anything that relates to this transaction I don't

20         think is -- constitutes the nature of a

21         jurisdictional contact for the federal litigation

22         under Montana.

23                   Sorry.  If you could go back and

24         read the last question.

25                   (Record read.)

```
 1                    THE WITNESS:  I don't know.
 2    BY MR. HANSEN:
 3    Q    You're aware that Kevin Shibilski had a personal
 4         financial interest in Big River Enterprises,
 5         correct?
 6    A    I was not aware of that.
 7    Q    When did you become aware of that?
 8                    MR. TUREK:  Objection, outside the scope.
 9         You're not going to answer.
10                    THE WITNESS:  Okay.
11    BY MR. HANSEN:
12    Q    Well, I think the issue is that under the second
13         Montana factor, it goes to the welfare of the
14         tribe, where it could harm the welfare of the
15         tribe, and I think Kevin Shibilski's conduct on the
16         reservation as a representative of Stifel if he had
17         an undisclosed interest in the transaction while he
18         was working for Stifel and had personal knowledge
19         about the financial effects of the bond deal, it
20         goes right to it.  And there's the statements that
21         he made at the reservation.
22                    MR. TUREK:  For starters that's never
23         been articulated in any briefing about Shibilski's
24         conduct having a relationship under Montana.  Even
25         assuming you could go beyond those things including
```

1        the fact that there's no proposed findings of fact
2        that have anything to do with this, this is just an
3        attempt to get your fraud case in through a
4        30(b)(6) deposition that had nothing to do with
5        fraud.
6                    And so he'll talk about contacts.
7        He's given you an idea of what the contacts and
8        nature of those contacts are about.  The exhibits
9        speak for themselves.  Whether they're true or not
10       true speaks for themselves, and the nature of
11       Mr. Shibilski's relationship has nothing to do with
12       Montana.  So I am going to instruct him to continue
13       to not answer that question.
14                   MR. HANSEN:  Just for the record, in the
15       Stifel proposed findings of fact, No. 28 states the
16       tribe and the EDC allege that Stifel had a conflict
17       of interest in the transaction, made
18       misrepresentations about the true financial
19       ramifications of the bond transaction and failed to
20       advise the tribe of other less risky alternatives
21       to the bond transaction.  And then it cites to the
22       complaint.
23                   So in terms of proposed findings of
24       fact dealing with the nature of the transaction and
25       the counterclaims and the tribal court statement of

```
 1         claim, it is in the proposed findings of fact.
 2         There's no question of that.
 3                 MR. TUREK:  We can debate that.  I
 4         disagree wholeheartedly that a characterization of
 5         the tribal court action gives you a proposed
 6         finding of fact to pursue a fraud defense to the
 7         federal litigation, but we can take that up with
 8         the judge and talk about that.
 9                 MR. HANSEN:  I'm just trying to make sure
10         that I understand what Stifel's role and
11         understanding was in the bond transaction through
12         Mr. Shibilski.  All right.
13   BY MR. HANSEN:
14   Q    He had a financial interest in Big River
15        Enterprises.  Big River Enterprises was a
16        participant in the Grand Soleil-Natchez project,
17        right?
18                 MR. TUREK:  Objection, outside the scope.
19                 MR. HANSEN:  Go ahead.
20                 MR. TUREK:  Outside the scope.  Don't
21        answer it.
22                 THE WITNESS:  Okay.
23   BY MR. HANSEN:
24   Q    When was the next time anyone from Stifel traveled
25        to the tribe after the January 2, 2008 meeting?
```

```
 1   A     The next time I'm aware is fall of 2008.
 2   Q     And what was the nature of that?
 3                   MR. CLARK:  2008?
 4                   THE WITNESS:  Fall of 2008.
 5   BY MR. HANSEN:
 6   Q     Who went?
 7   A     Kevin Shibilski and I were there.  I did not get
 8         the call from the tribe.  Kevin indicated that the
 9         tribe officials wanted to -- had some questions
10         about the transaction, and particularly they wanted
11         someone to talk about that the upcoming tribal
12         council election was heating up, and this
13         transaction had become an issue in that election.
14   Q     Who did you meet with?
15   A     Well, we met with Vicky Doud, met with Carl
16         Edwards.  Rick Lindsley was there.  I want to -- I
17         think -- and Kevin and I.  I think that was the
18         group if my memory is right.  It was not a called
19         meeting of the tribal council.
20   Q     And you discussed that the matters related to this
21         upcoming election?
22   A     They described to us the -- the political situation
23         there.
24   Q     Why did they talk to you about it?
25   A     They wanted to know if there was anything that we
```



```
 1        might be able to do to help describe the status of
 2        the Natchez project and its prospects for future
 3        success.
 4   Q    And how did you respond?
 5   A    I declined to do that.
 6   Q    Why?
 7   A    First of all, didn't have good -- didn't have
 8        firsthand knowledge; and secondly, that wasn't our
 9        role.  In other words, had they asked me about how
10        the credit was evolving on this transaction, I
11        probably would have been able to provide that.  But
12        questions on Natchez, I -- I didn't know.
13   Q    After that meeting, were there any other Stifel
14        visits to the tribe?
15   A    Not that I'm aware of.
16   Q    Did you ever go back?
17   A    No.
18   Q    Do you know whether Mr. Shibilski did?
19   A    No.  I mean I may have been on the reservation
20        driving through.  I got other clients in northern
21        Wisconsin and --
22   Q    You didn't go specifically for a meeting?
23   A    I didn't go there, that's right.
24   Q    How long after that fall meeting did Stifel and
25        Kevin Shibilski part ways?
```



```
 1   A     I'm not sure.  I did not manage that personnel
 2         change.  It was more than a year.
 3   Q     It was sometime in '09?
 4   A     '09 or early '10, early 2010.
 5   Q     Do you know why he left?
 6   A     His position was terminated.  Stifel public
 7         finance -- Stifel public finance presence in
 8         Wisconsin was reduced significantly to the point
 9         where they took us down to -- there were two of us
10         that maintained that presence after that decision
11         by management.  I believe it was in 2010.  Kevin
12         and Paul had been -- were offered severance
13         packages.  It was a layoff.
14   Q     Do you know what Mr. Shibilski is doing now?
15   A     No, I don't.
16   Q     You did speak to him in preparation for today?
17   A     I did.
18   Q     What did you talk about?
19   A     Huh?
20   Q     What did you talk about with Mr. Shibilski?
21   A     We talked about the -- again, about the meetings of
22         the 29th and the -- and again, the September
23         meeting, and I just wanted to make sure that I -- I
24         was asking Kevin is there something that he
25         remembered that I didn't because it's not the kind
```

```
 1        of thing you take a lot of notes on in anticipation
 2        that you're not going to have substantial recall.
 3        But we talked about his involvement during this
 4        period of time.
 5   Q    I think you mentioned earlier that back at the time
 6        that this bond deal was being negotiated and
 7        consummated, it might have been appropriate for
 8        Stifel -- people in Stifel's position to give
 9        financial advice, correct?
10   A    Yeah, it might have been.
11   Q    Even in the absence of a written agreement, right?
12   A    At that time, yes.
13   Q    As a placement agent or initial purchaser, would
14        Stifel -- if that were the relationship, would
15        Stifel still be able to give financial advice to a
16        participant in the transaction?
17              MR. CLARK:  Could you repeat the
18        question, please?
19              (Record read.)
20              THE WITNESS:  We would have that ability.
21   BY MR. HANSEN:
22   Q    There would be no prohibition on that as far as
23        you're concerned?
24   A    Prohibition as referring to legal prohibition?
25   Q    Would there be any regulatory prohibition on
```



```
 1          serving as both a placement agent in a transaction
 2          and providing financial advice to a participant in
 3          the transaction?
 4    A     Not at that time.
 5    Q     Would there have been any internal policy at Stifel
 6          that would have prohibited that placement agent and
 7          financial advisor role?
 8    A     No.
 9    Q     Would it have been appropriate as a placement agent
10          and initial purchaser to try to encourage a party
11          to the bond transaction to execute the bond
12          transaction?
13                  MR. TUREK:  Once again, can you read that
14          back?
15                  (Record read.)
16                  THE WITNESS:  Yes.
17    BY MR. HANSEN:
18    Q     Is that because Stifel would have an interest in
19          the financial outcome of the transaction?
20    A     That would be one reason.
21    Q     What would be the others?
22    A     There's reputation.  We have more than one customer
23          at the table here.  Our reputation with Saybrook to
24          bring a transaction to a positive conclusion was
25          important to us as well.
```



WWW.GRAMANNREPORTING.COM · 414.272.7878

GRAMANN
REPORTING
Innovation · Expertise · Integrity

```
 1                 MR. HANSEN:  Let's take five, 10 minutes.
 2        All right?
 3                 MR. TUREK:  Sure.
 4                 (Discussion off the record.)
 5    BY MR. HANSEN:
 6    Q    I want to return briefly to Exhibit 22 at the
 7         bottom of page 13, top of page 14.  We were talking
 8         about -- we talked about it a little before which
 9         is Mr. Shibilski's statement securing the debts of
10         a positive arbitrage which is greater interest than
11         you're paying going back to the tribe as well as $1
12         million.
13                    I don't want to ask you about the
14         truth or falsity of that question.  I just want to
15         understand that is an on-reservation statement made
16         by Mr. Shibilski, correct?
17    A    He was present on the reservation.
18    Q    And did he make that statement about arbitrage in
19         his capacity as a placement agent on behalf of
20         Stifel Nicolaus?
21                 MR. TUREK:  I'll just object for
22         foundation.
23                 THE WITNESS:  That is the reason he was
24         at the meeting.  He was -- because the items on the
25         agenda that we were being -- that we wanted to be
```

```
 1          prepared to discuss were items that related to this
 2          transaction, and our role in this transaction was
 3          as the placement agent.
 4   BY MR. HANSEN:
 5   Q    And Stifel, does it stand by that statement?
 6                  MR. TUREK:  Objection, outside the scope.
 7          I instruct him not to answer that.
 8                  MR. HANSEN:  You're instructing him not
 9          to answer whether Stifel stands by the statement
10          that was made on the reservation?
11                  MR. TUREK:  Correct.
12                  MR. HANSEN:  What's the basis for
13          instructing him not to answer?
14                  MR. TUREK:  I don't think it has anything
15          to do with the jurisdictional analysis.
16                  MR. HANSEN:  On-reservation conduct by a
17          Stifel representative does not have anything to do
18          with jurisdiction --
19                  MR. TUREK:  Sure, but the truth and
20          falsity of it doesn't which is the root of your
21          question is do we still stand by it.
22   BY MR. HANSEN:
23   Q    My question is, was it appropriate for Kevin
24          Shibilski serving as Stifel's -- as a placement
25          agent on behalf of Stifel to make that statement?
```

```
 1   A      He was answering a question posed by a customer.
 2          We typically will sometimes -- I'm trying -- we
 3          tried to be responsible to our -- responsive to our
 4          customers' inquiries.  So to that extent, he was
 5          responding to the question that Vicky Doud -- the
 6          question that Vicky Doud asked him.
 7   Q      On page -- hang on a second.
 8                  (Discussion off the record.)
 9   BY MR. HANSEN:
10   Q      What was the open-ended question that you thought
11          that Vicky Doud asked that gave rise to Mr.
12          Shibilski's --
13   A      She said I think it would be worth it to go through
14          the operations.  I'm not sure I understand the
15          context of that, but clearly she was -- whether she
16          made some -- Kevin interpreted that as being an
17          invitation and introduction for him because his
18          immediate response was, "Thank you, Madam
19          President."
20                  So the context and perhaps the body
21          language or whatever else that doesn't go through
22          in the transcript was that Kevin interpreted
23          Vicky's statement as being an introduction to bring
24          something forward that was being requested.
25   Q      If you look at page 10, the last two lines, 23 and
```

```
 1         24, Brian Pierson of Godfrey is saying there are
 2         political questions and legal questions.  And then
 3         it continues -- his statement continues on to page
 4         11.
 5                        At the bottom of page 11, lines 22
 6         to 24, Brian Pierson says,
 7                        "As far as the flow of funds and
 8         where it goes, Kevin" -- referring to Kevin
 9         Shibilski -- "I think you can provide a better
10         education of that."
11    A    Yes.
12    Q    And I believe there's a little --
13    A    Um-hum.
14    Q    That really is what Kevin Shibilski is responding
15         to which is the flow of funds.  That's what Kevin
16         is going to talk about.
17    A    Okay.
18    Q    And so that flow of funds, that was made by
19         Mr. Shibilski in his capacity as placement agent?
20    A    Yeah.  Because at that point he's talking about the
21         purposes for which the bond proceeds would be
22         expended.  We made a disclosure on that, an
23         offering memorandum.  There are certain disclosures
24         on that -- references to that made in other
25         documents as well.
```

 1   Q    And that would include the positive arbitrage?
 2   A    Yeah, that would include at that point that there
 3        was a loan being made down to Natchez with
 4        payments -- under terms that would create
 5        additional interest -- net interest income back to
 6        the tribe.
 7   Q    So Stifel was aware that Grand Soleil-Natchez was
 8        going to begin to cash flow?
 9   A    Yeah.  Well, no.  We were aware that a loan had
10        been made from the tribe to Grand Soleil-Natchez.
11        We were never engaged in any respect to do a credit
12        analysis of Grand Soleil-Natchez.  So we never
13        rendered an opinion as to Grand Soleil-Natchez's
14        ability to make payments under that loan.
15   Q    So if you turn to page 27, lines 12 through 17,
16        this is Mr. Shibilski speaking.
17                "Is there risk?  No question.
18        There's always risk in a business venture, but
19        there is substantial positive profit margin in your
20        operation in Mississippi, and that's what's given
21        the debt that the bond buyers comfort here.  So
22        there is no question about that."
23                Isn't Kevin Shibilski there talking
24        about profit margin on Grand Soleil-Natchez's
25        project?

```
 1   A     That's what he appears to be talking about, yes.

 2   Q     Where did Stifel get that information?

 3   A     To my knowledge, Stifel didn't have that

 4         information.

 5   Q     So is Kevin Shibilski making this statement on

 6         behalf of Stifel as bond placement agent?

 7   A     I don't know where Kevin got that information.

 8                    He makes representations --

 9              MR. TUREK:  There's no question.

10              THE WITNESS:  There is no question.

11         You're right.

12   BY MR. HANSEN:

13   Q     Any time you'd like to speak, feel free.

14   A     I understand.

15   Q     What were you going to say?

16   A     That there's a factual misstatement here by Kevin

17         that the bond buyers, which if it refers to the

18         purchase of Saybrook, the investor in these bonds,

19         was taking comfort in the Natchez's ability to make

20         loan payments to the EDC, that that is not an

21         accurate description of this -- of the bond

22         transaction.

23   Q     Page 28, line three.  Kevin Shibilski is speaking.

24         Why don't you read just to yourself lines three

25         through 13.
```

```
 1                    MR. CLARK:  What page?
 2                    MR. HANSEN:  Page 28, lines three through
 3        13.
 4                    THE WITNESS:  Okay.
 5   BY MR. HANSEN:
 6   Q    I'll paraphrase, but essentially Mr. Shibilski
 7        there is talking to the tribe and the EDC about the
 8        fact that the tribe has secured debt at Grand
 9        Soleil-Natchez?
10   A    I don't believe that's what that's referring to.
11   Q    What do you think it refers to?
12   A    I think --
13                    MR. TUREK:  Objection, foundation.  Go
14        ahead.
15                    THE WITNESS:  The word that's in the
16        transcript as redunning component I believe refers
17        to the refunding component of the --
18   BY MR. HANSEN:
19   Q    Of what?
20   A    Of the bonds.
21   Q    So --
22   A    And the bonds were in fact secured.
23   Q    So you're saying that here Mr. Shibilski is talking
24        about grabbing liens on everything you can, real
25        estate, projected cash flow, guarantees, personal
```

```
 1           guarantees, those are things that -- he's
 2           describing the security under the bond transaction?
 3   A   If the refunding component refers to that, yes, and
 4           he's -- he's responding to Brian, who I assume is
 5           Brian Pierson.  Again, Brian Pierson had no role
 6           that I'm aware of in the loan from the EDC down to
 7           Natchez.
 8                      He did have a role in the refunding
 9           component for the bonds, so I understand that what
10           he's referring to is the -- he's trying to --
11           referring to just a security for the bonds, but
12           it's not clear.
13   Q   Then 14 and 15 maybe on that same page will clear
14           it up where Brian Pierson of Godfrey says,
15                      "You were talking about the loan
16           being made by the FDC to the LLC?"
17                      And on 16 Kevin Shibilski answers,
18                      "To the LLC, that's right."
19                      Does that make it more clear that
20           what Mr. Shibilski is talking about in lines three
21           through 13 really refers to the transaction between
22           the tribe or the EDC and the Grand Soleil-Natchez
23           project?
24   A   That was his response to Brian Pierson's question.
25   Q   So was Kevin Shibilski making these on-reservation
```

1        representations to the tribe and the EDC in his

2        capacity as Stifel's placement agent or in his --

3        on behalf of Stifel as placement agent?

4   A    That is the reason that he was instructed to attend

5        the meeting.

6   Q    Did you know about all of these liens and cash flow

7        and personal guarantees in the Grand Soleil-Natchez

8        project?

9   A    No, I didn't know how the loan to Grand Soleil was

10       being secured.  I knew there was an arbitrage play.

11       But again, because we were not pledging any

12       proceeds to that loan, it was immaterial to our

13       description in the bond transaction other than

14       identifying it as an expenditure of bond proceeds.

15  Q    Why would Stifel know so much about that loan down

16       to Grand Soleil-Natchez?

17            MR. TUREK:  Objection, foundation,

18       misstates prior testimony.  Rests on evidence not

19       in the record.  You can answer if you know.

20            THE WITNESS:  No, that's it.  I did not

21       have this type of information on the loan from --

22       from Lac du Flambeau down to Natchez, those terms.

23  BY MR. HANSEN:

24  Q    But Stifel in general did.  Maybe you personally

25       didn't, but Stifel would have known?

```
 1   A    Not in general.  It appears from this that Kevin
 2        had information.
 3   Q    That Stifel didn't know about?
 4   A    Stifel doesn't know the middle names of my
 5        grandchildren either.  There's information that
 6        individual employees of Stifel know that the
 7        corporation or Stifel Nicolaus doesn't know.
 8                  So I'm telling you, I did not know
 9        everything that apparently Kevin was discussing
10        with regard to this transaction.  And I can tell
11        you that Stifel did not know those things either.
12   Q    Page 32, lines 10 through 14 -- eight through 14.
13        Do you know -- Muriel Fralick is speaking at line
14        eight.  She says,
15                  "So we need to borrow $20 million so
16        they will give us a kickback of $1 million."
17                  Do you know who Muriel Fralick is?
18   A    I do not.
19   Q    Safe to assume she's a member of either the EDC
20        board or the tribal council?
21   A    Or she could have been in the audience.  I don't
22        know.
23   Q    10 through 14 Kevin Shibilski says,
24                  "Many more millions than that.  You
25        have a 1.5 percent positive arbitrage, so you may
```

```
1              get something like $3 million a year."
2                         Line 13, Muriel Fralick says,
3                         "Some day?"
4                         At line 14 Kevin Shibilski says,
5                         "No, no, no, immediately."
6                         Do you see that?
7    A    Yep.
8    Q    What's he referring to there?
9    A    I don't know.  It appears that she was trying to do
10        math on the fly, and clearly she didn't reach one
11        and a half percent positive of $20 million is
12        300,000, not three million.
13                        And so -- but I assume that his --
14        his inability to properly do the math, I think
15        that's what -- he was trying to come up with a
16        dollar value that represented the value of a one
17        and a half percent positive arbitrage on
18        $20 million.
19   Q    When did Stifel do the analysis on the level of
20        cash flow that would be generated by Grand
21        Soleil-Natchez?
22   A    We did not.
23   Q    So for these on-reservation statements by
24        Mr. Shibilski in that regard, what Stifel
25        information was he relying on when he said it?
```

```
 1   A    I don't know.
 2   Q    Was the on-reservation statement made in his
 3        capacity as a placement agent?
 4   A    That was why he was there.
 5   Q    Are those the types of -- is that the type of
 6        information that Stifel asks its placement agents
 7        to provide?
 8   A    I don't understand the question.  Stifel is the
 9        placement agent.
10   Q    Does Stifel expect its representatives like
11        Mr. Shibilski when they're serving as a
12        representative of Stifel as a placement agent to
13        provide that type of information?
14   A    We ask them to be responsive to questions.  And to
15        the extent that that was a question and answer that
16        Kevin believed he had the ability to answer, he
17        did.
18   Q    At page 61, lines two through seven, Kevin
19        Shibilski says,
20                  "The consequences are to no action.
21        You will absolutely kill the project, and you know,
22        I'm not your business advisor, but I think that
23        anybody who walked into this room would know that
24        you would instantly endanger or jeopardize your
25        money invested so far."
```

```
 1                    Do you see that?
 2   A    I see that.
 3   Q    Is Kevin Shibilski making those on-reservation
 4        statements in his capacity as bond placement agent?
 5   A    Again, he was representing our position in the bond
 6        purchase agreement, and that's why he was sent to
 7        that meeting.
 8   Q    What's the purpose of that statement?  What bond
 9        purchase agent interest does that advance?
10   A    I don't know.
11   Q    But he was there as the bond placement agent?
12   A    Um-hum.
13   Q    So --
14             MR. TUREK:  Is that a yes?
15             THE WITNESS:  That's correct.
16   BY MR. HANSEN:
17   Q    But you don't know why as a bond placement agent
18        that statement would be made?
19   A    The statement would be made because we want to be
20        responsive to clients' questions.  It appears in
21        the previous -- previous page that it was Brian
22        Pierson who was speaking prior to that.
23                    But yeah, he would be -- he's
24        drawing conclusions that would be outside the scope
25        of our normal -- our role as placement agent.
```

```
1   Q     You would never say this, would you?
2               MR. TUREK:  Objection, irrelevant.
3               THE WITNESS:  I wouldn't use those words.
4   BY MR. HANSEN:
5   Q     Do you know what research Stifel would have done to
6         provide the information to Kevin Shibilski so they
7         could make these representations on the
8         reservation?
9   A     No.
10  Q     Do you think Stifel did any research or
11        investigation to help Mr. Shibilski make these
12        representations?
13  A     Can I hear that again?
14              (Record read.)
15              THE WITNESS:  No, we did not.
16  BY MR. HANSEN:
17  Q     Page 83, lines 11 to 20.  It's kind of long, so
18        I'll just let you read that to yourself and just
19        let me know when you're done, please.
20              MR. CLARK:  Sorry, what was the page?
21              MR. HANSEN:  Page 83, lines 11 through
22        20.
23              THE WITNESS:  Okay.
24  BY MR. HANSEN:
25  Q     You see it's Kevin Shibilski talking about the
```



```
 1        tribe being 50/50 partners with Bill Bayba,
 2        correct?
 3   A    That's what he said.
 4   Q    He says at line 19 and 20,
 5                    "You should know that, too.  You
 6        have a very good partner, Mr. Bayba."
 7                    Does Stifel often act as a placement
 8        agent and get into this level of detail and
 9        knowledge about --
10   A    No.
11   Q    On page 84, lines 11 through 14.  Again, this is
12        Kevin Shibilski,
13                    "You are going to ruin not only your
14        project, but you're going to ruin your partner's
15        project if you do nothing.  That's a fiduciary
16        fact, and I'm obliged to tell you that."
17                    Did placement agents typically
18        make -- what obligation was Stifel under to tell
19        the tribe that?
20   A    Under no obligation.
21   Q    How did Stifel even know that?  How did Stifel know
22        that failing to commit to the bond transaction
23        would ruin the Grand Soleil project and ruin Bill
24        Bayba's project?
25   A    We were aware that the contractors on the Grand
```

1       Soleil project were threatening to stop work

2       because of late payments on their invoices.  I was

3       catching phone calls from -- in one case catching a

4       phone call from a bank that actually begged one of

5       the contractors wanting to know when his customer

6       can expect payment.

7              I gave him the timing of the

8       transaction that we were working with at that time

9       and the budget of the transaction we were working

10      with at that time, and I said, you know, this

11      project is -- I don't remember what status it was

12      at that time.

13             So what I'm saying is we had -- to

14      that extent we had knowledge that there was

15      significant financial stress that the project in

16      Natchez was under.  So that is the only facts known

17      to Stifel that I could indicate would cause -- that

18      I was aware of that would cause Kevin to indicate

19      that failure to come up with the funds to keep the

20      project flowing would essentially close down the

21      project.  He says ruin.  Again, that wouldn't be my

22      choice of words.

23   Q   Did Stifel ever -- knowing that about the Grand

24      Soleil project, did Stifel ever advise the tribe or

25      the EDC not to go deeper into the hole in Grand



```
1          Soleil?
2    A     No.  We relayed the information that we were
3          getting to Saybrook.  I was also relaying the
4          information that I was getting to Rick Lindsley at
5          the tribe.  And they were still in the process of
6          negotiating the terms -- final terms of this bond
7          issue.
8                       So I felt that information I was
9          receiving was material, so I relayed it to both of
10         the parties and let them do with that what they
11         will as part of their future process in determining
12         appropriate terms and conditions in this financing.
13   Q     Why would that information be material to Saybrook?
14   A     Well, because again, Saybrook -- I don't know why.
15         You had -- there was even a contractor who was
16         doing work for a -- an affiliate of the tribe who
17         wasn't getting paid.  Was that relationship a
18         direct security for the bonds?  No.  But clearly it
19         does bear on the creditworthiness of one of the
20         obligors of the transaction.  Perhaps not directly.
21         Perhaps indirectly, but materiality wasn't the
22         decision I made.
23                       My decision was when I got
24         information like that, it could be material and
25         I -- and I basically made the information available
```

```
 1        to both parties.
 2   Q    But it didn't work its way into the limited
 3        offering memorandum?
 4   A    No.
 5   Q    What did Saybrook do in response to the
 6        information?
 7   A    They continued on with the project.  With this they
 8        did request some provisions.  I don't know if it
 9        was responded to this, but subsequently they did
10        request some provisions that restricted the
11        distribution of funds down to Natchez until certain
12        licensure targets were hit.
13                   So there was some cognizance of
14        whether or not -- under what circumstances bond
15        proceeds should be lent to Saybrook.  So Saybrook
16        did impose itself on essentially the terms of the
17        loan, if you will, between the EDC and the LLC down
18        in Natchez because they imposed themself -- they
19        had actually approval authority on distribution of
20        bond proceeds down to Natchez.
21                   Again, it wasn't part of that
22        negotiation.  We memorialized it in the documents,
23        but that is the transaction that finally resulted
24        was Saybrook developing what they viewed to be some
25        safeguards on the expenditure of the bond proceeds.
```

```
 1            Saybrook never asked for a security interest in
 2            that note though.
 3    Q    In Stifel's capacity as placement agent, is there
 4            anything about Mr. Shibilski's on-reservation
 5            representations and conduct that Stifel takes issue
 6            with?
 7                    MR. TUREK:  Objection, vague.  You can
 8            answer.
 9                    THE WITNESS:  We would have liked him to
10            be more careful in his responses, but I also
11            understand that that perhaps wasn't -- Kevin
12            developed a relationship with all of his clients
13            for which his informality was an asset and so --
14            I'll just let it go there.  He's responding less
15            formally than I would have.
16    BY MR. HANSEN:
17    Q    But other than the informality of it, Stifel is
18            fine with how Kevin Shibilski handled himself at
19            that meeting on January 2, 2008?
20    A    I wouldn't say we're fine with it.
21    Q    What would you say?
22    A    I would say clearly Kevin indicated that there
23            was -- that he would have required some additional
24            training.  We may have been more selective in the
25            way it was handled, and clearly had I had access to
```

```
 1        this type of information sooner, there would have

 2        been some follow-up conversation with the tribe.

 3   Q    What would that conversation have entailed?

 4   A    Just trying to clarify what the situation was with

 5        what was the -- what was driving some of these

 6        questions, what was behind them.  Again, I wasn't

 7        there.  Context is important.  I would have clearly

 8        had a conversation with Brian Pierson that I had

 9        not had.

10   Q    What about -- what would you like to talk to

11        Brian --

12   A    About this meeting, how he read the situation.

13   Q    But other than some follow-up training or a desire

14        to help clarify a few things, there's nothing else

15        about Mr. Shibilski's on-reservation conduct or

16        statements to Stifel's client that Stifel thinks

17        are inappropriate or has any other kind of problem

18        with?

19             MR. TUREK:  I'll object as overbroad.

20        You got 160-some pages here.  Subject to that, go

21        ahead.

22             THE WITNESS:  Kevin was trying to be

23        responsive to what the tribe was asking him.  He

24        did it inartfully.  He did it without a lot of

25        experience in bond transactions.  You know, without
```

```
1          perhaps a base of knowledge in the documents and

2          the way this transaction was -- Kevin was not a

3          credit analyst.  Kevin -- he was what he was.  He

4          basically handled -- he was a point man on this

5          client and other clients.

6                    So it's incumbent on us to have our

7          employees that are representing us parties to a

8          transaction that they be both -- that they be

9          knowledgeable both about our role and in all the

10         details of the transaction, what's material, what's

11         not.  We have to bring people along.

12                   At this point I've been in the

13         business for 25 years.  Kevin had been in the

14         business for five.  There was a significant

15         difference in the way we would have responded to

16         the questions -- that I would have responded to the

17         questions from the tribe, but Kevin was trying to

18         be responsive.

19  BY MR. HANSEN:

20  Q      But by trying to be responsive, that doesn't

21         relieve him of his obligation to be honest, does

22         it?

23  A      No.

24  Q      It doesn't relieve him of his obligation not to be

25         negligent when he's representing Stifel, right?
```

```
 1   A     No.
 2   Q     It doesn't relieve him of his obligation to follow
 3         the code of professional conduct, correct?
 4               MR. TUREK:  Objection, vague, assumes
 5         facts not in evidence.
 6               THE WITNESS:  I guess I'm not sure what
 7         code you're referring to.  We're in a business
 8         governed by rules of the Municipal Securities
 9         Rule-Making Board promulgated through delegated
10         authority from the Securities Exchange Commission.
11                    One of those rules requires us to
12         deal with all parties to our transaction fairly.  I
13         think Kevin was dealing with all parties here
14         fairly; inartfully perhaps, but fairly.
15   BY MR. HANSEN:
16   Q     Even though he was a direct recipient through his
17         position at Big River Enterprises of the bond
18         transaction proceeds?
19               MR. TUREK:  Objection, outside the scope.
20         No need to answer.
21               MR. HANSEN:  Well, he said fairly.  He
22         said Kevin acted fairly.  I have a right to follow
23         up on that.
24               MR. TUREK:  Not to that extent, no.  I
25         instruct you not to answer.
```

```
 1    BY MR. HANSEN:
 2    Q    Can you take a look at Exhibit 19 again --
 3    A    Um-hum.
 4    Q    -- all the way back to page 18 under Management
 5         Team.
 6    A    Um-hum.
 7    Q    It says, The management team will consist of
 8         Emerald Star whose members are Mr. Charles Cato,
 9         Mr. Bill Bayba, William Bayba and a political
10         subdivision of the tribe.
11                   Essentially that's what it says,
12         right?
13    A    Um-hum.
14              MR. TUREK:  Yes, Dave?
15              THE WITNESS:  Yes.
16    BY MR. HANSEN:
17    Q    And for Big River Enterprises, LLC, again, we
18         talked about this before, Mr. William Bayba's
19         indicated in parentheses after Big River
20         Enterprises, correct?
21    A    Correct.
22    Q    Why isn't -- why didn't Stifel disclose that Kevin
23         Shibilski was also a member of Big River
24         Enterprises in this document?
25              MR. TUREK:  Objection, outside the scope,
```

```
 1        assumes facts not in evidence.  I'm going to
 2        instruct the witness not to answer.
 3                  THE WITNESS:  Okay.
 4                  MR. HANSEN:  This is a document that he
 5        put together dealing with the bond transaction that
 6        dealt directly with Kevin Shibilski's
 7        on-reservation conduct.
 8                  MR. TUREK:  Where did that come in?  I
 9        must have missed that.
10                  MR. HANSEN:  This is a management team
11        that's going to run the casino that all the bond
12        proceeds are going to.
13                  MR. TUREK:  The one down in Mississippi?
14                  MR. HANSEN:  Um-hum.
15                  MR. TUREK:  So what does that have to do
16        with contact with a tribal entity in Wisconsin --
17        you're saying now that Mississippi --
18                  MR. HANSEN:  No.  This relates to
19        statements or omissions that Kevin Shibilski made
20        on behalf of Stifel at the reservation.
21                  MR. TUREK:  I don't -- I guess I didn't
22        see that in the transcript if anyone asked him what
23        roles he held in entities as part of the
24        transcript.  I'll also go back to the fact I don't
25        think this is relevant to Montana one or Montana
```

```
1          two under the nature of the tribal court action, so
2          I'm going to instruct him not to answer that.
3   BY MR. HANSEN:
4   Q    Turning back briefly to Exhibit 22 at page 137,
5          lines three through seven.  Are you there?
6   A    Yep.
7   Q    Muriel Fralick asks,
8                    "May I just ask what our monthly
9          fees will be on that 50 million?"
10                   Kevin Shibilski answers,
11                   "The net effect is that you will
12         have cash.  The debt will be at the same rate you
13         are at now plus you get $1 million."
14                   Do you see that?
15  A    Um-hum.
16  Q    Do you know what he's talking about there?
17  A    No.
18  Q    Was that a calculation that Stifel ran?
19  A    No.
20  Q    Is that based on information that Stifel provided
21         to Mr. Shibilski as part of Mr. Lehky's analysis,
22         for example, the casino revenue?
23  A    We were well beyond a Lehky analysis by
24         January 2nd.  The transaction was in -- the terms
25         of the transaction hadn't been finalized at that
```

```
 1        point.
 2   Q    So what's the basis for the statement that the
 3        tribe will have cash and $1 million?
 4   A    I do not know.
 5             MR. CLARK:  Excuse me, what page are we
 6        on now again?
 7             MR. HANSEN:  137, lines three through
 8        seven.
 9   BY MR. HANSEN:
10   Q    Those are not the kind of things that a placement
11        agent would normally tell bond issuers, are they?
12        Isn't Kevin Shibilski just giving financial advice
13        to the tribe?
14   A    He's answering a question from Muriel Fralick.
15   Q    Does Stifel stand by that answer?
16   A    The reference to the same rate, I don't know about
17        the other rate, but if he's referring to the rate
18        that they were currently paying on the debt that
19        was refunded, the new transaction increased the
20        interest rate.  It was not at the same rate.
21             Again, he doesn't refer to the
22        interest rate either.  He refers to rate.  I don't
23        know what he's referring to there.
24   Q    We talked a little bit about Stifel Financial and
25        Stifel Nicolaus, and I think you said Stifel
```



```
 1        Nicolaus is a wholly owned subsidiary of Stifel
 2        Financial.
 3   A    That's correct.
 4   Q    Does Stifel Financial control and manage Stifel
 5        Nicolaus or is it -- is Stifel Financial a holding
 6        company and Stifel Nicolaus operates more or less
 7        independently?
 8   A    Stifel Nicolaus is a wholly owned subsidiary of
 9        Stifel Financial.  Stifel Nicolaus is the licensed
10        broker/dealer.  It is that entity that engages in
11        those broker/dealer activities.
12                  The supervisory structure is as a
13        result performed by licensed individuals
14        supervising other licensed individuals.
15   Q    When you talked to Mr. Shibilski in preparation for
16        your deposition today, did you ask him at all about
17        Exhibit 22, the transcript we've been talking
18        about?
19   A    I did not.
20   Q    You were aware of the transcript before you talked
21        to Mr. Shibilski, correct?
22   A    I was.
23   Q    And weren't you curious to hear what he'd have to
24        say about it?
25                  MR. TUREK:  Objection, relevance.  You
```



```
 1        can answer.
 2                  THE WITNESS:  No.  I mean, I knew Kevin
 3        well enough.  I look at this, and yeah, Kevin did
 4        the best he could.  Kevin was trying to be
 5        responsive to his clients.  Kevin was behaving in a
 6        way less formal than perhaps I would have.  I'm
 7        sorry I was on January 2nd sitting at home under
 8        the effects of painkillers.
 9                  MR. HANSEN:  All right.  I think that's
10        all I have for right now.  Obviously we'll reserve
11        the right to follow up depending on what happens on
12        March 14th.
13                  But for purposes of the preliminary
14        injunction hearing, I think I don't have any more
15        questions today.  I don't know if you guys have
16        any.
17                  MR. TUREK:  I do have a few questions.
18        Do any of you have questions?
19                  MR. CLARK:  No, I don't have any
20        questions.
21                  MR. FINE:  You first.
22                      EXAMINATION
23   BY MR. TUREK:
24   Q    I first want to run through a couple of the
25        meetings that Stifel attended involving the
```



WWW.GRAMANNREPORTING.COM · 414.272.7878

**GRAMANN** REPORTING

*Innovation · Expertise · Integrity*

```
1          transaction.  The first meeting that I heard you
2          discuss was a May -- late May, May 29th meeting, is
3          that right?
4     A    Right.
5     Q    Did anyone ask Stifel to attend that meeting?
6     A    Yes.
7     Q    Who?
8     A    Rick Lindsley.
9     Q    And who was Mr. Rick Lindsley operating --
10    A    Mr. Lindsley --
11    Q    Let me finish the question.  Who did you understand
12         that he was acting on behalf of?
13    A    On behalf of the tribe.  He was the CFO of the
14         tribe.
15    Q    And did Stifel -- I'm sorry, did Mr. Lindsley
16         invite the Stifel representatives to the tribal
17         land?
18    A    Yes.
19    Q    Now, I think the next meeting you mentioned was the
20         September meeting, correct?
21    A    Um-hum.
22    Q    And at that meeting is where you presented the
23         options for investors in the tribe, correct?  Maybe
24         you wouldn't describe it that way.
25    A    We had two competing indications of interest in
```



```
 1        purchasing bonds from the tribe.
 2   Q    And for those -- the presentation of those
 3        competing interests, did you present those to the
 4        tribe initially over the phone?
 5   A    Yeah.  I initially had called Rick Lindsley and
 6        outlined for him over the phone what the two
 7        options were, and after a phone -- near the end of
 8        the phone conversation, I frankly asked Rick, what
 9        do you want to do with these?  Rick's response was,
10        I don't have the authority to make that call and --
11        or words to that effect.  He says, you're going to
12        have to come up and basically talk to other tribal
13        officials, and so we set a date and a time to do
14        that.
15   Q    Did you take Mr. Lindsley's invitation as a request
16        to come up to tribal land?
17   A    Yes.
18   Q    Same thing for the January 2nd meeting.  This is
19        the one we spent a lot of time going through the
20        transcript on.  Was that a meeting attended at the
21        request of the tribe?
22   A    Yes.
23   Q    And how was that request communicated, if you know?
24   A    I don't know.  The timing and the calling of the
25        tribal meeting at that point we were communicating
```

```
 1        almost entirely with the tribe's legal counsel on a
 2        matter like that.
 3                    So I believe that the -- it would
 4        have been Brian Pierson who worked out the
 5        agreeable timing of that.  He was the one that was
 6        responsible, and he and bond counsel at Godfrey &
 7        Kahn, they were the ones that were generating the
 8        documents that required tribal action, so he pretty
 9        much was driving the timing.
10   Q    Did someone ask Mr. Shibilski to be there, or did
11        Mr. Shibilski volunteer to attend himself without
12        prompting?
13   A    Stifel was asked to be there, and I asked Kevin to
14        attend on our behalf.
15   Q    Who asked someone from Stifel to be there?
16   A    I believe that that request came from Brian Pierson
17        at that point, the tribe's legal counsel.
18   Q    I want to ask just a couple what may seem like
19        obvious questions, but I want to understand the
20        dynamics and the identities of certain parties to
21        this transaction.
22   A    Um-hum.
23   Q    Stifel in the bond purchase transaction was the
24        bond placement agent, correct?
25   A    Well, we were identified as the initial purchaser
```

```
 1        because this was a placement in which we were

 2        acting as a riskless principal under Section 144 of

 3        the Securities Act, so it was -- we were fulfilling

 4        a placement agent function but we -- on the bond

 5        purchase agreement.  The bond purchase agreement

 6        was with Stifel, not directly with Saybrook.  The

 7        bond purchase agreement was between the tribe and

 8        Stifel, not between the tribe and Saybrook.  That's

 9        the way this transaction was prepared.

10   Q    So under this SEC Rule 144(a), Stifel served as the

11        initial purchaser of the bonds from the EDC?

12   A    Yeah.

13   Q    And then Stifel resold those bonds to LDF

14        Acquisition?

15   A    Yes.

16   Q    And LDF Acquisition is related to what company?

17   A    That was the name on the account that was

18        established by Saybrook for the purposes of closing

19        this transaction.  It was the account that they

20        established that collected the funds necessary to

21        buy the bonds.

22   Q    So I think what you said earlier is that Stifel was

23        the initial holder of the bonds upon acquisition

24        from EDC, correct?

25   A    Correct.
```



```
 1   Q    And then Stifel sold the bonds to LDF Acquisition,
 2        correct?
 3   A    Correct.
 4   Q    Did that make LDF Acquisition then the holder of
 5        the bonds?
 6   A    Yes.
 7   Q    And who is Wells Fargo bank in this transaction?
 8   A    They are the trustee of the transaction.
 9   Q    And what role does the trustee play in this
10        transaction?
11   A    The trustee is the entity that is responsible for
12        essentially collecting payments of principal and
13        interest.  It's the -- essentially they're
14        responsible for both monitoring and enforcing the
15        rights of the bondholders.
16   Q    As they relate to collection of money?
17   A    Collection of that and -- yeah, there are other
18        things the trustee does in terms of they may be the
19        middleman in communicating with bondholders.
20             There are some, for example,
21        provisions of a bond deal that can be amended after
22        closing with bondholder consent.  The trustee is
23        normally the one responsible for both soliciting
24        and collating that consent to make sure there's a
25        sufficient majority, et cetera.
```

```
 1   Q    Okay.  You may have said this earlier, but what was
 2        Stifel's understanding of why EDC was interested in
 3        issuing the bonds?
 4   A    This transaction early on was being discussed as
 5        two things.  One, their debt was structured in such
 6        a way that they needed -- that they had some
 7        balloon payments coming up that needed to be
 8        refinanced.  The -- and they had this project in
 9        Natchez, Mississippi.
10                  So the scope of what we are asked to
11        provide them -- or interview on May 29th, and I
12        presume Robert W. Baird was given the same request,
13        was to basically show us how -- what it looks like
14        if we refinance this debt and how much money can we
15        raise to support this project in Natchez.
16   Q    You were asked some questions earlier about the
17        mechanics for the transfers of the bonds.
18   A    Yes.
19   Q    I just want to make sure I understand what you were
20        describing.  Again, Stifel Nicolaus was the initial
21        purchaser of the bonds, correct?
22   A    Correct.
23   Q    And does Stifel Nicolaus have an account at this
24        deposit trust company?
25   A    Depository Trust & Clearing Corp, yes.  We have an
```

1       account with Depository Trust.

2   Q   There's a reference in the bonds to a company

3       called Cede & Co., C-E-D-E & Co.  Can you tell us

4       what Cede & Co. is?

5   A   Cede & Co. is a nominee or what's often called in

6       the nomenclature of our business a street name

7       that's designated by Depository Trust to identify

8       investments that they are holding merely in

9       safekeeping that they don't have an actual

10      ownership interest in.

11                  In other words, they have physical

12      possession of the bond certificate, but by

13      registering it in Cede & Co., it distinguishes it

14      from other investments that they may carry on their

15      balance sheet that are registered in Depository

16      Trust & Clearing Corporation.  Those are

17      investments that DTC actually owns.  In this case

18      they are holding the certificate for safekeeping.

19  Q   Does Cede & Co. have any substantive rights under

20      the bonds?

21  A   They act as the clearing agent for both bondholder

22      payments, bondholder communications, but those I

23      would characterize more as procedural rights than

24      substantive rights in terms of incidents of

25      ownership.

```
1                    No, Cede & Co. never paid anything
2         for any interest in these bonds, and nobody in this
3         transaction offered to make them a gift of any
4         interest in the bonds.
5    Q    So let me try to isolate some time periods then
6         here.  When Stifel acquired the bonds from the
7         issuer, DTC, you mentioned earlier that those bonds
8         were registered in Stifel's account at DTC?
9    A    Um-hum.
10   Q    Was that a yes?
11   A    Yes.
12   Q    What did Stifel do with the bonds?  Did they
13        register their rights in any way?
14   A    Well, we posted the ownership of those bonds to an
15        inventory account.  We maintain accounts for
16        investments that we hold for our own investment
17        purposes, also other securities that we hold for
18        resale to customers.  And so once it was in our DTC
19        account, we posted it to an inventory account at
20        Stifel.
21                   (Exhibit 23 was marked for
22        identification.)
23   BY MR. TUREK:
24   Q    Mr. DeYoung, I have shown you what's marked as
25        Exhibit 23.  Do you have that in front of you?
```

1    A    I do.

2    Q    First off, what is this document?

3    A    This is a computer run of at least one page of the

4         transactions in Stifel's trading inventory account

5         for January 18, 2008.

6    Q    There's handwritten a bracket on the right side of

7         Exhibit 23.  Does that bracket reflect the

8         transactions that involve Stifel and the bonds on

9         that date?

10   A    Yes.

11   Q    You mentioned earlier that Stifel registered the

12        bonds in their inventory account.

13                   Can you tell us where that

14        transaction is reflected on Exhibit 23?

15   A    The transaction that indicates that there was a

16        purchase of bonds carrying -- it's hard to describe

17        because they don't -- 12 percent interest bonds at

18        98.25 percent of principal, that was the price at

19        which we bought, and that was the coupon rate of

20        the bonds that we bought.  The principal amount is

21        designated here at $50 million.

22   Q    Let me just stop you so we're all on the same page.

23        This and the bracketed entries would be essentially

24        the bottom two rows?

25   A    The bottom two rows, there you go, of the bracketed

```
1         entries.
2    Q    And can you tell us this inventory account that
3         Stifel registered the bonds in, what number is
4         that?
5    A    The account number is in this case 00753186.
6    Q    And by depositing those in Stifel's account and
7         registering them there, was Stifel demonstrating
8         its ownership to the bonds?
9    A    Yes.  I mean, we don't -- those bonds don't get
10        posted to us until we've paid for them.
11   Q    Now, you described then a transfer -- a sale of the
12        bonds to LDF Acquisition, correct?
13   A    Right.
14   Q    Is that transaction reflected on Exhibit 23?
15   A    For that we would look at the top two rows of the
16        thing, and that is the sale of 50 million bonds at
17        99.  That was the higher -- the price at which we
18        sold LDF Acquisitions.
19   Q    And were then those bonds registered in an account
20        held by LDF?
21   A    Yeah.  There's a customer account number associated
22        with this, so those bonds would have been posted to
23        the customer account.  Again, the customer's name
24        isn't identified here, but the account is
25        identified as Account No. 19690389.
```

```
1   Q    And in preparing for today's deposition, do you
2        have an understanding of who controlled that
3        account?
4   A    I've seen monthly statements for that account, and
5        those statements are addressed to LDF Acquisitions
6        in care of Saybrook in Santa Monica, California.
7   Q    Is that an account that is administered by Stifel
8        Nicolaus?
9   A    Yes.  That's a customer account.
10  Q    At the point that Stifel had the bonds registered
11       in its account and before they were sold to LDF,
12       how would you describe Stifel's role vis-a-vis the
13       bonds?
14  A    Well, during that period of time, we were the sole
15       bondholder, and clearly we had bought it under the
16       conditions described in the bond purchase
17       agreement.
18  Q    And if something would have happened during that
19       period of time that required a holder to execute
20       some rights, Stifel would have been the party that
21       would have executed on those rights?
22  A    We would have been at that point the only party
23       that had those rights.
24  Q    And if an agreement gives the bondholders from time
25       to time rights, is it your understanding that that
```

```
 1          would include all bondholders current and past?
 2    A     Yes.
 3    Q     One last, I think, question.
 4                    At some point you described Stifel
 5          having multiple customers in this transaction,
 6          correct?
 7    A     Right.
 8    Q     And one of those customers was EDC/the tribe?
 9    A     Correct.
10    Q     And then at another point Stifel had two customers
11          that were potentially interested in becoming a --
12          in a relationship with the tribe, correct?
13    A     Correct.
14    Q     And those were Saybrook and then that other
15          potential investor that we can't remember?
16    A     Right.
17    Q     And then eventually Saybrook became the investor
18          who was interested in buying the bonds?
19    A     Correct.
20    Q     Did Stifel have any kind of agency relationship
21          with Saybrook, that is principal and agent
22          relationship with Saybrook or LDF Acquisition?
23    A     No.  They were just -- they were customers.  We
24          had -- in terms of us being able to act as their
25          agent on either one of them, no.
```

```
 1                    MR. TUREK:  Those are all the questions I
 2        have.  Thanks.
 3                    MR. FINE:  None from me.
 4                    MR. HANSEN:  Jim?
 5                    MR. CLARK:  I don't have any.
 6                    MR. HANSEN:  Let me get just a couple of
 7        real quick follow-ups.
 8                            EXAMINATION
 9     BY MR. HANSEN:
10     Q    Do you know whether the tribe or the EDC ever
11          actually had possession of any of the funds from
12          the bond proceeds?  Did it have an account that
13          they controlled?
14     A    I believe so.  There were closing instructions that
15          distributed the funds.  I'd have to review that
16          document to know -- when you ask about account they
17          control, yeah, I believe that the trustee was
18          holding the funds that were designated for --
19          advanced in Natchez, but I believe the tribe still
20          had the ability to approve or not approve
21          distributions out of that account.
22     Q    The tribe did?
23     A    Yeah.
24     Q    And if the documents are in conflict with that
25          statement, would you agree that you're going from
```

```
 1       memory?
 2   A   I'm going from memory.
 3   Q   Last question.  Did you ever find out -- Rick
 4       Lindsley eventually quit working as the tribal CFO.
 5       Do you know where he ended up?
 6   A   I don't know where he ended up.  No, I do not know.
 7   Q   Less than no, what do you hear?
 8   A   I heard that he was working in some capacity for
 9       Bill Bayba in either Wisconsin or Mississippi or
10       both.
11                 MR. HANSEN:  All right.  Nothing further.
12                 MR. TUREK:  Nothing from me.
13                 (Deposition concluded at 5:15 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1        STATE OF WISCONSIN )
                            ) SS:
2        MILWAUKEE COUNTY   )

3

4                I, Dawn M. Lahti, RPR, Certified

5        Realtime Reporter, and Notary Public in and for the

6        State of Wisconsin, do hereby certify that the

7        preceding deposition was recorded by me and reduced

8        to writing under my personal direction.

9                I further certify that said

10       deposition was taken at 309 North Water Street,

11       Milwaukee, Wisconsin, on the 3rd day of March,

12       2014, commencing at 1:05 p.m.

13               I further certify that I am not a

14       relative or employee or attorney or counsel of any

15       of the parties, or a relative or employee of such

16       attorney or counsel, or financially interested,

17       directly or indirectly, in this action.

18               In witness whereof, I have hereunto

19       set my hand and affixed my seal of office on this

20       4th day of March, 2014.

21

22                          _____
                            DAWN M. LAHTI, RPR
23                          Certified Realtime Reporter
                            Notary Public
24
         My commission expires April 17, 2016.
25
```

WWW.GRAMANNREPORTING.COM · 414.272.7878    GRAMANN REPORTING

Innovation · Expertise · Integrity

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 138 of 155

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

## $

**$1 (6)**
83:7,11;95:11;
104:16;119:13;120:3
**$20 (3)**
104:15;105:11,18
**$3 (1)**
105:1
**$375,000 (2)**
56:6;60:6
**$5 (1)**
37:21
**$50 (3)**
52:1;56:6;131:21

## A

**ability (6)**
84:9;93:20;99:14;
100:19;106:16;
135:20
**able (10)**
24:3;28:11;32:13;
40:4;46:19;80:17;
91:1,11;93:15;
134:24
**above (3)**
14:9,9,10
**above-entitled (1)**
2:2
**absence (4)**
17:24;19:21;20:11;
93:11
**absent (1)**
17:17
**Absolutely (2)**
63:18;106:21
**access (2)**
10:20;113:25
**Account (37)**
4:;39:9;71:6,11,13,
17,20;72:5,6,11,16;
126:17,19;128:23;
129:1;130:8,15,19,
19;131:4,12;132:2,5,
6,19,21,23,24,25;
133:3,4,7,9,11;
135:12,16,21
**accounts (4)**
36:7;70:4;75:5;
130:15
**accurate (5)**
47:4;50:19,21;
61:17;100:21
**achieve (1)**
32:13
**acquire (1)**
68:9,12
**acquired (2)**
72:2;130:6
**Acquisition (8)**
2:;126:14,16,23;
127:1,4;132:12;

134:22
**Acquisitions (3)**
72:11;132:18;
133:5
**across (1)**
31:8
**act (4)**
109:7;126:3;
129:21;134:24
**acted (2)**
66:17;116:22
**acting (3)**
46:21;123:12;
126:2
**action (6)**
2:2;89:5;106:20;
119:1;125:8;137:17
**activities (1)**
121:11
**acts (1)**
65:20
**actual (1)**
129:9
**actually (8)**
29:4;64:5;70:8;
80:25;110:4;112:19;
129:17;135:11
**add (1)**
86:16
**added (1)**
84:21
**additional (3)**
68:22;99:5;113:23
**address (1)**
5:10
**addressed (1)**
133:5
**administered (1)**
133:7
**administrative (1)**
64:10
**adopt (2)**
53:16;54:3
**advance (1)**
107:9
**advanced (1)**
135:19
**advice (26)**
17:20,23;18:4,10,
24,25;19:3,7,15,16,
23;20:1,3,16,21,23;
21:1,4,12;23:4,5;
58:9;93:9,15;94:2;
120:12
**advise (5)**
18:17;22:24;58:21;
88:20;110:24
**advised (1)**
22:20
**advising (2)**
67:24;84:12
**advisor (4)**
5:20;16:22;94:7;
106:22
**advisors (1)**

20:14
**advisory (6)**
17:8,11;18:8,9;
19:1,9
**affect (4)**
73:16,17;74:9;
75:16
**affects (1)**
73:4
**affiliate (1)**
111:16
**affirmative (1)**
68:13
**affixed (1)**
137:19
**afford (1)**
29:22
**afield (2)**
85:23;86:15
**after (19)**
12:25;27:11,25;
34:6,13;38:15;46:16;
48:13;53:12;56:13;
60:12;78:24;89:25;
91:13,24;92:10;
117:19;124:7;127:21
**afternoon (1)**
5:7
**again (33)**
9:17;23:14;26:25;
27:19;37:19,24;38:2;
50:14;53:24;64:13;
68:18;75:24;79:3;
83:22;85:22;92:21,
22;94:13;102:5;
103:11;107:5;
108:13;109:11;
110:21;111:14;
112:21;114:6;117:2,
17;120:6,21;128:20;
132:23
**against (1)**
86:18
**agency (1)**
134:20
**agenda (1)**
95:25
**agent (33)**
5:21;21:8;50:15;
56:19;66:22;81:10;
93:13;94:1,6,9;
95:19;96:3,25;98:19;
100:6;103:2,3;106:3,
9,12;107:4,9,11,17,
25;109:8;113:3;
120:11;125:24;
126:4;129:21;
134:21,25
**agents (2)**
106:6;109:17
**agent's (1)**
65:13
**agree (1)**
135:25
**agreeable (1)**

125:5
**agreeing (1)**
56:4
**Agreement (30)**
4:14;10:15,23;
11:2;17:2,17;18:8,9,
11,15;19:1,9,17;
20:12,20;32:13,16;
56:21;70:22;71:2;
75:3;76:2;79:7;
93:11;107:6;126:5,5,
7;133:17,24
**agreements (4)**
10:18,25;11:12;
78:10
**ahead (11)**
14:12,13;22:4;
69:14;74:23;76:18;
78:3;79:1;89:19;
101:14;114:21
**airport (1)**
48:25
**allege (1)**
88:16
**allow (1)**
73:21
**allowing (1)**
38:6
**almost (1)**
125:1
**along (2)**
40:24;115:11
**alternative (3)**
37:12,14;55:11
**alternatives (1)**
88:20
**although (1)**
33:7
**always (6)**
6:21;21:7;45:20;
50:15;59:6;99:18
**amended (2)**
65:16;127:21
**among (3)**
43:6;55:19;85:2
**amount (6)**
29:11;37:9,10;
51:19,23;131:20
**analyses (2)**
62:14,19
**analysis (10)**
52:7;62:10,12,22;
63:23;96:15;99:12;
105:19;119:21,23
**analyst (3)**
15:4;29:18;115:3
**annual (2)**
63:9,24
**anticipate (1)**
8:24
**anticipated (1)**
26:8
**anticipation (2)**
29:8,16;93:1
**anymore (1)**

73:4
**apart (1)**
22:18
**apparently (1)**
104:9
**appear (1)**
76:21
**Appeared (4)**
2:12,16,21;3:5
**appearing (1)**
56:22
**appears (5)**
44:23;100:1;104:1;
105:9;107:20
**application (2)**
67:7,9
**applied (2)**
29:25;52:5
**appropriate (4)**
93:7;94:9;96:23;
111:12
**approval (2)**
60:13;112:19
**approve (2)**
135:20,20
**approved (2)**
54:10,23
**April (6)**
7:1,3,8;13:2,3;137:
**arbitrage (9)**
83:9;84:8,9;95:10,
18;99:1;103:10;
104:25;105:17
**area (2)**
6:23,23
**areas (2)**
6:16,20;77:15
**arise (2)**
74:14;78:16
**arose (1)**
57:20
**around (4)**
39:6;42:9;49:1;
50:2
**arrangements (2)**
34:13;72:14
**articulated (1)**
87:23
**aside (5)**
9:22;68:17;74:7;
76:12;77:19
**assembled (3)**
43:24;66:19;70:21
**asset (1)**
113:13
**assets (3)**
54:7;61:24;78:9
**assist (1)**
18:15
**assisted (1)**
66:24
**assisting (3)**
18:12;67:9;83:8
**associated (2)**
33:14;132:21

**Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 139 of 155**

Stifel Nicolaus & Co v.                                                    Deposition of David DeYoung
Lac du Flambeau Lake Superior Chippewa Indians, et al.                     March 3, 2014

**assume (13)**
9:10;18:24;22:8;
26:13;31:5,16;37:11,
11;63:11;85:16;
102:4;104:19;105:13
**assumed (1)**
23:19
**assumes (2)**
116:4;118:1
**assuming (1)**
87:25
**assumptions (4)**
52:5;63:5,7,10
**attached (2)**
4:,17
**attachments (1)**
64:21
**attempt (1)**
88:3
**attempted (1)**
86:4
**attend (6)**
53:18,25;103:4;
123:5;125:11,14
**attended (3)**
53:21;122:25;
124:20
**attention (1)**
10:22
**attorney (2)**
137:14,16
**attorney/client (1)**
77:15
**attorneys (1)**
7:16
**Au (1)**
73:5
**audience (5)**
44:6,7;65:9,10;
104:21
**auditors (1)**
66:6
**authority (4)**
32:10;112:19;
116:10;124:10
**authorization (6)**
11:13;37:3;41:12,
14;76:20;77:12
**available (11)**
26:14;32:23;40:21;
51:5,10;56:25;57:6;
62:24;63:11;71:11;
111:25
**Avenue (1)**
2:20
**avoid (1)**
53:10
**aware (28)**
16:24;17:3,19,22;
21:20,24;28:16;
40:25;59:19;63:16;
73:24;74:2,17,19;
77:20,22;82:13;87:3,
6,7;90:1;91:15;99:7,
9;102:6;109:25;

110:18;121:20
**away (1)**
73:21

**B**

**back (21)**
9:10;13:2;15:3;
20:12;24:25;40:4;
41:5;54:24;55:12;
59:16;83:11;86:12,
23;91:16;93:5;94:14;
95:11;99:5;117:4;
118:24;119:4
**bad (1)**
39:6;84:14
**Baird (4)**
30:18;52:16,18;
128:12
**balance (1)**
129:15
**Balch (6)**
66:23;67:2,8,16,
24;68:1
**ball (1)**
55:16
**balloon (1)**
34:25;128:7
**Band (3)**
30:22;45:5;81:21
**Bank (3)**
2:18;110:4;127:7
**barbecue (2)**
31:24,25
**base (1)**
115:1
**based (4)**
29:23;32:20;65:14;
119:20
**basically (8)**
30:2;31:10;52:18;
72:13;111:25;115:4;
124:12;128:13
**basis (2)**
35:5;47:13;63:9;
80:16;96:12;120:2
**Bayba (13)**
45:4,13,14,21;46:5,
15,21,24;109:1,6;
117:9,9;136:9
**Bayba's (2)**
109:24;117:18
**Bayliss (6)**
48:22;50:4,6,11,
22;51:4
**bear (1)**
111:19
**became (3)**
29:1;63:2;134:17
**become (2)**
87:7;90:13
**becoming (1)**
134:11
**before (23)**
2:4;7:3,13;8:15;

9:2;16:13;20:20;
29:19;40:5;44:21;
45:8;47:15;55:12;
64:4,18;67:20;70:19;
72:19;82:14;95:8;
117:18;121:20;
133:11
**began (2)**
15:22;82:24
**begged (1)**
110:4
**begin (1)**
99:8
**behalf (13)**
2:12,16,21;3:5;6:7;
95:19;96:25;100:6;
103:3;118:20;
123:12,13;125:14
**behaving (1)**
122:5
**behind (2)**
25:19;114:6
**below (1)**
45:24
**beneficiaries (1)**
78:8
**beneficiary (1)**
74:21
**benefited (1)**
75:6
**benefits (1)**
58:21
**besides (1)**
34:15
**best (5)**
8:25;24:7,20;
30:25;122:4
**better (3)**
14:15;18:4;98:9
**beyond (3)**
33:17;87:25;
119:23
**bidding (1)**
52:10
**Big (14)**
45:18,19;46:4,16,
23;50:25;61:21;87:4;
89:14,15;116:17;
117:17,19,23
**Bill (7)**
45:13,15,21;109:1,
23;117:9;136:9
**Bingham (4)**
66:23;67:2,8,16
**Bingham's (2)**
67:24;68:1
**bit (5)**
6:12;11:21;42:23;
82:5;120:24
**blank (1)**
35:20
**board (3)**
16:13;104:20;
116:9
**boardroom (1)**

31:5
**boat (1)**
24:12
**body (1)**
97:20
**Bond (77)**
4:14;5:19;6:23;
10:9,15,23;11:1,11,
23;13:13;17:2;21:22;
22:19;23:23;29:1;
55:23;56:3,20;57:1,
20;58:12;60:7;61:12;
66:12,13;67:5,20;
70:13;71:2;75:3;
76:1;79:7,18;83:22;
84:9,22,23;87:19;
88:19,21;89:11;93:6;
94:11,11;98:21;
99:21;100:6,17,21;
102:2;103:13,14;
107:4,5,8,11,17;
109:22;111:6;
112:14,20,25;114:25;
116:17;118:5,11;
120:11;125:6,23,24;
126:4,5,7;127:21;
129:12;133:16;
135:12
**bonded (1)**
83:23
**bondholder (7)**
78:5,6,17;127:22;
129:21,22;133:15
**bondholders (9)**
78:7,20;79:16;
80:10,11;127:15,19;
133:24;134:1
**bonds (73)**
29:11;65:6,11;
68:13;69:8,9,17,19;
70:8,9,16,18;71:3,5,
13,16,25;72:3,5,15;
73:1,11,75:7,13,17;
79:10;80:9,14,17,20;
81:1,7;83:16,25;
100:18;101:20,22;
102:9,11;111:18;
124:1;126:11,13,21,
23;127:1,5;128:3,17,
21;129:2,20;130:2,4,
6,7,12,14;131:8,12,
16,17,20;132:3,8,9,
12,16,19,22;133:10,
13;134:18
**bonus (3)**
13:10,12;32:23
**book (1)**
70:17
**book-entry-only (1)**
70:14
**borrow (1)**
104:15
**borrower (1)**
65:18
**borrowing (3)**

51:20;54:9;84:10
**both (20)**
10:18;14:10;15:5;
25:23;34:25;44:8;
49:12;60:3;65:10;
76:21;77:22;94:1;
111:9;112:1;115:8,9;
127:14,23;129:21;
136:10
**bottom (5)**
83:5;95:7;98:5;
131:24,25
**bought (3)**
131:19,20;133:15
**bracket (2)**
131:6,7
**bracketed (2)**
131:23,25
**break (3)**
9:13;12:11;33:25
**breaking (1)**
33:24
**Brian (17)**
9:20;14:23,25;
53:22;64:10;98:1,6;
102:4,5,5,14,24;
107:21;114:8,11;
125:4,16
**Brian's (1)**
15:2
**brief (1)**
12:11
**briefing (1)**
87:23
**briefly (2)**
95:6;119:4
**bring (5)**
11:15;30:13;94:24;
97:23;115:11
**bringing (1)**
50:16
**broad (1)**
69:16
**broker (2)**
24:14,19
**broker/dealer (3)**
72:8;121:10,11
**brought (3)**
25:17;30:7;57:17
**budget (5)**
29:5;58:2;79:25;
85:2;110:9
**built (1)**
84:3
**business (11)**
30:18;33:1,15,19;
55:24;99:18;106:22;
115:13,14;116:7;
129:6
**buy (1)**
126:21
**buyer (2)**
5:21;50:16
**buyers (2)**
99:21;100:17

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 140 of 155

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

**buying (1)**
134:18

**C**

**Cahill (1)**
9:20
**calculation (1)**
119:18
**calculations (1)**
63:20
**calendar (1)**
55:16
**California (1)**
133:6
**call (12)**
22:11;24:5;31:21;
36:1;40:22;41:2,3;
57:3;67:18;90:8;
110:4;124:10
**called (11)**
5:2;22:21,22,25;
40:4;44:14;53:16;
90:18;124:5;129:3,5
**calling (4)**
38:15;40:7,18;
124:24
**calls (5)**
21:15;32:2;38:17;
68:5;110:3
**came (3)**
16:13;53:24;
125:16
**can (31)**
8:19,20;20:20;
24:5,18,19;29:22;
42:17;51:9;57:2;
68:6;70:6;74:11,13;
89:3,7;94:13;98:9;
101:24;103:19;
104:10;108:13;
110:6;113:7;117:2;
122:1;127:21;
128:14;129:3;
131:13;132:2
**capacity (9)**
17:14,16;95:19;
98:19;103:2;106:3;
107:4;113:3;136:8
**capital (4)**
18:16;23:15;28:24;
35:2
**Capital's (1)**
42:25
**care (1)**
133:6
**careful (1)**
113:10
**Carl (2)**
31:19;90:15
**carry (2)**
83:19;129:14
**carrying (3)**
31:24;53:23;
131:16

**case (7)**
20:12;42:2;60:22;
88:3;110:3;129:17;
132:5
**cash (7)**
81:4;99:8;101:25;
103:6;105:20;
119:12;120:3
**casino (20)**
23:9;24:12;29:12,
25;31:7,9;44:19;
46:1;49:13,23;50:3;
51:12,23;62:11,19;
63:17;80:21,24;
118:11;119:22
**Casino-Natchez (1)**
45:1
**catching (2)**
110:3,3
**Cato (8)**
24:9,9,13,20,22;
45:3,8;117:8
**cause (3)**
74:13;110:17,18
**Cede (6)**
129:3,4,5,13,19;
130:1
**C-E-D-E (1)**
129:3
**cell (1)**
31:25
**center (4)**
31:7,10;36:14;61:7
**CEO (2)**
6:11,15
**certain (11)**
16:2;52:5;60:18;
63:9;67:6;68:9;
70:17;79:16;98:23;
112:11;125:20
**certainly (1)**
76:6
**certificate (4)**
70:13,16;129:12,
18
**Certified (2)**
137:4,23
**certify (3)**
137:6,9,13
**cetera (3)**
6:21;62:15;127:25
**CFO (3)**
6:15;123:13;136:4
**chain (1)**
73:14
**change (1)**
92:2
**changed (1)**
19:14
**characterization (1)**
89:4
**characterize (3)**
23:5,6;129:23
**charge (4)**
14:8;20:4;50:5;

84:5
**charged (1)**
83:21
**Charles (5)**
24:9,9,13;45:3;
117:8
**chart (2)**
14:16;15:20
**check (1)**
15:3
**checked (1)**
17:11
**Chicago (2)**
2:1;31:23
**Chippewa (3)**
30:22;45:5;81:21
**choice (2)**
52:20;110:22
**Chris (2)**
67:1,22
**Christian (1)**
67:1
**Christmas (1)**
54:16
**chronology (1)**
12:18
**circulated (2)**
47:21;62:17
**circumstances (2)**
14:20;112:14
**cites (1)**
88:21
**Civil (1)**
2:4
**claim (3)**
79:5;86:17;89:1
**claims (1)**
86:18
**clarification (1)**
12:13
**clarify (3)**
9:9;114:4,14
**Clark (10)**
2:;30:9;59:15;
90:3;93:17;101:1;
108:20;120:5;
122:19;135:5
**clean (1)**
8:18
**clear (5)**
34:8;35:3;102:12,
13,19
**Clearing (3)**
128:25;129:16,21
**clearinghouse (1)**
66:17
**clearly (11)**
61:4;73:12;78:8;
79:7;97:15;105:10;
111:18;113:22,25;
114:7;133:15
**client (15)**
18:13;20:5,9,21;
21:3,12;22:10;38:8;
40:11;47:3;55:13;

68:1;85:19;114:16;
115:5
**clients (6)**
38:19,20;91:20;
113:12;115:5;122:5
**clients' (1)**
107:20
**close (4)**
31:17;46:5;56:3;
110:20
**closes (1)**
55:25
**closing (11)**
11:8,11;54:4;
69:18;70:12,19,21,
24;126:18;127:22;
135:14
**Co (7)**
129:3,3,4,5,13,19;
130:1
**code (2)**
116:3,7
**cognizance (1)**
112:13
**collaborative (1)**
64:8
**collateral (1)**
84:21
**collating (1)**
127:24
**colleague (1)**
15:21
**collected (1)**
126:20
**collecting (1)**
127:12
**collection (2)**
127:16,17
**combination (2)**
39:11;43:8
**comfort (2)**
99:21;100:19
**coming (7)**
33:14;34:23,25;
52:22,23;54:14;
128:7
**commencing (2)**
2:8;137:12
**commensurate (1)**
33:3
**commerce (1)**
68:24
**Commission (6)**
19:13;26:19;32:18;
67:10;116:10;137:
**commit (2)**
38:3;109:22
**common (3)**
41:1;65:24;66:1
**communicate (2)**
40:13;77:6
**communicated (3)**
36:6;41:16;124:23
**communicating (6)**
20:2;38:24;39:4,5;

124:25;127:19
**communication (1)**
51:9
**communications (6)**
38:25;39:7,10,16;
40:16;129:22
**Company (17)**
2:;5:13;8:2;11:19;
14:3;45:3;66:10;
70:15;71:4,7,8;76:4;
85:25;121:6;126:16;
128:24;129:2
**comparison (1)**
38:7
**compensated (2)**
32:19,20
**compensation (5)**
26:20;27:3;32:15,
24;33:2
**compete (1)**
53:3
**competing (3)**
30:17;123:25;
124:3
**competitive (3)**
30:20;52:9,17
**complaint (1)**
88:22
**complement (1)**
31:13
**complete (1)**
64:20
**completed (2)**
30:21;38:4
**completely (4)**
34:10;71:15,16,22
**completeness (1)**
8:9
**compliance (1)**
6:21
**complicated (1)**
57:2
**component (4)**
101:16,17;102:3,9
**compound (1)**
22:4
**Computer (3)**
4:15;30:1;131:3
**concept (2)**
25:19;77:25
**concerned (2)**
34:20;93:23
**conclude (1)**
52:9
**concluded (1)**
136:13
**concluding (1)**
2:8
**conclusion (11)**
21:16;57:4;68:6;
69:13;74:11,22;
76:17;78:2,25;81:12;
94:24
**conclusions (1)**
107:24

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 141 of 155

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

condition (1)
65:18
conditioned (1)
83:25
conditions (3)
75:4;111:12;
133:16
conduct (9)
82:4;86:3;87:15,
24;96:16;113:5;
114:15;116:3;118:7
confirm (2)
17:4,7
conflict (2)
88:16;135:24
conform (1)
65:17
connect (1)
40:5
connection (2)
24:2;28:14
consent (1)
127:22,24
consequences (1)
106:20
consider (1)
62:19
considerable (1)
55:1
consideration (1)
63:13
considered (1)
63:19
consist (2)
45:1;117:7
consolidate (1)
54:7
constitute (1)
70:25
constitutes (3)
19:15;84:25;86:20
consummate (1)
41:15
consummated (2)
55:23;93:7
contact (10)
15:24;16:6;20:9;
23:18,20;31:20,22;
45:9;86:21;118:16
contacted (3)
23:14,17;31:19
contacts (8)
22:10;47:12;86:1,
5,7;88:6,7,8
contained (3)
73:25;75:9,15
contains (1)
82:3
cont'd (1)
3:1
contemplated (1)
21:8
context (3)
97:15,20;114:7
continue (3)

9:2;32:6;88:12
continued (1)
112:7
continues (3)
73:10;98:3,3
continuous (1)
12:12
continuously (1)
12:22
contract (11)
16:25;17:8,12,18,
24;18:5;23:25;68:3,
7;76:8;77:19
contractor (1)
111:15
contractors (3)
35:4;109:25;110:5
contracts (2)
76:13;77:20
contraire (1)
73:5
contributed (2)
66:11,18
contribution (2)
32:21;33:3
control (4)
86:3,4;121:4;
135:17
controlled (3)
45:21;133:2;
135:13
conversation (7)
23:8;25:2;71:4;
114:2,3,8;124:8
conversations (2)
8:23;39:21
Copies (2)
4:17,17
corner (1)
82:8
Corp (4)
2:13;26:15;72:2;
128:25
corporate (4)
6:14;47:13;54:6,8
Corporation (8)
46:13;61:25;76:3,
9,15,16;104:7;129:16
correspondence (3)
10:16,24;11:4
council (7)
31:13;53:16;66:14;
82:15;90:12,19;
104:20
counsel (17)
9:19;53:22;58:6,7;
65:14;66:12,13,16,
22;77:5,9,12;125:1,6,
17;137:14,16
counsel's (1)
10:4
counter (1)
30:24
counterclaims (1)
88:25

countersigned (1)
68:8
COUNTY (1)
137:2
couple (6)
36:20;40:2;45:16;
122:24;125:18;135:6
coupon (1)
131:19
court (6)
8:18;55:16;86:17;
88:25;89:5;119:1
Courte (1)
30:22
cover (3)
6:20;64:13;75:24
covered (2)
33:10;36:7
covering (1)
39:8
create (2)
69:3;99:4
creating (1)
77:25
credit (9)
15:6;18:18,20;
29:24;33:17;52:5;
91:10;99:11;115:3
credited (1)
72:16
creditworthiness (1)
111:19
criteria (1)
29:24
CRUEGER (1)
3:
culminated (1)
22:19
culminating (1)
26:21
curious (1)
121:23
current (4)
6:25;29:12;52:8;
134:1
Currently (3)
5:15;26:13;120:18
customary (1)
56:25
customer (14)
20:9;24:13;35:23;
36:10;39:7;71:11,13,
25;94:22;97:1;110:5;
132:21,23;133:9
customers (6)
38:25;130:18;
134:5,8,10,23
customers' (1)
97:4
customer's (1)
132:23
cut (1)
8:24
Czajkowski (3)
5:25;14:20,21

D

Dana (1)
15:13
Daniel (1)
2:
date (10)
13:17,18;15:10;
42:20;65:7,8;68:22;
73:9;124:13;131:9
dated (1)
68:23
dates (2)
12:10;14:1
Dave (7)
9:19;14:13;42:14;
52:21,22;69:14;
117:14
David (20)
2:,1;5:2,9;12:15,
16,21;13:16;16:5,15,
16;19:6,25;20:15;
22:14;24:20;27:19;
30:17,20;52:24
Dawn (4)
2:4;9:3;137:,4
day (20)
2:7;31:17;32:12;
40:6;49:1,2,2,6;
60:19,25;61:1,6;70:1,
2,19,23,24;105:3;
137:11,20
days (1)
70:13
deadlines (2)
34:20,21
deal (18)
21:22;28:1;31:17;
33:6,6;44:10;55:6,
25;56:3;57:10,23;
58:2;84:22,23;87:19;
93:6;116:12;127:21
dealing (4)
67:20;88:24;
116:13;118:5
dealings (2)
27:11;28:8
dealt (2)
25:24;118:6
debate (2)
55:19;89:3
debt (14)
28:23;29:6;34:23;
35:1;62:11,24;63:12;
83:9;99:21;101:8;
119:12;120:18;
128:5,14
debts (1)
95:9
December (1)
54:14
decide (4)
20:22;21:11;38:21,
22

decided (2)
54:16;77:9;85:13
decision (13)
37:2;39:4;41:10;
55:13;58:14;65:6;
67:19;80:6;85:14,15;
92:10;111:22,23
decisions (2)
58:14;85:17
declined (1)
91:5
deemed (1)
66:5
deeper (1)
110:25
defaults (1)
62:7
Defendants (2)
2:3;3:5
defense (1)
89:6
defined (4)
19:14;63:1;67:6;
79:22
definition (1)
18:22
delay (2)
55:9,18
delegated (1)
116:9
deliberately (1)
35:4
delivered (1)
70:9
delivery (1)
75:3
demonstrating (1)
132:7
Denver (1)
30:8
department (4)
5:16;14:4;30:16;
64:9
depending (1)
122:11
depends (1)
59:1
deposed (1)
8:15
deposit (1)
128:24
depositing (1)
132:6
Deposition (11)
2:1;4:,12;9:16;
11:10;88:4;121:16;
133:1;136:13;137:7,
10
Depository (8)
66:10;70:15;71:4,
8;128:25;129:1,7,15
derived (2)
66:13,15
describe (6)
6:12;70:6;91:1;

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 142 of 155
Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.
Deposition of David DeYoung
March 3, 2014

123:24;131:16;
133:12
**described (8)**
65:7;66:11,12,14;
90:22;132:11;
133:16;134:4
**describing (3)**
57:18;102:2;
128:20
**description (9)**
13:17,18;14:1,15;
47:5,6;61:17;100:21;
103:13
**designated (3)**
129:7;131:21;
135:18
**designates (1)**
77:4
**designation (1)**
77:7
**designed (1)**
68:25
**desire (1)**
114:13
**detail (2)**
61:14;109:8
**details (1)**
115:10
**determining (2)**
63:21;111:11
**develop (1)**
25:7
**developed (3)**
33:13;63:3;113:12
**developer (1)**
45:14
**developing (2)**
50:20;112:24
**development (10)**
23:10;26:12,14;
46:12,25;61:25;76:3,
9,15,16
**development-type (1)**
22:10
**DeYOUNG (7)**
2:1;5:2,7,9;7:12;
39:24;130:24
**DICKINSON (1)**
3:
**difference (4)**
37:7,20,21;115:15
**differences (1)**
33:9
**different (4)**
11:1;14:3;35:15,16
**diligence (10)**
37:3;38:4;48:17;
49:9;50:1,5;51:1,3,
11;58:17
**direct (8)**
5:24,25;20:9;
32:21;72:1,3;111:18;
116:16
**direction (4)**
38:14;86:3,4;137:8

**directly (7)**
40:10;49:18;72:1;
111:20;118:6;126:6;
137:17
**director (1)**
5:16
**disagree (1)**
89:4
**disappear (1)**
55:15
**disciplined (2)**
22:12,14
**disclose (2)**
81:8;117:22
**discloses (1)**
79:15
**disclosing (1)**
79:15
**disclosure (1)**
98:22
**disclosures (2)**
79:24;98:23
**discovered (1)**
79:4
**discuss (6)**
29:10;34:15;79:18;
85:10;96:1;123:2
**discussed (7)**
29:24;36:22;44:10;
56:13;85:5;90:20;
128:4
**discussing (2)**
34:17;104:9
**discussion (7)**
27:13;34:1;55:2,5;
63:25;95:4;97:8
**discussions (5)**
9:20;10:3;25:20;
40:24;85:13
**dispute (2)**
13:9,13
**distinct (1)**
23:23
**distinguishes (1)**
129:13
**distributed (1)**
135:15
**distribution (3)**
13:10;112:11,19
**distributions (1)**
135:21
**divested (1)**
75:12
**divided (2)**
6:15;32:24
**division (1)**
6:18
**document (43)**
7:13;42:6,9,13,17,
19;43:7,22,24;44:7,
13;47:20;48:8;64:5,
20,20,23;65:4,14,25;
66:18;68:10,12,15,
18,23;73:8,19;75:4,6;
76:6,12,19,24;77:4;

79:15;81:20;82:1,2;
117:24;118:4;131:2;
135:16
**documented (1)**
36:2
**documents (22)**
10:13,21;11:4,5,7,
15;47:13;53:23;
54:10;57:4;60:18,25;
61:1;70:21;77:17;
78:8,13;98:25;
112:22;115:1;125:8;
135:24
**dog (1)**
54:12
**Dolan (5)**
35:23;36:7;38:7,
18;39:25
**Dolan's (4)**
36:4;40:10;47:3;
53:7
**dollar (1)**
105:16
**dollars (1)**
85:4
**done (13)**
16:10;45:16;48:16,
20;54:17,18;55:6;
58:17;62:14;65:15;
74:25;108:5,19
**double-sided (1)**
81:19
**Doud (6)**
36:19;82:19;90:15;
97:5,6,11
**Doud's (2)**
41:13;76:21
**Dougherty (2)**
35:21,22
**down (21)**
6:11;8:19;31:23;
32:9;47:15;52:16;
56:14,15;67:2;83:17;
85:17;92:9;99:3;
102:6;103:15,22;
110:20;112:11,17,20;
118:13
**drafted (2)**
64:5;65:12
**drawing (2)**
35:20;107:24
**Drive (2)**
2:15;5:11
**driving (4)**
49:1;91:20;114:5;
125:9
**DTC (9)**
71:18;72:2,4,14;
75:17;129:17;130:7,
8,18
**du (25)**
15:23;16:9,19,23;
17:1,21;22:1,20,24;
23:25;25:18,25;26:5;
27:10,10;28:2,9,17;

34:6;38:13;45:5;
76:14;80:22;81:20;
103:22
**due (12)**
34:24,25;37:3;
38:4;48:16;49:9,25;
50:5;51:1,3,11;58:17
**duly (1)**
5:3
**duplicate (1)**
65:20
**during (9)**
14:25;20:1;28:15;
51:1;54:24;79:4;
93:3;133:14,18
**dynamics (1)**
125:20

## E

**eager (1)**
38:19
**earlier (8)**
29:18;36:14;93:5;
126:22;128:1,16;
130:7;131:11
**early (10)**
12:23;13:10,22;
25:1;41:9,11;43:5;
92:4,4;128:4
**easier (1)**
9:3
**East (1)**
2:20
**Economic (4)**
61:25;76:2,9,15
**EDC (17)**
61:25;80:16;83:18;
84:19;88:16;100:20;
101:7;102:6,22;
103:1;104:19;
110:25;112:17;
126:11,24;128:2;
**EDC/the (1)**
134:8
**EDC's (1)**
83:24
**education (1)**
98:10
**Edwards (2)**
31:19;90:16
**effect (4)**
29:15;63:21;
119:11;124:11
**effected (2)**
70:11,12
**effects (2)**
87:19;122:8
**effort (2)**
64:8;65:20
**eight (3)**
42:21;104:12,14
**either (17)**
5:20;10:1;18:19;

26:25;31:19;38:9;
39:24;41:21;48:6;
78:1;86:11;104:5,11,
19;120:22;134:25;
136:9
**ELDEN (1)**
2:14
**election (3)**
90:12,13,21
**electronic (1)**
70:4
**else (8)**
9:25;10:10;25:11;
34:15;68:20;77:22;
97:21;114:14
**elsewhere (1)**
75:19
**e-mail (5)**
10:16,24;39:11;
40:6;48:6
**e-mailed (1)**
48:2
**e-mails (1)**
39:19
**Emerald (7)**
22:21,22;44:19,20;
45:1;46:1;117:8
**emphasizing (1)**
55:14
**employed (2)**
15:7;27:20
**employee (2)**
137:14,15
**employees (3)**
9:21;104:6;115:7
**employment (6)**
12:10,12;13:17,18;
14:1,6
**enabling (1)**
53:17
**encourage (1)**
94:10
**end (9)**
32:22;40:5;41:9;
56:9,9,10,11;70:23;
124:7
**endanger (1)**
106:24
**ended (3)**
56:4;136:5,6
**enforcing (1)**
127:14
**engaged (2)**
16:20;99:11
**engages (1)**
121:10
**enough (2)**
38:10;122:3
**entail (1)**
5:17
**entailed (1)**
114:3
**Enterprises (12)**
45:18;46:4,16,23;
50:25;87:4;89:15,15;

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 143 of 155

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

116:17;117:17,20,24
**enters (1)**
68:24
**entire (1)**
31:13
**entirely (1)**
125:1
**entities (6)**
17:21;43:10;46:1;
66:10;76:14;118:23
**entitled (2)**
75:8;84:5
**entity (10)**
16:25;17:1;45:20;
54:8;69:22;77:21,21;
118:16;121:10;
127:11
**entries (3)**
70:17;131:23;
132:1
**entry (1)**
70:17
**envisioned (1)**
29:5
**equity (3)**
6:19;26:17;85:11
**essence (1)**
55:15
**essentially (15)**
8:10;18:3;19:16;
33:8;43:9;70:12;
71:10,19;101:6;
110:20;112:16;
117:11;127:12,13;
131:23
**established (2)**
126:18,20
**estate (1)**
101:25
**et (3)**
6:21;62:15;127:25
**evaluating (2)**
18:13,16
**Even (16)**
17:17;19:21;20:11,
18;68:18;73:22;
78:13;79:8,9;83:20;
84:23;87:24;93:11;
109:21;111:15;
116:16
**event (1)**
62:7
**events (1)**
79:4
**eventually (3)**
41:5;134:17;136:4
**everyone (1)**
33:1
**evidence (3)**
103:18;116:5;
118:1
**evolve (1)**
8:23
**evolving (1)**
91:10

**exact (2)**
15:10;70:6
**exactly (6)**
10:20;14:6;15:2;
20:7;34:14;49:3
**EXAMINATION (7)**
5:5;7:18,25;8:13;
9:17;122:22;135:8
**examined (1)**
5:4
**example (7)**
61:23;68:14,16;
79:6,19;119:22;
127:20
**exceptions (1)**
86:9
**excess (1)**
51:25
**Exchange (5)**
19:13;53:1;71:12;
84:4;116:10
**excuse (1)**
27:8;59:15;120:5
**execute (3)**
28:22;94:11;
133:19
**executed (5)**
60:18,25;61:1,6;
133:21
**Executive (3)**
4:13;42:4;64:6
**Exempt (1)**
2:17
**EXHIBIT (35)**
4:11;7:9,13;8:5,8;
9:18;41:22,25;42:1,
2;43:14;47:18;48:8,
11;64:1,4,12,13,14;
75:20,23,25;76:12;
77:19;81:15,18;95:6;
117:2;119:4;121:17;
130:21,25;131:7,14;
132:14
**exhibits (4)**
4:,17;64:20;88:8
**existing (1)**
35:1
**expect (2)**
106:10;110:6
**expectation (1)**
32:25
**expected (1)**
57:22
**expended (3)**
58:13;79:23;98:22
**expenditure (3)**
84:25;103:14;
112:25
**experience (8)**
22:15;25:8;30:14,
17,23,25;33:18;
114:25
**experienced (1)**
55:9
**expertise (3)**

25:23;29:21;33:18
**expires (1)**
137:
**Explain (1)**
73:6
**expressions (4)**
35:16;37:6,7;38:14
**extent (11)**
14:12;21:15;51:7;
68:5,8;78:4;79:3;
97:4;106:15;110:14;
116:24
**extra (1)**
83:7

**F**

**facilitating (1)**
20:10
**facilitator (1)**
23:15
**facility (2)**
30:1;49:15
**fact (20)**
32:13;47:21;53:10;
79:21,22;80:3,4,7,10;
84:23;88:1,1,15,24;
89:1,6;101:8,22;
109:16;118:24
**factor (1)**
87:13
**factors (2)**
86:8,11
**facts (4)**
65:5;110:16;116:5;
118:1
**factual (2)**
47:13;100:16
**failed (1)**
88:19
**failing (1)**
109:22
**failure (1)**
110:19
**fair (2)**
66:20,21
**fairly (6)**
37:20;116:12,14,
14,21,22
**fall (5)**
6:10;14:7;90:1,4;
91:24
**falsity (2)**
95:14;96:20
**familiar (8)**
22:23;42:6;45:15;
46:23,24;61:11;
64:25;76:6
**far (7)**
38:22;47:15;85:23;
86:15;93:22;98:7;
106:25
**Fargo (2)**
2:18;127:7
**FDC (1)**

102:16
**Federal (5)**
2:3;46:12;76:15;
86:21;89:7
**fee (14)**
32:5,6,16,19;56:2,
2,2,4,7,11,15;60:6,6;
83:7
**feel (3)**
61:11;74:3;100:13
**fees (7)**
32:3;34:9,12,13,
15;83:20;119:9
**felt (9)**
24:11;29:11;30:24;
50:7;61:14;73:17,18;
76:25;111:8
**few (3)**
64:22;114:14;
122:17
**fiduciary (4)**
21:3,10,13;109:15
**figures (1)**
63:24
**file (2)**
17:11,12
**files (1)**
24:25
**filing (2)**
42:2;64:14
**final (4)**
54:3;63:3;79:25;
111:6
**finalized (1)**
119:25
**finally (2)**
43:1;112:23
**finance (16)**
5:16;6:3;7:4;12:9;
13:19;14:16;15:19;
30:8,14,15,23;31:1;
53:2;64:9;92:7,7
**financed (1)**
33:8
**Financial (49)**
2:13;5:20;6:5,8;
8:11;10:21;11:18,20;
16:22;17:8,11,20;
18:8,9;19:1,8,15;
20:14,21;49:12;51:5;
52:4;57:5,9,10,23;
58:1;59:2;63:8;
65:18;66:7;73:22;
78:12;87:4,19;88:18;
89:14;93:9,15;94:2,7,
19;110:15;120:12,
24;121:2,4,5,9
**financial-advice-type (1)**
17:24
**financially (1)**
137:16
**financials (2)**
68:23;84:3
**financing (4)**
35:15;42:25;85:2;

111:12
**find (5)**
6:16;18:7;24:18;
29:3;136:3
**finding (1)**
89:6
**findings (4)**
88:1,15,23;89:1
**Fine (8)**
2:;9:12;22:7;53:2;
113:18,20;122:21;
135:3
**finish (2)**
9:2;123:11
**fired (1)**
13:4
**firm (12)**
5:19;12:24;14:5;
33:15;36:4;37:1,4;
46:20;67:3,11,14,20
**firms (1)**
35:16
**first (19)**
5:3;15:22,24;16:7,
8;18:13;28:16;29:3;
41:3;42:21;43:15;
52:21;64:4;70:7;
91:7;122:21,24;
123:1;131:2
**firsthand (1)**
91:8
**fit (2)**
6:13;72:9
**five (9)**
7:20,22,25;8:12;
47:10;82:19;85:24;
95:1;115:14
**fixed (1)**
6:17,22
**Flambeau (25)**
15:23;16:9,19,23;
17:1,21;22:1,20,24;
23:25;25:18,25;26:5;
27:10,10;28:2,9,17;
34:6;38:13;45:5;
76:14;80:22;81:20;
103:22
**flaw (1)**
75:14
**Florida (4)**
24:15;27:2;45:9,10
**flow (9)**
70:6;81:4;98:7,15,
18;99:8;101:25;
103:6;105:20
**flowing (1)**
110:20
**fluctuations (2)**
63:14,17
**fly (1)**
105:10
**focus (1)**
10:21
**focused (1)**
51:11

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

**FOLEY (1)**
2:19
**folks (4)**
8:24;10:7;11:22;
32:16
**follow (5)**
38:12;40:18;116:2,
22;122:11
**Following (2)**
43:2,2
**follows (1)**
5:4
**follow-up (5)**
31:20;49:11;51:9;
114:2,13
**follow-ups (1)**
135:7
**forgive (1)**
6:4
**form (2)**
27:3;39:6
**formal (2)**
17:17;122:6
**formally (1)**
113:15
**former (1)**
9:20
**forward (10)**
27:18;34:18;35:3;
44:11;50:8;55:20,21;
77:14,17;97:24
**foster (1)**
22:1
**found (3)**
32:12;66:5;67:17
**foundation (3)**
95:22;101:13;
103:17
**four (1)**
82:19
**Fralick (5)**
104:13,17;105:2;
119:7;120:14
**frankly (1)**
124:8
**fraternity (2)**
53:3,3
**fraud (6)**
68:14;73:22;74:7;
88:3,5;89:6
**fraudulent (1)**
73:24
**free (1)**
100:13
**front (3)**
42:1,3;130:25
**fulfilled (1)**
79:9
**fulfilling (1)**
126:3
**full (1)**
77:25
**function (3)**
15:3;67:23;126:4
**functional (1)**

6:15
**functioned (1)**
6:22
**Fund (2)**
2:;80:25
**funds (17)**
26:12,14,16;71:1,
10,12;84:6;85:3;
98:7;15,18;110:19;
112:11;126:20;
135:11,15,18
**further (3)**
136:11;137:9,13
**future (4)**
68:19;80:10;91:2;
111:11

**G**

**gaming (5)**
25:7,8,23;67:7,10
**GASS (2)**
2:10;9:19
**gatekeeper (1)**
33:21
**gathered (2)**
51:5;52:4
**gave (7)**
32:10;37:24,25;
52:19;77:12;97:11;
110:7
**general (8)**
10:3;16:4;21:11,
12;44:10;57:15;
103:24;104:1
**generally (2)**
42:13,17
**generate (3)**
43:19,19;62:11
**generated (5)**
30:2;35:24;41:11;
76:25;105:20
**generating (2)**
47:2;125:7
**gentleman (1)**
24:8
**gift (1)**
130:3
**given (10)**
18:25;20:15;21:1;
35:16;55:5;63:13;
74:20;88:7;99:20;
128:12
**gives (3)**
79:5;89:5;133:24
**giving (6)**
19:7,25;21:3;58:9;
78:1;120:12
**glance (1)**
42:12
**Godfrey (6)**
2:;77:6,18;98:1;
102:14;125:6
**goes (6)**
47:10;70:3;86:11;

87:13,20;98:8
**Good (8)**
5:7;22:16;54:17,
17,19;84:13;91:7;
109:6
**governed (2)**
20:14;116:8
**governing (1)**
20:23
**grabbing (1)**
101:24
**Grand (58)**
22:25;23:8,13,22;
24:2,4,5,7;25:14,17;
26:4,12,20,22;27:5,7,
11,12,18;28:2,9,14;
44:21;51:14;58:9,11,
17,22;59:12;79:14,
19,23;80:1,2,7,13,15;
81:3,10;84:12;85:17,
19;89:16;99:7,10,12,
13,24;101:8;102:22;
103:7,9,16;105:20;
109:23,25;110:23,25
**grandchildren (1)**
104:5
**greater (2)**
83:10;95:10
**Griffin (1)**
7:4
**GRIPPO (1)**
2:14
**grips (1)**
37:8
**ground (1)**
8:17
**group (2)**
36:18;90:18
**guarantees (3)**
101:25;102:1;
103:7
**guarantors (1)**
18:20
**guess (3)**
18:22;116:6;
118:21
**guide (1)**
65:21
**guy (1)**
29:25
**guys (2)**
38:3;122:15

**H**

**half (2)**
105:11,17
**hand (6)**
8:8;41:25;64:12;
75:23;81:18;137:19
**handing (1)**
7:12
**handled (3)**
113:18,25;115:4
**handling (1)**

31:15
**handwritten (1)**
131:6
**hang (1)**
97:7
**HANSEN (85)**
3:,3;4:,;5:6;7:11;
8:7;14:22;21:17,19;
22:5,17;25:15,16;
30:12;33:25;34:2,11;
39:15,18,23;40:9;
41:24;42:16;46:11;
47:17;59:18;60:17;
64:3;68:11;69:20;
74:16,24;75:22;
76:22;78:15;79:11;
81:17;83:3;87:2,11;
88:14;89:9,13,19,23;
90:5;93:21;94:17;
95:1,5;96:4,8,12,16,
22;97:9;100:12;
101:2,5,18;103:23;
107:16;108:4,16,21,
24;113:16;115:19;
116:15,21;117:1,16;
118:4,10,14,18;
119:3;120:7,9;122:9;
135:4,6,9;136:11
**happen (2)**
69:25;70:25
**happened (6)**
12:19;23:6;28:20;
70:1,2;133:18
**happens (1)**
122:11
**hard (2)**
47:9;131:16
**Hark (5)**
30:7,11,13,14;31:2
**H-A-R-K (1)**
30:11
**harm (1)**
87:14
**heading (1)**
44:13
**heal (1)**
54:15
**hear (6)**
21:17;41:5;59:8;
108:13;121:23;136:7
**heard (3)**
34:6;123:1;136:8
**hearing (1)**
122:14
**heating (1)**
90:12
**held (3)**
6:25;118:23;
132:20
**help (5)**
74:25;77:13;91:1;
108:11;114:14
**helpful (1)**
67:11
**helping (1)**

29:16
**hereby (1)**
137:6
**herein (1)**
5:3
**here's (1)**
85:24
**hereunto (1)**
137:18
**hesitate (1)**
35:25
**hierarchy (2)**
6:10;14:8
**high (1)**
56:9
**higher (7)**
37:9,12,13;83:19;
84:5,11;132:17
**himself (2)**
113:18;125:11
**hired (4)**
12:21;13:20;27:23;
28:1
**hiring (1)**
67:16
**hit (1)**
112:12
**Hold (3)**
85:22;130:16,17
**holder (4)**
73:18;126:23;
127:4;133:19
**Holders (5)**
68:13,17,19;69:1;
79:17
**holding (4)**
121:5;129:8,18;
135:18
**hole (1)**
110:25
**home (1)**
122:7
**honest (1)**
115:21
**hopefully (1)**
65:21
**hospitality (4)**
25:23;45:14,22;
46:25
**hotel (6)**
23:9;24:12;45:22;
49:13,24;80:21
**Huh (1)**
92:19
**hyphen (1)**
23:2

**I**

**idea (3)**
24:8,23;88:7
**identical (1)**
8:10
**identification (7)**
7:10;8:6;41:23;

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 145 of 155

Stifel Nicolaus & Co  v.                                                    Deposition of David DeYoung
Lac du Flambeau Lake Superior Chippewa Indians, et al.                      March 3, 2014

64:2;75:21;81:16;
130:22
**IDENTIFIED (8)**
4:11;46:15;51:19;
69:7;77:11;125:25;
132:24,25
**identifies (1)**
81:20
**identify (4)**
24:3;46:20;77:13;
129:7
**identifying (4)**
29:6;70:18;73:13;
103:14
**identities (1)**
125:20
**ilk (1)**
18:21
**Illinois (1)**
2:
**imagination (1)**
74:15
**immaterial (1)**
103:12
**immediate (1)**
97:18
**immediately (4)**
7:2;69:21,23;105:5
**important (7)**
47:7;63:2;79:13,
17;94:25;114:7
**impose (1)**
112:16
**imposed (2)**
32:22;112:18
**impressions (1)**
41:6
**improve (1)**
18:18
**inability (1)**
105:14
**inappropriate (1)**
114:17
**inartfully (2)**
114:24;116:14
**Inc (2)**
2:;46:2
**incidents (2)**
75:18;129:24
**include (4)**
64:9;99:1,2;134:1
**included (1)**
11:7
**including (2)**
86:2;87:25
**income (3)**
6:17,23;99:5
**Incorporated (1)**
76:4
**increased (1)**
120:19
**Inc's (1)**
86:1
**incumbent (1)**
115:6

**independence (1)**
20:8
**independent (2)**
19:23;51:4
**independently (1)**
121:7
**Indian (3)**
30:14,23;31:1
**Indians (2)**
45:6;81:21
**indicate (4)**
10:2;25:5;110:17,
18
**indicated (10)**
17:9;29:9;37:25;
38:10;44:24;45:8;
82:7;90:8;113:22;
117:19
**indicates (2)**
69:18;131:15
**indicating (1)**
40:7
**indication (3)**
36:1,3;39:3
**indications (3)**
36:5;43:6;123:25
**indirectly (2)**
111:21;137:17
**individual (7)**
25:5;30:15,23;
31:1;32:16;35:25;
104:6
**individuals (4)**
32:25;36:21;
121:13,14
**individual's (1)**
24:17
**industry (6)**
22:9;65:24;66:1;
67:12;68:24;84:9
**informality (2)**
113:13,17
**information (38)**
43:11,15;47:23;
49:12;50:7;51:6;
52:4,6;59:10;63:8;
66:2,7,11,13,15,17,
19;68:22;84:17;
100:2,4,7;103:21;
104:2,5;105:25;
106:6,13;108:6;
111:2,4,8,13,24,25;
112:6;114:1;119:20
**informational (1)**
68:25
**informed (3)**
65:5;80:5;85:12
**initial (20)**
27:12,17;32:1,4;
56:20;69:7,9,17;71:2,
14,21;72:24;73:13;
79:10;93:13;94:10;
125:25;126:11,23;
128:20
**initially (6)**

38:5;57:17;69:18;
75:2;124:4,5
**injunction (1)**
122:14
**input (2)**
50:23;53:5
**inquiries (3)**
59:4,7;97:4
**instance (1)**
2:2
**instantly (1)**
106:24
**institution (2)**
19:6;35:20
**institutional (6)**
14:2,7,14;35:24;
43:5,6
**instruct (7)**
47:9;81:14;88:12;
96:7;116:25;118:2;
119:2
**instructed (1)**
103:4
**instructing (2)**
96:8,13
**instructions (1)**
135:14
**insurer (1)**
18:19
**intended (3)**
44:7;65:9,10
**intention (1)**
83:18
**interest (53)**
8:9;35:17;36:1,4,5,
9,25;37:1,6,6,7,13,
23;38:14;39:3;43:7,
20;47:2,4;55:22;
57:15,19;59:2,3;
61:23;71:19;73:1,23;
74:5;78:11,12;81:9;
83:10,19;84:5;87:4,
17;88:17;89:14;
94:18;95:10;99:5,5;
107:9;113:1;120:20,
22;123:25;127:13;
129:10;130:2,4;
131:17
**interested (6)**
39:1;41:6;128:2;
134:11,18;137:16
**interestingly (1)**
38:10
**interests (1)**
124:3
**internal (1)**
94:5
**internally (2)**
62:17;63:1
**interpreted (4)**
84:17;86:8;97:16,
22
**interview (3)**
30:20;52:20;
128:11

**interviewing (1)**
52:18
**into (13)**
6:15;10:8;32:4;
33:15;47:10;50:23;
63:7;66:2;72:9;
106:23;109:8;
110:25;112:2
**introduced (4)**
23:7;24:20,22;25:4
**introduction (2)**
97:17,23
**introductions (1)**
31:15
**Inventory (6)**
4:;130:15,19;
131:4,12;132:2
**invested (1)**
106:25
**investigation (2)**
15:6;108:11
**investing (1)**
58:22
**investment (18)**
14:4;23:11,16;
25:13,21;26:7,8;
27:17;28:24;55:24;
65:6;72:2;80:5,8,15;
84:14;85:11;130:16
**Investments (5)**
15:14;129:8,14,17;
130:16
**investment-type (1)**
17:18
**investor (6)**
57:18;63:4;77:2;
100:18;134:15,17
**Investors (7)**
2:,;39:22;40:20;
43:6;68:20;123:23
**invitation (2)**
97:17;124:15
**invite (2)**
47:14;123:16
**invited (1)**
51:8
**invoices (1)**
110:2
**involve (1)**
131:8
**involved (8)**
6:18;10:7,18;24:4;
27:7,9;46:25;61:18
**involvement (1)**
93:3
**involves (1)**
5:19
**involving (1)**
122:25
**irrelevant (1)**
108:2
**isolate (1)**
130:5
**issuance (1)**
70:25

**issue (6)**
5:19;70:14;87:12;
90:13;111:7;113:5
**issued (2)**
70:8,9
**issuer (5)**
57:14;65:18;68:15;
71:3;130:7
**issuers (2)**
80:9;120:11
**issuer's (1)**
66:14
**issues (3)**
5:20;79:13,18
**issuing (1)**
128:3
**items (2)**
95:24;96:1

## J

**Jackson (1)**
66:23
**Jacquart (1)**
3:
**James (1)**
2:
**January (16)**
53:15;56:17;58:1,
5;59:19;60:12;65:7,
8;81:22;82:16;89:25;
113:19;119:24;
122:7;124:18;131:5
**jeopardize (1)**
106:24
**Jim (1)**
135:4
**job (6)**
5:17;12:1;13:17,
18;14:1;22:16
**joined (2)**
6:22;7:8
**judge (1)**
89:8
**judgment (1)**
32:22
**jurisdiction (1)**
96:18
**jurisdictional (5)**
47:12;86:1,7,21;
96:15

## K

**Kahn (4)**
2:;77:6,18;125:7
**keep (3)**
34:14;39:1;110:19
**Kevin (91)**
9:21,22;11:23,25;
12:2,11,16,21,23,24;
13:2,23;15:20;19:7,
25;20:15;21:2,11;
22:6,15;27:20;30:6;
33:7,10,10;35:11;

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 146 of 155
Stifel Nicolaus & Co v.                                      Deposition of David DeYoung
Lac du Flambeau Lake Superior Chippewa Indians, et al.                   March 3, 2014

40:21,23;41:3;48:22;
53:21,24;56:14;
64:11;82:10,17,18,
24;87:3,15;90:7,8,17;
91:25;92:11,24;
96:23;97:16,22;98:8,
8,14,15;99:23;100:5,
7,16,23;102:17,25;
104:1,9,23;105:4;
106:16,18;107:3;
108:6,25;109:12;
110:18;113:11,18,22;
114:22;115:2,3,13,
17;116:13,22;
117:22;118:6,19;
119:10;120:12;
122:2,3,4,5;125:13
**Kevin's (3)**
33:6,18;84:7
**Kick (2)**
49:17,18
**kickback (1)**
104:16
**kill (1)**
106:21
**kind (14)**
13:25;20:4;32:19;
34:9;40:7;47:14,25;
50:2;72:18;92:25;
108:17;114:17;
120:10;134:20
**knew (11)**
30:20;38:22;52:22;
59:22;61:21;67:20;
77:5,17;84:18;
103:10;122:2
**knowing (1)**
110:23
**knowledge (8)**
60:24;85:25;87:18;
91:8;100:3;109:9;
110:14;115:1
**knowledgeable (2)**
16:3;115:9
**known (2)**
103:25;110:16
**Kubik (1)**
7:4

## L

**Lac (26)**
15:23;16:9,19,23;
17:1,21;22:1,20,24;
23:25;25:18,25;26:5;
27:10,10;28:2,9,17;
30:22;34:6;38:13;
45:5;76:14;80:22;
81:20;103:22
**lack (1)**
14:15
**Lahti (3)**
2:5;137:,4
**laid (3)**
29:4;36:24;55:10

**Lake (6)**
45:5;46:12;76:2,8;
80:24;81:21
**land (5)**
24:10;28:7;49:15;
123:17;124:16
**language (1)**
97:21
**LARDNER (1)**
2:19
**large (2)**
31:5;79:16
**last (7)**
30:9;59:16;78:19;
86:24;97:25;134:3;
136:3
**late (3)**
25:1;110:2;123:2
**later (2)**
32:12;75:14
**law (1)**
67:3
**laws (1)**
73:21
**lawsuit (2)**
13:14;21:23
**lawyer (1)**
66:24
**layoff (1)**
92:13
**LDF (13)**
2:;21:21;72:11;
126:13,16;127:1,4;
132:12,18,20;133:5,
11;134:22
**lead (4)**
27:21;33:7,10,21
**leading (1)**
50:6
**learn (2)**
55:4;75:14
**least (4)**
38:8,23;62:25;
131:3
**leaving (2)**
40:5;52:23
**led (5)**
13:9;30:19;52:9;
56:11;85:14
**left (10)**
12:16,24;13:6,21;
15:9,12;27:23;40:3;
75:18;92:5
**legal (20)**
6:21;11:10;21:16;
53:22;57:3;68:6;
69:13;74:5,11,22;
76:17;77:5,9;78:2,
25;81:12;93:24;98:2;
125:1,17
**legislation (1)**
53:17
**Lehky (9)**
14:23,24,25;29:16,
18;62:10;63:19;

64:11;119:23
**L-E-H-K-Y (1)**
14:23
**Lehky's (1)**
119:21
**lending (2)**
84:11,19
**length (1)**
14:6
**lent (1)**
112:15
**less (10)**
37:18,23;38:9,11;
51:21;88:20;113:14;
121:6;122:6;136:7
**letter (1)**
18:20
**level (5)**
52:3;56:15;62:10;
105:19;109:8
**levels (1)**
37:6
**leverage (2)**
37:10,12
**liability (4)**
45:2;74:4,9,14
**license (2)**
67:7,9
**licensed (3)**
121:9,13,14
**licensure (1)**
112:12
**liens (2)**
101:24;103:6
**life (2)**
8:16;73:9
**liked (1)**
113:9
**likely (5)**
16:5;23:21;25:2
**likewise (1)**
37:13
**Limited (26)**
4:;10:15,24;45:2;
61:16;64:15;65:3,23;
66:3;67:4,24;68:3;
69:5,10;73:3,25;74:8,
21;75:9,15;79:12;
80:12;81:9;85:1;
86:2;112:2
**Lindsley (24)**
23:20;29:9;31:14,
19;34:17;35:2;36:19;
38:16,17;40:18;
49:22;51:9;52:14;
59:1,11,13;90:16;
111:4;123:8,9,10,15;
124:5;136:4
**Lindsley's (1)**
124:15
**line (8)**
41:3;47:16;82:10;
100:23;104:13;
105:2,4;109:4
**lines (15)**

82:19;83:5;97:25;
98:5;99:15;100:24;
101:2;102:20;
104:12;106:18;
108:17,21;109:11;
119:5;120:7
**listed (2)**
46:1;81:13
**litigation (3)**
86:17,21;89:7
**little (7)**
6:12;11:21;42:23;
82:5;95:8;98:12;
120:24
**lived (2)**
33:12;48:24
**LLC (13)**
2:,,,10:3:;45:1,18;
46:4,16;102:16,18;
112:17;117:17
**LLP (1)**
2:19
**loan (17)**
26:16;83:18,19;
84:4;85:3,11;99:3,9,
14;100:20;102:6,15;
103:9,12,15,21;
112:17
**lobby (1)**
52:25
**log (1)**
34:14
**long (5)**
6:25;78:19;81:19;
91:24;108:17
**longer (2)**
73:1,22
**look (7)**
7:17;42:15;49:15;
97:25;117:2;122:3;
132:15
**looked (1)**
18:6
**looking (5)**
23:11;24:25;25:7;
62:23,24
**Lookout (1)**
5:11
**looks (2)**
42:3;128:13
**lose (1)**
39:2
**lot (9)**
9:3;20:7;31:8;
55:19;65:20;78:12;
93:1;114:24;124:19
**Louis (1)**
6:1
**low (4)**
35:2;56:9,10,11
**lunch (1)**
50:3

## M

**Madam (1)**
97:18
**mail (1)**
48:6
**maintain (2)**
17:10;130:15
**maintained (2)**
71:20;92:10
**majority (3)**
55:3;60:13;127:25
**makes (2)**
71:10;100:8
**making (7)**
50:9;84:1,4;85:16;
100:5;102:25;107:3
**man (1)**
115:4
**manage (2)**
92:1;121:4
**managed (1)**
33:7
**management (17)**
55:22;26:10;44:14;
16,18,25,25;45:24;
47:1,5,6;49:22,24;
92:11;117:4,7;
118:10
**manager (4)**
6:3;7:4;14:17;41:1
**managing (2)**
5:15;13:19
**manner (1)**
34:16
**many (2)**
78:7;104:24
**March (4)**
2:7;122:12;137:11,
20
**margin (2)**
99:19,24
**marked (14)**
7:9,12;8:5,8;41:22,
25;64:1,12;75:20,23;
81:15,18;130:21,24
**market (3)**
18:19;20:5;22:12
**material (2)**
43:4;47:23;50:22;
61:17;65:5,22;80:4,
10;111:9,13,24;
115:10
**materiality (1)**
111:21
**math (2)**
105:10,14
**mathematical (1)**
32:21
**matter (1)**
125:2
**matters (6)**
7:17,25;8:13;9:17;
57:16;90:20
**maximum (3)**
29:10;51:19,22
**may (32)**

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 147 of 155

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

18:14;25:1,12;
28:19,25;30:5;31:12;
34:3;35:11;36:20;
40:6,24;51:6,18;52:7,
10;56:13,24;63:1;
85:6;91:19;104:25;
113:24;119:8;123:2,
2,2;125:18;127:18;
128:1,11;129:14
**maybe (4)**
40:3;102:13;
103:24;123:23
**mean (14)**
11:6;18:4;19:12;
28:6;39:2;46:21;
47:14;49:9;70:8;
72:2;73:20;91:19;
122:2;132:9
**meaning (1)**
69:23
**means (2)**
6:18;50:15
**meant (1)**
15:4
**mechanics (1)**
128:17
**meet (2)**
49:10;60:4;73:11;
90:14
**Meeting (61)**
4:;28:19,20,25;
29:1,8;30:4;31:16,
18;34:4,7;35:12,13,
14;36:22;38:15;
47:22;48:13;51:2,18;
52:7;53:5,12,15,18,
25;54:2,22,25;55:10;
56:18,23;58:1,8;
59:19;60:12;63:1;
81:21;82:13,16,18;
89:25;90:19;91:13,
22,24;92:23;95:24;
103:5;107:7;113:19;
114:12;123:1,2,5,19,
20,22;124:18,20,25
**meetings (3)**
85:6;92:21;122:25
**member (2)**
104:19;117:23
**members (2)**
45:3;117:8
**Memorandum (24)**
4:;10:16,24;50:24;
61:16;64:16;65:3,23;
66:3;68:3;69:6,11;
73:3;74:1,8,21;75:10,
15;79:12;80:12;81:9;
85:1;98:23;112:3
**memorialization (1)**
42:24
**memorialized (2)**
41:13;112:22
**memory (4)**
37:19;90:18;136:1,
2

**mentioned (11)**
11:22;17:18,25;
18:6;51:17;55:1;
64:18;93:5;123:19;
130:7;131:11
**merely (2)**
33:5;129:8
**merits (1)**
58:14
**message (1)**
40:4
**met (12)**
9:19;35:11;48:23,
25;49:22,22,24;
52:25;67:6,22;90:15,
15
**Michael (2)**
13:25;14:2
**mid-'06 (2)**
19:19;20:18
**mid-'08 (2)**
19:19;20:18
**middle (6)**
11:24,25;15:1,1;
44:15;104:4
**middleman (1)**
127:19
**might (7)**
20:19;42:10;60:23;
77:24;91:1;93:7,10
**Mike (8)**
9:23;14:17,21;
30:7;31:1;36:7;
38:18,24
**Mike's (1)**
14:6
**million (22)**
37:17,21,22;52:1,2,
2;56:6;83:8,11;85:3;
95:12;104:15,16;
105:1,11,12,18;
119:9,13;120:3;
131:21;132:16
**millions (1)**
104:24
**Milwaukee (9)**
2:,,6;3:,4;7:5;
53:23;137:2,11
**minds (1)**
47:22
**minute (2)**
10:8;42:11
**Minutes (3)**
4:;81:22;95:1
**mischaracterizes (1)**
14:12
**misrep (1)**
86:18
**misrepresentation (1)**
73:19
**misrepresentations (1)**
88:18
**miss (1)**
65:21
**missed (2)**

6:4;118:9
**Mississippi (12)**
23:10;24:10,11;
45:2;66:23;67:3,10;
99:20;118:13,17;
128:9;136:9
**misstatement (1)**
100:16
**misstatements (1)**
74:8
**misstates (1)**
103:18
**mistake (1)**
54:15
**mode (1)**
32:5
**money (10)**
25:8;26:21;27:4;
71:9,10;84:10,19;
106:25;127:16;
128:14
**Monica (1)**
133:6
**monitoring (2)**
67:9;127:14
**Montana (8)**
86:8,9,22;87:13,
24;88:12;118:25,25
**month (3)**
41:8;55:12,15
**monthly (2)**
119:8;133:4
**more (18)**
10:7;19:14;22:12;
37:21,25;38:9;52:2;
55:11;65:24;92:2;
94:22;102:19;
104:24;113:10,24;
121:6;122:14;129:23
**Morgan (1)**
72:7
**most (7)**
16:3,5;23:20;25:1,
2;39:12,17
**mostly (2)**
40:1;50:4
**move (9)**
34:18;35:3;50:8;
55:20,21;64:4;77:3,
14,17
**moved (2)**
63:2;72:11
**moving (1)**
70:4
**much (8)**
29:22,22;32:23;
49:25;60:7;103:15;
125:9;128:14
**MULLINS (1)**
2:10
**multiple (3)**
62:14,17;134:5
**municipal (2)**
6:23;116:8
**Muriel (5)**

104:13,17;105:2;
119:7;120:14
**must (1)**
118:9
**myself (3)**
30:6;31:21;64:10

# N

**NA (1)**
2:18
**name (10)**
5:8;18:5;24:8,17;
30:10;44:21;46:23;
126:17;129:6;132:23
**names (2)**
49:23;104:4
**Natchez (33)**
23:2,10;24:10,22;
25:6;28:24;35:1;
43:20;44:19;45:23;
59:3,5,8;67:5;83:17,
17,21;84:1,19;85:3,
17;91:2,12;99:3;
102:7;103:22;
110:16;112:11,18,20;
128:9,15;135:19
**N-A-T-C-H-E-Z (1)**
23:2
**Natchez's (1)**
100:19
**nature (14)**
16:7;23:4;32:1;
36:25,25;62:22;
76:24;86:10,20;88:8,
10,24;90:2;119:1
**natures (1)**
37:5
**near (1)**
124:7
**necessarily (1)**
60:11
**necessary (5)**
11:8;54:7;65:5;
77:1;126:20
**need (7)**
9:13,14;18:3;41:2;
42:12;104:15;116:20
**needed (7)**
17:10;30:24;37:2;
47:4;50:7;128:6,7
**negligent (1)**
115:25
**negotiate (3)**
32:12;56:15;63:3
**negotiated (3)**
56:1;57:13;93:6
**negotiating (1)**
111:6
**negotiation (2)**
32:5;112:22
**negotiations (2)**
32:6;58:6
**neither (1)**
46:22

**net (4)**
62:24;63:11;99:5;
119:11
**nevertheless (1)**
17:20
**new (6)**
5:19;34:10;54:8,
16;70:15;120:19
**next (11)**
16:18,20;34:5,12;
35:6;40:13;48:14;
53:13;89:24;90:1;
123:19
**Nicolaus (37)**
2:;5:13;6:5,6,8,16;
8:2,11;10:1,18;11:17,
19;14:3;24:14;30:16;
43:22;62:18;64:7;
65:13;66:16;71:7,20;
72:12;76:3,10;85:25;
95:20;104:7;120:25;
121:1,5,6,8,9;128:20,
23;133:8
**night (1)**
52:23
**Noack (29)**
12:15,22;24:13;6;
14:9,9;16:5;17:19;
19:7,25;20:15;21:25;
22:6;24:20,21;25:10,
17,24;26:4,19;27:19,
23;28:5;30:17,20;
33:14;45:10,10,16;
52:21
**Noack's (3)**
13:16;16:15,16
**nobody (1)**
130:2
**Nods (1)**
9:4
**nomenclature (1)**
129:6
**nominee (1)**
71:18;129:5
**none (2)**
80:2;135:3
**nor (1)**
46:22
**normal (3)**
20:13;22:10;
107:25
**normally (8)**
38:17;57:17;60:20,
22;70:13,19;120:11;
127:23
**North (4)**
2:6,11;3:4;137:10
**northern (2)**
33:11;91:20
**Notary (3)**
2:5;137:,5
**note (1)**
113:2
**notes (1)**
93:1

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 148 of 155

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

**notice (7)**
2:4:4;,12;7:16;
8:10;47:11;68:21
**notify (1)**
72:4
**November (8)**
41:10,11;42:20;
48:19;49:6;53:12;
55:5;85:7
**number (5)**
38:8,10;132:3,5,21
**numbers (3)**
15:5;29:15;37:15
**nurturing (1)**
20:9

**O**

**oath (1)**
5:3
**object (9)**
14:11;21:15;22:3;
47:8;68:5;74:10,22;
95:21;114:19
**Objection (16)**
69:13;76:17;78:2,
25;81:12;87:8;89:18;
96:6;101:13;103:17;
108:2;113:7;116:4,
19;117:25;121:25
**obligation (8)**
68:14;75:12;83:24;
109:18,20;115:21,24;
116:2
**obligations (4)**
34:23;77:25;79:2,9
**obliged (1)**
109:16
**obligors (1)**
111:20
**obvious (1)**
125:19
**Obviously (1)**
122:10
**occasions (1)**
40:3
**occurred (5)**
31:22;34:19;48:18;
50:1;72:23
**October (1)**
41:9
**off (7)**
8:25;34:1;54:14;
63:25;95:4;97:8;
131:2
**offer (2)**
15:13;75:15
**offered (2)**
92:12;130:3
**Offering (23)**
4:;10:15,24;50:24;
61:16;64:15;65:3,23;
66:3;68:3;69:6,10;
73:3,25;74:8,21;
75:9;79:12;80:12;

**office (6)**
10:4;13:2;30:8;
31:10;41:4;137:19
**offices (2)**
31:6;50:2
**official (1)**
29:8
**officials (10)**
26:1;28:22;32:14;
35:14;36:16;49:11,
18;56:14;90:9;
124:13
**often (7)**
39:12,17;41:2;
61:3;78:7;109:7;
129:5
**omissions (1)**
118:19
**once (5)**
52:3;75:12,17;
94:13;130:18
**one (45)**
5:20;8:21;11:14;
17:21;19:8;21:8;
29:2,9;33:9;35:19,
22;37:4;40:3;49:4;
54:8,8;56:5;58:11;
62:14;67:4;68:16;
71:1;75:4;76:25;
79:24;84:10;85:25;
94:20,22;105:10,16;
110:3,4;111:19;
116:11;118:13,25;
124:19;125:5;
127:23;128:5;131:3;
134:3,8,25
**ones (4)**
10:21;42:21;61:2;
125:7
**only (12)**
8:19,20;21:20;
40:3;55:24;65:8;
68:1;69:18;73:9;
109:13;110:16;
133:22
**on-reservation (12)**
82:3;86:3,4;95:15;
96:16;102:25;
105:23;106:2;107:3;
113:4;114:15;118:7
**open-ended (1)**
97:10
**operates (1)**
121:6
**operating (1)**
123:9
**operation (1)**
99:20
**operational (1)**
6:16
**operations (5)**
43:12;49:13;52:8;
82:21;97:14

**opinion (3)**
66:12,14;99:13
**opinions (1)**
57:3
**opportunity (2)**
25:13;49:10
**opposed (1)**
8:11
**options (2)**
123:23;124:7
**oral (1)**
36:11
**order (3)**
49:25;50:7;70:23
**ordinarily (1)**
60:2
**Oreilles (1)**
30:22
**organizational (3)**
6:12;14:16;15:20
**Original (4)**
4:;,16:6;23:18
**originally (2)**
24:8;56:16
**origination (1)**
83:20
**others (2)**
22:13;94:21
**otherwise (2)**
10:2;84:14
**ourselves (2)**
56:25;57:6
**out (22)**
7:17;20:4;24:18;
26:13;29:4;32:12;
36:24;40:10;50:1;
55:10;57:14;62:3;
71:14,16,21;72:15,
15,24;84:11;125:4;
135:21;136:3
**outcome (1)**
94:19
**outline (3)**
35:15;36:24;43:12
**outlined (1)**
124:6
**outside (10)**
19:16;63:23;81:13;
87:8;89:18,20;96:6;
107:24;116:19;
117:25
**over (10)**
7:16;8:17;13:9,10;
20:23;41:8;53:24;
72:25;124:4,6
**overbroad (2)**
74:11;114:19
**overstepping (1)**
32:10
**own (4)**
19:22;20:4;51:3;
130:16
**owned (3)**
11:19;121:1,8
**owner (1)**

69:19
**owner/purchaser (1)**
75:7
**owners (1)**
73:11
**ownership (8)**
73:12;75:13,18;
79:4;129:10,25;
130:14;132:8
**owns (1)**
129:17

**P**

**packages (1)**
92:13
**PAGE (41)**
4:11;7:17;42:1,3,3,
23;44:13,15;64:13,
15;75:24,25;81:20;
82:7,7;83:4,5,6;95:7,
7;97:7,25;98:3,5;
99:15;100:23;101:1,
2;102:13;104:12;
106:18;107:21;
108:17,20,21;109:11;
117:4;119:4;120:5;
131:3,22
**pages (8)**
42:21,22;43:2,14;
44:4;61:4;64:19;
114:20
**paginated (1)**
42:22
**paid (8)**
35:5;55:24;63:22;
70:9;83:8;111:17;
130:1;132:10
**painkillers (1)**
122:8
**paragraph (1)**
45:25
**parameters (1)**
32:11
**paraphrase (1)**
101:6
**parcel (1)**
27:13
**parentheses (3)**
46:4,5;117:19
**parenthetically (1)**
46:16
**parents (1)**
31:24
**parking (1)**
31:8
**part (18)**
23:7;27:13;28:8;
33:21;48:16;52:6;
79:13,21,22;83:22;
84:2,2,2;91:25;
111:11;112:21;
118:23;119:21
**participant (11)**
71:7,17;72:1,4,5,6,

16;75:18;89:16;
93:16;94:2
**participants (1)**
22:12
**participant's (1)**
71:6
**participation (1)**
26:9
**particular (3)**
30:14;55:22;86:10
**particularly (2)**
77:14;90:10
**parties (17)**
5:21;41:7;66:4;
68:4,9,12;70:22;
77:11;86:2,6;111:10;
112:1;115:7;116:12,
13;125:20;137:15
**partner (2)**
25:8;109:6
**partners (1)**
109:1
**partner's (1)**
109:14
**party (9)**
10:19;27:1;57:8;
68:9;73:20;85:13;
94:10;133:20,22
**past (1)**
134:1
**Pat (10)**
35:23,23;36:7;
38:7,18,24;39:25;
40:3,10;53:7
**path (1)**
54:4
**Patrie (6)**
15:17,18;30:7;
32:18;48:21;64:11
**P-A-T-R-I-E (1)**
15:17
**Paul (6)**
3:;15:17,18;30:6;
64:11;92:12
**paying (4)**
83:10;84:6;95:11;
120:18
**payment (2)**
27:12;110:6
**payments (10)**
34:25;83:25;84:1;
99:4,14;100:20;
110:2;127:12;128:7;
129:22
**people (8)**
8:23;18:20;20:8;
31:12;32:19,20;93:8;
115:11
**percent (12)**
38:1,9,11;46:2,6,
13;56:5;104:25;
105:11,17;131:17,18
**perception (1)**
18:18
**perform (1)**

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

16:20
**performance (2)**
13:11,12
**performed (2)**
16:8;121:13
**perhaps (9)**
67:14;83:19;97:20;
111:20,21;113:11;
115:1;116:14;122:6
**period (11)**
12:14,25;13:16;
15:1;27:22;28:15;
42:9;54:25;93:4;
133:14,19
**periods (1)**
130:5
**permissible (1)**
17:23
**permitted (1)**
18:2
**person (8)**
16:3;27:2;29:21;
30:25;39:10;45:8,9;
48:4
**personal (6)**
60:24;87:3,18;
101:25;103:7;137:8
**personally (1)**
103:24
**personnel (1)**
92:1
**Peter (3)**
5:25;14:19,21
**Phillips (3)**
33:12;35:12;53:24
**phone (17)**
22:11,16;31:25;
32:2;34:14;39:10,17;
40:2,4;71:3;77:16;
110:3,4;124:4,6,7,8
**physical (1)**
129:11
**physically (3)**
28:18;70:3,3
**picked (3)**
27:24;48:25;77:16
**picture (4)**
61:21;71:15,16,21
**Pierson (10)**
53:22;98:1,6;
102:5,5,14;107:22;
114:8;125:4,16
**Pierson's (1)**
102:24
**place (5)**
19:19,20;31:4;
36:13;54:8
**placement (33)**
5:21;21:8;50:15;
56:19;65:13;66:22;
81:10;93:13;94:1,6,
9;95:19;96:3,24;
98:19;100:6;103:2,3;
106:3,6,9,12;107:4,
11,17,25;109:7,17;

113:3;120:10;
125:24;126:1,4
**Plaintiff (1)**
2:21
**Plaintiffs (2)**
2:12,16
**play (2)**
103:10;127:9
**pleading (1)**
75:25
**please (3)**
5:8;93:18;108:19
**pledge (1)**
80:13
**pledged (3)**
54:7;81:6;83:23
**pledges (2)**
78:9,10
**pledging (1)**
103:11
**plus (1)**
119:13
**pm (4)**
2:8,8;136:13;
137:12
**point (35)**
11:14;12:23;13:1;
18:12;21:7;26:10;
27:25;33:2;34:17;
50:14;55:14;58:2,14;
59:3;71:14,24;72:23;
73:2;74:4;76:24;
80:4;85:10;86:14;
92:8;98:20;99:2;
115:4,12;120:1;
124:25;125:17;
133:10,22;134:4,10
**points (2)**
62:20;67:6
**policy (1)**
94:5
**political (4)**
45:4;90:22;98:2;
117:9
**pool (1)**
32:24
**portion (3)**
45:22,22;60:10
**portray (1)**
78:13
**portrayed (1)**
58:4
**posed (1)**
97:1
**position (11)**
6:25;13:17;14:7;
15:13;21:2;58:20;
86:16;92:6;93:8;
107:5;116:17
**positions (1)**
6:11
**positive (10)**
81:4;83:9;84:8;
94:24;95:10;99:1,19;
104:25;105:11,17

**possession (2)**
129:12;135:11
**post (3)**
71:6,12;72:5
**posted (4)**
130:14,19;132:10,
22
**post-meeting (1)**
31:22
**potential (8)**
23:14;40:20;43:13;
68:19;74:4,9;79:17;
134:15
**potentially (2)**
74:13;134:11
**PowerPoint (3)**
42:3;48:3,5
**preceding (1)**
137:7
**pre-closing (1)**
70:20
**predated (1)**
33:14
**predominantly (1)**
45:15
**prefer (1)**
22:5
**Preliminarily (1)**
51:5
**preliminary (1)**
122:13
**premise (1)**
14:13
**preparation (7)**
10:13,22;50:24;
62:25;81:25;92:16;
121:15
**prepare (2)**
9:18;51:6
**prepared (10)**
7:24;29:10;32:11;
43:22;57:22,25;64:5,
7;96:1;126:9
**preparing (2)**
9:16;133:1
**presence (2)**
92:7,10
**present (6)**
38:20;44:1;58:16;
65:4;95:17;124:3
**presentation (11)**
26:3;28:21;31:3;
36:2,11,23;48:3,5;
56:13;85:7;124:2
**presented (7)**
25:21;33:17;35:14;
47:19;48:4;82:15;
123:22
**presently (1)**
16:1
**president (5)**
5:15;12:2,6;15:18;
97:19
**pressed (1)**
38:7

**presumably (1)**
78:19
**presume (1)**
128:12
**presuming (1)**
61:5
**pretty (4)**
22:15;34:19;49:25;
125:8
**previous (2)**
107:21,21
**previously (1)**
49:14
**price (2)**
131:18;132:17
**primarily (4)**
27:15;32:7,8;51:11
**principal (8)**
37:9;46:21;63:22;
126:2;127:12;
131:18,20;134:21
**prior (4)**
13:1;70:12;103:18;
107:22
**privy (1)**
61:19
**probably (2)**
24:25;91:11
**problem (2)**
86:13;114:17
**procedural (1)**
129:23
**Procedure (1)**
2:4
**proceed (6)**
11:13;34:16;37:3;
41:12,15;76:20
**proceeding (1)**
11:10
**PROCEEDINGS (1)**
5:1
**proceeds (16)**
58:12;67:5;79:19,
21,23;83:16;85:1;
98:21;103:12,14;
112:15,20,25;116:18;
118:12;135:12
**process (5)**
51:1;52:10;67:7;
111:5,11
**produce (2)**
61:16;66:18
**produced (1)**
52:6
**product (3)**
16:16;43:15,18
**production (3)**
13:10,12;32:20
**professional (2)**
67:22;116:3
**profit (2)**
99:19,24
**program (1)**
30:1
**progress (1)**

67:6
**prohibited (1)**
94:6
**prohibition (6)**
19:5,21;93:22,24,
24,25
**prohibitions (2)**
19:18,23
**prohibits (1)**
19:15
**project (59)**
22:21;23:7,22;
24:6,12,22;25:17;
26:4,13,21;27:5;28:3,
10,14;29:5;33:4,5,8;
35:1;43:20;44:19,21;
45:2,23;51:14;55:20;
58:10,18,22;59:5,8;
67:5;79:14,20,25;
80:8;81:3,6,11;
84:13;89:16;91:2;
99:25;102:23;103:8;
106:21;109:14,15,23,
24;110:1,11,15,20,
21,24;112:7;128:8,15
**projected (1)**
101:25
**projections (1)**
57:9
**projects (4)**
18:13;21:20;45:16,
17
**promises (1)**
79:6
**prompt (1)**
84:1
**prompting (1)**
125:12
**promulgated (1)**
116:9
**properly (1)**
105:14
**property (1)**
28:7
**proposal (15)**
29:17;32:3,4;
35:25;36:1;37:9,12,
14,16,17,24;38:4;
42:25;51:6,8
**proposals (1)**
55:11
**proposed (7)**
56:16;58:12;88:1,
15,23;89:1,5
**prospective (1)**
69:1
**prospects (1)**
91:2
**provide (9)**
28:23;49:11;57:3;
91:11;98:9;106:7,13;
108:6;128:11
**provided (13)**
17:20;20:8;26:11;
43:4,10,16;49:14;

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 150 of 155
Stifel Nicolaus & Co  v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.
Deposition of David DeYoung
March 3, 2014

65:13;66:2,9;80:1;
83:17;119:20
**providers (1)**
18:20
**providing (2)**
27:4;94:2
**provision (2)**
19:16;20:3
**provisions (4)**
57:5;112:8,10;
127:21
**Public (17)**
2:5;5:16,23;6:3;
7:4;12:9;13:19;
14:16;15:18;30:8,15;
53:2;64:9;92:6,7;
137:,5
**pulled (1)**
43:4
**Purchase (21)**
4:14;10:15,23;
11:2;17:2;26:17;
56:20;71:2;75:3,5;
76:1;79:7;100:18;
107:6,9;125:23;
126:5,5,7;131:16;
133:16
**purchased (1)**
71:19
**purchaser (15)**
56:20;69:7,9,17;
71:3,14,21;72:25;
73:13;79:10;93:13;
94:10;125:25;
126:11;128:21
**purchasers (3)**
65:11;68:19;73:10
**purchasing (1)**
124:1
**purely (2)**
26:8,8
**purpose (6)**
49:8;54:1;56:22;
65:3,4;107:8
**purposes (12)**
16:11;17:10;25:7;
38:6;50:9;58:11;
64:21;68:25;98:21;
122:13;126:18;
130:17
**pursuant (2)**
2:3,4
**pursue (1)**
89:6
**put (5)**
29:16,17;57:14;
68:21;118:5

## Q

**qualifications (1)**
28:22
**qualified (1)**
67:11
**qualifier (1)**

19:11
**quick (2)**
64:4;135:7
**quickly (1)**
34:19
**quit (1)**
136:4
**quote (1)**
38:5
**quoted (1)**
32:4

## R

**raise (1)**
128:15
**ramifications (1)**
88:19
**ran (2)**
15:5;119:18
**range (2)**
56:8,12
**rate (15)**
37:13;38:3;83:19;
84:5,10,11;119:12;
120:16,17,17,20,20,
22,22;131:19
**rating (1)**
18:19
**reach (2)**
39:4;105:10
**reached (1)**
40:10
**reaching (1)**
52:3
**react (1)**
48:10
**reaction (1)**
36:23
**reactions (1)**
48:7
**read (17)**
7:22;9:10;42:14,
15;45:25;59:15,17;
86:12,24,25;93:19;
94:13,15;100:24;
108:14,18;114:12
**readily (1)**
51:10
**real (3)**
64:4;101:24;135:7
**really (4)**
51:14;81:5;98:14;
102:21
**Realtime (2)**
137:5,23
**reason (12)**
17:13,15;30:13;
31:20;33:9,15;47:15;
58:24;81:8;94:20;
95:23;103:4
**recall (14)**
9:23;10:19;24:17;
31:14;35:19;48:7,12;
49:5,23;51:2,25;

52:3;53:13;93:2
**recapitulation (1)**
47:23
**received (5)**
11:14;15:13;26:19;
27:3;55:2
**receives (1)**
70:16
**receiving (1)**
111:9
**Recently (1)**
19:13
**recipient (1)**
116:16
**recollection (6)**
29:7;35:11;41:8;
54:5;75:2;77:8
**record (16)**
5:8;8:18,20;27:1;
28:12;34:1;59:17;
63:25;86:25;88:14;
93:19;94:15;95:4;
97:8;103:19;108:14
**recorded (1)**
137:7
**records (4)**
26:24;28:11;29:3;
49:4
**recovery (1)**
54:25
**recruited (1)**
27:23
**reduce (2)**
32:3;43:1
**reduced (2)**
92:8;137:7
**redunning (1)**
101:16
**refer (3)**
15:4;70:20;120:21
**reference (4)**
45:19;54:10;
120:16;129:2
**references (3)**
16:10;59:6;98:24
**referred (1)**
6:17
**referring (11)**
10:1;84:8;93:24;
98:8;101:10;102:10,
11;105:8;116:7;
120:17,23
**refers (7)**
84:8;100:17;
101:11,16;102:3,21;
120:22
**refinance (2)**
28:23;128:14
**refinanced (2)**
29:6;128:8
**reflect (1)**
131:7
**reflected (2)**
131:14;132:14
**refrain (1)**

68:14
**refunded (1)**
120:19
**refunding (3)**
101:17;102:3,8
**regard (3)**
21:9;104:10;
105:24
**regarding (3)**
22:25;44:16;59:5
**register (1)**
130:13
**registered (7)**
71:17;129:15;
130:8;131:11;132:3,
19;133:10
**registering (2)**
129:13;132:7
**regulatory (3)**
17:10;19:21;93:25
**rehired (2)**
12:17,25
**reinvesting (1)**
84:10
**relate (3)**
9:17;13:13;127:16
**related (8)**
22:22;23:12;24:1;
79:13,18;90:20;96:1;
126:16
**relates (2)**
86:19;118:18
**relationship (23)**
11:17;20:10,24;
22:1;24:14;27:21,25;
33:7,10,13,22;41:1;
47:13;72:12;79:8;
87:24;88:11;93:14;
111:17;113:12;
134:12,20,22
**relationship/business (1)**
33:20
**relationships (1)**
77:15
**relative (2)**
137:14,15
**relay (2)**
59:10,12
**relayed (3)**
38:23;111:2,9
**relaying (2)**
38:25;111:3
**release (2)**
67:5;71:5
**relevance (1)**
121:25
**relevant (6)**
42:10;81:5;84:23,
25;85:23;118:25
**reliable (1)**
66:6
**relieve (3)**
115:21,24;116:2
**rely (2)**
68:20;75:8

**relying (2)**
73:4;105:25
**remain (2)**
27:7,9
**Remedies (1)**
62:7
**remember (19)**
31:3,11;36:15,16,
18;37:15;38:24;
41:18,19,21;49:2,20;
50:3;51:17,22;52:19;
54:13;110:11;134:15
**remembered (1)**
92:25
**reminding (1)**
43:9
**remove (1)**
72:4
**rendered (1)**
99:13
**reorganization (1)**
42:24
**repay (2)**
80:9,17
**repayment (4)**
58:3;80:14,20,25
**repeat (1)**
93:17
**rephrase (1)**
19:4
**report (3)**
14:19,21;54:24
**reported (2)**
12:2;15:19
**reporter (4)**
8:19;9:9;137:5,23
**reports (2)**
14:17;62:12
**represent (3)**
7:15;64:19;76:1
**Representations (8)**
73:7;75:1,9;100:8;
103:1;108:7,12;
113:5
**representative (4)**
50:25;87:16;96:17;
106:12
**representatives (4)**
28:21;53:14;
106:10;123:16
**represented (4)**
23:9;77:11;82:18;
105:16
**representing (6)**
5:19;53:21;59:2;
107:5;115:7,25
**reproduction (1)**
43:3
**reputation (2)**
94:22,23
**request (7)**
112:8,10;124:15,
21,23;125:16;128:12
**requested (5)**
49:10;51:18;97:24

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 151 of 155

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

**required (3)**
113:23;125:8;
133:19
**requirements (1)**
73:12
**requires (1)**
116:11
**requiring (1)**
20:11
**resale (2)**
5:23;130:18
**research (2)**
108:5,10
**reservation (9)**
28:6;86:6;87:16,
21;91:19;95:17;
96:10;108:8;118:20
**reserve (1)**
122:10
**resold (1)**
126:13
**resolution (4)**
54:9;58:4,5,16
**resolutions (4)**
54:3,6,6;61:4
**resolved (1)**
41:11
**Resorts (1)**
46:2
**resource (1)**
57:1
**resources (1)**
86:5
**respect (4)**
34:23;58:8;73:2;
99:11
**respond (1)**
91:4
**responded (2)**
43:12;112:9;
115:15,16
**responding (4)**
97:5;98:14;102:4;
113:14
**response (5)**
38:17;97:18;
102:24;112:5;124:9
**responses (2)**
8:19;113:10
**responsibilities (1)**
26:10
**responsibility (2)**
23:19;27:24
**responsible (11)**
27:15;36:9;57:9,
12;58:25;67:16;97:3;
125:6;127:11,14,23
**responsive (6)**
97:3;106:14;
107:20;114:23;
115:18,20;122:5
**restricted (1)**
112:10
**Rests (1)**
103:18

**result (6)**
26:3;27:4;31:16,
18;58:5;121:13
**resulted (1)**
112:23
**return (1)**
95:6
**revenue (5)**
62:19;63:14,17;
80:24;119:22
**revenues (6)**
54:8;62:24;63:11;
78:10;80:3,21
**review (4)**
10:13;28:11;81:25;
135:15
**revise (1)**
32:3
**REYNOLDS (1)**
3:
**Rick (18)**
23:20;29:9;34:17;
38:15,16,17;49:22;
52:13,14;59:1,6;
90:16;111:4;123:8,9;
124:5,8;136:3
**Rick's (2)**
41:4;124:9
**right (38)**
9:14;29:20;31:9;
39:23;43:17;44:1,3;
45:24;49:7;51:16;
59:25;64:23;72:20,
22,22;77:6;87:20;
89:12,17;90:18;
91:23;93:11;95:2;
100:11;102:18;
115:25;116:22;
117:12;122:9,10,11;
123:3,4;131:6;
132:13;134:7,16;
136:11
**right-hand (1)**
82:8
**rights (17)**
68:9,12;69:3,5,10,
15;78:1,6;127:15;
129:19,23,24;130:13;
133:20,21,23,25
**rise (2)**
79:5;97:11
**risk (2)**
99:17,18
**riskless (1)**
126:2
**risks (1)**
58:21
**risky (1)**
88:20
**River (15)**
24:10,11;45:18,20;
46:4,16,23;50:25;
87:4;89:14,15;
116:17;117:17,19,23
**Robert (2)**

30:18;128:12
**role (20)**
6:10;16:11;23:12;
40:15;50:12;56:17,
19;58:8;67:24;72:25;
89:10;91:9;94:7;
96:2;102:5,8;107:25;
115:9;127:9;133:12
**roles (1)**
118:23
**room (2)**
31:5;106:23
**root (1)**
96:20
**roughly (1)**
12:18
**route (2)**
53:6,7
**rows (3)**
131:24,25;132:15
**RPR (2)**
137:,4
**RPR/CRR (1)**
2:5
**ruin (5)**
109:13,14,23,23;
110:21
**rule (4)**
20:11,19;21:7;
126:10
**Rule-Making (1)**
116:9
**Rules (8)**
2:3;8:17;19:13;
20:13,22,23;116:8,11
**Run (4)**
4:15;118:11;
122:24;131:3
**running (1)**
35:2

**S**

**Safe (1)**
104:19
**safeguards (1)**
112:25
**safekeeping (2)**
129:9,18
**sale (2)**
132:11,16
**sales (3)**
14:4,14,17
**salesman (1)**
9:24;14:2,7;35:24
**salespeople (5)**
39:6,14,22;40:20;
43:5
**salesperson (3)**
36:6;39:8,24
**same (14)**
9:3;13:16,25;
25:12;36:13;70:1,2;
102:13;119:12;
120:16,20;124:18;

128:12;131:22
**Santa (1)**
133:6
**saw (1)**
55:15
**Saybrook (59)**
2:,17;35:19;36:4,9,
10,25;37:8,16;40:11;
41:14,17;42:25;
43:10;44:2,3,4,8;
46:22;47:3;48:10,22;
49:10;50:22;53:6,12;
57:5,14;58:6;59:9,
12;61:23;65:10;66:9;
69:21;70:2;71:10,18;
72:3,10;77:8;94:23;
100:18;111:3,13,14;
112:5,15,15,24;
113:1;126:6,8,18;
133:6;134:14,17,21,
22
**Saybrook's (2)**
37:23;71:9
**saying (6)**
51:9;84:24;98:1;
101:23;110:13;
118:17
**scenario (1)**
74:13
**schedule (1)**
58:3
**Schinzer (12)**
9:23;13:25;14:2,
10,21;15:15;36:8,9;
38:18;39:24;48:21;
59:9
**school (2)**
16:11;21:21
**scope (3)**
18:14;19:17;33:18;
63:23;81:13;87:8;
89:18,20;96:6;
107:24;116:19;
117:25;128:10
**Scott (2)**
48:22;50:10
**seal (1)**
137:19
**seasonal (2)**
63:13,16
**SEC (1)**
126:10
**second (7)**
42:2;52:22;64:15;
75:25;81:19;87:12;
97:7
**secondly (2)**
65:20;91:8
**secret (1)**
84:18
**Section (1)**
126:2
**secure (1)**
33:1
**secured (3)**

101:8,22;103:10
**securing (2)**
83:9;95:9
**securities (14)**
5:22;6:19;19:13;
50:17;67:12;68:15;
72:7,8;73:15,21;
116:8,10;126:3;
130:17
**securities' (1)**
72:6
**security (9)**
61:23;78:10;80:2;
81:6;84:22;102:2,11;
111:18;113:1
**seeing (1)**
47:10
**seek (1)**
68:22
**seeking (5)**
25:6,22;32:2,2;
68:22
**seem (1)**
125:18
**seemed (1)**
55:6
**seems (1)**
42:8
**selected (1)**
41:17
**selection (1)**
41:14
**selective (1)**
113:24
**seller (2)**
5:22;50:16
**send (1)**
51:10
**senior (1)**
5:15
**sent (4)**
7:16;40:6;70:14;
107:6
**separate (3)**
14:15,18;23:23
**September (4)**
35:8,9;48:13;53:5;
55:10;85:6;92:22;
123:20
**serve (2)**
16:22;17:14
**served (2)**
17:15;126:10
**service (3)**
18:19;62:25;63:12
**services (1)**
24:1
**serving (5)**
50:14,15;94:1;
96:24;106:11
**set (5)**
54:4;58:2,3;
124:13;137:19
**sets (1)**
7:17

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

**seven (3)**
106:18;119:5;
120:8
**several (3)**
38:21;54:10;66:4
**severance (1)**
92:12
**share (2)**
32:18;33:2
**sheet (2)**
55:5;129:15
**Shibilski (75)**
9:21,22;11:23;
12:16,17;13:4;14:10;
17:19;19:7,25;20:15;
21:11,25;22:6;27:21;
30:6;31:21;32:7,8,
17;41:20;48:22;
53:21;54:24;56:14;
59:22;60:2,8;64:11;
82:10,17,24;84:15;
85:20;87:3;89:12;
90:7;91:18,25;92:14,
20;95:16;96:24;98:9,
14,19;99:16,23;
100:5,23;101:6,23;
102:17,20,25;104:23;
105:4,24;106:11,19;
107:3;108:6,11,25;
109:12;113:18;
117:23;118:19;
119:10,21;120:12;
121:15,21;125:10,11
**Shibilski's (13)**
11:25;13:23;15:20;
21:2;40:15;87:15,23;
88:11;95:9;97:12;
113:4;114:15;118:6
**short (2)**
12:25;27:22
**show (2)**
30:3;128:13
**showing (1)**
42:8
**shown (1)**
130:24
**sick (1)**
59:25
**sicker (1)**
54:12
**side (2)**
78:1;131:6
**signatories (4)**
77:23,24;78:7,14
**signature (3)**
41:13;61:4;76:21
**significance (1)**
47:1
**significant (4)**
37:20,20;110:15;
115:14
**significantly (1)**
92:8
**silo (1)**
14:16

**silos (1)**
14:18
**similar (1)**
65:15
**single (2)**
45:2;63:4
**sinus (1)**
54:14
**sit (1)**
74:18
**site (2)**
24:9;25:6
**sitting (1)**
122:7
**situated (2)**
67:13,15
**situation (4)**
74:5;90:22;114:4,
12
**situations (1)**
74:7
**six (2)**
31:12;82:10
**slot (2)**
52:20,21
**small (1)**
53:3
**smaller (1)**
36:18
**sold (3)**
127:1;132:18;
133:11
**sole (1)**
133:14
**Soleil (23)**
23:1;25:14,17;
26:4,12,21,22;27:5,7,
12,18;58:18,22;
79:23;80:1,3;85:17,
19;103:9;109:23;
110:1,24;111:1
**S-O-L-E-I-L (1)**
23:1
**Soleil-Natchez (34)**
23:1,9,13,22;24:2,
5,6,7;27:11;28:3,9,
14;44:22;51:14;58:9,
11;59:13;79:14,20;
80:7,13,15;81:3,11;
84:13;89:16;99:7,10,
12;101:9;102:22;
103:7,16;105:21
**Soleil-Natchez's (2)**
99:13,24
**solicit (1)**
43:6
**solicitation (1)**
57:15
**soliciting (1)**
127:23
**solution (1)**
30:2
**someone (8)**
19:6;20:14;21:2;
48:1,14;90:11;

**125:10,15**
**sometime (2)**
12:20;92:3
**Sometimes (2)**
8:24;97:2
**somewhere (2)**
26:24;36:2
**sooner (1)**
114:1
**sorry (11)**
14:25;20:18;25:15;
30:9;39:15,20;42:23;
86:23;108:20;122:7;
123:15
**sort (7)**
20:5;28:25;44:9;
50:5;66:19;74:5,20
**sound (1)**
54:19
**source (2)**
23:15;80:19
**sources (5)**
18:16;47:24;66:5,
20;79:24
**South (1)**
2:15
**speak (3)**
49:18;88:9;92:16;
100:13
**speaking (7)**
82:11,17,24;99:16;
100:23;104:13;
107:22
**speaks (4)**
65:7;73:8;83:4;
88:10
**specific (3)**
11:22;37:3;82:3
**specifically (9)**
22:8;28:1;45:19;
58:18;66:24;69:15;
74:17;79:22;91:22
**specificity (2)**
29:4;57:16
**specifics (1)**
37:15
**specific-type (1)**
65:25
**spelled (1)**
62:3
**spent (1)**
124:19
**spoke (1)**
49:20
**spot (1)**
33:24
**SS (1)**
137:
**St (1)**
6:1
**staff (1)**
64:10
**stand (4)**
73:14;96:5,21;
120:15

**stands (1)**
96:9
**Star (7)**
22:21,22;44:19,20;
45:1;46:1;117:8
**start (4)**
7:6;8:23;47:15;
65:19
**started (6)**
7:6;9:7;13:3,21;
26:6;50:1
**starters (1)**
87:22
**State (4)**
2:5;5:7;137:1,6
**statement (16)**
88:25;95:9,15,18;
96:5,9,25;97:23;
98:3;100:5;106:2;
107:8,18,19;120:2;
135:25
**statements (8)**
73:25;87:20;
105:23;107:4;
114:16;118:19;
133:4,5
**states (1)**
88:15
**status (7)**
59:5,7;71:5;78:16,
17;91:1;110:11
**stay (1)**
22:10
**staying (1)**
22:16
**step (1)**
70:7
**Stephens (1)**
7:5
**stepped (1)**
32:4
**steps (1)**
18:17
**Stifel (236)**
2:,13;5:13;6:5,5,6,
7,8,11,16,22;7:6,8;
8:2,11,11;9:25,25;
10:1,1,18,25;11:17,
18,19,20;12:17,22,
25;14:3;15:7,15,22,
25;16:1,8,11,18,22,
25;17:5,14;18:10;
19:6,22;20:2;21:21;
22:20,24;23:14,17,
22;24:1,4,14;27:2,7,
9,15,20;28:1,13,17,
21;30:4,16;31:1;
32:15;33:5;34:5;
35:6,24;41:16;43:18,
19,22,25;45:9;47:2,
14;48:1,14;51:3,19,
23;53:5,9,14,21;
55:22;56:22;57:8,21,
22;58:17,20,24,25;
60:6,24;61:14,21;

**62:5,7,17;63:16;**
64:7;65:13,24;66:16,
19;67:25;69:3,5,10;
71:7,11,20;72:12,15,
24;73:4,13,16,17;
74:4,20,25;75:6,16,
19;76:3,9,13;77:21;
82:4,14;84:12;85:5,
25;86:18;87:16,18;
88:15,16;89:24;
91:13,24;92:6,7;93:8,
14,15;94:5,18;95:20;
96:5,9,17,25;99:7;
100:2,3,6;103:3,15,
24,25;104:3,4,6,7,11;
105:19,24;106:6,8,
10,12;108:5,10;
109:7,18,21,21;
110:17,23,24;113:5,
17;114:16;115:25;
117:22;118:20;
119:18,20;120:15,24,
25,25;121:1,4,4,5,6,8,
9,9;122:25;123:5,15,
16;125:13,15,23;
126:6,8,10,13,22;
127:1;128:20,23;
130:6,12,20;131:8,
11;132:3,7;133:7,10,
20;134:4,10,20
**Stifel's (25)**
4:15;23:12;24:1;
26:24;51:11;56:2,17;
58:8;72:16;74:9;
75:12;78:16;80:23;
86:2;89:10;93:8;
96:24;103:2;113:3;
114:16;128:2;130:8;
131:4;132:6;133:12
**still (15)**
15:7,15;20:22;
35:19;39:20;50:14;
71:17;73:13,14;79:5;
86:13;93:15;96:21;
111:5;135:19
**stop (2)**
110:1;131:22
**stream (1)**
68:24
**Street (5)**
2:6,11;3:4;129:6;
137:10
**stress (1)**
110:15
**strictly (1)**
19:14
**structure (10)**
6:13,14;44:10;
57:10,13,16,23;58:1;
61:12;121:12
**structured (1)**
128:5
**structures (1)**
35:15
**stuff (1)**

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 153 of 155

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

61:21
**subdivision (2)**
45:4;117:10
**subject (3)**
13:14;21:23;
114:20
**submit (1)**
51:8
**submitted (2)**
41:12;61:3
**subsequent (4)**
65:11;73:10,18;
79:17
**subsequently (2)**
79:3;112:9
**subset (1)**
6:24
**subsidiary (3)**
11:20;121:1,8
**substantial (3)**
73:19;93:2;99:19
**substantive (2)**
129:19,24
**success (1)**
91:3
**successful (1)**
81:4
**successor (1)**
2:17
**sufficient (1)**
127:25
**suggest (1)**
55:18
**suitable (1)**
24:11
**Suite (1)**
3:4
**suited (1)**
67:8
**Summary (5)**
4:13;42:4,19;44:9;
64:6
**superior (3)**
13:23;45:5;81:21
**supervising (1)**
121:14
**supervisor (2)**
5:24,25
**supervisory (1)**
121:12
**support (7)**
29:12,13;51:24;
52:8;55:3;62:11;
128:15
**sure (22)**
8:18;12:11;17:4;
24:7;26:7;32:9;
33:19;35:4;46:17;
47:21;50:9,18;70:22;
89:9;92:1,23;95:3;
96:19;97:14;116:6;
127:24;128:19
**surgery (1)**
54:14
**surprised (3)**

55:4,7,8
**survive (2)**
79:2,8
**suspect (1)**
46:19
**sworn (1)**
5:3
**system (1)**
70:17

**T**

**table (2)**
57:17;94:23
**tacked (1)**
83:8
**talk (13)**
10:10;11:21;78:8;
82:4;88:6;89:8;
90:11,24;92:18,20;
98:16;114:10;124:12
**talked (13)**
25:10,12;29:18;
34:9;36:14;72:18;
92:21;93:3;95:8;
117:18;120:24;
121:15,20
**talking (22)**
11:9,11,24;20:13;
26:1;32:14;34:3;
77:18;82:14;83:12,
15;95:7;98:20;99:23;
100:1;101:7,23;
102:15,20;108:25;
119:16;121:17
**targets (1)**
112:12
**Tax (1)**
2:17
**Team (11)**
44:14,16,18,25,25;
45:24;47:1;77:13;
117:5,7;118:10
**telling (2)**
84:15;104:8
**template (3)**
65:14,16,19
**term (3)**
27:20;55:5;63:2
**terminated (3)**
12:16,23;92:6
**terms (30)**
25:10;29:5;36:5;
37:9;42:19,25;50:20;
57:4,15,18;61:17;
63:3;65:17;66:6,8;
67:4;71:1;72:24;
78:9;88:23;99:4;
103:22;111:6,6,12;
112:16;119:24;
127:18;129:24;
134:24
**testified (1)**
5:4
**testify (2)**

6:7;7:24
**testimony (1)**
103:18
**Thanks (1)**
135:2
**thinking (3)**
10:7;12:15;38:11
**Thompson (1)**
7:5
**though (12)**
14:5;20:19;21:11;
32:8;46:24;51:11;
57:2,8;72:23;78:13;
113:2;116:16
**thought (2)**
51:23;97:10
**threatening (1)**
110:1
**three (10)**
10:23;36:21;46:1;
100:23,24;101:2;
102:20;105:12;
119:5;120:7
**three-quarters (1)**
56:5
**throughout (1)**
83:4
**Tim (1)**
33:23
**timely (2)**
35:5;84:1
**times (1)**
50:19
**timing (4)**
110:7;124:24;
125:5,9
**Timothy (1)**
3:3
**tires (2)**
49:17,18
**title (9)**
5:18;6:2;7:2;12:1;
14:1,25;15:2;69:17;
73:14
**titled (1)**
42:4
**today (12)**
6:7;7:24;10:14,22;
11:15;64:21;74:18,
19;81:25;92:16;
121:16;122:15
**today's (2)**
9:16;133:1
**together (5)**
29:16,17;43:4;
50:16;118:5
**told (3)**
37:1;41:19;52:11
**took (5)**
31:4;52:21;72:15,
15;92:9
**top (3)**
83:4;95:7;132:15
**topic (1)**
85:24

**topics (3)**
47:10;81:13;85:24
**Torches (4)**
46:12;76:2,9;80:24
**touch (2)**
22:11,16
**touting (1)**
30:23
**track (1)**
32:9
**tracked (1)**
56:14
**Trading (2)**
4:15;131:4
**traditionally (1)**
19:8
**training (2)**
113:24;114:13
**transaction (108)**
10:9;11:24;13:13;
16:10,20,21;21:9,22;
22:19;23:8,20,23;
25:11,12;27:1,14;
28:23;29:1;33:16,20;
35:17;41:15;42:20;
43:13;47:22;50:8,20;
53:17;54:23;55:2,23;
56:6,7;57:13,20;60:7,
13;61:12,18,19;
65:17;66:9;67:4,21;
68:2;72:9,10,18;73:7,
23;77:3;78:5;80:2,6;
83:23;84:2;86:19;
87:17;88:17,19,21,
24;89:11;90:10,13;
91:10;93:16;94:1,3,
11,12,19,24;96:2,2;
100:22;102:2,21;
103:13;104:10;
109:22;110:8,9;
111:20;112:23;
115:2,8,10;116:12,
18;118:5;119:24,25;
120:19;123:1;
125:21,23;126:9,19;
127:7,8,10;128:4;
130:3;131:14,15;
132:14;134:5
**transactions (8)**
6:19;30:21;57:1;
65:15;83:24;114:25;
131:4,8
**transcript (17)**
4:,17;5:1;10:20;
11:4,5,7,9,10,11;
97:22;101:16;
118:22,24;121:17,20;
124:20
**transfer (3)**
70:2;71:13;132:11
**transferred (4)**
69:21;71:1,25;
75:17
**transfers (1)**
128:17

**travel (1)**
86:5
**traveled (1)**
89:24
**tribal (41)**
17:1;26:1;28:22,
23;29:8,12;31:6,7,10,
10,13;32:14;35:14;
36:13,16;43:11;
49:11,13;50:1;53:16;
56:14;61:7;76:14;
77:21;82:15;86:1,5,
17;88:25;89:5;90:11,
19;104:20;118:16;
119:1;123:16;
124:12,16,25;125:8;
136:4
**tribe (128)**
11:14;15:23;16:9,
19,23;17:21;21:10,
21;22:2,20,25;23:10;
24:1,23;25:11,18;
26:5,6,14,22;27:4,10,
12,17;28:2,5,6,7,9,13,
17;29:11;30:3;31:11;
32:2;34:6,21;35:7;
38:6,13,21,22;39:3;
22;40:13;41:5,16,17;
43:8,10,16;44:1,2,8;
45:11;46:22;47:19;
48:2,7,13,15,17;
49:19,20;51:18,20;
53:6,13,14;55:19;
58:7,15,21;61:24;
63:9;66:4,4;75:1,4;
76:16;79:8;80:16,20;
83:11,21;84:4,12,15;
85:16;87:14,15;
88:16,20;89:25;90:8,
9,91:14;95:11;99:6,
10;101:7,8;102:22;
103:1;109:1,19;
110:24;111:5,16;
114:2,23;115:17;
117:10;120:3,13;
123:13,14,23;124:1,
4,21;126:7,8;134:8,
12;135:10,19,22
**tribe's (7)**
27:10;53:22;59:2;
77:5;80:23;125:1,17
**tried (1)**
53:9;97:3
**trip (2)**
48:21;49:21
**true (3)**
88:9,10,18
**trust (11)**
28:7;66:10;70:15;
71:4,5,8;128:24,25;
129:1,7,16
**trustee (6)**
127:8,9,11,18,22;
135:17
**truth (2)**

Case: 3:13-cv-00372-wmc   Document #: 136   Filed: 03/10/14   Page 154 of 155

Stifel Nicolaus & Co  v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

95:14;96:19
**try (7)**
　8:25;9:9;24:19;
　43:19;77:13;94:10;
　130:5
**trying (15)**
　9:23;39:1,4;54:15;
　77:17;89:9;97:2;
　102:10;105:9,15;
　114:4,22;115:17,20;
　122:4
**Turek (59)**
　2:,4:3;9:19;14:11;
　21:15;22:3;25:14;
　33:23;34:8;39:13,20;
　42:14;46:8;47:8;
　60:15;68:5;69:13;
　74:10,22;76:17;78:2,
　25;81:12;83:1;85:22;
　87:8,22;89:3,18,20;
　94:13;95:3,21;96:6,
　11,14,19;100:9;
　101:13;103:17;
　107:14;108:2;113:7;
　114:19;116:4,19,24;
　117:14,25;118:8,13,
　15,21;121:25;122:17,
　23;130:23;135:1;
　136:12
**turn (3)**
　22:6;64:14;99:15
**Turning (1)**
　119:4
**two (24)**
　11:22;21:20;35:15,
　16,18;37:5;38:13;
　41:6;43:8;55:10;
　70:13,25;86:9;92:9;
　97:25;106:18;119:1;
　123:25;124:6;128:5;
　131:24,25;132:15;
　134:10
**type (15)**
　18:9;19:7,23;20:1,
　10,23;26:20;47:20;
　56:7;57:21;62:15;
　103:21;106:5,13;
　114:1
**types (1)**
　106:5
**typical (4)**
　6:14;56:7;60:4;
　62:16
**typically (5)**
　18:10,25;60:3;
　97:2;109:17

**U**

**ultimately (2)**
　32:8;85:12
**Um-hum (17)**
　19:2;46:3,7;60:14;
　78:21;82:9,25;98:13;
　107:12;117:3,6,13;

118:14;119:15;
123:21;125:22;130:9
**under (35)**
　14:20;18:10,25;
　19:8;44:24;56:20;
　57:18;68:12;69:5,10;
　71:1;77:25;79:7;
　83:25;85:23;86:9,11,
　22;87:12,24;99:4,14;
　102:2;109:18,20;
　110:16;112:14;
　117:4;119:1;122:7;
　126:2,10;129:19;
　133:15;137:8
**underlying (1)**
　10:9
**understood (4)**
　9:11;50:10;62:5,8
**undertaken (1)**
　18:14
**underwriter (1)**
　5:22
**undisclosed (1)**
　87:17
**unless (3)**
　10:2;75:13,14
**up (32)**
　9:13;27:24;32:17;
　33:1;38:12;40:19;
　48:13,24,25;52:24;
　53:12,23;55:13;56:4,
　24;74:13;77:16;
　82:14;83:4;85:14;
　89:7;90:12;102:14;
　105:15;110:19;
　116:23;122:11;
　124:12,16;128:7;
　136:5,6
**upcoming (2)**
　90:11,21
**upon (5)**
　32:20;65:15;68:20;
　83:25;126:23
**upper (1)**
　82:7
**upset (1)**
　33:16
**upshot (1)**
　34:4
**use (4)**
　18:22;67:3;74:14;
　108:3
**used (3)**
　43:19,25;80:25
**uses (2)**
　79:24;85:2
**using (1)**
　22:9
**Usually (1)**
　8:17

**V**

**vague (2)**
　113:7;116:4

value (3)
　84:21;105:16,16
**variety (1)**
　66:20
**various (3)**
　47:24;61:24;62:20
**vehicle (1)**
　80:8
**venture (1)**
　99:18
**verbal (2)**
　8:19,20
**verbally (2)**
　36:6;46:9
**versions (2)**
　62:15,17
**vested (1)**
　75:19
**vice (4)**
　5:15;12:2,6;15:18
**Vicky (7)**
　36:19;41:13;82:19;
　90:15;97:5,6,11
**Vicky's (1)**
　97:23
**Victoria (1)**
　76:20
**view (2)**
　23:22;50:12
**viewed (1)**
　112:24
**vis-a-vis (1)**
　133:12
**visit (5)**
　28:7,13,16;48:17;
　49:8
**visited (3)**
　28:5,6;35:7,8;
　48:15
**visiting (1)**
　53:14
**visits (1)**
　91:14
**volunteer (1)**
　125:11

**W**

**Wacker (1)**
　2:15
**Waddell (1)**
　67:1,1,22
**walk (2)**
　49:15;73:21
**walked (1)**
　106:23
**Water (3)**
　2:6,11;137:10
**Waukesha (1)**
　5:11
**way (20)**
　13:13;17:4,7;29:5;
　46:19;50:2;53:6;
　67:13;84:3,17;112:2;
　113:25;115:2,15;

117:4;122:6;123:24;
126:9;128:6;130:13
**ways (1)**
　91:25
**WEBER (2)**
　2:10;9:19
**Wedbush (4)**
　72:7,12,21,22
**Wedbush's (1)**
　72:17
**weekend (1)**
　31:23
**weeks (1)**
　38:21
**welfare (2)**
　87:13,14
**Wells (2)**
　2:18;127:7
**weren't (6)**
　11:4;40:4;57:2;
　78:14;85:13;121:23
**What's (24)**
　6:2,17;7:12;8:8;
　16:18;25:3;41:25;
　45:18;64:12;65:2;
　72:7;75:23;76:23,24;
　81:18;96:12;99:20;
　105:8;107:8;115:10,
　10;120:2;129:5;
　130:24
**whenever (1)**
　33:23
**whereof (1)**
　137:18
**whole (1)**
　42:14
**wholeheartedly (1)**
　89:4
**wholly (3)**
　11:19;121:1,8
**Who's (1)**
　65:9
**Whose (3)**
　33:5;45:3;117:8
**wife's (1)**
　31:23
**William (5)**
　45:4,13;46:5;
　117:9,18
**willing (4)**
　37:11,11;43:1;
　63:11
**Wisconsin (21)**
　2:,,6,7,20;3:,5:11;
　13:19;33:11;45:6,14,
　17;67:14;80:22;
　91:21;92:8;118:16;
　136:9;137:1,6,11
**wisdom (1)**
　58:21
**within (6)**
　17:4;18:14;30:15;
　32:11;69:24;70:4
**without (3)**
　114:24,25;125:11

**witness (41)**
　2:1;5:2;14:14;
　21:18;22:8;30:11;
　39:17;40:1;46:10;
　60:16;68:7;69:15;
　74:12;76:19;78:4;
　79:2;81:14;83:2;
　87:1,10;89:22;90:4;
　93:20;94:16;95:23;
　100:10;101:4,15;
　103:20;107:15;
　108:3,15,23;113:9;
　114:22;116:6;
　117:15;118:2,3;
　122:2;137:18
**wondering (1)**
　38:20
**word (1)**
　101:15
**words (7)**
　14:19;79:14;91:9;
　108:3;110:22;
　124:11;129:11
**work (10)**
　5:12;16:8,16,18;
　32:15;43:15,18;
　110:1;111:16;112:2
**worked (5)**
　12:22;21:21;50:2;
　70:6;125:4
**working (11)**
　15:22;26:6;37:19;
　45:21;63:24;77:3;
　87:18;110:8,9;136:4,
　8
**works (2)**
　14:3,4
**world (1)**
　79:16
**worth (2)**
　82:20;97:13
**writing (4)**
　11:14;43:1;49:14;
　137:8
**written (10)**
　10:17,25;11:12;
　19:17;20:11,20;
　41:12;62:12;77:1;
　93:11

**X**

**XYZ (4)**
　72:2,6,21,22

**Y**

**year (4)**
　32:22;62:20;92:2;
　105:1
**years (1)**
　115:13
**Year's (1)**
　54:16
**Yep (2)**

Stifel Nicolaus & Co v.
Lac du Flambeau Lake Superior Chippewa Indians, et al.

Deposition of David DeYoung
March 3, 2014

105:7;119:6
**York (1)**
  70:15

**0**

**00753186 (1)**
  132:5
**05 (1)**
  25:1
**06 (2)**
  15:1;25:2
**07 (3)**
  11:25;30:5;49:6
**08 (2)**
  11:25;15:1
**09 (2)**
  92:3,4

**1**

**1.5 (1)**
  104:25
**1/22/08 (1)**
  4:
**1:05 (2)**
  2:8;137:12
**10 (9)**
  31:12;38:1,9,11;
  92:4;95:1;97:25;
  104:12,23
**100 (1)**
  52:2
**11 (5)**
  98:4,5;108:17,21;
  109:11
**111 (1)**
  2:15
**12 (2)**
  99:15;131:17
**122 (1)**
  4:3
**13 (8)**
  82:7;83:4,6;95:7;
  100:25;101:3;
  102:21;105:2
**1305 (1)**
  5:11
**131 (1)**
  4:15
**135 (1)**
  4:
**137 (2)**
  119:4;120:7
**14 (8)**
  83:5;95:7;102:13;
  104:12,12,23;105:4;
  109:11
**144 (1)**
  126:2
**144a (1)**
  126:10
**14th (1)**
  122:12
**15 (1)**

102:13
**15-plus (1)**
  85:3
**16 (1)**
  102:17
**160-some (1)**
  114:20
**17 (6)**
  4:12;7:9,13;9:18;
  99:15;137:
**18 (9)**
  4:;8:5,8;9:18;
  44:13;65:7,8;117:4;
  131:5
**19 (12)**
  4:13;41:22,25;
  43:14,14;44:4;47:18;
  48:8,11;64:4;109:4;
  117:2
**19.9 (1)**
  46:2
**19690389 (1)**
  132:25

**2**

**2 (9)**
  7:17;42:22,23;
  53:15;56:17;59:19;
  82:16;89:25;113:19
**20 (6)**
  4:;64:1,12;108:17,
  22;109:4
**200 (1)**
  3:4
**2003 (1)**
  12:20
**2004 (2)**
  16:12;21:22
**2005 (1)**
  27:18
**2006 (1)**
  13:11
**2007 (17)**
  7:1,3,7,8;12:23;
  13:1,3,10,22;28:19,
  25;34:3;42:21;48:13,
  19;51:18;53:12
**2008 (13)**
  53:15;56:17;59:19;
  65:8,8;81:22;82:16;
  89:25;90:1,3,4;
  113:19;131:5
**2009 (2)**
  15:11;72:24
**2010 (2)**
  92:4,11
**2014 (3)**
  2:7;137:12,20
**2016 (1)**
  137:
**21 (5)**
  4:14;75:20,23;
  76:12;77:19
**22 (8)**

4:;81:15,18,22;
  95:6;98:5;119:4;
  121:17
**23 (8)**
  4:15;83:6;97:25;
  130:21,25;131:7,14;
  132:14
**24 (4)**
  64:19;83:6;98:1,6
**25 (1)**
  115:13
**25th (1)**
  35:9
**27 (1)**
  99:15
**28 (3)**
  88:15;100:23;
  101:2
**29 (3)**
  28:25;30:5;34:3
**29th (8)**
  28:19;51:6;52:7;
  56:13;63:1;92:22;
  123:2;128:11
**2nd (6)**
  58:1,5;60:12;
  119:24;122:7;124:18

**3**

**3 (1)**
  7:17
**300,000 (1)**
  105:12
**309 (3)**
  2:6,11;137:10
**30b6 (2)**
  7:15;88:4
**316 (1)**
  3:4
**32 (1)**
  104:12
**3rd (2)**
  2:7;137:11

**4**

**40.05 (2)**
  46:6,13
**41 (1)**
  4:13
**45 (2)**
  37:22,23
**4th (1)**
  137:20

**5**

**5 (1)**
  4:
**5:15 (2)**
  2:8;136:13
**50 (3)**
  37:17;119:9;
  132:16

**50/50 (1)**
  109:1
**53202 (3)**
  2:,;3:
**55 (1)**
  52:2

**6**

**60606 (1)**
  2:
**61 (1)**
  106:18
**64 (1)**
  4:

**7**

**7 (2)**
  4:12;42:23
**75 (1)**
  4:14
**777 (1)**
  2:20

**8**

**8 (4)**
  4:;42:22;43:14;
  44:4
**81 (1)**
  4:
**83 (2)**
  108:17,21
**84 (1)**
  109:11

**9**

**98.25 (1)**
  131:18
**99 (1)**
  132:17