Page 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
----------------------------------------------------------
STIFEL NICOLAUS & COMPANY, INC.,
STIFEL FINANCIAL CORP.,
SAYBROOK FUND INVESTORS, LLC
(successor to SAYBROOK TAX EXEMPT
INVESTORS, LLC),
LDF ACQUISITION, LLC,
WELLS FARGO BANK, N.A.,
and GODFREY & KAHN, S.C.,

            Plaintiffs,

            vs.                    Case No. 13-CV-372

LAC DU FLAMBEAU BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS and
LAKE OF THE TORCHES ECONOMIC
DEVELOPMENT CORPORATION,

            Defendants.
----------------------------------------------------------

            Deposition of PENNY J. COLEMAN

            Thursday, February 27th, 2014

                10:13 a.m.

                    at

            GASS WEBER MULLINS LLC
            309 North Water Street
            Milwaukee, Wisconsin

        Reported by Sarah A. Hart, RPR/RMR/CRR

Page 2

1          Deposition of PENNY J. COLEMAN, a witness in the

2     above-entitled action, taken at the instance of the

3     Plaintiffs, pursuant to the Federal Rules of Civil

4     Procedure, pursuant to notice, before Sarah A. Hart,

5     RPR/RMR/CRR, and Notary Public, State of Wisconsin,

6     at GASS WEBER MULLINS LLC, 309 North Water Street,

7     Milwaukee, Wisconsin, on the 27th day of February,

8     2014, commencing at 10:13 a.m. and concluding at

9     5:17 p.m.

10   A P P E A R A N C E S:

11                GASS WEBER MULLINS LLC, by
                  Mr. David J. Turek
12                309 North Water Street
                  Milwaukee, Wisconsin 53202
13                Appeared on behalf of Plaintiffs
                  Stifel Nicolaus & Company, Inc.
14                and Stifel Financial Corp.

15                GRIPPO & ELDEN, by
                  Ms. Laura K. McNally
16                Mr. Rami Fakhouri
                  111 South Wacker Drive
17                Chicago,  Illinois  60606
                  Appeared on behalf of Plaintiffs
18                Saybrook Fund Investors, LLC
                  (successor to Saybrook Tax Exempt
19                Investors, LLC), LDF Acquisition, LLC,
                  Wells Fargo Bank, N.A.
20

                  FOLEY & LARDNER LLP, by
21                Mr. James R. Clark
                  777 East Wisconsin Avenue
22                Milwaukee, Wisconsin  53202
                  Appeared on behalf of Plaintiff
23                Godfrey & Kahn.

24

25

Deposition of Coleman, Penny, 3/7/2014

Page 3

```
 1   A P P E A R A N C E S (cont'd):

 2              HOGEN ADAMS, by
                  Ms. Vanya S. Hogen
 3                1935 West County Road B2, Suite 460
                  St. Paul, Minnesota  55113
 4                Appeared on behalf of the Defendants.

 5              HANSEN REYNOLDS DICKINSON CRUEGER LLC, by
                  Mr. Paul R. Jacquart
 6                316 North Milwaukee Street, Suite 200
                  Milwaukee, Wisconsin  53202
 7                Appeared on behalf of the Defendants.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Coleman, Penny, 3/7/2014

Page 4

1                    I N D E X

2

3                E X A M I N A T I O N

4  BY MS. McNALLY                            5
   BY MR. TUREK:                           115
5  BY MR. CLARK:                           162
   BY MR. TUREK:                           180
6  BY MR. CLARK:                           190

7                E X H I B I T S

8  EXHIBIT NO.                    PAGE IDENTIFIED

9  No. 1  Curriculum Vitae                  50
   No. 2  Affidavit of Penny J. Coleman     79
10 No. 3  "Spotlight on Penny Coleman" article  112
   No. 4  Approval of Management Contracts - 25   129
11        CFR 533
   No. 5  1/18/08 Bond Purchase Agreement   148
12 No. 6  Taxable Gaming Revenue Bond Series  160
          2008
13 No. 7  Tribal Agreement                 162
   No. 8  5/7/08 to Justin Weinberg from Peggy   180
14        Coleman
   No. 9  2/19/09 Letter to Michael Roy and   182
15        Jerome Miranowski from Peggy Coleman
   No. 10  9/1/09 Letter to Brenda Shemayme   183
16         Edwards and Frank Shunock from
           Peggy Coleman
17 No. 11  2/22/10 Letter to Thomas Beauty and   183
           Gwendolyn Parada from Penny Coleman
18 No. 12  2/22/10 Letter to Kent Richey from   184
           Penny Coleman
19 No. 13  3/19/10 Letter to Peter Yucupicio   184
           from Penny Coleman
20 No. 14  4/2/10 Letter to Larriann Musick from   185
           Penny Coleman
21 No. 15  5/27/10 Letter to Peter Larson and   186
           Glenn Reynolds from Penny Coleman
22 No. 16  3/10/11 Letter to Chief Leaford   186
           Bearskin, Jeff Hitchcock, Michael
23         Sawruk, Canton Park Financial, Alan
           Ginsburg, Kerey Carpenter from Penny Coleman
24   (Original exhibits were attached to original transcript;

25                copies to transcript copies.)

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 5

1               TRANSCRIPT OF PROCEEDINGS

2          PENNY J. COLEMAN, called as a witness herein,

3     having been first duly sworn on oath, was examined

4     and testified as follows:

5               MS. McNALLY:  Good morning, Ms. Coleman.

6     My name is Laura McNally.  I represent the Saybrook

7     parties and LDF Acquisition, LLC, and Wells Fargo in

8     this action.  I'll be asking you questions during

9     your deposition today.

10                    Do the other parties want to say who's

11    here on the record?

12              MR. TUREK:  Sure.  David Turek on behalf of

13    Stifel Nicolaus and Stifel Financial.

14              MR. CLARK:  Jim Clark on behalf of Godfrey

15    & Kahn.

16              MR. JACQUART:  Paul Jacquart for the tribal

17    parties.

18              MS. HOGEN MOLINE:  Vanya Hogen Moline for

19    the tribal parties.

20              MS. McNALLY:  And this is Rami Fakhouri.

21    He's also from my law firm for Saybrook, LDF, and

22    Wells Fargo.

23              THE WITNESS:  Okay.

24                    EXAMINATION

25

Deposition of Coleman, Penny, 3/7/2014

Page 6

```
 1   BY MS. McNALLY
 2   Q    Have you been deposed before?
 3   A    I have been deposed before, yes.
 4   Q    And have you taken depositions before?
 5   A    I think I assisted in one.
 6   Q    Okay.  Not recently, I'm guessing?
 7   A    No.  This is a long time ago.
 8   Q    All right.  So I'll just quickly review some of the
 9        cautions for the beginning of a deposition.  I'm sure
10        you're familiar with these things, but --
11   A    Okay --
12   Q    -- just so we're all on the same page.
13                   It will be important that you give
14        answers that are words, instead of nods or sounds
15        like "um-hmm" so that the court reporter can
16        correctly collect what it is that you say.
17                   Does that make sense?
18   A    Yes.
19   Q    And that reminded me.  If you can, make sure that you
20        speak up so that she can hear you and that we have a
21        clear record of your answers and my questions.
22   A    Okay.
23   Q    Okay?  And please allow me to finish my questions
24        before you answer, and I'll try and do my best so
25        that I let you finish your answers before I ask the
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 7

1      next question.

2    A   Okay.

3    Q   And if I think you're done and ask a question but you

4        weren't finished, please stop me and finish your

5        answer, okay?

6    A   Okay.

7    Q   I'd ask that you ask for any clarification if you

8        don't understand a question so that we both know what

9        we're talking about, okay?

10   A   Okay.

11   Q   And if you answer a question, I'll assume that you

12       understood what I was asking, okay?

13   A   Yes.

14   Q   Okay.  Feel free if you need to take a break at any

15       time; just let me know, and as long as a question

16       isn't pending, we can do that.

17                     If you need to speak with your counsel

18       at any time, that's fine as well, but please ask --

19       unless it relates to privilege, don't do that

20       unless -- while a question is pending, okay?

21   A   Okay.

22   Q   All right.  You understand you're under oath, just as

23       if you were in a courtroom procedure, correct?

24   A   Yes.

25   Q   Okay.  And I have to ask this:  Are you on any

Deposition of Coleman, Penny, 3/7/2014

Page 8

1         medication or is there any reason you can't give full

2         and complete truthful testimony here today?

3    A    No.

4    Q    Okay.  And you said you've been deposed before?

5    A    Um-hmm.  Yes.

6    Q    Can you tell me what that -- what the occasion was of

7         your prior deposition?

8    A    I have been deposed on a personnel matter and once on

9         a personal matter.

10   Q    Okay.  And when were these depositions?

11                    Let's start with -- sorry.  Any other

12        deposition?

13   A    Not that I can remember.

14   Q    Okay.  Let's start with the personnel matter.

15                    When was that?

16   A    That was about 15 years ago.

17   Q    Okay.  And were you a party or a witness?

18   A    I was working for the federal government.  I was a

19        witness, I guess.

20   Q    Were you a fact witness or an expert witness?

21   A    Fact.

22   Q    And in the personal matter, when was that?

23   A    1982, I believe.

24   Q    Okay.  And were you a fact witness or a party?

25   A    I was a fact witness, I guess.

Deposition of Coleman, Penny, 3/7/2014

```
 1   Q    Okay.  Were you deposed in that trial or at a

 2        deposition?

 3   A    Deposition.

 4   Q    Okay.  And where was that pending?

 5   A    Arlington, Virginia.

 6   Q    And what do you mean by a "personal matter"?

 7   A    Personal matter?

 8   Q    Um-hmm.

 9   A    Oh, it was a divorce.

10   Q    Okay.  Fact witness in somebody else's divorce?

11   A    Yes.

12   Q    That's a lot of fun.

13   A    Truly.

14   Q    Okay.  We don't need to spend more time on that.

15                   Can you tell me your opinions that

16        you're planning to offer as an expert witness in this

17        case?

18   A    Can I tell you my opinions?

19   Q    Yes, please tell me your opinions that you are

20        offering as an expert witness in this case.

21   A    Okay.  I was asked to describe the -- NIGC's

22        processes, how they got into the two-part processes

23        for reviewing management contracts and what we refer

24        to as "R contracts."  They're called "R contracts"

25        because in the database there was an "R" on them for
```

Deposition of Coleman, Penny, 3/7/2014

```
 1          "review."  And I was asked to describe those two.
 2                     And then to look at a long list of
 3          documents, including an indenture and security
 4          agreement, tribal agreement, several other documents,
 5          and look to see if they contained indicia of
 6          management which the NIGC might determine are
 7          management contracts.
 8     Q    Okay.  Were you asked to do anything else?
 9     A    I would have to think about that.  Not off the top of
10          my head.
11     Q    So you said you were asked to describe the
12          two-part -- the history of the two-part process?
13     A    Uh-huh.
14     Q    And then the long list of -- you reviewed the long
15          list of documents --
16     A    Yes.
17     Q    -- for indicia of management?
18     A    Yes.
19     Q    And right now you can't think of any other
20          assignments?
21     A    Right.
22     Q    Okay.  My question, though, was what are your
23          opinions.  So those are your assignments, but what
24          are the opinions you're planning to provide as an
25          expert witness?
```

Deposition of Coleman, Penny, 3/7/2014

                                                          Page 11

 1   A   Well, other than the background, I will be saying

 2       where I think certain provisions within the contracts

 3       indicate management, based on what the NIGC has done

 4       in the past.

 5   Q   Okay.  Anything else?  Any other opinions?

 6   A   I guess the only addition to that is that looking at

 7       the management, it will be -- I'll be looking at

 8       whether collectively the documents indicate

 9       management or singly indicate management.

10   Q   Okay.  And what are your opinions as to indications

11       of management?

12   A   What are indications of management?

13   Q   No.  What are the opinions you've reached?

14   A   Well, can I use my affidavit and I can run through

15       it?

16   Q   Okay.  Is it fair to say that your affidavit contains

17       your opinions?

18   A   Generally.  They're -- I saw one mistake on the

19       affidavit.  I've kind of looked at the contracts a

20       little more, and there's some -- there's possibly

21       other -- other indications.

22                   Certainly, the affidavit -- one of the

23       things it doesn't do is it doesn't go into fulsome

24       detail on how -- how much these documents are related

25       or interrelated.

Deposition of Coleman, Penny, 3/7/2014

Page 12

1   Q   Um-hmm.

2   A   Because there was so much in the documents, there

3       were so many times that one document was dependent

4       upon another -- either they're referenced or they're

5       incorporated -- that I tried to limit myself more to

6       just a half a dozen and didn't spend time going --

7       didn't -- repeating everything that was in every

8       document.

9   Q   Okay.  Would you say there are any general -- those

10      are examples --

11  A   Um-hmm.

12  Q   -- you're talking about right now?

13  A   Um-hmm.

14  Q   Would you say there are any broad categories of

15      opinions that aren't in your affidavit that you're

16      planning to give in this case?

17  A   "Broad categories."  I don't understand.

18  Q   Right.  The things you're saying are missing are some

19      examples of, you just mentioned, interrelationships.

20                  Are there any big opinions that aren't

21      contained in your affidavit?

22  A   I don't think so.

23  Q   Okay.  I'm not trying to trick you.  I'm just

24      saying --

25  A   I just don't know what you're -- what you're getting

Deposition of Coleman, Penny, 3/7/2014

Page 13

1          at, so I don't really...

2    Q     Well, I guess there are many issues in this case.

3    A     Right.

4    Q     And so I just want to make sure that your

5          affidavit -- are there any issues that just aren't

6          addressed at all in your affidavit that you're

7          planning to opine on?  That's what I'm asking.

8    A     Good question.  No, there isn't anything else I'm

9          planning on opining on.

10   Q     All right.  We'll come back to those issues.

11   A     Okay.

12   Q     Can you tell me, what did you do to prepare your --

13         to prepare for this deposition?

14   A     To prepare for this deposition?

15   Q     Um-hmm.

16   A     I went back and looked at the notice of violation;

17         final commission decisions; and the general counsel

18         opinions that are on the website; and looked at my

19         stack of them, which I had run off over the course of

20         time; looked at the stack of court cases that I had.

21                   I didn't do any real research.  I know

22         there's lots of decisions out there, but I had a

23         stack, and so I reread them.

24                   I basically breezed through several of

25         the briefs that have been filed.  I didn't spend a

Deposition of Coleman, Penny, 3/7/2014

1      lot of time on them because they didn't tend to get

2      to the issues that I was dealing with, but I just

3      wanted to know what was going on.

4   Q   Um-hmm.

5   A   I asked for guidance from Vanya about how you do a

6      deposition because, despite my years of experience,

7      deposition is not something I do.  And sat and kind

8      of tried to figure out what questions that you might

9      ask so that I would be prepared.

10  Q   Anything else?

11  A   No.  I chatted with the lawyers on that subject, what

12      questions are they going to be interested in.

13  Q   Okay.  Anything else?

14  A   I reread some emails.

15  Q   Can you think of anything else you did?

16  A   That's pretty much it.

17  Q   Okay.  So you looked at -- you said you looked at

18      notice of violations, general counsel opinions, and

19      letters on the website?

20  A   Yes.

21  Q   When you say "on the website," do you mean all of

22      those things were on the website or just the letters

23      were on the website?

24  A   They were all on the website.

25                      Talking about final commission

Deposition of Coleman, Penny, 3/7/2014

1      decisions, they -- the National Indian Gaming

2      Commission is an enforcement agency.  And so not only

3      do they approve or disapprove management contracts,

4      they also take enforcement action.  And so in both

5      management contract appeals or enforcement actions,

6      they would be final agency decisions.

7                     And "NOVs" are "notices of violation."

8      Those are the enforcement document.  They're actually

9      the initial decision that is a final agency action,

10     if they're not appealed.

11                     So I looked at those to see what

12     would -- what had been said, see if there was

13     anything new, see if there was any changes.

14  Q  Okay.  Anything new or changes since when?

15  A  Since I left the commission in 2010.

16  Q  Are these materials that you looked at in preparing

17     your affidavit?

18  A  Yeah.  I think some of the later materials -- the

19     general counsel opinions I don't think were all on

20     the website when I prepared it, but -- and I was

21     looking at those just to see if there was any change

22     in analysis from -- from 2010 when I left.

23  Q  Right.  Was there anything -- but these are things

24     you did not necessarily all look at at the time you

25     drafted and signed your affidavit; is that right?

Deposition of Coleman, Penny, 3/7/2014

Page 16

1    A    Those -- those from -- some into 2012 and 2013 I

2         don't think were on the website when I prepared it.

3    Q    And did you find that any of these things were new,

4         or were there changes?

5    A    I only saw one change.

6    Q    What was that?

7    A    And that was the -- these general counsel opinions

8         have fairly standard language when it comes to the

9         Wells Fargo case.

10                   And after the Wells Fargo case, you

11        know, this language had been added because the office

12        generally agreed with the outcome of that decision

13        and -- but -- so what the decisions -- what the --

14        those opinions had said was that under the UCC and

15        available remedies under law, that those are probably

16        not -- that -- that -- that they didn't intend in

17        those -- in contracts that said "You have available

18        remedies under law," the contractors didn't intend to

19        mean that that meant you could just go ahead and

20        appoint a receiver to manage the facility.

21                   Well, then they became more -- they've

22        become more nuanced or just a little bit different in

23        the sense that now they tend to say, "It looks like

24        appointing a receiver isn't even an available

25        remedy," so...

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 17

1    Q    Is not an available remedy?  Is that what you said?

2    A    Right.

3    Q    Is not an available remedy?

4    A    So it's not one of those broad categories of

5         available remedy.  So, consequently, there's no

6         indicia of management when you say "available

7         remedy."

8    Q    And that was a change that you noticed since the time

9         you signed your affidavit?

10   A    Yes.

11   Q    Okay.  And does that change your opinion, any of the

12        opinions you've included in your affidavit?

13   A    No.

14   Q    And when you talk about these letters, are these

15        referred to as "declination letters"?

16   A    Yes.

17   Q    Yes?  Okay.

18                    Then you talked about you had a stack

19        of cases?

20   A    Um-hmm.

21   Q    Did you rely on those cases in forming your opinions

22        in your affidavit?

23   A    I -- I don't think I referenced any cases.

24   Q    Yeah, I'm not asking if you referenced any cases.

25        I'm asking if they were something you used -- you

Deposition of Coleman, Penny, 3/7/2014

Page 18

```
 1          relied on in reaching your conclusions in your
 2          affidavit.
 3     A    Well, they were part of the body of knowledge that I
 4          have, just from all of my years of experience.  And
 5          so they helped just kind of remind me, oh, yeah, you
 6          know -- I can't remember what they reminded me,
 7          actually.  I would have to look at them again.
 8     Q    Did you -- were any of these cases in the stack of
 9          documents that you didn't have -- or didn't refer to
10          at the time you drafted your affidavit?
11     A    I had them when I drafted my affidavit.  I don't
12          really remember if I referred to them.
13     Q    Okay.  Was there anything you saw when you reviewed
14          them in preparing for the deposition that led you to
15          change any of the conclusions you included in your
16          affidavit?
17     A    No.
18     Q    Okay.  Have you provided those documents to your
19          counsel?
20     A    Yes.
21     Q    Okay.  Can you remember what --
22               MS. McNALLY:  Maybe I can shorten this if
23          you can tell me, is that the stack of cases we
24          received?
25               MS. HOGEN MOLINE:  Yes.
```

Deposition of Coleman, Penny, 3/7/2014

1            MS. McNALLY:  Okay.  All right.

2    BY MS. McNALLY:

3    Q    Are there any cases that you reviewed in preparing

4         for your deposition that you did not provide to your

5         counsel?

6    A    No.

7    Q    Okay.  Now, you said you reviewed some briefs?

8    A    The briefs that -- some of the briefs that were filed

9         in the court cases that are going on with you all.

10   Q    Okay.  Which case is that?  This case, the one

11        pending in federal court right now?

12   A    I think so, yes.

13   Q    Okay.  Did you review briefs in any other case that

14        involves these parties?

15   A    I probably did.  I don't remember specifically which

16        ones.

17   Q    That was in preparation for your deposition?

18   A    Yes.

19   Q    Okay.  When did you do this preparation?

20   A    Last week.  I spent the day.

21   Q    What documents -- which briefs do you recall

22        reviewing?

23   A    This is how briefly I reviewed them.  I don't really

24        recall which ones.

25   Q    Do you remember when you did this, when you did this

Deposition of Coleman, Penny, 3/7/2014

Page 20

1      review?  When last week?

2    A  I think it was Sunday.

3    Q  Okay.  Did you review any briefs that related in

4      particular to use of experts in this case?

5    A  No.

6    Q  Okay.  How did you come to have the briefs you

7      reviewed?

8    A  I asked counsel.

9    Q  What did you ask?

10   A  I said it would be helpful if I saw what people are

11     talking about on the -- in the court case.  And I

12     didn't know where the court case was; I didn't know

13     what court we were in.  I -- you know, I just haven't

14     been following this at all, and so...

15   Q  Did they select the briefs to send to you?

16   A  Yes.

17   Q  Did you review the briefing on the motion for

18     preliminary injunction, do you think?

19   A  I would --

20   Q  You don't need to guess.  If you don't know, you

21     don't know.

22   A  Yeah, I just don't remember.

23   Q  Okay.

24   A  I didn't look at the headings.  I just was looking at

25     what they said, and -- like I said, very briefly.

Deposition of Coleman, Penny, 3/7/2014

Page 21

1  Q  Did you review the complaint, do you think?

2  A  Not recently, no.  Definitely not that.

3  Q  Okay.  Did you review any declarations or affidavits

4     filed by any other people -- any other experts in

5     this case?

6  A  I looked at Kevin Washburn's and Perry Israel's and

7     Elaine Trimble Saiz.

8  Q  Okay.  And when did you review Kevin Washburn's

9     declaration -- I'm sorry.  I think it's an affidavit.

10                When did you review it?

11 A  I don't know exactly what day.  I pretty much spent

12    one day trying to review the materials.

13 Q  Okay.

14 A  And I really don't remember if it was Sunday for

15    sure, but, you know, I just --

16 Q  Okay.

17 A  -- I spent a day trying to go through those things,

18    and that's pretty much it.

19 Q  I'm not trying to grill you if it was Saturday versus

20    Sunday --

21 A  Yeah.

22 Q  -- I'm just trying to -- if it was recently, you

23    recently reviewed it.

24 A  Yes, I recently looked at them.

25 Q  Okay.  And do you remember what the case was in which

Deposition of Coleman, Penny, 3/7/2014

1        Kevin Washburn filed his affidavit that you reviewed?

2    A   I'm pretty sure it was the one that's pending.

3    Q   In this action?

4    A   Yeah.

5    Q   Okay.  And Perry Israel, when did you review his

6        declaration -- or affidavit?

7    A   I looked at them all at the same time.

8    Q   Okay.  And Elaine Trimble Saiz?

9    A   Same time.

10   Q   Okay.  Had you reviewed those at any time before this

11       last week?  Let's start with Kevin Washburn.

12                   Had you reviewed Kevin Washburn's

13       affidavit before this past week?

14   A   I reviewed Kevin Washburn's affidavit about the same

15       time that the district court issued the decision.

16   Q   Which decision?

17   A   The first one.

18   Q   Are you talking about Judge Randa's decision in --

19       there have been enough district court decisions --

20   A   Yeah, I know.  Well, and consequently, I can't tell

21       you for sure.

22   Q   Okay.

23   A   I can tell you that I remember reading his affidavit

24       as part and parcel of the decision that said that the

25       indenture and the other contracts were management

Deposition of Coleman, Penny, 3/7/2014

Page 23

```
 1        contracts.
 2   Q    Okay.  Thank you.  And then you reviewed it again
 3        recently.
 4                      Did you review it in between those two
 5        times?
 6   A    I'm sure I reviewed it when I was preparing the
 7        affidavit.
 8   Q    Okay.  And in reviewing it this week, did you see
 9        anything that would lead you to change anything you
10        said in your affidavit?
11   A    No.
12   Q    Okay.  Now, Perry Israel's affidavit, when did you
13        first review that?
14   A    I don't -- I don't remember reviewing it any time
15        except for this last week.
16   Q    Okay.  Did you see anything in his affidavit that
17        would change anything you said in your affidavit?
18   A    No.
19   Q    Okay.  How about Elaine Trimble Saiz's affidavit?
20        When did you first review that?
21   A    I don't know how many affidavits have been filed by
22        her.
23   Q    Um-hmm.  Okay.
24   A    But -- so all I can say is that I reviewed an
25        affidavit by her --
```

Deposition of Coleman, Penny, 3/7/2014

Page 24

1   Q   Okay.

2   A   -- in preparation -- when I was preparing the

3       affidavit -- my affidavit.

4   Q   Okay.  And then you saw it again this past week?

5   A   Yes.

6   Q   Was there anything that you read this past week that

7       changed your opinions that you filed in the affidavit

8       in this case?

9           MS. HOGEN MOLINE:  Are you asking her that

10      question generally, or in the Saiz affidavit?

11  BY MS. McNALLY:

12  Q   Is there anything you saw in the Saiz affidavit that

13      would lead you to change -- when you reviewed it this

14      week, that would lead you to change anything you said

15      in your affidavit that you filed in this case?

16  A   No.

17  Q   Okay.  And just for clarification --

18  A   Um-hmm.

19  Q   -- you filed -- you signed an affidavit in a case

20      that's pending in Waukesha County as well.  Do you

21      recall doing that?

22  A   Yes.

23  Q   Okay.  So today, if I talk about your affidavit, I'm

24      going to be talking about the affidavit that you

25      filed in this case.

Deposition of Coleman, Penny, 3/7/2014

Page 25

1   A   Okay.

2   Q   And not the one in Waukesha.

3   A   Okay.

4   Q   If I refer to the Waukesha -- your Waukesha

5       affidavit, that will be -- that's when I'm talking

6       about that --

7   A   Okay.

8   Q   -- other one.

9   A   Okay.

10  Q   So just so the record's clear, all the questions I've

11      been asking about changes to your affidavit, you were

12      answering as to the affidavit filed in this case?

13  A   Yes.

14  Q   Okay.  How much time did you spend preparing for this

15      deposition?

16  A   I don't know.  I spent more time trying to pull

17      together the documents for you.

18                  Probably, if you count the time I

19      spent pulling together the documents, which tended to

20      take quite a while, 20 hours.

21  Q   Okay.  Are you being compensated by the hour?

22  A   Yes.

23  Q   All right.  We'll come back to that in a second.

24                  You said you reread some emails?

25  A   Um-hmm.

Deposition of Coleman, Penny, 3/7/2014

Page 26

1  Q   When you say "reread," when did you read them before?

2  A   When I wrote them --

3  Q   Were these emails where you were a sender, recipient,

4      or copied on the email?

5  A   Yes.

6  Q   Okay.  Can you describe the emails you reviewed?

7  A   Well, there were emails back and forth with counsel,

8      and then there were a few emails back and forth with

9      Rob Gibbs.

10 Q   With Rob Gibbs, okay.

11 A   Um-hmm, Gibbs.

12 Q   Okay.  And why did you review these emails?

13 A   Well, most of them were -- I thought were going to be

14     responsive to the document request.

15 Q   Okay.  But then you changed -- did you decide they

16     weren't responsive?

17 A   No.  Counsel told me that you all had agreed you

18     didn't need those.

19 Q   All right.  And when you said "communications with

20     counsel," you mean counsel in this action?

21 A   Yes.

22 Q   Okay.  You spoke with counsel in preparation for this

23     deposition.

24               Did you speak with anyone else in

25     preparation for this deposition?

Deposition of Coleman, Penny, 3/7/2014

Page 27

1   A   I talked briefly to Rob Gibbs.

2   Q   Did you talk to Rob Gibbs about the issues involved

3       in this case?

4   A   No.  I -- no.  I was -- I called him to find out if

5       I -- if I had worked for Saybrook on an affidavit I

6       had drafted.

7   Q   In another matter?

8   A   Yeah.

9   Q   Okay.  Did you speak with Rob Gibbs about the issues

10      in this case?

11                  Let me ask it this way:  Did you speak

12      with Rob Gibbs about the substance of your testimony

13      today?

14  A   He said something to me.

15  Q   Okay.  Did you speak --

16  A   I didn't -- I hadn't really asked him about it, but

17      we kind of -- it was just kind of an off-the-cuff,

18      "oh," kind of a deal.

19  Q   Okay.  And did you speak about the substance of the

20      testimony you were going to be giving here today

21      relating to your opinions?

22  A   Well, yeah, I think so.

23  Q   What did you say?

24  A   Well, I didn't say anything.  He said something to

25      me.

Deposition of Coleman, Penny, 3/7/2014

Page 28

```
 1    Q    Okay.  Did you speak with anyone else?

 2    A    No.

 3    Q    Did you speak with Perry Israel?

 4    A    No.

 5    Q    Have you spoken with Perry Israel at any time about

 6         the issues involved in this case?

 7    A    I don't think so.

 8    Q    Have you spoken with Elaine Trimble Saiz about the

 9         issues in this case?

10    A    No.

11    Q    Have you spoken with Kevin Washburn about the --

12    A    No.

13    Q    -- issues in this case?

14                    If you can just make sure I get to ask

15         the whole question so the record's clear.

16    A    Sorry.

17    Q    All right.  Can you briefly describe your academic

18         background, starting with college?

19    A    I went to a small college at -- in South Dakota and

20         got a B.S. degree in English and library science, and

21         took a few graduate courses while I was a teacher.

22         And then I went to the University of South Dakota and

23         got a law degree.

24    Q    Okay.  Was that Northern -- for undergrad, was that

25         Northern State University?
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 29

| 1 | A | That's what it's called now, yes.  I think. |
| 2 | Q | What was it called -- |
| 3 | A | No.  I think it's Northern University -- I'm not real |
| 4 |   | sure what it's called now. |
| 5 | Q | What was it called then? |
| 6 | A | I think it's -- well, it wasn't called Northern |
| 7 |   | Normal.  It was called Northern State, I believe. |
| 8 | Q | Okay. |
| 9 | A | It's had lots of names.  It's grown over the years. |
| 10 | Q | Okay.  And when did you graduate? |
| 11 | A | From undergrad?  I think it was 1976. |
| 12 | Q | Okay.  And then were you involved in any |
| 13 |   | organizations or -- any organizations that would have |
| 14 |   | had involvement in Native American issues? |
| 15 | A | Any organization.  What do you mean? |
| 16 | Q | Like any clubs or any -- |
| 17 | A | In undergrad? |
| 18 | Q | Yeah, in undergrad. |
| 19 | A | No. |
| 20 | Q | Okay.  And did your studies at that time focus in any |
| 21 |   | way on Indian law issues? |
| 22 | A | In undergrad? |
| 23 | Q | Right, in undergrad. |
| 24 | A | No. |
| 25 | Q | Okay.  And then you said you did some graduate work |

Deposition of Coleman, Penny, 3/7/2014

Page 30

1       while you were teaching.  That was -- what's the

2       teaching part of that?

3    A  I was teaching English.

4    Q  Okay.

5    A  And we were required to take some classes as part of

6       our teaching degree, continuing education kind of

7       thing.

8    Q  Was that high school?

9    A  Yeah.  High school and junior high.

10   Q  And were the graduate classes education-related?

11   A  Yes.  I think they were on things like diversity and

12      kinds of things that you want teachers to know about.

13                       I don't really remember.  This was a

14      very long time ago.

15   Q  Sure.  And did any of those issues relate to Indian

16      law topics, any of those classes?

17   A  No.

18   Q  And you said you went to law school?

19   A  Yes.

20   Q  Where did you go and when did you graduate?

21   A  I went to the University of South Dakota.  I

22      graduated in 1981.

23   Q  Were you originally from South Dakota?

24   A  Yes, I am from South Dakota.

25   Q  All right.  Did you have any activities or academic

Deposition of Coleman, Penny, 3/7/2014

```
 1        focus on Indian issues at the time?

 2   A    I had -- I took a class in Indian law.

 3   Q    Was that second or third year, I'm guessing?

 4   A    It was second or third year.

 5   Q    Okay.  Anything else?

 6   A    In Indian law?

 7   Q    Right, in Indian law.

 8   A    No.

 9   Q    Were you on a journal or any club, any organization

10        on Indian-related issues?

11   A    No.  There weren't any.

12   Q    Okay.  Any other graduate training that you took

13        after law school?

14   A    No.

15   Q    Okay.  Have you had any continuing education since

16        law school?

17   A    Yes.

18   Q    Okay.  Can you just generally describe what you've

19        done?

20   A    I'm bar'ed in Virginia, so I take a minimum of 12

21        hours a year, two of which have to be ethics.

22                    And then in addition to that, I try to

23        either go to the Federal Bar Association Indian Law

24        conference, or I speak and get credit for speaking.

25                    I probably do mostly Indian law CLE,
```

Deposition of Coleman, Penny, 3/7/2014

Page 32

1     but also try to do other CLEs that include -- you

2     know, to help you with your practice.

3  Q  Okay.  Have you had any continuing education on

4     tribal financing?

5                      And I'm putting aside the

6     presentations you gave or speeches you made, but ones

7     where you attended and learned from someone else.

8  A  I've attended NAFOA conferences.

9  Q  How do you spell that?

10 A  N-A-F-O-A, I think.  Native American Finance -- I

11    can't remember what the "OA" stands for.

12 Q  And NAFOA is related to tribal financing?

13 A  That's what -- yes.

14 Q  Okay.  And do you remember when you attended those?

15 A  Two years ago I think is the last time I attended

16    one.

17 Q  Okay.  When else?

18 A  And the year before that.  And in addition, the

19    Indian law classes I sometimes take are about

20    financing.

21 Q  I'm sorry.  I couldn't hear you.

22 A  The Indian law classes that they have midyear in

23    D.C., I try to get to that.

24 Q  Who is "they"?

25 A  "They," the FBA.

Deposition of Coleman, Penny, 3/7/2014

Page 33

1    Q    Federal Bar Association?

2    A    Yes.

3    Q    All right.  You said that you went to the NAFOA

4         conference two years ago and the year before that.

5    A    Yes.

6    Q    Before that did you go?

7    A    I don't -- I don't remember going any other time to

8         one of them.

9    Q    Okay.  And in the midyear Indian law -- the midyear

10        meetings of the Federal Bar Association, did they

11        talk about tribal financing?

12   A    Sometimes.

13   Q    Okay.  Do you have a memory of being --

14   A    No.

15   Q    How about have you had any continuing education on

16        management of casino operations?

17   A    Continuing education?  Other than being -- setting up

18        a commission?

19   Q    Right.  Not the work you did, but did you have --

20        have you had any formal training relating to

21        management of casino operations?

22   A    I'm not sure.

23   Q    Okay.  Do you recall having any formal training on

24        issues relating to management contracts?

25   A    Formal training on management contracts?

Deposition of Coleman, Penny, 3/7/2014

Page 34

1   Q   Um-hmm.

2   A   No.

3   Q   Okay.  Do you recall having any formal training on

4       IGRA?

5   A   Yes.

6   Q   Okay.  And where was that?

7   A   The National Indian Gaming Association has an annual

8       conference and a midyear conference, and I go to

9       those regularly.  I don't always get to them, but I

10      go to them regularly.

11                   Also G2E.

12  Q   What's that?

13  A   It --

14  Q   Is that the letter "G" and the number "2" --

15  A   Yeah.

16  Q   -- and the letter "E"?

17  A   Yeah.

18  Q   Okay.

19  A   It's a very big conference in Las Vegas.  I've gone

20      to it probably the last 10 or 15 years.  And it

21      always has a tribal gaming conference -- or section;

22      some of which I've taught, and some of which I've

23      attended.

24  Q   Okay.  Did you say that you -- I'll ask it this way:

25      How many times have you gone to the National Indian

Deposition of Coleman, Penny, 3/7/2014

Page 35

1      Gaming Association conferences do you think, roughly?

2  A   Twenty, 25.

3  Q   Okay.  And G2E?

4  A   Fifteen.

5  Q   Have you had any formal education or training

6      relating to NIGC regulations?

7  A   Yes, I have.

8  Q   Okay.  You're chuckling.

9  A   I'm chuckling because, of course, since I was there

10     at its inception, we were the ones who did the

11     training.  But once I left in 2010, I did go and --

12     to a training that NIGC provided, and, actually, I

13     had two different trainings from NIGC.

14 Q   Okay.  Can you tell me about the first one?

15 A   The first one was on setting up a commission.  It was

16     something that I had organized to help train the

17     tribal council on what you need for a regulatory

18     body, what kinds of things are required.  And I sat

19     in on it.

20 Q   So you organized it, and then you attended it?

21 A   Yes.

22 Q   And then when was -- that was in 2010?

23 A   No.  That was 2013.

24 Q   Okay.  What was it called?

25 A   It didn't have a name.

Deposition of Coleman, Penny, 3/7/2014

Page 36

1   Q   Was it at the NIGC?

2   A   No.  The NIGC came to us.

3   Q   Who is "us"?

4   A   Pardon?

5   Q   Who is "us"?

6   A   The Mashpee Wampanoag Tribal Council and the Mashpee

7       Wampanoag Tribal Gaming Commission.

8   Q   And you have a formal role with them?

9   A   I did at the time.

10  Q   Okay.  And what was that?

11  A   I was the chair of the gaming commission.

12  Q   When did you set that training up?  I think you

13      said -- I'm not trying to put words in your mouth.

14      I'm trying to understand.

15              Did you say you set that training up

16      when you were at the NIGC and then you attended it?

17  A   No.

18  Q   Oh, okay.  When did you set it up?

19  A   I set it up --

20  Q   As part of the Gaming Commission?

21  A   As part of the Gaming Commission, yes.

22  Q   Okay.  And you invited them to come in, and they made

23      a presentation that you attended?

24  A   Yes.

25  Q   Got it.

Deposition of Coleman, Penny, 3/7/2014

Page 37

1                              Okay.  And then you said there was a
2          second training as well?
3     A    Yes.  They were -- the NIGC was having its regional
4          training at Saint Regis Mohawk at the Akwesasne
5          Reserve.  And so I attended that.
6     Q    And what was the topic of that training?
7     A    The one I can best remember is the minimum internal
8          control standards.  They had other topics, but I
9          don't remember all of them.
10    Q    And when was this training?
11    A    2013.
12    Q    Did you learn anything at either of these trainings
13         that caused you to change the opinions you're
14         providing in this case?
15    A    No.
16    Q    Do you recall whether these trainings were before or
17         after you submitted an affidavit in this case?
18    A    I don't recall.
19    Q    Okay.  I would like to talk about your work history
20         on issues relating to Indian law.
21    A    Okay.
22    Q    We don't need to -- we can skip over any, like, high
23         school -- when you were teaching.
24                             So let's talk about post-law school,
25         okay?

Deposition of Coleman, Penny, 3/7/2014

Page 38

1   A   Okay.

2   Q   Where did you start after law school?

3   A   After law school I started at the Office of the

4       Solicitor in the Department of the Interior in the

5       Division of Indian Affairs in their General Indian

6       Legal -- General Indian Law section.

7   Q   When you were in law school, did you have any

8       employment relating to Indian law issues?

9   A   No.

10  Q   Any internships or unpaid work?

11  A   I had an internship at the Crow Creek Legal Aid

12      office, worked on what were called Section 2415

13      claims.

14  Q   And what are those?

15  A   If I remember correctly, Congress had passed a law

16      establishing a statute of limitations on a number of

17      claims that individual Indians and the Indian tribes

18      could bring against the federal government.  And the

19      legal aid office was apparently funded to -- to

20      research the claims.

21  Q   Okay.  Did that relate to gaming in any way?

22  A   No.

23  Q   Okay.  You were at that organization; then you were

24      at the Department of the Interior, right?

25  A   Right.

Deposition of Coleman, Penny, 3/7/2014

Page 39

```
 1   Q   When were you there?
 2   A   Started in 1981.  Left there in 1984 -- excuse me.
 3       '94.
 4   Q   Okay.  And then in 1994, where did you go?
 5   A   National Indian Gaming Commission.
 6   Q   And how long were you there?
 7   A   Till 2010.
 8   Q   Okay.  And then in 2010, where did you go?
 9   A   2010, I didn't go anywhere for a while.
10   Q   Okay.
11   A   And I established a consulting firm, and then
12       established -- in 2011 established a law firm.
13   Q   Okay.  The consulting firm, did you start that -- you
14       said in 2010 you started the consulting firm?
15   A   Um-hmm.
16   Q   What's the name of that firm?
17   A   Gwe: Nis Consulting.
18   Q   Can you spell that for the court reporter.
19   A   G-W-E, colon, space, N-I-S.
20   Q   Is that a present organization?
21   A   Yes.
22   Q   And then you also began a law firm in 2011, you said?
23   A   Yes.
24   Q   And what is that called?
25   A   Coleman Indian Law.
```

Deposition of Coleman, Penny, 3/7/2014

Page 40

```
 1   Q   Okay.  And does that still exist?

 2   A   Yes.

 3   Q   Any other employment that we haven't covered?

 4   A   Well, we discussed that I was chair of the Mashpee

 5       Gaming Commission.

 6   Q   Okay.

 7   A   And I'm --

 8   Q   When was that?

 9   A   That was -- can I look at --

10   Q   Are you currently the chair of the Gaming --

11   A   No.  No.  I resigned the end of October, first part

12       of November, 2013.

13   Q   Okay.  And I'm guessing you began that after you left

14       the NIGC?

15   A   Yes.

16   Q   Okay.  Any other employment that I'm forgetting --

17       that I didn't cover?

18   A   I am a commissioner on the Judicial Oversight

19       Commission for the Saint Regis Mohawk tribe.

20   Q   And that began sometime after you left the NIGC?

21   A   Yes.

22   Q   Any other employment?

23   A   No.

24   Q   Did you have a relationship with Anderson Indian Law?

25   A   Yes.
```

Deposition of Coleman, Penny, 3/7/2014

Page 41

1   Q   When was that?

2   A   I was of counsel with them for maybe a year.

3   Q   And was that between any of these that we've talked

4       about or overlap?  Can you give me a time frame?

5   A   It was after I had established Coleman Indian Law and

6       while -- and that has been ongoing since I've

7       established it.  So I think it was about 2012.

8   Q   So there was a time -- tell me if I have this

9       right -- that you were of counsel with Anderson and a

10      principal of Coleman?

11  A   Yes.

12  Q   And a principal of --

13  A   Gwe: Nis.

14  Q   Gwe: Nis.  There was -- and then right now, it's just

15      Coleman and Gwe: Nis; is that right?

16  A   Yes.

17  Q   Okay.  All right.  Well, we've been going for an

18      hour, so we can stop for a break, or we can keep

19      going.  Whatever you prefer.

20  A   Let's keep going until I need --

21  Q   Okay.  All right.

22          (A discussion was held off the record.)

23  BY MS. McNALLY

24  Q   Can you tell me -- let's start with the Department of

25      the Interior, '81 to 1994.

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 42

1    A    Um-hmm.

2    Q    Tell me everything you ever did -- I'm just kidding.

3         We would be here all day.

4                        From 1981 to 1994 -- why did you leave

5         in 1994?

6    A    I left in 1994 because the National Indian Gaming

7         Commission was just really getting started, and I

8         knew that I -- that it would be a good career move.

9                        And it so happened that a good friend

10        of mine who was working at the National Indian Gaming

11        Commission got a job at the Department of the

12        Interior Solicitor's.  And so the general counsel

13        needed to quickly replace her, and so I moved over to

14        the NIGC.

15   Q    So you essentially --

16   A    Yes.

17   Q    -- kind of swapped positions?

18   A    Yes.

19   Q    Okay.  All right.  Just backing up a second to the

20        Crow Creek work you did.

21   A    Um-hmm.

22   Q    That didn't relate to gaming --

23   A    No.

24   Q    -- it sounds like, correct?

25                        Okay.  All right.  In the Office of

Deposition of Coleman, Penny, 3/7/2014

1       the Solicitor did you work on gaming issues?

2   A   Yes.

3   Q   Did you work on management contract issues?

4   A   Yes.

5   Q   All right.  Can you describe the work you did, then?

6   A   The Indian Gaming Regulatory Act was passed in 1988,

7       and it said that the NIGC should start doing --

8       reviewing and approving management contracts, but

9       that the Department of the Interior would remain

10      responsible for reviewing and approving them until --

11      until the NIGC got up and running.

12             Basically, the Department of the

13      Interior retained its 25 USC Section 81 authority.

14      Section 81, the courts and then the BIA concluded

15      that management contracts were subject to 81 and to

16      be approved.

17  Q   And BIA is the --

18  A   Bureau of Indian Affairs.

19  Q   Okay.

20  A   And so the person who had been primarily responsible

21      for gaming had been -- was Michael Cox, the then --

22      who they -- once they appointed the chair of the

23      Gaming Commission, Michael was hired as the general

24      counsel.  And so I took over the Division of Indian

25      Affairs for the responsibility for doing whatever was

Deposition of Coleman, Penny, 3/7/2014

Page 44

1        needed to continue the responsibilities of the -- of

2        the department on gaming issues.

3                      And so what I ended up doing is

4        providing advice to the secretary of the interior and

5        to the solicitor of the Department of the Interior,

6        who at that time was really the number two person in

7        the department, that they should start an Indian

8        gaming office and -- excuse me, before that, I and

9        this other woman, this woman from the BIA, we were

10       responsible for doing the Section 81 approvals,

11       reviewing the management contracts, trying to educate

12       the field offices on what they needed to be doing.

13                     I recommended the establishment of the

14       Indian gaming office.  The secretary established that

15       office, and then they hired someone to run that

16       office.  And I worked with her very closely on these

17       issues, including she and I developed the -- the

18       policies for what should be -- what you should look

19       at when you review a management contract, what are

20       the important components, what should be in there.

21                     And so she and I actually spent quite

22       a bit of time on that.

23    Q   Okay.  And who is this person?

24    A   That was Hilda Manuel.

25    Q   And this was all at the Department of -- at the

Deposition of Coleman, Penny, 3/7/2014

Page 45

1          Department of the Interior?

2     A    Yes.

3     Q    You said Michael Cox left to go to NIGC?

4     A    Yes.

5     Q    And prior to his departure, did you do anything

6          relating to Indian gaming in the department?

7     A    I did some things, but he was the lead attorney on

8          gaming issues.  So it wasn't the kind of full-time

9          job it became after he left.

10    Q    Did you do any work relating to management contracts

11         before he left?

12    A    I don't remember.

13    Q    Okay.  When did he leave?

14    A    I think 1991.  It may have been 1990.

15    Q    And then you said you recommended forming an Indian

16         gaming office?

17    A    Um-hmm.  Yes.

18    Q    That's an Indian gaming office within the Department

19         of the Interior?

20    A    Yes.

21    Q    Was that within the Office of the Solicitor?

22    A    No.  It -- I believe that they set it up within the

23         Office of the Assistant Secretary of Indian Affairs.

24    Q    What was that called, that office?

25    A    It was originally called IGMO, Indian Gaming

Deposition of Coleman, Penny, 3/7/2014

Page 46

1        Management Office.

2   Q    Okay.  And then did it change names at some point?

3   A    Yes.  I think it's now called Office of Indian

4        Gaming, OIG.

5   Q    And how does the Office of Indian Gaming's

6        responsibility relate to the work by the NIGC today?

7   A    Well, the NIGC and the OIG have to coordinate their

8        work because -- as it relates to contracts

9        specifically is that the Bureau of Indian Affairs has

10       retained authority over some contracts and of a lot

11       of land issues.  And, of course, the NIGC has similar

12       authorities; not exactly the same.

13                   And in particular with respect to the

14       contracts, the -- the contracts would sometimes have

15       to be reviewed by -- or approved by the Department of

16       the Interior and sometimes have to be approved by the

17       NIGC.  And it wasn't always clear who -- who had to

18       review and approve them.

19                   So they coordinated to make sure that

20       that was done in a way -- to make sure that it was

21       done in a way that was efficient.

22   Q   And what time period are you talking about?

23   A   Well, that really happened in '93, when they really

24       started doing that.  I was still at the Department of

25       the Interior, and the NIGC had passed their

Deposition of Coleman, Penny, 3/7/2014

1       regulations that included management contract

2       approvals.  And the Department of the Interior had

3       been approving these contracts right along, and

4       suddenly the NIGC was responsible for approving them.

5                       And what was happening is that

6       contracts that were really subject to NIGC approval

7       were going to region staff or the bureau's

8       headquarters for review and approval, and they

9       wouldn't necessarily get to the NIGC.

10                      And so that would -- you know, that

11      would cause a breakdown in the system, especially if

12      there were management contracts where the -- where

13      the department clearly didn't have jurisdiction to

14      make the decisions.

15  Q   Okay.  Is it fair to say that once the NIGC began

16      reviewing management contracts, that it was the

17      exclusive governmental body to review and approve

18      management contracts?

19  A   Yes.

20  Q   For the purpose of management?

21  A   Right.

22  Q   There might have been review for other purposes, but

23      if there was somebody reviewing a management

24      contract, that would be the NIGC?

25  A   Yes.

Deposition of Coleman, Penny, 3/7/2014

Page 48

1    Q    Okay.  And when did that begin?

2    A    In '93, I -- I, as the department's representative,

3         met with -- as did, I believe, Hilda; I'm not sure --

4         met with the NIGC, and we talked about the fact that

5         these contracts were falling through the cracks or

6         getting -- not getting reviewed.

7                       And so we agreed that all documents

8         would first go to the NIGC for determination of

9         whether they were under their jurisdiction.  And then

10        if they weren't -- if they didn't need review and

11        approval by the NIGC, then they would be sent to the

12        Department of the Interior for determination of

13        whether they were under their jurisdiction.

14   Q    Okay.  That was in '93?

15   A    Yes.

16   Q    Okay.  And at what point did the interior department

17        stop reviewing documents for management contract

18        purposes?

19   A    Well, theoretically, in '93, when the regulations

20        became final for the NIGC.

21   Q    Okay.  And until that point, did you work on

22        management contract issues at the department?

23   A    Yes.

24   Q    Okay.  And you moved to the NIGC straight from the

25        interior department?

Deposition of Coleman, Penny, 3/7/2014

Page 49

```
1   A    Yes.

2   Q    In 1994?

3   A    Yes.

4   Q    Okay.  And you stayed there until 2010?

5   A    Yes.

6   Q    Can you just tell me the job titles you had while you

7        were there?

8   A    Senior attorney, associate general counsel, deputy

9        general counsel, and acting general counsel.

10                        Associate general counsel and deputy

11       general counsel were essentially the same.

12  Q    Okay.  How long were you -- when were you -- and then

13       you left as acting general counsel?

14  A    I left when I was acting general counsel, yes.

15  Q    Okay.  How long were you a senior attorney -- or what

16       years were you a senior attorney?

17  A    Can I look at my CV?

18  Q    Yes, of course.

19  A    I have it written down.

20  Q    Sure.  Let's just make it an exhibit.

21            (A discussion was held off the record.)

22            (Exhibit 1 marked for identification.)

23  BY MS. McNALLY:

24  Q    Do you recognize what I've handed you as Exhibit 1?

25  A    Yes.
```

Deposition of Coleman, Penny, 3/7/2014

Page 50

1    Q    What is that?

2              (A discussion was held off the record.)

3    BY MS. McNALLY

4    Q    Do you recognize what I've marked as Exhibit 1?

5    A    Yes.

6    Q    And what is that?

7    A    That was my -- that's my CV.

8    Q    Who prepared this?

9    A    I prepared all the way down to "Publications."  And

10        then the HRDC office added the list of publications

11        from my website for me.

12   Q    And the HRDC office is?

13   A    The --

14   Q    Your counsel?

15   A    Yes.

16   Q    Okay.  Did you have this -- did you create this

17        document for the purposes of the litigation?

18   A    Yes.

19   Q    Okay.  Did you have a CV before that?

20   A    I had a resume.

21   Q    Okay.  What is on the resume that's not on the CV?

22   A    More explanation as to what each of these functions

23        are, references.  That's mainly it.

24   Q    Okay.  What references are on your resume?

25   A    What references?

Deposition of Coleman, Penny, 3/7/2014

Page 51

1    Q    Yeah.  Individuals?  Clients?

2    A    Individuals, yes.

3    Q    Okay.  Who is -- who was a reference?

4    A    Former acting chair and Former Deputy Assistant

5         Secretary George Skibine; Former Chairman of the

6         Gaming Commission Phil Hogen; Former Commissioner

7         Chuck Choney; and Former Gaming Commission Chair Tad,

8         whose last name I've forgotten.

9    Q    Okay.

10   A    And Denise Desiderio, legislative -- she's senior --

11        she was senior counsel on the Senate Committee of

12        Indian Affairs.

13   Q    Okay.  And then, in addition, you said there were

14        descriptions of these -- for example, you had --

15        maybe had descriptions of your prior employment?

16   A    Of the -- yes.

17   Q    Okay.  Are there any other entries that aren't

18        contained in this CV?

19   A    Yes.  I had other work background before I went to

20        law school that I didn't include.

21   Q    What's on your resume that's not on your CV relating

22        to work background?

23   A    I was an English teacher and librarian.  I -- I ran

24        an experimental social services program for a short

25        time.  I don't remember what I called myself in that.

Deposition of Coleman, Penny, 3/7/2014

Page 52

1    And I had one other job with the YMCA that I

2    mentioned.  I don't remember what it was.

3                    Those are the work.

4  Q   Okay.  When was the experimental social services

5    program job?

6  A   That was -- that was right before I went to law

7    school, so it must have been about '78.

8  Q   And was the YMCA job before law school as well?

9  A   Yes.

10 Q   Okay.  Is there anything else that's on your resume

11    that you didn't include on this document that you

12    created for the litigation?

13 A   Probably.

14 Q   Like what?

15 A   I believe I had affiliations on it of organizations

16    that I've been involved in.

17 Q   Okay.  Any other categories?

18 A   Not that I remember.

19 Q   What affiliations are on your resume that you didn't

20    include in the CV?

21 A   Where I'm bar'ed.

22 Q   And where is that?

23 A   I'm active in Virginia and inactive in South Dakota.

24    And I'm a member of the Native American Bar

25    Association.

Deposition of Coleman, Penny, 3/7/2014

Page 53

1    Q    That's on your resume, but not on the CV?

2    A    Yeah.

3    Q    Okay.  Anything else?

4    A    I can't remember anything else.  How's that?

5    Q    Did you go about the process of taking your resume

6         and making this document, or did someone else do

7         that?

8    A    I took the resume and made this document.

9    Q    You did that?

10   A    Yes.

11   Q    And then counsel added the publications?

12   A    Yes.

13   Q    Okay.  How did you decide which things to not copy

14        into this document?

15   A    Very simple.  I asked my husband.  I said, "So what

16        in your mind is a CV as opposed to a resume?"

17        Because I always give out a resume, not a CV.  And he

18        says, "It's a one-pager, and it just lists your

19        education and your work experience, and that's really

20        all it is."

21   Q    Okay.

22   A    And I thought, makes sense to me.  So that's what I

23        used.

24   Q    Okay.  Is there anything else that you recall that

25        you deleted from the resume when you created that CV?

Deposition of Coleman, Penny, 3/7/2014

Page 54

1  A   Not that I remember.

2  Q   Okay.  Looking at the list here, I see there's one

3      topic -- one position we hadn't discussed, which we

4      don't have to spend much time on, I assume, but the

5      Office of the State's Attorney in Deadwood, South

6      Dakota, what kind of work did you do there?

7  A   I was interning, and I did criminal cases.

8  Q   Criminal cases?

9                    Anything relating to gaming?

10 A   No.

11 Q   I think we got onto this topic by talking about when

12     you were a senior attorney.

13 A   Um-hmm.  Yes.

14 Q   When were you a senior attorney?

15 A   So I was -- I started in, I believe, July of 2010 --

16     or '94, as a senior attorney, and -- till '96.

17                    And then I believe in '96 I was given

18     the title of associate general counsel, and pretty

19     much at the same time became the acting general

20     counsel.

21 Q   Okay.  Let's -- and this document doesn't say

22     "associate general counsel."

23 A   Right, because I was acting general counsel, too,

24     so...

25 Q   Okay.  I see.

Deposition of Coleman, Penny, 3/7/2014

Page 55

```
 1                        So is it correct to say you were a
 2        senior attorney from '94 to '96, associate general
 3        counsel and acting general counsel '96 to '98?
 4   A    Yes.
 5   Q    And then from '98 to 2002, deputy general counsel and
 6        no longer acting general counsel, right?
 7   A    Right.
 8   Q    And then you became acting general counsel again from
 9        2002 to 2010?
10   A    Yes.
11   Q    Okay.  What were your responsibilities as senior
12        attorney?
13   A    I reviewed management contracts, ordinances, advised
14        on -- on notices of violation.  Did R contract review
15        to a more limited extent because I was primarily
16        doing management contract review.  And at that time
17        we were working on classification of games.
18                        The -- I was one of two attorneys in
19        that office, general counsel and myself.  We had
20        interns, but basically he and I just did everything.
21        We provided, you know, services, advice to the
22        commission, to the chairman, to the staff.  At the
23        time the staff was very small.  So it was a very, you
24        know -- you could -- Freedom of Information Act work,
25        anything -- we were in the process of setting up the
```

Deposition of Coleman, Penny, 3/7/2014

Page 56

1      Gaming Commission and really getting it going, so

2      anything that related to that.

3   Q  You mentioned this earlier, and so if you could

4      explain a little bit, what is an R contract?  That's

5      the letter "R"?

6   A  Yes, that's the letter "R."

7                   The -- the NIGC has two -- two ways of

8      handling contracts.  One is management contracts,

9      which I don't think they put a name on it, but they

10     might have.  And the management contracts went to the

11     Division of Contracts, and they reviewed those for

12     compliance with the Indian Gaming Regulatory Act

13     and -- and would provide feedback.

14                   The R contracts went to the Office of

15     General Counsel, and they were reviewed for --

16     essentially for compliance with the Indian Gaming

17     Regulatory Act also, but in a different way, in that

18     this is when the -- when the NIGC had started

19     realizing that companies, investors, consultants,

20     other people had figured out a way to get around the

21     management contract approval process.  And so we

22     would encourage parties to submit those contracts for

23     determination of whether or not they were management

24     contracts.

25   Q  Are you done?  I didn't want to cut you off.  Is that

Deposition of Coleman, Penny, 3/7/2014

Page 57

1       the end?

2   A   Yeah, essentially.

3   Q   Okay.  So is it -- another phrase used to describe

4       the R contracts, that sometimes is used the

5       "declination process"?  Is that the same thing?

6   A   Yes.  That's the process that the outside world used.

7   Q   Okay.

8   A   And we -- and the NIGC adopted it somewhere along the

9       lines, but yes.

10  Q   It used to be called -- or at least internally is or

11      was called the R contract process?

12  A   Yes.

13  Q   And what does "R" stand for?

14  A   "R" stands for review.

15  Q   And the point of that review was to determine whether

16      or not a document was a management contract that

17      should go and get approved by the Division of

18      Contracts; is that right?

19  A   Not -- not -- not usually.

20  Q   Okay.

21  A   Usually people who knew that they had a management

22      contract submitted it to the Division of Contracts

23      for approval as a management contract.

24  Q   Okay.

25  A   The R contract review was -- had a lot of -- there

Deposition of Coleman, Penny, 3/7/2014

Page 58

1    were a lot of reasons for it; one was that the -- the

2    Indian Gaming Regulatory Act is intended to protect

3    tribes, is intended to keep organized crime out, make

4    sure tribes are the primary beneficiaries of gaming.

5    And the -- there were some people who were trying to

6    get around the contract approval process by just not

7    submitting them for approval.

8              And so initially, the department --

9    the NIGC was actually asking people to submit it or

10   calling the BIA and saying, "Are you getting these

11   contracts?  Remember, you're supposed to send them to

12   us first."

13             And then as things went along, more

14   people started just submitting them as protection not

15   just for their tribal clients, but also for their

16   business clients.

17 Q   I think actually we're going to spend a bit of time

18     on that process in a little while, so I just want to

19     get -- in the '94 to '96 period when you were senior

20     attorney --

21 A   Um-hmm.

22 Q   -- it was you and the general counsel were the only

23     people in the legal department at NIGC; is that

24     right?

25 A   Yeah, we had -- well --

Deposition of Coleman, Penny, 3/7/2014

Page 59

1   Q   The only employee attorneys; is that right?

2   A   Well, there was one young woman who had been an

3       intern who worked for us for a while -- I don't

4       really remember the dates -- who was, you know, an

5       attorney.

6   Q   And Mr. Cox was the general counsel at the time?

7   A   Yes.

8   Q   Okay.  And the Division of Contracts was somewhere

9       else at the time?  Were there employees in the

10      Division of Contracts in that time period?

11  A   It wasn't until about '96 that the office actually --

12      the NIGC actually established divisions.

13  Q   Okay.

14  A   There was commissioners; there was the general

15      counsel; there was Mr. Stuckwisch, whose title I

16      think was executive director; and then there were the

17      rest of us.

18                  I reported directly to the general

19      counsel, and the interns -- the legal interns

20      reported directly to the general counsel.  Everybody

21      else reported directly to Mr. Stuckwisch.

22  Q   Who were the "all else" and what kind of work did

23      they do?

24  A   Alan Fedman was an enforcement person; Elaine Trimble

25      was an -- and Joe Dutz were management contract

Deposition of Coleman, Penny, 3/7/2014

```
 1        people.  We had two or three people who were "keep
 2        everything running" people.
 3   Q    Like an administrative-type --
 4   A    Administrative and computer and -- the Department of
 5        Interior did our personnel work, and so the paperwork
 6        had to be handled --
 7   Q    Sure, sure.
 8   A    -- so there was a personnel person.
 9   Q    Okay.  Anyone else?
10   A    I imagine, but I --
11   Q    I mean, any other kind of categories of people?
12   A    Environmental.  There was a person who did
13        environmental review.
14   Q    Okay.
15   A    There was a person who was -- who did congressional
16        liaison and FOIA work.
17   Q    Okay.  And those people all reported to the executive
18        director?
19   A    Yes.
20   Q    And this is in '94 to '96 you're talking about?
21   A    Yes.
22   Q    Okay.  You had people -- Trimble and Dutz, did you
23        say?
24   A    Yes.
25   Q    Did management contract review -- does that suggest
```

Deposition of Coleman, Penny, 3/7/2014

Page 61

1      that you weren't doing management contract review at

2      that time?

3    A    No.  I was doing it also, but they did it first, and

4      then I would review their review.

5    Q    You reviewed their work?

6    A    I reviewed their work, and they would ask me legal

7      questions and...

8    Q    Did they do legal review?

9    A    What they were doing is they were reviewing contracts

10     for compliance with the Indian Gaming Regulatory Act,

11     which has a number of items that need to be -- need

12     to be in a contract to be approvable.

13               They reviewed the deal as a whole.

14   Q    Okay.

15   A    They -- they had -- someone I forgot to mention, they

16     had people who did background investigations on

17     the -- the people who had to be backgrounded as part

18     of the management contract approval process.

19               And, of course, because this was --

20     this was a new agency, they were also in the process

21     of developing policies and procedures.

22   Q    And then after they would review management contracts

23     for compliance with IGRA, you would review their

24     conclusions, or would you do a different kind of a

25     review?

Deposition of Coleman, Penny, 3/7/2014

1  A   Well, certainly, in the first years I just reviewed

2      absolutely everything because we were so new at this,

3      and that we wanted to make sure that we were all on

4      the same page and were doing the same thing and

5      understood what was going on and could make changes

6      to how we were approaching things.

7               So later, as it became a Division of

8      Contracts and it became more specialized, and they

9      became more experienced and the systems were more in

10     place.  You know, they -- they carried a lot more of

11     the burden.

12 Q   Um-hmm.  So when they would review the contracts for

13     compliance with IGRA, did you review their work, or

14     did you do a separate kind of review?

15 A   I would review their work.  And if they had specific

16     legal questions, I would answer those.

17 Q   Okay.  Did your job responsibilities change when you

18     became associate general counsel and acting general

19     counsel in 1996?

20 A   Well, we started hiring more people.  We started

21     developing our processes.

22               You know, it was an ever-growing

23     agency, so there was always something new going on.

24 Q   Did your job responsibilities with respect to R

25     contracts change when you became associate general

Deposition of Coleman, Penny, 3/7/2014

```
 1        counsel and acting general counsel in 1996?
 2   A    Well, Michael Cox left about that time, yes, and so I
 3        became the lead on R contract review.
 4   Q    What does that mean, to be the lead?
 5   A    I was the one that signed the letters.
 6   Q    Okay.
 7   A    So I either wrote the letters or somebody else wrote
 8        them, and I reviewed them to make sure that I agreed
 9        with them before I signed them.
10   Q    Okay.  And when we talk about the letters, those are
11        the letters relating to the R contracts?
12   A    The declination letters, yes.
13   Q    Okay.  And is the reason you became associate general
14        counsel and acting general counsel because he left?
15   A    Yes.
16   Q    Okay.  Did your job responsibilities change with
17        respect to management contracts?
18   A    Well, not right away.  I continued to review
19        management contracts.
20   Q    Did they change at some point?
21   A    I became -- over time, over the course of -- from
22        '96 to 2010, I became more of the supervisor and
23        didn't spend as much time on the management
24        contracts, per se.
25   Q    When did the Division of Contracts come about?
```

Deposition of Coleman, Penny, 3/7/2014

Page 64

1    A    I think it was in '96.

2               Just as I became associate counsel,

3         basically divisions were established, supervisors

4         were appointed.  And so there was a Division of

5         Contracts, Division of Enforcement, Division of

6         Administration.

7               The background investigation people, I

8         think, were a section within the Division of

9         Contracts, if I remember right.

10   Q    And was the R contract process still within the

11        Office of the General Counsel?

12   A    Yes.

13   Q    Not within the Division of Contracts?

14   A    No.

15   Q    Okay.  Sorry, that -- I asked that in a way to lead

16        to an unclear record.

17               Was the R contract process in the

18        Division of Contracts?

19               It was the way I phrased it.  When you

20        said, "no," it wasn't clear exactly what you were

21        answering --

22   A    Okay.

23   Q    -- so I'm just going to ask it in a nonnegative way.

24               Was the R contract process part of the

25        Division of Contracts?

Deposition of Coleman, Penny, 3/7/2014

Page 65

1    A    Assuming what we're saying is that -- the part of the

2         R contract process that was completely separate from

3         the management contracts, that was in the Office of

4         General Counsel.

5    Q    The declination process?

6    A    Yes.

7    Q    Okay.  And was there part of that process that was

8         within the Division of Contracts?

9    A    Yeah.  The Division of Contracts, when they would get

10        a management contract, would also be looking at all

11        of the additional contracts that would be submitted

12        with the management contract for a determination of

13        whether or not there was management in those

14        contracts and whether or not they should be subject

15        to approval.

16   Q    Okay.  But if an organization submitted a deal and

17        said, "We would like you to decide whether this is a

18        management contract or not," would that go to the

19        Division of Contracts?

20   A    No.  That would go to the Office of General Counsel.

21   Q    Okay.  Now, in this time period you said that you

22        began -- you would sign the letters; sometimes you

23        would write them, and sometimes someone else would

24        write them.

25   A    Um-hmm.

Deposition of Coleman, Penny, 3/7/2014

Page 66

1   Q   Who was that someone else who would write them?

2   A   It would almost always be an attorney in the Office

3       of General Counsel.

4   Q   Okay.  Who would those attorneys -- what would the

5       job title be of that person?

6   A   They had various titles.  They could be a staff

7       attorney; they could be a senior attorney; or at some

8       point, I made two people associate general counsel.

9   Q   Okay.  How many people were in the Office of the

10      General Counsel from '96 to '98?

11  A   I don't know.

12  Q   How many lawyers worked in the Office of the General

13      Counsel in that time period?

14  A   I don't know.

15  Q   Was it under five?

16  A   That would be a guess.  It wasn't as -- by the time I

17      left, it was 20.

18  Q   Okay.

19  A   It grew slowly over the years.  I don't know how many

20      were in there between '96 and '98.  I just don't

21      know.

22  Q   When you started in '96, the Office of the General --

23      when you started in '94, it was you -- there were

24      two, right?

25  A   Yes.

Deposition of Coleman, Penny, 3/7/2014

Page 67

1    Q    And then by the time you left in 2010, it was 20?

2    A    Twenty people.

3    Q    Twenty, right.  Lawyers?

4    A    No.

5    Q    Okay.  How many lawyers?

6    A    Approximately 15 or 16.

7    Q    How would you decide which letters you would write

8         and which letters you would have someone else write?

9    A    Well, that would be based usually just on workload

10        and -- and how fast something needed to go out and

11        whether I was available or whether someone else was

12        available.

13   Q    Okay.  And did your job responsibilities with respect

14        to those letters change when you became deputy

15        general counsel and no longer acting general counsel

16        in 1998?

17   A    No, not really.

18   Q    Other than your job title, what did change in that

19        time period?

20   A    When I was deputy general counsel, then we had a --

21        we had two general counsels during that time.

22   Q    All right.  Were you considered to be named general

23        counsel in the 1996 to '98 time period?

24   A    What do you mean?

25   Q    When you were acting general counsel, were you ever

Deposition of Coleman, Penny, 3/7/2014

Page 68

1      considered to be named as general counsel?

2    A    Do you mean was I ever asked if I wanted to be, or

3         did someone think maybe I should be?  Or what's your

4         question?

5    Q    Okay.  Were you ever asked if you wanted to be?

6    A    Yes.

7    Q    And what did you say?

8    A    I said no.

9    Q    Why did you say no?

10   A    Because the general counsel position is a

11        high-profile, controversial position.  And at the

12        time, I was still a long way from being able to leave

13        the government with a pension, and I didn't want to

14        have to deal with it.

15   Q    When you were in that position, even as acting

16        general counsel, was it a position of controversy

17        then?

18   A    Of course.

19   Q    Okay.  You just did not want to have that as a

20        permanent job?  Is that why you said no?

21   A    At that time, yep.  Yes.

22   Q    Okay.  And what was the controversy about at that

23        time?  Do you recall?

24   A    This is Indian gaming.  Indian gaming is

25        controversial.  Just about everything we did was

Deposition of Coleman, Penny, 3/7/2014

```
1          controversial, whether we classified a game as

2          Class II or as Class III, one side or the other

3          didn't like it.  If we said a particular piece of

4          land could be gamed on or not, one side or the other

5          didn't like it.

6                        We were starting into the enforcement

7          process more, which, you know, is a black eye on the

8          people who are being enforced against.

9    Q     Um-hmm.

10   A     I had to work with the Department of Justice,

11         Department of Interior, the U.S. attorneys.

12                        We were an independent agency trying

13         to do what we thought was right.  That didn't

14         necessarily always coincide with what other people

15         thought was right.

16                        It was a controversial job.

17   Q     Got it.  You must have been relieved in 1998 when

18         someone else became the general counsel?

19   A     Relieved.  I don't know that --

20   Q     You don't need to answer that.  That's fine.

21                        Tell me about how your job changed

22         when you became deputy general counsel in 1998.

23   A     It didn't change a lot.

24   Q     Okay.

25                        MR. TUREK:  Off the record.
```

Deposition of Coleman, Penny, 3/7/2014

1           (A discussion was held off the record.)

2           (A lunch recess was taken at 11:54 a.m.)

3            (Back on the record at 12:57 p.m.)

4            MS. McNALLY:  Back on the record.

5  BY MS. McNALLY

6  Q   Ms. Coleman, did anything occur to you during the

7      break that you needed to correct that you testified

8      to this morning?

9  A   No.

10  Q   Okay.  Now moving -- we were up to the deputy general

11      counsel time period.

12  A   Okay.

13  Q   I know that gave you a sense of hopelessness when I

14      just said what I said, but from there until the time

15      period you left the NIGC, did your role with respect

16      to review of management contracts or R contracts

17      change?

18  A   No.

19  Q   Okay.  And then after you left the NIGC -- can you

20      tell me why you left?

21  A   It was a good time to leave.

22  Q   What made it a good time to leave?

23  A   There was a new administration coming in; there was

24      likely to be a new general counsel.

25               I had already been general counsel for

Deposition of Coleman, Penny, 3/7/2014

Page 71

```
 1        a very long time.  It was a good time.
 2   Q    When you were in your second round as acting general
 3        counsel, did you at that point want the official job?
 4   A    Sometimes.
 5   Q    Okay.  Were you approached to consider taking the
 6        general counsel job?
 7   A    It was discussed.
 8   Q    Who discussed it?
 9   A    The chairman.
10   Q    Who was that?
11   A    At the time, the chairman was Phil Hogen.
12   Q    Is that your counsel's father?
13   A    Yes.
14   Q    And did you express an interest in the job?
15   A    Yes.
16   Q    And do you have any understanding about why you did
17        not -- you were not named general counsel at any
18        time?
19   A    We -- no, I'd say.  I would -- I would only be
20        guessing, and I'm not going to guess.
21   Q    Okay.  What are some possible reasons that you
22        believe could be the reason why you weren't named
23        general counsel?
24             MS. HOGEN MOLINE:  I'll just note that that
25        calls for speculation.
```

Deposition of Coleman, Penny, 3/7/2014

```
 1                    MS. McNALLY:  Okay.

 2                    THE WITNESS:  Truly.

 3   BY MS. McNALLY

 4   Q    Go ahead.  You can speculate.

 5   A    There are a couple powerful people who didn't really

 6        want me in that job.

 7   Q    Who are those people?

 8   A    I'm not going to speculate.  I just won't do it.

 9                    I mean, there's -- there's always

10        some.  And, you know, who they -- I know that in that

11        kind of job you're just in a difficult situation.

12        You're general counsel, as I mentioned, it's a

13        high-profile position, and there will always be

14        people who would rather you get replaced with

15        somebody they like.

16   Q    All right.  But sitting here today, you would have to

17        completely speculate to guess who didn't want you in

18        the job?

19   A    Yes.

20   Q    Did any of the reasons that individuals didn't want

21        you in the job relate to your job performance, to

22        your knowledge?

23   A    No.

24   Q    When you -- after you left, you started, we talked

25        earlier, Gwe: Nis Consulting?
```

Deposition of Coleman, Penny, 3/7/2014

Page 73

```
 1   A   Gwe: Nis, yes.
 2   Q   I apologize if I'm not pronouncing it correctly.
 3                       What does the origin of that name
 4       mean?
 5   A   It's Onondaga.
 6   Q   What does it mean?
 7   A   It means "pennies or small change."
 8   Q   Ah, clever.
 9                       Okay.  What kind of work does your
10       consulting firm do?
11   A   Well -- let's see.  What did I do.
12                       I didn't do -- I did some work early
13       on, and then essentially haven't done any work using
14       that firm for a couple of years.
15                       My husband is a partner, and he uses
16       it.
17   Q   Okay.  So most of the work you do now is through
18       Coleman Indian Law?
19   A   Yes.
20   Q   Is there anyone other than your husband working
21       Gwe: Nis Consulting?
22   A   No.
23   Q   Is that work done on behalf of tribes?
24   A   He does work on behalf of Johns Hopkins, the Boys and
25       Girls Clubs, tribes.
```

Deposition of Coleman, Penny, 3/7/2014

Page 74

1  Q   What kind of consulting?

2  A   Mainly it's -- hmm.  It's liaison with -- liaising

3      with organizations and colleges and --

4  Q   Just what topics?  What kind of work is it?

5  A   Well, Boys & Girls Club would be Boys & Girls Club

6      stuff.

7                    Johns Hopkins would be like --

8  Q   I mean, consulting with -- what kind of consulting is

9      what I'm trying to ask.

10  A   Well, it's a variety.

11  Q   Okay.

12  A   He has an Indian health service and education

13      background.  And so --

14  Q   I'm sorry to interrupt.

15                    I mean, when you were doing work, what

16      was the work you -- what kind of consulting work did

17      you do with that organization?

18  A   I did some expert work for a tribe.  I can't even

19      think of what else.

20  Q   What kind of expert work?

21  A   If I remember right, it was managing R -- it was

22      reviewing documents -- or reviewing documents on

23      whether they're management.

24  Q   So in your work for Gwe: Nis -- let me just make sure

25      I understand -- you did some expert consulting on

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 75

1        whether certain contracts were management contracts?
2    A    Yeah.
3    Q    Okay.  And was that for purposes of litigation or
4         something else?
5    A    I believe so.
6    Q    You believe it was for litigation?
7    A    Well, I was -- yeah.  I mean, I -- well --
8    Q    Was there a lawsuit when you were being an expert --
9    A    I don't remember that.
10   Q    Okay.  You weren't deposed?
11   A    No.
12   Q    And then in Coleman Indian Law, what kind -- how much
13        of the work you do there is for tribes?
14   A    Most of it's for tribes.
15   Q    Okay.  And can you just kind of generally describe
16        the nature of your practice?
17   A    Indian law.
18   Q    Okay.  Do you do litigation matters?
19   A    I assist on litigation matters.  I --
20   Q    What does that mean?
21   A    Well, I am -- I have done Indian law for 33 years.
22        And so I have broad knowledge in it, and I also know
23        people who are -- you know, that are the right
24        contacts to make when you're trying to work on a
25        case.

Deposition of Coleman, Penny, 3/7/2014

 1                     And so I'll do briefs, give ideas,

 2          tell them how to get through the process, who to talk

 3          to at DOJ.  Those kinds of things.

 4   Q      Okay.  Are you counsel of record in any litigation

 5          matters?

 6   A      No.

 7   Q      Okay.  Have you served as an expert in your -- when

 8          you've been working through Coleman Indian Law, other

 9          than in this matter?

10   A      No -- well --

11   Q      Giving expert opinion?

12   A      No, I don't think so.

13   Q      Okay.  Have you ever testified as an expert in --

14          through Coleman Indian Law -- and I'm not trying to

15          trick you with this, but I noticed on your website

16          that it says you've testified as an expert in cases,

17          plural, so I'm trying to understand that.

18   A      Well, testimony includes affidavits.

19   Q      Um-hmm.

20   A      And so that's the reference.

21   Q      And it says "cases."  So what case -- are you talking

22          about this case --

23   A      Yes.

24   Q      -- or other cases as well?

25   A      Yes, this case.

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 77

1    Q    Any other cases?

2    A    No.

3    Q    Okay.  All right.  And then you do some work with

4         Internet gaming?

5    A    Primarily I do education.

6    Q    Do you represent any, like, gaming alliances, any

7         work like that?

8    A    No.

9    Q    Do you do lobbying work?

10   A    No.

11   Q    You know, I think we talked about this earlier:

12        You're compensated on an hourly basis for this case?

13   A    Yes.

14   Q    And what's your rate?

15   A    $500 an hour.

16   Q    Is that the rate you charge in other litigation

17        matters where you're assisting clients?

18   A    Not always, no.

19   Q    Okay.  What's the spectrum of rates you charge?

20   A    I've charged everywhere from 200 to 500.

21   Q    Okay.  Is there any other payment component in this

22        case?

23   A    No.

24   Q    Is there any flat fee component?

25   A    No.

Deposition of Coleman, Penny, 3/7/2014

Page 78

1  Q   Any success fee component?

2  A   No.

3  Q   Now, let's turn to the opinions that you're providing

4      in this case.

5                      In preparing those opinions, what

6      materials did you review?

7                      And if you want to refer just

8      generally to the ones we talked about this morning,

9      we kind of covered those.  And, in addition, what

10     other materials did you review in consideration -- in

11     order to prepare for today?

12  A   So everything that was on the closing index that was

13     provided to you, which was all of the basic

14     documents: the security agreement, tribal agreement,

15     limited offering memo, the bond agreement -- or bond

16     resolution.  Those things.

17  Q   Um-hmm.

18  A   And then the specific ones I reviewed for purposes of

19     drafting my affidavit are the ones that are listed in

20     the affidavit.

21  Q   Right.

22  A   And, in addition, as I mentioned, I looked at the

23     NOVs.  I looked at the court cases.  I looked at the

24     declination letters.

25  Q   So those are the things that we discussed at the

Deposition of Coleman, Penny, 3/7/2014

Page 79

```
 1        beginning today?

 2   A    Yeah.

 3   Q    Okay.  Were there any other legal treatises or

 4        sources of information that you reviewed?

 5   A    No.

 6   Q    Okay.  Did you interview anyone?

 7   A    Interview anyone.

 8   Q    Um-hmm.

 9   A    No.

10   Q    And did you consult with anyone, other than counsel,

11        in preparing your declaration?

12   A    No.

13                        Are we done with this?

14   Q    Yeah, just put it to the side.

15            (Exhibit 2 marked for identification.)

16   BY MS. McNALLY:

17   Q    I'm going to hand you what I've marked as Exhibit 2.

18   A    Okay.

19   Q    Can you tell me what that is?

20   A    That's the affidavit of Penny J. Coleman.

21   Q    And does that appear to be the affidavit that was

22        submitted -- that was filed on June 13th in this

23        matter?

24   A    Yes.  June 8th.

25   Q    And is that your signature on page 16?
```

Deposition of Coleman, Penny, 3/7/2014

Page 80

```
 1   A    Yes.

 2   Q    And you signed it on June 8th, 2003, in front of a

 3        notary, right?

 4   A    Yes.

 5   Q    Did you prepare this document?

 6   A    Yes, I did.

 7   Q    And is this a full copy of your declaration?

 8   A    It appears to be.

 9   Q    I think you said this morning that there was

10        something in this declaration you thought was

11        inaccurate.  And I'm not trying to put words in your

12        mouth, but I thought I heard you say that.  Is that

13        right?

14   A    Yes.

15   Q    Okay.  Can you tell me what that is?

16   A    Fifty-six, I believe it is.  Yeah, the bond purchase

17        agreement.

18   Q    Okay.

19   A    In reviewing that section, I looked at Section 9 and

20        realized that that wasn't really the right section to

21        be looking at because Section 9 is just a list of

22        what counsel's going to provide, rather than a --

23        rather than a lien that's being placed pursuant to

24        that section.

25                   And so I looked at the bond purchase
```

Deposition of Coleman, Penny, 3/7/2014

Page 81

1      agreement again and -- let me find it -- to see if I

2      should still look at it, and I determined that really

3      a better example of what is pertinent here -- let's

4      see.  This is under transaction documents --

5                     (Reporter clarification.)

6                     THE WITNESS:  I'm sorry.

7                         This section, No. 56, is under the

8      heading:  "The Transaction Documents are Individually

9      Management Contracts Subject to NIGC Approval,"

10     and --

11 BY MS. McNALLY

12 Q    That's -- you're reading from page 12, that heading?

13 A    I'm reading from page 12, the bold headline.

14                         And I looked at page 5 of the bond

15     purchase agreement, the Section 6:  "Corporations,

16     Representations, and Warranties:  The corporation

17     makes the following representations and warranties."

18     And then it lists what essentially the corporation

19     guarantees through its warranties.

20                         And it says that the indenture is

21     enforceable in accordance with its terms.  The

22     agreement is enforceable in accordance with its

23     terms.  Security agreement is enforceable in

24     accordance with its terms.  The bonds will constitute

25     legal and valid binding obligations and will be

Deposition of Coleman, Penny, 3/7/2014

Page 82

```
 1        entitled to the benefit and security of the

 2        indenture.  The security agreement and the tribal

 3        agreement will be enforceable.

 4                    Essentially, I would say that what --

 5        Section 6, you know, those sections of that -- of the

 6        bond purchase agreement, essentially incorporate

 7        these agreements, and by doing so, incorporate the

 8        default remedies and the other authorities that

 9        are -- include management.

10                    And so I would say that if given the

11        opportunity, I would strike the "See Section 9" and

12        say "See Section 6."

13   Q    See Section 6?

14   A    Yeah.

15   Q    Is there anything else that you think is inaccurate

16        in your affidavit?

17   A    Not inaccurate.

18   Q    All right.  Now, the first -- if you start -- the

19        first big heading in your affidavit is the "NIGC

20        Declination Process," and it begins on page 3.

21   A    Yes.

22   Q    I want to ask a little bit about the NIGC declination

23        process.

24   A    Okay.

25   Q    That's the R contract program that we talked about
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 83

1      earlier?

2   A   Yes.

3   Q   Okay.  When the Office of General Counsel sends those

4       letters --

5   A   Um-hmm.

6   Q   -- what oversight, if any, is provided by the

7       commission members?

8   A   General counsel responds directly to the chairman.

9       He is the head of the staff.  And so to the extent

10      that there is, you know, responsibility to keep him

11      informed of what the General Counsel's Office is

12      doing and how they're approaching things, he's the

13      one that oversees.

14  Q   Does the chair review the letters?

15  A   Very rarely.

16  Q   What would require -- why would that ever happen?

17  A   One example of why that would happen is if there was

18      a request to have a decision of the commission that

19      might be subject to appeal; or they might ask the

20      commission to issue an agency decision so that it

21      could be appealed.

22  Q   But for your standard letters, those would not be

23      reviewed by the direct -- the commissioners, right?

24                  I'll ask it again.

25  A   Yes.

Deposition of Coleman, Penny, 3/7/2014

Page 84

1   Q    Were -- as a general matter, were the declination

2        letters reviewed by any commissioners?

3   A    No.

4   Q    Okay, thanks.

5                    And what training was provided to the

6        individuals drafting the letters about what would be

7        included in them?

8   A    Well, of course, with any new attorneys, we sat down

9        and talked to them about it, told them how we had

10       been approaching it, showed them the letters.

11                   In fact, the director of contracts was

12       fairly involved in, you know, just contract review

13       and helping teach attorneys how to do it.

14  Q    Who was that did you say?  The director of contracts?

15  A    Yeah.

16                   And I had -- as time went on and we

17       got bigger, then I had a deputy -- or -- yeah,

18       associate general counsel, whatever his title was,

19       and he was actively, you know, reviewing the cases.

20                   Anybody who doesn't have a background

21       in that, in this, we would -- either I or he would go

22       through the entire contract after they prepared the

23       draft and said -- and look at it and say, "Okay," you

24       know, "I don't agree with this because of this

25       reason; I agree with this because of this reason."

Deposition of Coleman, Penny, 3/7/2014

Page 85

1         We were very proactive that way.

2                 The other thing, too, is that I always

3         assigned mentors for each attorney so that they would

4         have somebody to go talk to.

5    Q    Okay.

6    A    And then some of the attorneys we brought in already

7         had -- were outside counsel and had experience.  And

8         so that --

9    Q    The director of contracts, is that someone in the

10       Division of Contracts?  Who is --

11   A    Yeah.  Yes.

12   Q    I thought we said -- I thought when we talked earlier

13       today that the Division of Contracts wasn't involved

14       in declination.

15   A    Well, they're not the ones who sign the letters, but

16       because they do management contract review, they

17       have, you know, a group of contracts that come in

18       with every contract.  And so there's often

19       declination letters requested for those contracts.

20   Q    Okay.

21   A    And so, you know, we worked closely together to get

22       those letters out.

23   Q    So it sounds like that -- would it be fair to say

24       that the training for people who were writing the

25       letters was largely one-on-one --

Deposition of Coleman, Penny, 3/7/2014

Page 86

1    A    Yes.

2    Q    -- on-the-job training?

3    A    Yeah.

4    Q    And was it -- it wasn't a textbook, in other words,

5         right, obviously?

6    A    No.  There was no textbook.

7    Q    Were there any regulations that listed the particular

8         elements that you would look for in doing the

9         declination process?

10   A    There's 94.5, which is a bulletin.  And we had

11        in-house memoranda on the kinds of things to look

12        for.

13   Q    So, no, there were no reg- -- I'm talking about --

14   A    No regulation.

15   Q    Okay.  And that's NIGC bulletin 94-5?

16   A    Yes.

17   Q    And that talks about consulting agreements?

18   A    Yes.

19   Q    And then you said there were in-house memoranda?

20   A    Yes.

21   Q    Were those published anywhere?

22   A    No.

23   Q    Were they subject to any review from outside of the

24        agency?

25   A    No.

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

```
 1   Q    Is it fair to call it an "agency," the commission an
 2        agency?  I don't want to get the terminology wrong.
 3   A    We used "agency."
 4   Q    Okay.  So the internal memoranda, were they -- I
 5        think you just said they were not published outside
 6        the agency, right?
 7   A    (Witness nods head.)
 8   Q    Okay.  In your declaration, if we look at paragraph
 9        16, you talk about ordinary and customary practice.
10   A    Um-hmm.
11   Q    What's the source of the ordinary and customary
12        practice that you're talking about?
13   A    There's the two bulletins, 93.3 and 94.5.  And we
14        work very closely with all tribes and companies
15        and -- you know, who -- if you want to be sure that
16        these are not management contracts, to get some -- to
17        have some reliance, then you need to submit them.
18   Q    Okay.  Was that -- the ordinary and customary
19        practice wasn't created subject to any formal rule
20        making?
21   A    No.
22   Q    And it would have been involved -- it sounds like,
23        from what you're saying, that those practices would
24        have evolved over time?
25   A    Yes.
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 88

1   Q    Okay.  And they're pretty context-dependent?

2   A    Pretty what?

3   Q    Context-dependent?

4   A    If you mean that they're very case by case?

5   Q    Yeah.

6   A    Yes.

7   Q    Okay.  All right.  And what's the difference between

8        "policy" and "custom and practice," when you use

9        those terms?

10  A    Custom and practice is this is what the -- this is

11       what the agency was doing.

12                     Policy was agency was going to do it

13       for tribes and for companies, rather than issue

14       NO- -- notices of violation.

15  Q    I'm not sure I understand what that means, the policy

16       part.  Maybe I just couldn't hear what you said.

17  A    The decision to use agency resources to review these

18       contracts is a policy developed to help tribes, help

19       companies become compliant.  And it's a way of

20       preventing -- or reducing the need to do enforcement

21       actions.

22  Q    Okay.  And that's different from -- "custom and

23       practice" is a term that kind of just describes on

24       the ground what was happening?

25  A    Yes.

Deposition of Coleman, Penny, 3/7/2014

Page 89

1   Q   Okay.  If you look in paragraph 14, it says, "A

2       typical set of agreements submitted to the NIGC for

3       review."  Do you see that language?

4   A   Yes.

5   Q   And just to back up for a minute, these are all your

6       words in this affidavit, right?

7   A   Yes.

8   Q   Okay.  So when you say "a typical set," what do you

9       mean by that?

10  A   Well, here, we're referring to the management

11      contract approval process.

12               So a tribe -- you know, tribes and

13      companies were expected, if they were submitting a

14      contract, management contract, to submit all the

15      agreements that really made up the deal.  And these

16      three were usually the core of that deal.

17               There would often be a lot more

18      contracts.

19  Q   Okay.  So at this point in the affidavit you're

20      talking about -- and I guess it's right in paragraph

21      13, too -- that you're talking about management

22      contract approval --

23  A   Yes.

24  Q   -- as opposed to declination?

25  A   Yes.

Deposition of Coleman, Penny, 3/7/2014

Page 90

```
 1   Q    Okay.

 2                    Okay.  And the second half of that

 3        paragraph talks about the parties are careful to

 4        assert that documents can stand alone -- the

 5        collateral documents can stand alone -- I'm sorry.

 6        I'm not going to summarize it.

 7                    "The parties are seeking" -- "seeking

 8        contract approval are careful to assure that the loan

 9        and developing agreements can stand alone and not

10        require management and gaming" -- sorry, I'm not

11        reading that quote right.

12                    Just read that paragraph 14 where

13        you're talking about what the parties are careful to

14        do, okay?

15   A    Okay.  Yes.

16   Q    All right.  What's your basis for that?

17   A    In practice, while there are sometimes parties who

18        will want the management contract and everything else

19        all decided and agreed to at the same time, there

20        were many more who would want the management contract

21        to be approved but that wasn't the first thing that

22        they felt they needed to do.  They wanted to go ahead

23        and do the loan, do the development agreement, you

24        know, do the environmental review, all the things

25        that are precursors to opening a casino.
```

Deposition of Coleman, Penny, 3/7/2014

```
 1                        And the only way to do that is to make

 2          sure that the contracts are not interdependent and

 3          don't contain management.

 4     Q    Okay.  Did that point have any practical impact on

 5          the review process?

 6     A    Pardon?

 7     Q    What you're saying here about what the parties would

 8          do or not do, did that have an impact on the decision

 9          that the NIGC would make, your decision-making

10          process?

11     A    I don't understand your question.

12     Q    When the NIGC was evaluating the contracts --

13     A    Um-hmm.

14     Q    -- did the parties' intentions here make a difference

15          in the evaluation?

16     A    Well, in -- not in the ultimate outcome as a general

17          matter.

18     Q    If you'd look at 25.

19     A    Okay.

20     Q    Twenty-five talks about "The contracts can be so

21          inextricably linked that the contracts taken together

22          constitute a management contract."

23     A    Um-hmm.

24     Q    And then at the end you cite to a letter to Principal

25          Chief Jones of the Eastern Band of Cherokee Indians.
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 92

1                              Is that your source for that position?

2    A    It's a -- it's an example of how the NIGC approached

3         this.

4    Q    Okay.  What was the legal basis for that position?

5    A    What's the legal basis for it?

6    Q    Right.  For example, is there a regulation that

7         states this?

8    A    No.

9    Q    Okay.  Is there a statute?

10   A    No.

11   Q    Okay.  So what's the legal basis?

12   A    Well, I'm not here to give legal advice.

13   Q    Did you have a legal basis for this position at the

14        NIGC?

15   A    I believe that the commission took -- looked at each

16        contract separately, and using the bulletins, the

17        advice that had been given before, the internal

18        documents that describe, you know, what consists --

19        what consists of management, and then later, you

20        know, final agency decisions that say what

21        constitutes management, they were -- they were

22        looking to see if the two, taken together, were so --

23        so much a -- the same action, the same contract, that

24        they had to be treated together.

25   Q    Okay.  Anything -- any other -- anything outside of

Deposition of Coleman, Penny, 3/7/2014

1      the commission's own view as a legal basis for that

2      opinion?

3   A   Well, certainly, as time went on, there were court

4      cases who discussed these kinds of things.

5                   I don't know if there's one that --

6      that describes that specific issue.  You know, in the

7      next paragraph it does in a more tangential way.

8   Q   Okay.  I notice in paragraph 27 you said that the

9      NIGC is still -- no apparent change, and they

10     continue to agree generally with the decision of

11     Wells Fargo?

12  A   Um-hmm.  Yes.

13  Q   That was language that also appeared in letters you

14     signed, right --

15  A   Yes.

16  Q   -- "I agree generally with the decision"?

17  A   Yes.

18  Q   What does the "generally" mean -- reference?

19  A   It's a word that makes clear that -- you know, that

20     each one of these are fact-specific and, you know,

21     that you just can't take something from one court

22     case and say, well, then this decides everything.

23     You have to look at each -- each set of files, each

24     set of contracts.

25  Q   Were there aspects of that opinion that you did not

Deposition of Coleman, Penny, 3/7/2014

Page 94

1        agree with?

2   A    That I did not agree with?

3   Q    Um-hmm.

4   A    Not that I remember.

5   Q    Okay.  Are you aware of aspects of that opinion that

6        the NIGC did not agree with?

7   A    Not that I know of.

8   Q    Okay.  Let's look at page 9 -- oh, I'm sorry.  Yeah,

9        I meant page 9 at the bottom.  At the top it says

10       page 8.

11                    But in between paragraphs 30 and 31,

12       is this your opinion that contracts are interrelated

13       and should be treated as one transaction?

14  A    Yes.

15  Q    Okay.  Are you saying that as a legal matter they

16       should be treated as one transaction?

17  A    I'm saying that as an expert in this area.

18  Q    I know that's your role, but are you saying that as a

19       legal matter?

20  A    I don't understand the question.

21  Q    I'm trying to understand what you mean by "They

22       should be treated as one transaction."

23                    Do you mean under the law they should

24       be treated as one transaction?

25  A    I'm saying that for purposes of the Indian Gaming

Deposition of Coleman, Penny, 3/7/2014

Page 95

1      Regulatory Act and for purposes of acquiring approval

2      by the NIGC, the NIGC would consider them to be one

3      trans- -- I believe that the NIGC would consider them

4      to be one transaction.

5   Q  Okay.  So am I correct in saying you're not saying

6      that as a matter of law they should be treated as one

7      transaction.  You're instead saying it's your opinion

8      the NIGC would treat them as one transaction?

9   A  It is my opinion that the NIGC would treat them as

10     one transaction.

11  Q  Okay.  If you look at paragraph 31, "The following

12     documents repeatedly reference the other agreements,

13     and substantive provisions are provisions" -- "are

14     dependent upon provisions in other agreements."

15                    Can you describe what testing you did

16     to determine things are substantive or not

17     substantive?

18  A  No.

19  Q  Did you do anything other than read the documents?

20  A  I read the documents.

21  Q  Okay.  And when you say they "repeatedly reference,"

22     is that kind of chronicled in the following

23     paragraph?

24  A  As I mentioned earlier, it's not everything, but it

25     was a good example of repeated reference to other

Deposition of Coleman, Penny, 3/7/2014

Page 96

1         agreements.

2    Q    Okay.  So is it fair to say that under your analysis,

3         you can look at the documents and they're clear on

4         their face that they are -- that they are so

5         intertwined they should be viewed as one transaction?

6    A    Yes.

7    Q    Okay.  Later on, for example in 42, you talk about

8         these things being inextricably linked.  Not just

9         that they're linked, but they're inextricably linked.

10                        What did you do to determine that

11        those links are inextricable?

12   A    Where is "inextricable"?  I'm trying to find it.

13        What number?

14                   MR. TUREK:  Page 12.

15   BY MS. McNALLY:

16   Q    Paragraph 42 is the one I was --

17   A    Okay.  It's actually 41.

18   Q    Okay.

19   A    But --

20   Q    Both of them.  Okay?

21   A    Forty-two really explains that.

22   Q    Okay.

23   A    They're dependent upon each other.  None functions

24        without the other; the trust indenture's void; the

25        bonds can't be issued without a trustee; the

Deposition of Coleman, Penny, 3/7/2014

Page 97

```
 1        corporation could not borrow without the trustee.
 2   Q    Right, right.  I understand that you kind of
 3        summarized them, but I'm asking -- I'm asking a
 4        slightly different question.
 5                   Did you do anything to try and
 6        evaluate whether any of these things could be
 7        de-linked, or did you read them and say based on --
 8        it's so transparent in the documents that they can't
 9        be -- that they're inextricably linked?
10   A    Well, it's my understanding that you can't de-link a
11        void document.
12                   These documents have -- are -- if
13        they're management contracts, they're either subject
14        to approval or not.  And so you've got to look at
15        them -- in a particular case like this, you have to
16        look at them altogether because they're -- the
17        provisions from one document to the other are the
18        same.  They rely on each other for -- for, you know,
19        most of the fundamental aspects of the contract.
20   Q    All right.  And I don't mean de-linked because of
21        voidness.  You don't just say "they're interlinked."
22        You repeatedly say "They're inextricably
23        interlinked."
24                   So in coming to that, you said the
25        word "inextricably."  I'm wondering what you did to
```

Deposition of Coleman, Penny, 3/7/2014

Page 98

1    reach that conclusion.  Or did you just simply look

2    at the language?

3  A  I looked at the language of the documents.  I also

4    was aware that the trust indenture had been declared

5    void and that most of the documents rely on the trust

6    invention -- indenture.

7  Q  Okay.  And is that what you mean in paragraph 43

8    where you say that "Indenture is central"?

9  A  On page what?

10 Q  Paragraph 43, "central to the transaction"?

11 A  Yes.

12 Q  Okay.

13 A  Well, I -- I guess I'm not real sure what you mean,

14   but the indenture -- the indenture is -- everything

15   flows from the indenture.  And that's how I -- what I

16   meant -- what I meant by "central to the

17   transaction."

18 Q  That's exactly what I was asking.  So okay.

19                  When you say it's "central to the

20   transaction," you meant everything flows from the

21   indenture?

22 A  Essentially, yeah.

23 Q  Okay.  Was there something wrong with what I said so

24   that you said "essentially"?

25 A  I don't remember what you said, so...

Deposition of Coleman, Penny, 3/7/2014

Page 99

```
 1   Q   Okay.  What did you -- I'll just ask it a different
 2       way.
 3                    When you say "The indenture is central
 4       to the transaction" in the first sentence of
 5       paragraph 43, what did you mean by "central to the
 6       transaction"?
 7   A   I thought I answered that.
 8   Q   And I'm just -- I'm not sure that I understood it.
 9       So if you could just answer it again, I would
10       appreciate it.
11   A   In --
12   Q   Are you basing it on the wording in the documents?
13   A   In the wording of the documents?  Yes.
14   Q   Okay.  And then -- all right.
15                    But paragraph 43 is under a headline
16       that says, "Absent the indenture, the transaction
17       documents remain inextricably linked and constitute
18       an unapproved management contract."
19   A   Yes.
20   Q   Is that your opinion, your expert opinion?
21   A   Yes.
22   Q   Now, are you stating that as a matter of law these
23       constitute an unapproved management contract?
24   A   I am stating that this is what I think the NIGC would
25       determine.
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 100

```
 1   Q    Okay.  Thank you.

 2              In the next paragraph, 44, you talk

 3        about the bonds, security agreement, and LOM

 4        incorporating default remedies.

 5   A    Yes.

 6   Q    What do you mean by "incorporate"?  What does that

 7        mean?

 8   A    Well, I hadn't noticed this, but this also has the

 9        wrong citation.

10   Q    Okay.

11   A    And what I mean by "incorporate" is that the -- you

12        look at the agreements, and the agreements say the --

13        that the -- those other -- those agreements have the

14        same default remedies as -- as -- well, it's actually

15        what was in the indenture, but -- which is one of the

16        reasons why it makes this so hard, is that if there's

17        no indenture, are there default remedies?

18              But also the bondholders or receiver

19        could theoretically assume management control under

20        the default remedies.  They're listed in each of

21        these documents.

22   Q    And when you said "the wrong citation," that's what

23        you were talking about just a little while ago, that

24        that -- in paragraph 56, you would also change the

25        citation here --
```

Deposition of Coleman, Penny, 3/7/2014

Page 101

```
 1   A    Right.

 2   Q    -- in paragraph 44?

 3   A    Right.  The bond purchase agreement section to refer

 4        to Section 6 rather than Section 9.

 5   Q    In your analysis, did you evaluate the difference in

 6        language between "incorporate by reference" or

 7        "reference" or use the same language?

 8             Do you make distinctions in your

 9        analysis when you have -- this is just a horrible

10        question, so let me start over from the top.

11             When you say "The documents

12        incorporate," use that verb, "incorporate" --

13   A    Um-hmm.

14   Q    -- was that the language in these agreements,

15        "incorporate"?

16   A    Not usually.  I don't remember there being -- that

17        they used that term.

18   Q    Okay.  But is it fair to say that when you say --

19        because you said "incorporate," you read whatever the

20        language was in those agreements to be equivalent to

21        "incorporating"?

22   A    Yes.

23   Q    Okay.  We talked earlier you submitted an affidavit

24        in the Waukesha matter --

25   A    Yes.
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 102

1   Q   -- is that right?

2                       This third opinion --

3   A   Yes.

4   Q   -- isn't in the Waukesha affidavit.  Do you remember

5       that?

6   A   "Absent the indenture"?

7   Q   Right.

8   A   No, I really didn't remember that, but...

9   Q   Okay.  Do you remember when you came to have this

10      third opinion?

11  A   When I came to have this third opinion.  I --

12                  MR. CLARK:  Could you read the prior

13      question and answer back when she's looking?

14                  Could you read the prior question and

15      answer?

16          (A discussion was held off the record.)

17                  THE WITNESS:  If I remember right, counsel

18      asked me to answer the question of whether -- you

19      know, to provide my views on this issue.

20  BY MS. McNALLY:

21  Q   So sometime between the time the Waukesha affidavit

22      was filed, which you might recall was in May of 2013,

23      and the time that you signed this one in June of

24      2013, counsel asked you to render an opinion on this

25      third topic?

Deposition of Coleman, Penny, 3/7/2014

Page 103

1    A    I don't specifically remember, but -- I don't
2         specifically remember.
3    Q    Okay.  Was there a time where you were ever asked to
4         give an opinion and you were unable to give an
5         opinion that counsel asked you to give?
6    A    Oh, on -- you mean on the specifics of this?
7    Q    In this case have you ever been asked to give an
8         opinion that you said you weren't able to give?
9              MS. HOGEN MOLINE:  Are you asking her if
10        her -- if counsel for the tribal parties asked her to
11        give an opinion?
12             MS. McNALLY:  Yeah.
13             THE WITNESS:  I don't specifically
14        remember.
15   BY MS. McNALLY:
16   Q    Okay.  Then in the back, in the last section --
17        starting on page 13 at the bottom, paragraph 48,
18        there's a heading above it:  "The transaction
19        documents are individually management contracts
20        subject to NIGC approval."
21   A    Yes.
22   Q    Do you see that?  And is that your opinion?
23   A    Yes.
24   Q    And is it accurate to say that that opinion is not as
25        a matter of law, but your opinion is that the NIGC

Deposition of Coleman, Penny, 3/7/2014

1       would view the transaction documents as being

2       individual management contracts?

3    A  That the -- the list of documents would be -- would

4       also be considered management contracts, yes.

5    Q  So you don't have an opinion as to whether they

6       actually are under the law.  Your opinion is only

7       what NIGC would say?

8    A  Yes.

9    Q  Okay.  And you talk about -- you talk about the

10      indenture, the security agreement, the bond, bond

11      purchase agreement, account control agreement, and

12      tribal agreement and tribal resolution.  Right?

13   A  Yes.

14   Q  Okay.  And as to each of those, that's your view of

15      what the NIGC's view would be about whether they're

16      management contracts?

17   A  Yes.

18   Q  Okay.  Have you exhausted your reasons for each of

19      these conclusions in this affidavit?

20   A  There is one -- one section that I saw that merits

21      bringing up that wasn't put in here.  Like I said,

22      there are probably many provisions that weren't

23      cited, but they weren't major.

24                  There is one provision that, when I

25      was looking through the documents this morning, I

Deposition of Coleman, Penny, 3/7/2014

Page 105

1          saw, and it would cause me great concern.  And that

2          is if you look at the bond itself, bond series,

3          "Taxable Gaming Revenue Bond, Series 2008," there is

4          a section that says -- on page 5, it's the

5          second-to-last paragraph, it says, "To the extent

6          permitted by and as provided in the indenture, the

7          terms and provisions of the indenture, or any

8          instrument supplemental thereto, may be modified or

9          altered by the assent or authority of the registered

10         owners of at least 66 2/3 percent in aggregate

11         principal amount of the bonds then outstanding

12         thereunder."

13                        Now, since -- even if we're --

14         essentially, what that seems to say is that the

15         bondholders could change any part of the -- 66 2/3

16         percent could change any part of the indenture, which

17         is -- because there are management functions in the

18         indenture, you know, it's just -- gives them

19         unbelievable control.

20    Q    You noticed that today?

21    A    Yep.

22    Q    And I'm guessing you noticed that since we talked

23         about things you noticed this morning?

24                        Did you notice that at lunch?

25    A    No.  No, no.  This is something that I noticed this

Deposition of Coleman, Penny, 3/7/2014

Page 106

```
 1        morning when I was tabbing things.
 2   Q    And you noticed that when you were going through the
 3        documents in preparation for your deposition today?
 4   A    Yeah.
 5   Q    Okay.  Anything else jump out at you today?
 6   A    No.
 7   Q    No?  Okay.  If you look at paragraph 60.
 8   A    Sixty?
 9   Q    Um-hmm.
10   A    Yes.
11   Q    Talking about the LOM?
12   A    Yes.
13   Q    And it starts:  "To the extent the LOM is a
14        contract"?
15   A    Yes.
16   Q    Is that the kind of language that NIGC would use?
17   A    No, I don't believe so, because the NIGC would, more
18        likely than not, decide whether it's a contract
19        before opining.
20   Q    All right.  Then I'm a little confused because I
21        thought you said this section is your prediction of
22        what the NIGC would do.
23   A    That hasn't changed.
24   Q    Okay.  So what would then -- but except -- so is that
25        the case, except as to this last thing about being a
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 107

1      contract?

2   A   You mean that --

3   Q   You're not making a prediction about what the NIGC

4       would do about whether it's a contract?

5   A   I did not make a prediction about what they would say

6       about it being a contract.

7   Q   Okay.  And then is it fair to say you don't have an

8       opinion about that?

9   A   Yes.

10  Q   Okay.  And then is it your view in paragraph 61 that

11      the tribal resolution is a contract?

12  A   I did not opine on that.  I was not asked to opine on

13      that.

14  Q   Okay.  Well, when you say "It is a void management

15      contract," does that mean it is your opinion that the

16      resolution is a contract?

17  A   Well, I know that the resolution claims to be a

18      contract.

19  Q   All right.  I'm just asking, do you have an opinion

20      as to whether the resolution is a contract?

21  A   No.

22  Q   Okay.  And do you have an opinion as to whether any

23      other documents that aren't specifically addressed in

24      this report are management contracts?

25  A   No, because I was asked to review these, and these

Deposition of Coleman, Penny, 3/7/2014

Page 108

1      are the ones I reviewed.

2  Q   Okay.  Did you ever ask for any documents to review

3      that you were not provided with?

4  A   You mean was anything withheld from me?

5  Q   Yeah.  Was there anything you asked for and you

6      didn't get it, whether or not it was withheld.  Maybe

7      it didn't exist.

8                      But was there anything you wanted that

9      you weren't able to get?

10 A   No.

11 Q   Okay.  And do you feel like you had sufficient

12     materials to reach the opinions you've reached?

13 A   Yes.

14 Q   Okay.

15              MR. TUREK:  Off the record.

16          (A break was taken at 1:55 p.m.)

17          (Back on the record at 2:04 p.m.)

18 BY MS. McNALLY:

19 Q   I think I might have misspoken.

20                      On that last point about -- you said

21     you don't have an opinion whether the tribal

22     resolution is a contract.

23 A   If it -- right.  If it is a contract, it appears to

24     have the indicia of management in the management

25     contract.

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 109

1  Q   Although, am I right to say that your opinion isn't

2      that it is a management contract; your opinion is

3      that the NIGC would think it's a management contract?

4  A   That's right.

5  Q   Okay.  And then, also, you don't have an opinion

6      about whether the NIGC would view it as a contract,

7      correct?

8                  I think I asked you whether you have

9      an opinion as to whether it's a contract.  And really

10     what I want to know is whether you have an opinion

11     whether the NIGC would view it as a contract.

12 A   What number is this?

13 Q   Sixty-one.

14 A   Sixty-one.

15 Q   Tribal resolution.

16 A   If I remember right, this is a -- this claims to be a

17     contract with the trustee.

18                  My view is that the NIGC would say

19     that it's no longer a contract because the

20     contract -- to the extent it was a contract, it isn't

21     a contract because of the fact that the entity it's

22     with is no -- no longer there.  You know, there is no

23     trustee.

24 Q   So is it -- so then do you have an opinion about

25     whether the NIGC would view the tribal resolution as

Deposition of Coleman, Penny, 3/7/2014

Page 110

```
 1        a contract?

 2    A   As I said, I think the NIGC would say that -- that

 3        it's not a contract because there's no trustee.

 4    Q   Okay.  Then the next thing is we talked a little bit

 5        about training and you described the one-on-one

 6        training and the mentoring --

 7    A   Yes.

 8    Q   -- and those types of things.

 9                        And just in case my questions weren't

10        clear, is that the type of training that was provided

11        also to people who were not attorneys who were

12        reviewing contracts, or was there any different

13        training provided to them?

14    A   The only other people that weren't attorneys that

15        were reviewing them were -- were people who had been

16        there since the beginning of time and were part of

17        the development of the policy.

18                        And so -- so there wasn't specific

19        training given to them.

20    Q   They were in on the evolution --

21    A   Yes.

22    Q   -- so they didn't need to have training?

23    A   Well, they were certainly given more advice and

24        assistance than maybe we might -- someone who was

25        a -- a very experienced attorney in this.  But, you
```

Deposition of Coleman, Penny, 3/7/2014

Page 111

1    know, they were very experienced themselves in it.

2  Q    Okay.  And then I forgot to ask you, on your CV,

3        Exhibit 1, it says "Publications" at the bottom.

4                  Is this a full list of publications

5        you've written?

6  A    Those are things that I wrote since I left the

7        federal government in 2010.

8  Q    Okay.  And did you -- not including things like your

9        letters or your work product in your role, did you

10       have any publications before you left the government?

11                 Did you write any articles, that kind

12       of thing?

13  A    I don't think I wrote any articles that were

14       attributed to me.

15  Q    Did you write any articles that weren't attributed to

16       you?

17  A    Sure.

18  Q    Okay.  And what were those topics?  What do you

19       recall?

20  A    I don't recall.  I remember writing an article for

21       the chairman.  I wrote testimony.  I wrote a lot of

22       things.

23  Q    And did you do that in your role as -- whatever role

24       you had at the time at the NIGC?

25  A    Yes.

Deposition of Coleman, Penny, 3/7/2014

Page 112

```
 1    Q    Okay.  Did you -- so that would be your work product
 2         in your role at the NIGC?
 3                        You were doing that in the capacity of
 4         your job?
 5    A    I was doing it in the capacity of my job, yeah.
 6    Q    Right.  Did you do any publications other than in the
 7         capacity of your job --
 8    A    No.
 9    Q    -- during that time period?  Okay.
10                        One of the publications I just want to
11         ask you about is the "Spotlight on Penny Coleman,"
12         which I think is such a great title.  I want to have
13         an article about me some day, a spotlight on me.
14            (Exhibit 3 marked for identification.)
15    BY MS. McNALLY:
16    Q    Does this -- this appears on Exhibit 1, this article?
17    A    Okay.
18    Q    Right?
19    A    Yeah.
20    Q    "Internet Gaming Q&A"?
21    A    Um-hmm.
22    Q    Who was the "Q"?  Who was the questioner in this
23         piece?
24    A    The -- one of the editors gave me the questions, and
25         I wrote the answers.
```

Deposition of Coleman, Penny, 3/7/2014

Page 113

1  Q    Okay.  Did you write the section in italics at the

2       top?

3  A    I believe that that actually came off of my website.

4  Q    I want to ask you about the third sentence down, I

5       think.

6              It says:  "As lead counsel" -- talking

7       about your time at the NIGC -- "she reviewed hundreds

8       of contracts and developed groundbreaking analysis on

9       managing without an approved management contract and

10      IGRA's sole proprietary interest requirement, which

11      resulted in millions of savings for tribes."

12              Do you see that?

13 A    Yes.

14 Q    Was that your language?

15 A    Yes.

16 Q    What did you mean by developed -- in your role as

17      lead counsel, you developed groundbreaking analysis

18      on managing without an approved management contract?

19 A    Well, as you have noted, there isn't a lot of

20      management contract classes out there because

21      management contracts and sole proprietary interest

22      analysis under IGRA was nonexistent.  And every

23      agency has to figure out how they're going to

24      implement an act.

25              And I -- because I was the person

Deposition of Coleman, Penny, 3/7/2014

```
 1        there who was working on it and I was the lead in the
 2        evolution of this, that's what I meant.
 3   Q    What do you mean by "managing without a management
 4        contract"?  What did that mean?
 5   A    Well, that means controlling, directing, organizing.
 6        Any of the indicia of management.  If you're doing
 7        the things that constitute management and you're not
 8        an individual employee, you're a company, then under
 9        IGRA, you're required to have an approved management
10        contract.
11   Q    Oh, so what you're saying here is that an analysis so
12        that people don't manage without an approved
13        management contract?  Is that kind of --
14   A    Right.
15   Q    -- what you mean?
16   A    Right.
17   Q    Okay.  And the groundbreaking analysis, is that the
18        analysis used in the letters you signed while you
19        were at the NIGC?
20   A    Well, certainly that's somewhat -- some of it, but
21        really, the groundbreaking analysis applies more to
22        the sole proprietary interest because that's
23        something that was -- you know, happened more in the
24        last five years I was there and trying to figure out
25        what Congress meant by "sole proprietary interest"
```

Deposition of Coleman, Penny, 3/7/2014

```
 1        and then apply it to -- to these contracts.
 2   Q    Got it.  So all this is saying is essentially -- so
 3        people reading this know that when you were at the
 4        NIGC, you came up with kind of the approaches on
 5        these topics?
 6   A    Yes.
 7   Q    Okay, great.
 8             MS. McNALLY:  I think my friends here have
 9        some questions for you.  But unless I have some
10        follow-up to them, I appreciate that you answered my
11        questions.  Thank you.
12             THE WITNESS:  No problem.  Thanks.
13                    EXAMINATION
14   BY MR. TUREK:
15   Q    Good afternoon, Ms. Coleman.  I just have a few
16        questions for you.
17   A    Okay.
18   Q    You were the acting general counsel at the NIGC from
19        2002 to 2010 approximately, correct?
20   A    Yes.
21   Q    And as I understand your testimony, was there any
22        point during that time where you sought to have the
23        acting title removed from your designation?
24   A    Yes.
25   Q    When was that?
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 116

1   A   I don't remember.

2   Q   And was there a process that that went through?  Did

3       you apply for the position, a full-time position?

4   A   No.  It's a full-time position.

5   Q   I understand that.  A full -- permanent position.

6   A   It -- since it's the lead counsel position, there

7       isn't any particular process.

8                        It's -- the chairman hires whoever he

9       wants to hire.

10  Q   Were you turned down in the request to have the

11      "acting" label removed from your title?

12  A   No.

13  Q   At the time, this 2002 to 2010 period, Phil Hogen was

14      the commissioner of the NIGC?

15  A   Yes.

16  Q   I believe Mr. Hogen left in October 2009.  Does that

17      sound right?

18  A   Yes.

19  Q   And in this position as the commissioner, Mr. Hogen

20      was essentially your boss, correct?

21  A   Yes.

22  Q   Did you get along with Mr. Hogen?

23  A   I definitely got along with him.

24  Q   How would you describe your relationship with

25      Mr. Hogen while he was the commissioner and you were

Deposition of Coleman, Penny, 3/7/2014

Page 117

```
 1        the acting general counsel?
 2   A    He -- I thought a lot of him.  I thought he was a
 3        very smart, capable man.  We worked well together.
 4        We both spoke South Dakota.  It worked real well.
 5   Q    Did you have an understanding of whether he thought
 6        the same of your performance as an attorney?
 7   A    I think he thought that, yes.
 8   Q    Did he say things to you about how he appreciated the
 9        work that you were doing for the NIGC?
10   A    Yes.
11   Q    Did you get performance reviews from him over the
12        years?
13   A    No.
14   Q    Mr. Hogen, I think you referenced earlier, was a
15        reference on the resume that we haven't seen today,
16        correct?
17   A    Yes.
18   Q    And so you would expect that if someone called
19        Mr. Hogen to ask about you, he would give you glowing
20        accolades?
21   A    I would expect him to, yes.
22   Q    Since you've left the NIGC, have you done anything
23        socially with Mr. Hogen?
24   A    I don't think so, no.
25   Q    You understand that Mr. Hogen is a member of the law
```

Deposition of Coleman, Penny, 3/7/2014

Page 118

1    firm that's representing the tribe in this case,

2    correct?

3  A  Yes.

4  Q  And your dealings with counsel in this case have

5     primarily been with Mr. Hogen's daughter, Mrs. Hogen,

6     correct -- Ms. Hogen?

7  A  Yes.

8  Q  At any point before today, have you been involved in

9     a bond transaction as a lawyer?

10 A  I've been -- my involvement has always been from the

11    general counsel.

12 Q  So you've never been representing one of the parties,

13    either the bond issuer --

14 A  No.

15 Q  -- or one of the other parties involved in the

16    transaction --

17 A  No.

18 Q  -- correct?

19 A  Right.

20 Q  You said "right" at the end?

21 A  Yes.

22 Q  Have you ever drafted bond documents?

23 A  No.

24 Q  Have you ever litigated the enforcement of any bond

25    documents at any point?

Deposition of Coleman, Penny, 3/7/2014

Page 119

1    A     No.

2    Q     Have you been involved at any point prior to today in

3          any transactions related to securities at all?

4    A     Have I been involved?

5    Q     Yeah.

6    A     You mean in the same vein of the questions that

7          you've asked?

8    Q     Well, let me clarify.  In a professional capacity.  I

9          don't necessarily need to know if you have an E*Trade

10         account and what your stocks are, but I want to know

11         if you've been involved in any professional capacity

12         in any kind of transaction involving security

13         instruments.

14   A     After being general counsel?

15   Q     Let's start first before you were -- strike that --

16         yeah, let's talk about any time.

17                     Anytime before today, have you been

18         involved in a bond -- strike that.

19                     Anytime before today, have you been

20         involved in a transaction involving the purchase,

21         sale, or transfer of securities?

22   A     I believe that there were -- that that happened, and

23         there were documents that we reviewed at the NIGC.

24   Q     All right.  But, again --

25   A     Not -- I didn't write security agreements; I didn't

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 120

1      represent either side to an agreement, no.  I was a

2      government lawyer.

3  Q   And you've been a government lawyer for the vast

4      majority of your legal career, right?

5  A   Yes.

6  Q   And since leaving the government back in 2010, have

7      you been involved in any kind of transactions at all

8      where you've represented one side or another in a

9      financial transaction?

10 A   No.

11 Q   So your understanding about bonds, indentures, bond

12     purchase agreements, things like that, has come

13     inclusively from your time working as a government

14     lawyer?

15 A   Yes.

16 Q   I want to ask a little bit about IGRA.

17                     Is it fair to say that the intent of

18     IGRA was to prevent unscrupulous outside parties from

19     actively managing a tribe's gaming operations?

20 A   That is one, yes.

21 Q   What other purposes would there be?

22 A   To ensure the tribes are the primary beneficiary.

23                     There are others that don't come to

24     mind.

25 Q   The initial concern at the time the statute was

Deposition of Coleman, Penny, 3/7/2014

Page 121

1       passed was about outside parties actively coming in

2       and managing a tribe's gaming operations, true?

3   A   Yes.

4   Q   And then at some point, there was a concern about the

5       evolution of the management process by outside

6       parties.  Would that be fair?

7   A   Well, it's not so much the evolution as companies

8       became slicker at interjecting themselves into

9       management.

10  Q   And one of the first ways that that manifested itself

11      was through consulting agreements, correct?

12  A   Yes.

13  Q   And so the NIGC created a bulletin to talk about the

14      distinction between consulting agreements and

15      management contracts?

16  A   Yes.

17  Q   Initially, in that first four or five years of IGRA's

18      application, was there concern about financing

19      transactions equating to management contracts?

20  A   Not as much.  The NIGC wasn't seeing financing

21      documents as much.

22  Q   When did an active review of financing documents

23      begin?

24  A   Well, there -- well, there was always an active

25      review of whatever documents were submitted.

Deposition of Coleman, Penny, 3/7/2014

1                      Certainly, the 2005 decision that told

2       people that attorneys might be guilty of malpractice

3       if they didn't submit their documents to the NIGC

4       made them realize that they had better do that.

5                      But at first, there was -- there

6       was -- there was always review of some financing

7       agreements.  It -- the bond review didn't start until

8       closer to the 2000s rather than the 1990s.

9   Q   This 2005 document you just referenced, is that a

10      declination letter?

11  A   No, no.  It was a court case.

12  Q   Court case.  Which court case?

13  A   I think I reference it in the -- my affidavit.  It

14      involves Dorsey & Whitney.  They're one of the

15      parties.

16                     I am not seeing it in my affidavit.  I

17      do remember it is in Kevin Washburn's affidavit.

18  Q   Is it a federal district court decision?  An

19      appellate decision?

20  A   It's a federal district court decision.  I think it

21      was appealed.  I don't remember.

22                     Yeah, I don't see it in there.

23  Q   And the concern with the financing arrangements was

24      the same with the consulting agreements.  The NIGC

25      was concerned that those financing arrangements would

Deposition of Coleman, Penny, 3/7/2014

Page 123

1        camouflage as a management of the operations of the

2        gaming operations --

3    A   Right.

4    Q   -- correct?

5    A   Right.

6    Q   In connection with that review of financing

7        agreements, did the NIGC ever promulgate any kind of

8        regulations specific to the review of financing

9        arrangements?

10   A   No.

11   Q   At any point has the NIGC issued a bulletin of any

12       kind specific to whether financing arrangements

13       constitute management contracts?

14   A   That was specific to finance agreements?

15   Q   Yes.

16   A   No.

17   Q   Is there any bulletin at all that relates to

18       management contracts for financial transactions?

19   A   Well, I believe that 94.5 does -- dash 5 does because

20       it gives the general description of what is

21       considered to be management.

22   Q   And at the time 94-5, that bulletin, was promulgated,

23       financing arrangements weren't really the focus of

24       the NIGC's review, correct?

25   A   At that time consulting agreements were the bigger

Deposition of Coleman, Penny, 3/7/2014

Page 124

1       problem.  It doesn't mean that that issue hadn't come

2       up, but it was not considered to be the big problem

3       that was facing the NIGC.

4   Q   And as review of financial agreements became more and

5       more pronounced, the NIGC never issued any kind of

6       bulletins specific to financing arrangements?

7   A   That's right.

8   Q   The review process that we talked a little bit about

9       today, the two-stage process, the submission to

10      management of management contracts, and then the

11      R contract process --

12  A   Yes.

13  Q   -- the submission of management contracts is actually

14      governed by regulation, correct?

15  A   Yes.

16  Q   The submission of R contracts or the declination

17      process is not covered by regulation.

18  A   That's right.

19  Q   And it's a voluntary process, this R submission

20      process, that is optional to the parties that are

21      parties to those agreements?

22  A   Yes.

23  Q   You yourself did not approve any management

24      contracts.  That was the function of the

25      commissioner.

Deposition of Coleman, Penny, 3/7/2014

Page 125

1   A   That was the function of the chairman.

2   Q   The chairman.

3                   As part of the chairman's review of

4       management contracts, did you ever provide any kind

5       of guidance, or were you really a separate part of

6       the agency?

7   A   Pardon?

8   Q   As the chairman was doing his approval and review of

9       management contracts, were you involved in providing

10      any advice on that process?

11  A   Yes.

12  Q   How would that advice be communicated?

13  A   Unless the contract brought up unique issues or it

14      was one where we were going to -- where we were

15      recommending that despite everything, all the changes

16      that may have been made, we were going to still

17      recommend disapproval, the contract and any of the

18      agreements that went with it would go to the chairman

19      in a file with a memo from the Division of Contracts

20      and from the Office of General Counsel laying out the

21      deal, explaining the provisions, and recommending

22      approval.

23  Q   And, again, that process that you've just described

24      is very different than your work on the declination

25      process, true?

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 126

```
 1   A    Yes.
 2   Q    Did anyone review your opinions made during the
 3        declination?
 4   A    You mean anyone higher than me?
 5   Q    Yes.
 6   A    That was only the chairman.  And, generally, he would
 7        not.
 8   Q    So just walk me through how would that work?  Someone
 9        submits contracts for you to comment on, get an
10        advisory opinion on?
11   A    Right.
12   Q    You would prepare an opinion letter, correct?
13   A    Well, usually at the time I left and had a staff of
14        20, it would be assigned to an attorney who would
15        work on it, prepare it, would come to the associate
16        general counsel with issues who -- and they may both
17        come to me with issues to resolve.
18                        And then the memorandum would be
19        prepared and final and be signed off on by the
20        associate general counsel and then signed by me.
21   Q    You, as acting general counsel, had the ultimate
22        authority over those declination letters, true?
23   A    Unless the chairman decided to exercise that
24        authority.
25   Q    How many times during your run as acting general
```

Deposition of Coleman, Penny, 3/7/2014

Page 127

1        counsel did the chairman intervene in one of your

2        declination decisions?

3    A   Very rarely.

4    Q   Less than five?  More than five?

5    A   I don't know.

6    Q   And in the times that the chairperson intervened, did

7        he overrule the determination that you had made?

8    A   I don't remember him ever overruling because that

9        wouldn't necessarily be how we -- why the chairman

10       might get involved.  It might be because there's

11       something unique and I wanted to make sure that he

12       was comfortable with the approach.

13                    One of the great things about being

14       there for as long as I was is that I was able to

15       develop a relationship where I had a good feel for

16       what he wanted and what he would agree with and what

17       he wouldn't agree with.  And if something was

18       something I wasn't sure about, I would be able to

19       talk to him.

20   Q   You're familiar with your various opinions on how

21       pledged revenues are handled in your declination

22       letters?

23   A   Yes.

24   Q   Did you ever talk to the chairperson at any point

25       about how you were handling opinions about pledged

Deposition of Coleman, Penny, 3/7/2014

Page 128

1          revenues and financing arrangements?

2    A    I don't remember.

3    Q    Would you agree that there is no statute and no

4          regulation that requires a party to submit all of

5          their agreements in a financing transaction to the

6          NIGC for review?

7    A    In this voluntary process, that's true.

8                       If we -- if the NIGC decides that they

9          want to see those contracts, then there is statutory

10         process.  They can -- they can ask for them first, or

11         they can subpoena them.

12   Q    But as part of the declination process that underlies

13         most of your opinions about intertwinement and

14         submitting together, would you agree with me that

15         there's no statute or regulation --

16   A    That mandates.

17   Q    -- that requires all those agreements to be submitted

18         by the submitting parties?

19   A    That's right.

20   Q    And, in fact --

21              (Exhibit 4 marked for identification.)

22   BY MR. TUREK:

23   Q    I'm going to start over again.

24                       I'm going to show you what's been

25         marked as Exhibit 4.

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 129

1           And isn't it true that 25 CFR Section
2      533.3 governs the process for submitting a management
3      contract for approval?
4  A    It says "Submission of Management Contract for
5      Approval."
6  Q    And it says, "A tribe shall include in any request
7      for approval of a management contract under this
8      part," colon, and then lists some items, correct?
9  A    Yes.
10 Q    Does it say in here "collateral agreement" at any
11     point?
12 A    No.
13 Q    Does it say "All contracts that are part of the same
14     transaction as the management contract"?
15 A    It doesn't say -- it doesn't refer to any additional
16     contracts.
17 Q    So any informal practice of getting more documents
18     beyond the management contract was an informal
19     request and procedure by the NIGC, correct?
20 A    If the question is, is it in the regulations, I do
21     not see it in the regulations.
22 Q    And so the requests that you've been describing
23     that's described in your affidavit, the submission
24     process, is an informal practice that was proposed by
25     the NIGC and taken up voluntarily by parties

Deposition of Coleman, Penny, 3/7/2014

Page 130

1        submitting agreements, true?

2   A    Are we talking about the management contract

3        approval, or are we talking about R contracts?

4   Q    We're talking about the declination process.

5   A    Okay.  This part, 533, doesn't have anything to do

6        with the declination process.

7   Q    This is the process that we were describing earlier

8        that the commissioner does -- the chairperson does

9        the review, correct?

10  A    Yes.  The Division of Contracts assumes staffing

11       authority -- primary staffing responsibility.

12  Q    Then set 533.3 aside.

13                   And I think maybe you agreed with me;

14       maybe you didn't.  But are there any regulations that

15       require submitting parties to provide all of the

16       contracts that are part of a transaction that

17       includes a management contract?

18  A    Not in 533.  I would have to review the rest of the

19       regulations to be sure.

20  Q    All right.  What regulations would you like me to

21       pull up for you?

22  A    Well, the whole NIGC.

23  Q    Okay.  Well, maybe we'll do that, but as you sit here

24       right now as being acting general counsel for ten

25       years at the NIGC, can you point me to any regulation

Deposition of Coleman, Penny, 3/7/2014

Page 131

1          that states that all the contracts, as part of a

2          transaction that includes a management contract, need

3          to be submitted as part of the declination process?

4     A    There isn't anything that uses those words.

5                    It -- I know that the commission has

6          the authority that will require that the rest of the

7          contracts be submitted.  They started doing that in

8          order to be able to see what the deal is.  There's

9          certainly a lot more to approval of management

10         contracts than there is here.

11                   For instance, where it's -- there is a

12         section that says that a trustee -- there it is,

13         "Trustee exercising the skill and diligence to which

14         a trustee is commonly held would not approve the

15         contract."  And it's extremely difficult to implement

16         that part of the section of the approval process

17         without having the deal in front of them.

18                   And then there is a whole section in

19         the regulations that talk about the 30 percent -- the

20         date -- it talks about the fact that you can only

21         have a 30 percent fee and can't exceed 40 percent.

22                   If you don't see all of the documents,

23         it's impossible to know if it's 30 percent, because

24         what happens is that -- not all management

25         contractors, but some management contractors will

Deposition of Coleman, Penny, 3/7/2014

Page 132

1    sprinkle the percentages throughout other contracts

2    in an effort to up the amount of percentage they

3    receive, but not have it all be in the management

4    contract.

5  Q  All right.  I want to go back to my question, which

6     is:  Can you point me to any regulation that states

7     that a submitting party, as part of the declination

8     process, needs to submit all of the agreements that

9     are part of that transaction?

10 A  The declination process, as I said, is not part of

11    this at all.  There are no regulations on the

12    declination process.

13 Q  And so it follows, then, that there's no regulation

14    that requires all of the documents to be submitted as

15    part of the process, true?

16 A  That is right.  It's a voluntary process.

17 Q  And so the points that you were just making, which is

18    in 533.6, looks like sub 5, sub 4, about a trustee

19    and the 30 percent fee, that's about the formal

20    approval of management contracts.

21 A  That's right.

22 Q  And does that formal approval of management contract

23    process have any relevance to your opinions in this

24    case?

25 A  Well, if a contract is a management contract and it's

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 133

1      not being submitted pursuant to these regulations,

2      then the -- the contractor and the tribe are out of

3      compliance with the regulations.

4    Q   Right.  Okay.  So let me be more specific.

5                 You make opinions about intertwinement

6      and whether all these documents would be viewed as

7      one transaction or one document.

8                 Does the process related to the

9      approval of management contracts have any relevance

10     to those opinions about intertwinement and so on?

11   A   Yes.

12   Q   How so?

13   A   Well, because when the chairman is deciding what

14     needs to be approved and what doesn't, he looks at

15     those kind of issues.

16   Q   And now I'll ask some more questions about this,

17     then.

18                Are there any regulations on the more

19     formal management approval process that require a

20     party in the first instance to submit all of the

21     documents that are part of the transaction for the

22     commissioner's review?

23   A   Not in those words.

24   Q   And if I understand you correctly, the NIGC -- strike

25     that.

Deposition of Coleman, Penny, 3/7/2014

1              As I understand it, the commissioner

2        has the ability to request those materials --

3   A    Yes.

4   Q    -- from the parties, correct?

5   A    Yes.

6   Q    And it not only can request them, but can order them

7        to be produced by the parties?

8   A    Yes.

9   Q    But the parties themselves don't have to provide them

10       to the commissioner in order for the approval process

11       to occur, true?

12  A    The NIGC is taking the position that those documents

13       all have to be submitted.

14  Q    And now let me understand the origin of that request

15       from the NIGC.

16              Is that regulatory?

17  A    That's a practical application of the -- of the

18       requirements for approval.

19  Q    And is that embodied in a bulletin?

20  A    Actually, I think it is.

21  Q    Do you know the number of the bulletin?

22  A    No.

23  Q    Regardless of what it is, is it considered an

24       informal agency policy to have those documents

25       submitted by the parties in one grouping?

Deposition of Coleman, Penny, 3/7/2014

Page 135

1   A   I'm not getting -- understanding where you're going

2       with this.

3                   I mean, is there anything -- any

4       regulation that says, "You will submit all of these"?

5       No.

6   Q   The next series of questions I'm going to focus just

7       on the declination process.  So I'm not as concerned

8       now about the formal review process.

9   A   All right.

10  Q   I asked you some questions about whether there were

11      regulations requiring submission of the documents by

12      the submitting parties.  And this question is a

13      little different.

14  A   Okay.

15  Q   Are there any regulations that provide that the NIGC

16      must review all of the documents together in its

17      evaluation of whether the transaction constitutes a

18      management contract?

19  A   No.

20  Q   Is there any informal agency practice or policy that

21      dictates that all of the documents must be reviewed

22      together?

23  A   Informal agency practice, yes.

24  Q   And the practice would be one that was developed by

25      the lawyers who are doing the review process?

Deposition of Coleman, Penny, 3/7/2014

Page 136

1   A   It was -- well, it was developed as part of that, but

2       it was also developed in -- as a result of case law,

3       the -- the consulting agreement that had been

4       submitted and had -- the OGC had opined that it was

5       not a management contract.

6                       But then there was a lending agreement

7       that required the consultant to have everything he

8       did -- well, required the tribe to follow everything

9       the consultant told them to.

10                      You know, those kinds of practical

11      problems are what caused the agency to develop the

12      practice of saying, "Give us everything so that we

13      can look at it," because the practice -- the process

14      is for protecting companies, protecting tribes.  It's

15      a way to not have a notice of violation, not have an

16      enforcement.  It's, like I said, a voluntary

17      practice.

18  Q   Right.  And the tribes or the other parties to the

19      transaction don't have to submit everything to the

20      NIGC for an informal review?

21  A   At their risk.

22  Q   I believe your first sort of macro level opinion is

23      that all of the various bond documents fall because

24      the indenture is void.

25                      Is that a fair characterization?

Deposition of Coleman, Penny, 3/7/2014

Page 137

1    A    Essentially.

2    Q    And I believe you argue that these other bond

3         documents, the nonindenture documents, are

4         intertwined with the indenture; is that right?

5    A    Yes.

6    Q    And that opinion about intertwinement, what is that

7         based on?  What's sort of the legal authority for

8         that conclusion?  And maybe it doesn't have to be

9         legal, but what's your reasoning for why there's

10        intertwinement?

11   A    Because the documents are dependent upon each other.

12        They can't be read separately.

13   Q    And in reaching that conclusion about dependency, did

14        you consult any case law?

15   A    When the agency -- I think case law came at about the

16        same time that the agency was developing those

17        policies.

18   Q    Bad question.  I want to be a little bit more

19        specific.

20   A    Okay.

21   Q    In this case you said intertwinement and dependency;

22        the documents are dependent on one another.

23                        In reaching that conclusion in this

24        case about dependency, did you consult any case law?

25   A    I consulted the practice of the NIGC, that's what I

Deposition of Coleman, Penny, 3/7/2014

1       looked to, to see what they would do.

2    Q    So that's a "no" on the case law question, correct?

3    A    I would say so, yes.

4    Q    Did you consult any statutes?

5    A    No.

6    Q    Did you consult any regulations?

7    A    No.

8    Q    It was simply the practice of the NIGC during the

9        time that you were there, true?

10   A    And since, yes.

11   Q    And when we talk about the NIGC practice, that would

12       be the declination review process, correct?

13   A    Yes.

14   Q    That you were the sole -- the lead authority on at

15       the agency, correct?

16   A    Yes.

17   Q    Of the people that reported to you while you were at

18       the NIGC, have any of them left?

19   A    Yes.

20   Q    Did you consult with any of them in reaching your

21       conclusions about intertwinement and dependency in

22       this case?

23   A    On this?

24   Q    Yes.

25   A    No.

Deposition of Coleman, Penny, 3/7/2014

Page 139

1    Q    Has anyone, to your knowledge, reviewed your
2         conclusions in this case about intertwinement or
3         dependency?
4    A    Reviewed my conclusions?
5    Q    Right.  Did you submit them to anyone to review or
6         check for you?
7    A    No.
8    Q    Again, I don't want to leave here without -- not
9         knowing your -- specifically what you're saying.
10                        And so correct me if I'm wrong, but
11        the basis for your conclusion that the other bond
12        documents are intertwined with the indenture is the
13        practice of the NIGC?
14   A    The practice of going through the documents,
15        identifying documents that are incorporated by
16        reference, documents when the -- when a contract says
17        you have to do something that's in another contract.
18        Much like the consulting and loan agreement, when one
19        says you have to do something in another.
20   Q    And so the agency practice that you were describing,
21        then, leads to a review of the language in the
22        agreements, correct?
23   A    Yes.
24   Q    And so when you talk about the basis for your
25        opinions that these agreements are dependent on one

Deposition of Coleman, Penny, 3/7/2014

Page 140

1       another, it's really focusing on the specific

2       language of the various bond documents, true?

3   A   Yes.

4   Q   And then your say-so as to whether those are

5       independent or not?

6   A   I'm not real sure what you're saying.

7   Q   All right.  You reviewed the contract language in the

8       bond documents to determine whether they are

9       independent, correct?

10  A   Yeah.  Yes.

11  Q   And, then, not based on any case law, not based on

12      any statute, not based on any regulation, you

13      yourself came to the conclusion that these are

14      dependent on one another, true?

15  A   Based on the way the NIGC has been approaching it for

16      the last 15 years, yes.

17  Q   And that informal process, that's not reviewed by

18      Congress or anyone else, correct?

19  A   Yes.

20  Q   And that process that was made at the NIGC as to

21      whether there was interdependence between the

22      contracts, was that a determination that was made by

23      the in-house legal staff at the NIGC?

24  A   Are you asking if work -- I believe that's something

25      that the lawyers and contract people developed

Deposition of Coleman, Penny, 3/7/2014

Page 141

1          together.

2     Q    And, ultimately, the determination of whether there

3          was interdependency was a call that a lawyer made at

4          the NIGC, correct?

5     A    The general counsel, yes --

6     Q    That would be you?

7     A    -- or deputy.  Yes.

8     Q    Right.  So people could present their findings to

9          you, but, ultimately, the conclusion of whether there

10         was interdependency between the agreements was a

11         legal call that you made at the time you were there,

12         true?

13    A    It was a fact-based decision.  I don't know whether

14         you would want to call it a "legal call" or if

15         it's -- or what, but it was a decision by the general

16         counsel.

17    Q    A layperson was not making the determination of

18         whether there was interdependency, correct?

19    A    Not usually.

20    Q    And in making your interdependency determinations,

21         you would often discuss the application of certain

22         contract provisions, correct?

23    A    Yes.

24    Q    And you would cite case law at points in your opinion

25         letters, correct?

Deposition of Coleman, Penny, 3/7/2014

Page 142

```
 1   A      Yes.
 2   Q      Those declination decisions were legal determinations
 3          that you made as the acting general counsel of the
 4          NIGC, correct?
 5   A      As I said, they're opinions that were provided.
 6   Q      In your role as the lawyer for the NIGC.
 7   A      In my role as the general counsel.
 8   Q      Let me just ask a couple, I think, last general
 9          questions on this topic.
10                           Is it true that the only agreements
11          that are void under IGRA are those agreements that
12          constitute management contracts that have not been
13          approved by the commission?
14   A      Management contracts, yes, or agreements that include
15          management, so -- and I -- I think of them as being
16          one and the same.  If it has one provision of
17          management as a management contract, it's the same as
18          one that has all of the provisions of management.
19          And those are the ones that are void, yes.
20   Q      Right.  And so if an agreement is not a management
21          contract, it is not void if it is unapproved, true?
22   A      Are you talking about a -- if you're talking about a
23          separate stand-alone document that has nothing to do
24          with any other document, that would be a true
25          statement.
```

Deposition of Coleman, Penny, 3/7/2014

Page 143

1   Q    If that document has no indicia of management and is

2        not submitted for approval, it can still be enforced,

3        correct?

4   A    If it has no indicia of management and has not been

5        submitted for approval and it's still valid, yes.

6   Q    And I want to -- I think this question now goes to

7        what you were referencing earlier.

8                        Do you agree that a collateral

9        agreement is a management contract only if itself

10       contains the requisite indicia of management?

11  A    Yes.

12  Q    And that's something in case law that you've relied

13       on over the years in your opinion letters, correct?

14  A    Yes.

15  Q    Excuse me for one second.

16                  (Pause in proceedings.)

17  BY MR. TUREK

18  Q    I want to ask you some questions about the

19       enforcement procedures at the NIGC.

20  A    Okay.

21  Q    If the NIGC finds that an unapproved management

22       contract is in place, it can start an enforcement

23       action to shut down that gaming operation, correct?

24  A    It can, yes.

25  Q    While at the NIGC, you knew about litigation between

Deposition of Coleman, Penny, 3/7/2014

Page 144

1      Wells Fargo and Lac du Flambeau arising out of this

2      2008 bond transaction, true?

3  A    Yes.

4  Q    I think you even referenced a couple of times Judge

5      Randa's district court opinion in some of your

6      declination letters.

7  A    Yes.

8  Q    That decision by Judge Randa determined that the

9      indenture was a management contract, correct?

10 A    Yes.

11 Q    In response, did the NIGC ever consider an

12      enforcement action with regard to gaming operations

13      at the Lac du Flambeau?

14 A    I'm not in a position to answer that question.

15 Q    Do you have any knowledge of enforcement proceedings

16      being considered by the NIGC as it relates to gaming

17      at the Lac du Flambeau?

18 A    All I can say is, is that no action was brought.

19              MS. McNALLY:  I'm sorry, what was that last

20      part?

21              THE WITNESS:  No action was brought.

22 BY MR. TUREK

23 Q    And, again, I don't know if that necessarily answers

24      my question, which is:  Do you have any knowledge of

25      an enforcement action ever being considered at Lac du

Deposition of Coleman, Penny, 3/7/2014

Page 145

```
 1        Flambeau?

 2   A    I don't feel like I can answer that question.

 3              MS. HOGEN MOLINE:  Yeah, I'm going to

 4        object to that.  There's a federal regulation that

 5        prohibits her from answering that question.

 6              MR. TUREK:  Do you guys have the cite?  Do

 7        you know what it is?

 8              MS. HOGEN MOLINE:  25 CFR Part 516.

 9   BY MR. TUREK

10   Q    Ms. Coleman, do you believe that that CFR statute

11        precludes you from answering that question?

12   A    I don't have that memorized.

13   Q    What's your hesitancy?  You sound like you had

14        some -- you didn't know if you could answer it, and I

15        just want to know why.

16   A    Because as general counsel -- well, think of it this

17        way:  Would you expect a U.S. attorney to answer a

18        question about whether or not they were considering

19        bringing an action?  The answer is no.  Because those

20        are internal discussions.  Sometimes discussions

21        result in an action; sometimes they don't.  But those

22        are not the kind of thing that I feel I can respond

23        to.

24   Q    In any event, you're not aware of any enforcement

25        action ever being initiated by the NIGC with respect
```

Deposition of Coleman, Penny, 3/7/2014

Page 146

```
 1        to Lac du Flambeau?
 2   A    That's correct.
 3   Q    In your time as acting general counsel, there were
 4        instances where the tribe -- a tribe and another
 5        party were in litigation that implicated whether
 6        agreements were management contracts, correct?
 7   A    Yes.
 8   Q    And in those instances, you refrained from opining on
 9        whether there was indicia of management in the
10        agreements, true?
11   A    Usually.
12   Q    Why was that?
13   A    There was already a forum looking at that issue.
14   Q    There would be a judge that would be deciding whether
15        there was a management contract or not, correct?
16   A    Yes.
17   Q    And as the NIGC general counsel, you deferred to that
18        judge to let that issue play out in the courts,
19        correct?
20   A    Sometimes.
21   Q    Did you ever make an opinion about whether there was
22        a management contract while a matter was pending in
23        litigation on that issue?
24   A    Yes.
25   Q    And when the courts were looking at that same issue,
```

Deposition of Coleman, Penny, 3/7/2014

Page 147

```
 1        do you know whether or not they looked to your
 2        opinions as guidance in any way?
 3   A    I understand that the courts viewed the guidance --
 4        the opinions as anywhere from guidance to something
 5        that they just didn't feel like they needed to pay
 6        attention to.
 7   Q    Are you aware of any court ever giving persuasive
 8        value to a declination letter that you provided
 9        during the time that you were at NIGC?
10   A    As I remember, yes.
11   Q    Can you give me the name of that court or ruling or
12        judge?
13   A    No, not offhand.  But as I remember, they talked
14        about Skidmore deference.
15   Q    Skidmore deference?
16   A    Skidmore.  That's the persuasive.
17   Q    And that deference -- one, I'll take you at face
18        value.  I don't know what these decisions say.  I
19        don't have any information about them.
20              But the deference was provided, if at
21        all, based on NIGC opinions about whether they were
22        management contracts, correct?
23   A    Yes.
24   Q    I understood before we sat down here today that your
25        affidavit had an exhaustive list of reasons for why
```

Deposition of Coleman, Penny, 3/7/2014

```
 1        these agreements -- individual agreements were
 2        management contracts.  But I understand you've made
 3        some additions today.
 4                       Are there any other things that you
 5        can think of as you sit here that constitute indicia
 6        of management in any of the bond documents that we
 7        haven't spoken about today?
 8   A    No.
 9   Q    Do you have the bond purchase agreement in front of
10        you?  I think it was --
11   A    Yeah, I've got it.
12             (Exhibit 5 marked for identification.)
13   BY MS. McNALLY:
14   Q    Ms. Coleman, just so we're working off the same page
15        literally --
16   A    Okay.
17   Q    -- I'm going to give you Exhibit 5.
18   A    Okay.
19   Q    Can I have that back for just one second?  I'm sorry.
20        I just want to make sure I didn't give you the one I
21        wrote on.
22                  MR. CLARK:  Can we mark that?
23                  MR. TUREK:  It's being marked as Exhibit 5.
24                  THE WITNESS:  Yeah, it certainly doesn't
25        look like mine -- oh, yeah, it does.
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 149

1             MR. TUREK:  I think this is a clean

2      version.

3             THE WITNESS:  Okay.

4   BY MR. TUREK

5   Q    I would like you to first turn to page 13.

6   A    (Witness complies.)  Okay.

7   Q    In your declaration --

8             MR. CLARK:  Do you have an extra copy?

9             MR. TUREK:  Oh, yeah, I do, Jim.

10            (Pause in proceedings.)

11  BY MR. TUREK:

12  Q    So we're on page 13?

13  A    Yes.

14  Q    All right, Ms. Coleman.  We're looking at page 13 of

15       Exhibit 5, which is the bond purchase agreement.

16  A    Yes.

17  Q    And in your declaration you initially opined that

18       Section 9(i)(5)(iv), and Section 6(vii) were indicia

19       of management, correct?

20  A    Yeah.

21  Q    Are you now withdrawing that conclusion that they are

22       indicia of management?

23  A    I -- yes.

24  Q    And explain to me again why you are no longer of the

25       belief that those sections in the BPA constitute

1        indicia of management.

2   A    Because this is just a list of documents that will be

3        received.  And, in particular, 5 is just part of the

4        bond opinion.  And the bond opinion is the opinion of

5        Godfrey & Kahn; it's not a contract.

6   Q    And the references in the opinion letter subsection

7        to the other documents, is it fair that those are not

8        incorporations of those bond documents into the bond

9        purchase agreement?

10  A    Yes.

11  Q    And so because those bond documents have not been

12       incorporated into the bond purchase agreement in

13       these two sections, is it fair to say that these

14       sections are not indicia of management?

15  A    Yes.

16  Q    And so as I understand it now, you are turning to

17       Section 6 of the bond purchase agreement --

18  A    Yes.

19  Q    -- to support an opinion that there is indicia of

20       management, correct?

21  A    Yes.

22  Q    And, specifically, as I understood your testimony

23       earlier -- correct me if I'm wrong -- it's the

24       references to the bond documents in Section 6, sub D,

25       E, F, and G?

Deposition of Coleman, Penny, 3/7/2014

Page 151

1    A    And H.

2    Q    Any other subsections in 6?

3    A    No.

4    Q    And would you agree that these are representations by

5         the EDC about the enforceability of those various

6         bond documents?

7    A    I'm not sure what you mean by "representations," but

8         as I read Section 6, "The corporation makes the

9         following representations and warranties," I

10        understood "warranties" to be -- to mean guarantees.

11                      And so the corporation is saying that

12        the indenture is enforceable, the agreement is

13        enforceable, security agreement is enforceable,

14        and -- and as are the bonds and -- and that they

15        will -- all of these -- the bonds will have the

16        security of the indenture, security agreement, and

17        the tribal agreement, all of which will be

18        enforceable.

19   Q    So it's those warranties that are in those sections

20        that you believe equates to an incorporation --

21   A    Yes.

22   Q    -- of those documents?

23   A    Yes.

24   Q    When did you come to that conclusion?

25   A    Actually, that's something that I had thought when I

Deposition of Coleman, Penny, 3/7/2014

1      first reviewed this, but -- and I'm not sure why I

2      ended up putting 9 in there instead of 6.  And so it

3      was, I assume, an error on my part.

4   Q  So no communications with the tribe's counsel or

5      briefing or anything like that is what led you to

6      discover this mistake?

7   A  Not with respect to 6.

8                      Counsel did ask me if -- if I wanted

9      to stand behind my -- I don't know exactly what she

10     said, but she directed me to look at 9.  And I looked

11     at 9 and thought, what was I thinking?

12  Q  Okay.  So let's make sure I understand this.

13                     You included 6 in your affidavit.

14     Counsel for the tribe prompted you to go back to

15     Section 9.

16  A  No.  I included Section 9 in my affidavit.  I had --

17     in reviewing this document, I had skipped over 6.  I

18     had only included 9.

19                     She didn't talk to me about 6 at all,

20     but she did ask me if I was sure I wanted to include

21     9.

22                     And I looked at it, realized it was a

23     list, and decided that I needed to correct that.

24  Q  So it was at the urging of counsel that you've now

25     removed Section 9 as an indicia of management?

Deposition of Coleman, Penny, 3/7/2014

Page 153

1    A    Yes.

2    Q    Okay.  Do you have the indenture in front of you or a

3         copy of it handy?

4    A    Yes.

5    Q    Could you turn to page 39 of the indenture, Section

6         6.25.

7    A    (Witness complies.)

8    Q    Are you with me yet?

9    A    Yeah.

10   Q    Do you see under "Representations and Warranties" in

11        Section 6.25?

12   A    Yes.

13   Q    There's the phrase "Incorporated herein by this

14        reference."  Do you see that?

15   A    Yes.  Uh-huh.

16   Q    You understand that to be a means and a mechanism by

17        which parties can express their intent to incorporate

18        something else by reference, true?

19   A    Yes.

20   Q    Do you see that phrase incorporated herein by

21        reference in Section 6 of the bond purchase

22        agreement?

23   A    No.

24   Q    Do you have the issuer's opinion letter in front of

25        you?  It would have been a Godfrey & Kahn issuer's

Deposition of Coleman, Penny, 3/7/2014

Page 154

1         letter.

2    A    I don't know.

3    Q    Not the bond opinion letter -- bond counsel letter,

4         but the issuer's opinion letter.

5    A    Yes.  The opinion of whom?

6    Q    Godfrey & Kahn as issuer's counsel.

7    A    Yes.

8    Q    Can you turn to that, please.  Page 3.

9    A    (Witness complies.)  Okay.

10   Q    In the paragraph that starts, "In rendering this

11        opinion, we have with your permission" on page 3,

12        again, there's the phrase "incorporated by

13        reference," correct?

14   A    Um-hmm.

15   Q    Yes?

16   A    Yes.

17   Q    And you don't see that language in the bond purchase

18        agreement, true?

19   A    I did not see it in the bond purchase agreement.

20   Q    But yet you are subscribing that intent of

21        incorporation by reference into the bond purchase

22        agreement, true?

23   A    Is the question do I believe that under Section 6,

24        that the agreements have been incorporated by

25        reference?  Is that the question?

Deposition of Coleman, Penny, 3/7/2014

Page 155

1    Q    No.  It's a little different.

2                         You've seen now two examples in the

3         indenture and in this issuer's opinion letter where

4         the parties -- one of the parties to the agreement

5         specified "incorporation by reference" to reflect

6         their intent to incorporate something into that

7         particular document, all right?  Do you see that?

8    A    Yeah.

9    Q    And that's not in Section 6 of the bond purchase

10        agreement, true?

11   A    That language, "incorporated by reference," is not in

12        there.

13   Q    And yet you are attaching that same significance to

14        the bond purchase agreement as if that language had

15        been in there, correct?

16   A    Isn't that what they're doing on 3?

17   Q    Yeah.  And they're using the phrase "incorporated by

18        reference," true?

19   A    Aren't they saying that these -- that things were

20        incorporated by reference in the other documents,

21        and -- even though those other documents don't use

22        those words?

23   Q    What's your understanding of what you're looking at

24        in Section 3?

25                         The phrase "incorporated by

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 156

1        reference," you have an understanding of what that

2        means as a lawyer, right?

3   A    Yes.

4   Q    And that's, again, a mechanism that lawyers use to

5        expressly state, "We want that terminology or those

6        terms to be incorporated into this other document" --

7   A    Yes.

8   Q    -- correct?

9   A    Yes.

10  Q    And it's a common phrase that you see all the time

11       used in agreements, true?

12  A    Yes.

13  Q    And that language is not in Section 6 of the bond

14       purchase agreement, true?

15  A    That language is not in Section 6.

16  Q    Does the fact that that language is not in Section 6

17       but is in other documents that you see as part of

18       this transaction influence at all your opinions that

19       Section 6 effectuates an incorporation by reference

20       of those documents?

21  A    No.

22              MR. TUREK:  Okay.  Take a break.

23          (A break was taken at 3:20 p.m.)

24          (Back on the record at 3:28 p.m.)

25

Deposition of Coleman, Penny, 3/7/2014

1  BY MR. TUREK

2  Q    All right, Ms. Coleman.  We're back on the record.

3                      At any point while you were acting

4       general counsel at NIGC, did you determine that a

5       collateral agreement was a management contract merely

6       because it referenced another management contract?

7  A    It would -- it would depend on the context.

8  Q    Well, maybe I want to try to get you to -- let me see

9       if I can get you to agree to this.

10                     One, there's a difference between

11      "reference" and "incorporation," correct?

12 A    Yes.

13 Q    Okay.  At your time as acting general counsel at

14      NIGC, did you ever determine that a collateral

15      agreement that referenced a management contract

16      transformed that collateral agreement into a

17      management contract?

18 A    As I said, it would depend on the context.

19                     It's a -- because you don't apparently

20      understand what I mean by "incorporation by

21      reference."  You know, in -- in these approvals or in

22      contracts, if it says, you know, that the -- the

23      default remedies of the secure -- of the

24      management -- you know, the lender has that right

25      under it, that would be something that we would say,

Deposition of Coleman, Penny, 3/7/2014

Page 158

```
 1          "No, you can't do that because that's part of the
 2      management contract and those two go together."
 3                      But if it -- there were occasional
 4      times where they would say something about a
 5      management contract, and we would let it stay in, but
 6      it was one of those -- one of those areas that you
 7      had to be extremely careful.
 8                      And so it was more often than not that
 9      if they wanted to go forward with the other
10      contracts, they would -- they would take out any
11      reference to management contract.
12  Q   So if I understand what you're saying correctly, a
13      collateral agreement's reference to a management
14      contract does not, per se, invalidate that collateral
15      agreement, true?
16  A   True.
17  Q   And let me just throw this hypothetical out to you.
18                      Contract A --
19  A   Um-hmm.
20  Q   -- has a default provision that you believe makes
21      Contract A a management contract.
22  A   Yes.
23  Q   Okay.  Contract B makes a reference generically to
24      Contract A.  Not to the default provisions, not to
25      the consequences of default, but just makes a
```

Deposition of Coleman, Penny, 3/7/2014

Page 159

```
 1          reference to Contract A.
 2                       Is Contract B a management contract?
 3     A    What's the reference?
 4     Q    It says that Contract A is enforceable.
 5     A    Oh.  That would be probably one of the first ones
 6          that I would suggest that they take out.
 7                       I mean, those -- those are the kinds
 8          of concerns that are raised because are these
 9          separate standalone contracts, or are they contracts
10          that are -- that have to stand together?
11     Q    And that determination would be one that you would
12          make individually without consulting any case law,
13          statutes, or regulations, true?
14     A    It would be something that -- not beyond what had
15          been done originally to come up -- to understand how
16          to do this.
17     Q    Do you have a copy of the bond in front of you now --
18          actually, just to make it easier, I'll give you an
19          exhibit here.
20     A    Okay.
21          (Exhibit 6 marked for identification.)
22     BY MS. McNALLY:
23     Q    Here's Exhibit 6.  Keep that to one side.  And then
24          your affidavit or your declaration in this case on
25          page 15 at paragraph 55 comments on the bond.
```

Deposition of Coleman, Penny, 3/7/2014

Page 160

1            Where in the bond does it incorporate

2       the trust indenture's default remedies?

3    A   I would say that if you look at the fact that there's

4       many references to the trustee and the indenture, and

5       then you look at the fact that on top of page 3, the

6       bonds of this series are authorized by a bond

7       resolution and trust indenture.  And the bonds are

8       equally and ratably secured by the pledged revenues

9       pursuant to the indenture.

10           And "Reference is hereby made to the

11      indenture and bond resolution, and any amendments" --

12      "for a description and limitation of the property,

13      revenues and funds pledged and appropriated to the

14      payment of the bonds, the nature and extent of the

15      security thereby created, the rights of the owners of

16      the bonds, the rights, duties, and immunities of the

17      trustee."  And it continues.

18           And then you look down to the bottom

19      of 3, you see "Prior to the date fixed for

20      redemption, funds shall be deposited with the trustee

21      sufficient to pay the bonds called."

22           And then up on top of page 4 it says,

23      "This bond is transferable, as provided in the

24      indenture, only upon the registration records

25      maintained by the trustee under the indenture by the

Deposition of Coleman, Penny, 3/7/2014

Page 161

1      registered owner."

2                       And then down to the third-to-last

3      paragraph on 4 it says, "In case an event of default

4      as defined in the indenture occurs, the principal of

5      this bond and all other bonds outstanding may be

6      declared or may become due and payable prior to the

7      stated maturity" -- "and with the effect and subject

8      to the conditions provided in the indenture, but no

9      owner of any bond shall have the right to enforce the

10     provisions of the indenture, except as herewith

11     provided."

12                      And then finally, the fact that "The

13     bond is not valid or becomes obligatory for any

14     purpose until it has been authenticated by the

15     execution of the certificate herein endorsed by the

16     trustee under the indenture."

17                      I read that altogether to take that

18     position.

19  Q  Without necessarily reference to the bonds or the

20     indenture, do you understand the difference between

21     an obligation to repay and security for that

22     obligation to repay?

23  A  Yes.

24  Q  The bonds are themselves a promise to repay the debt,

25     and the indenture was security for that promise to

Deposition of Coleman, Penny, 3/7/2014

Page 162

1        repay the debt, true?

2    A    The indenture seems to be a lot more than just a

3         security, but it is part and parcel of that.

4              MR. TUREK:  All right.  I'm going to hold

5         the rest of my exam, pending some off-the-record

6         discussion about the letters.  I'll pass the baton to

7         Jim.

8                        EXAMINATION

9    BY MR. CLARK:

10   Q    While we're on the subject of the bond, do you agree

11        that the bond -- which I think -- do you have the

12        bond in front of you?

13   A    I have the bond series 2008.

14   Q    You agree that the bond does not contain the language

15        that Mr. Turek was discussing with you a while back

16        to the effect of "incorporation by reference" --

17        "hereby incorporated by reference"?

18                   Do you see anywhere in the bond that

19        it says that the terms and conditions of the trust

20        indenture are hereby incorporated by reference?

21   A    I have not seen those words.

22              (Exhibit 7 marked for identification.)

23   BY MR. CLARK:

24   Q    Do you have the agreement there?

25   A    Lac du Flambeau Band of Lake Superior Chippewa

Deposition of Coleman, Penny, 3/7/2014

Page 163

1      Indians No. 1 through 8?  Is that what you're talking

2      about?

3  Q   No, the tribal agreement.  It's called the "Tribal

4      Agreement."

5  A   Yeah.

6  Q   Do you see anywhere in the tribal agreement where it

7      says anything to the effect that the terms and

8      conditions of the indenture are incorporated by

9      reference into the tribal agreement?

10 A   Are you looking for those exact words, or are you

11     looking for --

12 Q   Or words that come close to that.

13 A   "The tribe here absolutely and unconditionally

14     guarantees the trustee the payment of the

15     obligation."

16 Q   Are you saying that you believe those words are the

17     equivalent of incorporating by reference the terms

18     and conditions of the trust agreement?

19 A   That is part of it.

20               The entire -- if you'll look at B, C,

21     D, E, F, G, H, they all talk about the trust

22     agreement, including -- like, in, for instance, H,

23     "All remedies according to the trustee, by reason of

24     this agreement, are separate and cumulative" --

25 Q   Let me interrupt you for a second.

Deposition of Coleman, Penny, 3/7/2014

Page 164

```
 1                        I recognize that there are provisions
 2         in there that talk about the trust agreement.
 3                        What I'm asking you is:  Is there
 4         anything in that document that you can point me to
 5         that says that the terms and conditions of the
 6         indenture are incorporated by reference in that
 7         document?
 8    A    If you're asking are those exact words in there, no.
 9         The answer is no.
10    Q    And other than -- okay.  And other than the
11         provisions that -- is it your testimony that you view
12         those provisions that you've previously mentioned and
13         that you include in your report or your affidavit as,
14         in your mind, being the equivalent of incorporating
15         the terms and conditions of the indenture into the
16         tribal agreement?
17    A    Just so that I don't get confused, which section were
18         we looking at in the --
19    Q    Well, you named just a minute ago a number of
20         different provisions in the tribal agreement when I
21         asked you the question of whether the terms and
22         conditions of the indenture were incorporated by
23         reference into the tribal agreement.
24                        In response to that question, you
25         rattled off a number of different provisions in the
```

Deposition of Coleman, Penny, 3/7/2014

1        tribal agreement that you made reference to in

2        response to my question.

3                        Do you recall that?

4    A   Yes, I recall that.

5    Q   All right.  And what I'm asking you is:  Is it your

6        testimony that you -- in your view, that those

7        provisions are the functional equivalent of expressly

8        incorporating into a document the terms and

9        conditions of another document?

10   A   It's my testimony that the -- that -- well, for one

11       thing, we started talking about "incorporation by

12       reference" probably a lot more than is appropriate.

13   Q   Why do you say that?

14   A   Well, because the concept is more that these --

15       that -- you know, in some instances -- like the

16       default remedies, in particular, will become a remedy

17       of the other agreement.  That's very common

18       throughout these.

19                        But the other is, is that the

20       documents are -- they don't -- they don't stand

21       alone.  They are documents that are dependent upon

22       each other.  This tribal agreement is dependent upon

23       having a trustee and --

24   Q   And that concept you're talking about, that's the

25       concept that was developed while you were at the

Deposition of Coleman, Penny, 3/7/2014

Page 166

1           NGIC; is that correct?

2    A      NIGC, yes.

3    Q      NIGC.

4    A      Yes.

5    Q      If you'd look at paragraph 8 -- I'm sorry, page 8,

6           paragraph 27.

7    A      Okay.

8    Q      Paragraph 27 you're talking about the -- reviewing

9           contracts containing the indicia of management.

10   A      Um-hmm.

11   Q      And then you talk about the declination process.  And

12          then you refer to the decision by the Eastern

13          District of Wisconsin in the Wells Fargo matter.

14   A      Yes.

15   Q      Now, are you aware of the fact that the Eastern

16          District decision in the Wells Fargo matter was

17          appealed to the Seventh Circuit?

18   A      Yes.

19   Q      And there was a Seventh Circuit decision on all this,

20          correct?

21   A      Yes.

22   Q      Why did you not cite the Seventh Circuit decision as

23          opposed to citing the Eastern District decision?

24   A      If I remember right, they're still referring to that

25          in the letters.

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 167

1   Q   The commission is still referring to the Eastern

2       District decision in their letters?

3   A   Yes.

4   Q   And they're doing that even though there was a

5       Seventh Circuit decision that, at least in

6       significant part, overruled the Eastern District

7       decision?

8   A   Well, I'm not going to get into whether or not they

9       overruled it, but I do know that the lower court

10      talked about a receiver.  And it seemed to me that

11      the Seventh Circuit decided to not reach that

12      decision.

13                  And the Seventh Circuit decision -- I

14      don't know, and I haven't asked, why they didn't

15      change the reference.  I would have to actually

16      double-check to make sure they haven't.

17  Q   And was that true while you were the person writing

18      the opinions before you left the agency; even though

19      the Seventh Circuit decision had been rendered, you

20      still referred to the --

21  A   No, I don't think the --

22  Q   -- the Eastern District decision?

23  A   I don't think that the Seventh Circuit decision had

24      been rendered.

25  Q   You were gone before that decision was rendered?

Deposition of Coleman, Penny, 3/7/2014

Page 168

```
 1   A   Yes, because Wells -- the lower court decision was
 2       issued in 2010, and that's when I left.
 3   Q   Okay.  But your understanding is that the commission
 4       continues to refer to the Eastern District decision,
 5       notwithstanding the appeal on the decision of the
 6       Seventh Circuit?
 7   A   Like I said, I don't remember double-checking that
 8       particular thing.  That can be checked on the website
 9       very easily, but that would -- certainly, the
10       receiver part of that analysis was something that --
11       and as you see, found persuasive.
12   Q   Now, are you aware of the fact that in the
13       Seventh Circuit decision, which was the appeal from
14       this Eastern District decision that's referenced in
15       your declaration, that one of the things that the
16       Seventh Circuit said was that the mere reference to a
17       related management contract does not render a
18       collateral document subject to the act's approval
19       requirement?
20                    Are you aware of that holding by the
21       Seventh Circuit?
22   A   I remember language somewhat to that effect.
23   Q   Okay.  Do you know whether or not, in light of that
24       language, the commission has undertaken any
25       reasonably definitive research on the question of the
```

Deposition of Coleman, Penny, 3/7/2014

Page 169

1          difference between referring to a management contract

2          and actually incorporating the terms of the

3          management contract into another document?

4     A    I do not know.

5     Q    In the Seventh Circuit opinion, another thing they

6          say in a footnote, Footnote 13, they said that it

7          appears that through its regulatory authority, the

8          commission should undertake the task at some point in

9          order to give entities that it regulates more certain

10         guidance as to the permissible scope of financing

11         agreements.

12                    Do you recall that portion of the

13         Seventh Circuit opinion?

14    A    Yes.

15    Q    Why was it that there was no regulation that gave

16         anyone an indication of what would or would not be

17         considered management under the operative rules?

18    A    Why?

19    Q    Yes.  Why were there no -- why are there no

20         regulations?  If you could tell me from your

21         perspective, why did that not happen while you were

22         at the commission?

23    A    We spent a lot of our time writing regulations.  That

24         was just not one of the ones that had risen to the

25         top as far as importance.

Deposition of Coleman, Penny, 3/7/2014

Page 170

1          The NIGC writes minimum internal
2     control standards.  They should be changed about once
3     every two years.  If you've ever seen a minimum
4     internal control standard, they are extraordinarily
5     lengthy.  And when it came to regulatory writing
6     resources, they tended to focus on that.
7          There wasn't a big call by the outside
8     community to write regulations.  And, you know,
9     agencies have to focus their resource where the
10    demand is.
11  Q   Could you turn to paragraph 14 of your declaration.
12  A   Okay.
13  Q   That's the one that starts out, "For example, a
14      typical set of agreements submitted to the NIGC for
15      review and approval will include a management
16      contract, a loan agreement, and a development
17      agreement."
18              Do you see that?
19  A   What number was it again?  I'm sorry.
20  Q   Fourteen.
21  A   Oh, No. 14 or page 14?
22  Q   I'm sorry.  If I said page 14, I meant paragraph 14.
23  A   Okay.  Okay.
24  Q   Do you see that first sentence --
25  A   Yeah.

Deposition of Coleman, Penny, 3/7/2014

1   Q   -- I just read?

2   A   Yes.

3   Q   And then you go on to say, "The parties that are

4       seeking management contract approval are careful to

5       assure that the loan and development agreements can

6       stand alone and not provide for any management of the

7       gaming enterprise, and thus do not require NIGC

8       approval."

9                   Do you see that?

10  A   Yes.

11  Q   So you recognize that, at least in most cases,

12      parties that are seeking management contracts will

13      take steps to try to ensure that that's the case,

14      correct?

15  A   Yes.

16  Q   And if they do that; namely, if the loan and

17      development agreements can stand alone, then they --

18      you agree they don't require NIGC approval, correct?

19  A   Yes.  And what we're talking about, of course, is

20      that they don't have any management in them; they're

21      not dependent upon the management agreement.

22  Q   Right.

23  A   Yeah.

24  Q   They're not -- assuming they're not management

25      contracts, correct?

Deposition of Coleman, Penny, 3/7/2014

Page 172

```
 1   A   Well, yes and no.  I mean, as we've discussed with
 2       respect to these contracts --
 3   Q   Wait a minute.  I'm asking about paragraphs in your
 4       affidavit.
 5   A   Right.
 6   Q   Now, let's stick to paragraph -- with the language in
 7       paragraph 14 of your affidavit.  I'm trying to
 8       understand this.
 9                   You say, "The parties that are seeking
10       management contract approval are careful" -- and I
11       assume that means in most cases, from your
12       perspective -- "to assure that the loan and
13       development agreements can stand alone," correct?
14   A   Right.
15   Q   All right.  And not provide for management, correct?
16   A   Right.
17   Q   So you recognize that loan agreements can be drafted
18       that can stand alone and not provide for management,
19       correct?
20   A   Yes.
21   Q   And you recognize that development agreements can be
22       drafted that can stand alone and not provide for
23       management, correct?
24   A   Right.
25   Q   And if this happens, if the management agreement is
```

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 173

```
 1          drafted in a way that -- strike that.
 2                        If the loan agreement is drafted in a
 3          way that it does not provide for management, then you
 4          recognize in the last sentence that the parties could
 5          proceed on a loan agreement, even though the
 6          management contract was still pending approval,
 7          correct?
 8    A     If it can stand alone.
 9    Q     Correct.  Yeah.  And if the -- if the development
10          agreement can stand alone, in that it doesn't provide
11          for management, then --
12    A     This is an "and," not a --
13    Q     If the development agreement can stand alone and does
14          not provide for management, then you recognize that
15          the parties can proceed with that development
16          agreement, even though the management contract, which
17          is part of the transaction, is still pending approval
18          by the commission --
19    A     Yes.
20    Q     -- correct?
21    A     Yes.
22    Q     Could you go to paragraph 18 of your affidavit.
23    A     Okay.
24    Q     In paragraph 18 you talk about what you referred to
25          as the "NIGC policy" --
```

Deposition of Coleman, Penny, 3/7/2014

Page 174

1    A    Yes.

2    Q    -- insofar as what management encompasses, correct?

3    A    Yes.

4    Q    Then you go on to say a little bit later in that

5         paragraph, "A contract does not have to require that

6         the contractor manage all aspects of the operation."

7                   Do you see that?

8    A    Yes.

9    Q    If the contractor manages any aspect of the gaming

10        operation, then, in your view, the contract is

11        subject to NIGC approval; is that correct?  Is that

12        what you're saying?

13   A    Yes.

14   Q    Okay.  So is it your view that -- well, you're saying

15        it's subject to NIGC approval, meaning that it

16        would -- when you say "subject to NIGC approval,"

17        what do you mean by that phrase?

18   A    That means that the chairman has to approve the

19        contract.

20   Q    Okay.  And it doesn't necessarily mean that the

21        chairman wouldn't approve the contract, does it?

22   A    No.  It just means that it has to be approved in

23        order to not be void.

24   Q    And whether or not it has to be approved in order not

25        to be void would depend on whether it's actually a

Deposition of Coleman, Penny, 3/7/2014

1       management contract or not, correct?

2   A   Yes.

3   Q   So was it your view when you were at the agency that

4       any contract that managed any aspect of a gaming

5       operation, no matter how trivial, that that would --

6       that that would require NIGC approval?

7   A   Well, it wasn't just my view.  The NIGC issued

8       notices of violation.  I think they had a final

9       agency action --

10  Q   Well, we're talking about your view here.  Is that

11      your view?

12  A   Well, obviously, I take my view from what the agency

13      decides, yes -- or I did when I was there, yes.

14                  I think it's actually in the

15      regulations also.

16  Q   Where in the regulations does it say that a contract

17      that manages any aspect of a gaming operation, no

18      matter how trivial that might be, is subject to NIGC

19      approval?

20  A   I'm sure it does not use the word "trivial" in it.

21  Q   Which regulation are you referring to that you would

22      point me to to support that statement?

23  A   I will look in 533 to see if it is there.  I know

24      it's "all" or "part" is the language.

25                  It's not -- it doesn't appear to be in

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 176

1          533, but I do know it's in the regulations somewhere.

2          It's the "all" or "part" language --

3     Q    Is there anything you would look at, because I would

4          very much like to know what it is that you would

5          point to as support for that.

6                    MS. HOGEN MOLINE:  I'm just trying to pull

7          up the regulation.

8     BY MR. CLARK:

9     Q    If you can't easily think of it sitting here today,

10         why don't we do this:  Why don't you -- if you think

11         of it at some future time, just let your counsel

12         know --

13    A    Okay.  Because I know the language is there.

14    Q    -- and they can pass it on to us, all right?

15    A    Okay.

16    Q    If you'd go to paragraph 21.

17    A    Okay.

18    Q    In that, you describe the process, the declination

19         process.  We've gone over that in some detail

20         previously, so I don't intend to cover old ground

21         here hopefully, but you refer to the fact that if the

22         parties have provisions in a particular agreement

23         that you were to conclude was an indicia of

24         management or, in your opinion, made it a management

25         contract, then you would give the parties an

Deposition of Coleman, Penny, 3/7/2014

Page 177

1       opportunity to remove that offending provision; is
2       that correct?
3    A  Yes.
4    Q  All right.  And if the offending provision that you
5       felt -- or provisions that you felt made it a
6       management contract were removed, then you would
7       issue the -- the declination opinion, correct?
8    A  Yes.
9    Q  And that declination opinion would, in essence, be
10      that the submitted contract, in your opinion, didn't
11      constitute a management agreement that was subject to
12      NIGC approval; is that correct?
13   A  Yes.
14   Q  And do I remember correctly that I saw at one point
15      that this is referred to as an advisory opinion?
16   A  Yes.
17   Q  And why is it referred to as an advisory opinion?
18   A  Because it's -- it's equivalent to if you were lucky
19      enough to have a criminal prosecutor say, "If you do
20      this, you will be violating the law," something like
21      that.
22                       It's providing advice so that the
23      parties can go forward without concern that the NIGC
24      is going to conclude that they are violating the law.
25   Q  Is it binding on the NIGC?  Is it binding on the

Deposition of Coleman, Penny, 3/7/2014

Page 178

1      chairman?

2  A   No.

3  Q   So when you say, "so the parties can proceed without

4      concern," how can the parties proceed without concern

5      if the opinion that's being issued as part of this

6      process is not binding on the chairman?

7  A   Probably because the chairman has never brought an

8      action against someone who submitted all of the

9      contracts that needed to be submitted and were

10     reviewed by the OGC and never, then, proceeded with

11     action.

12 Q   So there's some level of comfort that if the opinion

13     is issued that the chairman won't go against the

14     opinion.  Is that what you're saying?

15 A   Right.

16 Q   But you would agree that there is nothing legally, by

17     virtue of the fact that you issued the opinion, that

18     would prevent the chairman, if certain -- if the

19     chairman, for various reasons, might have a different

20     point of view down the road, from taking the position

21     that it was a management contract; is that correct?

22 A   That's correct.

23 Q   And you -- if the chairman did that, I assume the

24     commission would take the position that the letter

25     that was issued was just an opinion.  It was an

Deposition of Coleman, Penny, 3/7/2014

Page 179

1    advisory opinion.  It wasn't a conclusive statement

2    that was binding on the chairman that this was not a

3    management contract.

4  A    That's correct.

5  Q    You would agree with me that if a party chose to do

6    this, there's nothing that would require them to

7    submit any documents in connection with the

8    transaction to the commission, if they were

9    reasonably confident that they weren't management

10    contracts, correct?

11  A    That's correct.

12  Q    And, of course, they're taking a risk if they do that

13    that someone might later determine that it was a

14    management contract, but there's nothing that

15    requires them to get that advanced review or

16    approval; is that correct?

17  A    That's correct.

18         MR. CLARK:  If it's all right, I guess this

19    would be a good time to break.  I don't have too much

20    more.  So if you could work out the document issues,

21    and I can take my call.

22              In the meantime I'll try to organize

23    my thoughts here a little bit, and I would think we

24    can -- at least in terms of anything I have, can

25    finish up pretty soon when I get back.

Deposition of Coleman, Penny, 3/7/2014

Page 180

```
 1                    THE WITNESS:  Jim, the definition of
 2          management contract, 502.15.
 3                    MR. TUREK:  25 CFR.
 4                    MR. CLARK:  Hold that there.  I'll ask you
 5          about that when I get back.
 6                    THE WITNESS:  Okay.
 7               (A break was taken at 4:11 p.m.)
 8               (Back on the record at 4:18 p.m.)
 9               (Exhibit 8 marked for identification.)
10                         EXAMINATION
11     BY MR. TUREK:
12     Q    All right, Ms. Coleman.  I just have a few questions
13          for you about some letters that we obtained related
14          to your time at the National Indian Gaming
15          Commission.
16                    The first document I'm going to show
17          you is Exhibit 8.
18     A    Okay.
19     Q    This is a letter dated May 7, 2008, from you to
20          Mr. Justin Weinberg at a law firm in Minnesota,
21          correct?
22     A    Yes.
23     Q    Is this a true, accurate, and authentic copy of that
24          May 7th letter to Mr. Weinberg?
25     A    I believe so.
```

Deposition of Coleman, Penny, 3/7/2014

Page 181

1  Q   And that's your signature at the very end of the

2      agreement, correct?

3  A   Yes.

4  Q   This letter is a public record, true?

5  A   Yes.

6  Q   It's subject to the Freedom of Information Act?

7  A   Yes.

8  Q   In fact, often you would reference that at the

9      conclusion of these letters, correct?

10 A   Yes.

11 Q   You prepared this letter as part of your duties as

12     acting general counsel for the NIGC, correct?

13 A   Yes.

14 Q   This letter sets out the activities performed by you

15     in your capacity as general counsel for NIGC, true?

16 A   Yes.

17         (Exhibit 9 marked for identification.)

18         MR. JACQUART:  Perhaps we can stipulate

19     that the same set of questions applies to each.

20         MR. TUREK:  All right.  Well, I'm going to

21     do this one of two ways:  I'm going to get a

22     stipulation that they can be admitted, and I'm not

23     going to ask all these questions.  Or I'm going to go

24     through the process of getting these buttoned up.

25         So pick it.

Deposition of Coleman, Penny, 3/7/2014

 1              MR. JACQUART:  Question away.

 2   BY MR. TUREK:

 3   Q   Okay.  Ms. Coleman, I'm going to show you what's been

 4       marked as Exhibit No. 9.

 5   A   Okay.

 6   Q   This is a true, accurate, and authentic copy of a

 7       letter from you to Mr. Michael Roy and Jerome

 8       Miranowski, dated February 19, 2009, correct?

 9   A   Yes.

10   Q   That's your signature on the second page?

11   A   Yes.

12   Q   This document was prepared by you within the scope of

13       your duties as acting general counsel of NIGC,

14       correct?

15   A   Yes.

16   Q   This letter sets out the activities you performed

17       while acting general counsel of NIGC, correct?

18   A   Yes.

19          (Exhibit 10 marked for identification.)

20   BY MR. TUREK:

21   Q   Ms. Coleman, I'm going to show you what's been marked

22       as Exhibit 10.

23                    Exhibit 10 is a true and correct and

24       authentic copy of a letter from you, dated

25       September 1, 2009, correct?

Deposition of Coleman, Penny, 3/7/2014

Page 183

```
 1   A     Pardon me?

 2   Q     Exhibit 10 is a true, accurate, and authentic copy of

 3         a letter authored by you, dated September 1, 2009,

 4         correct?

 5   A     Yes.

 6   Q     That's your signature on the last page?

 7   A     Yes.

 8   Q     And this letter sets out the activities you performed

 9         within the scope of your duties as acting general

10         counsel of NIGC, correct?

11   A     Yes.

12               (Exhibit 11 marked for identification.)

13   BY MR. TUREK:

14   Q     Ms. Coleman, I'm going to show you what's been marked

15         as Exhibit 11.

16                       Do you have Exhibit 11 in front of

17         you, Ms. Coleman?

18   A     Yes.

19   Q     This is a letter -- strike that.

20                       This is a true, correct, and authentic

21         copy of a letter from you, dated February 22nd, 2010,

22         to Mr. Beauty and Ms. Parada, correct?

23   A     Yes.

24   Q     And that's your signature on the last page?

25   A     Yes.
```

Deposition of Coleman, Penny, 3/7/2014

Page 184

```
 1   Q    And Exhibit 11 sets out the activities you performed

 2        in your capacity as general counsel for NIGC,

 3        correct?

 4   A    Yes.

 5             (Exhibit 12 marked for identification.)

 6   BY MR. TUREK:

 7   Q    Ms. Coleman, do you have Exhibit 12 in front of you?

 8   A    Yes.

 9   Q    This is a true, accurate, and authentic copy of a

10        letter from you to Mr. Kent Richie, dated

11        February 22nd, 2010, correct?

12   A    Yes.

13   Q    That's your signature on the last page, yes?

14   A    Yes.

15   Q    And this letter also sets out the activities

16        performed by you in your capacity as acting general

17        counsel for the NIGC, true?

18   A    Yes.

19             (Exhibit 13 marked for identification.)

20   BY MR. TUREK:

21   Q    Ms. Coleman, do you have Exhibit 13 in front of you?

22   A    Yes.

23   Q    This is a true, accurate, and authentic copy of a

24        letter from you, dated March 19, 2010, correct?

25   A    Yes.
```

Deposition of Coleman, Penny, 3/7/2014

Page 185

```
 1   Q    This is your signature on the last page of the

 2        letter?

 3   A    Yes.

 4   Q    And this letter sets out your activities as acting

 5        general counsel of the NIGC, true?

 6   A    Yes.

 7             (Exhibit 14 marked for identification.)

 8   BY MR. TUREK

 9   Q    Ms. Coleman, in front of you is Exhibit 14.

10                       Exhibit 14 is a true, accurate, and

11        authentic copy of a letter from you, dated April 2nd,

12        2010, correct?

13   A    Yes.

14   Q    That's your signature on the last page of the

15        document?

16   A    Yes.

17   Q    And this document, this letter, sets out your

18        activities as acting general counsel of NIGC, true?

19   A    Yes.

20             (Exhibit 15 marked for identification.)

21   BY MR. TUREK:

22   Q    Ms. Coleman, do you have Exhibit 15 in front of you?

23   A    Yes.

24   Q    This is a true, accurate, and authentic copy of a

25        letter from you, dated May 27, 2010, correct?
```

Deposition of Coleman, Penny, 3/7/2014

Page 186

```
 1   A   Yes.

 2   Q   This letter has your signature on page 12, correct?

 3   A   Yes.

 4   Q   And this letter sets out your activities as acting

 5       general counsel for NIGC, true?

 6   A   Yes.

 7   Q   All of the letters that we've gone through, which

 8       were Exhibits 8 through 15, were letters you drafted

 9       as part of your duties as acting general counsel of

10       the NIGC, correct?

11   A   Yes.

12             MR. TUREK:  Those are all the questions I

13       have.  Thank you.

14         (A discussion was held off the record.)

15       (Exhibits 16-17 marked for identification.)

16             MR. TUREK:  I'm going to withdraw 17.

17   BY MR. TUREK:

18   Q   Ms. Coleman, I've put in front of you Exhibit No. 16.

19       It's a letter dated March 10, 2011.

20                   Have you had a chance to look at that?

21   A   No.

22   Q   I'll give you a couple minutes.  Take as long as you

23       need to take a look at it.

24   A   Okay.

25   Q   Earlier in today's deposition -- I believe it was
```

Deposition of Coleman, Penny, 3/7/2014

Page 187

```
 1          early on in today's deposition -- you mentioned there
 2          being a change in the approach on certain issues in
 3          declination letters from when you were there until
 4          after you left.
 5                    Do you remember that testimony?
 6     A    Yes.
 7     Q    And I believe you even referenced a declination
 8          letter that reflected that change in approach after
 9          you left the agency.
10                    Is Exhibit 16 --
11     A    No.
12     Q    -- the letter you were referencing?
13     A    No.
14     Q    Do you know approximately the date that the
15          declination letter that you were referencing was
16          authored?
17     A    Probably -- well, it's the 2012 and 2013 letters that
18          still use pretty much the same standard language that
19          is in all the other declination letters, but it -- it
20          concludes that -- could be that receivership is no
21          longer a generic available remedy.
22                    So it's -- this is really a document
23          that looks like it was part of an enforcement action.
24          You know, it's the field investigators who pulled
25          together -- pulled together the agreements.
```

Deposition of Coleman, Penny, 3/7/2014

Page 188

1                        There had been an October '09 letter

2          probably from me saying that these constituted

3          management.  And it looks like they didn't do

4          anything about it, and -- until they -- well, no, no.

5                        I guess in the very first place, it

6          was the enforcement people looking at it, and then

7          they -- the acting general counsel was probably

8          relooking at them, and then -- and notifying them

9          that we saw a problem with it.  They made changes,

10         and looks like there was then some back and forth.

11         And ultimately the then general counsel determined

12         that the contracts were not management contracts.

13    Q    Was Lawrence Roberts your successor --

14    A    Yes.

15    Q    -- at the commission?

16                        And on page 2 there's some reference

17         here to "pledged revenues."

18                        And you had previously opined that

19         having gross gaming revenues pledged as part of a

20         security arrangement was indicia of management,

21         correct?

22    A    Correct.

23    Q    Here Mr. Roberts points out that if the priority is

24         given to operating expenses, that addresses the

25         management concerns.  Do you see that?

Deposition of Coleman, Penny, 3/7/2014

Page 189

```
 1   A     Yes.

 2   Q     Do you agree with that conclusion by Mr. Roberts?

 3   A     In the context of what I'm reading here.  You know,

 4         you can't know what else is in a document, but

 5         certainly, they seem to think that there is no longer

 6         an ability to have a receiver, that the pledged

 7         revenues no longer -- that the -- that there's no one

 8         who can take over the operating expenses, that they

 9         can't direct it.

10                    So that's why those changes are --

11         alleviate the concerns.

12   Q     How about you?  Do you agree with that conclusion,

13         that by making the changes that were made to how

14         pledged revenues were handled, that that alleviates

15         the concern about management?

16   A     Assuming that this is all there is to it, yes.

17   Q     Were there differences of opinion from time to time

18         among the attorneys at the NIGC as to whether certain

19         components of an agreement constituted management

20         indicia?

21   A     Well, certainly there was a lot of back and forth

22         among whoever was working on them as to what the

23         language said and whether it had -- it showed

24         control, so...

25   Q     And so there would be a discussion between the
```

Deposition of Coleman, Penny, 3/7/2014

Page 190

```
1        lawyers at the commission; one may take a certain

2        position, another lawyer may take a different

3        position, but ultimately it was your call on whether

4        these were management concerns?

5   A    Yes.

6                MR. TUREK:  Those are all the questions I

7        have about Exhibit 16.  And I think that's all I

8        have, pending Jim's additional questions.

9            (A break was taken at 4:40 p.m.)

10           (Back on the record at 4:52 p.m.)

11                          EXAMINATION

12  BY MR. CLARK:

13  Q    Okay.  Before we broke, I think I was asking you

14       questions about paragraph 18 of your affidavit, and

15       particularly the statement about managing any aspect

16       of a gaming operation.  Do you see that?

17  A    Um-hmm.

18  Q    And I had asked you for the basis for that statement,

19       and you referred me, following the break that we just

20       took, to CFR 502.15; is that right?

21  A    Yes.

22  Q    Okay.  And other than that, did you have anything

23       else in mind in the way of regulatory or statutory

24       authority for that statement?

25  A    No.  I know that there were -- I believe there was an
```

Deposition of Coleman, Penny, 3/7/2014

Page 191

```
 1        NOV and possibly a commission decision on -- that
 2        uses that language.
 3   Q    And I think we've established from prior questions
 4        that with regard to the question of what it means to
 5        manage or to constitute management, that has not been
 6        specifically defined in any regulation; is that
 7        correct?
 8   A    It's been defined in a final agency action.
 9   Q    I'm asking you about a regulation.
10   A    Not a regulation.
11   Q    And no statute, correct?
12   A    No statute.
13   Q    If you would turn to page 56 -- I said "page" again.
14        I mean paragraph 56.
15   A    Okay.
16   Q    There you're referring to the bond purchase
17        agreement.  Do you see that?
18   A    Yes.
19   Q    You're talking about a blanket lien on the
20        corporation's assets, and then you say, "As in the
21        other documents, this lien evidences control over the
22        corporation's assets and thus authorizes management
23        of the gaming operation."
24                    Do you see that?
25   A    Yes.
```

Deposition of Coleman, Penny, 3/7/2014

Page 192

1   Q   Is it your view that a lien on any asset of the -- of

2       a tribe or a tribal corporation constitutes

3       management of a gaming operation?

4   A   No.

5   Q   So what is it that differentiates what assets taking

6       the lien on would constitute management and a lien on

7       which assets would not?

8   A   This lien is a lien on everything the corporation

9       has.  Everything.  And it allows the trustee, the

10      bondholders, a receiver to -- any of those to control

11      that -- those assets.

12                      By controlling those assets, they are

13      running, they are managing, the gaming operation --

14  Q   I don't mean to interrupt you, but you're answering a

15      different question than I asked you.

16                      I asked you with regard to -- in

17      general, what differentiates a lien on certain assets

18      apparently, as you indicated in your view, being a

19      management -- constituting management and certain

20      assets not?

21                      Where -- what's the distinction?

22  A   If the lien doesn't include control over the -- the

23      operating expenses and the capital expenditures, that

24      would often be -- that would mean that there wouldn't

25      be that control of the manager -- management of the

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

Page 193

```
 1        facility.
 2   Q    So, for example, a lien on equipment, would that
 3        be -- would you deem -- in your view, would you deem
 4        that a management contract?
 5   A    Probably not.
 6   Q    Has the view of the agency with regard to language
 7        concerning liens on revenue, in terms of whether or
 8        not it is a management contract, changed somewhat
 9        since you left the agency?
10   A    Only in the sense that they seem to be taking a more
11        clear statement that a receiver is no longer an
12        available remedy under law for people who are
13        attempting to enforce obligations --
14   Q    Other than that, have you seen a change?
15   A    No.
16   Q    When you were at the agency, did you take the
17        position that a lien on gross revenues was a
18        management contract, unless it excepted out
19        expenses --
20   A    Expenses --
21   Q    -- of the corporation?
22   A    Yes.
23   Q    Have you seen any more recent management letters
24        since you left that simply required that the lender
25        give priority to management expenses and not require
```

Deposition of Coleman, Penny, 3/7/2014

Page 194

1        that they be net on the management expenses?

2    A   Well, yes, when I was looking at the -- actually,

3        that was one that I signed.  And I believe that the

4        way we addressed it was by giving priority; in other

5        words, making sure that the operating expenses were

6        not impacted, that the casino wasn't impacted, that

7        the tribe remained in control of the -- running the

8        casino.  Then they could -- they could go ahead and

9        have a loan like that.

10                       I think that those two examples are

11       really very much the same thing.

12   Q   You don't see any distinction?

13   A   Not really, no.

14   Q   Getting back to paragraph 56 again, you say that the

15       document has a blanket lien on all the corporation's

16       assets --

17   A   Yes.

18   Q   -- you refer to Sections 9(i)(5) --

19   A   No, this is the one --

20   Q   This is the one where you, then, refer -- went back

21       to Section 6.

22   A   Yes.

23   Q   We've gone over that.

24                       So you have indicated, I think, in

25       prior questions where in the bond purchase agreement

Deposition of Coleman, Penny, 3/7/2014

```
 1          you believe that alleged blanket lien can be found;

 2          is that correct?

 3  A       Yes.

 4  Q       Okay.  Did you have any discussions, to the best of

 5          your knowledge, with anybody associated with the

 6          tribe or purporting to represent the tribe in

 7          connection with the tribe's anticipated decision not

 8          to continue making payments on the bonds in

 9          connection with this transaction?

10  A       Not that I remember, no.

11  Q       Do you have any knowledge or recollection of anybody

12          else associated with the NIGC having had any

13          conversations with anybody associated with the tribe

14          or the EDC with regard to the potential default on

15          the bonds?

16  A       Not that I remember, no.

17  Q       Subsequent to the Seventh Circuit decision in the Lac

18          du Flambeau case, I understand that in terms of

19          policy or practice, there's evolved what's referred

20          to as "safe harbor language"?

21  A       Yes.

22  Q       And is that in response, at least in part, to the

23          Seventh Circuit decision?

24  A       No.  The language was developed before the

25          Seventh Circuit --
```

Deposition of Coleman, Penny, 3/7/2014

Page 196

1    Q    What is the safe harbor language?

2    A    It's language intended to clarify that there's no

3         intention to -- to manage in -- by specifically

4         saying that -- that the contractor won't determine

5         budget, determine operating expenses.

6                        There's a lot of other language, but

7         those are the important ones.

8    Q    And if the parties to that transaction accept that

9         language, then by "safe harbor," what is the --

10        what's the consequence or meaning of that?

11   A    Well, then it makes clear that if there's other very

12        generic language, like "and the contractor can" -- or

13        "lender can, you know, have" -- "avail itself of any

14        available remedies under law or maybe under the UCC,"

15        it will -- it will make clear that you have -- that

16        even though there's a possibility of a receiver under

17        available remedies under the UCC, that -- that a

18        receiver is not -- cannot -- cannot touch the

19        operating expenses and --

20   Q    I don't mean to interrupt you, but I think you

21        misunderstood my question again.

22                        My question is:  Assuming that a --

23        let's use the example of a lender --

24   A    Um-hmm.

25   Q    -- agrees to those safe harbor provisions, what's the

Gramann Reporting, Ltd. (414) 272.7878

Deposition of Coleman, Penny, 3/7/2014

1       effect of that?

2  A   They're much more likely to get a declination letter.

3  Q   So, in general, if the terms and conditions of the

4       safe harbor provisions that are currently being used

5       by the commission are agreed to, then, in general,

6       it's likely that the -- that the parties will get a

7       declination letter or, in other words, an advisory

8       opinion that it doesn't need management -- it doesn't

9       need approval of the management contract --

10  A   Yes.

11  Q   -- correct?

12  A   Yes.

13  Q   When was that general policy adopted, approximately?

14  A   In January '09, we wrote a letter to Kent Richie of

15       Faegre & Benson, who was often before us as counsel

16       for both sides on agreements.  And we were attempting

17       to assist the parties to come up with a way to

18       develop these agreements without having to worry

19       about very, you know, general provisions, arguably

20       the management, you know, making it clear that

21       they're not going to be able to manage.

22               And they were more specific than --

23       than the generic language that used to be in a lot of

24       contracts, which is just, "Well, this is not a

25       management contract, and we don't intend to manage."

Deposition of Coleman, Penny, 3/7/2014

Page 198

1   Q    And that safe harbor process has been generally in

2        place since that time?

3   A    Yes.

4   Q    If the parties came to the commission with a

5        transaction, financial transaction, involving a note

6        and a mortgage, and for the sake of my question

7        assuming that the mortgage, in your view, had

8        provisions in it that made it a management

9        contract --

10  A    Yes.

11  Q    -- if the parties nevertheless decided to proceed

12       with the transaction with just the note and not the

13       mortgage, would you agree with me that -- and

14       assuming the mortgage -- the note did not have any

15       provisions in it that made it a management contract,

16       you would agree with me that there would be nothing

17       inappropriate or illegal about that transaction; is

18       that correct?

19  A    Well, assuming it has no management in it, assuming

20       that it stands alone, you're essentially talking

21       about a lending agreement, that can be done.

22  Q    And you recognize there can be an independent promise

23       to pay an obligation that wouldn't -- even if it was,

24       at least at one point, part of a transaction that

25       had -- another agreement that had management

Deposition of Coleman, Penny, 3/7/2014

Page 199

1    provisions in it, that that -- that there can be

2    circumstances under which one can proceed to enforce

3    a separate independent promise to pay, correct?

4    A    I'm not real sure what you're getting at.  But if

5    what you're getting at is, is if they formed the

6    contract so that it's no longer part of the other

7    contract, yes.

8    Q    Now, you said that you left the agency before the Lac

9    du Flambeau Seventh Circuit decision was rendered; is

10   that correct?

11   A    Yes.  I'm quite sure of that.

12   Q    So would it be a fair statement that the analysis

13   that was used by the Seventh Circuit in the Lac du

14   Flambeau decision to determine whether or not the

15   indenture was a management contract was not something

16   that you took into consideration in connection with

17   any of the opinions that you prepared while you were

18   at the commission?  Is that correct?

19   A    The question is, did I rely on the Seventh Circuit

20   opinion to make --

21   Q    Did you rely on the rationale of the Seventh Circuit

22   opinion that the Seventh Circuit used in determining

23   whether or not it was a management -- whether or not

24   the trust indenture was a management contract, did

25   you rely on that particular rationale for purposes of

Deposition of Coleman, Penny, 3/7/2014

Page 200

```
 1        any of the opinions that you issued while you were at

 2        the agency?

 3   A    You know, I don't know what rationale you're talking

 4        about.

 5                     We had before us the lower court

 6        decision, and the NIGC's opinions reflect that they

 7        generally agreed with that.

 8   Q    I think you would agree with me, though, that that

 9        decision was overruled, at least in part, by the

10        Seventh Circuit; is that correct?

11   A    I understand that the court -- the most important

12        issue to me -- the courts do not need to reach

13        receiver discussion.  And I would say that the NIGC

14        continues to -- to view a receiver as management in

15        the context of that kind of case.

16   Q    Well, let me just test a little bit what you know

17        about the Seventh Circuit decision.

18                     Did the Seventh Circuit decision

19        overrule the district judge with respect to the

20        district judge's finding that because the trust

21        indenture was void, that all the rest of the

22        documents in the transaction were also void?

23   A    As I remember, that was remanded back to the circuit

24        for a further determination on whether the rest of

25        the documents were also void.
```

Deposition of Coleman, Penny, 3/7/2014

Page 201

1    Q    So at least insofar as the decision that all the

2         documents -- the decision by the district judge that

3         all the documents were void, that was overturned by

4         the Seventh Circuit and remanded for further

5         proceedings.  You're -- is that your understanding?

6    A    That's my understanding.

7    Q    Okay.

8              MS. HOGEN MOLINE:  We've got to catch a

9         plane here.

10             MR. CLARK:  Yeah, I said I would be done by

11        5:30, and I will be.

12             THE WITNESS:  Let's do it a little faster

13        than that.

14             MR. CLARK:  Yeah, well, we've got a few

15        things we've got to get through here.

16             THE WITNESS:  Okay.

17   BY MR. CLARK:

18   Q    Are you familiar with -- do you recall the analysis

19        the Seventh Circuit used or the thought process it

20        went through to determine whether or not the

21        indenture was a management contract?

22   A    I can't remember specifically.  I would have to look

23        back at it.

24   Q    Do you know whether or not the agency today factors

25        into its determination as to whether or not something

Deposition of Coleman, Penny, 3/7/2014

Page 202

1       is or is not a management contract based upon the

2       approach that the Seventh Circuit used in deciding

3       the Lac du Flambeau decision?

4   A   I don't know.

5   Q   Did the approach used by the Lac du Flambeau -- by

6       the Seventh Circuit in the Lac du Flambeau decision

7       play any role in the formation of any of your

8       opinions that's contained in the affidavit that we

9       marked as Exhibit 2?

10  A   I'm sure I read it -- well, I don't know when -- I

11      don't even remember when it was decided.

12                    When was it decided?

13  Q   It was decided in September of 2011.

14  A   Then I'm sure I read it.

15  Q   My question wasn't whether you read it or not.  I

16      guess I would have thought you would have read it.

17                    But did it play any specific role in

18      any of the opinions that you've reached in your

19      affidavit marked as Exhibit 2?

20  A   I would say that I took a broader approach, more akin

21      to the approach that I would expect the district

22      court to take upon remand.

23  Q   So you -- you projected ahead as to what you

24      personally thought might happen on remand, and that's

25      the way you primarily looked at it; is that correct?

Deposition of Coleman, Penny, 3/7/2014

Page 203

```
 1    A    Well, I used the NIGC -- I was looking at this as
 2         what is the NIGC going to do.  And the NIGC has
 3         continued, as I said, to view the receiver provision
 4         as being important to the analysis.
 5    Q    So getting back to my question, then, would it be
 6         fair to say that the decision of the Seventh Circuit
 7         in the Lac du Flambeau matter, in terms of how they
 8         went about reaching their conclusions, didn't play
 9         any significant role in the development of your
10         opinions that are represented in Exhibit 2?
11    A    Well, it certainly did in the sense that it continued
12         to uphold the district court on major provisions in
13         that on -- some of the provisions were sent back.  So
14         there didn't seem to be any real inconsistencies
15         between the two, as I remember.
16    Q    Okay.  Can you point me to any -- is there anything
17         in the Seventh Circuit decision that, sitting here
18         today, you can identify as having played any
19         significant role in the formation of your opinions in
20         Exhibit 2?
21    A    I don't remember the -- what specifically is in the
22         Seventh Circuit decision so that I can point to it
23         without reviewing the decision again.
24    Q    So I take it sitting here today, you can't point me
25         to anything in the Seventh Circuit decision that's
```

Deposition of Coleman, Penny, 3/7/2014

Page 204

1        played any role in any of the formations -- in the

2        formation of any of your opinions in Exhibit 2?

3    A   As I said, I don't remember the -- all of the

4        specific provisions in there.  I imagine I could.

5                        If you want me to sit there and read

6        it and go through it and say, "yes, you know, this is

7        what I" -- "consistent with" -- "and when I saw this,

8        I thought, well, it's consistent with the thinking

9        that's been going on" -- you know, I don't see the

10       affidavits, the Seventh Circuit opinion, the lower

11       court opinion as being inconsistent with each other.

12   Q   That wasn't my question.

13                       My question is:  Sitting here today,

14       you can't point me to anything with respect to the

15       Seventh Circuit opinion that played --

16   A   Not without looking directly at it.

17   Q   -- that played any significant role in the formation

18       of your opinions in Exhibit 2; is that correct?

19   A   Not without looking directly at the circuit opinion.

20                  MR. CLARK:  All right.  That's all I have.

21                  MS. McNALLY:  Thank you for your time.

22              (Deposition concluded at 5:17 p.m.)

23      (Original exhibits were attached to original transcript;

24              copies to transcript copies.)

25

Deposition of Coleman, Penny, 3/7/2014

Page 205

1    STATE OF WISCONSIN )
                        ) SS:
2    MILWAUKEE COUNTY   )

3

4              I, Sarah A. Hart, RPR/RMR/CRR and Notary

5    Public in and for the State of Wisconsin, do hereby

6    certify that the preceding deposition was recorded by

7    me and reduced to writing under my personal

8    direction.

9                   I further certify that said deposition

10   was taken at GASS WEBER MULLINS LLC, 309 North Water

11   Street, Milwaukee, Wisconsin, on the 27th day of

12   February, 2014, commencing at 10:13 a.m.

13                  I further certify that I am not a

14   relative or employee or attorney or counsel of any of

15   the parties, or a relative or employee of such

16   attorney or counsel, or financially interested

17   directly or indirectly in this action.

18                  In witness whereof, I have hereunto

19   set my hand and affixed my seal of office on this 3rd

20   day of March, 2014.

21

22              _____
                SARAH A. HART, RPR/RMR/CRR
23              Notary Public

24   My commission expires September 27, 2015.

25

Gramann Reporting, Ltd. (414) 272.7878