## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WISCONSIN

STIFEL, NICOLAUS & COMPANY, INC.,
STIFEL FINANCIAL CORP., SAYBROOK
FUND INVESTORS, LLC, LDF
ACQUISITION, LLC, WELLS FARGO
BANK, N.A., and GODFREY & KAHN, S.C.,

         Plaintiffs,       OPINION & ORDER

   v.
                  13-cv-372-wmc

LAC DU FLAMBEAU BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS and
LAKE OF THE TORCHES ECONOMIC
DEVELOPMENT CORPORATION,

         Defendants.

In what is only the latest chapter of litigation arising out of an ill-fated bond transaction executed in January of 2008 (the "Bond Transaction"), plaintiffs seek injunctive relief precluding defendants from pursuing a related lawsuit in the Tribal Court of the Lac Du Flambeau Band of Lake Superior Chippewa Indians. Plaintiffs argue that based on both federal law and on various documents executed as part of the Bond Transaction, the Tribal Court lacks jurisdiction over them. In response, defendants argue that they are immune from the current suit and that, in the alternative, the tribal court may exercise jurisdiction over plaintiffs.

Currently before this court are plaintiffs' various motions for preliminary injunctive relief. (*See* dkt. ##5, 17, 42.) The court held a hearing on those motions on March 14, 2014, and for the reasons discussed below, now holds that: (1) defendants waived their sovereign immunity; (2) comity does not require exhaustion of tribal court remedies; and (3) based on the record before it, defendants should be preliminary enjoined from

proceeding against plaintiffs Stifel, Nicolaus & Company and Stifel Financial Corp. (collectively, "the Stifel plaintiffs"); and Saybrook Fund Investors, LLC, LDF Acquisition, LLC and Wells Fargo Bank, N.A. (collectively, "the Saybrook plaintiffs") in Tribal Court pending a final resolution of this lawsuit.  Because plaintiff Godfrey & Kahn, S.C. has not demonstrated a similar likelihood of success on the merits, however, the court will deny its motion for a preliminary injunction at this time.

SUMMARY OF FACTS[*]

The Lake of the Torches Economic Development Corporation ("the Corporation") is a wholly-owned corporation of the Lac Du Flambeau Band of Lake Superior Chippewa Indians, a federally-recognized Indian Tribe ("the Tribe").  The Corporation is chartered by the Tribe and, among other things, has the authority to issue and sell bonds for specific purposes and to pledge any revenues received from the Lake of the Torches Resort Casino as security.  Pursuant to this authority, in January of 2008, the Corporation entered into a bond transaction in order to refinance and consolidate certain outstanding bank loans and loan funds to the Lake of the Torches Federal Development Corporation ("FDC"), so that the FDC could then loan funds to Grand Soleil for a gaming complex in Natchez, Mississippi.  Stifel, Nicolaus & Company ("Stifel") is a financial services company that acted as initial purchaser of the bonds issued.  Stifel alleges, and defendants purport to dispute, that it sold the bonds to LDF Acquisition, LLC, a special purpose vehicle created by

---

[*] Based on the parties' submissions and the record to date, the following brief summary of facts and the other facts set forth in the opinion below are essentially undisputed for purposes of deciding plaintiffs' motions for preliminary injunction except as otherwise noted.

2

Saybrook Tax Exempt Investors, LLC.  Plaintiff Godfrey & Kahn, S.C. served as counsel to the Corporation and as Bond counsel in connection with the sale.

Pursuant to the Bond Transaction, various of the parties in this lawsuit executed a multitude of documents (collectively, the "Bond Documents").  Those documents include:

1. A specimen bond, issued on January 18, 2008.  (Compl. Ex. A (dkt. #1-1) (hereinafter "Specimen Bond").)

2. A Limited Offering Memorandum, dated January 18, 2008, which was signed by the president of the Corporation.  (Compl. Ex. B (dkt. #1-2) (hereinafter "LOM").

3. A Bond Purchase Agreement, dated January 18, 2008, between the Corporation and Stifel.  (Compl. Ex. C (dkt. #1-3) (hereinafter "Bond Purchase Agreement").)

4. A Trust Indenture, dated January 18, 2008, between the Corporation and Wells Fargo Bank, N.A.  (Compl. Ex. D (dkt. #1-4) (hereinafter "Indenture").)

5. Resolution No. 1(08), adopted by the Corporation's Board of Directors on January 2, 2008.  (Compl. Ex. E (dkt. #1-5) (hereinafter "Bond Resolution").)

6. An Opinion Letter, dated January 18, 2008, issued by Godfrey & Kahn as counsel for EDC and the Tribe and addressed to Stifel, Wells Fargo and Saybrook.  (Compl. Ex. F (dkt. #1-6) (hereinafter "Issuer Opinion Letter").)

7. An Opinion Letter, dated January 18, 2008, issued by Godfrey & Kahn as the Bond Counsel and addressed to the Corporation, Stifel, Wells Fargo and Saybrook. (Compl. Ex. G (dkt. #1-7) (hereinafter "Bond Counsel Opinion Letter").)

8. A Tribal Agreement dated January 1, 2008, between the Tribe and Wells Fargo. (Compl. Ex. I (dkt. #1-9) (hereinafter "Tribal Agreement").)

9. Resolution No. 1(008), adopted by the Tribe's Tribal Council on January 2, 2008. (Compl. Ex. J (dkt. #1-10) (hereinafter "Tribal Resolution").)

The parties agree that the Bond Documents were to be governed by and construed in accordance with Wisconsin law. There is also no dispute that plaintiffs executed the documents off-reservation. Although the documents themselves represent otherwise, defendants nevertheless maintain that they executed the documents on-reservation.

At some point in 2009, defendants failed to meet their obligations as contemplated by the Bond Documents. Acting as trustee to enforce the Indenture, Wells Fargo then filed suit in the Western District of Wisconsin. In that lawsuit, this court originally determined that: (1) the Indenture was void as an unapproved management contract; (2) the various transactional documents at issue here were merely collateral to the Indenture, making them similarly void; and (3) the bonds themselves incorporated by reference the Indenture's terms, rendering them void on those grounds as well. The court also concluded that the collateral documents were interdependent, supporting only a single transaction, and that the Indenture was a crucial part. On those grounds, the court held that the entire transaction had required the approval of the National Indian Gaming Commission ("NIGC") and that there could be no valid waiver of sovereign immunity without it. *See Wells Fargo Bank., N.A. v. Lake of the Torches Econ. Dev. Corp.*, No. 09-cv-768, 2010 WL 1687877, at *5-7 (W.D. Wis. Apr. 23, 2010).

On appeal, the Seventh Circuit affirmed this court's conclusion that the Indenture was void based on various problematic provisions in the Indenture, including: (1) a provision requiring the Casino's gross revenues to be deposited in a trust fund, setting conditions on revenue allocation and disposition, and giving Wells Fargo ultimate control

4

over withdrawals, which allowed the bondholders to control the Corporation's capital expenditures; (2) a provision permitting bondholders to retain an independent consultant, whose recommendations the Corporation was required to "use its best efforts to implement," if the debt-service-coverage ratio fell below "2.00 to 1"; and (3) a provision requiring defendants to obtain the consent of the bondholders to replace the casino's management. *See Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 698 (7th Cir. 2011). "[T]aken together," the Seventh Circuit held these provisions "transfer significant management responsibility to Wells Fargo and the bondholder and therefore render the Indenture a management agreement subject to the approval of the Chairman." *Id.* at 699.

At the same time, the Seventh Circuit rejected the notion that the collateral documents were void simply because they referred to the Indenture. The court explained that collateral documents would require agency approval *"only if* [they] 'provide[] for the management of all or part of a gaming operation'" -- that is, if they, too, meet the definition of a "management contract." *Id.* at 701 (quoting *Catskill Dev.*, 547 F.3d at 130) (emphasis in original). The Seventh Circuit also found the district court's conclusion that the documents were interdependent, and thus void, was "premature."

> It is not immediately apparent that the waivers contained in the documents attached to the proffered amended complaint, when read separately or together, ought to be construed as dependent on the validity of the waiver in the Indenture and that they do not make clear the Corporation's intent to render itself amenable to suit for legal and equitable claims in connection with the bond transaction.

*Id.* Accordingly, the Seventh Circuit held that on remand, the district court should address "whether the transactional documents, taken alone or together, evince an intent on the part of the Corporation to waive sovereign immunity." *Id.* at 702.

Following remand, Wells Fargo made several unsuccessful attempts to amend the complaint to establish its standing to sue before voluntarily dismissing its original lawsuit. The next day, plaintiffs Saybrook and LDF Acquisition filed a new federal lawsuit in the Western District of Wisconsin, invoking federal-question jurisdiction under 28 U.S.C. § 1331, but alerting the court to a split in authority as to whether such jurisdiction existed. While the Corporation argued jurisdiction was present, this court concluded in March of 2013 that it was not and asked the parties for proof of diversity jurisdiction under 28 U.S.C. § 1332. *See Saybrook Tax Exempt Investors, LLC v. Lake of the Torches Econ. Dev. Corp.*, 929 F. Supp. 2d 859 (W.D. Wis. 2013). In April, the court concluded that diversity jurisdiction was also lacking and dismissed that case as well. *Saybrook Tax Exempt Investors, LLC v. Lake of the Torches Econ. Dev. Corp.*, No. 12-cv-255-wmc, 2013 WL 2300991 (W.D. Wis. Apr. 1, 2013). Plaintiffs then brought suit in Wisconsin state court.

On March 27, 2013, the Tribe amended the portion of its code governing procedures in the tribal court. The previous version of the Tribal Code read:

> The Tribal Court shall have jurisdiction over:
>
> (1) All actions in which the provisions of the Indian Child Welfare Act of 1978, 25 U.S.C. s. 1901, *et seq.*, are applicable;
>
> (2) All matters which the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa invests, by appropriate ordinance, the Court with jurisdiction; [and]
>
> (3) All actions brought under the provisions of this Code.

(Compl. Ex. L (dkt. #1-12) § 80.102.)  The amended version read in relevant part:

> The Tribal Court shall have jurisdiction over all cases and controversies, both criminal and civil, in law or in equity, arising under the Constitution, laws, customs, and traditions of the Lac du Flambeau Band of Lake Superior Ojibwe.

(Compl. Ex. M (dkt. #1-13) § 80.102.

The amendments also created the position of "judge *pro tempore.*"  The Tribal Code provides that the Tribal Council may appoint such a judge *pro tempore* "[t]o fill the role of a standing Trial Judge in any case to which the Tribe or a tribal agency or enterprise is a party and the opposing party is a non-member of the Tribe, except cases involving traffic and other criminal offenses, Indian-child welfare, child support, family law, natural resources, land management, or the Tribe's housing authority."  (*Id.* at § 80.103(3)(a)(iii).)  Appellate judges reviewing the decisions of judges *pro tempore* would also be appointed by the Tribal Council.  The Tribal Court Code does not provide for a trial by jury.

On April 25, 2013, the Tribe and Corporation then filed suit in tribal court against Saybrook, Wells Fargo, Stifel Financial Corp., Stifel Nicolaus & Company, and Godfrey & Kahn, seeking a declaration that *all* Bond-related documents are void under the Indian Gaming Regulatory Act ("IGRA") and tribal law.  The Tribe also appointed as judge *pro tempore* Professor Matthew L.M. Fletcher, an Indian law expert and blogger from Michigan State University College of Law.[1]

---

[1] Professor Fletcher's published papers include *Resisting Federal Courts on Tribal Jurisdiction*, 81 U. Colo. L. Rev. 973 (2010).

OPINION

## I. Sovereign Immunity

### A. Application and Waiver

Plaintiffs initially argue that because this is a suit for injunctive and declaratory relief, the defense of tribal sovereign immunity does not apply.  There is a circuit split on this question.  *Compare Comstock Oil & Gas Inc. v. Ala. & Coushatta Indian Tribes of Tex.*, 261 F.3d 567, 571-72 (5th Cir. 2001) (finding that tribes are not entitled to sovereign immunity in suits for injunctive or declaratory relief), *with Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1271 (9th Cir. 1991) ("It is absolutely clear that the Pala Band, as an Indian tribe, possesses 'the common-law immunity from suit traditionally enjoyed by sovereign powers.'  The immunity extends to suits for declaratory and injunctive relief.") (internal citation omitted).

This court need not delve into these competing analyses, however, since the Seventh Circuit stated as recently as 2008 that "[t]ribal sovereign immunity is 'a necessary corollary to Indian sovereignty and self-governance,' and extends to suits for injunctive or declaratory relief."  *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 929 (7th Cir. 2008) (internal citations omitted).   Since that decision binds this court, it will proceed to consider whether defendants have waived their sovereign immunity here.[2]

"As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity."  *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *Ho-Chunk Nation*, 512 F.3d at 928.  Here, neither

---

[2] The Saybrook plaintiffs also argue that no waiver of sovereign immunity is required, but provide no persuasive legal or evidentiary support.  *National Farmers Union Insurance Companies v. Crow Tribe of Indians*, 471 U.S. 845 (1985), on which they rely, says nothing of the sort, having resolved the case on tribal exhaustion grounds without even mentioning sovereign immunity.

party contends that Congress has abrogated the Tribe's immunity.   Rather, the dispute centers on whether the Tribe waived its sovereign immunity in the Bond Documents.[3]

To relinquish its sovereign immunity, a tribe's waiver must be "clear."  *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)).  Both the Supreme Court of the United States and the Seventh Circuit have found waivers to be sufficiently clear when an Indian tribe agreed by express contract "to adhere to certain dispute resolution procedures" via an arbitration clause.   *See id.* at 420; *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 660-61 (7th Cir. 1996).   Put another way, "[t]o agree to be sued is to waive any immunity one might have from being sued."  *Sokaogan Gaming,* 86 F.3d at 659.

As an initial matter, there can be little dispute that the waivers of sovereign immunity in the Bond Documents are sufficiently "clear."  Each unambiguously states not only that defendants have waived sovereign immunity but also that they consent to jurisdiction in this court.  (*See, e.g.*, Specimen Bond 4-5 ("The Corporation hereby expressly waives its sovereign immunity from suit[.] . . . The Corporation expressly submits to and consents to the jurisdiction of the United States District Court for the Western District of Wisconsin[.]"); Bond Purchase Agreement 19 (same); Bond Resolution 3 ("RESOLVED, that all Legal Provisions in the Bond Documents are hereby approved; more specifically and

---

[3] A waiver of sovereign immunity need not be by contract.  For example, courts have found that a tribe validly waived its sovereign immunity (1) where "the Tribal Council, as the duly constituted legislative body of the Tribe, by the terms of the severance tax ordinance, expressly consented to suits against the Tribe in the United States District Court or in the Jicarilla Apache Tribal Court," *Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537, 540 (10th Cir. 1980); and (2) by corporate charter, which gave it the power "[t]o sue and be sued in courts of competent jurisdiction within the United States," *Fontenelle v. Omaha Tribe of Neb.*, 430 F.2d 143, 147 (8th Cir. 1970).

expressly the Corporation (i) waives its immunity from suit[.]"); Tribal Agreement 4-5 (waiving Tribe's sovereign immunity and consenting to jurisdiction of Western District of Wisconsin); Tribal Resolution 2 ("RESOLVED, that all Legal Provisions in the Tribal Agreement are hereby approved; more specifically and expressly, those by which the Tribe (i) provides a limited waiver of sovereign immunity from suit[.]").

Instead, defendants argue that the court cannot reach the question of the clarity of these waivers because all the Bond Documents, whether read separately or together, are void as unapproved management contracts under IGRA, 25 U.S.C. §§ 2701 to 2721.  In light of the Seventh Circuit's *Wells Fargo* decision, the court agrees that if the Bond Documents are void, so too are the waivers of sovereign immunity contained within them, such that the tribe would not be subject to suit in this court.[4]  Accordingly, the court turns to an analysis of those documents, keeping in mind the Seventh Circuit's direction to determine whether the Bond Documents, "alone or together, evince an intent on the part of the [Tribe and/or] Corporation to waive sovereign immunity."  *Wells Fargo*, 658 F.3d at 702.

## B. Unapproved Management Contracts

The general purpose of IGRA is to provide a statutory basis for the operation and regulation of gaming by Indian tribes.  *See* 25 U.S.C. § 2702; *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996).  Section 2710 of IGRA permits an Indian tribe to "enter into a management contract for the operation of a class III gaming activity if such contract has

---

[4] In *Wells Fargo,* the Seventh Circuit found that the Bond Indenture containing the waiver of sovereign immunity was void as an unapproved management contract and then considered whether the indenture could be reformed by severing the illegal terms.  It concluded that the "Commission's regulation is not subject to reformation by excision of offending provisions."  658 F.3d at 700. Accordingly, the court held that because the Indenture was void, the "waiver of sovereign immunity contained in that document [was] also void."  *Id.* at 686.

been submitted to, and approved by, the Chairman" of the National Indian Gaming Commission ("NIGC"). 25 U.S.C. § 2710(d)(9). Likewise, section 2711 permits an Indian tribe to enter into a management contract for the operation and management of a class II gaming activity "[s]ubject to the approval of the Chairman." 25 U.S.C. § 2711(a)(1). Management contracts that are *not* approved by the Chairman are void *ab initio* and, at least in the Seventh Circuit, cannot be enforced as a whole or in part. *Wells Fargo*, 658 F.3d at 700.

The regulations provide guidance as to what constitutes a "management contract." The Commission has defined the term to include "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15. "Collateral agreement" means "any contract, whether or not in writing, that is related, either directly or indirectly, to a management contract, or to any rights, duties or obligations created between a tribe (or any of its members, entities, or organizations) and a management contractor or subcontractor (or any person or entity related to a management contractor or subcontractor)." 25 C.F.R. § 502.5.

While "management" itself is not defined in the regulations, the NIGC has produced an informal bulletin distinguishing between management contracts and consulting agreements consistent with the broad definition in § 502.15:

> Management encompasses many activities (e.g., planning, organizing, directing, coordinating, and controlling). The performance of any one of such activities with respect to all or part of a gaming operation constitutes management for the purpose of determining whether any contract or agreement for the performance of such activities is a management contract that requires approval.

11

*Wells Fargo*, 658 F.3d at 696 (quoting NIGC Bulletin No. 94-5, at 1 (Oct. 14, 1994)).  As an informal agency pronouncement, this bulletin is not entitled to *Chevron* deference.[5]  Still, the Seventh Circuit found it "of relevance" to the management contract inquiry, *Wells Fargo*, 658 F.3d at 696, and so this court will consider it as well.

Other courts have interpreted the definition of the term "management contract" broadly.  *See, e.g., New Gaming Sys., Inc. v. Nat'l Indian Gaming Comm'n*, 896 F. Supp. 2d 1093, 1105 (W.D. Okla. 2012) (a management contract need not strip a tribe of decision-making authority entirely).  Moreover, a contract may be void not because its own terms impinge on casino management, but because the terms of other, interrelated documents or agreements do.  In *United States ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419 (8th Cir. 2002), for example, even though a consulting agreement stipulated that Casino Magic had no management power over the gaming enterprise, the agreement was held void because other documents, including a Participation Agreement and a Construction and Term Loan Agreement purported to (1) transfer more power to Casino Magic than the consulting agreement indicated, and (2) strip the tribe of its ultimate decision-making authority by mandating compliance with Casino Magic's recommendations.  *Id.* at 424-25.

### C. Bond Documents

Relying on this precedent, defendants argue that because the Indenture is void as a management contract, the Bond Documents, which reference the Indenture, are void as well.  The court rejects this argument as a general principle.  As plaintiffs point out, the principle that all documents signed in conjunction with a void management contract are "inextricably intertwined," such that they necessarily rise or fall together, appears nowhere

---

[5] *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

in IGRA or its regulations.  More important for this court's present purposes, the Seventh Circuit already held otherwise with respect to the Bond Documents at issue in this case: "[i]t is not immediately apparent that the waivers contained in the documents . . . when read separately or together, ought to be construed as dependent on the validity of the waiver in the Indenture and that they do not make clear the Corporation's intent to render itself amenable to suit for legal and equitable claims in connection with the bond transaction."  *See Wells Fargo Bank*, 658 F.3d at 701.

For similar reasons, the court also declines to void all of the Bond Documents across the board based on admittedly problematic provisions contained in only a few of those documents.  As the Seventh Circuit held in *Wells Fargo Bank*, while collateral agreements *may* constitute management contracts, "a document collateral to a management contract 'is subject to agency approval . . . only if it provides for the management of all or part of a gaming operation.'"  *Wells Fargo Bank*, 658 F.3d at 701.  While courts have found that the documents taken together can constitute a "management contract," defendants cite no case in which *every* document from a transaction -- including those that provide for *no* management authority under any circumstance -- is necessarily void simply because they were connected to a common, larger transaction.

The Eighth Circuit's decision in *Casino Magic* arguably comes the closest to such a proposition.  While the parties' Consulting Agreement purported to give ultimate authority to the tribe, in that case the court found the Construction and Term Loan Agreements actually revoked that supposed authority by *mandating* the Tribe's compliance with recommendations made by Casino Magic under the Consulting Agreement.  293 F.3d at 424-25.  The parties' Participation Agreement also gave Casino Magic a percentage

13

ownership interest in the Tribe's indebtedness. *Id.* The *Casino Magic* court, therefore, held that these three agreements, when taken together, laid out a comprehensive management scheme in which Casino Magic Corporation had ultimate decision-making authority in violation of IGRA. *See id.* at 426 (noting that "the series of agreements constituted a management agreement").

Here, defendants can only point to individual provisions in *some* of the Bond Documents that, if taken together, arguably would transfer some management authority away from the Tribe and the Corporation under certain circumstances. But nothing in *Casino Magic* suggests that other documents not arguably part of this "comprehensive scheme" are "infected" and void as well. Were this not so, the Seventh Circuit's statement that "the mere reference to a *related* management contract does not render a collateral document subject to the Act's approval requirement" would make little sense. *Wells Fargo Bank,* 658 F.3d at 701.

Two individual Bond Documents in particular stand out as providing an unequivocal, independent waiver of the Tribe's sovereign immunity: the Tribal Resolution and the Bond Resolution. The Tribal Resolution, adopted by the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians, states in pertinent part:

> WHEREAS, the Tribal Council has been advised that as a condition to the purchase of the Bonds, the bondholders require that the Tribe agree to various legal provisions (the "Legal Provisions") that will provide for (a) a limited waiver of its sovereign immunity with respect to suits or other legal actions or proceedings arising because of disputes related to the Tribal Agreement or other agreements related thereto . . .

> RESOLVED, that all Legal Provisions in the Tribal Agreement are hereby approved; more specifically and expressly, those by which the Tribe (i) provides a limited waiver of sovereign

immunity from suit, (ii) agrees that the laws of the State of Wisconsin shall apply including, specifically, the Wisconsin Uniform Commercial Code, (iii) consents to the jurisdiction: of the United States District Court for the Western District of Wisconsin (including all federal courts to which decisions of the United States District Court for the Western District of Wisconsin may be appealed), and the courts of the State of Wisconsin wherein jurisdiction and venue are otherwise proper, with respect to any dispute or controversy arising out of the Tribal Agreement, this Resolution and including any amendment or supplement which may be made thereto, or to any transaction in connection therewith[.]

(Tribal Resolution, at 1-2.)

Similarly, the Bond Resolution adopted by the Board of Directors of the Lake of the

Torches Economic Development Corporation states:

RESOLVED, that all Legal Provisions in the Bond Documents are hereby approved; more specifically and expressly the Corporation (i) waives its immunity from suit, (ii) agrees that the laws of the State of Wisconsin shall apply including, specifically, the Wisconsin Uniform Commercial Code, and (iii) consents to the jurisdiction of the United States District Court for the Western District of Wisconsin . . . with respect to any dispute or controversy arising out of the Indenture, the Security Agreement, the Bond Placement Agreement, the Bonds, this Bond Resolution and including any amendment or supplement which may be made thereto, or to any transaction in connection therewith[.]

(Bond Resolution, at 3.)

Despite these broad unambiguous waivers, defendants argue that their resolutions

evince an intent to waive sovereign immunity only with respect to a non-existent "Trustee"

for a now void Indenture and not with respect to any of the plaintiffs in this case. The plain

language in the resolutions is, however, to the contrary. Nothing in either resolution

indicates any intent by the Tribe or the Corporation to limit its waiver of sovereign

immunity only to a particular *party*. Rather, the Tribal Resolution state that the Tribe's

waiver extends to *any* dispute or controversy arising out of the Tribal Agreement, the Resolution or any transaction in connection therewith.  So, too, does the Corporation's waiver extend to *any* dispute or controversy arising out of the Bond Documents.  There is no hint of intent in either Resolution to narrow, much less language *actually* narrowing, these broadly-phrased waivers to extend only to suits brought by the "Trustee."

Moreover, the present case falls well within the express terms of that waiver.  Indeed, the controversy between the parties in this case unquestionably arises out of: (1) the various Bond Documents, in that it implicates their validity as well as the enforceability of defendants' representations that they have waived tribal court jurisdiction; and (2) the Bond Transaction itself, in that the Stifel and Saybrook plaintiffs contend that the circumstances surrounding the Transaction do not permit the tribal court to exercise jurisdiction over them.  Even strictly construing the above waivers in defendants' favor, they have waived sovereign immunity for purposes of this case and, in particular, for purposes of vindicating or denying the interests of the bondholders.

Defendants also argue that the Bond Resolution entered into by the Corporation merely references but does not incorporate the waivers of sovereign immunity in other documents and so cannot be construed to waive the Corporation's sovereign immunity on a stand-alone basis.  First, it is not immediately apparent that defendants are correct: the Bond Resolution both approves the provisions in other documents and goes on to state that "more specifically and expressly the Corporation (i) waives its immunity from suit."  (Bond Resolution, at 3.)  The Tribal Resolution *does* contain the language defendants point out, but even so, the relevant question in analyzing a waiver of sovereign immunity is one of *intent*.  *See Wells Fargo Bank*, 658 F.3d at 701.  No "magic words" are required to evince such

16

an intent.  *See Sokaogon Gaming*, 86 F.3d at 660; *see also Val-U Constr. Co. of S.D. v. Rosebud Sioux Tribe*, 146 F.3d 573, 577 (8th Cir. 1998) (noting that the Supreme Court has "never required the invocation of 'magic words'" for a waiver of sovereign immunity).  In the context of the larger transaction here, the Corporation and Tribe's intent to waive its sovereign immunity to facilitate the $50 million Bond Transaction speaks loudly in the Bond Resolution and Tribal Resolution, respectively.

Finally, defendants argue that the Tribal Resolution, standing on its own, constitutes a "management contract" and is void under IGRA.  However, the only problematic provision the Tribe identifies in that Resolution is the Tribal Council's approval of "covenants not to replace key management of the Casino Facility without obtaining the requisite consent of the holders of the Bonds."  (Tribal Resolution, at 2.)  The court does not believe that this provision *alone* gives bondholders the authority to plan, organize, direct, coordinate or control casino operations.  All the Resolution does is acknowledge that bondholders will have limited input into the *tribal parties'* decisions on replacement of key managers.

While the Seventh Circuit considered a comparable provision when analyzing the Indenture, it did so *in conjunction* with other provisions giving Wells Fargo ultimate control over disposition of gross revenue and capital allocation, as well as permitting the bondholders under certain circumstances to retain an independent consultant whose recommendations the Corporation had to implement, before concluding that the Indenture gave the bondholders "truly powerful authority over the management of the Corporation." *Wells Fargo Bank*, 658 F.3d at 698-99.  In contrast, a single provision in the Resolution requiring approval of a simple majority of bondholders, standing alone, does not "transfer

17

significant management responsibility to . . . the bondholder and therefore render the [Tribal Resolution] a management agreement subject to the approval of the Chairman." *Id.* at 699. The entire document is by definition a "Resolution," not an enforceable contract, management or otherwise, and establishes the Tribe's *intent*, whether or not it is a binding agreement.[6]

At a minimum then, the Bond and Tribal Resolutions evince an intent on the part of the Corporation and the Tribe, respectively, to waive their sovereign immunity for purposes of the current suit. Because the court has rejected defendants' argument that the waivers are void as part of unapproved management contracts, it concludes that these are valid waivers of sovereign immunity and that neither the Tribe nor the Corporation is immune from this lawsuit.

## II. Exhaustion of Tribal Remedies

Having determined that both defendants have consented to this court's exercise of jurisdiction over them on matters related to the Bond Documents and Transaction, the court turns next to defendants' argument under the doctrine of tribal exhaustion, which asserts that, based on principles of comity, a tribal court should be given the opportunity to determine its jurisdiction first, before this court weighs in. The Seventh Circuit considered this doctrine in some detail in *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803 (7th Cir. 1993), ultimately rejecting a tribal corporation's similar defense of failure to exhaust tribal

---

[6] In fairness, while the Resolutions are only signed by representatives from the Tribal Council and the Corporation, respectively, there is a provision in each one stating that they shall "constitute a contract with the Trustee." Since this provision runs counter to the remainder of the document, and there is no countersignature, it is doubtful the Resolutions would constitute enforceable "contracts." Even if they were deemed to be contracts between a "Trustee" and the Tribe and Corporation, respectively, that would not alter the stated intent of each resolution. Furthermore, whether enforceable or not, other Bond Documents evince this same intent.

remedies.   In *Altheimer*, the Seventh Circuit began by noting that courts must "examine the factual circumstances of each case ... to determine whether the issue in dispute is truly a reservation affair entitled to the exhaustion doctrine."  *Id.* at 814-15.   In that case, the tribal corporation defendant, Sioux Manufacturing Corporation ("SMC"), had entered into a formal "Letter of Intent" that "explicitly agreed to submit to the venue and jurisdiction of federal and state courts located in Illinois."  *Id.* at 815.   Based on that provision, the Seventh Circuit held that requiring tribal exhaustion would not serve the policies behind the rule:

> To refuse enforcement of this routine contract provision would be to undercut the Tribe's self-government and self-determination.  The Tribe created SMC to enhance employment opportunities on the reservation.   As the Ninth Circuit recognized, economic independence is the foundation of a tribe's self-determination.  If contracting parties cannot trust the validity of choice of law and venue provisions, SMC may well find itself unable to compete and the Tribe's efforts to improve the reservation's economy may come to naught.  We therefore affirm the district court's denial of SMC's motion for a stay of proceedings based on the tribal exhaustion rule.

*Id.*; *accord FGS Constructors, Inc. v. Carlow*. 64 F.3d 1230, 1233 (8th Cir. 1995) ("The contracting parties agreed that a plaintiff could sue either in the federal district court of South Dakota (a court of competent jurisdiction) or in the tribal court.   By this forum selection clause, the Tribe agreed that disputes need not be litigated in tribal court.   The district court, therefore, had no significant comity reason to defer . . .  first to the tribal court.").

While defendants argue that the current dispute "is truly a reservation affair entitled to the exhaustion doctrine," and as such distinguishable from *Altheimer,* the court finds no material difference in the facts of these cases.   As in *Altheimer,* the Tribe and the

19

Corporation alike agreed to litigate disputes involving the Bond Documents or the Bond Transaction, like this one over enforcement of the provisions of the Bonds themselves, in Wisconsin's federal or state courts, and they agreed that the law of Wisconsin should apply to such litigation.   In the words of the *Altheimer* court, by doing so, the defendants apparently "wished to avoid characterization of the contract as a reservation affair by actively seeking the federal forum." *Altheimer & Gray,* 983 F.2d at 815.   To refuse to enforce those explicit contract provisions would "undercut the Tribe's self-government and self-determination." *Id.*

The legal reasoning in *Altheimer* also applies with equal, if not greater, force here. Indeed, the Resolutions here state that the waiver provisions in question were *required* in order for the original transaction to take place.   (*See, e.g.*, Bond Resolution, at 2 ("WHEREAS, the Board of Directors has been advised that as a condition to the issuance of the Bonds, the Corporation will be required to agree to various legal provisions . . . that will provide for (a) a limited waiver of its sovereign immunity . . . [and] (b) consent by the Corporation to the jurisdiction of the United States District Court for the Western District of Wisconsin[.]"); Tribal Resolution, at 1 (same, for Tribal Council).)   If courts in turn refuse to enforce those clauses, contracting parties may conclude they "cannot trust the validity of choice of law and venue provisions, [and defendants] may well find [themselves] unable to compete." *Id.*   For this reason, the court holds that plaintiffs need not exhaust their tribal court remedies with respect to disputes regarding the Bond Documents and Transaction.[7]

---

[7] In their reply to Godfrey's supplemental briefing on subject-matter jurisdiction, defendants raised

### III. Preliminary Injunction

Having concluded that this court has jurisdiction over the party's dispute and need not defer to the Tribal Court, the court turns to plaintiffs' request for a preliminary injunction.  Plaintiffs bear the burden of demonstrating that:  (1) they have a reasonable likelihood of success on the merits of their underlying claim; (2) they have no adequate remedy at law; and (3) they will suffer irreparable harm without injunctive relief.  *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 803 (7th Cir. 2002).  If they meet this burden, plaintiffs must then show that the harm they will suffer outweighs any harm defendants will suffer due to the entry of an injunction and that the preliminary injunction will not harm the public interest.  *Id.* at 803-04.

The Seventh Circuit has oft instructed that this analysis involves a sliding scale, so that "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position."  *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).  This approach "is not mathematical in nature[;] rather[,] 'it is more properly characterized as subjective and intuitive, one which permits district courts to

---

an additional argument with respect to *Altheimer,* pointing out that the *Altheimer* court had subject matter jurisdiction over the merits of the underlying contract dispute between the parties.  So, defendants note the question of tribal court exhaustion arose in the context of determining whether to keep the case in the federal forum as the parties had contractually agreed.  In contrast, the case before this court is intended *solely* to determine tribal court jurisdiction, a question which is traditionally addressed first by the tribal court itself for comity reasons.  *See Nat'l Farmers Union*, 471 U.S. at 856.  Given the importance of *Altheimer,* defendants' failure to raise this distinction during briefing on the plaintiffs' motions for preliminary injunction is troubling.  To the extent the court will consider it now, it is relevant only with respect to Godfrey, since it was raised in that context.  Moreover, *Altheimer* still supports this court's conclusion that plaintiffs need not exhaust their tribal remedies in this lawsuit.  As in *Altheimer,* defendants entered into contracts calling for a federal or state forum in connection with *any* dispute arising out of the Bond Documents or related transactions, including defendants' tribal court suit to void the Bond Documents.  Defendants' own actions, therefore, have characterized the current suit as one not requiring tribal court exhaustion under *Altheimer,* even if the question this court is being asked would otherwise be an excellent candidate for the tribal court to answer in the first instance.

weight the competing considerations and mold appropriate relief.'" *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).  In performing this balancing, "the court bears in mind that the purpose of a preliminary injunction is 'to minimize the hardship to the parties pending the ultimate resolution of the lawsuit.'" *AM Gen. Corp.*, 311 F.3d at 804 (quoting *Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998)).

### A.    Likelihood of Success on the Merits

In determining whether the tribal court has jurisdiction over plaintiffs, it is appropriate to consider the basic principles of tribal court jurisdiction.  "[A]bsent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances."  *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997).  This doctrine arises from the Supreme Court's decision in *Montana v. United States*, 450 U.S. 544 (1981), which established both the general presumption against tribal court jurisdiction absent express authorization, as well as two "exceptions" to that presumption.  Before reaching *Montana*, however, the court must first address defendants' arguments against the application of that rule.[8]

---

[8] Defendants have maintained that this case is "really about" the forum selection clauses within the contracts and that plaintiffs should be held closely to that theory, given that their proposed findings of fact focused on the contracts and not on *Montana*.  The Stifel and Saybrook plaintiffs did brief *Montana* in their motions for preliminary injunction, however, putting defendants on notice of that theory.  (*See* Stifel Br. (dkt. #6) 16-19; Saybrook Br. (dkt. #18) 14-17.)  To the extent defendants argue that plaintiffs should have explicitly proposed additional facts relating to *Montana*, defendants actually stipulated to the fact on which Saybrook centrally relies -- that it only made a single visit to the reservation -- and the Stifel plaintiffs did propose facts regarding the off-reservation nature of their conduct and negotiations.  (*See* Stifel PFOF (dkt. #7) ¶¶ 14-15.)

### 1. Express Authorization

Defendants first argue that the court need not address the *Montana* presumption or exceptions in this case, because IGRA "expressly authorizes" tribal court jurisdiction here. *See Strate,* 520 U.S. at 449 ("As the Court made plain in *Montana*, the general rule and exceptions there announced govern only in the absence of a delegation of tribal authority by treaty or statute."). Defendants contend that Congress has specifically delegated the authority to regulate gaming to the tribes through IGRA, which also allows the tribal court to exercise jurisdiction over gaming-related disputes. Certainly, IGRA gives general authority to tribes to regulate gaming activities on their lands. *See, e.g.*, 25 U.S.C. § 2702(2) ("The purpose of this chapter is . . . to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players[.]").

Unfortunately for defendants, the case currently proceeding in tribal court has nothing to do with the Tribe's and Corporation's rights to regulate gaming as established by IGRA. Rather, the tribal court action is intended to void the Bond Documents for failure to comply with *federal law*, which required the parties to submit those documents for approval by a *federal agency*. It goes too far to say that through IGRA, tribes have been delegated the authority to regulate *any* action that tangentially touches upon gaming, even when its own regulatory power plays *no* role in the outcome.

Similarly, defendants argue that they retain treaty rights to exclude nonmembers from their land, which translates into the right to regulate nonmember conduct on their

land.  *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982) ("Nonmembers who lawfully enter tribal lands remain subject to the tribe's power to exclude them.  This power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct[.]").  As the court will discuss further below, however, nonmember conduct on tribal land surrounding the issuance of the Bonds at issue here is virtually non-existent, making *Merrion* and any claimed treaty right inapplicable.  Moreover, there is no logic in the assertion that because defendants retain the power to *exclude* nonmembers from their reservations, they necessarily have the power to hale them *into* tribal court.

## 2.  *Montana*'s Applicability on Tribal Land

Defendants also argue that *Montana* is inapplicable for another reason:  its general presumption against jurisdiction and its exceptions only apply in actions involving conduct on *nonmember fee land* and this lawsuit involves conduct on tribal *trust lands*.  The Ninth Circuit, at least, has embraced the importance of this distinction, holding that *Montana* applies only in cases arising on non-Indian land in *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 813 (9th Cir. 2011).  Specifically, the Ninth Circuit held that on tribal land, tribes maintain the sovereign authority to exclude nonmembers, which in turn permits them to regulate by setting conditions on nonmembers' entry.  *Id.* at 811-12.  Thus, the Ninth Circuit concluded that where the tribal court exercised jurisdiction over a non-Indian corporation and its owner for breach of their lease of tribal lands and trespass, the inherent power to exclude, coupled with the "necessarily include[d] . . . lesser authority to set conditions on [nonmembers'] entry," justified the exercise of tribal court jurisdiction over those parties without reference to *Montana*.  *Id.* at 811.

24

Plaintiffs respond that the Supreme Court rejected this same argument in *Nevada v. Hicks*, 533 U.S. 353 (2001), finding instead that *Montana* applies regardless of land status. In *Hicks*, the Court held that a tribal court lacked jurisdiction over a claim under 42 U.S.C. § 1983 arising out of state police officers' execution of a search warrant on tribal lands.  In doing so, the court stated:

> *Montana*, after announcing the general rule of no jurisdiction over nonmembers, cautioned that "[t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands," 450 U.S. at 565—clearly implying that the general rule of *Montana* applies to both Indian and non-Indian land.  The ownership status of land, in other words, is only one factor to consider in determining whether regulation of the activities of nonmembers is "necessary to protect tribal self-government or to control internal relations."

*Hicks*, 533 U.S. at 359-60; *see also id.* at 387 (O'Connor, J., concurring) ("Today, the Court finally resolves that *Montana v. United States* governs a tribe's civil jurisdiction over nonmembers regardless of land ownership.") (citation omitted).  In *Plains Commerce Bank v. Long Family Land and Cattle Company*, 554 U.S. 316 (2008), the Supreme Court provided further support for plaintiffs' position, stating that the general rule of *Montana* "restricts tribal authority over nonmember activities taking place on the reservation, and is *particularly strong* when the nonmember's activity occurs on land owned in fee simple by non-Indians." *Id.* at 328 (emphasis added).  This language suggests that, while the presumption against tribal court jurisdiction is *stronger* on fee land, at a minimum it *applies* on tribal trust land as well.

To the extent the *Water Wheel* decision conflicts with those of the Supreme Court in *Hicks* and *Plains Commerce Bank* which the Ninth Circuit disputed, the latter cases obviously

control.  Moreover, there is no evidence in this case that plaintiffs' conduct took place on tribal trust land, at least with respect to the Stifel and Saybrook plaintiffs.[9]  The tribal court action at issue here arises from the Bond Documents, but the evidence adduced at the hearing establishes that the Stifel and Saybrook plaintiffs' conduct in relation to those documents took place almost exclusively off-reservation.  Although defendants argue that the Bond Documents themselves purport to grant significant control over tribal land to plaintiffs, the tribal court action challenges neither plaintiffs' exercise of that control nor any attempt to do so.  Instead, the tribal court action is intended simply to invalidate the documents based on the failure to acquire proper federal approval.  Defendants' inherent power to exclude parties from tribal trust land and set conditions on nonmembers' entry simply does not come into play here.  Thus, regardless of whether *Montana* applies only to cases involving nonmember conduct on non-Indian land, it applies here.

### 3. *Montana* Presumption and Exceptions

In *Montana*, the Supreme Court delineated two specific exceptions to the general proposition that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."[10]  450 U.S. at 565.  The first exception states that "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."  *Id.*  This exception requires

---

[9] The court does not include Godfrey & Kahn in this analysis, because Godfrey stipulated for the purposes of its motion for preliminary injunction that the tribal court could assert jurisdiction consistent with *Montana*.  (*See* dkt. #131.)  Moreover, Godfrey's relationship as defendants' counsel appears to have been different in character and scope than that of the other plaintiffs.

[10] Though *Montana* specifically addressed a tribe's *regulatory* authority, the Supreme Court confirmed in *Strate* that *Montana* applies to a tribe's adjudicative authority as well.  *Strate,* 520 U.S. at 453.

that the regulation imposed by the tribe have some nexus to the consensual relationship itself. *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 657 (2001); *see, e.g.*, *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 338 (2008) (bank's lengthy on-reservation commercial relationship with tribal party did not support jurisdiction, because it was unrelated to tribal party's attempt to regulate the bank's sale of land it owned in fee simple); *Strate*, 520 U.S. at 457 (though defendant in traffic accident case had contract with the tribe, plaintiff was not party to the subcontract, and tribe was not party to the accident, so case did not fall within *Montana*'s first exception).

Recently, the Supreme Court addressed the application of the *Montana* exceptions in *Plains Commerce Bank*. The Court explained that in analyzing whether the first *Montana* exception supports tribal court jurisdiction, courts should focus on the *conduct* of the nonmember parties that the tribe seeks to regulate:

> *Montana* and its progeny permit tribal regulation of nonmember *conduct* inside the reservation that implicates the tribe's sovereign interests. *Montana* expressly limits its first exception to the "activities of nonmembers," allowing these to be regulated to the extent necessary "to protect tribal self-government [and] to control internal relations[.]"

*Id.* at 332 (emphasis in original) (internal citations omitted). As reflected in the first sentence of the quote above, even though the first *Montana* exception does not on its face limit the relevant inquiry to conduct *on Indian land,* unlike the second exception, the Supreme Court explained both exceptions are similarly limited. First, the *Plains Commerce Bank* court pointed out that the four cases originally cited to explain *Montana*'s first exception all involved "regulation of non-Indian activities *on the reservation*": a contract dispute arising from an on-reservation sale of merchandise from a non-Indian to an Indian,

27

and three cases involving taxes on non-members' economic activities on Indian land.  *Id.* at 332 (emphasis added).  The Court further pointed out that the cases since *Montana* "have followed the same pattern, permitting regulation of certain forms of nonmember conduct on tribal land."  *Id.* at 333.  Finally, the Court noted that "[t]ellingly, with only 'one minor exception, we have never upheld under *Montana* the extension of tribal civil authority over nonmembers *on non-Indian land*."[11]  *Id.* at 333 (quoting *Hicks*, 533 U.S. at 360) (emphasis in original).  The Court concluded that discussion by reaffirming the importance of looking at the *nonmember conduct* the action seeks to regulate.

Consistent with these observations, the *Plains Commerce Bank* court concluded that regardless of land status, "*Montana* cases have always concerned nonmember conduct on the land."  *Id.* at 334.  For this reason, the *Montana* exceptions did not extend to the mere *sale* of the land at issue in *Plains Commerce Bank*.  According to the Court, this distinction is consistent with the touchstone of *Montana*:  the tribe's interests in protecting internal relations and self-governance.  "[T]he logic of *Montana* is that certain activities on non-Indian fee land (say, a business enterprise employing tribal members) or certain uses (say, commercial development) may intrude on the internal relations of the tribe or threaten tribal self-rule.  To the extent they do, such activities or land uses may be regulated."  *Plains Commercial Bank,* 554 U.S. at 334-35.  To the extent the activity *itself* does not threaten the tribe's sovereign interests, then the first *Montana* exception does not allow regulation of that activity in tribal court.  *Id.* at 336-37.

---

[11] In that case, *Brendale v. Confederated Tribes & Bands of Yakima Nation*, 492 U.S. 408 (1989), six Justices concluded that *Montana* did not authorize the Yakima Nation to impose zoning regulations on non-Indian fee land located on the reservation where nearly half the acreage was nonmember-owned, but five Justices concluded that *Montana* allowed the Nation to impose zoning restrictions on "nonmember fee land isolated in 'the heart of [a] closed portion of the reservation.'"  *See Plains Commerce Bank*, 554 U.S. at 334 (summarizing *Brendale*) (alteration in original).

Applying the framework of *Plains Commerce Bank* to the facts of this case, the court finds that the Stifel and Saybrook plaintiffs' activities likely do not support the exercise of tribal court jurisdiction. As explained at the preliminary injunction hearing, the parties' on-reservation conduct is minimal, particularly with respect to Saybrook. Indeed, the parties have stipulated for purposes of the present motions that the *only* visit to the reservation by Saybrook or LDF Acquisitions was a single visit by a Saybrook representative, Scott Bayliss, and that Bayliss engaged in no negotiations with the Tribe or the Corporation during that visit. (*See* Limited Stipulation (dkt. #154) ¶ 1.) In fact, defendants have stipulated that the sole purpose of his visit was to gather information as part of Saybrook's due diligence. (*Id.*) With respect to the Stifel plaintiffs, the question is arguably closer, since Stifel representatives apparently visited the reservation on multiple occasions to make presentations related to the Bond Transaction, but even as to Stifel there has been no evidence presented that any *negotiations* with respect to the Bond Transaction or Documents took place on tribal land. At the very most, defendants have established that the Stifel plaintiffs engaged in a not-insignificant amount of conduct on the reservation.

In any event, the final step in establishing the applicability of the first *Montana* exception to both the Stifel and Saybrook plaintiffs is missing: the tribal court action does not seek to regulate nonmember *conduct*. As Stifel pointed out at the preliminary injunction hearing, the tribal court action seeks declaratory judgments that: (1) all the Bond Documents are void as inextricably intertwined with the Indenture; (2) each separate document is an unapproved management contract under IGRA; and (3) the Tribal Agreement and Tribal Resolution are void as unapproved by a referendum vote of members

of the Tribe.  (*See* Statement of Claim (dkt. #1-14).)  None of this requested relief seeks to regulate *plaintiffs' conduct on the reservation*.[12]

Defendants also do not allege in tribal court that plaintiffs have taken any action by way of their commercial relationship with the Tribe and the Corporation that necessitates regulation.  Neither do they contend that plaintiffs have breached the terms of the Bond Documents, nor seek to hold plaintiffs liable for conduct connected with the negotiation and execution of the Bond Documents.[13]  Similarly, they do not allege trespass, nor are they asking plaintiffs to comply with particular conditions of entry onto tribal land.

In the end, all defendants offer is the mere fact of a commercial relationship, which they now seek to invalidate.  Based on the Supreme Court's explicit warning that *Montana's* exceptions are limited and "cannot be construed in a manner that would 'swallow the rule,' or 'severely shrink it,'" the court concludes that this relationship alone, without more, is likely not enough.  *See Plains Commerce Bank*, 554 U.S. at 330 (internal citations omitted).

This result is also consistent with the "sovereign interests" touchstone of the *Montana* analysis as articulated in *Plains Commerce Bank*.  As noted above, the overarching inquiry in

---

[12] Defendants argue that that the court should consider not only plaintiffs' on-reservation conduct but also: (1) the activities of the Tribe and the Corporation; and (2) the rights that the Bond Documents purport to give plaintiffs to manage the on-reservation casino.  The first proposition is unsupported by law.  If *Montana's* consensual relationship exception allowed for tribal court jurisdiction whenever *any* party to the relationship, including a tribal party, took action on tribal land, the exception would swallow the rule.  Indeed, the Supreme Court has explicitly cautioned against broadly construing the *Montana* exceptions in this manner.  *See Plains Commerce Bank*, 554 U.S. at 330.  The second proposition is superficially appealing, but it strays from *Montana*'s emphasis on regulation of nonmember *conduct*.  The tribal court action is not trying to regulate conduct; it seeks simply to invalidate the Bond Documents.  That the alleged grounds for invalidation are provisions purportedly transferring management authority to plaintiffs does not appear relevant to application of the first *Montana* exception, which only allows for the regulation of nonmember activity on tribal lands.

[13] Although the Statement of Claim in tribal court refers to alleged "misrepresentations" and "false and misleading statements," defendants bring no claims for misrepresentation, nor do they seek any relief on those grounds.  (*See* Statement of Claim ¶¶ 139-65.)

*Montana* is whether the activities "intrude on the internal relations of the tribe or threaten tribal self-rule.  To the extent they do, such activities . . . may be regulated." *Id.* at 335. Here, plaintiffs' actual activities amount to nothing more than entrance into a commercial transaction with defendants -- a transaction defendants now challenge in tribal court upon purely legal grounds.  (*See* Statement of Claim ¶¶ 139-65.)  This sort of regulation "cannot be justified by reference to the tribe's sovereign interests." *Plains Commerce Bank*, 554 U.S. at 336.  While the validation or invalidation of the Bond Documents may well have an impact on defendants, that is not enough to establish tribal court jurisdiction. *Id.* ("This is not to suggest that the sale of the land will have no impact on the tribe. . . . But the key point is that any threat to the tribe's sovereign interests flows from changed uses or nonmember activities, rather than from the mere fact of resale.").  Here, any threat to the Tribe's ability to govern itself as sovereign does not flow from plaintiffs' conduct in entering into the commercial deal, and so *Montana*'s first exception does not permit tribal court jurisdiction over the Stifel and Saybrook parties.

Under the second *Montana* exception, a "tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566.  Unlike the first *Montana* exception, which the Supreme Court has narrowed through case law, the second exception expressly grants tribal authority over non-Indians' *conduct on reservation land*.  As previously discussed, the tribal court action here does not seek to regulate plaintiffs' conduct *at all*, let alone their conduct on reservation land.  Thus, for the same

31

reasons discussed above, the second *Montana* exception is unlikely to support tribal court jurisdiction over the Stifel and Saybrook plaintiffs in that action.

Furthermore, although the terms of this exception are otherwise broad, the Supreme Court has held its actual application is fairly narrow.  For example, in *Strate*, a traffic accident occurred on a highway within reservation land, although neither the allegedly negligent driver nor that driver's employer was a member of the tribe.  The Supreme Court concluded that the second *Montana* exception did not allow the tribal court to exercise jurisdiction over the nonmember parties.

As an initial matter, the *Strate* Court recognized that "[u]ndoubtedly, those who drive carelessly on a public reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members."  *Id.* at 457-58.  However, the Court also recognized that "if *Montana's* second exception requires no more, the exception would severely shrink the rule." *Id.* at 458.   Accordingly, the Court looked to *Montana's* citations to determine "the character of the tribal interest" at stake, concluding that the second exception was effectively intended to "protect tribal self-government or to control internal relations."  *Id.* at 458-59 (quoting *Montana*, 450 U.S. at 564).  Where a case will not affect a tribe's ability "to preserve 'the right of reservation Indians to make their own laws and be ruled by them,'" the Court found the second *Montana* exception does not apply.  *Id.* (quoting *Williams*, 358 U.S. at 220).

While a large sum of money is undoubtedly at stake here, *Montana's* second exception requires that the harm "do more than injure the tribe, it must 'imperil the subsistence' of the tribal community."  *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 341 (2008).  "[T]h[e] elevated threshold for application of the second

*Montana* exception suggests that tribal power must be necessary to avert catastrophic consequences." *Id.* (quoting F. Cohen, Handbook of Federal Indian Law § 4.02[3][c], at 232 n.220). The central question, as articulated by the Supreme Court, is whether the case at issue involves consequences that are "'catastrophic' for *tribal self-government*." *Id.* (emphasis added).

Here, defendants are unlikely to meet such a high standard. In particular, although they have offered evidence that making payments on the Bonds will require cuts to tribal programming, defendants have not even attempted to demonstrate that the commercial dispute at the center of the tribal court action requires regulation to preserve the tribe's right to *self-governance*. The tribal court action seeks to void the Bond Documents for failure to acquire proper federal approval and will not itself affect the Tribe's ability to make its own laws and be ruled by them. Thus, the Stifel and Saybrook plaintiffs are likely to succeed in demonstrating a lack of tribal court jurisdiction under either of the *Montana* exceptions to the presumption against the tribal court's exercise of jurisdiction over them.

### 4. Forum Selection

This does not end the merits inquiry, however, since plaintiff Godfrey & Kahn has stipulated for purposes of its motion for preliminary injunction that *Montana* does not insulate it from tribal court jurisdiction. Rather, Godfrey relies on forum selection provisions within various Bond Documents to foreclose tribal court jurisdiction, an alternative argument also advanced by the Stifel and Saybrook plaintiffs.

As a preliminary matter, defendants contend that because Godfrey relies entirely on contract law, rather than on federal law, Godfrey's claims do not "arise" under federal law

for purposes of 28 U.S.C. § 1331.  Godfrey disputes this characterization, arguing that the federal question of inherent tribal authority over non-Indians is not exclusively governed by *Montana,* but also arises in determining whether a Tribe has waived any such inherent authority.[14]

The answer to this question is by no means clear-cut.  The oft-quoted language upon which both plaintiffs and defendants rely comes from *National Farmers Union*, which stated:

> The question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a "federal question" under § 1331.   Because petitioners contend that federal law has divested the Tribe of this aspect of sovereignty, it is federal law on which they rely as a basis for the asserted right of freedom from Tribal Court interference.  They have, therefore, filed an action "arising under" federal law within the meaning of § 1331.

*Nat'l Farmers Union*, 471 U.S. at 852-53.   Unlike the Stifel and Saybrooke plaintiffs, Godfrey's claims do not fall neatly within that language, since Godfrey does not contend that *federal law* has divested the tribal court of jurisdiction over it.   Instead, Godfrey contends that state *contract law* has foreclosed defendants from invoking tribal court jurisdiction.

In support of its argument that *National Farmer* still applies, Godfrey principally relies on cases involving the enforcement of arbitration provisions in contracts between tribes and private parties.  While the court agrees the circumstances are analogous, the absence of a

---

[14] The fact that part of this dispute requires the court to interpret IGRA does not provide a basis for subject matter jurisdiction.  *See Wisconsin v. Ho-Chunk Nation*, 463 F.3d 655, 659-60 (7th Cir. 2006), *abrogated in part on other grounds by Vaden v. Discover Bank*, 556 U.S. 49 (2008); *Saybrook Tax Exempt Investors, LLC*, 929 F. Supp. 2d at 863 (defendants must raise IGRA as an affirmative defense).  Nor does the question of sovereign immunity present such a question.  *Oklahoma Tax Comm'n v. Graham*, 489 U.S. 838, 841-42 (1989) (possible existence of tribal immunity defense does not convert claims into federal questions for subject matter jurisdiction purposes).

federal law component is not.  For instance, Godfrey points to *Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840 (8th Cir. 2003).  In that case, Gaming World filed a suit seeking a declaratory judgment that its agreement with the White Earth Band was valid as approved by the Interior Board of Indian Appeals (IBIA) and an order compelling arbitration pursuant to the agreement.   In holding that federal question jurisdiction existed over the parties' dispute, the Eighth Circuit explained that "the petition in this case raises the issue of whether the March 6, 1992 contract received valid federal approval under the IGRA regulatory scheme."  *Id.* at 848.  In so holding, the *Gaming World* court actually used language suggesting that a claim like Godfrey's, which is contract-based, does not present an underlying federal question.  *See id.* ("If a management company alleges only a 'routine contract action' against a tribe, such as a claim that the tribe has violated a consulting agreement not subject to regulation under IGRA, the complaint does not invoke federal jurisdiction.").

Certainly, *Gaming World* and another case Godfrey cites, *Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412 (8th Cir. 1996), appear to interpret *National Farmers Union* more broadly than its plain language would appear to support.  For instance, *Gaming World* goes on to state as an alternative basis for federal question jurisdiction that "an action filed in order to avoid tribal court jurisdiction necessarily asserts federal law."  *Gaming World*, 317 F.3d at 848.  Similarly, although *Bruce H. Lien* involved an action to compel arbitration pursuant to a properly-approved management agreement, the court stated that "[t]he existence of tribal court jurisdiction itself presents a federal question," citing to the same language in *National Farmers Union* quoted above.  *See Bruce H. Lien*, 93 F.3d at 1422.  At the same time, neither of these courts considered the distinction suggested by that language

between cases alleging that *federal law* has divested a tribal court of jurisdiction (e.g., those brought pursuant to *Montana*) and cases alleging that contract law makes invocation of tribal court jurisdiction improper, making Godfrey's argument for independent subject-matter jurisdiction over its claims substantially less persuasive -- at least in this court's view.

Both *Gaming World* and *Bruce H. Lien* are distinct from the present case in another arguably important respect.  Each involved the invocation of federal law, the Federal Arbitration Act, to divest the tribal court of jurisdiction.  While Godfrey rightly points out that the FAA does not itself *create* jurisdiction, to the extent that the FAA's policy in favor of arbitration supported divestment of tribal jurisdiction, the defendants in both cases "relied" on federal law "as a basis for the asserted right of freedom from Tribal Court interference." *National Farmers Union*, 471 U.S. at 853.  In contrast, this case involves ordinary contract law principles.

Another case both parties cite, *Ninigret Dev't Corp. v. Narragansett Indian Wetuomuch Housing Authority*, 207 F.3d 21 (1st Cir. 2000), does little to resolve the question of this distinction's importance.  In *Ninigret*, the First Circuit found federal question jurisdiction to decide whether an Indian tribe may compel a non-Indian to submit to the civil jurisdiction of a tribal court, even when the plaintiff's claims are not premised on federal law.  *Id*. at 27-28.  Nevertheless, the First Circuit went on to fault the district court for ruling on the enforceability of the forum-selection clause, stating that:

> [U]nder *National Farmers*, the determination of the existence and extent of tribal court jurisdiction must be made with reference to federal law, not with reference to forum-selection provisions that may be contained within the four corners of an underlying contract.  At that stage, the pivotal question is not which court the parties agreed would have jurisdiction, but which court should, in the first instance, consider the scope of the tribal

court's jurisdiction and interpret the pertinent contractual clauses (including any forum-selection proviso).

*Id.* at 33. *Ninigret*, therefore, is at best ambiguous as to a federal district court's exercise of subject matter jurisdiction over a contractual forum selection clause.

Assuming defendants are correct and the question of a tribe's arguable waiver of its own forum to resolve a contract dispute is not subject to federal jurisdiction, this court may still exercise supplemental jurisdiction over Godfrey's claim under 28 U.S.C. § 1367(a).[15] Section 1367(a) states that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," even if those claims "involve the joinder or intervention of additional parties."  Two claims are part of the same case or controversy if they derive from a common nucleus of operative facts, with a loose factual connection between them generally sufficing for § 1367(a) purposes. *Sanchez* & *Daniels v. Koresko*, 503 F.3d 610, 614 (7th Cir. 2007).  Here, Godfrey's claim that the Tribal Defendants have waived their right to proceed in tribal court arises from the same operative facts as the *Montana* questions over which this court has already found it has subject-matter jurisdiction over the other plaintiffs' claims.  In addition, those plaintiffs raise the very same contractual waiver claim as Godfrey.  Finally, whether the pending tribal

---

[15] Additionally, Godfrey has only agreed not to contest jurisdiction under *Montana* for purposes of the current preliminary injunction motion.  It is, therefore, not necessarily accurate to say that Godfrey has *no* claim that federal law precludes tribal court jurisdiction over it.  Still, although Godfrey has not waived its right to challenge the exercise of tribal court jurisdiction under *Montana*, the nature and extent of its relationship with the Tribe and the Corporation would also appear to make the likelihood of success on that question less than the other plaintiffs', which is likely part of Godfrey's reasoning in not pressing *Montana* as a basis for a preliminary injunction.

37

court action brought against all plaintiffs may proceed is the only matter in dispute.  This more than satisfies the requirement of a "loose factual connection."

The problem is that supplemental jurisdiction does not lie indefinitely.  Under 28 U.S.C. § 1367(c)(3), a court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction.  If those federal claims are resolved before trial, as this court has already found is likely, a presumption arises in favor of relinquishing jurisdiction.  *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007).  Moreover, it may well make little sense to retain jurisdiction over Godfrey's contract-based claims at that point.  Certainly resolution of Godfrey's contract-based claim will likely involve a substantial amount of additional work for this court, given that the issues are altogether different than the issues involved in the Stifel and Saybrook plaintiffs' *Montana* arguments.  As importantly, these *same* contract issues will likely have to be resolved by the state court with respect to the Stifel and Saybrook plaintiffs.  Thus, while the court will continue to exercise supplemental jurisdiction over Godfrey's claim at this stage, it may end up dismissing that claim without resolving its merits.  This is by no means set in stone, given the substantial investment the court has already been required to make and may yet be required to make in assessing the merits of Godfrey's claims, as set forth below.

Admittedly, it seems odd (or at least inefficient) to enjoin defendants from proceeding in tribal court against the Stifel and Saybrook plaintiffs under *Montana*, while permitting defendants to proceed in that court against Godfrey -- particularly since defendants concede that they named Godfrey in the tribal court suit principally to bind it to the judgment against the principal plaintiffs, ensuring complete relief and avoiding the

possibility of inconsistent results should their efforts to invalidate the Bond Documents prove unsuccessful.  *See City of Chicago v. Int'l College of Surgeons,* 522 U.S. 156, 173 (1997) ("[Section 1367] reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.") (internal quotation marks omitted).  Indeed, Godfrey arguably ought not be named a defendant in the tribal court action at all, at least given defendants' position that Godfrey is not party to, and has no rights under, the Bond Documents.  Still, the question of whether Godfrey is a "proper defendant" in the tribal court action may well prove something for another court to decide.  Indeed, with respect to Godfrey, the state and tribal courts may ultimately need to apportion jurisdiction via a *Teague* conference before proceeding to resolve the *merits* of the action.[16]  *See Teague v. Bad River Band of Lake Superior Tribe of Chippewa Indians*, 2000 WI 79, 236 Wis. 2d 384, 612 N.W.2d 709

Even if this court were to ignore its jurisdictional concerns with Godfrey's claim, Godfrey has also not yet established a substantial likelihood of success on the merits. Preliminarily, the forum selection language vary among the Bond Documents.  For example, the Tribal Resolution, the Bond Resolution and the Bond Purchase Agreement state only that the Tribe and the Corporation, respectively, consent to the jurisdiction of Wisconsin federal and state courts.  Thus, Wisconsin courts are not "specified with mandatory or obligatory language," "only jurisdiction is specified."  *Paper Exp., Ltd. v. Pfankuch Maschinen*

---

[16] Even so, the court would be remiss not to point out that with respect to contract claims under the Bond Documents or other claims related to the Bond Transaction, a strong argument can be made for allocating jurisdiction to the state court, since it will have to resolve those issues anyway (for Saybrook and Stifel) and the tribal court need not unless the Tribe and Corporation insist somewhat nonsensically to proceed alone against Godfrey.

*GmbH*, 972 F.2d 753, 756 (7th Cir. 1992).   The mere fact that Wisconsin courts have jurisdiction over claims arising from the Bond Documents pursuant to that clause does not mean that the tribal court necessarily *lacks* jurisdiction.   That court might still be an appropriate forum for resolution of the dispute (subject, of course, to the *Montana* analysis).

As plaintiffs point out, the Tribal Agreement goes a step further, stating:

> The Tribe expressly submits to and consents to the jurisdiction of the United States District Court for the Western District of Wisconsin (including all federal courts to which decisions of the Federal District Court for the Western District of Wisconsin may be appealed), and, in the event (but only in the event) the said federal court fails to exercise jurisdiction, the courts of the State of Wisconsin wherein jurisdiction and venue are otherwise proper, for the adjudication of any dispute or controversy arising out of this Agreement and including any amendment or supplement which may be made hereto, or to any transaction in connection therewith, *to the exclusion of the jurisdiction of any court of the Tribe*.

(Tribal Agreement, at 5 (emphasis added).)   The Specimen Bond mirrors this language, including a provision in which the Corporation consents to the jurisdiction of the Wisconsin courts "for the adjudication of any dispute or controversy arising out of [the] Bond, the Indenture, or the Bond Resolution and including any amendment or supplement which may be made thereto, or to any transaction in connection therewith, to the exclusion of the jurisdiction of any court of the Corporation."   (*See* Specimen Bond, at 5.)

This language appears to constitute an unambiguous consent to the exclusive jurisdiction of Wisconsin courts.   Certainly, it excludes the possibility of tribal court jurisdiction for a certain category of lawsuits, including that currently before the tribal court in which defendants' attempt to void *all* of the Bond Documents, including the Tribal Agreement and the Bonds, based on the failure to acquire proper federal approval.

Despite this unambiguous consent, plaintiff Godfrey has other hurdles to overcome before establishing its entitlement to injunctive relief similar to the other plaintiffs. *First*, defendants argue that because the Indenture has been found by the Seventh Circuit to be void *ab initio,* both the Tribal Agreement and the Bonds are unenforceable as there is no longer -- and indeed never was -- a "Trustee" appointed under the Indenture. Specifically, the Tribal Agreement purports to be a contract between the Tribe and Wells Fargo as the Trustee, but defendants point out that no Trust ever existed. According to defendants, the Bonds are unenforceable for this same reason: because each Bond provides that it "shall not be valid or become obligatory for any purpose until it shall have been authenticated by the execution of the certificate hereon endorsed by the Trustee under the Indenture." (Specimen Bond, at 5.) Without a Trustee, defendants contend, the Bond never became valid or obligatory, so the forum selection provisions within that Bond cannot now be enforced.

There are a number of flaws in this argument. As a practical matter, Wells Fargo was *acting as trustee* throughout this transaction and all the parties proceeded on that basis. Although the Trust as contemplated ultimately failed after the Indenture was determined to be void *ab initio,* a constructive trust still arose at the time $50 million changed hands, making Wells Fargo at the very least the *de facto* trustee, albeit with none of the powers granted under the Indenture. *See* Restatement (Second) of Trusts § 422 cmt. a ("[I]t is just that a resulting trust should be imposed in order to prevent the transferee from being unjustly enriched at the expense of the transferor."). Indeed, the parties stipulated for purposes of the pending preliminary injunction motions that on January 18, 2008, the Corporation issued an Order to Wells Fargo directing it to "authenticate, register, and

deliver the Bonds" to Stifel.  (*See* Defs.' Limited Stipulation (dkt. #154) ¶ 2.)  Defendants' current contention that this authentication, which they directed, rendered the Bonds unenforceable is inconsistent with principles of equity and with the way the Uniform Commercial Code (which Wisconsin has adopted) is generally interpreted.  *See* Uniform Commercial Code § 8-202 cmt. 1 ("Nor is a defect in form or the invalidity of a security normally available to the issuer as a defense."); Wis. Stat. § 408.202 (adopting UCC language).  Thus, defendants are unlikely to succeed in invalidating the Tribal Agreement or Bonds themselves based on the voiding of the Indenture.

*Second*, defendants argue that Godfrey is not a party to *any* of the contracts or documents in this case, including the Tribal Agreement and Bonds, and so it cannot invoke their forum selection language.[17]  In the Seventh Circuit, a non-party to a contract can be bound by a forum selection clause if it is "'closely related' to the dispute, such that it becomes 'foreseeable' that it will be bound."  *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993).[18]  For this reason, a plaintiff-signatory cannot defeat a forum selection

---

[17] The court continues to focus on Godfrey for this analysis because the Stifel and Saybrook plaintiffs have proven a likelihood of success on the merits under *Montana* and need not rely on the forum selection language.

[18] Much of defendants' written argument on this point is based on the premise that Godfrey must be a third-party beneficiary to the contracts before invoking the forum selection clause.  While third-party beneficiary status is sufficient to satisfy the "closely related" and "foreseeability" standards, the Seventh Circuit has indicated that it is not necessary.  *Hugel*, 999 F.2d at 209 n.7.  At the preliminary injunction hearing, defendants contended that the Seventh Circuit held forum-selection clauses may only be enforced by non-parties to a contract if they are: (1) affiliates of a signatory; or (2) "secret" principals or agents.  (Hr'g Tr. (dkt. #158) 190:11-191:5.)  The court does not believe the case defendants cite, *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436 (7th Cir. 2012), stands for this proposition.  *Adams* sought to clarify the "closely related" standard by distilling it into "two reasonably precise principles" -- affiliation and mutuality.  *Id.* at 439.  Affiliation means the companies in question are under common ownership.  *Id.* at 439-40.  Mutuality means where a party could be *bound* by the forum selection clause, it is also entitled to invoke that clause itself.  *See id.* at 443 ("So the plaintiffs, because they alleged that Starwood . . . controlled DTR, could have held Starwood to the forum selection clause had they wanted to sue in Mexico – and from this it follows that Starwood can hold the plaintiffs to the clause in the opposite situation and thus defend the suit

clause by suing a related defendant who was not a party to the contract. *Am. Patriot Ins. Agency, Inc. v. Mutual Risk Mgmt., Ltd.*, 364 F.3d 884, 888 (7th Cir. 2004); *see also Organ v. Byron*, 434 F. Supp. 2d 539, 541-42 (N.D. Ill. 2005) ("Plaintiff bargained for and agreed to [forum selection clause] as part of his contract with Mosaic. [Non-signatory] Defendants do not lack standing to argue that Plaintiff is bound to that promise.").

Godfrey appears to fall somewhere in the middle of being a "complete stranger" to the Bond Documents, as defendants contend, and being a mere substitute sued to avoid the forum selection clause, as the defendants in *American Patriot* apparently were. Godfrey is certainly no "stranger" to this transaction. In fact, Godfrey served as counsel to the Corporation and as Bond Counsel for this transaction and is now facing potential liability for playing that role. Defendants' counsel represented at the hearing that Godfrey actually drafted most of the Bond Documents and provided defendants legal advice with respect to those documents. (*See* Hr'g Tr. (dkt. #158) 193:6-12.) At the same time, Godfrey cites no case, nor could the court find a case, where a law firm successfully invoked a forum selection clause in a transactional document, which it presumably drafted on behalf of its former client, *against* that same client. Godfrey's citation to a California case in which a court permitted a similar suit does little to assuage the court's misgivings on that point. *See Bugna v. Fike*, 95 Cal. Rptr. 2d 161 (Cal. Dist. Ct. App. 2000) (allowing non-signatories to invoke forum selection clause when they were the "deal makers who negotiated, evaluated and

---

in Mexico."). Nowhere did the *Adams* court say that *only* secret relationships give rise to this principle of mutuality.

otherwise put together the very SCN transactions" under attack, despite the previous fiduciary relationship between appellants and respondents).[19]

On balance, Godfrey may nevertheless show that it could invoke the forum selection clauses with respect to the lawsuit currently in tribal court. As previously noted, while defendants have sued Godfrey in that court, they assert no claims against Godfrey. Rather, Godfrey is a defendant in that suit for the sole purpose of binding them to any determination regarding the validity of the Bond Documents, even though defendants contend in this court that Godfrey is a "stranger" to those documents. (*See* Hr'g Tr. (dkt. #158) 192-95.) Essentially, defendants have obliged Godfrey to defend the Bond Documents' validity in tribal court while maintaining in *this* court that those documents give Godfrey no enforceable rights. Those positions are inconsistent, and the court would be disinclined to foreclose Godfrey from the benefit of the documents' forum selection clause given the nature of the tribal court action.[20]

*Third*, and most troubling, the Seventh Circuit's earlier decision appears to hold that if the Bond Documents are deemed void as unapproved management contracts, then so too

---

[19] The Supreme Court's decision in *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas*, 2013 WL 6231157 (U.S. Dec. 3, 2013), which reaffirmed the presumption in favor of enforcing selection clauses, also leaves open the question of enforceability where "public-interest factors" outweigh the parties' contractual choice. Here, there is a policy question as to Godfrey's right to enforce this provision not only as a non-party, but also as a law firm against its former client. *See* Brian F. Spector, *Predispute Agreements to Arbitrate Legal Malpractice Claims: Skating on Thin Ice in Florida's Ethical Twilight Zone?*, 82 Florida Bar J. No. 4 (2008); Michael M. Karayanni, *The Public Policy Exception to the Enforcement of Forum Selection Clauses*; 34 Duquesne L. Rev. 1009 (1996).

[20] As indicated at the hearing, the court would have far less hesitance in allowing defendants to proceed in tribal court were the claim against Godfrey in that court not so targeted at the meaning and enforcement of the Bond documents. (*See* Hr'g Tr. (dkt. #158) 194:11-18.) But it is, and the court concludes that defendants' decision to sue Godfrey for a declaratory judgment on the documents' validity justifies permitting it to benefit from the provisions within those documents it is being obliged to defend. This conclusion is strengthened by the fact that the forum selection clause is drafted broadly enough to encompass the current dispute in this court. *Cf. Adams*, 702 F.3d at 444; *Am. Patriot*, 364 F.3d at 889.

is the forum selection language contained within them.[21]  *See Wells Fargo*, 658 F.3d at 700.

Defendants challenge both the Tribal Agreement and the Bond on this basis, and it is here

that Godfrey's case is most likely to break down.

Taking first the Tribal Agreement, defendants point to the provision prohibiting the

Tribe from replacing the general manager, controller or executive director without the prior

written consent of 51% of the bondholders.  As the Seventh Circuit recognized, this is a

problematic provision that weighs in favor of characterizing the Tribal Agreement as a

management contract.  *Wells Fargo,* 658 F.3d at 698-99.  As discussed above, the court does

not believe this "veto provision" *alone* is sufficient to render the Tribal Agreement a

management contract, but the Tribal Agreement contains other provisions that are

problematic as well.  For instance, Section 3(b) gives the Trustee extensive authority to

manage collateral, including surrendering or collecting it without notice, and Section 4(c)

allows the Trustee to inspect and repossess collateral when authorized to do so by other

documents; the collateral in question apparently includes all the furnishings and equipment

of the casino itself.  Section 4(d) requires the Tribe to obtain the prior written consent of

51% of the bondholders before it may modify its land lease with the Corporation; the land

in question is the land on which the casino, hotel and convention center sit.  Although these

---

[21] This remains something of an open question.  The general rule is that forum selection clauses are enforceable unless obtained by fraud, even when the underlying contracts in which they are contained are void.  *See Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 762 (7th Cir. 2006).  This general rule appears somewhat in tension with the Seventh Circuit's holding in *Wells Fargo*, however, which concluded that the Indenture was "void in its entirety" and could not even support a waiver of sovereign immunity (which generally need only be evinced by a clear manifestation of intent) contained therein.  *Wells Fargo*, 658 F.3d at 702.  While *Muzumdar* may support an argument that documents void under IGRA should not void forum selection clauses contained therein, given the Seventh Circuit's more recent *Wells Fargo* holding, which took an all-or-nothing approach to unapproved management contracts, the court assumes without deciding that there is an exception under IGRA to the general rule of *Muzumdar*.

provisions exist in the context of the Tribe's guaranty of the Corporation's obligations and are aimed at protecting the bondholders' investments after default, rather than providing control over the casino, taken together, they arguably involve a troubling amount of control over the gaming operation similar to the Indenture found void by the Seventh Circuit.[22] While the court declines to hold that the Tribal Agreement *is* void at this stage, Godfrey has not established that it is substantially likely to prevail in demonstrating that document is enforceable.

The grounds on which defendants seek to void the Specimen Bond are somewhat less persuasive.[23]  Defendants argue that it provides a security interest in the operating and gross revenues of the casino, but that in no way allows for the management of all or part of a gaming operation; indeed, in the Seventh Circuit's *Wells Fargo* decision, the court was not troubled by the fact that the Indenture provided for a repayment schedule secured by gaming revenues.  *Wells Fargo*, 658 F.3d at 698 (listing provisions favoring characterization of Indenture as non-management contract and including "fixed repayment schedule that, although secured by gaming revenues, is not set as a proportion of it").

---

[22] Defendants also point to § 3(b)'s provision allowing the Trustee to "amend, modify, extend or supplement the Indenture or other instrument evidencing the Obligations [payments]" without notice to the Tribe, so long as it does not affect the Tribe's liabilities.  If interpreted broadly, this provision could potentially give rise to problems, since it arguably would allow for the Trustee to modify *any* of the Bond Documents to take away some or all of the Tribe's management authority.  However, the court does not find such an interpretation reasonable, at least in the context in which it arose (the Tribe's guarantee of the Corporation's debt and the Trustee's ability to modify written instruments with respect to required payments).  The alternative interpretation would be absurd given that it would virtually sweep away all of the other provisions of the Bond Documents.

[23] Defendants point out that the Specimen Bond is not an actual bond, and that there is no guarantee that it reflects the language in the actual Bonds themselves.  They have presented no evidence to the contrary beyond this single speculative remark, however, and there is no reason to believe the terms of the Specimen Bond diverge in *any* material way from the actual Bonds, so this unsupported argument has little bearing on plaintiffs' likelihood of success.

Defendants also argue that the Specimen Bond incorporates the default remedies from the Indenture -- remedies which the Seventh Circuit found to be problematic.  The Indenture has been declared void *ab initio*, however, and as the Stifel plaintiffs pointed out in the motion to dismiss briefing, "the Bond cannot incorporate the Indenture's remedies for default if those remedies never existed."   (Stifel Pls.' Opp'n (dkt. #68) 45.) Furthermore, the Seventh Circuit has already held in the context of the Bonds themselves that "the mere reference to a related management contract does not render a collateral document subject to the Act's approval requirement."  *Wells Fargo*, 658 F.3d at 701. Rather, each document must *independently* provide for the management of all or part of a gaming operation.  *Id.*  Far from functioning as agreements through which plaintiffs could gain the authority to control defendants' gaming operation, the Bonds are debt instruments representing a promise to repay fixed sums of money to the lenders.  To enforce the obligation to repay borrowed funds on a fixed schedule with set interest will not affect defendants' ability to control the day-to-day operation of the casino, just how the profits of that operation are distributed.

Unfortunately for Godfrey, the Bond does *not* provide a forum selection clause that applies to the Tribe.  It specifically states only that the *Corporation* consents to the jurisdiction of Wisconsin federal and state courts, to the exclusion of any court of the Corporation.  At most, Godfrey has, therefore, established a likelihood of obtaining a permanent injunction against the Corporation proceeding against it in a tribal court action

seeking to void the Bonds themselves.  This is partial success at best, and it would not protect Godfrey from litigating both in state and tribal court simultaneously.[24]

Overall, Godfrey's case falters in too many ways for the court to conclude it has demonstrated the requisite likelihood of success on the merits, particularly with respect to the Tribe.  In any event, it makes little sense to *exercise* supplemental jurisdiction over Godfrey's claims given that there is a reasonable likelihood that this court will not ultimately reach the merits of its claims.  Accordingly, the court will not enter a preliminary injunction on Godfrey's behalf at this time, but without prejudice to revisiting this question should the Corporation attempt to press its claim in tribal court without participating in a *Teague* conference.

### B.  Irreparable Harm

Next, the court must consider whether the Stifel and Saybrook plaintiffs will suffer irreparable harm absent entry of a preliminary injunction.  Generally, harm that can be redressed via monetary compensation does not qualify as irreparable harm.  *Wis. Cent. Ltd. v. Pub. Serv. Comm'n of Wis.*, 95 F.3d 1359, 1370 (7th Cir. 1996).  In the same vein, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."  *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (quoting *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975)).

---

[24] Neither party meaningfully addressed the impact of the LOM, which also contains exclusivity language.  As Godfrey pointed out in its brief in opposition to the tribe's motion to dismiss, the LOM is evidence of defendants' intent to waive sovereign immunity.  Still, it is not a binding contract, and no one has argued to date that a forum selection clause is enforceable without a contract.  In fact, Stifel specifically argues that the LOM is not a contract so as to avoid it being voided on the basis of its providing management authority over the casino.

To classify the harm plaintiffs will suffer if the tribal court were allowed to proceed as merely requiring plaintiffs' expenditure of money and time, however, is an oversimplification. *First,* plaintiffs will not merely be forced to litigate in two forums, expending significant effort and resources: they will be deprived of the benefits of the forum for which they expressly contracted. Federal courts have found that the loss of such a bargain can constitute irreparable harm. *See, e.g.*, *Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., Inc.*, 651 F.3d 1355, 1363-65 (Fed. Cir. 2011) (affirming district court's finding of irreparable harm based on deprivation of bargained-for forum and litigation of the same issue on multiple fronts simultaneously); *see also Push Pedal Pull, Inc. v. Casperson*, 971 F. Supp. 2d 918, 929 ("A party to a bargained-for forum selection clause suffers harm whenever that party does not receive the benefit of his bargain."). *Second*, plaintiffs will be forced to litigate before, and submit to the judgment of, a court that likely lacks jurisdiction over them. *See Seneca-Cayuga Tribe of Okla. v. State of Okla. ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir. 1989). While they can later challenge the tribal court's jurisdiction in a collateral proceeding, unless a federal court determines that the tribal court lacked jurisdiction entirely, they will be unable to litigate any of the merits issues in the forum for which they contracted. *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 19 (1987).

Defendants attempt to turn this argument on its head, asserting that "it is the Tribal Defendants – sovereign entities – who have endured more than three years of litigation in state, federal and appellate courts, all the while contesting jurisdiction." (Defs.' Br. Opp'n Prelim. Inj. (dkt. #56) 14-15.) Given this court's determination that at least some of the Bond Documents are likely valid, including those that contain express waivers of sovereign immunity and consent to Wisconsin federal and state courts, this argument rings hollow.

49

## C. Balancing of Harms

Defendants contend that the harm they will suffer from entry of a preliminary injunction far exceeds any harm that plaintiffs might face if the tribal court suit is allowed to proceed on a parallel track to any state lawsuit.  In particular, defendants argue that any entry of an injunction will undercut the autonomy both of the Tribe, as a sovereign nation, and of the state court (presumably because enjoining the tribal court would prevent the tribal and state courts from engaging in a *Teague* conference).  In contrast, defendants argue, the harm plaintiffs suffer will be minimal, since they will be free to seek plenary review of any tribal court decision regarding its jurisdiction in federal court after the tribal proceedings are complete.

Defendants' position is severely weakened by the fact that this court has already found at least some of the Bond Documents are likely valid.  *See* discussion *supra*.  To enforce the various waivers of sovereign immunity, as well as forum selection clauses, is not to undercut the autonomy of a sovereign nation; it is to hold the Tribe and the Corporation to the terms to which they agreed when entering into the Bond Transaction.  In light of that fact, the balance of the harms weighs in plaintiffs' favor.

## D. Public Interest

Finally, the Tribal defendants contend that the entry of an injunction would be detrimental to the public interest.  First, defendants point to the "Federal Government's longstanding policy of encouraging tribal self-government."  *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987).  Second, they point out that the *Teague* protocol was established to allow state and tribal courts to allocate jurisdiction in order to "foster the greatest amount of respect" between those courts.  *Teague*, 2000 WI 79, ¶ 38.

50

Like many of defendants' other arguments, these interests assume that the Bond Documents are invalid.  Certainly, the public interest favors encouraging tribal sovereignty and self-government, as well as respect and cooperation between state and tribal courts.  But to "refuse enforcement of . . . routine contract provision[s] would be to *undercut* the Tribe's self-government and self-determination." *Altheimer & Gray*, 983 F.2d at 815 (emphasis added).  As the Seventh Circuit recognized in *Altheimer & Gray*, if contracting parties cannot trust the validity of choice of law and venue provisions, Tribes and their corporations may quickly find themselves unable to compete in the marketplace, as both will be shunned by parties wary of entering into commercial relationships uncertain as to who will enforce their contractual rights should the relationship sour.  *See Sokaogan Gaming*, 86 F.3d at 660 (noting that "the harder it is for a tribe to waive its sovereign immunity the harder it is for it to make advantageous business transactions"); *Altheimer & Gray*, 983 F.2d at 815.  Indeed, there is an unhealthy air of latent paternalism in the notion that Tribes and their corporations are unable to protect their interests in arms-length commercial transactions, especially when represented by legal counsel.

The defendants' reliance on the *Teague* protocol fails for the same reason: it makes little sense to encourage state and tribal courts to apportion jurisdiction between them when this court has found it unlikely that the tribal court has *any* jurisdiction over the Stifel and Saybrook plaintiffs with respect to the subject matter in suit.  Even if it did, those courts have delayed far too long their obligation to allocate responsibilities efficiently and fairly.

51

ORDER

IT IS ORDERED that:

1. Plaintiffs Stifel Financial Corp. and Stifel, Nicolaus & Company's Motion for Preliminary Injunction (dkt. #5) is GRANTED.

2. Plaintiffs LDF Acquisition, LLC, Saybrook Fund Investors, LLC and Wells Fargo Bank, N.A.'s Motion for Preliminary Injunction (dkt. #17) is GRANTED.

3. Plaintiff Godfrey & Kahn's Amended Motion for Preliminary Injunction (dkt. #42) is DENIED.

4. Defendants are preliminary enjoined from participating in any tribal court proceeding against the Stifel and Saybrook plaintiffs regarding a dispute or controversy arising out of the Bond Documents or related transactions, including without limitation the lawsuit filed on April 25, 2013.

5. A telephonic scheduling conference will be held on June 13, 2014, at 10:30 a.m. to establish a schedule for an expedited resolution of this case on the merits.  The parties shall meet and confer in advance of this date.

Entered this 16th day of May, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge